UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES ex rel. MARTHA L. BAKER,<br><br>Plaintiff-Relator,<br><br>v.<br><br>BANNER HEALTH and BANNER MEDICAL GROUP COLORADO,<br><br>Defendants. | Civil Action No. 12-CV-3029-WJM-CBS |

**RELATOR'S EARLY MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

Pursuant to Fed. R. Civ. P. 56 and Section III.E.2 of this Court's Revised Practice Standards, Plaintiff-Relator Martha L. Baker ("Relator") hereby moves for partial summary judgment holding (i) that a physician or nonphysician practitioner who does not meet the requirements to be considered an "authorized user" under the Colorado Code of Regulations cannot provide the required "direct supervision" for external beam radiation therapy services payable under the Medicare program, and (ii) that hospital claims submitted to Medicare for external beam radiation therapy services provided without the direct supervision of an "authorized user" constitute false claims.

This motion does not seek to identify specific claims submitted for services provided without such supervision, as additional discovery is required to identify such claims. Nor does it address whether any false claims were submitted "knowingly" for purposes of the False Claims Act. Rather, this motion addresses the qualifications necessary for a person to supervise external beam radiation therapy services for which payment is sought from Medicare. An early ruling on

this issue will significantly clarify and reduce the issues remaining in this case, and Relator believes it is therefore particularly appropriate for an early motion for partial summary judgment. *See* WJM Revised Practice Standards, § III.E.2 ("within 30 days after entry of the initial scheduling order, a party may also file one early motion for partial summary judgment …which presents a substantial and well-supported argument for significantly reducing the claims or issues in the case").[1]

## I. Movant's Statement of Material Facts.

1.

During 2010, 2011, and 2012, Defendants Banner Health and Banner Medical Group Colorado ("Banner") provided radiation therapy services to patients at North Colorado Medical Center ("NCMC"), McKee Medical Center ("MMC"), and Sterling Regional MedCenter ("SRMC"), all of which are in Colorado. First Amended Complaint, Doc. 38, ¶ 21; Answer, Doc. 39, ¶ 21; Scheduling Order, Doc. 46, § 4(10); Baker Declaration, ¶ 3 (attached as Exhibit 1).

2.

These radiation therapy services included external beam radiation therapy, which involves using a radiation therapy machine to deliver ionizing radiation to the patient for therapeutic purposes. Common types of external beam radiation therapy include Intensity-Modulated Radiation Therapy ("IMRT"), 3-dimensional conformal radiation therapy, and 2-dimensional conventional radiation therapy. Baker Declaration, ¶ 3.

---

[1] Pursuant to Local Rule 56.1(a), this motion "include[s] a statement of undisputed facts, argument, and legal authority incorporated into the motion in lieu of a separate opening brief." *See also* WJM Revised Practice Standards, § III.C.1 ("Motions and briefs shall be combined and will be considered one paper for purposes of computing page limitations."). Pursuant to Sections III.C.1 and III.E.7 of the Court's Revised Practice Standards, this motion includes Movant's Statement of Material Facts of no more than 10 pages, and argument of no more than 15 pages.

3.

Banner submitted claims for payment to Medicare for external beam radiation therapy under various CPT codes, ranging from 77402-77418. Baker Declaration, ¶ 3.

4.

Medicare reimburses hospitals for radiation therapy services under the Medicare Hospital Outpatient Prospective Payment System ("HOPPS"). First Amended Complaint, Doc. 38, ¶ 11; Answer, Doc. 39, ¶ 11; Scheduling Order, Doc. 46, § 4(9).

5.

On July 20, 2009, the Centers for Medicare and Medicaid Services ("CMS") issued a proposed rule with respect to the HOPPS, and stated, among other things, as follows:

> Appropriate supervision is a key aspect of the delivery of safe and high quality hospital outpatient services that are paid under Medicare.
>
> In addition, the definition of direct supervision in existing § 410.27(f) has included and would continue to specify under our CY 2010 proposal that the physician or nonphysician practitioner must be available to furnish assistance and direction throughout the performance of the procedure. This means that the physician or nonphysician practitioner must be prepared to **<u>step in and perform the service, not just to respond to an emergency</u>**. This includes the ability to **<u>take over performance of a procedure</u>** and, as appropriate to both the supervisory physician or nonphysician practitioner and the patient, **<u>to change a procedure or the course of treatment being provided to a particular patient</u>**. We originally stated in the April 2000 OPPS final rule (65 FR 18525) that the physician does not "necessarily need to be of the same specialty as the procedure or service that is being performed." We also have stated in manual guidance that hospital medical staff that supervises the services "need not be in the same department as the ordering physician" (section 20.5.1 of chapter 6 of the Medicare Benefits Policy Manual). However, in order to furnish appropriate assistance and direction for any given service or procedure, we believe **<u>the supervisory physician or nonphysician practitioner must have, within his or her State scope of practice and hospital-granted privileges, the ability to perform the service or procedure</u>**.

74 Fed. Reg. 35232, 35367 (emphasis added). *See* Exhibit 2.

6.

On November 20, 2009, CMS issued its final rule with respect to the HOPPS, and stated, among other things, as follows:

> As we explained in the CY 2010 OPPS/ASC proposed rule (74 FR 35367), we believe the supervising physician or nonphysician practitioner must be prepared to step in and **perform the service**, not just to respond to an emergency. This includes the **ability to take over performance of a procedure** and, as appropriate to both the supervisory physician or nonphysician practitioner and the patient, **to change a procedure or the course of treatment being provided to a particular patient**….[I]n order to furnish appropriate assistance and direction for any given service or procedure, we continue to believe the supervisory physician or nonphysician practitioner must have, within his or her State scope of practice and hospital-granted privileges, the ability to perform the service or procedure. We believe that our interpretation of the requirement means that t**he supervisor must be a person who is "clinically appropriate" to supervise the service or procedure**. We believe it is inappropriate for a supervisory physician or nonphysician practitioner to be responsible for patients, hospital staff, and services that are **outside the scope of their knowledge, skills, licensure, or hospital-granted privileges**.
>
> This interpretation of the previously codified language is consistent with our longstanding application of direct supervision across settings in terms of the physical presence of the physician and what it means to "furnish assistance and direction throughout the performance of the procedure." We do not believe that allowing a supervisor to be responsible for emergencies only would satisfy the standard to "furnish assistance and direction throughout the performance of the procedure" as the language has historically been interpreted for physicians' offices and PBDs. We disagree with commenters who stated that the historical intent of direct supervision has been for a supervising physician to provide guidance and direction without expecting that professional to be able to perform the service or procedure and that performance of the procedure applies only to personal supervision. **It would be unreasonable to think that a physician or nonphysician practitioner could competently assist and direct a procedure for which they do not have sufficient knowledge and skills to perform or redirect the procedure or service**.

74 Fed. Reg. 60316, 60584 (emphasis added). *See* Exhibit 3.

7.

On November 24, 2010, CMS issued a final rule regarding the HOPPS, and stated, among other things, as follows:

> *Comment:* During the past year, we were often questioned about clinical requirements for practitioners supervising extremely specialized services, notably radiation oncology services. **One commenter requested that CMS consider the direct supervision requirement to be met for diagnostic or therapeutic radiation oncology services if a non-specialist practitioner who can handle an emergency provides the direct supervision and also has access by phone or other telemedicine link to a specialist who is able to change the plan of care should the need arise**. One commenter asserted that one does not have to posses the clinical skills to fully provide a service in order to be an effective supervisor.
>
> *Response:* As we have stated in the Medicare Benefit Policy Manual (Pub. No. 100-02), Chapter 6, Section 20.5.24, "the supervisory physician or nonphysician practitioner must have, within his or her State scope of practice and hospital-granted privileges, the knowledge, skills, ability, and privileges to perform the service or procedure. Specially trained ancillary staff and technicians are the primary operators of some specialized diagnostic or therapeutic equipment, and while in such cases CMS does not expect the supervisory practitioner to operate this equipment instead of a technician, CMS does expect the physician or nonphysician practitioner that supervises the provision of the service must be knowledgeable about the test and clinically appropriate to furnish the test. The supervisory responsibility is more than the capacity to respond to an emergency, and includes furnishing assistance and direction throughout the performance of a procedure and, as appropriate to the supervisory physician or nonphysician practitioner and the patient, **to change a procedure or the course of care for a particular patient**. CMS would not expect that the supervisory practitioner would make all decisions unilaterally without informing or consulting the patient's treating physician or nonphysician practitioner." We do not believe it is sufficient or consistent with our rules for direct supervision for the individual on site to be capable of only emergency management. **The supervisory practitioner or nonphysician practitioner who is physically present should have the training and knowledge to clinically redirect the service or provide additional orders**.

75 Fed. Reg. 71800, 72012 (emphasis added). *See* Exhibit 4.

8.

CMS also stated as follows:

> We support all specific training nurses may receive to administer safe and quality specialized services, such as chemotherapy, under direct supervision. However, we believe there is an important distinction between ability and training to administer a service, and ability to supervise a service or to administer it without supervision…. We emphasize that Medicare's supervision rules do not govern who may perform a service. Rather, they govern who must be available to furnish assistance and

> direction through the procedure **should developments require a change in the course of treatment in order to ensure a therapeutic outcome**.

75 Fed. Reg. 71800, 72009 (emphasis added).

9.

CMS also stated as follows:

> [W]e continue to expect the supervisory practitioner to be physically present for the services he or she is supervising…. With respect to telecommunication, we note that direct supervision requires the ability to be physically present immediately, and to be able to furnish assistance and direction throughout the performance of the procedure (74 FR 60580). We do not see how a practitioner who is only remotely available by phone or other means of telecommunication could fulfill these requirements and, therefore, we do not consider availability by means of telecommunication to be an acceptable means of providing direct supervision.

75 Fed. Reg. 71800, 72008.

10.

The Colorado Department of Public Health and Environment ("DPH") has adopted regulations governing the use of radiation therapy for therapeutic purposes, which are published online at the website of the Colorado Secretary of State, as part of the Colorado Code of Regulations ("CCR"). *See* http://www.sos.state.co.us/CCR/Welcome.do; *see* Colo. Rev. Stat. § 24-4-103(11) (noting that CCR is to be published in electronic form by Secretary of State).

11.

CCR regulations regarding radiation control are set forth in 6 CCR 1007-1, and a historical record of these regulations may be found on the Secretary of State's website at http://www.sos.state.co.us/CCR/NumericalCCRDocList.do?deptID=16&deptName=1000%20Department%20of%20Public%20Health%20and%20Environment&agencyID=141&agencyName=

1007%20Hazardous%20Materials%20and%20Waste%20Management%20Division. *See* Exhibit 5.

12.

From at least January 30, 2008 until July 1, 2010, regulations regarding the therapeutic use of radiation machines were set forth in 6 CCR 1007-1, Part 20, "Particle Accelerators and Therapeutic Radiation Machines in the Healing Arts," and a historical record of Part 20 may be found on the Secretary of State's website at http://www.sos.state.co.us/CCR/DisplayRule.do?action=ruleinfo&ruleId=2939&deptID=16&agencyID=141&deptName=1000%20Department%20of%20Public%20Health%20and%20Environment&agencyName=1007%20Hazardous%20Materials%20and%20Waste%20Management%20Division&seriesNum=6%20CCR%201007-1%20Parts%2016-20. *See* Exhibit 6.

13.

The version of Part 20 in effect from January 30, 2008 until July 1, 2010 may be found on the Secretary of State's website at http://www.sos.state.co.us/CCR/GenerateRulePdf.do?ruleVersionId=2159&fileName=6%20CCR%201007-1%20Parts%2016-20. *See* Exhibit 7.

14.

Effective July 1, 2010, Part 20 was renumbered as Part 24, "Particle Accelerators and Therapeutic Radiation Machines in the Healing Arts." A historical record of Part 24 may be found on the Secretary of State's website at http://www.sos.state.co.us/CCR/DisplayRule.do?action=ruleinfo&ruleId=3083&deptID=16&agencyID=141&deptName=1000%20Department%20of%20Public%20Health%20and%20Environ

ment&agencyName=1007%20Hazardous%20Materials%20and%20Waste%20Management%20Division&seriesNum=6%20CCR%201007-1%20Part%2024. *See* Exhibit 8.

15.

The version of Part 24 in effect on July 1, 2010 may be found on the Secretary of State's website at http://www.sos.state.co.us/CCR/GenerateRulePdf.do?ruleVersionId=3602&fileName=6%20CCR%201007-1%20Part%2024. *See* Exhibit 9.

16.

Since at least January 30, 2008, the CCR has provided that "[h]uman use of a therapeutic radiation machine shall be by, or under the general supervision of, an authorized user radiation therapy physician who has a current active State of Colorado license to practice the healing arts." 6 CCR 1007-1, § 24.3.2.1; *see also* former 6 CCR 1007-1, § 20.3.2.1. "General supervision" means the procedure is under the supervisor's overall direction and control but the supervisor's presence is not required during the performance of the procedure. 6 CCR 1007-1, § 1.2.2 (see Exhibit 11).

17.

Since at least January 30, 2008, the CCR has provided that "[n]o individual shall be exposed to the useful beam except for medical therapy purposes pursuant to a written directive by an authorized user." 6 CCR 1007-1, § 24.3.8; *see also* former 6 CCR 1007-1, § 20.3.8.

18.

The term "useful beam" is defined as "the portion of ionizing radiation originating from the radiation head of the therapy system intended for therapeutic purposes." 6 CCR 1007-1, §

24.2; *see also* former 6 CCR-1007-1, § 20.2. "'Radiation' means alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions. For purposes of these regulations, ionizing radiation is an equivalent term." 6 CCR 1007-1, § 1.2.2 (see Exhibit 11).

19.

The term "written directive" is defined as "an order in writing for the administration of radiation to a specific human patient or human research subject, in accord with the requirements of 24.6 [or 20.6, prior to July 1, 2010]." 6 CCR 1007-1, § 24.2; *see also* former 6 CCR-1007-1, § 20.2. The CCR states that a written directive:

> (1) Shall be dated and signed by a radiation therapy authorized user prior to the administration of radiation;
>
> (2) Shall contain the human patient or human research subject's name, the type and energy of the beam, the total dose, dose per fraction, treatment site, and number of fractions;
>
> (3) May be revised at the discretion of the authorized user, provided that the revision is written, dated and signed by the authorized user;
>
> (4) May be subject to oral revision, if because of the patient's condition, a delay in the order to provide a written revision to an existing written directive would jeopardize the patient's health, and provided that:
>
>> (a) The oral revision is documented as soon as possible in writing in the patient's record; and
>>
>> (b) A revised written directive is signed by an authorized user within 48 hours of the oral revision; and
>
> (5) Shall be retained (a copy is acceptable) for 3 years.

6 CCR 1007-1, § 24.6.2.1; *see also* former 6 CCR-1007-1, § 20.6.2.1.

20.

From January 30, 2008 through July 1, 2010, the term "authorized user" was defined to mean "an individual who meets the requirements of Appendix 20C." Former 6 CCR-1007-1, § 20.2. Effective July 1, 2010, "authorized user" was defined to mean "an individual who meets the requirements of Appendix 2K." 6 CCR 1007-1, § 24.2.

21.

At all times since at least January 30, 2008, in order to satisfy the requirements of either Appendix 20C or Appendix 2K, and thus be an authorized user, an individual must be "a physician who has a current active State of Colorado license." 6 CCR 1007-1, Appendix 2K (*see* Exhibit 10); former 6 CCR 1007-1, Appendix 20C (*see* Exhibit 7). The term "physician" is defined to mean "an individual licensed by a State or Territory of the United States, the District of Columbia or the Commonwealth of Puerto Rico to dispense drugs in the practice of medicine." 6 CCR 1007-1, § 1.2.2 (see Exhibit 11).

22.

In addition, an authorized user must have a current certification in one of the following areas: (i) radiology or therapeutic radiology by the American Board of Radiology, (ii) radiation oncology by the American Osteopathic Board of Radiology (or, before July 1, 2010, the American Osteopathic Association), (iii) therapeutic radiology by the Royal College of Physicians and Surgeons of Canada, (iv) radiology, with specialization in radiotherapy, by the British Royal College of Radiology, as a British "Fellow of the Faculty of Radiology" or "Fellow of the Royal College of Radiology," or (v) radiation therapy by a recognized specialty board that meets certain requirements. 6 CCR 1007-1, Appendix 2K; former 6 CCR 1007-1, Appendix 20C.

23.

In addition, an authorized user must have satisfied the following criteria: (i) satisfactory completion of 700 hours in basic techniques applicable to the use of a therapeutic radiation machine unit, including 200 hours of classroom and laboratory training and 500 hours of work experience in specified areas, and (ii) completion of 3 years of supervised clinical experience in radiation therapy, including an approved formal training program approved by the Residency Review Committee of the Accreditation Council for Graduate Medical Education or Committee on Post Graduate Training of the American Osteopathic Association. 6 CCR 1007-1, Appendix 2K; former 6 CCR 1007-1, Appendix 20C.

24.

During 2010, 2011, and 2012, there were occasions when Banner performed external beam radiation therapy on patients at NCMC, MMC, and SRMC when there was no "authorized user" present at the facility. Baker Declaration, § 4.

25.

Other than radiation oncologists, none of the physicians or nonphysician practitioners supervising external beam radiation therapy at NCMC, MMC, or SRMC met the qualifications to be considered an "authorized user." Baker Declaration, § 5-6.

## II. <u>Argument</u>.

As discussed below, external beam radiation therapy services, like other outpatient therapeutic services, are covered by Medicare only if they are provided under the direct supervision of a clinically appropriate supervisor who is immediately available to furnish assistance and direction throughout the performance of the procedure. Because only an

"authorized user" is able to furnish such assistance and direction, external beam radiation therapy services that are provided when there is no authorized user present at the facility are not covered by Medicare, and claims submitted for such services constitute "false claims."

**A. <u>To be covered by Medicare, radiation therapy services must be provided "incident to" the services of a qualified physician who is immediately available to furnish assistance and direction throughout the performance of the procedure</u>.**

In order to be payable by Medicare, outpatient hospital therapeutic services, including radiation therapy services, must be furnished "incident to" the services of a physician or qualified nonphysician practitioner. *See* 42 U.S.C. § 1395x(s)(2)(B); 42 C.F.R. § 410.27(a); 74 Fed. Reg. 60316, 60582 ("the only statutory basis for payment of hospital outpatient therapeutic services is incident to the services of a physician, meaning the services are ordered by the physician or qualified practitioner and furnished as an integral though incidental part of his or her services. It follows, then, that a qualified physician or nonphysician practitioner would supervise the provision of those services to ensure the service or procedure is being furnished appropriately.").

With limited exceptions not applicable here, in order to be considered "incident to" the services of a physician or nonphysician practitioner (and thus payable by Medicare), the therapeutic services must be furnished under the "direct supervision" of a physician or nonphysician practitioner. 42 C.F.R. § 410.27(a)(1)(iv). This means that the physician or nonphysician practitioner must be "immediately available to furnish assistance and direction throughout the performance of the procedure." 42 C.F.R. § 410.27(a)(1)(iv)(A). The regulation

states that "[n]onphysician practitioners[2] may provide the required supervision of services that they may personally furnish in accordance with State law and all additional requirements." 42 C.F.R. § 410.27(a)(1)(iv)(C). Thus, in order to provide required supervision, a nonphysician practitioner must be able to "personally furnish" the services herself in accordance with State law.

**1. <u>"Immediate availability" requires immediate physical presence</u>.**

In order to be considered "immediately available," the supervisor must be physically on-site and not performing services that cannot be interrupted, and must be able to be physically present at the procedure immediately if needed. *See* 74 Fed. Reg. 60316, 60580 ("direct supervision requires immediate physical presence," and supervisor is not immediately available if he or she is "performing another procedure or service that he or she could not interrupt"); 75 Fed. Reg. 71800, 72117 ("immediately available" means "physically immediately available"); *id.* at 72008 ("[T]he supervisory practitioner must be physically present and interruptible…. [T]he requirement for physical presence distinguishes direct supervision from general supervision"). CMS has consistently rejected suggestions that an individual be considered immediately available if he or she is available by telephone or other forms of communication. *See* 75 Fed. Reg. 71800, 72008 ("we do not consider availability by means of telecommunication to be an acceptable means of providing direct supervision").

[2] "Nonphysician practitioner" is defined as "a clinical psychologist, licensed clinical social worker, physician assistant, nurse practitioner, clinical nurse specialist, or certified nurse-midwife." 42 C.F.R. § 410.27(g).

**2. <u>A supervisor can "furnish assistance and direction" throughout the performance of external beam radiation therapy only if he or she has the ability to change the course of the radiation treatment being provided to the patient and clinically redirect the procedure or service</u>.**

CMS has repeatedly made clear that, in order to be able to "furnish assistance and direction" throughout a procedure, a supervising practitioner must be able to do more than respond to an emergency – rather, the supervisor must be able to take over performance of the procedure, to change the procedure or course of treatment being provided to the patient, and to clinically redirect the procedure or service. As CMS has stated:

> [W]e believe the supervising physician or nonphysician practitioner must be prepared to step in and perform the service, not just to respond to an emergency. This includes the **<u>ability to take over performance of a procedure</u>** and, as appropriate to both the supervisory physician or nonphysician practitioner and the patient, **<u>to change a procedure or the course of treatment being provided to a particular patient</u>**….[I]n order to furnish appropriate assistance and direction for any given service or procedure, we continue to believe the supervisory physician or nonphysician practitioner must have, within his or her State scope of practice and hospital-granted privileges, **<u>the ability to perform the service or procedure</u>**. We believe that our interpretation of the requirement means that the supervisor must be a person who is "clinically appropriate" to supervise the service or procedure. We believe it is inappropriate for a supervisory physician or nonphysician practitioner to be responsible for patients, hospital staff, and services that are outside the scope of their knowledge, skills, licensure, or hospital-granted privileges…. **<u>It would be unreasonable to think that a physician or nonphysician practitioner could competently assist and direct a procedure for which they do not have sufficient knowledge and skills to perform or redirect the procedure or service</u>**.

74 Fed. Reg. 60316, 60584 (emphasis added). Thus, CMS has recognized that "not all practitioners are qualified to supervise services of any specialty." 75 Fed. Reg. 71800, 72007.

CMS has specifically addressed this requirement as it relates to "extremely specialized services, notably radiation oncology services," and expressly rejected the idea that supervision could be provided by a "non-specialist practitioner who can handle an emergency … and also

has access by phone or other telemedicine link to a specialist who is able to change the plan of care should the need arise":

> *Comment:* During the past year, we were often questioned about clinical requirements for practitioners supervising extremely specialized services, notably radiation oncology services. **One commenter requested that CMS consider the direct supervision requirement to be met for diagnostic or therapeutic radiation oncology services if a non-specialist practitioner who can handle an emergency provides the direct supervision and also has access by phone or other telemedicine link to a specialist who is able to change the plan of care should the need arise**. One commenter asserted that one does not have to posses the clinical skills to fully provide a service in order to be an effective supervisor.
>
> *Response:* As we have stated in the Medicare Benefit Policy Manual (Pub. No. 100-02), Chapter 6, Section 20.5.24, "the supervisory physician or nonphysician practitioner must have, within his or her State scope of practice and hospital-granted privileges, the knowledge, skills, ability, and privileges to perform the service or procedure. Specially trained ancillary staff and technicians are the primary operators of some specialized diagnostic or therapeutic equipment, and while in such cases CMS does not expect the supervisory practitioner to operate this equipment instead of a technician, CMS does expect the physician or nonphysician practitioner that supervises the provision of the service must be knowledgeable about the test and clinically appropriate to furnish the test. The supervisory responsibility is more than the capacity to respond to an emergency, and includes furnishing assistance and direction throughout the performance of a procedure and, as appropriate to the supervisory physician or nonphysician practitioner and the patient, **to change a procedure or the course of care for a particular patient**. CMS would not expect that the supervisory practitioner would make all decisions unilaterally without informing or consulting the patient's treating physician or nonphysician practitioner." We do not believe it is sufficient or consistent with our rules for direct supervision for the individual on site to be capable of only emergency management. **The supervisory practitioner or nonphysician practitioner who is physically present should have the training and knowledge to clinically redirect the service or provide additional orders**.

75 Fed. Reg. 71800, 72012 (emphasis added). Indeed, CMS has noted that the ability to make "a change in the course of treatment in order to ensure a therapeutic outcome" is critical to being able to "furnish assistance and direction":

> We support all specific training nurses may receive to administer safe and quality specialized services, such as chemotherapy, under direct supervision. However, we

> believe there is an important distinction between ability and training to administer a service, and ability to supervise a service or to administer it without supervision…. We emphasize that Medicare's supervision rules do not govern who may perform a service. **Rather, they govern who must be available to furnish assistance and direction through the procedure should developments require a change in the course of treatment in order to ensure a therapeutic outcome**.

*Id.* at 72009 (emphasis added).

Thus, under clearly expressed CMS guidance, an individual is not qualified to "furnish assistance and direction" for a procedure unless he or she is able to "take over performance of a procedure," to "change a procedure or course of treatment being provided to a particular patient," to "redirect the procedure or service," and to make "a change in the course of treatment in order to ensure a therapeutic outcome." In short, the supervisor who is physically present on-site must have the ability to do all the things that the physician who ordered the procedure would be able to do. Although, as a practical matter, the on-site supervisor is likely to consult with the patient's primary treating physician before making a change in the course of the patient's treatment, CMS has made it abundantly clear that the on-site supervisor must be someone with the **ability** to make such changes independently in order to "furnish assistance and direction."

**B. A physician or nonphysician practitioner who is not an "authorized user" cannot "furnish assistance and direction" for external beam radiation therapy services, because he or she cannot issue orders for the delivery of radiation or change the orders issued by an authorized user.**

As discussed above, the State of Colorado has issued extensive regulations governing who can provide radiation therapy services to human patients. These regulations expressly state that "[n]o individual shall be exposed to the useful beam[3] except for medical therapy purposes

[3] The term "useful beam" means "the portion of ionizing radiation originating from the radiation head of the therapy system intended for therapeutic purposes." 6 CCR 1007-1, § 24.2; *see also* former 6 CCR-1007-1, § 20.2. For purposes of the CCR, the term "ionizing radiation" is

**<u>pursuant to a written directive by an authorized user</u>**." 6 CCR 1007-1, § 24.3.8 (effective July 1, 2010) (emphasis added); *see also* former 6 CCR 1007-1, § 20.3.8 (effective January 30, 2008). The regulations require the registrant of a radiation therapy machine to "develop, implement, and maintain a quality management program to ensure that radiation will be administered **<u>as directed by the authorized user</u>**." 6 CCR 1007-1, § 24.6.1 (emphasis added); *see also* former 6 CCR 1007-1, § 20.6.1. The regulations require that "[h]uman use of a therapeutic radiation machine shall be by, or under the general supervision of, an authorized user radiation therapy physician." 6 CCR 1007-1, § 24.3.2.1; *see also* former 6 CCR 1007-1, § 20.3.2.1. This means, among other things, that the procedure must be "under the supervisor's [i.e., the authorized user's] overall direction and control." 6 CCR 1007-1, § 1.2.2. Thus, only an "authorized user" can authorize the exposure of an individual to radiation, and he or she must do so pursuant to a written directive that cannot be amended except by an authorized user.

Under the CCR, a physician is required to have extremely specialized training and certifications to be considered an "authorized user." To begin with, the physician must be certified in one of a number of fields specifically relating to radiation therapy: (i) radiology or therapeutic radiology by the American Board of Radiology, (ii) radiation oncology by the American Osteopathic Board of Radiology, (iii) therapeutic radiology by the Royal College of Physicians and Surgeons of Canada, (iv) radiology, with specialization in radiotherapy, by the British Royal College of Radiology, as a British "Fellow of the Faculty of Radiology" or "Fellow

---

synonymous with "radiation," and "means alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions." 6 CCR 1007-1, § 1.2.2. External beam radiation therapy, such as IMRT, 3-dimensional conformal radiation therapy, and 2-dimensional conventional radiation therapy, involves the use of a radiation machine to deliver ionizing radiation to the patient for therapeutic purposes. *See* Baker Declaration, ¶ 3.

of the Royal College of Radiology," or (v) radiation therapy by a recognized specialty board that meets certain requirements. 6 CCR 1007-1, Appendix 2K; former 6 CCR 1007-1, Appendix 20C.

In addition, the physician must have completed 700 hours in basic techniques applicable to the use of a therapeutic radiation machine unit, including 200 hours of classroom and laboratory training and 500 hours of work experience in specified areas. The physician must also have completed three years of supervised clinical experience in radiation therapy, including a formal training program approved by the Residency Review Committee of the Accreditation Council for Graduate Medical Education or Committee on Post Graduate Training of the American Osteopathic Association. 6 CCR 1007-1, Appendix 2K; former 6 CCR 1007-1, Appendix 20C. If a person does not meet all of these requirements, he or she cannot be considered an "authorized user," and thus cannot authorize the exposure of a human being to radiation. In particular, such a person cannot issue a "written directive," or make changes to a written directive issued by an authorized user, or provide the "direction and control" of therapeutic radiation treatment, all of which is necessary for the delivery of external beam radiation therapy.

As discussed above, CMS has made clear that, in order to be able to "furnish assistance and direction" throughout the performance of a procedure, the supervisor must be able to do more than emergency management – rather, he or she must be able to "take over performance of a procedure," to "change a procedure or course of treatment being provided to a particular patient," to "redirect the procedure or service," and to make "a change in the course of treatment in order to ensure a therapeutic outcome." Indeed, CMS has expressly stated that the supervision

rules "govern who must be available to furnish assistance and direction through the procedure **should developments require a change in the course of treatment in order to ensure a therapeutic outcome**." 75 Fed. Reg. 71800, 72009 (emphasis added).

Because the only person who can issue or alter a written directive for the provision of radiation therapy is an "authorized user," and because an authorized user must have "overall direction and control" of the exposure of radiation to a human patient, a physician or nonphysician practitioner who is not an authorized user cannot change the course of radiation treatment ordered by the authorized user or clinically redirect the radiation therapy service. Accordingly, under clearly expressed CMS guidance, such a person is not able to "furnish assistance and direction" throughout the course of the radiation therapy procedure. The only thing such a person can do is provide emergency management, which CMS has made clear is not sufficient.

Although an individual who is not an authorized user may be able to contact the authorized user telephonically for direction, CMS has expressly rejected the notion that this is sufficient. Indeed, CMS rejected a commenter's request that "CMS consider the direct supervision requirement to be met for diagnostic or therapeutic radiation oncology services if a non-specialist practitioner who can handle an emergency provides the direct supervision and also has access by phone or other telemedicine link to a specialist who is able to change the plan of care should the need arise," stating that "[t]he supervisory practitioner or nonphysician practitioner **who is physically present** should have the training and knowledge to clinically redirect the service or provide additional orders." 75 Fed. Reg. 71800, 72012.

### C. **Claims submitted to Medicare for external beam radiation therapy provided without the direct supervision of an authorized user are false claims.**

As discussed above, Medicare only covers hospital outpatient therapeutic services if they are provided "incident to" the services of a physician or non-physician practitioner, and to be "incident to" such services, the therapeutic services must be furnished under the direct supervision of a qualified physician or non-physician practitioner who is immediately available to furnish assistance and direction throughout the performance of the procedure. *See* 42 U.S.C. § 1395x(s)(2)(B); 42 C.F.R. § 410.27(a); 74 Fed. Reg. 60316, 60582 ("the only statutory basis for payment of hospital outpatient therapeutic services is incident to the services of a physician"). As discussed above, only an "authorized user" is able to "furnish assistance and direction" throughout the performance of an external beam radiation therapy procedure, and thus provide the required "direct supervision." Accordingly, external beam radiation therapy services furnished without the direct supervision of an authorized user are not covered by Medicare. Therefore, claims for payment for such services constitute false claims, since they are seeking payment for something not covered by Medicare. *See United States ex rel. Walker v. R & F Props. of Lake County, Inc.*, 433 F.3d 1349, 1356 (11th Cir. 2005) ("Medicare claims may be false if they claim reimbursement for services or costs that … are not reimbursable").

## CONCLUSION

For the reasons discussed above, Relator respectfully requests that the Court grant partial summary judgment holding (i) that a physician or nonphysician practitioner who does not meet the requirements to be considered an "authorized user" under the Colorado Code of Regulations cannot provide the required direct supervision for external beam radiation therapy services payable under the Medicare program, and (ii) that hospital claims submitted to Medicare for

external beam radiation therapy services provided without the direct supervision of an "authorized user" constitute false claims.

This 15th day of January, 2015.

Respectfully submitted,

/s/ G. Mark Simpson
G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

/s/ Jamie M. Bennett
Jamie M. Bennett
Ashcraft & Gerel
4301 Garden City Drive
Landover, Md. 20785
(301) 459-8400
(301) 459-1364
jbennett@ashcraftlaw.com

/s/ Andrew M. Stone
Andrew M. Stone
(Pa. #35176)
Stone Law Firm, LLC
437 Grant Street Suite 1806
Pittsburgh, PA 15219
Phone: (412) 391-2005
Fax: (412) 391 -0853
astone@stone-law-firm.com
Attorneys for Plaintiff-Relator

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record.

This 15th day of January, 2015.

/s/ G. Mark Simpson