IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-03029-WJM-CBS

UNITED STATES ex rel,
MARTHA L. BAKER,

Plaintiff-Relator,

v.

BANNER HEALTH and BANNER
MEDICAL GROUP COLORADO,

Defendants.

---

**RESPONSE TO PLAINTIFF-RELATOR'S EARLY MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Defendants Banner Health and Banner Medical Group Colorado ("Defendants") submit their response to Plaintiff-Relator's ("Relator") Early Motion for Partial Summary Judgment as follows:

## I. Introduction

Relator filed this case alleging that Banner Health and Banner Medical Group Colorado ("BMGC") violated the Federal False Claims Act ("FCA") in connection with certain claims for radiation therapy services. 31 U.S.C. §§ 3729-3733 (2012). Relator's Early Motion for Partial Summary Judgment ("Relator's Motion") relates to her allegation that Banner Health violated the FCA by submitting claims to Medicare for external beam radiation therapy treatments supervised by persons Relator alleges were not qualified to provide such supervision. Banner denies these allegations, and asserts that the

supervision provided at the Banner facilities was fully consistent with the requirements of the applicable federal regulations.

What Relator has styled as a motion for partial summary judgment is nothing of the sort. This is obvious from the fact that Relator's claimed undisputed "facts" are actually citations to regulations and sub-regulatory guidance and because Relator does not seek judgment on any count of the complaint or any element of her claims. Instead, Relator's Motion is an effort to get the Court to interpret complex regulations without first having the benefit of evidence regarding the clinical realities of how these regulations apply to Relator's claims. This factual vacuum alone makes Relator's Motion premature, and the Court should defer ruling on these legal issues until it has a fuller record.

More fundamentally, however, Relator also misstates and misapplies the relevant regulations in the context of radiation therapy services. Relator picks and chooses selected portions of certain regulatory and sub-regulatory provisions of general applicability, and then attempts to reassemble the selected portions in the specific context of radiation therapy to support her arguments. Relator argues that certain federal and state regulations prohibit the supervision of radiation therapy services by non-physicians who are equally capable of providing supervision as are the physicians Relator claims must supervise. Relator is wrong on the law. A general overview of the factual context in which supervision takes place as well as review of the federal and state regulations will reveal the errors in Relator's argument.

The legal dispute in this case arises out of Medicare supervision rules for

therapeutic outpatient hospital services which require "direct supervision," meaning that the supervisor must be "immediately available." 42 C.F.R § 410.27(a)(1)(iv)(A)(2015). The Medicare supervision rules also contemplate that the supervisor may be a physician or non-physician practitioner, such as an advanced practice nurse. 42 C.F.R. § 410.27(a)(2015). (Banner sometimes used advanced practice nurses to supervise when radiation oncologists were not immediately available).

Even though Relator does not dispute that Medicare rules generally allow physicians and non-physician practitioners to supervise outpatient services, Relator seeks to conflate the role of an "authorized user" (i.e., a radiation oncologist as defined by Colorado regulations) and the role of the person supervising the radiation therapy services under federal law to reach the conclusion that any claim not supervised by an "authorized user" under state law must be a false claim under federal law. Specifically, Relator's motion asks the Court to find that, as a matter of law, any claim submitted to the Centers for Medicare and Medicaid Services ("CMS") for external beam radiation therapy that was not directly supervised by an "authorized user" is a false claim under the FCA. In other words, Relator takes the position that advanced practice nurses and most physicians are disqualified from providing supervision for Medicare purposes because they are not "authorized users" under Colorado law.

Relator is wrong about the relationship between state and federal law here. For the reasons described below, the Colorado rules relating to "authorized users" of radiation equipment are irrelevant to the question of who can supervise radiation therapy for purposes of the Medicare supervision rules. Authorized users are only

required to provide “general supervision,” meaning that they are not required to be at the facility when services are performed. In contrast, the Medicare supervision rules require that a supervisor be immediately available. Additionally, Medicare rules do not require the physician or non-physician practitioner who supervises the service to perform the functions that are reserved for authorized users, such as writing an order for radiation therapy services. Moreover, because of the nature of external beam radiation therapy, the types of services performed by a person directly supervising a therapy session are limited in nature and well within the authority of a qualified non-physician practitioner.

For these reasons, the Court should deny Relator’s Motion and not enter any finding regarding “false” claims absent a resolution of the primary disputed fact in this case, which is whether Banner violated the FCA when it used advanced practice nurses to directly supervise external beam radiation therapy.

II. **Response to Movant's Material Facts**

1. Disputed. Defendants admit that they provided external beam radiation therapy services to patients at North Colorado Medical Center ("NCMC"), McKee Medical Center ("MMC"), and Sterling Regional MedCenter ("SRMC") and that the three hospitals are located in Colorado. BMGC denies that it provided external beam radiation therapy services to any patients prior to October 2010. BMGC and Banner did not provide external beam radiation therapy services to any patients at SRMC until late

October 2010.[1] (Ex. A, Affidavit of Julianne Fritz).

2. Defendants admit Relator's material fact 2.

3. Banner admits that it has submitted claims for payment to Medicare for external beam radiation therapy under various CPT codes. CPT codes change regularly. However, the specific codes used for external beam radiation therapy are not material to Relator's Motion.

4. Defendants admit that Medicare reimburses hospitals for certain components of radiation therapy services under the Medicare Hospital Outpatient Prospective Payment System ("HOPPS"). (Answer, ECF No. 39, ¶ 11).

5-9. Relator's material facts in paragraphs 5-9 are not facts. Rather, they are recitations of commentary made by CMS in the Federal Register.

10. Defendants admit that the Colorado Department of Public Health and Environment ("CDPHE") has adopted regulations governing radiation control and these are published online.

11. Defendants admit Relator's material fact number 11.

12. Defendants admit Relator's material fact number 12.

13. Defendants admit Relator's material fact number 13.

14. Defendants admit Relator's material fact number 14.

15. Defendants admit Relator's material fact number 15.

16-23. Relator's material facts numbered 16-23 are not facts. Rather, they are recitations to the Colorado Code of Regulations ("CCR").

---

[1] While the Defendants dispute the date range articulated by Relator, they acknowledge that dates are not material to Relator's Motion.

24. Defendants admit paragraph 24 of Relator's material facts but add that there is no legal requirement that an authorized user be present at the facility.

25. Defendants admit paragraph 25 of Relator's material facts but deny that the law requires physician or non-physician practitioners directly supervising external beam radiation therapy be "authorized users."

## III. Additional Material Facts

A. *The Creation of a Radiation Plan*

1. External beam radiation is a widely used type of radiation therapy. It uses high-energy rays to destroy cancer cells or slow their growth. (Ex. B, Affidavit of Dr. Elizabeth Ceilley, ¶ 4).

2. This type of radiation is most commonly delivered by machines called linear accelerators ("linacs"). (*Id.* at ¶ 5).

3. Typically, a course of external beam radiation therapy is administered on a five-day-a-week basis over the course of several weeks. (*Id.* at ¶ 6).

4. The delivery of external beam radiation is dependent on a team of professionals working together. This includes, but is not limited to, a radiation oncologist, a dosimetrist, a medical physicist and a radiation therapist. Often, the team includes an advanced practice nurse and a nurse. (*Id.* at ¶ 7).

5. Prior to the delivery of any radiation, treatment planning occurs. First, the treating radiation oncologist will consult with the patient and explain an anticipated treatment plan. (*Id.* at ¶ 8).

6. Next, the radiation oncologist will order a simulation which requires

acquiring images of the patient. These are most often obtained through a CAT scan, a PET scan or an MRI. (*Id.* at ¶ 9).

7. Using the images developed during simulation, the physician or a dosimetrist will then draw the patient's anatomy over the images in a process called contouring. The radiation oncologist then outlines the target and creates a radiation prescription. (*Id.* at ¶ 10).

8. Next, the radiation oncologist and dosimetrist will create the plan to simultaneously target the tumor and protect all healthy tissue. This is accomplished by simulating the delivery of the radiation beams to the patient on a computer. The treatment plan is then reviewed by the radiation oncologist. The radiation oncologist may increase or decrease the dose recommended based on dosage to normal tissues. The dosimetrist's plan may go back and forth between the radiation oncologist and the dosimetrist several times before the radiation oncologist is satisfied. This is especially true if the plan is complicated. (*Id.* at ¶ 11).

9. Once the radiation oncologist signs off on the radiation plan, he or she will issue a written directive and write the final radiation prescription. (*Id.* at ¶ 12).

10. Then a medical physicist will perform a quality assurance review and check the plan. The medical physicist ensures that the beams are properly configured to deliver high doses of radiation close to the tumor and lower levels of radiation to the surrounding areas. Then the medical physicist delivers a fraction, or daily dose, of the radiation therapy to a "phantom patient." If there are no complications with the delivery of the radiation beams, the medical physicist will sign off on the plan. (*Id.* at ¶ 13).

11. Once the medical physicist signs off on the plan, the plan is reviewed again by a radiation therapist. (*Id. at* ¶ 16).

12. This process can take anywhere from hours to a few weeks. (*Id.* at 15).

13. The radiation therapist is the team member who operates the therapeutic radiation machine. Radiation oncologists do not receive training on operating the machines and do not know how to operate them. In fact, most radiation oncologists are not credentialed to operate the machine. (*Id.* at ¶ 16).

14. Once the operator turns the machine on for a daily therapy session, it is not possible for anyone to revise the energy of the beam, the dose per fraction of treatment, or the treatment site. The only options are to deliver the therapy completely or to turn off the machine before the therapy session is complete. (*Id.* at ¶ 17).

15. If, for any reason, the radiation oncologist decides that she needs to change the dose of radiation, the process described above must be repeated. (*Id.* at ¶ 20).

B. *The Delivery of Radiation Therapy at NCMC, MMC and SRMC*

16. Within NCMC, MMC, SRMC, Banner Health provides hospital outpatient radiation therapy services. (Fritz Aff., ¶ 3).

17. On September 30, 2010, BMGC hired Dr. Elizabeth Ceilley. Dr. Ceilley was the first radiation oncologist employed by BMGC.[2] BMGC hired Dr. Brian Fuller, who is also a radiation oncologist, on November 8, 2010. Dr. Ceilley worked primarily at MMC. Dr. Fuller primarily was assigned to NCMC. (Fritz Aff., ¶ 4).

---

[2] Prior to the fall of 2010, a group of physicians in private practice provided radiation oncology services to patients at NCMC and MMC.

18. SRMC opened the David Walsh Cancer Center ("DWCC") in September 2010. Patients started to receive radiation therapy at DWCC in late October 2010. (*Id.* at ¶ 3).

19. SRMC is a small regional hospital that has 25 beds.[3] (*Id.,* ¶ 3).

20. In preparation for the opening of DWCC, Julianne Fritz, who was the Director of Oncology Services, Wound Care, HBO, Palliative Care, and the Interim Director of Emergency Services, at the time, researched questions relating to CMS's supervision rules. She participated in a conference call hosted by the Association of Community Cancer Centers ("ACCC") on or around February 24, 2010, reviewed publications regarding whether it was appropriate for an advanced practice nurse to directly supervise the delivery of external beam radiation therapy, reviewed the Colorado Nurse Practice Act, and drafted a position statement. (*Id.,* ¶ 6).

21. The position statement outlined the evolution of the 2010 HOPPS rule requiring that the delivery of therapeutic services be directly supervised by a physician or non-physician practitioner. (*Id.).*

---

[3] In response to concerns expressed by the hospital community, in particular Critical Access Hospitals ("CAH") and small rural hospitals, regarding CMS's proposed rule and final rule clarifying that direct supervision is a requirement for hospital outpatient therapeutic services covered and paid for by Medicare in hospitals, CMS instructed all Medicare contractors not to evaluate or enforce supervision requirements for the therapeutic services provided to outpatients at CAHs on or after March 15, 2010. CMS extended the notice of nonenforcement for calendar years 2011, 2012, and 2013 and expanded its application to small rural hospitals having 100 or fewer beds. (Final Rule Regarding Changes to CMS payments, 72,007(Nov. 24, 2010)(to be codified at 42 C.F.R. pts. 410, 411, 412, 413, 416, 419, 489). SRMC is a small rural hospital and therefore, excluding November and December 2010, the direct supervision requirement did not apply to SRMC for the time period relevant to Relator's first amended complaint.

22. From 2000 through 2008, hospital outpatient departments located on a hospital campus, such as those at Banner Health, were entitled to assume that direct supervision rules were met because physicians are generally available in hospital settings. However, in the November 2008 proposed rule issued by HOPPS, CMS signaled that hospitals and CAHs could no longer assume physician supervision for services and supplies furnished incident to a physician's service. In response to concerns raised by numerous heath care systems that this requirement would greatly limit access to outpatient therapies such as chemotherapy and radiation therapy for patients in rural communities, CMS revised the supervision regulation to permit non-physician practitioners to supervise therapeutic outpatient hospital services. (*Id.* at ¶ 5); *see* Final Rule Regarding Changes to HOPPS, 74 Fed. Reg. 60,316 (Nov. 20, 2009)(to be codified at 42 C.F.R. pt. 410.27.)

23. Ms. Fritz discussed her research and conclusions with compliance officers within the Banner Health system. They decided that under the CMS regulations and the Colorado Nurse Practice Act, Colo. Rev. Stat. §§ 12-38-101 et. seq. (2014), an advanced practice nurse could act as the direct supervisor of the delivery of external beam radiation therapy. They also specifically acknowledged that advanced practice nurses could not directly supervise CT-simulations, treatment planning, or treatment plan approval. (Fritz. Aff. at ¶ 8).

24. As a result of this research, once SRMC started providing outpatient radiation therapy, if Dr. Fuller or Dr. Ceilley were not at the facility, an advanced practice nurse would directly supervise the delivery of daily fractions of external beam radiation

therapy. On the days where there was no radiation oncologist on site at SMRC, Dr. Fuller and/or Dr. Ceilley were available by telephone or video conferencing. (*Id.* at ¶ 9).

25. On the days that either Dr. Ceilley or Dr. Fuller were at SMRC, an advanced practice nurse directly supervised the delivery of external beam radiation therapy at MMC or NCMC. (*Id.* at ¶ 10).

## IV. Legal Argument

### A. *Standard of Review and the False Claims Act.*

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine dispute regarding a material fact depends upon whether the evidence presents a sufficient disagreement as to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)(citation omitted); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987)(citation omitted).

Generally, the FCA protects against "fraudulent attempts to cause the Government to pay out sums of money." *United States v. Niefert-White Co.*, 390 U.S. 228, 233 (1968). Under the FCA, private parties can bring *qui tam* actions in the name of the United States to enforce the provisions of the statute. 31 U.S.C. § 3730(b) (2012).

The FCA imposes liability on any person or entity who: "(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval; (1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ." 31 U.S.C. § 3729(a).

For purposes of the statute, the terms "knowing" and "knowingly" mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information . . . *Id.* § 3729(b)(1)(A). "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. *Id.* § 3729(b)(4). A "claim" is defined as "any request or demand" that is "presented to an officer, employee, or agent of the United States," or "is made to a contractor, grantee, or other recipient, if the money is to be spent or used on the Government's behalf or to advance a Government program or interest," and if the government "provides or has provided any portion of the money or property requested or demanded," or "will reimburse such contractor, grantee, or other recipient" for "any portion of the money . . . which is requested or demanded." *Id.* §§ 3729(b)(2)(A)(i)-(ii).

Thus, liability under the FCA requires (1) a claim, (2) that the claim or a statement material to a claim was false or fraudulent, and (3) the defendant knew the claim or statement was false or fraudulent. *United States ex rel. Todd v. Fid. Nat'l Fin., Inc.*, No. 1:12-cv-666-REB-CBS, 2014 WL 4636394, at *7 (D. Colo. Sept. 16, 2014) (citing *United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 811 (S.D.N.Y. 2010)). "The gravamen of a false claim focuses on the conduct of the defendant and inquires into the defendant's purpose and intention in filing the requests for payment or reimbursement." *United States ex rel. Trim v. McKean*, 31 F. Supp. 2d

1308, 1315 (W.D. Okla. 1998)(citation omitted).

Here, Relator is requesting that the Court assume claims were made to CMS and issue an order stating that any claim made to CMS wherein a non-physician practitioner, rather than a radiation oncologist, acted as the direct supervisor during the delivery of external beam radiation therapy is a "false claim." Relator does not define "false claim" and she specifically states that she does not address whether "false claims" were submitted knowingly. Thus, Relator is not using this motion for partial summary judgment to present a substantial and well-supported argument for significantly reducing the claims or issues in the case as required by this Court's practice standards. *See* WJM Revised Practice Standards, § III.E.2. Relator as much as concedes this point because she does not rely on any case law to support the conclusion that language in subregulatory comments can, as a matter of law, create FCA liability for a hospital. In fact she relies on only one case in which the 11th Circuit held that subregulatory comments attempting to interpret an ambiguous Medicare regulation created a genuine issue of fact as to the falsity of the Defendant's claim and, therefore, the 11th Circuit remanded the case to the District Court. *See United States v. R & F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1358 (11th Cir. 2005); Motion at 20.

B. *Use of Non-Physician Practitioners as Direct Supervisors is Permitted Under Federal Law.*

Medicare Part B provides supplemental health insurance for certain outpatient medical services for the aged and disabled. 42 U.S.C. §§ 1395j-1395w-5 (2012). Hospitals are reimbursed for the facility components of such services through the

HOPPS. *Id.* § 13951(t).[4]

Medicare covers numerous therapeutic and diagnostic benefit categories, including radiation therapy. *Id.* § 1395x(s)(4). Medicare pays for hospitals' services and supplies furnished incident to a physician's or non-physician practitioner's service. *Id.* § 1395x(s)(2)(B); 42 C.F.R. § 410.27(a) (2015).[5] Such therapeutic services and supplies must be furnished under the direct supervision (or other level of supervision as specified by CMS for the particular service) of a physician or non-physician practitioner, such as a nurse practitioner. 42 C.F.R. § 410.27(a)(1)(iv).[6] Non-physician practitioners may provide the required supervision of services that they may personally furnish in accordance with State law. *Id.* § 410.27(a)(1)(iv)(C). Direct supervision does not mean that the physician or non-physician practitioner must be present in the room when the procedure is performed, but rather the physician or non-physician practitioner must be "immediately available to furnish assistance and direction throughout the performance of the procedure." *Id.* § 410.27(a)(1)(iv)(A).

Relator devotes much of her brief to citing comments in the Federal Register that discuss the meaning of "furnish assistance and direction." However, an analysis of the CMS comments cited by Relator is unnecessary because the rule is not ambiguous.

---

[4] Physician services and billing are not an issue here because supervision is not a professional service and does not trigger any payment to the physician. To the extent Relator is requesting that the Court issue any order relating to BMGC which only bills for professional services, that request is unfounded.

[5] While not relevant to responding to Relator's motion, Defendants note that radiation therapy has a coverage category separate from "incident to" and Defendants do not concede that 42 C.F.R. § 410.27 applied to radiation therapy prior to 2012.

[6] Non-physician practitioner means a clinical psychologist, licensed clinical social worker, physician assistant, nurse practitioner, clinical nurse specialist, or certified nurse-midwife. 42 C.F.R. § 410.27(g) (2015).

*See, e.g.*, *Tierdael Constr. Co. v. Occupational Safety & Health Review Comm'n*, 340 F.3d 1110, 1114 (10th Cir. 2003) ("When the meaning of a regulatory provision is clear on its face, the regulation must be enforced in accordance with its plain meaning. . . . If the regulation is ambiguous, this court must give substantial deference to the agency's interpretation of the regulation.")(citing *Walker Stone Co., Inc. v. Sec'y of Labor*, 156 F.3d 1076, 1080 (10th Cir. 1998)). C.F.R. section 410.27 contemplates that a non-physician practitioner may directly supervise or be the designee immediately available to furnish assistance and direction for therapeutic outpatient hospital services and supplies furnished incident to a physician's or non-physician practitioner's service as long as it is in accordance with state law scope of practice. If CMS intended to require that only a physician directly supervise the delivery of radiation therapy, CMS could have done so. Indeed, the rule expressly requires that a doctor of medicine or osteopathy directly supervise pulmonary rehabilitation, cardiac rehabilitation, and intensive cardiac rehabilitation. 42 C.F.R. § 410.27(a)(1)(iv)(D) (2015).[7] Such limitations were not extended to radiation therapy.

C. *The Regulations Issued by the State Board of Health Do Not Limit the Ability of a Non-Physician Practitioner to Directly Supervise the Delivery of External Beam Radiation Therapy Under State Law or CMS Regulations*.

Relator does not dispute that under Colorado law an advanced practice nurse

[7] CMS expressly requires these types of outpatient therapy to be supervised by a doctor of medicine or osteopathy because Congress has required this level of supervision. *See* Medicare Improvements for Patients and Providers Act of 2008 § 144; 42 U.S.C. § 1395(x)((eee)-(fff)) (2012).

acts within his or her scope of practice when furnishing assistance and direction during the delivery of external beam radiation therapy. Instead, she asks the Court to find that the only way to furnish the assistance and direction required by 42 C.F.R. section 410.27 is to issue a written directive as it is defined in 6 Colorado Code of Regulations section CR 1007-1, Appendix 2K, and only an "authorized user" or "radiation therapy physician" can issue a written directive.

This argument fails for two reasons. First, a person does not have to be an "authorized user" under Colorado regulations to directly supervise an external beam radiation therapy session. Second, even an authorized user (i.e., radiation oncologist or radiation therapy physician) would not be able to change the written directive during the therapy session as Relator argues is necessary. As a result, the skills and training required to supervise an external beam radiation therapy session are well within the ability and the scope of practice of an advanced practice nurse in the state of Colorado.[8]

Colorado Statutes confer upon the "state board of health the power and duty to issue from time to time such orders, to adopt such rules and regulations, and to establish such standards as the board may deem necessary or proper ... to enforce the public health laws of this state." Colo. Rev. Stat. § 25-1-108(1)(c)(l). Specifically,

> the state board of health shall formulate, adopt, and promulgate rules that cover subject matter relative to radiation machines and radioactive

[8] The definition of advanced practice nurse references and encompasses the definition of professional nursing. Colo. Rev. Stat. §13-38-111.5 (2014). The scope of practice of a professional nurse includes but is not limited to broad areas where professional judgment is applied such as advanced assessment, diagnosing, treating, prescribing, ordering, selecting, administering and dispensing diagnostic and therapeutic measures under a variety of circumstances. 3 Colo. Code Regs. 716-1,(2015)(ch xiv. Rule 4.3 (Attached as Ex. C).

> materials, including naturally occurring radioactive materials and other sources of radiation. The subject matter of the rules shall include: Licenses and registration; records; permissible levels of exposure; notification and reports of accidents; technical qualifications of personnel; technical qualifications of mammographers; handling, transportation, and storage; waste disposal; posting and labeling of hazardous sources and areas; surveys; monitoring; and financial assurance warranties.

*Id.* § 25-11-104(1)(a). However, the General Assembly cautioned:

> the rules adopted pursuant to this part 1 shall never be construed to limit the kind or amount of radiation that may be intentionally applied to a person for diagnostic or therapeutic purposes by or under the direction of a duly licensed practitioner of the healing arts.

*Id.* § 25-11-104(3). Practitioner of the healing arts means “any person upon whom the U.S. Food and Drug Administration has conferred the authority to administer prescription drugs.”[9] 6 Colo. Code. Regs. § 1007-1:1.2.2 (2015).

Relying on statutory authority, the state board of health has promulgated regulations related to radiation control. *See Id.* § 1007-1:1.1 *et seq*. Part 24 of 6 Colo. Code Regs. Section 1007-1 specifically governs the use of particle accelerators and therapeutic radiation machines in the healing arts. Under these regulations, “an authorized user radiation therapy physician with a current active State of Colorado license to practice the healing arts must generally supervise human use of a therapeutic radiation machine.” *Id.* § 1007-1:24.3.2.1. General supervision means "the procedure is under the supervisor's overall direction and control but the supervisor's presence is

[9] The Colorado Board of Nursing may authorize advanced practice nurses to prescribe controlled substances and prescription drugs. Colo. Rev. Stat. § 12-38-111.6 (2014); Colo. Rev. Stat. § 12-38-111.5(5) (2014). Thus for the purposes of 6 Colo. Code Regs. section 1007-1, an advanced practice nurse is a duly licensed practitioner of the healing arts.

not required during the performance of the procedure."[10] *Id.* § 1007-1:24.3.2.2. Colorado regulations do not require direct supervision by a physician. In addition, they specifically acknowledge radiation may be intentionally applied to a person for therapeutic purposes by or under the direction of a duly licensed *practitioner* of the healing arts. *See* Colo. Rev. Stat. § 25-11-104(3) (emphasis added).

Colorado regulations require that all facilities using therapeutic radiation machines develop a quality management program to ensure that radiation will be administered as directed by the authorized user. 6 Colo. Code. Regs. §1007-1:24.6.2 (2015). They further require that all quality management programs require that radiation only be administered if there is a written directive for the radiation that is signed by an authorized user. 6 Colo. Code Regs. §1007-1: 24.6.2.1(1).

Under the regulations a written directive means an order in writing for the administration of radiation to a specific human patient or human research subject which:

> (1) shall be dated and signed by a radiation therapy authorized user prior to the administration of radiation; (2) shall contain the human patient or human research subject's name, the type and energy of the beam, the total dose, dose per fraction, treatment site, and number of fractions; (3) may be revised at the discretion of the authorized user, provided that the revision is written, dated and signed by the authorized user prior to administration of the next fraction; (4) may be subject to oral revision, if because of the patient's condition, a delay in the order to provide a written revision to an existing written directive would jeopardize the patient's health, and provided that: (a) the oral revision is documented as soon as possible in writing in the patient's record; and (b) a revised written directive is signed by an authorized user within 48 hours of the oral

[10] By contrast, direct supervision "means the supervisor is present in the facility and immediately available to observe, correct, assist and direct the supervisee throughout the performance of a procedure, as needed, but is not always required to be in the room." *Id.*

revision; and (5) shall be retained (a copy is acceptable) for 3 years.

*See Id.* §§ 1007: 24.6.2.1 (emphasis added).[11] A written directive must be signed before performance of the procedure. This is because a written directive is the radiation plan and prescription. (Ceilley Aff., ¶ 12). This directive takes hours and, sometimes weeks, to create. (*Id.* at ¶ 15). It requires that the radiation oncologist and dosimetrist work together to image the tumor, contour the anatomy over the tumor, outline the tumor, create a radiation plan that targets the tumor and protects the healthy tissue. (*See* Ceilley Aff.). Once it is created, the medical physicist must program the linac with the plan. (*Id.* at ¶ 13).

D. *The Ability to Issue a Written Directive Does Not Influence Whether a Physician or Non-Physician Practitioner Has the Ability to Furnish Assistance and Direction During the Delivery of External Radiation Beam Therapy*.

The concept of a "written directive" is not synonymous with the concept of "furnish assistance and direction." As explicitly stated in the Colorado Code of Regulations, a written directive is signed prior to the administration of radiation to a patient. While a written directive may be altered either in writing or orally at some point during a patient's multiple week course of radiation therapy, it cannot be altered during the delivery of radiation. Once the beam is turned on, the type of beam, type of energy, or the dose for the fraction cannot be adjusted. (Ceilley Aff., ¶ 17). The only possible

[11] Effective January 14, 2014, the words “prior to the administration of the next fraction” were added to the end of 6 Colo. Code. Regs. section 1007-1: 24.6.2.1(3). Earlier versions of the regulation did not contain such language and solely stated that a written directive “may be revised at the discretion of the authorized user, provided that the revision is written, dated, and signed by the authorized user. . . . ”

intervention as it relates to the machine is to turn off the linac. (*Id.*). Furthermore, if there is a problem or emergency with the machine, the regulations require the radiation therapist to contact the medical physicist, not the radiation therapy physician. *See* 6 Colo. Code Regs. §1007-1: 24.3.7 (2015). While the regulations require general supervision by an authorized user, the authorized user is not tasked with operating the machine or with responding to problems or emergencies.

The Defendants maintain that the Court does need not review the CMS commentary relied on by the Relator because the HOPPS rule at issue unambiguously permits a non-physician practitioner to provide direct supervision so long as it is within his or her scope of practice. *See* 42 C.F.R § 410.27 (2015). Nevertheless, even a cursory review of the sections quoted by Relator demonstrates that CMS does not require that a direct supervisor be able to sign a written directive or otherwise be deemed an "authorized user" of the radiation machine. In fact, in response to a question about diagnostic or therapeutic radiation oncology services, CMS stated: "Specially trained ancillary staff and technicians are the primary operators of some specialized diagnostic or therapeutic equipment, and while CMS does not expect the supervisory practitioner to operate this equipment instead of a technician, CMS does expect the physician or non-physician practitioner that supervises the provision of the service must be knowledgeable about the test and clinically appropriate to furnish the test." Final rule Regarding Changes to CMS Payments 75 Fed. Reg. 71,800, 72,012 (Nov. 24, 2010).

Even when asked specifically about direct supervision relating to radiation

therapy, CMS specifically contemplated non-physician practitioners could be proper supervisors. The Federal Register continued: "CMS would not expect that the supervisory practitioner would make all decisions unilaterally without informing or consulting the patient's treating physician or non-physician practitioner." *Id.* In addition, CMS did not suggest that the direct supervisor must be credentialed to write a radiation prescription or issue a "written directive" as it is defined under Colorado law. As has been established with respect to the delivery of external beam radiation therapy, a radiation oncologist does not program the linac or operate it. In this sense, he or she does not furnish the test. Rather, a physician or non-physician practitioner is present to clinically manage the needs of the patient should they arise. These needs include treating a patient who is dehydrated and light-headed, controlling pain, or helping with shortness of breath. (Ceilley Aff., ¶ 18). Such skills are well within the scope of practice of the advanced practice nurse.

**V. Conclusion**

By cobbling together subregulatory language issued by CMS and isolated portions of regulations promulgated by the state board of health relating to the operation of a radiation machine, Relator requests that the Court find as a matter of law that only a radiation oncologist physician can issue a written directive and only someone who can issue a written directive can provide the CMS required direct supervision for external beam radiation therapy services. This request is unreasonable given that a written directive must be created prior to the delivery. Furthermore, the Relator is requesting the Court find that even though the use of advanced practice nurses as a direct

supervisor is appropriate under Federal law and appropriate under State law, it can amount to a false claim under the FCA when the two laws are read together. This result is illogical. This conclusion is only possible by weaving together isolated phrases from several sections in the complex scheme of Medicare subregulatory comments and Colorado regulations promulgated by the state board of health. "This cut and paste approach is not supported by the structure of the regulatory scheme, and it is not reasonable to expect Medicare providers to attempt such an approach to regulatory interpretation in their efforts to comply with the FCA." United States *ex rel. Hobbs v. Medquest Associates Inc.*, 711 F.3d 707, 715 (Sixth Cir. April 1, 2013).

For the reasons asserted above, the Court should deny Relator's early motion for partial summary judgment because her requested relief is not supported by the law. In the alternative, the Court should defer ruling on these legal issues until it is presented with a more robust record.

Respectfully submitted this 9th day of February, 2015.

CAPLAN AND EARNEST LLC

s/ Meghan E. Pound

Linda L. Siderius, #12931
Meghan E. Pound, #33915
1800 Broadway, Suite 200
Boulder, CO 80302
Phone: 303-443-8010
Facsimile: 303-440-3967
Email: lsiderius@celaw.com
mpound@celaw.com
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Marcy E. Cook
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202

G. Mark Simpson, Esq.
Simpson Law Firm, LLC
110 Habersham Drive, suite 108
Fayetteville, GA 30214

Jamie M. Bennett, Esq.
ASHCRAFT & GEREL, LLP
4301 Garden City Drive, Suite 301
Landover, MD 20785

Nathan M. Peak, Esq.
ASHCRAFT & GEREL, LLP
4301 Garden City Drive, Suite 301
Landover, MD 20785

Andrew M. Stone, Esq.
Stone Law Firm, LLC
437 Grant Street
Suite 1806
Pittsburgh, PA 15219

s/ Rhonda L. Bender
Rhonda L. Bender, Paralegal