UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES ex rel. MARTHA L. BAKER,<br><br>Plaintiff-Relator,<br><br>v.<br><br>BANNER HEALTH and BANNER MEDICAL GROUP COLORADO,<br><br>Defendants. | Civil Action No. 12-CV-3029-WJM-CBS |

**REPLY BRIEF IN SUPPORT OF RELATOR'S EARLY MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants' response brief clearly shows why an early ruling on the issues presented in this motion is appropriate. Defendants admit that non-physician practitioners ("NPs") provided supervision of external beam radiation therapy services performed at Banner's facilities when there was no authorized user present at the facility. As discussed below and in Relator's prior brief, however, Medicare allows NPs to provide the necessary "direct supervision" of services **only** if they are able to "personally furnish" such services under state law, and even Defendants do not contend that NPs can "personally furnish" external beam radiation therapy services. Accordingly, an early ruling on this question would greatly simplify the issues remaining for trial.

## I. <u>Response Concerning Additional Disputed Facts</u>.

Relator hereby responds to the numbered paragraphs contained in Defendants' "Additional Material Facts," for purposes of the pending motion only, as follows:

1. Admitted.

2. Admitted.

3. Admitted.

4. Relator admits that different individuals, including a radiation oncologist, dosimetrist, medical physicist, and radiation therapist, work on different aspects of the preparation of a radiation treatment plan and delivery of external beam radiation treatment, although Defendants' use of the terms "dependent" and "team" is vague. Relator admits that Banner used nurses to provide supervision of external beam radiation therapy services, although this was not allowed by law.

5. To the extent that paragraph 5 is intended to describe the normal practice at Banner, it is admitted. The supporting declaration does not purport to describe the planning or treatment of any particular patient, or describe any deviation from this standard practice.

6. To the extent that paragraph 6 is intended to describe the normal practice at Banner, it is admitted. The supporting declaration does not purport to describe the simulation for any particular patient, or describe any deviation from this standard practice.

7. To the extent that paragraph 7 is intended to describe the normal practice at Banner, it is admitted. The supporting declaration does not purport to describe the contouring process for any particular patient, or describe any deviation from this standard practice.

8. To the extent that paragraph 8 is intended to describe the normal practice at Banner, it is admitted. The supporting declaration does not purport to describe the planning or treatment of any particular patient, or describe any deviation from this standard practice.

9. To the extent that paragraph 9 is intended to describe the normal practice at Banner, it is admitted. The supporting declaration does not purport to describe the planning or treatment of any particular patient, or describe any deviation from this standard practice.

10. To the extent that paragraph 10 is intended to describe the normal practice at Banner, it is admitted. The supporting declaration does not purport to describe the quality assurance process for any particular patient, or describe any deviation from this standard practice.

11. To the extent that paragraph 11 is intended to describe the normal practice at Banner, it is admitted. The supporting declaration does not purport to describe the review process for any particular patient, or describe any deviation from this standard practice.

12. Admitted.

13. It is admitted that the radiation therapist operates the radiation therapy machine, but otherwise denied. Dr. Ceilley's affidavit is insufficient to establish that radiation oncologists as a group do not know how to operate radiation therapy machines, and are not credentialed to do so. Relator notes that the Colorado Code of Regulations specifically authorizes an "authorized user" (i.e., a radiation oncologist) to operate a radiation therapy machine. 6 CCR 1007-1, § 24.3.5.1.

14. It is admitted that paragraph 14 describes standard practice, but the conclusory statements in Dr. Ceilley's affidavit are not sufficient to establish that these are the only

"options." The Colorado regulations expressly contemplate a situation arising where an authorized user may need to make an oral revision to a radiation treatment plan without sufficient time to change the written directive. *See* 6 CCR § 1007-1, § 24.6.2.1(4) (written directive "[m]ay be subject to oral revision, if because of the patient's condition, a delay in the order to provide a written revision to an existing written directive would jeopardize the patient's health, and provided that: (a) The oral revision is documented as soon as possible in writing in the patient's record; and (b) A revised written directive is signed by an authorized user within 48 hours of the oral revision").

15. Denied, in that the phrase "the process" is vague. It is admitted that a radiation oncologist must revise the treatment plan. However, the Colorado regulations expressly contemplate a situation arising where an authorized user may need to make an oral revision to a radiation treatment plan without sufficient time to change the written directive. *See* 6 CCR § 1007-1, § 24.6.2.1(4).

16. Admitted.

17. Admitted, to the best of Relator's knowledge.

18. Admitted.

19. It is admitted that SRMC is a small regional hospital with 25 beds.[1]

20. Denied. Other than Ms. Fritz's self-serving statement, which need not be believed, there is no evidence of the matters asserted. Among other things, there is no evidence of what "questions" she researched, what was stated in the alleged conference call, what publications she reviewed, or what was contained in the "position paper" she claims to have

[1] Relator does not interpret Defendants' footnote 3 as being part of their statement of facts.

prepared. Moreover, this paragraph is not a "simple, declarative sentence" setting forth a discrete fact that may be admitted or denied, but consists of multiple unrelated assertions. Moreover, such facts are immaterial to the issues presented in the motion.

21. Denied. Other than Mr. Fritz's self-serving statement, which need not be believed, there is no evidence as to what is discussed in the supposed "position statement," which is not attached to the declaration. Moreover, the statement is immaterial, since any "position statement" prepared by Ms. Fritz would not change what the law requires.

22. This paragraph is not a "simple, declarative sentence" setting forth a discrete fact that may be admitted or denied, but is a collection of unrelated assertions regarding what hospitals may have been "entitled to assume, what CMS "signaled," and the motivation for CMS actions. To the extent that a response is required, this paragraph is denied, as the CMS regulations cited in support speak for themselves. As discussed in Relators' brief, CMS only allowed non-physician practitioners to supervise those services that they could "personally furnish" under state law.

23. This paragraph is not a "simple, declarative sentence" setting forth a discrete fact that may be admitted or denied, but consists of multiple unrelated assertions. To the extent that a response is required, this paragraph is denied. Other than Ms. Fritz's self-serving statement, which need not be believed, there is no evidence of the matters asserted. Moreover, such facts are immaterial to the issues presented in the motion, since what Ms. Fritz and others may have "decided" does not change what the law requires.

24. This paragraph is not a "simple, declarative sentence" setting forth a discrete fact that may be admitted or denied, but consists of multiple unrelated assertions. To the extent that a

response is required, it is admitted that advanced practice nurses supervised external beam radiation treatments, although this did not constitute "direct supervision" as required by Medicare, but otherwise denied. Other than Ms. Fritz's self-serving statement, which need not be believed, there is no evidence of the matters asserted. Moreover, the assertion that Dr. Ceilley and Dr. Fuller were available by telephone or video conferencing is immaterial to the issues presented in the motion.

25. It is admitted that advance practice nurses, as a matter of practice, supervised external beam radiation procedures, but denied that this constitutes "direct supervision" as required by Medicare.

## II. <u>Argument</u>.

### A. <u>Defendants do not contend that their NPs can "personally furnish" external beam radiation therapy services under state law, but simply that they can "supervise" such services under state law, which is not sufficient to provide the "direct supervision" required by Medicare</u>.

In their response, Defendants assert that the Court should not consider CMS commentary because the language of 42 C.F.R. § 410.27 is unambiguous. Doc. 52, p. 14-15.[2] However, this argument gets Defendants nowhere, since the regulation unambiguously makes it clear that NPs may not provide "direct supervision" of outpatient hospital therapeutic services unless they can also "personally furnish" such services under state law – and even Defendants do not contend that their NPs can "personally furnish" external beam radiation therapy services to patients.

---

[2] As discussed below, CMS commentary is clearly relevant to determining the meaning of the phrase "furnish assistance and direction throughout the performance of the procedure." However, Relator agrees that the regulation is unambiguous in only allowing NPs to supervise services that they may "personally furnish" under state law.

As Defendants acknowledge in their brief, 42 C.F.R. § 410.27 states that "[n]onphysician practitioners may provide the required supervision of services that they may **personally furnish** in accordance with State law and all additional requirements, including those specified in … [§] 410.75." 42 C.F.R. § 410.27(a)(1)(iv)(C) (emphasis added). Significantly, the regulation does not state that NPs may provide the required supervision of services that they may "supervise" under state law – it says they must be able to "personally furnish" such services under state law.[3] And 42 C.F.R. § 410.75(e)(1) provides that "[s]upervision of other nonphysician staff by a nurse practitioner does not constitute personal performance of a professional service by a nurse practitioner."

Defendants do not contend that the NPs at Banner (none of whom qualified as an authorized user[4]) had the ability to "personally furnish" external beam radiation therapy services under state law. And indeed, there is no sense whatsoever in which such NPs may be said to have the ability to "personally furnish" external beam radiation therapy services in accordance with Colorado law:

- They cannot make the decision to expose a patient to external beam radiation, since only an authorized user can do so.[5]

---

[3] Defendants blur this distinction by stating that "the HOPPS rule at issue unambiguously permits a non-physician practitioner to provide direct supervision so long as **it** is within his or her scope of practice," without explaining what they mean by "it." Doc. 52, p. 20 (emphasis added). As the unambiguous language of the regulation makes clear, however, what must be within the scope of their practice is the ability to "personally furnish" the service, not the ability to "supervise" the performance of the service by others. Indeed, the regulation clearly provides that "[s]upervision of other nonphysician staff by a nurse practitioner does not constitute personal performance of a professional service by a nurse practitioner." 42 C.F.R. § 410.75(e)(1).

[4] *See* Defendants' response to Movant's Statement of Material Fact No. 25.

[5] *See* 6 CCR 1007-1, § 24.3.8; 6 CCR 1007-1, § 24.3.2.1.

- They cannot issue an order to provide external beam radiation therapy to a patient, since only an authorized user can do so.[6]

- They cannot prepare or approve a radiation treatment plan setting forth the type and amount of radiation to be provided, and the manner in which it is to be delivered to a patient, since only an authorized user can do so.[7]

- They cannot make changes to a radiation treatment plan ordered by someone else, since only an authorized user may do so.[8]

- They cannot have "overall direction and control" of radiation therapy services, since that must be provided by an authorized user.[9]

- They cannot personally perform the actual delivery of external beam radiation to the patient, since only an authorized user or a licensed radiation therapist is permitted to operate a radiation therapy machine.[10]

---

[6] *See* 6 CCR 1007-1, § 24.3.8.

[7] *See* 6 CCR 1007-1, § 24.6.2.1; *see also* Doc. 52, p. 18 (acknowledging that "Colorado regulations require that all facilities using therapeutic radiation machines develop a quality management program to ensure that radiation will be administered **<u>as directed by the authorized user</u>**.") (emphasis added); Response to Movant's Statement of Material Fact No. 23 (admitting that Banner's NPs cannot supervise, much less personally furnish, treatment planning.

[8] *See* 6 CCR 1007-1, § 24.6.2.1.

[9] *See* 6 CCR 1007-1, § 24.3.2.1; 6 CCR 1007-1, § 1.2.2 ("general supervision" means the procedure is under the supervisor's "overall direction and control").

[10] *See* 6 CCR 1007-1, § 24.3.5.1 ("Each individual who will be operating a therapeutic radiation machine for human use shall be: (1) An authorized user who meets the requirements of Appendix 2K; or (2) An individual, designated by a facility authorized user, who meets the requirements of Appendix 2L, 'Radiation Therapist (24.3.5) Adequate Radiation Safety Training and Experience'."); *see also* 6 CCR 1007-1, Part 2, Appendix 2L (operator of therapeutic radiation machine must, among other things, have been accredited as a radiation therapist by The American Registry of Radiologic Technologists or equivalent specialty board, and have completed a training program in radiation therapy which has resulted in a certificate, associate, or baccalaureate degree in an approved radiologic technology program).

Thus, under state law, there is no aspect of external beam radiation therapy that NPs may be said to "personally furnish" – they can neither authorize radiation to be delivered to a patient, issue orders for such treatment to be provided, develop the plan for such treatment, make changes to such plan, or actually perform the procedure themselves. The only thing that Defendants claim such individuals are able to do under state law is to "supervise" the provision of radiation therapy by others – and the regulations make it clear that this is not sufficient to allow them to provide the "direct supervision" required for an outpatient hospital therapeutic service to be covered by Medicare. *See* 42 C.F.R. 410.75(e)(1) ("Supervision of other nonphysician staff by a nurse practitioner does not constitute personal performance of a professional service by a nurse practitioner.").

Defendants assert that Colorado law does not require the authorized user to be present during the performance of an external beam radiation service, and thus allows NPs to supervise such services. *See* Doc. 52, p. 17-18 (noting that, under Colorado regulations, although authorized user must provide "general supervision," that does not require the authorized user to be physically present during the procedure). It is more accurate to say that that Colorado law requires an authorized user to provide "general supervision" of radiation therapy services (which requires the authorized user to have "overall direction and control" of the procedure, but does not require his presence during the procedure), but does not impose any particular requirement for on-site supervision.

However, this argument completely misses the point. It is <u>**federal**</u> law which requires that, to be payable by Medicare, outpatient hospital therapeutic services must be provided under "direct supervision," and it is <u>**federal**</u> law which provides that an NP may provide such direct

supervision only if she may "personally furnish" the services under state law. Therefore, the question is not whether Colorado law allows NPs to "supervise" the provision of radiation therapy services by others – the question is whether such NPs can "personally furnish" the services themselves. If they cannot, then they cannot provide the "direct supervision" that is required in order for the outpatient hospital therapeutic service to be payable by Medicare.

Defendants' argument would require the Court to conclude that the term "personally furnish," as used in § 410.27, is synonymous with the term "supervise" – i.e., it would require the Court to interpret § 410.27 as stating that "[n]onphysician practitioners may provide the required supervision of services that they may [supervise] in accordance with State law and all additional requirements." Clearly, however, the terms "personally furnish" and "supervise" are not synonymous in their ordinary meaning – indeed, they are mutually exclusive, since one who "personally furnishes" a service is not "supervising" the furnishing of the service by another. Indeed, the regulation expressly states that "[s]upervision of other nonphysician staff by a nurse practitioner does not constitute personal performance of a professional service by a nurse practitioner." 42 C.F.R. § 410.75(e)(1). Accordingly, the unambiguous language of the regulation distinguishes between the ability to "personally furnish" a service and the ability to "supervise" the performance of the service by another. And, indeed, this is consistent with CMS's own commentary. *See, e.g.*, 75 Fed. Reg. 71800, 72009 ("we believe there is an important distinction between ability and training to administer a service, and ability to supervise a service or to administer it without supervision"); 74 Fed. Reg. 60316, 60587 ("we are finalizing our proposal to allow … nonphysician practitioners to directly supervise services **<u>that they may perform themselves</u>** under their State license and scope of practice and hospital-granted or

CAH-granted privileges"); 74 Fed. Reg. 35232, 35368 (nonphysician practitioner must have "the ability to **perform** the services being **supervised**").

The language of the regulation is thus clear – although CMS allowed NPs to provide the required direct supervision of hospital outpatient therapeutic services in certain circumstances, it limited that permission to services NPs could "personally furnish" under state law, and expressly provided that supervising others is **not** personally performing a service. And since the NPs at Banner are not permitted, under state law, to order external beam radiation therapy services, to develop and approve a plant of treatment, or to actually deliver the treatment to the patients themselves, they can in no sense be considered able to "personally furnish" external beam radiation therapy services under state law. Therefore, they cannot provide the "direct supervision" of such services required by Medicare.

### B. CMS commentary is appropriate to explain the meaning of "furnish assistance and direction."

Although the regulation is unambiguous that NPs cannot "supervise" services unless they can "personally furnish" such services in accordance with state law, that does not mean that CMS commentary is not relevant in interpreting the meaning of other relevant language contained in the regulation. For example, the regulation defines "direct supervision" to mean that "the physician or nonphysician practitioner must be immediately **available to furnish assistance and direction** throughout the performance of the procedure." 42 C.F.R. § 410.27(a)(iv)(A) (emphasis added). As Relator has shown, CMS has consistently interpreted this language to mean that the supervisor must have the ability to "take over performance" of the procedure, to "change a procedure or the course of treatment" being provided to the patient, and to "clinically redirect" the procedure or service.

Contrary to Defendants' suggestions, the meaning of the phrase "available to furnish assistance and direction" is not so clear and unambiguous as to render CMS commentary irrelevant – indeed, to the extent that the language is unambiguous, it is unambiguous in the sense that someone **cannot** be thought of as having the ability to "furnish assistance and direction" for services that she can neither order nor perform herself – particularly in light of the express language permitting NPs to supervise only those services that they may "personally furnish" under state law. Thus, the plain language of the regulation does not support Defendants' position, and CMS's consistent interpretation of its own regulations confirms this fact. *See Auer v. Robbins*, 519 U.S. 452, 460 (1997) (holding that agency's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with the regulation); *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1062 (10th Cir. 2014) (court defers to agency's interpretation of its own ambiguous regulation, unless interpretation is plainly erroneous or inconsistent with regulation). Accordingly, Defendants cannot rely on the supposedly "unambiguous" nature of the regulatory language to authorize NPs to supervise services they are not qualified to perform themselves.

### C. Defendants' arguments about making changes to a course of radiation treatment are meritless.

Defendants argue that, as a practical matter, an authorized user would not make changes to a patient's radiation treatment plan during the course of a treatment, but would simply cancel a day's treatment if any problems develop, and then would make any necessary changes to the treatment plan before any subsequent daily treatment.[11] Defendants suggest that, since an NP

[11] As a purely factual matter, the Colorado regulations expressly contemplate a situation arising where an authorized user may make an oral revision to a radiation treatment plan without

can cancel a day's treatment just as easily as an authorized user, the NP is just as effective a supervisor as the authorized user would be.

This argument misses the point.[12] The supervision rules are designed to address what **qualifications** a person must have in order to be considered "available to furnish assistance and direction" throughout the performance of a procedure (which would include, among other things, the ability to determine whether it is in the patient's best interests to proceed with treatment or to cancel treatment for the day in order to revise the treatment plan), and CMS has made it clear that such an individual must have the **ability** to "take over performance" of the procedure, to "change a procedure or the course of treatment" being provided to the patient, and to "clinically redirect" the procedure or service. Indeed, CMS has expressly stated that:

> It would be unreasonable to think that a physician or nonphysician practitioner could competently assist and direct a procedure for which they do not have sufficient knowledge and skills to perform or redirect the procedure or service.

74 Fed. Reg. 60316, 60584. If an individual does not have the **ability** to take such actions, then CMS has made clear that they do not have the ability to "furnish assistance and direction" for the type of procedure in question.

---

sufficient time to change the written directive. *See* 6 CCR § 1007-1, § 24.6.2.1(4) (written directive "[m]ay be subject to oral revision, if because of the patient's condition, a delay in the order to provide a written revision to an existing written directive would jeopardize the patient's health, and provided that: (a) The oral revision is documented as soon as possible in writing in the patient's record; and (b) A revised written directive is signed by an authorized user within 48 hours of the oral revision"). Thus, the person who is on-site to provide the "direct supervision" must have the ability to determine whether such oral revisions are necessary, and to make such oral revisions if appropriate – i.e., he or she must be an authorized user.

[12] Indeed, since a radiation therapist can cancel a treatment as easily as an NP, Defendants' argument is essentially an argument that **anybody** can provide supervision of external beam radiation therapy services. However, CMS has made clear that this is not the case.

Indeed, CMS has addressed this issue in the precise context of radiation oncology services, and has rejected the idea that a non-specialist who is unable to make changes to a plan of treatment can furnish the required assistance and direction for such services:

> *Comment:* During the past year, we were often questioned about clinical requirements for practitioners supervising extremely specialized services, **notably radiation oncology services**. One commenter requested that CMS consider the direct supervision requirement to be met for diagnostic or therapeutic radiation oncology services if a non-specialist practitioner who can handle an emergency provides the direct supervision **and also has access by phone or other telemedicine link to a specialist who is able to change the plan of care should the need arise**. One commenter asserted that one does not have to posses the clinical skills to fully provide a service in order to be an effective supervisor.
>
> *Response:* As we have stated in the Medicare Benefit Policy Manual (Pub. No. 100-02), Chapter 6, Section 20.5.24, "the supervisory physician or nonphysician practitioner must have, within his or her State scope of practice and hospital-granted privileges, the knowledge, skills, ability, and privileges to perform the service or procedure. Specially trained ancillary staff and technicians are the primary operators of some specialized diagnostic or therapeutic equipment, and while in such cases CMS does not expect the supervisory practitioner to operate this equipment instead of a technician, CMS does expect the physician or nonphysician practitioner that supervises the provision of the service must be knowledgeable about the test and clinically appropriate to furnish the test. **The supervisory responsibility is more than the capacity to respond to an emergency**, and includes furnishing assistance and direction throughout the performance of a procedure and, as appropriate to the supervisory physician or nonphysician practitioner and the patient, **to change a procedure or the course of care for a particular patient**. CMS would not expect that the supervisory practitioner would make all decisions unilaterally without informing or consulting the patient's treating physician or nonphysician practitioner." We do not believe it is sufficient or consistent with our rules for direct supervision for the individual on site to be capable of only emergency management. **The supervisory practitioner or nonphysician practitioner who is physically present should have the training and knowledge to clinically redirect the service or provide additional orders**.

75 Fed. Reg. 71800, 72012 (emphasis added). Thus, CMS has made clear that, in the context of radiation oncology services, the person providing the on-site supervision is not capable of furnishing assistance and direction unless she has the **ability** (whether she exercises it or not) to

"change a procedure or the course of care for a particular patient," and to "clinically redirect the service or provide additional orders" – things that only an authorized user can do with respect to external beam radiation therapy services.

This 26th day of February, 2015.

Respectfully submitted,

/s/ G. Mark Simpson
G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

/s/ Jamie M. Bennett
Jamie M. Bennett
Ashcraft & Gerel
4301 Garden City Drive
Landover, Md. 20785
(301) 459-8400
(301) 459-1364
jbennett@ashcraftlaw.com

/s/ Andrew M. Stone
Andrew M. Stone
(Pa. #35176)
Stone Law Firm, LLC
437 Grant Street Suite 1806
Pittsburgh, PA 15219
Phone: (412) 391-2005
Fax: (412) 391 -0853
astone@stone-law-firm.com
Attorneys for Plaintiff-Relator

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record.

This 26th day of February, 2015.

/s/ G. Mark Simpson