IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-03029-WJM-CBS

UNITED STATES ex rel,
MARTHA L. BAKER,

Plaintiff-Relator,

v.

BANNER HEALTH and BANNER
MEDICAL GROUP COLORADO,

Defendants.

---

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Banner Health and Banner Medical Group Colorado ("Defendants") submit their Motion for Partial Summary Judgment as follows:

## I. Introduction

This is not a case about the knowing submission of legally false claims. To the contrary, certain of the claims that Relator attacks that were not false as a matter of law. Other claims, where Relator alleges there were errors in the claims, there is inadequate evidence as a matter of law that any alleged error was anything other than a good faith mistake, or was made with the required knowledge or reckless disregard of falsity.

Defendant Banner Health ("Banner") owns or operates three hospitals in northern Colorado that provide outpatient radiation oncology treatment to patients. Defendant

Banner Medical Group Colorado ("BMGC") employs radiation oncologists who work at these cancer centers. Relator has filed this lawsuit alleging that Defendants violated the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A), (B), (C), and (G) (2012). The Relator alleges that Banner Health ("Banner") billed the Centers for Medicare and Medicaid ("CMS") for technical claims for the delivery of external beam therapy when a nonphysician practitioner acted as the "direct supervisor" of the delivery of this service in violation of 42 C.F.R. § 410.27 (2015). Relator further alleges that both Defendants, Banner and BMGC, inappropriately billed CMS for "other services" because the medical records were not sufficient to support the claims for which they were billing. Relator has not alleged that the Defendants submitted claims to CMS or received payment from CMS for services that were not performed.

Defendants file the present motion and request that the Court rule as a matter of law based on undisputed facts: (1) the Defendants could not have submitted false claims to CMS for external beam radiation therapy when a nonphysician practitioner was acting as the direct supervisor of the delivery of treatment from October 2010 through January 1, 2012 because during that period of time the direct supervision rules articulated in 42 C.F.R. § 410.27 did not apply to radiation oncology; and (2) the allegations that Relator has made under the subheading "Other Billing Issues" in her First Amended Complaint fail as a matter of law because Relator has no evidence that the alleged "false claims" were submitted knowingly, in deliberate ignorance of the truth or falsity of the information, or in reckless disregard of the truth or falsity of the information.

First, the Court should find that from the time BMGC first employed radiation oncologists in late 2010 through January 1, 2012, the Defendants could not have submitted false claims to CMS when nonphysician practitioners supervised the delivery of external beam radiation therapy because 42 C. F. R.. § 410.27, the regulation that required direct supervision of medical services provided "incident to" a physician's services in an outpatient hospital setting as a condition of payment, did not apply to services rendered in the discipline of radiation oncology. Even if the Court were to find that the applicability of the regulation to radiation was unclear, the claims are not false as a matter of law because Banner did not have the requisite scienter to establish that it was submitting false claims to CMS.

Second, the Defendants are entitled to summary judgment as a matter of law with respect to the allegations Relator describes as "Other Billing Issues" in her First Amended Complaint because no reasonable fact finder could conclude that the Defendants *knowingly* acted to present or cause to be presented a false claim to CMS; knowingly made a material false statement to CMS; knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to CMS; knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to CMS; or that Defendants conspired to submit fraudulent claims to CMS. *See* U.S.C. § 3729 (a)(1)(A),

(B), (C), and (G). After a lengthy discovery period and numerous depositions, Relator has developed no evidence that Defendants knowingly sought to defraud CMS.[1]

## II. Procedural History

In November 2010, Relator filed the original complaint in this *qui tam* action on behalf of the United States pursuant to 31 U.S.C. § 3730(b) (2006). (ECF No. 1.) After the federal government declined to intervene, the Complaint was unsealed and Defendants waived service on September 23, 2014. (ECF No. 20.) Relator filed the First Amended Complaint on October 31, 2014. (ECF No. 38.) The Defendants answered on December 5, 2014 (ECF No.39.) On January 15, 2015, Relator filed an Early Motion for Partial Summary Judgment asking this Court to hold that "a physician or nonphysician practitioner who does not meet the requirements to be considered an authorized user under the Colorado Code of Regulations cannot provide the required direct supervision for external beam radiation therapy services payable under the Medicare program." (ECF No. 51, 1.) This Court granted Relator's Early Motion for Partial Summary Judgment holding that nonphysician practitioners may not provide the required supervision of external beam radiation therapy because Colorado law does not allow nonphysician practitioners to personally furnish radiation therapy. (ECF No. 56, 10.) The Court emphasized that the ruling does not resolve any question of intent under

[1] Pursuant to Local Rule 56.1(a), this motion includes a statement of material facts, legal argument, and legal authority incorporated into the motion in lieu of a separate opening brief. *See also* WJM Revised Practice Standards, § III.C.1 ("Motions and briefs shall be combined and will be considered one paper for purposes of computing page limitations."). Pursuant to Sections III.E.3 of the Court's Revised Practice Standards, exclusive of Movant's Statement of Material Facts, this motion is no more than 20 pages including the attorney signature block and the certificate of service.

the FCA.[2] (*Id.*)

Defendants file the present motion to request that the Court rule as a matter of law that the Relator cannot meet her burden of proof that Banner knowingly submitted false claims for two reasons: (1) the conditions of payment in C.F.R. § 410.27 did not apply to radiation therapy until January, 2012, and (2) Relator has no evidence to support her allegations that Defendants knowingly submitted false claims to CMS relating to "other billing issues".

**III. Movant's Statement of Material Facts**

A. *Background Facts*

1. Banner Health ("Banner") is a non-profit organization that is headquartered in Phoenix, Arizona. (ECF No. 39, ¶ 6.) (Ex. A, ¶ 3.)

2. The hospitals that Banner owns or operates in Colorado include North Colorado Medical Center ("NCMC"), McKee Medical Center ("MMC"), and Sterling Regional MedCenter ("SRM"). These are the only Banner facilities where outpatient radiation oncology services are provided. (Ex. A, ¶ 5.)

3. SRM is a small rural hospital with 25 beds. (*Id.* ¶ *6.*)

4. Banner Medical Group Colorado (BMGC) is Banner's Colorado based employed physician group. It also is a non-profit organization. (ECF No. 39, ¶ 8.) (Ex. A

[2] Defendants are not requesting the Court to resolve any questions as to intent with respect to its Order that nonphysician practitioners may not provide the required supervision of external beam radiation therapy because Colorado law does not allow nonphysician practitioners to personally furnish radiation therapy in the present motion. However, Defendants are not waiving their right to raise this issue as a motion for directed verdict. In addition, they are not waiving their right to appeal the Court's Order granting Relator's Early Motion for Partial Summary Judgment. (ECF No. 56.)

¶ 4.)

B. *The History of Radiation Oncology Therapy at NCMC, MMC and SRM*

5. In 2002, the Cancer Center opened at MMC. The Cancer Institute at NCMC opened in 2004. At the time neither Banner Health nor Banner Medical Group Colorado employed radiation oncologists. Rather, NCMC and MMC provided the facilities and equipment needed to provide radiation oncology treatment but contracted with private physicians for the provision of professional services. (Ex. A. ¶ 7.)

6. In 2008, Sterling residents, Frank and Gloria Walsh announced that they would make an 8.8 million dollar charitable donation to SRM and the Banner Health Foundation in honor of their son who died of cancer at the age of 41. The intent behind the donation was to build a cancer treatment center at SRM so that residents of Sterling and nearby communities would not have to travel as far as 120 miles for cancer treatment. (Ex. A. ¶ 8.)

7. The David Walsh Cancer Center (DWCC) was built on SRM's medical campus and opened on September 9, 2010. (Ex. A. ¶ 9)

8. The DWCC did not treat any radiation oncology patients using a linear accelerator machine until September 26, 2010. (*Id.*)

C. *The OPPS Rule Regarding Physician Supervision of Outpatient Therapeutic Services*

9. Every year, CMS issues a final rule that updates payment policies and rates under the Outpatient Prospective Payment System ("OPPS"), and also sometimes

amends the regulations applicable to the OPPS. (Ex. B at 1-2).

10. Medicare Part B covers outpatient services furnished by hospitals. (Id., 4).

11. Certain outpatient services are referred to as “incident to” services because they are furnished incident to a physician service provided to outpatients, described in 42 U.S.C. § 1395x(s)(2)(B) and a corresponding regulation covering “incident to” services set forth in 42 C.F.R. § 410.27. (Ex. C at 3).

12. Radiation therapy is described in 42 U.S.C. § 1395x(s)(4) and the corresponding regulation regarding radiation therapy is set forth in 42 C.F.R. § 410.35. (Ex. D at 2).

13. In 2000, the Centers for Medicare and Medicaid Services (“CMS”) amended 42 C.F.R. § 410.27 and added a requirement that physicians directly supervise outpatient therapeutic services that are provided incident to a physician’s service to outpatients. (Ex. B at 3-4).

14. Explaining the addition in the proposed rule, CMS stated: “Our proposed amendment of 42 C.F.R. § 410.27 to require direct supervision of hospital services furnished incident to a physician service to outpatients does not apply to services furnished in a department of a hospital that is located on the campus of that hospital. For hospital services furnished incident to a physician service to outpatients in a department of a hospital that is located on the campus of the hospital, we assume the direct supervision requirement to be met…” *(Id.* at 3).

15. As a result, hospitals were entitled to assume that there was appropriate supervision for outpatient “incident to” services furnished on campus (like SRM, NCMC

and MMC). The "assumed" supervision was based on an assumption that there would always be physicians in the hospital. At that time, there were no requirements relating to the qualifications of the supervising physician. (*Id.*).

16. In late 2008, CMS published the 2009 OPPS regulations. It did not change the content of 42 C.F.R. § 410.27 but in the preamble to the 2009 rule, CMS stated that hospitals must ensure supervising physician presence in the outpatient department. (Ex. E at 2-3).

17. In 2010, CMS amended 42 C.F.R. § 410.27.

The amended rule stated in relevant part:

> (a) Medicare Part B pays for hospital or CAH services and supplies furnished incident to a physician or nonphysician practitioner service to outpatients, including drugs and biologicals that cannot be self-administered, if—
>
> (1) They are furnished—
>
> (iv) Under the direct supervision of a physician or a nonphysician practitioner as specified in paragraph (f) of this section. Nonphysician practitioners may directly supervise services that they may personally furnish in accordance with State law and all additional requirements, including those specified in §§ 410.71, 410.73, 410.74, 410.75, 410.76, and 410.77.

(Ex. C at 3).

18. In the 2012 final OPPS rule, 42 C.F.R. § 410.27 was again amended, effective January 1, 2012, to provide as follows:

> **(a)** Medicare Part B pays for therapeutic hospital or CAH services and supplies furnished incident to a physician's or nonphysician practitioner's service, which are defined as all services and supplies furnished to hospital or CAH outpatients that are not diagnostic services and that aid the physician or nonphysician practitioner in the treatment of the patient, including drugs and biologicals that cannot be self-administered, if—

> **(1)** They are furnished—
>
> (iv) Under the direct supervision of a physician or a nonphysician practitioner as specified in paragraph (f) of this section. Nonphysician practitioners may directly supervise services that they may personally furnish in accordance with State law and all additional requirements, including those specified in §§ 410.71, 410.73, 410.74, 410.75, 410.76, and 410.77.

(Ex. F at 2) (emphasis added).

D. *Cost Reports*

19. Defendants submit cost reports to the government on an annual basis.

These cost reports contain the following certification language:

> I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [Provider's Name(s) and Number(s) for the cost reporting period beginning___ and ending___ and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

(*See, e.g.*, Ex G.)

## III. Legal Argument

A. Standard of Review and the False Claims Act.

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine issue of material fact depends upon whether the evidence presents a sufficient disagreement as to

require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (citation omitted); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987) (citation omitted).

Generally, the FCA protects against "fraudulent attempts to cause the Government to pay out sums of money." *U.S. v. Niefert-White Co.*, 390 U.S. 228, 233 (1968). Under the FCA, private parties can bring *qui tam* actions in the name of the United States to enforce the provisions of the statute. 31 U.S.C. § 3730(b) (2012).

The FCA imposes liability on any person or entity who: "(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ." 31 U.S.C. § 3729(a).

For purposes of the statute, the terms "knowing" and "knowingly" mean that a person (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information. *Id.* § 3729(b)(1)(A). [T]he term “material” means “having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.” *Id.* § 3729(b)(4). A "claim" is defined as "any request or demand" that is "presented to an officer, employee, or agent of the United States," or "is made to a contractor, grantee, or other recipient, if the money is to be spent or used on the Government's behalf or to advance a Government program or interest," and if the government "provides or has provided any portion of the money or property requested

or demanded," or "will reimburse such contractor, grantee, or other recipient" for "any portion of the money . . . which is requested or demanded." *Id.* § 3729(b)(2)(A)(i)-(ii).

Thus, liability under the FCA requires (1) a claim, (2) that the claim or a statement material to a claim was false or fraudulent, and (3) the defendant knew the claim or statement was false or fraudulent. *U.S. ex rel. Todd v. Fid. Nat'l Fin., Inc.*, No. 1:12-cv-666-REB-CBS, 2014 WL 4636394, at *7 (D. Colo. Sept. 16, 2014) (citing *U.S. ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 811 (S.D.N.Y. 2010)). While no proof of specific intent to defraud is required, Congress specifically expressed "its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence." *U.S. ex rel. Hochman v. Nackman,* 145 F.3d 1069, 1073 (9th Cir. 1998) (quoting S.Rep. No. 99–345, at 7 (1986), U.S.Code Cong. & Admin.News 1986, pp. 5266, 5272). "The gravamen of a false claim focuses on the conduct of the defendant and inquiries into the defendant's purpose and intention in filing the requests for payment or reimbursement." *U.S. ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1315 (W.D. Okla. 1998)(citation omitted).

Here, Relator must establish falsity under one of two theories: (1) factual falsity or (2) legal falsity. Under either theory, Relator's claims fail because Relator does not allege any of the claims at issue were factually false nor can she prove they were legally false. A claim is factually false if a statement on its face is untrue. Examples of factual falsity include "an incorrect description of goods or services provided or a request for reimbursement of goods or services never provided." *U.S. ex rel. Conner v. Salina Reg'l*

*Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotes and citation omitted).

A claim is legally false if a defendant submitted it and "certifie[d] compliance with a statute or regulation as a condition to government payment, yet knowingly failed to comply with such statute or regulation." *Id.* (internal quotes and citation omitted). "Legally false certification claims can rest on one of two theories—express false certification, and implied false certification." *Id.* "An express false certification theory applies when a government payee 'falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment.'" *Id.* (*quoting Mikes v. Straus*, 274 F.3d 687, 698 (2d Cir. 2001)).

Under an implied false certification theory, by contrast, courts do not look to the contractor's actual statements; rather, the analysis focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *Id.* at 1218. "If a contractor knowingly violates such a condition while attempting to collect remuneration from the government, [the contractor] may have submitted an impliedly false claim." *Id.* Claims of implied false certification arise only under 31 U.S.C. 3729(a)(1)(A). *Lemmon v. Envirocare of Utah Inc.*, 614 F.3d 1163, 1168 (10th Cir. 2010); *U.S. ex rel. Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531-32 (10th Cir. 2000); *U.S. ex rel. New Mexico v. Deming Hosp. Corp.* 992 F. Supp. 2d 1137, 1146 (D.N.M. 2013);

With respect to Relator's "Other Billing Issues" allegations in her First Amended Complaint, Relator has not alleged that Defendants submitted claims to the government

containing an incorrect description of goods or services provided or a request for reimbursement of goods or services never provided. (ECF No. 38.) Thus, she cannot proceed under a theory of a factual falsity. Rather, Relator appears to assert that Defendants have either submitted express false certifications to CMS or implied false certifications to CMS. However, regardless under which theory Relator intends to proceed, her claims fail as a matter of law because the record is bereft of any evidence that the Defendants had the requisite intent to submit false claims to CMS.

B. Medicare's Physician Supervision Rules Did Not Apply to Radiation Oncology Prior to 2012.

Relator alleges that Banner violated the FCA because it failed to comply with conditions of payment for hospital outpatient services under 42 C.F.R. § 410.27 because it used nonphysician practitioners to act as direct supervisors for the delivery of external beam radiation therapy. (ECF No. 38.)

Prior to the 2012 OPPS rule, the supervision requirements under 42 C.F.R. § 410.27 explicitly applied to outpatient hospital services and supplies furnished "**incident to**" a physician or nonphysician practitioner's service . . . ." (emphasis added). "Incident to" services are included in a category of outpatient services described in the Social Security Act ("SSA") 42 U.S.C. § 1395x(s)(2)(B). The SSA states: "The term 'medical and other health services' means any of the following items or services: … 2(B) hospital services (including drugs and biologicals which are not usually self-administered by the patient) incident to physicians' services rendered to outpatients and partial hospitalization services incident to such services." 42 U.S.C. § 1395x(s)(2)(B)

In 2010, 42 C.F.R. § 410.27 described the conditions for payment for "incident to services" and read in relevant part:

> (a) Medicare Part B pays for hospital or CAH services and supplies furnished incident to a physician or nonphysician practitioner service to outpatients, including drugs and biologicals that cannot be self-administered, if—
>
> (1) They are furnished—
>
> (iv) Under the direct supervision of a physician or a nonphysician practitioner as specified in paragraph (f) of this section. Nonphysician practitioners may directly supervise services that they may personally furnish in accordance with State law and all additional requirements, including those specified in §§ 410.71, 410.73, 410.74, 410.75, 410.76, and 410.77.

42 C.F.R. § 410.27(a)(1)(iv).

"Incident to" services are not the only type of therapeutic service furnished in a hospital outpatient department. Additional sections of the SSA and corresponding regulations describe services that are covered on a basis other than being "incident to" a physician's services. Specifically, radiation therapy is described separately in a different subsection of SSA from the subsection relating to "incident to" services, and coverage of radiation therapy is described in a separate regulatory section from 42 C.F.R. § 410.27. *See,* 42 U.S.C. § 1395x(s)(4*) (*"The term 'medical and other health services' means any of the following items or services: …(4) X-ray, radium, and radioactive isotope therapy, including materials and services of technicians"); 42 C.F.R. § 410.35 ("Medicare Part B pays for X-ray therapy and other radiation therapy services, including radium therapy and radioactive isotope therapy, and materials and the services of technicians administering the treatment.").

CMS acknowledged this distinction in the CY 2012 OPPS proposed and final rules. Specifically, CMS stated that § 410.27 "only refers to 'incident to' services" and "**could be read as limited to services and supplies described under section 1861(s)(2)(B) of the Act, hospital services incident to physicians' services furnished to outpatients**." 76 Fed. Reg. 230, 74369 (Nov. 30, 2011) (emphasis added).

Consequently, in the CY 2012 OPPS rule, CMS amended the regulations by stating that therapeutic services and supplies described by benefit categories other than ''incident to'' services under 42 U.S.C. § 1395x (s)(2)(B) are also now subject to the conditions of payment in § 410.27 when they are furnished to hospital outpatients:

> We stated our belief that this clarification could most readily be accomplished by more specifically defining the services and supplies described in the regulation text to which the requirements at § 410.27 apply. Accordingly, we proposed to revise the description of the services and supplies addressed in § 410.27(a) by adding the term ''therapeutic'' so that paragraph (a) would read, ''Medicare Part B pays for therapeutic hospital or CAH services and supplies furnished incident to a physician's or nonphysician practitioner's service'' to outpatients. We proposed to define these services, similar to the way they are currently defined in Section 20.5, Chapter 6, of the Medicare Benefit Policy Manual, to mean ''all services and supplies furnished to hospital outpatients that are not diagnostic services and that aid the physician or practitioner in the treatment of the patient.'' We also proposed to add the term ''therapeutic'' to the title of § 410.27 so that it would read, ''Therapeutic outpatient hospital or CAH services and supplies incident to a physician's or nonphysician practitioner's service: . . . ''

76 Fed. Reg. 230, 74369 (Nov. 30, 2011).

Here, Relator alleges that Defendants violated the FCA when it submitted claims for the delivery of external beam radiation therapy where a nonphysician practitioner was designated as the direct supervisor in violation of 42 C.F.R. § 410.27. (ECF No. 38.) However, prior to 2012, the Defendants could not have submitted false claims for allegedly failing to follow any of the conditions set forth in 42 C.F.R. § 410.27 because it only applied to services provided "incident to" a physician's services. These services did not include radiation therapy because it is listed as a separate Medicare Benefit. *See,* 42 U.S.C. § 1395x(s)(4). Given that direct supervision rules were not a condition of payment for radiation therapy services from 2010 through 2012, Defendants could not have submitted false claims to CMS for its alleged failure to follow those rules.

If Relator argues that it was unclear whether the conditions of payment as set forth in 42 C.F.R. § 410.27 applied to radiation therapy from 2010 through December 31, 2012, she still cannot prevail as a matter of law because differences in interpretation growing out of a disputed legal question cannot give rise to a false claim under the FCA. *See Little v. Eni Petroleum Co., Inc*, 2009 WL 2424215, at *3 (W.D. Okla. 2009) (quoting *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 477-78 (9th Cir. 1996)); *U.S. ex rel. Ketroser v. Mayo Found.,* 729 F.3d 825, 832 (8th Cir. 2013) (A defendant's "reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud.") Thus, for the period of October 2010 through November 16, 2012, Relator cannot create a disputed issue of material fact that Defendants knowingly submitted false claims to CMS for its alleged

failure to comply with payment conditions for "incident to" hospital outpatient services under 42 C.F.R. § 410.27.[3]

### C. There is No Evidence to Support Relator's Allegations that Defendants Routinely and Knowingly Submitted False Claims When Billing Medicare for Radiation Oncology Services with Respect to the "Other Billing Issues" Alleged in the First Amended Complaint.

The second part of Relator's First Amended Complaint alleges that Defendants "routinely submitted false claims" by billing CMS for Intensity Modulated Radiation Therapy ("IMRT") without the appropriate documentation to support medical necessity, upcoding simulations to the highest level of complexity even though such complexity was not supported by the medical record, billing for simulations when the documentation was not robust, inappropriately billing both professional and technical components of Image Guided Radiation Therapy ("IGRT"), submitting claims for treatment management without documentation showing the face to face visit with the radiation oncologist required for billing this service, and billing for special physics

---

[3] Relator acknowledges and, therefore, concedes that the supervision rules set forth in 42 C.F.R. 410.27 do not apply to SRM from the time period January 1, 2011 through December 31, 2012. She alleges that SRM is a 25 bed hospital. (ECF No. 38, ¶ 7.) She then alleges, in March 2010, in response to staffing concerns raised by certain small rural hospitals, CMS instructed its Medicare contractors not to enforce the physician supervision requirements for outpatient therapeutic services provided by designated Critical Access Hospitals ("CAHs") during the calendar year 2010, stating that CMS would revisit the supervision policy in the 2011 rulemaking process. (*Id.* ¶ 13.) CMS subsequently extended this non-enforcement instruction for calendar years 2011 and 2012. In addition, CMS expended the instruction for calendar years 2011 and 2012 to include "small rural hospitals" which CMS defined as hospitals with 100 or fewer beds that are geographically located in rural area or that are paid under the hospital outpatient prospective payment system with a rural wage index. (ECF No. 38, ¶ 13.) The parties have agreed that the relevant time period for the allegations asserted in the Complaint are October 1, 2010 through November 16, 2012, the day Relator filed her Complaint under seal.

consultations when there was no physician request, and for special treatment procedures when the requirements for billing such procedures were not met. (ECF No. 38, ¶¶ 39, 42, 43, 44, 49, 50, 53, 57, and 60.)

After listing the alleged errors, Relator alleges, "[t]he above examples are illustrative of different ways in which Defendants have routinely submitted improper claims for payment." (*Id.* ¶ 64.) "Each claim for payment submitted for the services described above constitutes a false claim." (*Id.* ¶ 65.) To support these allegations, Relator cites no statute or regulation that Defendants allegedly violated, rather she appears to allege that these claims are contrary to billing guidance set forth in a Local Coverage Determination published by Trailblazer Enterprises, LLC, the Medicare contractor for the state of Colorado at the time relevant to the allegations set forth in the First Amended Complaint. (*Id.* ¶ 39.)

Relator also alleges that Banner submitted annual cost reports to CMS, certifying that that the health care services identified therein were provided in compliance with Medicare laws and regulations and these certifications were false as such services were not provided in compliance with applicable laws and regulations. (*Id.* ¶ 66.) She adds that,

> part of the annual cost report process involves a settlement of amounts either owed by CMS to the hospital, or vice versa, relating to the cost report year. To the extent that health care services, for which Banner has been previously reimbursed during the cost report year, were not provided in compliance with Medicare laws and regulations, Banner was required to reflect such fact in its annual cost report as part of the settlement process with CMS, thus decreasing the amount it was due from CMS or increasing the amount it was required to repay CMS. Banner failed to do so, and thus improperly retained funds it was required to repay to CMS.

(*Id.* ¶ 67.) Consequently, Relator alleges that Defendants thereby "violated the Federal False Claims Act . . . ." (*Id.* ¶ 70.)

1. *Relator Cannot Assert an Express Legally False Claim.*

Tenth Circuit case law prohibits Relator from asserting that Banner submitted an express false certification to CMS by virtue of filing annual cost reports on behalf of NCMC, MMC and SRM to CMS and within these cost reports, making the following certification:

> I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [Provider's Name(s) and Number(s) for the cost reporting period beginning___ and ending___ and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

*Conner,* 543 F.3d 211, 1220-122*.* In *Conner*, the relator alleged that the certification language stated above explicitly conditions Medicare payments on compliance with all applicable Medicare statutes and regulations. *Id.* at 1218. After examining how medical providers submit claims for Medicare payment, the Tenth Circuit noted that: "although this certification represents compliance with underlying laws and regulations, it contains only general sweeping language and does not contain language stating that payment is conditioned on perfect compliance with any particular law or regulation." *Id.* at 1219. Nor does any underlying Medicare statute or regulation provide that payment is so conditioned. *Id.* Therefore, *Conner* squarely rejected the argument that a certification on an annual cost report could form the basis of an express false certification theory.

*Id.* at 1220.

2. *Relator's Claims Fail Under a Theory of Implied False Certification Because The Record Is Void of Any Evidence Demonstrating the Requisite Scienter to Prevail Under the FCA.*

Because Relator cannot proceed on a theory of express false certification, Defendants assume she is proceeding under a theory of implied false certification. As described above, under an implied false certification theory, courts do not look to the contractor's actual statements; rather, the analysis focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment. *Conner*, 543 F.3d at 1218 (10th Cir. 2008). Claims of implied false certification arise only under 31 U.S.C. 3729(a)(1)(A). *Deming Hosp. Corp.* 992 F. Supp. 2d at1146; *U.S. ex rel. Lemmon*, 614 F.3d at 1168; *Shaw*, 213 F.3d at 531-32.

Here, the Relator appears to rely exclusively on guidance provided in a LCD published by Trailblazer and relating to IMRT to allege that Defendants "routinely submitted false claims." (*See* ECF No. 38, ¶ 39.)

As an initial matter, it is not clear that alleged violation of billing guidance set forth in a LCD can be the grounds for a false claim. The Ninth Circuit of the United States Court of Appeals has recognized that LCDs are not binding on Administrative Law Judges or the federal courts. *Erringer v. Thompson*, 371 F.3d 625, 631 n.10 (9th Cir. 2004). The Court has supported this finding. In *Willowood of Great Barrington, Inc. v. Sebelius*, the United States District Court of Massachusetts declared:

> These local coverage determinations are "administrative and educational tools" that are published by contractors "to provide guidance to the public and the

> medical community within their jurisdictions" as to the "clinical circumstances" under which "a service is considered to be reasonable and necessary," but LCDs are not binding during the administrative process or before this court [internal citations omitted].

638 F. Supp. 2d 98, 106 (D. Mass. 2009), citing 42 C.F.R. § 405.1062(a) (citations to record omitted.) At least one other Court has examined this analysis and expressed doubt regarding whether a LCD issued by a CMS contractor can serve as the basis for a FCA violation especially where the relator does not cite to a statute or regulation that conditions payment of a Medicare claim on compliance with any LCD. *McMullen v. Ascension Health*, 3-12-0501, 2013 WL 6073549, at *2 n.3 (M.D. Tenn. Nov. 18, 2013). *But See U.S. v. Space Coast Medical Associates, L.L.P*., 2015 WL 1456122, *7 n.13 (M.D. Fl. Feb. 6, 2015) (unpublished)(holding that the LCD requirements focus on billing and coding, so a violation of the determination could be an implied false certification of a payment condition).

The Court, however, need not decide if the LCD relied upon by the Relator could be the basis of an implied false certification of a payment condition to find that Relator cannot prevail on her claims as a matter of law because she has no evidence that Defendants acted with the requisite knowledge to subject themselves to FCA liability for Relator's allegations of "other billing issues."

Regardless of what theory of falsity Relator relies upon, Relator cannot establish that Defendants had actual knowledge or acted in deliberate ignorance or in reckless disregard of the truth or falsity of the information.[4] While Relator attempts to blur the line

[4] It is Defendants' position that if a LCD forms a basis for a potential FCA claim, the only theory of liability a relator can proceed on is an implied false certification theory. *See*

between an error and an actionable FCA violation by ignoring the requisite knowledge element, the FCA is absolutely clear that one must first act “knowingly” in order to be potentially subjected to FCA liability. 31 U.S.C. § 3729(a). Yet here, Relator has no evidence that Defendants acted with the requisite knowledge to subject themselves to FCA liability for Relator’s allegations of “other billing issues” (ECF No. 38, ¶¶ 38-64.)

Not only is the FCA clear that “knowledge” is essential to any FCA claim, courts have affirmed that merely listing alleged errors in documentation for claims falls far short of meeting the threshold knowledge requirement under the FCA. Even if Relator had evidence to support allegations of technical billing errors, this does not support an FCA claim. Simple negligence does not violate the FCA. *See. e.g.*, *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 949-51 (10th Cir. 2008). Violation of a regulatory provision, in the absence of a knowingly false or misleading representation, does not amount to fraud. *U.S. ex rel. Trim v. McKean*, 31 F.Supp.2 1308 (W.D. Okla. 1998). Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. *Id.* (*citing United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir.1996)). Falsity under the FCA “does not mean ‘scientifically untrue’; it means ‘a lie.’” *US. ex rel. Morton v. A Plus Benefits, Inc.,* 139 F.App'x 980, 982-84 (10th Cir. 2005) (Internal citations omitted); *U.S. ex rel. Quirk v. Madonna Towers*, Inc., 278 F.3d 765, 767 (8th Cir. 2002) (internal quotations omitted) (“[i]nnocent mistakes and negligence are not offenses under the [FCA] ... In short, the claim must be a lie.”); *U.S. v. Kaman Precision*

---

*Space Coast Medical Associates, L.L.P*., 2015 WL 1456122, at *7 n.13. However, even if the Relator alleges she is proceeding upon a factual false theory or an expressly false certification theory, the analysis regarding lack of evidence of the requisite scienter found herein applies to all theories of liability.

*Products, Inc.,* 2011 WL 3841569, at *4 (M.D.Fla. Aug. 20, 2011) (The "knowingly" element of the False Claims Act was not meant to punish honest mistakes or incorrect claims submitted through mere negligence; it was meant to reach the situation where an individual has "buried his head in the sand" and failed to make basic inquiries which would alert him that false claims are being submitted.)

Here, the record is bereft of any evidence that Defendants knowingly submitted false claims to CMS with respect to these "other billing issues" or that they acted in reckless disregard or in deliberate ignorance to the truth or falsity of claims submitted to CMS. There is no deposition testimony relevant to the issue of scienter or intent with respect to the allegations raised with respect to "other billing issues". There are no interrogatories or requests for admission relevant to the issue of scienter or intent. There is no evidence that Defendants knowingly ignored statutory criteria or, even, guidance set forth in the cited LCD. There is no evidence that Defendants acted in deliberate ignorance as to the truth or falsity of these claims. There is no evidence that Defendants acted in reckless disregard as to the falsity of these claims. In short, Relator failed to create any record whatsoever with respect to the element of scienter that would support allegations described as "other billing issues."

Consequently, without any evidence of the requisite intent needed for a colorable FCA allegation, Relator cannot prove that the "Other Billing Issues" under Paragraphs 38-64 of Relator's First Amended Complaint are false claims. Her claims fail as a matter of law.

## IV. Conclusion

For the foregoing reasons, the Defendants respectfully request that the Court issue a ruling as a matter of law based on undisputed facts: (1) the Defendants could not have submitted false claims to CMS for external beam radiation therapy when a nonphysician practitioner was acting as the direct supervisor of the delivery of treatment from October 2010 through January 1, 2012 because during that period of time, the direct supervision rules articulated in 42 C.F.R. § 410.27 did not apply to radiation oncology; and (2) the allegations that Relator has made under the subheading "Other Billing Issues" in her First Amended Complaint fail as a matter of law because Relator has no evidence that the alleged "false claims" were submitted knowingly, in deliberate ignorance of the truth or falsity of the information, or in reckless disregard of the truth or falsity of the information.

Respectfully submitted this 21st day of August, 2015.

CAPLAN AND EARNEST LLC

*s/ Meghan E. Pound*

Linda L. Siderius, #12931
Meghan E. Pound, #33915
Gregory S. Lindquist, #42780
1800 Broadway, Suite 200
Boulder, CO 80302
Phone: 303-443-8010
Facsimile: 303-440-3967
Email: lsiderius@celaw.com
lsiderius@celaw.com
mpound@celaw.com
glindquist@celaw.com
Attorneys for Defendants

CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Marcy E. Cook
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202

G. Mark Simpson, Esq.
Simpson Law Firm, LLC
110 Habersham Drive, suite 108
Fayetteville, GA 30214

Jamie M. Bennett, Esq.
The J Bennett Law Firm
8 Creek Side Court
Middle River, Md. 21220

Andrew M. Stone, Esq.
Stone Law Firm, LLC
437 Grant Street
Suite 1806
Pittsburgh, PA 15219

*s/ Rhonda L. Bender*
Rhonda L. Bender, Paralegal