UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | | |
|---|---|---|
| UNITED STATES ex rel. MARTHA L. BAKER, | ) | Civil Action No. 12-CV-3029-WJM-CBS |
| Plaintiff-Relator, | ) | |
| v. | ) | |
| BANNER HEALTH and BANNER MEDICAL GROUP COLORADO, | ) | |
| Defendants. | ) | |

**RELATOR'S RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

As discussed below, Defendants' motion for partial summary judgment is based on the supposed idea that the law regarding physician supervision fundamentally changed on January 1, 2012, when CMS amended 42 C.F.R. § 410.27 to formally define, in the regulation itself, the phrase "therapeutic hospital or CAH services and supplies furnished incident to a physician's or nonphysician practitioner's service." According to Defendants' new argument, because radiation therapy is described in a separate Medicare benefit category, outpatient hospital radiation therapy services were not furnished "incident to" the services of a physician, and thus were not subject to the requirements of § 410.27, until the 2012 amendments.[1]

[1] The Medicare statute "does not contain a comprehensive list of specific items or services eligible for Medicare coverage. Rather, it lists categories of items and services, and vests in the Secretary the authority to make determinations about which specific items and services within these categories can be covered under the Medicare program." 68 Fed. Reg. 55634, 55635. The statute defines the term "medical and other health services" to include various items or services, each of which is sometimes referred to as a "benefit category." *See* 42 U.S.C. § 1395x(s). One of these benefit categories includes "hospital services … incident to physicians' services rendered to outpatients." 42 U.S.C. § 1395x(s)(2)(B). Another benefit category includes "X-ray,

What Defendants somehow forgot to tell the Court, however, is that CMS made it unmistakably clear that this amendment did not **change** the law, but merely "clarified" what had **always** been the case – i.e., that **all** outpatient hospital therapeutic services are furnished "incident to" the services of a physician, and thus must comply with 42 C.F.R. § 410.27, even if they are also described in a separate benefit category. Indeed, in the very rule adopting the 2012 amendments, CMS clearly stated, in language impossible to miss, that:

> Thus, we have long maintained that **all hospital outpatient therapeutic services are, according to our policy, furnished "incident to" a physician's service even when described by benefit categories other than the specific "incident to" provision in section 1861(s)(2)(B) of the Act**. Because hospital outpatient therapeutic services are furnished "incident to" a physician's professional service, we believe the conditions for payment, including the direct supervision standard, should apply to all hospital outpatient therapeutic services.

76 Fed. Reg. 74122, 74369 (emphasis added); *see also id.* (describing amendment as a "clarification"). CMS expressly **rejected** the idea that § 410.27 did not previously apply to outpatient therapeutic services that were described in a separate benefit category, stating that "CMS has not interpreted the regulation so narrowly," and that "[w]e … clearly treated all nondiagnostic services that are furnished to hospital outpatients as 'incident to services.'" *Id.* It is incredibly misleading for Defendants to tell the Court that the 2012 amendments substantively changed the law on this issue, without mentioning that CMS (who issued the amendments in the first place) says the exact opposite.

---

radium, and radioactive isotope therapy, including materials and services of technicians." 42 U.S.C. § 1395x(s)(4). Thus, hospital outpatient radiation services that are furnished incident to a physician's service would be described by two different benefit categories. As CMS has noted, "[i]f an item or service can fit into more than one benefit category, we have the discretion to assign it to the most appropriate benefit category." 68 Fed. Reg. 55634, 55637.

Moreover, although they do not mention this in their brief, Defendants **themselves** never interpreted § 410.27 as not applying to outpatient radiation therapy services. Rather, along with everyone else in the industry, Defendants have always correctly interpreted § 410.27 as applying to all hospital outpatient therapeutic services, including radiation therapy services. Indeed, when analyzing the effect of an earlier amendment to § 410.27, Banner prepared a "white paper" entitled "Physician Direct Supervision under the HOPPS Regulations," which specifically noted that the regulation applied to "outpatient radiation therapy":

> In December 2008, CMS (Centers for Medicare and Medicaid Services) published the 2009 HOPPS regulations which included new rules or newly re-defined rules on "physician supervision" for outpatient therapeutic services, **including** outpatient chemotherapy and **outpatient radiation therapy**.

*See* Exhibit 19 (emphasis added); *see also* Fritz Dep., p. 27-30 (Exhibit 25). Thus, Defendants' current "argument" – which they did not take seriously enough to pursue in their opposition to Relator's summary judgment motion, or in their motion for reconsideration[2] – does not reflect Banner's contemporaneous interpretation of the regulation, but is simply a *post hoc*, and erroneous, invention of their lawyers for purposes of this litigation.[3]

[2] Defendants hinted at this argument in passing in a footnote to their summary judgment response, stating that "While not relevant to responding to Relator's motion, Defendants note that radiation therapy has a coverage category separate from 'incident to' and Defendants do not concede that 42 C.F.R. § 410.27 applied to radiation therapy prior to 2012." Doc. 52, p. 14 fn. 5. Defendants did not mention this issue at all in their motion for reconsideration. Doc. 60.

[3] Defendants also seek summary judgment with respect to the non-supervision claims identified in Relator's complaint as "Other Billing Issues." Defendants do not deny that they submitted such false claims, and do not contest the evidence on this point, but simply argue that they did not act "knowingly" with respect to such non-supervision claims. Particularly in light of the Court's grant of partial summary judgment to Relator on the supervision claim, and the strength of the evidence that Defendants acted knowingly with respect to such claim, and in an effort to streamline the case for trial, Relator is withdrawing the "Other Billing Issues" claims, and will proceed to trial on the supervision claims for which the evidence is strongest. *See, e.g., Jones v.*

**RESPONSE TO MOVANT'S MATERIAL FACTS**

1. Admitted, but completely immaterial that Banner is a "non-profit organization," since even non-profit organizations must comply with the law. Moreover, although it may not distribute profits to shareholders, Banner is one of the largest health care organizations in the country, and generates substantial profits. According to financial reports accessible on its website, www.bannerhealth.com, Banner had more than $5 billion in revenues in 2014, with more than $263 million in operating income (revenues less expenses). *See* Exhibit 1.

2. The first sentence is admitted. The second sentence is denied, as Banner provides radiation therapy at numerous other facilities. *See* Exhibit 2.

3. Admitted.

4. Admitted, but immaterial that BMCG is a "non-profit organization."

5. Admitted, but immaterial.

6. Denied, in that Julianne Fritz, the sole source for this paragraph, provides no basis for claiming to know the "intent" behind someone else's donation. Also completely immaterial, since Banner is not exempt from compliance with the law simply because it accepts millions of dollars in donations from private individuals.

7. Admitted.

8. Admitted, but immaterial.

---

*Barnes*, 463 U.S. 745, 751 (1983) (noting the "importance of winnowing out weaker arguments" and "focusing on one central issue if possible"); *Beden-El v. Prelesnik*, 1991 U.S. App. LEXIS 29478, *17 (6th Cir. Dec. 6, 1991) ("Experienced advocates 'winnow out' the weaker arguments and focus on a few key issues in order to prevent dilution of their stronger claims.").

9. Admitted that CMS routinely issues final rules under the hospital outpatient prospective payment system ("HOPPS"), although the only citation provided for this statement does not describe the frequency of such rules. Admitted that CMS sometimes amends applicable regulations, although these amendments are often for the purpose of clarifying established policy, rather than changing such policy.

10. Admitted.

11. Admitted that "incident to" services include hospital outpatient services, such as radiation therapy services. *See, e.g.*, 65 Fed. Reg. 18434, 18444 ("We proposed to designate the following services to be paid under the hospital outpatient OPPS: All hospital outpatient services … including radiation therapy") (Exhibit 4). As discussed below, CMS has always required that **all** hospital outpatient therapeutic services must be furnished incident to the services of a physician or nonphysician practitioner, and thus subject to 42 C.F.R. 410.27, regardless of whether they are also described in a separate benefit category.

12. Denied that "radiation therapy" is "described" in 42 U.S.C. § 1395x(s)(4), or that "the" corresponding regulation is set forth in 42 C.F.R. § 410.35. The statutes and regulations speak for themselves, and CMS has always made clear that all hospital outpatient therapeutic services are provided "incident to" the service of a physician or nonphysician practitioner, and thus are subject to 42 C.F.R. § 410.27, even if they are described in a separate benefit category.

13. Admitted that 42 C.F.R. § 410.27 was amended in 2000, but denied that this amendment "added" a requirement of physician supervision that did not previously exist. *See, e.g.*, 73 Fed. Reg. 68502, 68703 ("The expectation that a physician would always be nearby predates the OPPS and is related to the statutory authority for payment of hospital outpatient

services—that Medicare makes payment for hospital outpatient services 'incident to' the services of physicians in the treatment of patients.").

14. Admitted that the quoted language appears in the cited document, although it is not a complete statement. *See* Response to Statement No. 13, above.

15. Denied that **hospitals** were "entitled" to "assume" that there was "appropriate" supervision for services furnished on campus; to the contrary, it is **CMS** that assumed that hospitals had physicians present on the campus to provide required supervision. Denied that there were "no requirements relating to the qualifications of the supervising physician." *See* Response to Statement No. 13, above. The regulations speak for themselves.

16. Admitted that CMS published a final rule on November 18, 2008, with an effective date of January 1, 2009, the terms of which speak for themselves. 73 Fed. Reg. 68502.

17. Admitted that CMS published a final rule on November 20, 2009, with an effective date of January 1, 2010, the terms of which speak for themselves. 74 Fed. Reg. 60316. Admitted that the quoted language appears in the rule (although Defendants have omitted language without using an ellipsis).

18. Admitted that, on November 30, 2011, CMS published a final rule with an effective date of January 1, 2012, the terms of which speak for themselves. *See* 76 Fed. Reg. 74122. Denied that Defendants have correctly quoted the language of 42 C.F.R. § 410.27(a)(1)(iv) as set forth in such rule. *See* 76 Fed. Reg. 74122, 74580; *see also* Doc. 67-6.

19. Admitted, although the actual cost reports would not contain blanks for the cost reporting period.

**RELATOR'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

**A. CMS has always required direct supervision of all outpatient therapeutic hospital services, regardless of whether they come within a separate benefit category.**

1. In 2000, the Centers for Medicare and Medicaid Services ("CMS") established the Hospital Outpatient Prospective Payment System ("HOPPS" or "OPPS"). *See* 65 Fed. Reg. 18434 (Exhibit 3).

2. Since the establishment of the HOPPS, radiation therapy services provided by hospitals to outpatients have constituted hospital outpatient services that are paid under the HOPPS. *See id.* at 18444 ("We proposed to designate the following services to be paid under the hospital outpatient OPPS: All hospital outpatient services … including radiation therapy"); *id.* at 18634 (identifying CPT codes for radiation therapy services payable under HOPPS); 74 Fed. Reg. 60316, 60416, 60826 (2010 final rule noting HOPPS payment for radiation therapy services) (Exhibit 6); Scheduling Order, Doc. 46, p. 13 (stipulation no. 9).

3. In the final rule establishing the HOPPS, CMS noted that "we require that hospital services and supplies furnished to outpatients that are incident to physician services be furnished on a physician's order by hospital personnel and under a physician's supervision (Intermediary Manual, section 3112.4(A))." 65 Fed. Reg. 18434, 18525 (emphasis added) (Exhibit 3).

4. On September 26, 2003, CMS issued a final rule on the Medicare program, and stated that "[i]f an item or service can fit into more than one benefit category, we have the discretion to assign it to the most appropriate benefit category." 68 Fed. Reg. 55634, 55637 (Exhibit 4).

5. On July 20, 2009, CMS issued a proposed rule for the HOPPS. In issuing this proposed rule, CMS stated as follows:

> [W]e have stated in section 20 of chapter 6 of the Medicare Benefit Policy Manual (Pub. 100-2) that **hospitals provide two distinct types of services to outpatients: services that are diagnostic in nature, and other services that aid the physician in the treatment of the patient**. We further defined these therapeutic services and supplies in section 20.5.1 of the Medicare Benefit Policy Manual, stating "**therapeutic services and supplies which hospitals provide on an outpatient basis are those services and supplies (including the use of hospital facilities) which are incident to the services of physicians in the treatment of patients**." We also provide in section 20.5.1 that services and supplies **must be furnished on a physician's order and delivered under physician supervision**.

74 Fed. Reg. 35232, 35363 (Exhibit 5); *see also* Exhibit 28, p. 7-8.

6. On November 20, 2009, CMS issued a final rule for the HOPPS. 74 Fed. Reg. 60316 (Exhibit 6). In issuing the final rule, CMS reiterated that **all** hospital outpatient therapeutic services are furnished "incident to" the services of a physician, stating that:

> the **only statutory basis for payment of hospital outpatient therapeutic services is incident to the services of a physician**, meaning the services are ordered by the physician or qualified practitioner and furnished as an integral though incidental part of his or her services. It follows, then, that a qualified physician or nonphysician practitioner would supervise the provision of those services to ensure the service or procedure is being furnished appropriately.

*Id.* at 60582 (emphasis added).

7. In issuing the final rule, CMS made it clear that **all** hospital outpatient services, except diagnostic services, must be furnished "incident to" the services of a physician, or else Medicare does not pay for such services:

> *Comment:* Several commenters requested additional guidance as to what CMS considers hospital outpatient "incident to" services….
>
> *Response:* As previously stated in this discussion, § 410.27(a)(1)(ii) of the regulations states that Medicare Part B pays for hospital services and supplies furnished incident to a physician service to outpatients if they are provided "as an integral though incidental part of a physician's services." In addition, we have stated in Section 20 of Chapter 6 of the Medicare Benefit Policy Manual that **hospitals provide two distinct types of services to outpatients: services that are diagnostic in nature and other services that aid the physician in the treatment of the**

> **patient**. We further defined these therapeutic services and supplies in Section 20.5.1 of Chapter 6 of the Medicare Benefit Policy Manual, stating "therapeutic services and supplies which hospitals provide on an outpatient basis are those services and supplies (including the use of hospital facilities) which are incident to the services of physicians in the treatment of patients." In essence, **all hospital outpatient services that are not diagnostic are services that aid the physician in the treatment of the patient, and are called therapeutic services. These are the services for which Medicare makes a hospital facility payment only when they are provided "incident to" the services of a physician.**
> …
> Medicare makes payment for hospital outpatient therapeutic services **only when provided "incident to" the services of a physician**.

*Id*. at 60584-585, 60586 (emphasis added).

8. On November 24, 2010, CMS issued a final rule for the HOPPS, stating that

> As set forth in the CY 2000 OPPS final rule with comment period establishing the hospital outpatient prospective payment system, **direct supervision is the current standard for supervision of hospital outpatient therapeutic services** covered and paid by Medicare in hospitals and provider-based departments (PBDs) of hospitals.

75 Fed. Reg. 71800, 71999 (emphasis added) (Exhibit 7); *see also* Exhibit 29, p. 13 ("Direct supervision is the minimum standard for supervision of all Medicare hospital outpatient services.").

9. CMS further stated that "[w]e are maintaining our default requirement for direct supervision of **all** outpatient therapeutic services." 75 Fed. Reg. 71800, 72117 (emphasis added).

10. CMS went on to specifically emphasize that the direct supervision requirement applied to "radiation oncology services":

> *Comment*: During the past year, we were often questioned about clinical requirements for practitioners supervising extremely specialized services, notably **radiation oncology services**. One commenter requested that CMS consider the direct supervision requirement to be met for diagnostic or therapeutic radiation oncology services if a non-specialist practitioner who can handle an emergency provides the direct supervision and also has access by phone or other telemedicine link to a specialist who is able to change the plan of care should the need arise. One

> commenter asserted that one does not have to posses the clinical skills to fully provide a service in order to be an effective supervisor.
>
> *Response*: As we have stated in the Medicare Benefit Policy Manual (Pub. No. 100-02), Chapter 6, Section 20.5.24, "the supervisory physician or nonphysician practitioner must have, within his or her State scope of practice and hospital-granted privileges, the knowledge, skills, ability, and privileges to perform the service or procedure. Specially trained ancillary staff and technicians are the primary operators of some specialized diagnostic or therapeutic equipment, and while in such cases CMS does not expect the supervisory practitioner to operate this equipment instead of a technician, CMS does expect the physician or nonphysician practitioner that supervises the provision of the service must be knowledgeable about the test and clinically appropriate to furnish the test. The supervisory responsibility is more than the capacity to respond to an emergency, and includes furnishing assistance and direction throughout the performance of a procedure and, as appropriate to the supervisory physician or nonphysician practitioner and the patient, to change a procedure or the course of care for a particular patient.

*Id*. at 72012 (emphasis added).

11. On July 18, 2011, CMS issued a proposed rule under the HOPPS. In issuing the proposed rule, CMS stated as follows:

> In the CY 2000 OPPS final rule with comment period, CMS established the hospital OPPS and indicated that direct supervision is the standard for **all hospital outpatient therapeutic services** covered and paid by Medicare in hospitals and in provider-based departments (PBDs) of hospitals….
>
> …
>
> In the CY 2000 OPPS final rule with comment period (65 FR 18524 through 18526), **we adopted physician supervision policies as a condition of payment under the OPPS** to ensure that Medicare pays for high quality hospital outpatient services that are furnished in a safe and effective manner and consistent with Medicare requirements. **The agency has long divided hospital outpatient services into the two categories of "diagnostic" services and other "therapeutic" services that aid the physician in the treatment of patients** (Section 3112 of the Medicare Part A Intermediary Manual (July 1987)). **Thus, we considered all nondiagnostic services to be "therapeutic services" which would include, but not be limited to, the services listed under section 1861(s)(2)(B) of the Act as incident to the services of physicians**. As early as 1985, the agency defined therapeutic services as those services and supplies (including the use of hospital facilities) which are incident to the services of physicians in the treatment of patients (Section 3112.4 of the Medicare Part A Intermediary Manual (May 1985)). **In recognition of this historic classification of services, we established a direct supervision standard for**

> **outpatient therapeutic services under our regulation at § 410.27**, which establishes the conditions for payment for outpatient hospital services provided "incident to" physicians' services…. **Since 2000, we have maintained the classification of services as either diagnostic or therapeutic** in our manual guidance that establishes the conditions of payment for hospital outpatient services under the OPPS (Sections 20.4 and 20.5, Chapter 6 of the Medicare Benefit Policy Manual (Pub. 100-02)). In the requirements for therapeutic services, in addition to the direct supervision standard, we applied the requirements of §§ 410.27(a)(1)(i) and (a)(1)(iii) regarding under arrangement and provider-based site of service **to all outpatient therapeutic services that are paid under the OPPS** (Section 20.5, Chapter 6 of the Medicare Benefit Policy Manual (Pub. 100-02)).

76 Fed. Reg. 42170, 42277-42278 (emphasis added) (Exhibit 8).

12. In the proposed rule, CMS went on to note that it has always applied the requirements of 42 C.F.R. § 410.27 to **all** hospital outpatient therapeutic services, even if they are also described in a separate benefit category:

> 2. Conditions of Payment and Hospital Outpatient Therapeutic Services Described by Different Benefit Categories
>
> Another issue that has been raised to us is the applicability of the payment conditions for hospital outpatient therapeutic services in § 410.27 to services described in paragraphs or subparagraphs of section 1861(s) of the Act other than section 1861(s)(2)(B) of the Act, which describes outpatient hospital services incident to physicians' services. Over the years, and particularly in recent months, we have received inquiries asking that we explain or clarify our application of the payment conditions under our regulation at § 410.27, which explicitly applies to "hospital services and supplies furnished incident to a physician service to outpatients," to outpatient therapeutic services other than those specified under section 1861(s)(2)(B) of the Act. For example, we have received inquiries as to whether it is permissible for hospitals to furnish radiation therapy (described under section 1861(s)(4) of the Act) or ambulatory surgical center services (described under section 1832(a)(2)(F)(i) of the Act) under arrangement in locations that are not provider-based. **Some have suggested that the language in § 410.27 is not applicable to services described by benefit categories in section 1861(s) of the Act other than section 1861(s)(2)(B) of the Act because § 410.27 only refers to "incident to" services**.
>
> Although we acknowledge the language of § 410.27 could be read as limited to services and supplies described under section 1861(s)(2)(B) of the Act, hospital services incident to physicians' services furnished to outpatients, **we have not interpreted the regulation so narrowly**. For instance, in the CY 2010 OPPS/ASC final rule with comment period,

> we noted that, long before the OPPS, we required that hospital services and supplies furnished to outpatients incident to a physician's service must be furnished "on a physician's order by hospital personnel and under a physician's supervision" (section 3112.4 of the Medicare Intermediary Manual). **We also clearly treated all nondiagnostic services that are furnished to hospital outpatients as "incident to services"** (sections 3112 and 3112.4 of the Medicare Intermediary Manual; Section 20.5, Chapter 6, of the Medicare Benefit Policy Manual (Pub. 100-02)). While we have not delineated this position as clearly in the regulations, and while the regulation text of § 410.27 only explicitly refers to "incident to" services, **we note that our policy is longstanding and, in fact, predates the OPPS**. In longstanding manual guidance, we have expressed our view that **direct supervision is required for hospital outpatient therapeutic services**, and suggested that this requirement stems from the "incident to" nature of those services. In the CY 2010 OPPS/ASC final rule with comment period, we stated, "Therapeutic services and supplies which hospitals provide on an outpatient basis are those services and supplies (including the use of hospital facilities) which are incident to the services of physicians and practitioners in the treatment of patients" (74 FR 60584 through 60585). We indicated that outpatient therapeutic services and supplies must be furnished under the order of a physician or other appropriate nonphysician practitioner, and by hospital personnel under the direct supervision of a physician or appropriate nonphysician practitioner.
>
> **Thus, we have long maintained that all hospital outpatient therapeutic services are, in some sense, furnished "incident to" a physician's service even when described by benefit categories other than the specific "incident to" provision in section 1861(s)(2)(B) of the Act.** Because hospital outpatient therapeutic services are furnished "incident to" a physician's professional service, we believe the conditions for payment, including the direct supervision standard, should apply to all of these services.

76 Fed. Reg. 42170, 42282 (emphasis added) (Exhibit 8).

13. CMS went on to state that "[w]e believe it is important that we **continue** to apply the requirements in § 410.27 to **all** hospital outpatient therapeutic services and supplies that are paid under the OPPS," and that "we are proposing to amend our regulations to **clarify** our policy." *Id.* at 42284 (emphasis added).

14. CMS stated that "[w]e believe that this **clarification** could most readily be accomplished by more specifically defining the services and supplies described in the regulation text to which the requirements at § 410.27 apply." *Id.* at 42284 (emphasis added). CMS

proposed to amend the language of 42 C.F.R. § 410.27 by defining the phrase "therapeutic hospital or CAH services and supplies furnished incident to a physician's or nonphysician practitioner's service," and stated that:

> We are proposing to define these services, **similar to the way they are currently defined** in Section 20.5, Chapter 6, of the Medicare Benefit Policy Manual, to mean "all services and supplies furnished to hospital or CAH outpatients that are not diagnostic services and that aid the physician or practitioner in the treatment of the patient."

*Id.* (emphasis added); *see also* Exhibit 28, p. 7; Exhibit 29, p. 10-11.

15. On November 30, 2011, CMS issued a final rule under the HOPPS, amending the language of 42 C.F.R. § 410.27 as described in the July 18, 2011 proposed rule. In issuing the final rule, CMS stated as follows:

> 2. Conditions of Payment and Hospital Outpatient Therapeutic Services Described by Different Benefit Categories
>
> Another issue that we addressed in the CY 2012 OPPS/ASC proposed rule (76 FR 42277 through 42285) is the applicability of the payment conditions for hospital outpatient therapeutic services in § 410.27 to services described in paragraphs or subparagraphs of section 1861(s) of the Act other than section 1861(s)(2)(B) of the Act, which describes outpatient hospital services incident to physicians' services. Over the years, and particularly in recent months, we have received inquiries asking that we explain or clarify our application of the payment conditions under our regulation at § 410.27, which explicitly applies to "hospital services and supplies furnished incident to a physician service to outpatients," to outpatient therapeutic services other than those specified under section 1861(s)(2)(B) of the Act. For example, we have received inquiries as to whether it is permissible for hospitals to furnish radiation therapy (described under section 1861(s)(4) of the Act) or ambulatory surgical center services (described under section 1832(a)(2)(F)(i) of the Act) under arrangement in locations that are not provider-based. **Some inquirers have suggested that the language in § 410.27 is not applicable to services described by benefit categories in section 1861(s) of the Act other than section 1861(s)(2)(B) of the Act because § 410.27 only refers to "incident to" services**.
>
> In the proposed rule, we acknowledged that the language of § 410.27 could be read as limited to services and supplies described under section 1861(s)(2)(B) of the Act, hospital services incident to physicians' services furnished to outpatients. **However, we noted that CMS has not interpreted the regulation so narrowly**. For instance, in the CY

2010 OPPS/ASC final rule with comment period, we noted that, long before the OPPS, **we required that hospital services and supplies furnished to outpatients incident to a physician's service must be furnished "on a physician's order by hospital personnel and under a physician's supervision"** (section 3112.4 of the Medicare Intermediary Manual). **We also clearly treated all nondiagnostic services that are furnished to hospital outpatients as "incident to services"** (sections 3112 and 3112.4 of the Medicare Intermediary Manual; Section 20.5, Chapter 6, of the Medicare Benefit Policy Manual (Pub. 100-02)). While we have not delineated this position as clearly in the regulations, and while the regulation text of § 410.27 only explicitly refers to "incident to" services, we noted that **our policy is longstanding and, in fact, predates the OPPS**. In longstanding manual guidance, we have expressed our view that direct supervision is required for hospital outpatient therapeutic services, and suggested that this requirement stems from the "incident to" nature of those services. In the CY 2010 OPPS/ASC final rule with comment period, we stated, "Therapeutic services and supplies which hospitals provide on an outpatient basis are those services and supplies (including the use of hospital facilities) which are incident to the services of physicians and practitioners in the treatment of patients" (74 FR 60584 through 60585). We indicated that outpatient therapeutic services and supplies must be furnished under the order of a physician or other appropriate NPP, and by hospital personnel under the direct supervision of a physician or appropriate NPP.

**Thus, we have long maintained that all hospital outpatient therapeutic services are, according to our policy, furnished "incident to" a physician''s service even when described by benefit categories other than the specific "incident to" provision in section 1861(s)(2)(B) of the Act**. Because hospital outpatient therapeutic services are furnished "incident to" a physician's professional service, we believe the conditions for payment, including the direct supervision standard, should apply to all hospital outpatient therapeutic services. As discussed above, because the statute includes specific requirements for physician supervision of PR, CR, and ICR, we believe that those statutory specifications take precedence over the agency's general requirements.

In the CY 2012 OPPS/ASC proposed rule, we proposed to amend our regulations to **clarify** our policy as follows. Therapeutic services and supplies described by benefit categories other than the hospital outpatient "incident to" services under section 1861(s)(2)(B) of the Act are subject to the conditions of payment in § 410.27 when they are furnished to hospital outpatients and paid under the OPPS or to CAHs under section 1834(g) of the Act.

We stated our belief that this **clarification** could most readily be accomplished by more specifically defining the services and supplies described in the regulation text to which the requirements at § 410.27 apply. Accordingly, we proposed to revise the description of the services and supplies addressed in § 410.27(a) by adding the term "therapeutic" so that paragraph (a) would read, "Medicare Part B pays for therapeutic hospital or CAH services and supplies furnished incident to a physician's or nonphysician practitioner's

> service" to outpatients. We proposed to define these services, **<u>similar to the way they are currently defined in Section 20.5, Chapter 6, of the Medicare Benefit Policy Manual</u>**, to mean "all services and supplies furnished to hospital outpatients that are not diagnostic services and that aid the physician or practitioner in the treatment of the patient." We also proposed to add the term "therapeutic" to the title of § 410.27 so that it would read, "Therapeutic outpatient hospital or CAH services and supplies incident to a physician's or nonphysician practitioner's service: Conditions."

76 Fed. Reg. 74122, 74369 (emphasis added) (Exhibit 9).

16. The Medicare Benefit Policy Manual has at all relevant times defined hospital outpatient therapeutic services and supplies as "those services and supplies (including the use of hospital facilities) which are incident to the services of physicians in the treatment of patients," and has required that such services be furnished under the direct supervision of a physician or other qualified practitioner. *See* Exhibit 28, p. 7-8; Exhibit 29, p. 10-13; Exhibit 30, p. 12-15.

**B. <u>Defendants themselves – along with everyone else in the industry – have always recognized that § 410.27 applied to radiation therapy services</u>.**

17. On July 17, 2009, Jan Johnson, Banner's regional compliance officer for the western region, including Colorado, sent an email to various individuals, with the subject line "RE: Physician Supervision Outpatient Hospital Therapeutic Services." In this email, Johnson stated that "If we have to provide specific physician supervision it will involve potentially recruiting and staffing issues at a fairly high expense." *See* Exhibit 11; *see also* Johnson Dep., p. 17, 27-28, 47 (Exhibit 26).

18. In November 2009, Banner received an article from the law firm Foley & Lardner, advising hospitals of changes to CMS's physician supervision requirements in 42 C.F.R. § 410.27. Foley & Lardner noted that, in prior guidance, "CMS stated that that a physician must provide direct supervision … for **<u>all outpatient therapeutic services</u>** billed to Medicare by the hospital." *See* Exhibit 12, p. 2 (emphasis added). Foley & Lardner also advised

that "in calendar year 2010, CMS will allow certain nonphysician practitioners (NPPs) … to provide direct supervision for all hospital outpatient therapeutic services **that they are authorized to perform personally** according to their state's scope of practice rules and hospital-granted privileges." *Id.* (emphasis added); *see also* Johnson Dep., p. 51-55 (Exhibit 26).

19. On January 14, 2010, Julianne Fritz, the Director of Oncology Services at Banner's North Colorado Medical Center ("NCMC"), sent an email to Jan Johnson and others, discussing "CMS interpretation of the 'direct physician supervision' standards for **therapeutic outpatient services**. This question is specifically related to interpretation for **radiation therapy**." *See* Exhibit 13, p. 1 (emphasis added); *see also* Fritz Dep., p. 59 (Exhibit 25).

20. This email attached an analysis from the Association of Community Cancer Centers ("ACCC"). In this analysis, ACCC noted that "Medicare Part B will pay for hospital outpatient diagnostic and **therapeutic services only when they are furnished under the appropriate level of physician supervision** specified by CMS." Exhibit 13, p. 1 (emphasis added). ACCC pointed out that the new regulations allowed nonphysician practitioners to supervise services "that they may **perform** themselves," and that such practitioners must have "the ability to **perform** the service or procedure." *Id.*, p. 2-3 (emphasis added).

21. Julianne Fritz testified that she had this document in mind when she prepared her June 2010 "white paper." Fritz Dep., p. 60 (Exhibit 25).

22. On January 29, 2010, Revenue Cycle, Inc., a compliance consultant specifically focused on radiation oncology services, sent Defendants a copy of the new CMS rule and commentary regarding supervision. Revenue Cycle highlighted portions of the CMS guidance stating that nonphysician practitioners could only supervise those services "that they may

perform themselves," and that the supervisor "must be prepared to step in and perform the service, not just to respond to an emergency," and must be able to "change a procedure or the course of treatment being provided to a particular patient." *See* Exhibit 14 (Bates No. BB-0006072, 6075, 6079, 6083); Johnson Dep., p. 126 (Exhibit 26).

23. On February 15, 2010, Jan Johnson sent an email to various individuals at Banner, attaching "slides from a seminar I called in to discuss the new regulations/requirements to have physician supervision for therapeutic services in the outpatient hospital setting." Johnson noted that "I have worked here with our Radiation Oncology Manager in crafting how we will provide this at our new Red/Onc center being built in Sterling." *See* Exhibit 15, p. 1.

24. The slides attached to Johnson's email, prepared by The Advisory Board Company, a healthcare compliance consultant, noted that "[i]f therapeutic services are furnished in the hospital or in an off-campus outpatient department of the hospital, the services must be under the direct supervision of a supervising physician or nonphysician practitioner." *Id.*, p. 15; *see also* https://www.advisory.com/about-us. With respect to supervision by nonphysician practitioners, the slides noted that "[s]upervisory authority limited to services that the NPP can **personally perform**," that the nonphysician practitioner "[m]ust be able to step in to **perform** service, if necessary," and that "[s]upervision should be 'commensurate with the complexity of the service.'" Exhibit 15, p. 5-6 (emphasis added).

25. The slides specifically raised the question, "In radiation oncology where there is only one radiation oncologist (common at rural facilities), can an advanced practice nurse provide supervision when the radiation oncologist is off campus (knowing the APN cannot 'prescribe' radiation oncology, only a rad onc can)?" *Id.*, p. 10.

26. The American Society for Radiation Oncology ("ASTRO") is the largest radiation oncology professional society in the country, with more than 10,500 members. *See* https://www.astro.org/About-ASTRO/Index.aspx; *see also* Expert Report of David C. Beyer, M.D., p. 2 (Exhibit 10) (noting that 95% of practicing radiation oncologists are members of ASTRO). Many Banner employees are members of ASTRO. *See, e.g.*, Ceilley Dep., p. 10 (Exhibit 23); Ehrman Dep., p. 27 (Exhibit 24).

27. In February 2010, ASTRO published a document titled "Medicare's Physician Supervision Requirements," noting that hospital outpatient radiation therapy services are furnished "incident to" the services of a physician and must be provided under direct supervision:

> Hospitals provide two distinct types of services to outpatients: services that are diagnostic in nature and other services that aid the physician in the treatment of a patient. Therapeutic services are those services and supplies (including the use of hospital facilities) which are "incident to" the services of physicians in the treatment of patients. **Such services include <u>radiation therapy</u>**, clinic services and emergency room services….
>
> Hospital outpatient therapeutic services furnished in a hospital and in on-campus provider based departments … **have a minimum requirement of direct supervision**….
>
> The supervising physician or non-physician practitioner must also be a person who is clinically appropriate to supervise the services or procedures. More specifically, the current CMS regulations (410.27(f)) state that the physician or non-physician practitioner must be available to furnish assistance and direction throughout the performance of the procedure. This means that the physician or nonphysician practitioner **must be prepared to step in and perform the service, not just respond to an emergency**. The supervising physician does not necessarily need to be of the same specialty as the procedure or service that is being performed or from the same department as the ordering physician. However, the supervisory physician or non-physician practitioner must have within his or her State scope of practice and hospital-granted privileges, t**he ability to perform the service or procedure**.

Exhibit 16, p. 3-4 (underlining in original; bold added).

28. In March 2010, Defendants received a document from Regulatory Compliance Support, discussing the new supervision requirements in § 410.27, which noted that "[a]s a condition of Medicare coverage, OPPS hospitals … must provide direct physician supervision for outpatient hospital services…. **Services provided on or after January 1 without the appropriate level of supervision must not be billed to Medicare**." *See* Exhibit 17, p. 4 (emphasis in original). This document went on to note that "common examples of outpatient therapeutic services" included "Radiation Oncology." *Id.*, p. 7.

29. This document went on to advise that "Nonphysician practitioners must only supervise therapeutic services that they may **personally furnish** in accordance with State law," that "supervision of certain complex or technical services should be limited to specialists with the appropriate expertise," and that "Radiation oncology services should be supervised by a radiation oncologist." *See* Exhibit 17, p. 5, 6, 12 (emphasis added).

30. Upon receiving this document, Pam Stieb, the CFO for Sterling Regional MedCenter ("SRMC"), told Jan Johnson, the regional compliance officer, that "I think this document helps to clarify the new Physician Supervision Requirements." *See* Exhibit 17, p. 1.

31. In her deposition, Jan Johnson testified that she agreed with the requirement that, under the new supervision rules, a nonphysician practitioner could only supervise those services that she could "personally perform." Johnson Dep., p. 80-82 (Exhibit 26).

32. On March 3, 2010, Jan Johnson sent an email to various individuals at Banner, stating as follows:

> Just wanted to update you on the status of the **Physician Supervision requirement for outpatient therapeutic services** performed in Banner Hospitals by way of a HCCA Web Conference I and my Compliance Colleagues attended this morning. The Web

> Conference was conducted by two attorneys from the firm David, Wright, Tremaine, LLP.
>
> According to the attorneys, there is no argument which can dissuade CMS from going forward and requiring physician (NPP) supervision of **<u>outpatient therapeutic services</u>** within Banner hospitals (therapeutic services performed in on-campus and off-campus departments). The attorneys also indicated there was no argument to prevent CMS from requiring the supervising physician (NPP) to be immediately available to **<u>take over a therapeutic service</u>**, and the requirement that a physician (NPP) be credentialed by our hospitals to **<u>perform</u>** the service should they need to **<u>step in and perform</u>**.

*See* Exhibit 11, p. 1 (emphasis added).

33. Defendants also received a June 11, 2010 notice from the American Association of Professional Coders ("AAPC"), the nation's largest healthcare training and credentialing organization, specifically advising hospitals that "[n]ot only must the supervisory physician be immediately available, he or she must be capable of **<u>performing</u>** the service or procedure." *See* Exhibit 18 (emphasis added); *see* https://www.aapc.com/.

34. On June 24, 2010, at the request of senior Banner management, Julianne Fritz, the Director of Radiation Oncology for NCMC, prepared a "white paper" titled "Physician Direct Supervision under the HOPPS Regulations," which discussed the 2009 amendments to 42 C.F.R. § 410.27 and their effect on Banner's radiation therapy facilities. *See* Exhibit 19, p. 2; *see also* Fritz Dep., p. 27-29 (Exhibit 25). In this "white paper," Fritz acknowledged that § 410.27 applied to radiation therapy services, stating as follows:

> In December 2008, CMS (Centers for Medicare and Medicaid Services) published the 2009 HOPPS regulations which included new rules or newly re-defined rules on "physician supervision" for **<u>outpatient therapeutic services, including</u>** outpatient chemotherapy and **<u>outpatient radiation therapy</u>**.

Exhibit 19, p. 2 (emphasis added).

35. Although Julianne Fritz was tasked with preparing the “white paper” setting forth Banner’s position regarding whether nurses could supervise radiation therapy services, Fritz testified in her deposition that “I do not make decisions about compliance.” Fritz Deposition, p. 11 (Exhibit 25); *see also id.*, p. 48 (“I’m certainly not a compliance officer.”).

36. Fritz is neither a compliance officer, a radiation oncologist, nor a nurse practitioner, but has a background in general nursing. *Id.*, p. 10, 16, 48. When asked why the “white paper” was not issued by Banner’s compliance department, Fritz testified that “I’m not really able to answer that.” *Id.*, p. 19. Fritz testified that Banner did not have a formal policy on supervision of radiation oncology by nurse practitioners. *Id.*, p. 21.

37. Jan Johnson testified that she relied on Julianne Fritz to “do the research and put together the position paper,” even though Fritz was not a lawyer and did not have prior experience interpreting regulations, and even though she was not aware of Fritz ever having prepared any other position statements for Banner. Johnson Dep., p. 88-90 (Exhibit 26). Johnson did not know why Fritz, rather than Banner’s compliance department, was given responsibility for preparing the position statement. *Id.* at 90.

38. In April 2011, Defendants hired a consultant, Revenue Cycle, to perform a compliance audit. Revenue Cycle performed a site visit on April 18-21, 2011, and issued a written report to Defendants in April 2011, stating that:

> It is apparent the facility is knowledgeable of the requirement for direct supervision; however, the provision of this supervision by non-physician practitioners is the area of concern. While this is appropriate in medical oncology and many other outpatient departments, this is not considered appropriate for the Radiation Oncology specialty, due to the nature of the services and expectation for specialized training by the supervisor. It is understood the nurse practitioners are trained to handle emergencies, radiation side effects and general medical needs, but it is not within their training or scope of work to prescribe, adjust or administer radiation therapy services.

> …
> Based on this comment and response, it is understood CMS expects the supervising staff to be able to redirect or provide additional orders for services rendered. Due to the complex nature of the radiation oncology modality, orders and redirection of treatment delivery, simulation, dosimetry planning, etc. can only be provided by a physician trained within the specialty. It is recommended to further evaluate the scope of nurse practitioners within the Radiation Oncology department, as their role is more limited than currently employed, and ensure a radiation oncologist provides the necessary direct supervision for all technical services rendered.

Exhibit 20, p. 10, 12.

39. Revenue Cycle subsequently provided a presentation to Defendants, including a slide identifying typical radiation oncology issues requiring intervention of a radiation oncologist. *See* Exhibit 21; Fritz Dep., p. 123 (Exhibit 25).

40. Jan Johnson, the regional compliance officer for Banner's western region, including Colorado, testified that she never received the Revenue Cycle report, and wasn't even aware of it. Johnson Dep., p. 117, 127, 130 (Exhibit 26). She testified that, if she had received it, she would have provided it to legal counsel. *Id.*, p. 128. She testified that it would have been the responsibility of other compliance officers at Banner to provide such a report to legal counsel. *Id.*

41. Jan Johnson testified that she was not aware of any investigation of the supervision issue after Banner received the Revenue Cycle report. Johnson Dep., p. 133-134 (Exhibit 26). She was not aware of any position statements or white papers on the supervision issue other than the one prepared by Julianne Fritz. *Id.*, p. 134. She did not know whether Banner consulted any other experts or counsel after receiving the Revenue Cycle report. *Id.*, p. 134-135.

42. In her deposition, Julianne Fritz was asked, "Is there any sense in which a nurse practitioner can be said to perform radiation therapy treatment?," and she responded, "No." Fritz Dep., p. 58 (Exhibit 25).

43. Dr. Brian Fuller, Banner's radiation oncologist at NCMC, testified that a radiation oncologist "should be available to respond if there is a problem with the treatment that requires their decision-making ability." *See* Fuller Dep., p. 34 (Exhibit 27). He testified that numerous situations can arise during treatment that would require intervention by a radiation oncologist. *Id.*, p. 35-39. He testified that "I don't believe that we considered the nurse or the nurse practitioner equivalent to a physician in their ability to supervise radiation therapy." *Id.*, p. 30.

44. On April 21, 2011, Helene Christner, one of Banner's advanced practice nurses, sent an email to Julianne Fritz, noting that "I cannot take over giving a radiation treatment because I am not trained or certified." *See* Exhibit 22.

45. Banner's radiation oncologists, but not their advanced practice nurses, are credentialed to administer radiation therapy, which includes designing a course of therapy. *See* Fuller Dep., p. 23, 49 (Exhibit 27).

46. Julianne Fritz testified that "[a] family practice physician would not have the scope or training to be able to provide direct oversight for specific radiation oncology." Fritz Dep., p. 48 (Exhibit 25).

## ARGUMENT

**1. Defendants' new argument is false and misleading, since – as Defendants and others in the industry always recognized – CMS has always interpreted § 410.27 as applying to *all* hospital outpatient therapeutic services, including radiation therapy.**[4]

On January 15, 2015, Relator moved for partial summary judgment holding that claims for payment for external beam radiation therapy services performed without the direct supervision of an authorized user constitute false claims. Doc. 51. On May 28, 2015, after extensive briefing by both parties, the Court granted Relator's motion, holding as a matter of law that since advanced practice nurses cannot personally furnish radiation therapy services under Colorado law, they cannot provide the required "direct supervision" for such services under Medicare. Order, Doc. 56. The Court relied largely on 42 C.F.R. § 410.27, which provides that Medicare Part B pays for therapeutic hospital services and supplies furnished incident to a physician's or nonphysician practitioner's service only if such services are provided under "direct supervision." As the Court noted, the regulation provides that nonphysician practitioners can only supervise those services that they can "personally furnish" under state law.

On June 12, 2015, Defendants filed a motion for reconsideration, once again arguing that § 410.27 somehow permits supervision by nonphysician practitioners, even though they admittedly cannot "personally furnish" radiation therapy services. Doc. 60; *see* Fritz Dep., p. 58 (Exhibit 25) (admitting that there is no sense in which a nurse practitioner can be said to perform radiation therapy treatments); *see also* Fuller Dep., p. 23, 49 (Exhibit 27) (acknowledging that

---

[4] Defendants do not, in their partial summary judgment motion, deny that they submitted claims for payment to Medicare for services provided without the direct supervision of a radiation oncologist, and they do not challenge the evidence on this point. Indeed, they have admitted that they submitted such claims. *See* Response to Interrogatory No. 10 (Exhibit 31).

administering radiation therapy includes designing a course of therapy, and is not within the privileges given to nurse practitioners). The Court denied this motion on June 29, 2015, reaffirming its holding that § 410.27 does not permit direct supervision of radiation therapy services by a nurse practitioner. Order, Doc. 66.

Now, Defendants have decided to take a **third** bite at the apple, this time inventing an entirely new argument that they did not think important enough to make before. Apparently conceding that § 410.27 does not allow supervision by nonphysician practitioners, Defendants now tell the Court that § 410.27 did not even **apply** to radiation therapy until January 1, 2012. According to Defendants' current argument, because radiation is described in a separate Medicare benefit category, outpatient hospital radiation therapy services were not furnished "incident to" the services of a physician, and thus did not need to comply with the requirements of § 410.27, until January 1, 2012. Defendants tell the Court that this changed in 2012, when § 410.27 was amended to include a definition of hospital outpatient therapeutic services as "all services and supplies furnished to hospital or CAH outpatients that are not diagnostic services and that aid the physician or nonphysician practitioner in the treatment of the patient."

The problem with Defendants' argument is that it is **completely untrue**, and unbelievably misleading. Indeed, in the **very rule cited by Defendants**, CMS made it perfectly clear that the 2012 amendments to § 410.27 did not **change** the law, but simply clarified what had **always** been the case – i.e., that **all** outpatient hospital therapeutic services are furnished incident to the services of a physician, and thus must comply with 42 C.F.R. § 410.27, even if they are also described in a separate benefit category. As CMS plainly stated, in language that Defendants could not possibly have overlooked:

> Thus, we have long maintained that **all hospital outpatient therapeutic services are, according to our policy, furnished "incident to" a physician's service even when described by benefit categories other than the specific "incident to" provision in section 1861(s)(2)(B) of the Act**. Because hospital outpatient therapeutic services are furnished "incident to" a physician's professional service, we believe the conditions for payment, including the direct supervision standard, should apply to all hospital outpatient therapeutic services.

76 Fed. Reg. 74122, 74369 (emphasis added); *see also id.* (describing amendment as a "clarification"). Long before the 2012 amendments, CMS had expressly stated that "Medicare makes payment for hospital outpatient therapeutic services **only when provided 'incident to' the services of a physician**," and that "outpatient hospital services paid under the OPPS … must meet all conditions of § 410.27, including the requirement for direct supervision by a physician or qualified nonphysician practitioner." 75 Fed. Reg. 60316, 60586 (emphasis added).

To make it worse, Defendants had to actively truncate quotes in order to give the Court the erroneous impression that the 2012 amendments changed the law, rather than simply "clarifying" CMS's long-standing policy. For example, Defendants state in their brief that:

> CMS acknowledged this distinction in the CY 2012 OPPS proposed and final rules. Specifically, CMS stated that § 410.27 "only refers to 'incident to' services" and "**could be read as limited to services and supplies described under section 1861(s)(2)(B) of the Act, hospital services incident to physicians' services furnished to outpatients**." 76 Fed. Reg. 230, 74369 (Nov. 30, 2011) (emphasis added).

Doc. 67, p. 15 (emphasis in Defendants' brief). Incredibly, however, Defendants fail to quote the **very next sentence** in the final rule, where CMS stated that "[h]owever, we noted that **CMS has not interpreted the regulation so narrowly**." 76 Fed. Reg. 74122, 74369 (emphasis added). CMS pointed out that "[w]e … clearly treated all nondiagnostic services that are furnished to hospital outpatients as 'incident to services,'" that "our policy is longstanding and, in fact, predates the OPPS," and that " we have long maintained that all hospital outpatient

therapeutic services are, according to our policy, furnished 'incident to' a physician's service even when described by benefit categories other than the specific 'incident to' provision in section 1861(s)(2)(B) of the Act." 76 Fed. Reg. 74122, 74369. It is extremely misleading, and borders on contemptuous, for Defendants to tell the Court that CMS **changed** the law in 2012, when CMS actually said the exact **opposite**.

Indeed, the only relevant change to § 410.27 in the 2012 amendments was to provide a definition, in the regulation itself, of the phrase "therapeutic hospital or CAH services and supplies furnished incident to a physician's or nonphysician practitioner's service." However, as CMS noted in proposing the definition, CMS had **always** defined therapeutic hospital services in a similar manner in its guidance to hospitals. *See* 76 Fed. Reg. 42170, 42284 ("We are proposing to define these services, **similar to the way they are currently defined** in Section 20.5, Chapter 6, of the Medicare Benefit Policy Manual, to mean "all services and supplies furnished to hospital or CAH outpatients that are not diagnostic services and that aid the physician or practitioner in the treatment of the patient.") (emphasis added); *see also* Medicare Benefit Policy Manual, Chapter 6, § 20.5.2 ("Therapeutic services and supplies which hospitals provide on an outpatient basis are those services and supplies (including the use of hospital facilities) which are incident to the services of physicians and practitioners in the treatment of patients. All hospital outpatient services that are not diagnostic are services that aid the physician or practitioner in the treatment of the patient…. Direct supervision is the minimum standard for supervision of **all** Medicare outpatient hospital services.") (Exhibit 29, p. 11-12) (emphasis added). Thus, CMS was not changing the meaning of the terms, but was merely putting its longstanding definition into the body of the regulation itself. *See United States ex rel. Suter v.*

*Nat'l Rehab Partners, Inc*., 2009 U.S. Dist. LEXIS 88630, *17 (D. Idaho Sept. 24, 2009) (noting that Medicare manuals are binding interpretive rules and form the basis for FCA liability).

To further demonstrate the frivolousness of Defendants' new argument, long before the 2012 amendments to § 410.27, CMS expressly discussed the application of the direct supervision requirement to "extremely specialized services, notably **radiation oncology services**." 75 Fed. Reg. 71800, 72012 (emphasis added). The Court referenced this discussion in its prior order granting partial summary judgment to Relator, noting that CMS "specifically considered and rejected" a commenter's suggestion that "CMS consider the direct supervision requirement to be met for diagnostic or therapeutic radiation oncology services if a non-specialist practitioner who can handle an emergency provides the direct supervision and also has access by phone or other telemedicine link to a specialist who is able to change the plan of care should the need arise." Order, Doc. 56, p. 9-10. Thus, long before the 2012 amendments, it was abundantly clear that CMS interpreted the supervision requirements in § 410.27 as applying to all outpatient hospital therapeutic services, specifically including radiation therapy services.

As the Court noted in granting Relator's earlier motion for partial summary judgment, "Banner does not argue that CMS did not have authority to interpret its regulation in such a manner, or that its interpretation is unreasonable, or that the interpretation deserves no deference." Order, Doc. 56, p. 9-10; *see Auer v. Robbins*, 519 U.S. 452, 460 (1997) (agency's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with the regulation). Accordingly, despite Defendants' current effort to proffer an alternative interpretation of the regulation, "the fact remains that CMS specifically considered and rejected" Defendants' argument. Order, Doc. 56, p. 10.

Indeed, the evidence is clear that **Defendants themselves** – along with everyone else in the industry – always understood (correctly) that § 410.27 applied to all hospital outpatient therapeutic services, including radiation therapy services. When the 2009 amendments to § 410.27 were announced, allowing nonphysician practitioners for the first time to supervise hospital outpatient therapeutic services that they could personally furnish under state law, Defendants claim to have performed an analysis of such rules based on the (correct) understanding that they applied to the radiation therapy services being provided at Banner's facilities. *See* Doc. 52-1, ¶ 5-8. On January 14, 2010, Julianne Fritz sent an email to Jan Johnson, discussing "CMS interpretation of the 'direct physician supervision' standards for **therapeutic outpatient services**. This question is specifically related to interpretation for **radiation therapy**." *See* Exhibit 13, p. 1 (emphasis added); *see also* Fritz Dep., p. 59 (Exhibit 25).

On June 24, 2010, at the request of Banner management, Fritz prepared a "white paper" entitled "Physician Direct Supervision under the HOPPS Regulation," which expressly acknowledged that the amended § 410.27 applied to all outpatient therapeutic services, including outpatient radiation therapy:

> In December 2008, CMS (Centers for Medicare and Medicaid Services) published the 2009 HOPPS regulations which included new rules or newly re-defined rules on "physician supervision" for **outpatient therapeutic services, including** outpatient chemotherapy and **outpatient radiation therapy**.

*See* Exhibit 19 (emphasis added). Thus, Defendants themselves correctly recognized that the physician supervision rules in § 410.27 applied to radiation therapy.

Not only did **Defendants** correctly interpret § 410.27 as applying to all hospital outpatient therapeutic services, including radiation therapy, but everyone in the industry did so as well. For example, ASTRO, the premier radiation oncology professional society, published a

white paper on physician supervision requirements in February 2010, expressly noting that hospital outpatient radiation therapy services are furnished "incident to" the services of a physician and must be provided under direct supervision:

> Hospitals provide two distinct types of services to outpatients: services that are diagnostic in nature and other services that aid the physician in the treatment of a patient. **Therapeutic services are those services and supplies (including the use of hospital facilities) which are "incident to" the services of physicians in the treatment of patients. Such services include radiation therapy**, clinic services and emergency room services….
>
> Hospital outpatient therapeutic services furnished in a hospital and in on-campus provider based departments … **have a minimum requirement of direct supervision**….
>
> The supervising physician or non-physician practitioner must also be a person who is clinically appropriate to supervise the services or procedures. More specifically, the current CMS regulations (410.27(f)) state that the physician or non-physician practitioner must be available to furnish assistance and direction throughout the performance of the procedure. This means that the physician or nonphysician practitioner **must be prepared to step in and perform the service, not just respond to an emergency**.

Exhibit 16, p. 3-4 (underlining in original; bold added).

In March 2010, Regulatory Compliance Support circulated a document to Banner discussing the new supervision requirements in § 410.27, and noted that "[a]s a condition of Medicare coverage, OPPS hospitals … must provide direct physician supervision for outpatient hospital services…. **Services provided on or after January 1 without the appropriate level of supervision must not be billed to Medicare**." *See* Exhibit 17, p. 4 (emphasis in original). This document went on to note that "common examples of outpatient therapeutic services" included "Radiation Oncology." *Id.*, p. 7. This document noted that "supervision of certain complex or technical services should be limited to specialists with the appropriate expertise," and that "Radiation oncology services should be supervised by a radiation oncologist." *Id.*, p. 12.

In February 2010, regional compliance officer Jan Johnson attended a seminar by The Advisory Board Company, a prominent healthcare compliance consultant, and received a copy of a presentation called “Complying With Physician Supervision Requirements – Reviewing Revisions and Clarifications from the Hospital Outpatient 2010 Final Rule.” *See* Exhibit 15. These slides specifically discussed the application of § 410.27 to radiation oncology services, and noted that “[i]f therapeutic services are furnished in the hospital or in an on-campus outpatient department of the hospital, the services must be under the direct supervision of a supervising physician or a non-physician practitioner.” *See id.*, p. 10, 15.

In April 2011, Revenue Cycle, a healthcare compliance consultant focusing specifically on radiation oncology, performed an audit for Defendants, and expressly advised Defendants that their use of nonphysician practitioners to supervise radiation therapy treatments did not comply with Medicare’s supervision rules. As Revenue Cycle stated in its report:

> It is apparent the facility is knowledgeable of the requirement for direct supervision; however, the provision of this supervision by non-physician practitioners is the area of concern. While this is appropriate in medical oncology and many other outpatient departments, this is not considered appropriate for the Radiation Oncology specialty, due to the nature of the services and expectation for specialized training by the supervisor. It is understood the nurse practitioners are trained to handle emergencies, radiation side effects and general medical needs, but it is not within their training or scope of work to prescribe, adjust or administer radiation therapy services.
> …
> [I]t is understood CMS expects the supervising staff to be able to redirect or provide additional orders for services rendered. Due to the complex nature of the radiation oncology modality, orders and redirection of treatment delivery, simulation, dosimetry planning, etc. can only be provided by a physician trained within the specialty. It is recommended to further evaluate the scope of nurse practitioners within the Radiation Oncology department, as their role is more limited than currently employed, and ensure a radiation oncologist provides the necessary direct supervision for all technical services rendered.

Exhibit 20, p. 10, 12; Johnson Dep., p. 87 (“it’s the most complex of any other service line”).

Indeed, **every** communication Defendants received from any consultant, professional society, or other entity analyzing the physician supervision requirements was premised on the (correct) understanding that such rules applied to all hospital outpatient therapeutic services, including radiation therapy services. *See* Relator's Statement of Additional Material Fact No. 17-39, above. Defendants do not point to a single piece of evidence that they, or anyone else, ever interpreted § 410.27 as not applying to hospital outpatient radiation therapy services.

To be blunt, what Defendants are trying to do is clear – having lost at summary judgment, they are now trying to assert a *post hoc*, and completely erroneous, interpretation of § 410.27 which their lawyers came up with during this litigation, even though nobody at Banner ever actually relied on such incorrect interpretation. And they are trying to hide from the Court the fact that CMS has resoundingly repudiated this erroneous interpretation.

**2. Defendants' arguments regarding scienter are without merit, since Defendants never relied on the erroneous *post hoc* interpretation of § 410.27 that their lawyers came up with during this litigation.**

Defendants state in their brief that "[e]ven if the Court were to find that the applicability of the regulation to radiation was unclear, the claims are not false as a matter of law because Banner did not have the requisite scienter[5] to establish that it was submitting false claims to CMS." Doc. 67, p. 3; *see also id.*, p. 16 (asserting that "differences in interpretation growing out of a disputed legal question cannot give rise to a false claim under the FCA"). Defendants do not point to any actual **evidence** that they "did not have the requisite scienter" – indeed, they do not cite to any evidence at all touching on their knowledge. Rather, Defendants' motion is based on

[5] Although not mentioned in Defendants' brief, the only "scienter" requirement in the False Claims Act is the requirement that a defendant act "knowingly." This is defined to include situations where the defendant acts with actual knowledge, deliberate ignorance, or reckless disregard, and it is not necessary to show intent to defraud. *See* 31 U.S.C. § 3729(b)(1).

the contention that it is legally **impossible** for them to have acted with the requisite knowledge, given the supposed "differences in interpretation" over § 410.27

As discussed above, the applicability of the regulation to hospital outpatient radiation therapy was **not** unclear, and Defendants themselves (along with everyone else) always correctly interpreted § 410.27 as applying to such services – thus, there was no "difference in interpretation" on this issue. More fundamentally, however, Defendants are conflating the concepts of "falsity" and "knowledge," which are two distinct concepts. A claim is "false" if it seeks reimbursement for something that Medicare does not reimburse, regardless of whether the Defendant acts "knowingly." *See United States ex rel. Walker v. R & F Props.*, 433 F.3d 1349, 1356 (11th Cir. 2005) (Medicare claims are false "if they claim reimbursement for services or costs that … are not reimbursable"); *United States ex rel. Singh v. Bradford Reg'l Med. Ctr.*, 752 F. Supp. 2d 602, 640 (W.D. Pa. 2010) (granting summary judgment as to submission of false claims in violation of Stark Law, but holding that knowledge was question for trial).

In *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999), the district court held that "the 'falsity' element under the [False Claims] Act was not met because [the defendant] demonstrated that it made a reasonable interpretation of an ambiguous accounting standard." The Ninth Circuit reversed, holding that the defendant's interpretation of the regulation was not relevant to the issue of falsity, but only to the issue of whether the defendant acted "knowingly." The Court noted that the meaning of the regulations "is ultimately the subject of judicial interpretation, and it is [defendant's] compliance with these regulations, as interpreted by this court, that determines whether its accounting practices resulted in the submission of a 'false claim' under the Act." *Id.* at 463. "Thus, while the reasonableness of

[defendant's] interpretation of the applicable accounting standards may be relevant to whether it **knowingly** submitted a false claim, the question of 'falsity' itself is determined by whether [defendant's] representations were accurate in light of applicable law." *Id.* (emphasis added).[6]

In granting Relator's motion for partial summary judgment, this Court has already interpreted § 410.27, and determined that claims for radiation therapy services provided without appropriate supervision are false claims, since Medicare only pays for outpatient hospital services if they are provided with appropriate supervision. Thus, every time Defendants submitted a claim for services provided without required direct supervision, they were submitting a claim for services that are not payable by Medicare. *See Walker, supra*. The only question remaining is whether Defendants' acted "knowingly" – i.e., with actual knowledge, deliberate ignorance, or reckless disregard.

On that question, in order for a defendant to rely on a supposedly "reasonable interpretation" of an allegedly ambiguous regulation to defeat the "knowledge" component, the defendant must have actually **relied** on such an interpretation in submitting the allegedly false claims. *See, e.g., Minn. Ass'n of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002) (if defendants knew how agency interpreted regulation, "any possible ambiguity of the regulations is water under the bridge"); *United States ex rel. Suter v. Nat'l Rehab Partners, Inc.*, 2009 U.S. Dist. LEXIS 88630, *25-26 (D. Idaho Sept. 24, 2009) ("any

---

[6] Defendants cite *Little ex rel. United States Gov't v. Eni Petroleum Co.*, 2009 U.S. Dist. LEXIS 67253 (W.D. Okla. July 31, 2009), which quoted *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 477-78 (9th Cir. 1996) for the proposition that "differences in interpretation growing out of a disputed legal question cannot give rise to a false claim under the FCA." As discussed above, however, the Ninth Circuit itself has rejected the idea that *Hagood* stands for such proposition. *See Oliver, supra*, 195 F.3d at 463 ("*Hagood* does not stand for the proposition that a 'reasonable interpretation' of a regulation precludes falsity.").

possible ambiguity of the regulations is moot"). As discussed above, Defendants do not cite a **single fact** showing that they ever interpreted § 410.27 as not applying to radiation therapy, much less that they relied on such erroneous interpretation when they submitted claims to Medicare for services provided without proper supervision. To the contrary, the evidence demonstrates that Defendants, along with everyone else in the industry, interpreted § 410.27 in the same way as CMS – i.e., as applying to **all** hospital outpatient therapeutic services, including radiation therapy. The fact that Defendants' lawyers, after losing on summary judgment, have retroactively come up with an alternative, if erroneous, interpretation of § 410.27 thus says nothing whatsoever about Defendants' "knowledge" at the time they submitted the false claims. Accordingly, the motion for partial summary judgment must be denied.

**3. There is abundant evidence that Defendants acted knowingly.**

Defendants' motion for partial summary judgment does not challenge the sufficiency of the evidence that they acted "knowingly," but simply asserts that it would have been impossible to act knowingly in light of the supposed "differences of interpretation" regarding 410.27 (differences that did not, in fact, exist). However, Relator notes that there is abundant evidence that Defendants acted with actual knowledge, deliberate ignorance, or reckless disregard.

To begin with, Defendants were uniformly advised by numerous attorneys, consultants, and other entities that, in order for a nonphysician practitioner to supervise a service, she had to be able to "personally perform" the service herself, and had to be credentialed to do so. *See* Relator's Statements of Additional Facts No. 17-39. Jan Johnson, the regional compliance officer for Colorado and the western region, testified that she agreed with the requirement that, in order to supervise a service, the supervisor had to be able to "personally perform" the service.

Johnson Dep., p. 80-82 (Exhibit 26). Julianne Fritz testified that, when preparing her June 2010 "white paper," she had before her a report from ACCC that specifically pointed out that the new regulations only allowed nonphysician practitioners to supervise services "that they may perform themselves," and that such practitioners must have "the ability to perform the service or procedure." Fritz Dep., p. 60 (Exhibit 25); *see* Exhibit 13, p. 2-3 (emphasis added). In January 2010, Revenue Cycle sent Defendants a copy of the new CMS rule, and actually **highlighted** portions of the rule stating that nonphysician practitioners could only supervise those services "that they may perform themselves," that the supervisor "must be prepared to step in and perform the service, not just respond to an emergency," and that the supervisor must be able to "change a procedure or the course of treatment being provided to a particular patient." *See* Exhibit 14 (Bates No. BB-0006072, 6075, 6079, 6083); Johnson Dep., p. 120 (Exhibit 26).

In addition, regional compliance officer Jan Johnson had personally received and passed along a report from a healthcare consultant noting that "[s]upervisory authority [is] limited to services that the NPP can **personally perform**," and that the nonphysician practitioner "[m]ust be **able to step in to perform service**, if necessary." Exhibit 15, p. 4-5 (emphasis added). On March 3, 2010, Johnson sent an email to various individuals at Banner discussing a presentation given by attorneys on the new supervision requirements. In this email, Johnson noted that:

> The attorneys also indicated there was no argument to prevent CMS from requiring the supervising physician (NPP) to be immediately available to **take over a therapeutic service**, and the requirement that a physician (NPP) be credentialed by our hospitals to **perform** the service should they need to **step in and perform**.

Exhibit 11, p. 1 (emphasis added). Thus, Defendants were fully aware that nonphysician practitioners could not supervise services unless they could "step in and perform" the services themselves, and were credentialed to do so. They were also fully aware that their advanced

practice nurses could **not** "step in and perform" a radiation therapy service. As Julianne Fritz testified in her deposition:

> Q. Is there any sense in which a nurse practitioner can be said to perform radiation therapy treatment?
> A. No.

Fritz Dep., p. 58 (Exhibit 25). Banner's advanced practice nurses were not credentialed to "step in and perform" a radiation therapy service, which Defendants recognized was a requirement in order to supervise such services. *See* Fuller Dep., p. 23, 49 (Exhibit 27); *id*., p. 30 ("I don't believe that we considered the nurse or the nurse practitioner equivalent to a physician in their ability to supervise radiation therapy."); *id*., p. 35-39 (identifying numerous circumstances where radiation oncologist, not nurse practitioner, would need to be available to make decisions).

Moreover, for some inexplicable reason, Banner delegated responsibility for formulating policy on this issue to Julianne Fritz, who was neither a radiation oncologist nor a nurse practitioner, and thus had no medical background that would qualify her to determine whether a nurse practitioner was able to "step in and perform" a radiation therapy service, or "furnish assistance and direction" during such service.[7] Moreover, Fritz was not a lawyer, or even a compliance officer, and had no experience whatsoever in interpreting regulations governing physician supervision of complex medical services. Indeed, Fritz herself testified that "I do not make decisions about compliance." Fritz Dep., p. 11 (Exhibit 25); *id*., p. 48 ("I'm certainly not a compliance officer."). Neither Jan Johnson (the regional compliance officer who relied on Fritz

---

[7] Bizarrely, Fritz testified that family practice **physicians** are not qualified to supervise radiation therapy, a position totally inconsistent with an assertion that a **nonphysician** practitioner is qualified to do so. Fritz Dep., p. 48 (Exhibit 25). Under this theory, if one of Banner's advanced practice nurses went to medical school and got an M.D., she would no longer be qualified to supervise radiation therapy.

to prepare the white paper), nor Julianne Fritz herself could explain why Fritz was given this responsibility, rather than Banner's compliance department. *Id*., p. 19; Johnson Dep., p. 90.

Perhaps as a result of her complete lack of qualifications, the "white paper" prepared by Fritz completely failed to analyze the requirement that a nonphysician practitioner must be able to "personally perform" a service in order to supervise such service – even though Banner, Johnson, and Fritz herself were admittedly aware of such requirement, and Fritz has testified that there is no sense in which a nurse practitioner can be said to "perform" a radiation therapy procedure. In addition, the "white paper" gave **no consideration whatsoever** to Colorado regulations governing who could provide radiation therapy, even though such regulations are indispensable to a determination of who can "personally furnish" radiation therapy services under state law. Also, the "white paper" gave no consideration to the fact that Banner's advanced practice nurses were not credentialed to "step in and perform" a radiation procedure. Indeed, Fritz was not even aware of the scope of privileges granted to Banner's advanced practice nurses. Fritz Dep., p. 60-63 (Exhibit 25). Thus, the white paper completely failed to grapple with the fundamental requirements identified by CMS for supervision. *See United States v. Newport News Shipbuilding, Inc*., 276 F. Supp. 2d 539, 564 (E.D. Va. 2003) ("both the clarity of the regulation and the reasonableness of a contractor's interpretation are relevant in deciding whether [contractor's actions are] indicative of a reckless disregard of their falsity."); *United States ex rel. Westmoreland v. Amgen, Inc*., 812 F. Supp. 2d 39, 71 (D. Mass. 2011) (reasonableness of a defendant's interpretation is relevant inquiry with respect to FCA's knowledge requirement; "the jury properly may consider that the Defendants were obliged to take reasonable steps to ensure their compliance with applicable statutes and regulations and may

not now 'hide[] behind a shield of self-imposed ignorance.'"); Order, Doc. 56, p. 8 (describing Defendants' argument as "nonsense").

Moreover, Fritz's "white paper" completely failed to take into account the fact that **Banner's own radiation oncologists** recognized that situations frequently arise during treatment that require the intervention of a radiation oncologist. Dr. Brian Fuller, Banner's radiation oncologist at NCMC, testified that a radiation oncologist "should be available to respond if there is a problem with the treatment that requires their decision-making ability." Fuller Dep., p. 34 (Exhibit 27). He testified that there are numerous situations that arise during treatment that require intervention by a radiation oncologist, and that could not be delegated to a nurse practitioner. *Id.*, p. 35-39. He testified that "I don't believe that we considered the nurse or the nurse practitioner equivalent to a physician in their ability to supervise radiation therapy." *Id.*, p. 30. He testified that administration of radiation therapy "includes designing a course of therapy," and that Banner's advanced practice nurses were not credentialed to administer radiation therapy. *Id.*, p. 23, 49.

Moreover, after Revenue Cycle – a prominent radiation oncology compliance consultant specifically hired by Banner to review its operations – formally and emphatically placed Banner on notice that its use of nurse practitioners to supervise radiation therapy was a violation of Medicare's supervision rules, Banner, acting on the say-so of Julianne Fritz, summarily rejected this advice without bothering to seek a contrary opinion from any other lawyer, consultant, or expert, and without bothering to consult CMS directly. Thus, Banner rejected the advice of its own expert, based on nothing more than the vague opinion of someone who was neither a lawyer, a compliance officer, a radiation oncologist, nor a nurse practitioner, who had no

qualifications whatsoever to overrule the advice of an expert, and who made no attempt to explain how Revenue Cycle's analysis was legally incorrect. This fact standing alone is sufficient to justify, if not compel, a finding that Banner acted with at least deliberate ignorance or reckless disregard. *See United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 2015 U.S. App. LEXIS 11460, *23 (4th Cir. 2015) (holding that rejection of expert's advice supported finding that defendant acted knowingly; "Indeed, it is difficult to imagine any more probative and compelling evidence regarding Tuomey's intent than the testimony of a lawyer hired by Tuomey, who was an undisputed subject matter expert on the intricacies of the Stark Law, and who warned Tuomey in graphic detail of the thin legal ice on which it was treading with respect to the employment contracts."); *see also id.* at *31 ("We agree with the district court's conclusion that 'a reasonable jury could have found that Tuomey possessed the requisite scienter once it determined to disregard McAnaney's remarks.' … A reasonable jury could indeed be troubled by Tuomey's seeming inaction in the face of McAnaney's warnings.").

## CONCLUSION

For the reasons discussed above and in Relator's prior summary judgment motion, Defendants' motion for partial summary judgment on Relator's supervision claims should be denied. As discussed above, Relator is withdrawing the non-supervision claims described as "Other Billing Issues."

This 14th day of September, 2015.

Respectfully submitted,

<u>/s/ G. Mark Simpson</u>
G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC

110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

/s/ Jamie M. Bennett
Jamie M. Bennett
Ashcraft & Gerel
4301 Garden City Drive
Landover, Md. 20785
(301) 459-8400
(301) 459-1364
jbennett@ashcraftlaw.com

/s/ Andrew M. Stone
Andrew M. Stone
(Pa. #35176)
Stone Law Firm, LLC
437 Grant Street Suite 1806
Pittsburgh, PA 15219
Phone: (412) 391-2005
Fax: (412) 391 -0853
astone@stone-law-firm.com
Attorneys for Plaintiff-Relator

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record.

This 14th day of September, 2015.

/s/ G. Mark Simpson