EXHIBIT 3



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Health Care Financing Administration**

**42 CFR Parts 409, 410, 411, 412, 413, 419, 424, 489, 498, and 1003**

**[HCFA–1005–FC]**

**RIN 0938–AI56**

# Office of Inspector General; Medicare Program; Prospective Payment System for Hospital Outpatient Services

**AGENCY:** Health Care Financing Administration (HCFA), HHS, and Office of Inspector General (OIG), HHS.

**ACTION:** Final rule with comment period.

**SUMMARY:** This final rule with comment period implements a prospective payment system for hospital outpatient services furnished to Medicare beneficiaries, as set forth in section 1833(t) of the Social Security Act. It also establishes requirements for provider departments and provider-based entities, and it implements section 9343(c) of the Omnibus Budget Reconciliation Act of 1986, which prohibits Medicare payment for nonphysician services furnished to a hospital outpatient by a provider or supplier other than a hospital, unless the services are furnished under an arrangement with the hospital. In addition, this rule establishes in regulations the extension of reductions in payment for costs of hospital outpatient services required by section 4522 of the Balanced Budget Act of 1997, as amended by section 201(k) of the Balanced Budget Refinement Act of 1999.

**DATES:** *Effective date:* July 1, 2000, except that the changes to § 412.24(d)(6), new § 413.65, and the changes to § 489.24(h), § 498.2, and § 498.3 are effective October 10, 2000.

*Applicability date:* For Medicare services furnished by all hospitals, including hospitals excluded from the inpatient prospective payment system, and by community mental health centers, the applicability date for implementation of the hospital outpatient prospective payment system is July 1, 2000.

*Comment date:* Comments on the provisions of this rule resulting from the Balanced Budget Refinement Act of 1999 will be considered if we receive them at the appropriate address, as provided below, no later than 5 p.m. on June 6, 2000. We will not consider comments concerning provisions that remain unchanged from the September 8, 1998 proposed rule or that were revised based on public comment.

See section VIII for a more detailed discussion of the provisions subject to comment.

**ADDRESSES:** Mail written comments (one original and three copies) to the following address ONLY: Health Care Financing Administration, Department of Health and Human Services, Attention: HCFA–1005–FC, P.O. Box 8013, Baltimore, MD 21244–8013.

If you prefer, you may deliver, by courier, your written comments (one original and three copies) to one of the following addresses:

Room 443–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201, or
C5–14–03, Central Building, 7500 Security Boulevard, Baltimore, MD 21244–1850.

Comments mailed to those addresses may be delayed and could be considered late.

Because of staffing and resource limitations, we cannot accept comments by facsimile (FAX) transmission. In commenting, please refer to file code HCFA–1005–FC.

Comments received timely will be available for public inspection as they are received, generally beginning approximately 3 weeks after publication of a document, in Room 443–G of the Department's offices at 200 Independence Avenue, SW., Washington, DC, on Monday through Friday of each week from 8:30 a.m. to 5 p.m. (Phone (202) 690–7890).

For comments that relate to information collection requirements, mail a copy of comments to:

Health Care Financing Administration, Office of Information Services, Security and Standards Group, Division of HCFA Enterprise Standards, Room N2–14–26, 7500 Security Boulevard, Baltimore, MD 21244–1850, Attn: John Burke, HCFA–1005–FC; and
Lauren Oliven, HCFA Desk Officer, Office of Information and Regulatory Affairs, Room 3001, New Executive Office Building, Washington, DC 20503.

*Copies:* To order copies of the **Federal Register** containing this document, send your request to: New Orders, Superintendent of Documents, P.O. Box 371954, Pittsburgh, PA 15250–7954. Specify the date of the issue requested and enclose a check or money order payable to the Superintendent of Documents, or enclose your Visa or Master Card number and expiration date. Credit card orders can also be placed by calling the order desk at (202) 512–1800 or by faxing to (202) 512–2250. The cost for each copy is $8. As an alternative, you can view and photocopy the **Federal Register** document at most libraries designated as Federal Depository Libraries and at many other public and academic libraries throughout the country that receive the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:**
Janet Wellham, (410) 786–4510 or Chuck Braver, (410) 786–6719 (for general information)
Joel Schaer (OIG), (202) 619–0089 (for information concerning civil money penalties)
Kitty Ahern, (410) 786–4515 (for information related to the classification of services into ambulatory payment classification (APC) groups)
George Morey (410) 786–4653 (for information related to the determination of provider-based status)
Janet Samen (410) 786–9161 (for information on the application of APCs to community mental health centers)

**SUPPLEMENTARY INFORMATION:** To assist readers in referencing sections contained in this document, we are providing the following table of contents. Within each section, we summarize pertinent material from our proposed rule of September 8, 1998 (63 FR 47552) followed by public comments and our responses.

## Table of Contents

I. Background
A. General and Legislative History
B. Summary of Provisions of the Balanced Budget Act of 1997 (the BBA 1997)
1. Prospective Payment System (PPS)
2. Elimination of Formula-Driven Overpayment
3. Extension of Cost Reductions
C. The September 8, 1998 Proposed Rule
D. Overview of Public Comments
E. Summary of Relevant Provisions in the Balanced Budget Refinement Act of 1999 (the BBRA 1999)
1. Outlier Adjustment
2. Transitional Pass-Through for Additional Costs of Innovative Medical Devices, Drugs, and Biologicals
3. Budget Neutrality Applied to New Adjustments
4. Limitation on Judicial Review
5. Inclusion in the Hospital Outpatient PPS of Certain Implantable Items
6. Payment Weights Based on Mean Hospital Costs
7. Limitation on Variation of Costs of Services Classified Within a Group
8. Annual Review of the Hospital Outpatient PPS Components
9. Coinsurance Not Affected by Pass-Throughs

10. Extension of Cost Reductions
11. Clarification of Congressional Intent Regarding Base Amounts Used in Determining the Hospital Outpatient PPS
12. Transitional Corridors For Application of Outpatient PPS
13. Limitation on Coinsurance for a Procedure
14. Reclassification of Certain Hospitals
II. Prohibition Against Unbundling of Hospital Outpatient Services
A. Background
B. Office of Inspector General (OIG) Civil Money Penalty Authority and Civil Money Penalties for Unbundling Hospital Outpatient Services
C. Summary of Final Regulations on Bundling of Hospital Outpatient Services
D. Comments and Responses
III. Hospital Outpatient Prospective Payment System (PPS)
A. Hospitals Included In or Excluded From the Outpatient PPS
B. Scope of Facility Services
1. Services Excluded from the Scope of Services Paid Under the Hospital Outpatient PPS
a. Background
b. Comments and Responses
c. Payment for Certain Implantable Items Under the BBRA 1999
d. Summary of Final Action
2. Services Included Within the Scope of the Hospital Outpatient PPS
a. Services for Patients Who Have Exhausted Their Part A Benefits
b. Partial Hospitalization Services
c. Services Designated by the Secretary
d. Summary of Final Action
3. Hospital Outpatient PPS Payment Indicators
C. Description of the Ambulatory Payment Classification (APC) Groups
1. Setting Payment Rates Based on Groups of Services Rather than on Individual Services
2. Packaging Under the APC System
a. Summary of Proposal
b. General Comments and Responses (Supporting or Objecting to Packaging)
c. Packaging of Casts and Splints
d. Packaging of Observation Services
e. Packaging Costs of Procuring Corneal Tissue
f. Packaging Costs of Blood and Blood Products
g. Packaging Costs for Drugs, Pharmaceuticals, and Biologicals
h. Summary of Final Action
3. Treatment of Clinic and Emergency Department Visits
a. Provisions of the Proposed Rule
b. Comments and Responses
4. Treatment of Partial Hospitalization Services
5. Inpatient Only Procedures
6. Modification of APC Groups
a. How the Groups Were Constructed
b. Comments on Classification of Procedures and Services Within APC Groups
c. Effect of the BBRA 1999 on Final APC Groups
d. Summary of APC Modifications
e. Exceptions to the BBRA 1999 Limit on Variation of Costs Within APC Groups
7. Discounting of Surgical Procedures
8. Payment for New Technology Services
a. Background
b. Comments and Responses
D. Transitional Pass-Through for Innovative Medical Devices, Drugs, and Biologicals
1. Statutory Basis
2. Identifying Eligible Pass-Through Items
a. Drugs and Biologicals
b. Medical Devices
3. Criteria to Define New or Innovative Medical Devices Eligible for Pass-through Payments
4. Determination of ''Not Insignificant'' Cost of New Items
5. Calculating the Additional Payment
6. Process to Identify Items and to Obtain Codes for Items Subject to Transitional Pass-Throughs
E. Calculation of Group Weights and Conversion Factor
1. Group Weights (Includes Table 1, Packaged Services by Revenue Center)
2. Conversion Factor
a. Calculating Aggregate Calendar Year 1996 Medicare and Beneficiary Payments for Hospital Outpatient Services (Pre-PPS)
b. Sum of the Relative Weights
F. Calculation of Coinsurance Payments and Medicare Payments Under the PPS
1. Background
2. Determining the Unadjusted Coinsurance Amount and Program Payment Percentage
a. Calculating the Unadjusted Coinsurance Amount for Each APC Group
b. Calculating the Program Payment Percentage (Pre-deductible Payment Percentage)
3. Calculating the Medicare Payment Amount and Beneficiary Coinsurance Amount
a. Calculating the Medicare Payment Amount
b. Calculating the Coinsurance Amount
4. Hospital Election to Offer Reduced Coinsurance
G. Adjustment for Area Wage Differences
1. Proposed Wage Index
2. Labor-Related Portion of Hospital Outpatient Department PPS Payment Rates
3. Adjustment of Hospital Outpatient Department PPS Payment and Coinsurance Amounts for Geographic Wage Variations
4. Special Rules Under the BBRA 1999
H. Other Adjustments
1. Outlier Payments
2. Transitional Corridors/Interim Payments
3. Cancer Centers and Small Rural Hospitals
I. Annual Updates
1. Revisions to APC Groups, Weights and the Wage and Other Adjustments
2. Annual Update to the Conversion Factor
3. Advisory Panel for APC Updates
J. Volume Control Measures
K. Claims Submission and Processing and Medical Review
L. Prohibition Against Administrative or Judicial Review
IV. Provider-Based Status
A. Background
B. Provisions of the Proposed Rule
C. Comments and Responses
D. Requirements for Payment
V. Summary of and Response to MedPAC Recommendations
VI. Provisions of the Final Rule
VII. Collection of Information Requirements
VIII. Response to Comments
IX. Regulatory Impact Analysis
A. Introduction
B. Estimated Impact on the Medicare Program
C. Objectives
D. Limitations of Our Analysis
E. Hospitals Included In and Excluded From the Prospective Payment System
F. Quantitative Analysis of the Impact of Policy Changes on Payment Under the Hospital Outpatient PPS: Basis and Methodology of Estimates
G. Estimated Impact of the New APC System (Includes Table 2, Annual Impact of Hospital Outpatient Prospective Payment System in CY2000–CY2001)
X. Federalism
XI. Waiver of Proposed Rulemaking Regulations Text

**Addenda**

**Addendum A**—List of Hospital Outpatient Ambulatory Payment Classification Groups with Status Indicators, Relative Weights, Payment Rates, and Coinsurance Amounts
**Addendum B**—Hospital Outpatient Department (HOPD) Payment Rates and Payment Status by HCPCS, and Related Information
**Addendum C**—Hospital Outpatient Payment for Procedures by APC
**Addendum D**—1996 HCPCS Codes Used to Calculate Payment Rates That Are Not Active CY 2000 Codes
**Addendum E**—CPT Codes Which Will Be Paid Only As Inpatient Procedures
**Addendum F**—Status Indicators
**Addendum G**—Service Mix Indices by Hospital
**Addendum H**—Wage Index for Urban Areas
**Addendum I**—Wage Index for Rural Areas
**Addendum J**—Wage Index for Hospitals That Are Reclassified
**Addendum K**—Drugs, Biologicals, and Medical Devices Subject to Transitional Pass-Through Payment

## Alphabetical List of Acronyms Appearing in the Final Rule

APC Ambulatory payment classification
APG Ambulatory patient group
ASC Ambulatory surgical center
AWP Average wholesale price
BBA 1997 Balanced Budget Act of 1997
BBRA 1999 Balanced Budget Refinement Act of 1999
CAH Critical access hospital
CAT Computerized axial tomography
CCI [HCFA's] Correct Coding Initiative
CCR Cost center specific cost-to-charge ratio
CCU Coronary care unit
CMHC Community mental health center
CMP Civil money penalty
CORF Comprehensive outpatient rehabilitation facility
CPI Consumer Price Index
CPT [Physicians'] Current Procedural Terminology, 4th Edition, 2000,

copyrighted by the American Medical Association
DME Durable medical equipment
DMEPOS DME, orthotics, prosthetics, prosthetic devices, prosthetic implants and supplies
DRG Diagnosis-related group
DSH Disproportionate share hospital
EACH Essential access community hospital
EBAA Eye Bank Association of America
ED Emergency department
EMS Emergency medical services
EMTALA Emergency Medical Treatment and Active Labor Act
ENT Ear/Nose/Throat
ESRD End-stage renal disease
FDA Food and Drug Administration
FDO Formula-driven overpayment
FQHC Federally qualified health center
HCPCS HCFA Common Procedure Coding System
HHA Home health agency
HRSA Health Resources and Services Administration
ICD–9–CM International Classification of Diseases, Ninth Edition, Clinical Modification
ICU Intensive care unit
IHS Indian Health Service
IME Indirect medical education
IOL Intraocular lens
JCAHO Joint Commission on Accreditation of Healthcare Organizations
LTH Long-term hospital
MDH Medicare-dependent hospital
MedPAC Medicare Payment Advisory Commission
MRI Magnetic resonance imaging
MSA Metropolitan statistical area
NECMA New England County Metropolitan Area
OBRA Omnibus Budget Reconciliation Act
OT Occupational therapy
PPO Preferred provider organization
PPS Prospective payment system
RFA Regulatory Flexibility Act
RHC Rural health clinic
RPCH Rural primary care hospital
RRC Rural referral center
SCH Sole community hospital
SGR Sustainable growth rate
SNF Skilled nursing facility
TEFRA Tax Equity and Fiscal Responsibility Act of 1982
TPA Tissue Plasminogen Activator
Y2K Year 2000

## I. Background

### *A. General and Legislative History*

When the Medicare program was first implemented, it paid for hospital services (inpatient and outpatient) based on hospital-specific reasonable costs attributable to serving Medicare beneficiaries. Later, the law was amended to limit payment to the lesser of a hospital's reasonable costs or its customary charges. In 1983, section 601 of the Social Security Amendments of 1983 (Pub. L. 98–21) completely revised the cost-based payment system for most hospital inpatient services by enacting section 1886(d) of the Social Security Act (the Act). This section provided for a prospective payment system (PPS) for acute hospital inpatient stays, effective with hospital cost reporting periods beginning on or after October 1, 1983.

Although payment for most inpatient services became subject to the PPS, Medicare hospital outpatient services continued to be paid based on hospital-specific costs, which provided little incentive for hospitals to furnish outpatient services efficiently. At the same time, advances in medical technology and changes in practice patterns were bringing about a shift in the site of medical care from the inpatient to the outpatient setting. During the 1980s, the Congress took steps to control the escalating costs of providing outpatient care. The Congress amended the statute to implement across-the-board reductions of 5.8 percent and 10 percent to the amounts otherwise payable by Medicare for hospital operating costs and capital costs, respectively, and enacted a number of different payment methods for specific types of hospital outpatient services. These methods included fee schedules for clinical diagnostic laboratory tests, orthotics, prosthetics, and durable medical equipment (DME); composite rate payment for dialysis for persons with end-stage renal disease (ESRD); and payments based on blends of hospital costs and the rates paid in other ambulatory settings such as separately certified ambulatory surgical centers (ASCs) or physician offices for certain surgery, radiology, and other diagnostic procedures. However, Medicare payment for services performed in the hospital outpatient setting remains largely cost-based.

In the Omnibus Budget Reconciliation Act of 1986 (OBRA 1986) (Pub. L. 99–509), the Congress paved the way for development of a PPS for hospital outpatient services. Section 9343(g) of OBRA 1986 mandated that fiscal intermediaries require hospitals to report claims for services under the HCFA Common Procedure Coding System (HCPCS). Section 9343(c) of OBRA 1986 extended the prohibition against unbundling of hospital services under section 1862(a)(14) of the Act to include outpatient services as well as inpatient services. The HCPCS coding enabled us to determine which specific procedures and services were being billed, while the extension of the prohibition against unbundling ensured that all nonphysician services provided to hospital outpatients would be billed only by the hospital, not by an outside supplier, and, therefore, would be reported on hospital bills and captured in the hospital outpatient data that could be used to develop an outpatient PPS.

A proposed rule to implement section 9343(c) was published in the **Federal Register** on August 5, 1988. However, those regulations were never published as a final rule, so we included them in the hospital outpatient PPS proposed rule published in the **Federal Register** on September 8, 1998 (63 FR 47552) and will implement them as part of this final rule.

Section 1866(g) of the Act, as added by section 9343(c) of OBRA 1986, and amended by section 4085(i)(17) of the Omnibus Budget Reconciliation Act of 1987 (OBRA 1987) (Pub. L. 100–203), authorizes the Department of Health and Human Services' Office of Inspector General to impose a civil money penalty (CMP), not to exceed $2,000, against any individual or entity who knowingly and willfully presents a bill in violation of an arrangement (as defined in section 1861(w)(1) of the Act).

In section 9343(f) of the OBRA 1986 and section 4151(b)(2) of the Omnibus Budget Reconciliation Act of 1990 (Pub. L. 101–508), the Congress required that we develop a proposal to replace the current hospital outpatient payment system with a PPS and submit a report to the Congress on the proposed system.

The Secretary submitted a report to the Congress on March 17, 1995, summarizing the research we conducted searching for a way to classify outpatient services for purposes of developing an outpatient PPS. The report cited ambulatory patient groups (APGs), developed by 3M-Health Information Systems (3M–HIS) under a cooperative grant with HCFA, as the most promising classification system for grouping outpatient services and recommended that APG-like groups be used in designing a hospital outpatient PPS.

The report also presented a number of options that could be used, once a PPS was in place, for addressing the issue of rapidly growing beneficiary coinsurance. As a separate issue, we recommended that the Congress amend the provisions of the law pertaining to the blended payment methods for ASC surgery, radiology, and other diagnostic services to correct an anomaly that resulted in a less than full recognition of the amount paid by the beneficiary in calculating program payment (referred to as the formula-driven overpayment).

Three sections of the Balanced Budget Act of 1997 (the BBA 1997) (Pub. L. 105–33), enacted on August 5, 1997, affect Medicare payment for hospital outpatient services. Section 4521 of the BBA 1997 eliminates the formula-driven overpayment for ambulatory surgical

center procedures, radiology services, and diagnostic procedures furnished on or after October 1, 1997. In November 1998, we issued cost report instructions (Provider Reimbursement Manual, Part II, Chapter 36, Transmittal 4) that implemented this provision for services furnished on or after October 1, 1997. Section 4522 of the BBA 1997 amends section 1861(v)(1)(S)(ii) of the Act by extending cost reductions in payment for hospital outpatient operating costs and hospital capital costs, 5.8 percent and 10 percent respectively, before January 1, 2000. Section 4523 of the BBA 1997 amends section 1833 of the Act by adding subsection (t), which provides for implementation of a PPS for outpatient services. (Under Section 4523 of the BBA 1997 the outpatient PPS does not apply to cancer hospitals before January 1, 2000.) Set forth below in section I.B is a detailed description of the changes made by the BBA 1997.

On November 29, 1999, the Balanced Budget Refinement Act of 1999 (the BBRA 1999), Pub. L. 106–113, was enacted. This Act made major changes that affect the proposed hospital outpatient PPS. The legislative changes are summarized in section I.E, below. More specific details on individual provisions that we are implementing in this final rule with comment period are included under the various sections of this preamble.

*B. Summary of Provisions in the Balanced Budget Act of 1997 (the BBA 1997)*

1. Prospective Payment System (PPS)

Section 4523 of the BBA 1997 amended section 1833 of the Act by adding subsection (t), which provides for a PPS for hospital outpatient department services. (The following citations reflect the statute as enacted by the BBA 1997.) Section 1833(t)(1)(B) of the Act authorizes the Secretary to designate the hospital outpatient services that would be paid under the PPS. That section also requires that the hospital outpatient PPS include hospital inpatient services designated by the Secretary that are covered under Part B for beneficiaries who are entitled to Part A benefits but who have exhausted them or otherwise are not entitled to them. Section 1833(t)(1)(B)(iii) of the Act specifically excludes ambulance, physical and occupational therapy, and speech-language pathology services, for which payment is made under a fee schedule.

Section 1833(t)(2) of the Act sets forth certain requirements for the hospital outpatient PPS. The Secretary is required to develop a classification system for covered outpatient services that may consist of groups arranged so that the services within each group are comparable clinically and with respect to the use of resources.

Section 1833(t)(2)(C) of the Act specifies data requirements for establishing relative payment weights. The weights are to be based on the median hospital costs determined by 1996 claims data and data from the most recent available cost reports. Section 1833(t)(2)(D) of the Act requires that the portion of the Medicare payment and the beneficiary coinsurance that are attributable to labor and labor-related costs be adjusted for geographic wage differences in a budget neutral manner.

The Secretary is authorized under section 1833(t)(2)(E) of the Act to establish, in a budget neutral manner, other adjustments, such as outlier adjustments or adjustments for certain classes of hospitals, that are necessary to ensure equitable payments. Section 1833(t)(2)(F) of the Act requires the Secretary to develop a method for controlling unnecessary increases in the volume of covered outpatient services.

Section 1833(t)(3) of the Act specifies how beneficiary deductibles are to be treated in calculating the Medicare payment and beneficiary coinsurance amounts and requires that rules be established regarding determination of coinsurance amounts for covered services that were not furnished in 1996. The statute freezes beneficiary coinsurance at 20 percent of the national median charges for covered services (or group of covered services) furnished during 1996 and updated to 1999 using the Secretary's estimated charge growth from 1996 to 1999.

Section 1833(t)(3) of the Act also prescribes the formula for calculating the initial conversion factor used to determine Medicare payment amounts for 1999 and the method for updating the conversion factor in subsequent years.

Sections 1833(t)(4) and (t)(5) of the Act describe the method for determining the Medicare payment amount and the beneficiary coinsurance amount for services covered under the outpatient PPS. Section 1833(t)(5)(B) of the Act requires the Secretary to establish a procedure whereby hospitals may voluntarily elect to reduce beneficiary coinsurance for some or all covered services to an amount not less than 20 percent of the Medicare payment amount. Hospitals are further allowed to disseminate information on any such reductions of coinsurance amounts. Section 4451 of the BBA 1997 added section 1861(v)(1)(T) to the Act, which provides that any reduction in coinsurance must not be treated as a bad debt.

Section 1833(t)(6) authorizes periodic review and revision of the payment groups, relative payment weights, wage index, and conversion factor.

Section 1833(t)(7) of the Act describes how payment is to be made for ambulance services, which are specifically excluded from the outpatient PPS under section 1833(t)(1)(B) of the Act.

Section 1833(t)(8) of the Act provides that the Secretary may establish a separate conversion factor for services furnished by cancer hospitals that are excluded from hospital inpatient PPS.

Section 1833(t)(9) of the Act prohibits administrative or judicial review of the hospital outpatient PPS classification system, the groups, relative payment weights, wage adjustment factors, other adjustments, calculation of base amounts, periodic adjustments, and the establishment of a separate conversion factor for those cancer hospitals excluded from hospital inpatient PPS.

Section 4523(d) of the BBA 1997 made a conforming amendment to section 1833(a)(2)(B) of the Act to provide for payment under the hospital outpatient PPS for some services described in section 1832(a)(2) that are currently paid on a cost basis and furnished by providers of services, such as comprehensive outpatient rehabilitation facilities (CORFs), home health agencies (HHAs), hospices, and community mental health centers (CMHCs). This amendment provides that partial hospitalization services furnished by CMHCs be paid under the PPS.

2. Elimination of Formula-Driven Overpayment

Before enactment of section 4521(b) of the BBA 1997, using the blended payment formulas for ASC procedures, radiology, and other diagnostic services, the ASC or physician fee schedule portion was calculated as if the beneficiary paid 20 percent of the ASC rate or physician fee schedule amount instead of the actual amount paid, which was 20 percent of the hospital's billed charges. Section 4521(b), which amended sections 1833(i)(3)(B)(i)(II) and 1833(n)(1)(B)(i) of the Act, corrects this anomaly by changing the blended calculations so that all amounts paid by the beneficiary are subtracted from the total payment in the calculation to determine the amount due from the program. Effective for services furnished on or after October 1, 1997, payment for surgery, radiology, and other diagnostic services calculated by blended payment methods is now calculated by

subtracting the full amount of coinsurance due from the beneficiary (based on 20 percent of the hospital's billed charges).

3. Extension of Cost Reductions

Section 1861(v)(1)(S)(ii) of the Act was amended by section 4522 of the BBA 1997 to require that the amounts otherwise payable for hospital outpatient operating costs and capital costs be reduced by 5.8 percent and 10 percent, respectively, through December 31, 1999.

*C. The September 8, 1998 Proposed Rule*

We published a proposed rule in the **Federal Register** on September 8, 1998 (63 FR 47552) setting forth the proposed PPS for hospital outpatient services. In that proposed rule, we explained that, due to Year 2000 (Y2K) systems concerns, implementation of the new payment system would be delayed until after January 1, 1999. (The statement in the rule that the statute requires implementation ''effective January 1, 1999,'' and other similar statements in other rules, were not intended to mean that the statute requires retroactive implementation of the hospital outpatient PPS. As noted elsewhere in this rule, the statute does not impose such a requirement.) As noted in that document, the scope of systems changes required to implement the hospital outpatient PPS is so enormous as to be impossible to accomplish concurrently with the critical work that we, our contractors, and our provider-partners had to perform to ensure that all of our respective systems were Y2K compliant. Section XI of the proposed rule (63 FR 47605) explains in greater detail the reasons for delaying implementation.

The proposed rule originally provided for a 60-day comment period. However, the comment period was extended four times, ultimately ending on July 30, 1999. (See 63 FR 63429, November 13, 1998; 64 FR 1784, January 12, 1999; 64 FR 12277, March 12, 1999; and 64 FR 36320; July 6, 1999.)

On June 30, 1999, we published a correction notice (64 FR 35258) to correct a number of technical and typographical errors contained in the September 8, 1998 proposed rule. The numerical values in the proposed rule reflected incorrect data and data programming. Among other corrections, the notice set forth revised numerical values for the current payment, total services (total units), relative weights, proposed payment rates, national unadjusted coinsurance, minimum unadjusted coinsurance, and service-mix index.

*D. Overview of Public Comments*

We received approximately 10,500 comments in response to our September 8, 1998 proposed rule. That count includes the numerous requests from hospital and other interested groups and organizations that we extend the public comment period to allow additional time for analysis of the impact of our proposals. As we explain above, we extended the comment period four times, to end finally on July 30, 1999.

In addition to receiving comments from a number of organizations representing the full spectrum of the hospital industry, we received comments from beneficiaries and their families, physicians, health care workers, individual hospitals, professional associations and societies, legal and nonlegal representatives and spokespersons for beneficiaries and hospitals, members of the Congress, and other interested citizens. The majority of comments addressed our proposals regarding payment for: Corneal tissue; payment for high-cost technologies, both existing and future; payment for blood and blood products; and payment for high cost drugs, including chemotherapy agents. We also received numerous comments addressing: Our approach to ratesetting using the ambulatory payment classification (APC) system; our method of calculating the payment conversion factor; and the potentially negative impact of the proposed hospital outpatient PPS on hospital revenues. In addition, we received many comments concerning the proposed regulations for provider-based entities.

We carefully reviewed and considered all comments received timely. The many modifications that we made to our proposed regulations in response to commenters' suggestions and recommendations are reflected in the provisions of this final rule. Comments and our responses are addressed by topic in the sections that follow.

*E. Summary of Relevant Provisions in the Balanced Budget Refinement Act of 1999 (the BBRA 1999)*

As noted above, subsequent to publication of the proposed rule, the BBRA 1999 was enacted on November 29, 1999. The BBRA 1999 made major changes that affect the proposed hospital outpatient PPS. Because these changes are effective with the implementation of the PPS, we have had to make some revisions from the September 8, 1998 proposed rule. The provisions of the BBRA 1999 that we are implementing in this final rule with comment period follow.

1. Outlier Adjustment

Section 201(a) of the BBRA 1999 amends section 1833(t) by redesignating paragraphs (5) through (9) as paragraphs (7) through (11) and adding a new paragraph (5). New section 1833(t)(5) of the Act provides that the Secretary will make payment adjustments for covered services whose costs exceed a given threshold (that is, an outlier payment). This section describes how the additional payments are to be calculated and caps the projected outlier payments at no more than 2.5 percent of the total projected payments (sum of both Medicare and beneficiary payments to the hospital) made under hospital outpatient PPS for years before 2004 and 3.0 percent of the total projected payments for 2004 and subsequent years.

2. Transitional Pass-Through for Additional Costs of Innovative Medical Devices, Drugs, and Biologicals

Section 201(b) of the BBRA 1999 adds new section 1833(t)(6) to the Act, establishing transitional pass-through payments for certain medical devices, drugs, and biologicals. This provision does the following: Specifies the types of items for which additional payments must be made; describes the amount of the additional payment; limits these payments to at least 2 years but not more than 3 years; and caps the projected payment adjustments annually at 2.5 percent of the total projected payments for hospital outpatient services each year before 2004 and no more than 2.0 percent in subsequent years. Under this provision, the Secretary has the authority to reduce pro rata the amount of the additional payments if, before the beginning of a year, she estimates that these payments would otherwise exceed the caps.

3. Budget Neutrality Applied to New Adjustments

Section 201(c) of the BBRA 1999 amends section 1833(t)(2)(E) of the Act to require that the establishment of outlier and transitional pass-through payment adjustments is to be made in a budget neutral manner.

4. Limitation on Judicial Review

Section 201(d) of the BBRA 1999 amends redesignated section 1833(t)(11) of the Act by extending the prohibition of administrative or judicial review to include the factors for determining outlier payments (that is, the fixed multiple, or a fixed dollar cutoff amount, the marginal cost of care, or applicable total payment percentage), and the determination of additional payments for certain medical devices,

drugs, and biologicals, the insignificant cost determination for these items, the duration of the additional payment or portion of the PPS payment amount associated with particular devices, drugs, or biologicals, and any pro rata reduction.

5. Inclusion in the Hospital Outpatient PPS of Certain Implantable Items

Section 201(e) of the BBRA 1999 amends section 1833(t)(1)(B) of the Act to include as covered outpatient services implantable prosthetics and DME and diagnostic x-ray, laboratory, and other tests associated with those implantable items.

6. Payment Weights Based on Mean Hospital Costs

Section 201(f) of the BBRA 1999 amends section 1833(t)(2)(C) of the Act, which specifies data requirements for establishing relative payment weights, to allow the Secretary the discretion to base the weights on either the median or mean hospital costs determined by data from the most recent available cost reports.

7. Limitation on Variation of Costs of Services Classified Within a Group

Section 201(g) of the BBRA 1999 amends section 1833(t)(2) of the Act to limit the variation of costs of services within each payment classification group by providing that the highest median (or mean cost, if elected by the Secretary) for an item or service within the group cannot be more than 2 times greater than the lowest median (or mean) cost for an item or service within the group. The provision allows the Secretary to make exceptions in unusual cases, such as for low volume items and services.

8. Annual Review of the Hospital Outpatient PPS Components

Section 201(h) of the BBRA 1999 amends redesignated section 1833(t)(8) of the Act to require at least annual review of the groups, relative payment weights, and the wage and other adjustments made by the Secretary to take into account changes in medical practice, the addition of new services, new cost data, and other relevant information and factors. That section of the Act is further amended to require the Secretary to consult with an expert outside advisory panel composed of an appropriate selection of provider representatives who will review the clinical integrity of the groups and weights and advise the Secretary accordingly. The panel may use data other than those collected or developed by the Department of HHS for the review and advisory purposes.

9. Coinsurance Not Affected by Pass-Throughs

Section 201(i) of the BBRA 1999 amends redesignated section 1833(t)(7) of the Act to provide that the beneficiary coinsurance amount will be calculated as if the outlier and transitional pass-throughs had not occurred; that is, there will be no coinsurance collected from beneficiaries for the additional payments made to hospitals by Medicare for these adjustments.

10. Extension of Cost Reductions

Section 201(k) of the BBRA 1999 amends section 1861(v)(1)(S)(ii) of the Act to extend until the first date that the hospital outpatient PPS is implemented, the 5.8 and 10 percent reductions for hospital operating and capital costs, respectively.

11. Clarification of Congressional Intent Regarding Base Amounts Used in Determining the Hospital Outpatient PPS

Section 201(l) of the BBRA 1999 provides that, ''With respect to determining the amount of copayments described in paragraph (3)(A)(ii) of section 1833(t) of the Social Security Act, as added by section 4523(a) of the BBA, Congress finds that such amount should be determined without regard to such section, in a budget neutral manner with respect to aggregate payments to hospitals, and that the Secretary of Health and Human Services has the authority to determine such amount without regard to such section.'' Pursuant to this provision, we are calculating the aggregate PPS payment to hospitals in a budget neutral manner.

12. Transitional Corridors for Application of Outpatient PPS

Section 202 of the BBRA 1999 amends section 1833(t) of the Act by redesignating paragraphs (7) through (11) as paragraphs (8) through (12), and adding a new paragraph (7), which provides for a transitional adjustment to limit payment reductions under the hospital outpatient PPS. More specifically, for the years 2000 through 2003, a provider, including a CMHC, will receive an adjustment if its payment-to-cost ratio for outpatient services furnished during the year is less than a set percentage of its payment-to-cost ratio for those services in its cost reporting period ending in 1996 (the base year). Two categories of hospitals, rural hospitals with 100 or fewer beds and cancer hospitals, will be held harmless under this provision. Small rural hospitals, for services furnished before January 1, 2004, will be maintained at the same payment-to-cost ratio as their base year cost report if their PPS payment-to-cost ratio is less. The hold-harmless provision applies permanently to cancer centers. Section 202 also requires the Secretary to make interim payments to affected hospitals subject to retrospective adjustments and requires that the provisions of this section do not affect beneficiary coinsurance. Finally, this provision is not subject to budget neutrality.

13. Limitation on Coinsurance for a Procedure

Section 204 of the BBRA 1999 amends redesignated section 1833(t)(8) of the Act to provide that the coinsurance amount for a procedure performed in a year cannot exceed the hospital inpatient deductible for that year.

14. Reclassification of Certain Hospitals

Section 401 of the BBRA 1999 adds section 1886(d)(8)(E) to the Act to permit reclassification of certain urban hospitals as rural hospitals. Section 401 adds section 1833(t)(13) to the Act to provide that a hospital being treated as a rural hospital under section 1886(d)(8)(E) also be treated as a rural hospital under the hospital outpatient PPS.

## II. Prohibition Against Unbundling of Hospital Outpatient Services

*A. Background*

Sections 9343(c)(1) and (c)(2) of OBRA 1986 amended sections 1862(a)(14) and 1866(a)(1)(H) of the Act, respectively. As revised, section 1862(a)(14) of the Act prohibits payment for nonphysician services furnished to hospital patients (inpatients and outpatients), unless the services are furnished by the hospital, either directly or under an arrangement (as defined in section 1861(w)(1) of the Act). As revised, section 1866(a)(1)(H) of the Act requires each Medicare-participating hospital to agree to furnish directly all covered nonphysician services required by its patients (inpatients and outpatients) or to have the services furnished under an arrangement (as defined in section 1861(w)(1) of the Act). Section 9338(a)(3) of OBRA 1986 affected implementation of the bundling mandate by amending section 1861(s)(2)(K) of the Act to permit services of physician assistants to be covered and billed separately. Sections 4511(a)(2)(C) and (D) of the BBA 1997 further revised sections 1862(a)(14) and 1866(a)(1)(H) of the Act, respectively, to exclude services of nurse practitioners

and clinical nurse specialists, described in section 1861(s)(2)(K)(ii) of the Act, from the bundling requirement.

*B. Office of Inspector General (OIG) Civil Money Penalty Authority and Civil Money Penalties for Unbundling Hospital Outpatient Services*

In order to deter the unbundling of nonphysician hospital services, section 9343(c)(3) of OBRA 1986 added section 1866(g) to the Act to provide for the imposition of civil money penalties (CMPs), not to exceed $2,000, against any person who knowingly and willfully presents, or causes to be presented, a bill or request for payment for a hospital outpatient service under Part B of Medicare that violates the requirement for billing under arrangements specified in section 1866(a)(1)(H) of the Act. In addition, section 1866(g) includes authorization to impose a CMP, in the same manner as other CMPs are imposed under section 1128A of the Act when arrangements should have been made but were not. Section 4085(i)(17) of OBRA 1987 amended section 1866(g) of the Act by deleting all references to hospital outpatient services under Part B of Medicare. The result of this amendment is that the CMP is now applicable for services furnished to hospital patients, whether paid for under Medicare Part A or B.

In order to implement section 1866(g) of the Act, we proposed in our August 5, 1988 proposed rule that the OIG would impose a CMP against any person who knowingly and willfully presents, or causes to be presented, a bill or request for payment for a hospital outpatient service under Part B of Medicare that violates the billing arrangement under section 1866(a)(1)(H) of the Act or the requirement for an arrangement. The amount of the CMP is to be limited to $2,000 for each improper bill or request, even if the bill or request included more than one item or service.

*C. Summary of Final Regulations on Bundling of Hospital Outpatient Services*

In our September 8, 1998 proposed rule, we proposed to make final most of the provisions of the August 5, 1988 proposed rule but with a number of revisions that we describe in detail in the proposed rule (63 FR 47558 through 47559). We are adopting as final regulations what we proposed in the September 8, 1998 rule with the following additional changes:

- We are adding a new paragraph (b)(7) to § 410.42 (Limitations on coverage of certain services furnished to hospital outpatients) to provide an exception to the hospital bundling requirements for services hospitals furnish to SNF residents as defined in § 411.15(p). (Section 410.42 has been redesignated from § 410.39 in the proposed rule.)
- We are making a minor change to newly redesignated paragraph (m)(2) (this language was formerly included in paragraph (m)(1)) in § 411.15 (Particular services excluded from coverage) to make it clearer that the exclusion discussed in this section is referring to excluding certain services from coverage.
- Except for minor wording changes in introductory paragraph (b) of § 1003.102 (Basis for civil money penalties and assessments), that section remains as it appeared in the August 5, 1988 proposed rule. Paragraph (b)(15) is redesignated from proposed paragraph (b)(4) in the August 5, 1988 proposed rule and (b)(14) in the September 8, 1998 proposed rule. Paragraphs (b)(12) through (b)(14) of § 1003.102 are reserved.
- We are adding a new paragraph (k) to § 1003.103 (Amount of penalty) to indicate that the OIG may impose a penalty of not more than $2,000 for each bill or request for items and services furnished to hospital patients in violation of the bundling requirements.
- We are also amending § 1003.105 (Exclusion from participation in Medicare, Medicaid and other Federal health care programs) by revising paragraph (a)(1)(i) to reflect that the basis for imposition of a CMP is also a basis for exclusion from participation in Medicare, Medicaid and other Federal health care programs.

*D. Comments and Responses*

*Comment:* One association requested that we clarify whether lab tests are subject to the bundling requirement or whether those services are included in the definition of diagnostic tests that are not required to be bundled. If lab tests are bundled, the association asked that we seek a legislative change to permit a provider, other than the lab that performs the test, to bill for the test.

*Response:* Laboratory tests, like all other services furnished to hospital patients, must be provided directly or under arrangements by the hospital and only the hospital may bill the program. Section 1833(h)(5)(A)(iii) of the Act provides an exception to the requirement that payment for a clinical diagnostic lab may be made only to the person or entity that performed or supervised the performance of the test. This section provides that in the case of a clinical diagnostic laboratory test provided under arrangement made by a hospital or CAH, payment is made to the hospital.

All diagnostic tests that are furnished by a hospital, directly or under arrangements, to a registered hospital outpatient during an encounter at a hospital are subject to the bundling requirements. The hospital is not responsible for billing for the diagnostic test if a hospital patient leaves the hospital and goes elsewhere to obtain the diagnostic test.

*Comment:* The same association asked us to clarify that services billed to skilled nursing facilities (SNFs) under the consolidated billing requirement would be exempt from the bundling requirement for hospital outpatient services.

*Response:* We agree that in situations where a beneficiary receives outpatient services from a Medicare participating hospital or CAH while temporarily absent from the SNF, the beneficiary continues to be considered a SNF resident specifically with regard to the comprehensive care plan required under § 483.20(b). Such services are, therefore, subject to the SNF consolidated billing provision and should be exempt from the hospital outpatient bundling requirements. The final regulations at § 410.42(b)(7) reflect this exception.

We note that the SNF consolidated billing requirements, under § 411.15(p)(3)(iii), do not apply to a limited number of exceptionally intensive hospital outpatient services that lie well beyond the scope of care that SNFs would ordinarily furnish, and thus beyond the ordinary scope of SNF care plans. The hospital outpatient services that are currently included in this policy are: Cardiac catheterization; computerized axial tomography (CAT) scans; MRIs; ambulatory surgery involving the use of an operating room; emergency room services; radiation therapy; angiography; and lymphatic and venous procedures. When a hospital or CAH provides these services to a beneficiary, the beneficiary's status as a SNF resident ends, but only with respect to these services. The beneficiary is now considered to be a hospital outpatient and the services are subject to hospital outpatient bundling requirements. In November 1998, we issued Program Memorandum transmittal number A–98–37, which provides additional clarification on this exclusion as well as a list of specific HCPCS codes that identify the services that are excluded from SNF consolidated billing but subject to hospital outpatient bundling.

*Comment:* One commenter understood that the proposed rule

would permit payment for all diagnostic tests that are furnished by a hospital or other entity if the patient leaves the hospital and obtains the service elsewhere; however, the commenter requested clarification as to the treatment of ''outsourced'' hospital departments. The commenter stated that hospitals are increasingly outsourcing departments to providers that can furnish services efficiently. Often these providers do not operate as ''under arrangements'' providers to the hospital, but as free-standing providers offering outpatient services on hospital grounds. The commenter specifically asked whether a free-standing entity providing outpatient services on hospital grounds, but operated independently of the hospital is able to bill separately for services furnished or is the entity considered to be part of the hospital and required to furnish services ''under arrangement.''

*Response:* A free-standing entity, that is, one that is not provider-based, may bill for services furnished to beneficiaries who do not meet the definition of a hospital outpatient at the time the service is furnished. Our bundling requirements apply to services furnished to a ''hospital outpatient,'' as defined in § 410.2, during an ''encounter,'' also defined in § 410.2.

*Comment:* One commenter indicated that while the proposed revision to § 1003.102(b) accurately reflected the statutory directive that the basis for imposing a CMP is a ''bill or request for payment,'' the proposed amendment to § 1003.103(a) regarding the appropriate penalty amount to be imposed for bundling violations was in error. The commenter indicated that the OIG lacks the authority to impose a CMP in the amount of $10,000 for these violations, and that such a penalty should be not more than $2,000 for each violation.

*Response:* The commenter is correct. While section 231(c) of the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104–191, increased the CMP maximum amount from $2,000 to $10,000, the statute sets forth ''items or services'' as the basis upon which a higher CMP amount may be assessed. However, with regard to bundling violations, the Secretary may impose a CMP only on the basis of a ''bill or request for payment'' rather than ''for each item and service'' as stated in the proposed revision to § 1003.103. We are correcting this error by adding a new § 1003.103(k) to indicate that the OIG may impose a penalty of not more than $2,000 for each bill or request for items and services furnished to hospital patients in violation of the bundling requirements.

## III. Hospital Outpatient Prospective Payment System (PPS)

In this section, we designate the services for which Medicare will make payment under the hospital outpatient PPS, the payment rates set for those services, and the method by which we determined the outpatient PPS payment and coinsurance amounts.

We explain the structure of the hospital outpatient PPS, respond to comments that we received about the proposed PPS, and describe modifications that we made to the proposed PPS in response to comments, such as provisions we are making to expedite appropriate payment for new technologies and provisions to pay for blood and blood products.

In this section, we also discuss how we will implement requirements enacted by the BBRA 1999, including transitional payment corridors and other payment adjustments such as outliers and transitional pass-throughs.

### *A. Hospitals Included In or Excluded From the Outpatient PPS*

This PPS applies to covered hospital outpatient services furnished by all hospitals participating in the Medicare program, except as noted below. Partial hospitalization services in community mental health centers (CMHCs) are also paid under this PPS. Exclusions from outpatient PPS are different and more limited than exclusions from inpatient PPS. Thus, hospitals or distinct parts of hospitals that are excluded from the inpatient PPS are included in the outpatient PPS, to the extent that the hospital or distinct part furnishes outpatient services. For example, we will make payment under the outpatient PPS for outpatient psychiatric services. The outpatient services provided by hospitals of the Indian Health Service (IHS) will continue to be paid under separately established rates which are published annually in the **Federal Register**. We intend to develop a plan that will help these facilities transition to the PPS and will consult with the IHS to develop this plan.

The following hospitals are excluded from the outpatient PPS:

- Certain hospitals in Maryland qualify under section 1814(b)(3) of the Act for payment under the State's payment system. The excluded services are limited to those paid under the State's payment system as described in section 1814(b)(3) of the Act. Any other outpatient services furnished by the hospital are paid under the outpatient PPS.
- Critical access hospitals that are paid under a reasonable cost based system, as required under section 1834(g) of the Act.

*Comment:* National and State associations representing children's hospitals and a number of individual children's hospitals located across the country strongly recommended that their hospitals be excluded from the hospital outpatient PPS just as they have been excluded from the hospital inpatient PPS. These commenters argued that the exclusion should apply to outpatient services furnished by children's hospitals because these hospitals treat a unique patient group whose health needs are different from those of adult beneficiaries entitled to Medicare benefits. The commenters further argued that services to Medicare patients are, on average, only 1 percent of the total inpatient and outpatient services that children's hospitals furnish and that these services are largely ESRD services that are already excluded from the hospital outpatient PPS. The commenters were concerned that the resources required to implement and comply with the new system would be disproportionately high relative to the small number of patients who would be affected by the new system. In addition, the impact analysis that accompanied the proposed rule estimated that children's hospitals would lose more than 20 percent of their Medicare revenues under the new system. Commenters expressed great concern about this loss of revenue.

*Response:* Our most recent analysis of the impact on hospitals of the PPS shows a negative effect for children's hospitals of 11.9 percent, which is significantly less than what we estimated in the proposed rule. However, the transitional corridor payments provided by the BBRA 1999 will protect these hospitals from even this level of loss through 2004. The estimated loss for CY 2000–2001 for children's hospitals is only 3.2 percent. (See Table 2 in section IX of this preamble.) As we discuss in section III.H.2 below, we will conduct extensive analyses during the first years of implementation of the PPS to determine whether we should propose adjustments for certain types of hospitals, including children's hospitals, when the transitional corridor provision expires. In the meantime, we are not excluding any special class of hospital from the PPS.

### *B. Scope of Facility Services*

Section 1833(t)(1)(B)(i) of the Act gives us the authority to designate the services to be covered under the hospital outpatient PPS. In this section of the final rule, we designate the types

of services included or excluded under the hospital outpatient PPS.

1. Services Excluded From the Scope of Services Paid Under the Hospital Outpatient PPS

*a. Background*

In developing a hospital outpatient PPS, we want to ensure that all services furnished in a hospital outpatient setting will be paid on a prospective basis. We have already been paying, in part, for some hospital outpatient services such as clinical diagnostic laboratory services, orthotics, and end-stage renal disease (ESRD) dialysis services based on fee schedules or other prospectively determined rates that also apply across other sites of ambulatory care. Rather than duplicate existing payment systems that are effectively achieving consistency of payments across different service delivery sites, we proposed to exclude from the outpatient PPS those services furnished in a hospital outpatient setting that were already subject to an existing fee schedule or other prospectively determined payment rate. The similar payments across various settings create a more level playing field in which Medicare makes virtually the same payment for the same service, without regard to where the service is furnished.

We therefore proposed to exclude from the scope of services paid under the hospital outpatient PPS the following:

• Services already paid under fee schedules or other payment systems including, but not limited to: screening mammographies, services for patients with ESRD that are paid for under the ESRD composite rate; the professional services of physicians and non-physician practitioners paid under the Medicare physician fee schedule; laboratory services paid under the clinical diagnostic laboratory fee schedule; and DME, orthotics, prosthetics, and prosthetics devices, prosthetic implants, and supplies (DMEPOS) paid under the DMEPOS fee schedule when the hospital is acting as a supplier of these items. An item such as crutches or a walker that is given to the patient to take home, but that may also be used while the patient is at the hospital, would be billed to the DME regional carrier rather than paid for under the hospital outpatient PPS.

• Hospital outpatient services furnished to SNF inpatients as part of his or her resident assessment or comprehensive care plan (and thus included under the SNF PPS) that are furnished by the hospital ''under arrangements'' but billable only by the SNF, regardless of whether or not the patient is in a Part A SNF stay.

• Services and procedures that require inpatient care.

The statute excludes from the definition of ''covered OPD services'' ambulance services, physical and occupational therapy, and speech-language pathology services, specified in section 1833(t)(1)(B)(iii) of the Act (redesignated as section 1833(t)(1)(B)(iv) by section 201(e) of the BBRA 1999). These services are to be paid under fee schedules in all settings.

*b. Comments and Responses*

*Comment:* One commenter urged that we exclude services furnished to ESRD patients from the scope of the hospital outpatient PPS.

*Response:* Services furnished to ESRD patients include dialysis, Epoietin (EPO), drugs, and supplies provided outside the composite rate, surgery specific to access grafts, and many other medical services related to renal disease or to other coexisting conditions. We will continue to base payment for dialysis services on the composite rate, and we will continue to pay for EPO based on the current rate established for that service. The drugs and supplies that are used within a dialysis session, but for which payment is not included in the composite rate, are paid outside that rate. We have to conduct further analyses in order to develop appropriate APC groups upon which to base payment. In the meantime, we will continue to pay on a reasonable cost basis for dialysis related drugs and supplies that are paid outside the composite rate.

*Comment:* A hospital industry association took exception to the requirement that hospitals obtain a separate supplier number, post a bond, and bill separately to the DME regional carrier for DME supplies such as crutches. They believe that this is an unnecessary requirement that results in additional costs for small rural hospitals. The commenter recommended that we include within the PPS rate supplies such as crutches that are directly related to the provison of the hospital outpatient services or that we permit hospitals to bill under the DME fee schedule without having to obtain a DME supplier number or post a bond.

*Response:* Section 1834(j)(1)(A) of the Act provides that no payment may be made for items furnished by a supplier of medical equipment and supplies unless the supplier obtains a supplier number. Section 1834(a)(1)(C) of the Act provides that payment for DME can be made only under the DME fee schedule. Therefore, to receive payment for DME under Medicare, a hospital must obtain a supplier number and must meet the other requirements set by applicable Medicare rules and regulations.

*Comment:* Several major hospital associations and a number of other commenters opposed our proposal to exclude from payment certain procedures that we designate as ''inpatient only.'' Other commenters, including a physician professional society, agree that many of the procedures that we designated in the proposed rule as ''inpatient only'' are currently performed appropriately and safely only in the inpatient setting. However, these commenters believe that our explicit exclusion of individual procedures, besides being unnecessary, could have an adverse effect on advances in surgical care. Some commenters alleged that we provided no concrete support for designating procedures as ''inpatient only.'' A number of commenters argued that medicine is not practiced uniformly across the nation and that some services listed among the exclusions are currently being performed on an outpatient basis in various parts of the country with positive outcomes.

An industry association stated that we failed to consider surgical judgment and patient choice in determining the appropriate treatment setting for certain services that we proposed to exclude from coverage. Other commenters believe that the appropriate site for performing a medical service is best determined by physicians and their patients. One professional society stated that case law including medical malpractice case law is sufficient to ensure that medical services are delivered in the appropriate treatment setting and in conformance with prevailing medical standards.

*Response:* We recognize and acknowledge that our assigning ''inpatient only'' status to certain services and procedures raises numerous questions and concerns, and that some individual determinations can be reasonably debated. However, section 1833(t)(1)(B) of the Act explicitly authorizes the Secretary to designate which hospital outpatient services are to be ''covered OPD services'' subject to payment under the hospital outpatient PPS. Therefore, we have had to select from the universe of possible services those that we determine are reasonable, necessary, and appropriate for Medicare payment under the hospital outpatient PPS. We note that our designation of a service as ''inpatient only'' does not necessarily preclude the service from being furnished in a hospital outpatient

setting, but means only that Medicare will not make payment for the service were it to be furnished to a Medicare beneficiary in that setting. This unfortunately leaves the beneficiary liable for payment if the procedure is in fact performed in the outpatient setting. We hope that hospitals will advise beneficiaries of the consequences if procedures on the inpatient list are provided as outpatient services (that is, denial of Medicare payment with concomitant beneficiary liability). In section III.C.5 of this preamble, we discuss in greater detail our rationale for designating specific procedures as ''inpatient only.'' In response to comments, we have removed the ''inpatient only'' status from a number of services, which will allow them to be paid under the hospital outpatient PPS. We emphasize our intention to review annually, in consultation with hospital and professional societies and associations and the expert outside advisory panel mandated by the BBRA 1999, those procedures classified as ''inpatient only'' to ensure that the designation remains consistent with current standards of practice.

*Comment:* One industry association contends that the statutory and regulatory authorities that we cite in the proposed rule (section 1862(a)(1)(A) of the Act and 42 CFR 411.15(k)(1), respectively) do not support the proposed medical services exclusions. The commenter argues that those provisions are the basis for prohibiting coverage for services that are not reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member. The commenter states that these provisions are not the basis upon which we identified services for the ''inpatient only'' list. The commenter further states that use of these provisions as a basis for denying coverage of the services would be confusing to beneficiaries.

*Response:* The commenter is correct that the proper citations are not section 1862(a)(1) of the Act and 42 CFR 411.15(k)(1). In fact, the basis for our designating certain procedures as ''inpatient only'' is dependent on medical judgment regarding the proper site of service, and the proper citation for such designation is section 1833(t)(1)(B) of the Act. In some instances, the identification of services to be included or excluded from this PPS was perfectly clear. For example, emergency departments (EDs) are outpatient departments of hospitals. Thus emergency services rendered in EDs qualify as outpatient services. On the other hand, coronary artery bypass graft surgery (CABG) requires many hours in surgery, part of the time with the patient's life being sustained by artificial means; a period of hours, if not days, in the surgical intensive care unit (ICU); and further care in an inpatient unit with frequent nursing attention. It clearly cannot be an outpatient procedure, and it would not be reasonable to consider it for inclusion in this PPS. There are many procedures which require similar intensity of care, including periods in specialty ICUs and several days of intense nursing attention.

Some procedures formerly performed only in the inpatient setting, however, have moved to the outpatient site of service. This movement has taken place due to new, less-invasive surgical techniques, such as laparoscopy, or new anesthesia agents that clear from the body more rapidly, allowing some patients to have general anesthesia in the morning and return home that afternoon. Thus we have had to decide which procedures may reasonably be performed in the outpatient setting, and which cannot. We have been guided in this decision by our medical advisors' clinical judgment regarding what is reasonable in various settings, comments we received in response to the proposed rule, and bill data which shows movement from one site to another. In section III.C.5, we discuss the criteria we considered in defining ''inpatient only'' procedures.

*Comment:* One hospital asked how we would pay a hospital that routinely performs on an outpatient basis a procedure that we proposed to designate as ''inpatient only.'' The commenter recommended that a specific billing mechanism be used to guarantee payment in these situations.

*Response:* Services designated as ''inpatient only'' will be excluded from Medicare payment under the hospital outpatient PPS. If the service is performed on an outpatient basis and a claim is submitted, the claim will be denied, and the beneficiary may be billed for the service. We would consider this a very poor policy on the hospital's part, and would hope that hospitals decide to abide by the constraints of the inpatient list.

*Comment:* One commenter noted that hospital outpatient departments have never been limited to a list of approved procedures as are Medicare participating ASCs. The commenter stated that the ''inpatient only'' policy would exclude payment for a significant number of procedures that have traditionally been performed in the hospital outpatient setting. The commenter stated that some of the excluded procedures incorporate an observation stay in a recovery care center. The commenter contended that many of the excluded procedures could be safely performed in the outpatient setting particularly if a 24 to 72 hour recovery care center is part of the outpatient surgical care provided.

*Response:* Routinely billing an observation stay for patients recovering from outpatient surgery is not allowed under current Medicare rules nor will it be allowed under the hospital outpatient PPS. As we state in section III.C.5 of this preamble, one of the primary factors we considered as an indicator for the ''inpatient only'' designation is the need for at least 24 hours of postoperative care.

*Comment:* One commenter asked what option a hospital has if a beneficiary's secondary insurer requires that a procedure included on the Medicare inpatient only list be performed on an outpatient basis.

*Response:* Upon implementation, the provisions of this final rule will govern payment for Medicare covered outpatient services furnished by hospitals to Medicare beneficiaries. Medicare payment policy and rules are not binding on employer-provided retiree coverage that may supplement Medicare coverage. Medigap insurers, however, must follow Medicare's coverage determinations.

*c. Payment for Certain Implantable Items Under the BBRA 1999*

In the course of identifying items and services whose costs we proposed to designate for payment under the hospital outpatient PPS, we gave considerable thought to including implantable items and services because these items and services are such an integral part of the procedure by which they are inserted or implanted. However, a number of the more common implants such as aqueous shunts, hallux valgus implants, infusion pumps, and neurostimulators, are classified as implantable prosthetics or DME. The statutory language governing payment for DMEPOS provides that, notwithstanding any other provision of the Medicare statute, DMEPOS must be paid for using the DMEPOS fee schedule. Therefore, under the proposed rule, the scope of services paid under the hospital outpatient PPS did not include implantable prosthetics and DME paid under the DMEPOS fee schedule. However, we did propose to package payment for implanted items such as stents, vascular catheters, and venous ports within the APC payment rate for the procedure related to the insertion of these items because we

define these items as supplies rather than as prosthetic implants or implantable DME.

Section 201(e) of the BBRA 1999 amends section 1833(t)(1)(B) of the Act to provide that ''covered OPD services'' include implantable items described in paragraph (3), (6), or (8) of section 1861(s) of the Act. The conference report accompanying the BBRA 1999, H. R. Rep. No. 436 (Part I), 106th Cong., 1st Sess. (1999), expresses the belief of the conferees that the current DMEPOS fee schedule is not appropriate for certain implantable medical items such as pacemakers, defibrillators, cardiac sensors, venous grafts, drug pumps, stents, neurostimulators, and orthopedic implants as well as items that come into contact with internal human tissue during invasive medical procedures, but are not permanently implanted. In the conference report agreement, the conferees state their intention that payment for these items be made through the outpatient PPS, regardless of how these products might be classified on current HCFA fee schedules. The implantable items affected by this BBRA 1999 requirement include prosthetic implants (other than dental) that replace all or part of an internal body organ (including colostomy bags and supplies directly related to colostomy care and including replacement of these devices); implantable DME; and implantable items used in performing diagnostic x-rays, diagnostic laboratory tests, and other diagnostic tests.

*Comment:* A number of commenters disagreed with our proposal to pay under the DMEPOS fee schedule for implantable items and devices that require surgical insertion. We received comments on specific implantable items, including Vitrasert (a drug delivery system that is implanted in the eye); cochlear devices, which allow the profoundly deaf to hear sound and in some cases recognize speech; nerve stimulators that treat intractable epilepsy and other diseases; new technology intraocular lenses implanted following cataract surgery; and access devices for dialysis treatment. Commenters were also concerned that the costs of some implantable devices not paid under the DMEPOS fee schedule, which we packaged in our proposed rule, were not properly recognized in the APC payment.

*Response:* As we explain above, the amendments made to the statute by section 201(e) of the BBRA 1999 provide for payment to be made under the hospital outpatient PPS for implantable items that are part of diagnostic x-rays, diagnostic laboratory tests, and other diagnostic tests; implantable durable medical equipment; and implantable prosthetic devices (other than dental). This BBRA 1999 provision requires that an implantable item be classified to the group that includes the service to which the item relates. Thus, under this final rule with comment period, we are including within the scope of the hospital outpatient PPS items such as aqueous shunts that would, absent the BBRA 1999 provision, have been paid under the DMEPOS fee schedule. Because implantable items are now packaged into the APC payment rate for the service or procedure with which they are associated, certain items may be candidates for the transitional pass-through payment, which is discussed in detail in section III.D of this preamble. The APC rates may not in every case perfectly recognize the cost of implantable items. We will continue to review the impact of packaging implantables in future updates.

*d. Summary of Final Action*

We are modifying proposed § 419.22 to remove prosthetic implants from the list of services excluded from payment under the hospital outpatient PPS. We are adding subparagraphs (9), (10), and (11) to proposed § 419.2(b), to include the following in the list of items and services whose costs are included in hospital outpatient PPS payment rates: prosthetic implants (other than dental) that replace all or part of an internal body organ (including colostomy bags and supplies directly related to colostomy care), and including replacement of these devices; implantable DME; and implantable items used in performing diagnostic x-rays, diagnostic laboratory tests, and other diagnostic tests.

2. Services Included Within the Scope of the Hospital Outpatient PPS

We proposed to include three categories of services within the scope of the outpatient PPS, as follows:

*a. Services for Patients Who Have Exhausted Their Part A Benefits*

Section 1833(t)(1)(B)(ii) of the Act provides for Medicare payment under the hospital outpatient PPS for certain services designated by the Secretary that are furnished to inpatients who have exhausted their Part A benefits or who are otherwise not in a covered Part A stay. Examples of services covered under this provision include diagnostic x-rays and certain other diagnostic services and radiation therapy covered under section 1832 of the Act.

*b. Partial Hospitalization Services*

Section 1833(a)(2)(B) of the Act provides that partial hospitalization services furnished in CMHCs be paid under the hospital outpatient PPS. Partial hospitalization is a distinct and organized intensive psychiatric outpatient day treatment program, designed to provide patients who have profound and disabling mental health conditions with an individualized, coordinated, comprehensive, and multidisciplinary treatment program.

*c. Services Designated by the Secretary*

We proposed to designate the following services to be paid under the hospital outpatient PPS:

- All hospital outpatient services, except those that are identified as excluded, above, in section III.B.1 of this final rule. The types of services subject to payment under the hospital outpatient PPS include the following: surgical procedures; radiology, including radiation therapy; clinic visits; emergency department visits; diagnostic services and other diagnostic tests; partial hospitalization for the mentally ill; surgical pathology; and cancer chemotherapy.
- Specific hospital outpatient services furnished to a beneficiary who is admitted to a Medicare-participating SNF but who is not considered to be a SNF resident, for purposes of SNF consolidated billing, with respect to those services that are beyond the scope of SNF comprehensive care plans. The specific hospital outpatient services that are excluded from SNF consolidated billing are cardiac catheterization, computerized axial tomography (CAT) scans, MRIs, ambulatory surgery involving the use of an operating room, emergency room services, radiation therapy, angiography, and lymphatic and venous procedures.
- Supplies such as surgical dressings used during surgery or other treatments in the hospital outpatient setting that are also paid under the DMEPOS fee schedule. Payment for these supplies, when they are furnished in a hospital outpatient setting, is packaged into the APC payment rate for the procedure or service with which the items are associated.
- Certain preventive services furnished to healthy persons, such as colorectal cancer screening.

Section 4523(d)(3) of the BBA 1997 amended section 1833(a)(2)(B) of the Act to provide that we discontinue reasonable cost based payment and instead make Part B payment under the hospital outpatient PPS for certain medical and other health services when

they are furnished by other providers such as hospices, SNFs, and HHAs. Specifically, we proposed to pay under the hospital outpatient PPS for the following medical and other health services when they are furnished by a provider of services:

• Antigens (as defined in 1861(s)(2)(G) of the Act);

• Splints and casts (1861(s)(5) of the Act);

• Pneumococcal vaccine, influenza vaccine, hepatitis B vaccine (1861(s)(10) of the Act).

Upon implementation of the hospital outpatient PPS, we would make Part B payment for the above services under the outpatient PPS when they are furnished by an HHA or hospice program. We would also make payment for antigens and the vaccines under the PPS when they are furnished by CORFs. (Splints and casts furnished by CORFs are paid under the rehabilitation fee schedule.) However, this provision would not apply to services furnished by a CORF that fall within the definition of CORF services at section 1861(cc)(1) of the Act. It also would not apply to services furnished by a hospice within the scope of the hospice benefit. Nor would it apply to services furnished by HHAs to individuals under an HHA plan of treatment within the scope of the home health benefit.

*d. Summary of Final Action*

We received no comments about the services we proposed to include within the scope of the hospital outpatient PPS. As noted in the preceding section III.B.1, we added certain implantable items to § 419.2(b) to implement section 201(e) of the BBRA 1999.

3. Hospital Outpatient PPS Payment Indicators

In the September 8, 1998 proposed rule in the **Federal Register**, we proposed a payment status indicator for every code in the HCPCS to identify how the service or procedure described by the code would be paid under the hospital outpatient PPS. We received no comments on our proposal to assign a payment status indicator to every HCPCS code. (In section III.C.6, below, we respond to commenters who disagreed with the payment status indicator that we proposed for individual codes.) Therefore, we are implementing payment status indicators as part of the hospital outpatient PPS. Addendum B displays the final payment status indicator for each HCPCS code, including codes for incidental services that are packaged into APC payment rates. Addendum E identifies the HCPCS codes to which we have assigned payment status indicator ''C'' to identify inpatient services that are not payable under outpatient PPS as implemented by this final rule. We respond below, in section III.C.5, to public comments about the specific codes we classified as inpatient services in the proposed rule and our final determination regarding the payment status of those codes.

The following are the payment status indicators and description of the particular services each indicator identifies:

• We use ''A'' to indicate services that are paid under some other method such as the DMEPOS fee schedule or the physician fee schedule.

• We use ''C'' to indicate inpatient services that are not paid under the outpatient PPS.

• We use ''E'' to indicate services for which payment is not allowed under the hospital outpatient PPS. In some instances, the service is not covered by Medicare. In other instances, Medicare does not use the code in question, but does use another code to describe the service.

• We use ''F'' to indicate corneal tissue acquisition costs, which are paid separately.

• We use ''G'' to indicate a current drug or biological for which payment is made under the transitional pass-through.

• We use ''H'' to indicate a device for which payment is made under the transitional pass-through.

• We use ''J'' to indicate a new drug or biological for which payment is made under the transitional pass-through.

• We use ''N'' to indicate services that are incidental, with payment packaged into another service or APC group.

• We use ''P'' to indicate services that are paid only in partial hospitalization programs.

• We use ''S'' to indicate significant procedures for which payment is allowed under the hospital outpatient PPS but to which the multiple procedure reduction does not apply.

• We use ''T'' to indicate surgical services for which payment is allowed under the hospital outpatient PPS. Services with this payment indicator are the only services to which the multiple procedure payment reduction applies.

• We use ''V'' to indicate medical visits for which payment is allowed under the hospital outpatient PPS.

• We use ''X'' to indicate ancillary services for which payment is allowed under the hospital outpatient PPS.

The table below lists types of services, the hospital outpatient PPS payment status indicator assigned to each type of service, and the basis for Medicare payment for the service.

MEDICARE HOSPITAL OUTPATIENT PPS PAYMENT STATUS INDICATORS: HOW MEDICARE PAYS FOR VARIOUS SERVICES WHEN THEY ARE BILLED FOR HOSPITAL OUTPATIENTS

| Indicator | Service | Status |
|---|---|---|
| A | Pulmonary Rehabilitation; Clinical Trial | Not paid. |
| C | Inpatient Procedures | Not paid. |
| A | Orthotics, and Non-implantable Durable Medical Equipment and Prosthetics. | DMEPOS Fee Schedule. |
| E | Nonallowed Items and Services | Not paid. |
| A | Physical, Occupational and Speech Therapy | Rehab Fee Schedule. |
| A | Ambulance | Reasonable cost or charge or, when implemented, Ambulance Fee Schedule. |
| A | EPO for ESRD Patients | National Rate. |
| A | Clinical Diagnostic Laboratory Services | Lab Fee Schedule. |
| A | Physician Services for ESRD Patients | Bill to Carrier. |
| A | Screening Mammography | Lower of Charge or National Rate. |
| N | Incidental Services, Packaged into APC Rate | Packaged; No Additional Payment Allowed. |
| P | Partial Hospitalization Services | Paid Per Diem. |
| S | Significant Procedure, Not Reduced When Multiple Procedures Performed. | Paid Under Hospital Outpatient PPS (APC Rate). |
| T | Significant Procedure, Multiple Procedure Reduction Applies | Hospital Paid Under Outpatient PPS (APC Rate). |

request is made on the individual's behalf for examination or treatment of a potential emergency medical condition as otherwise described in paragraph (a) of § 489.24, the hospital is obligated to provide the individual with an appropriate medical screening examination and any necessary stabilizing treatment.

The capability of the hospital includes that of the hospital as a whole, not just the capability of the off-campus facility or organization. Except for cases described in paragraph (i)(3)(iii) (those in which the main hospital campus does not have the specialized capability or facilities needed to treat the individual, or the individual's condition is deteriorating so rapidly that transport to the main campus would significantly jeopardize the life or health of the individual), the obligation of a hospital under this section must be discharged within the hospital as a whole. However, the hospital is not required to locate additional personnel or staff to off-site locations to be on standby for possible emergencies.

In § 489.24(i)(2), Protocols for off-campus departments, we further state that the hospital must establish protocols for the handling of potential emergency cases at off-campus departments. These protocols must include provision for direct contact between personnel at the off-campus department and emergency personnel at the main hospital campus, and may provide for dispatch of practitioners, when appropriate, from the main hospital campus to the off-campus department to provide screening or stabilization services. The intent of these requirements is to ensure timely exchange of information between the two sites, and to allow the hospital the flexibility to bring emergency personnel to the patient, rather than the opposite, where doing so is the best medical approach to meeting the patient's needs.

Under the final rule, if the off-campus department is an urgent care center, primary care center, or other facility that is routinely staffed by physicians, RNs, or LPNs, these personnel must be trained, and given appropriate protocols, for the handling of emergency cases. At least one individual on duty at the off-campus department during its regular hours of operation must be designated as a qualified medical person as described in paragraph (d). The qualified medical person must initiate screening of individuals who come to the off-campus department with a potential emergency medical condition, and may be able to complete the screening and provide any necessary stabilizing treatment at the off-campus department, or to arrange an appropriate transfer.

The final rule further states that if the off-campus department is a physical therapy, radiology, or other facility not routinely staffed with physicians, RNs, or LPNs, the department's personnel must be given protocols that direct them to contact emergency personnel at the main hospital campus for direction. Under this direction, and in accordance with protocols established in advance by the hospital, the personnel at the off-campus department must describe patient appearance and reported symptoms and, if appropriate, arrange transportation of the individual to the main hospital campus (if the main hospital campus has the capability required by the individual, and movement to the main campus would not significantly jeopardize the individual's life or health), or assist in an appropriate transfer. Movement of the individual to the main campus of the hospital is not considered a transfer under this section, since the individual is simply being moved from one department of a hospital to another department or facility of the same hospital.

Finally, specific rules apply if the individual's condition warrants movement to a facility other than the main hospital campus, either because the main hospital campus does not have the specialized capability or facilities required by the individual, or because the individual's condition is deteriorating so quickly that taking the time required to move the individual to the main hospital campus could place the life or health of the individual in significant jeopardy. Under these circumstances, personnel at the off-campus department must, in accordance with protocols established in advance by the hospital, assist in arranging an appropriate transfer of the individual to a medical facility other than the main hospital. The hospital must have protocols to ensure that the movement is an appropriate transfer in accordance with paragraph (d)(2) of this section. The protocol must include procedures and agreements established in advance with other hospitals or medical facilities in the area of the off-campus department to facilitate these anticipated transfers. We note that the interpretive guidelines for enforcement of EMTALA requirements will be revised to conform to these new rules.

*Section 498.3 Scope and applicability*

*Comment:* A commenter asked for clarification as to whether appeal rights would be available in the event of revocation by us of provider-based status.

*Response:* We have revised § 489.3(b)(2) to specify that a determination that a facility or organization no longer qualifies for provider-based status is an initial determination, thus providing an administrative appeals mechanism for these decisions.

*D. Requirements for Payment*

We proposed to revise § 410.27, Outpatient Hospital Services and Supplies Incident to a Physician Service: Conditions, to require that services furnished at a location other than an RHC or an FQHC that we designate as having provider-based status under § 413.65 must be under the direct supervision of a physician as defined in § 410.32(b)(3)(ii).

*Comment:* Several commenters requested clarification of what we mean by "direct supervision." One commenter asked that we further define the nature and extent of the supervision needed to comply with our proposal. One commenter asked whether the supervision requirement would be met if a physician is in the hospital or whether the physician must be in the department while the procedure is being performed. The same commenter asked whether the physician billing for the incident to services must be of the same specialty as the procedure being performed. A large trade association stated that we appear to be replacing our current policy in section 3112.4(A) of the Intermediary Manual, which states that we assume the physician supervision requirement to be met when incident to services are furnished on hospital premises, with a policy requiring direct physician supervision at all times, in all outpatient departments, regardless of whether or not they are located on the hospital campus. The commenter recommended that if we retain a direct supervision requirement, it should be limited to outpatient departments located off-site of the main provider. One commenter stated that facilities and organizations accorded provider-based status that are located on the main provider's campus should be subject to the same physician supervision requirements that apply to "incident to" services provided elsewhere on the campus.

*Response:* We regret that our proposal to define "direct supervision" by referring to the definition of "direct supervision of a physician" given at § 410.32(b)(3)(ii) may have been confusing to some commenters. Section 410.32(b)(3)(ii) defines "direct supervision" within (a physician) office

setting as meaning that the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. The definition at § 410.32(b)(3)(ii) goes on to state that ''direct supervision'' does not mean that the physician must be present in the room when the procedure is performed.

Our intention in the proposed rule was to define ''direct supervision'' of hospital outpatient services incident to physician services when they are furnished at a department of a hospital to mean that a physician must be present on the premises of the entity accorded status as a department of the hospital and, therefore, immediately available to furnish assistance and direction for as long as patients are being treated at the site. By ''direct supervision'' we do not mean that the physician must physically be in the room where a procedure or service is furnished. Nor does the supervising physician necessarily have to be of the same specialty as the procedure or service that is being performed. We emphasize that our proposed amendment of § 410.27 to require direct supervision of hospital services furnished incident to a physician service to outpatients applies to services furnished at an entity that is located off the campus of a hospital that we designate as having provider-based status as a department of a hospital in accordance with the provisions of § 413.65. Our proposed amendment of § 410.27 to require direct supervision of hospital services furnished incident to a physician service to outpatients does not apply to services furnished in a department of a hospital that is located on the campus of that hospital. For hospital services furnished incident to a physician service to outpatients in a department of a hospital that is located on the campus of the hospital, we assume the direct supervision requirement to be met as we explain in section 3112.4(A) of the Intermediary Manual. The requirement at § 410.27 does not affect the definition of physician supervision in section 3112.4(A) of the Intermediary Manual. In response to these comments, we have revised our definition of ''direct supervision by a physician'' in the final regulation.

*Comment:* A major trade association asserted that requiring a physician to be on-site at a provider-based entity throughout the performance of all ''incident to'' services would be burdensome and costly for hospitals where there are a limited number of physicians available to provide coverage, particularly in rural settings. Another commenter believes that entities with provider-based status should not be subject to physician supervision requirements that are more stringent than those applicable to free-standing facilities. A third commenter believes that this requirement is unnecessary because the requirements for integration with the hospital and other requirements for provider-based status include adequate checks and balances to ensure quality care. The commenter recommended that this proposal be omitted from the final rule with the potential for a separate, better defined, proposal at a later date.

*Response:* We disagree with commenters who believe the proposed supervision requirement is not necessary or that it would be burdensome to the hospital. First, the supervision requirement is separate from and independent of the provider-based requirements, and hospitals and physicians already have to meet a direct supervision of ''incident to'' services requirement that is unrelated to provider-based issues. That is, we require that hospital services and supplies furnished to outpatients that are incident to physician services be furnished on a physician's order by hospital personnel and under a physician's supervision (Intermediary Manual, section 3112.4(A)). We assume the physician supervision requirement is met on hospital premises because staff physicians would always be nearby within the hospital. The effect of the regulations in this final rule is to extend this assumption to a department of a provider that is located on the campus of a hospital. However, the regulation *does not* extend the assumption of supervision to a department of a hospital that is located off the campus of the hospital. We would not extend this assumption to a provider-based entity, regardless of its location, because the ''incident to'' requirement in § 410.27(a)(1)(iii) applies only to hospitals. Also, as we state above, satisfying the requirements to be designated provider-based is unrelated to our requirement that hospital services furnished incident to a physician service to outpatients at an entity that has provider-based status be under the direct supervision of a physician. Finally, this supervision requirement is entirely consistent with the direct supervision requirements currently set forth in the Medicare Carriers Manual, Part 3, section 2050.1(B).

*Comment:* One commenter suggested that partial hospitalization services furnished by a hospital to its outpatients be exempt from the outpatient department ''incident to'' requirements, or that other requirements be drafted that would, in the commenter's opinion, be more appropriate to the nature of this care.

*Response:* Section 1861(s)(2)(B) restricts coverage of partial hospitalization services furnished by a hospital to its outpatients to services that meet ''incident to'' requirements. We do not have the discretion to ignore this statutory restriction.

*Comment:* One commenter asked that we provide an exception to the direct supervision requirement in the case of physical therapy services. The commenter questioned why therapists who furnish the same services in a provider-based entity that they would furnish in an independent practice should be subject to direct physician supervision in one setting and not the other.

*Response:* The provision on coverage for outpatient physical therapy and occupational therapy services does not require that they be ''incident to'' physician services (see section 1861(s)(2)(D) of the Act). Therefore, there is no need to exempt them from the supervision requirement for outpatient hospital services incident to a physician service that is furnished at a provider-based entity. We therefore made no change in the final regulation based on this comment.

*Comment:* One commenter suggested that we modify our proposed regulation to waive the direct supervision requirement in entities with provider-based status for certain procedures for which we already waive the direct supervision requirement when the procedures are performed on homebound patients, as set forth in section 2051 of the Medicare Carriers Manual. The commenter believes that general supervision is sufficient for these waived services, for example, the physician need not be present, but the services must be performed under a physician's overall supervision and control, and ordered by a physician.

*Response:* Under section 2050.2 of the Medicare Carriers Manual, subject to certain requirements, we waive the direct supervision requirement when the following services are furnished to homebound patients: injections; venipuncture; EKGs; therapeutic exercises; insertion and sterile irrigation of a catheter; changing of catheters and collection of catheterized specimen for urinalysis and culture; dressing changes, for example, the most common chronic conditions that may need dressing changes are decubitus care and gangrene; replacement and/or insertion of nasogastric tubes; removal of fecal

Case No. 1:12-cv-03029-WJM-MLC Document 68-4 filed 09/14/15 USDC Colorado pg 15 of 16



impaction, including enemas; sputum collection for gram stain and culture, and possible acid-fast and/or fungal stain and culture; paraffin bath therapy for hands and/or feet in rheumatoid arthritis or osteoarthritis; and, teaching and training the patient for the care of colostomy and ileostomy, the care of permanent tracheostomy, testing urine and care of the feet (diabetic patients only), and blood pressure monitoring. While we believe the commenter's suggestion has merit, we do not believe it would be appropriate to adopt it before we have had time to analyze the issue further. Therefore, we did not revise the final rule based on this comment.

In our proposed rule, we proposed to require that the same supervision levels established for diagnostic x-ray and other diagnostic tests in accordance with § 410.32(b)(3) be required when these tests are furnished at an entity that has been accorded provider-based status by us.

*Comment:* A large industry federation generally favored our requiring that diagnostic tests be furnished at provider-based entities under levels of physician supervision that we specify, consistent with the definitions of general, direct, and personal supervision established at § 410.32(b)(3). The commenter suggested that we modify the definition of general supervision to make it clear that the training of nonphysician personnel and the maintenance of necessary equipment and supplies are the responsibility of the hospital, not the physicians.

*Response:* We agree and we will modify our regulation accordingly.

*Comment:* Numerous commenters, including radiology and imaging specialty groups, neurologists, vascular technologists, and sonographers, questioned the level of supervision required for various specific diagnostic tests and services.

*Response:* Our model for this proposed requirement was the requirement for physician supervision for diagnostic tests payable under the Medicare physician fee schedule that was issued in the October 31, 1997 physician fee schedule final rule (for CY 1998) (62 FR 59048). There have been issues raised about the appropriate level of supervision for some specific diagnostic services, similar to the comments we received about our proposed regulation. We have not yet resolved these issues, and this final rule is not the place to convey decisions about appropriate supervision levels for specific diagnostic tests and services by individual HCPCS code. In January 1998, we sent a memorandum to all Associate Regional Administrators advising them to instruct carriers to follow their existing policies on physician supervision of diagnostic tests until we provide further instruction. We intend to instruct hospitals and intermediaries to use the October 31, 1997 physician supervision requirements as a guide, pending issuance of updated requirements. In the meantime, fiscal intermediaries, in consultation with their medical directors, will define appropriate supervision levels for services not listed in the October 31, 1997 final rule when those services are furnished at an entity with provider-based status in order to determine whether claims for these services are reasonable and necessary.

## V. Summary of and Response to MedPAC Recommendations

The following are additional recommendations contained in the report on Medicare payment policy that the Medicare Payment Advisory Commission submitted to the Congress in March 1999. (MedPAC, *Report to the Congress: Medicare Payment Policy,* March 1999.) We respond to recommendations that are specifically related to a particular component of the hospital outpatient PPS in the appropriate section of this preamble.

*MedPAC Recommendation:* MedPAC recommends that the Secretary evaluate payment amounts under the hospital outpatient PPS and the ambulatory surgical center (ASC) PPS along with the practice expense payments under the Medicare physician fee schedule for services furnished in physicians' offices to ensure that the differing payments made under the three payment systems do not create unwarranted financial incentives regarding site of care.

*Response:* We agree that the three payment systems should avoid creating unnecessary financial incentives to deliver care in particular settings. We will consider this matter further and evaluate differences in payments.

*MedPAC Recommendation:* MedPAC recommends that the Secretary study means of adjusting base prospective payment rates across ambulatory settings for patient characteristics such as age, frailty, comorbidities and coexisting conditions, and other measurable traits. Under this approach, payment would be less dependent on the type of facility and more dependent on the relative costliness of furnishing specific services to individual patients. MedPAC notes that no viable patient-level adjuster currently exists that could be used in this fashion.

As an interim measure, MedPAC recommends, with reservations, that HCFA evaluate facility-level adjustments in order to preserve access to care for particularly vulnerable segments of the Medicare population.

*Response:* The underlying premise in this recommendation, as MedPAC states, is that HCFA should move toward development of a more unified and rational payment system for ambulatory care. Many powerful arguments favor such a system, but the challenges of creating and implementing it are substantial. We will give further consideration to the recommendation to study possible adjustments that could be used in various settings.

We agree that we should evaluate the need for facility-level adjustments. We believe the best course is to evaluate the need for these adjustments during the next several years as we gain actual experience with the operation of the hospital outpatient PPS and are able to observe the effects on particular provider groups. In consideration of the transitional protections provided by the BBRA 1999, we have not adopted facility-level adjustments, other than an adjustment for local labor costs, at this time.

*MedPAC Recommendation:* MedPAC recommends that the Secretary seek legislation to develop and implement a single update mechanism that would link conversion factor updates to volume growth across all ambulatory care settings. These settings include hospital outpatient departments, physicians' offices, and ASCs, as well as other specific settings mentioned.

*Response:* We believe that this proposal requires further study to determine its feasibility and possible impact. Therefore, we are not prepared to seek legislation at this time.

*MedPAC Recommendation:* MedPAC recommends that we not use patient diagnosis to calculate relative weights or make payments for medical visits, "given the current state of the available data and the lack of definitive rules for reporting patients' diagnoses under the proposed system."

*Response:* As discussed in section III.C.3, we have dropped diagnosis from our characterization of medical visit APCs. We hope to develop procedure codes for medical visits that are more descriptive of hospital outpatient resource use, rather than physician services. Once we revise procedure coding to better reflect hospital services, we will assess whether accurate diagnosis coding further improves recognition of resources.

*MedPAC Recommendation:* MedPAC recommends that the Secretary closely

ADDENDUM B.—HOSPITAL OUTPATIENT DEPARTMENT (HOPD) PAYMENT STATUS BY HCPCS CODE AND RELATED INFORMATION—Continued

| CPT/ HCPCS | HOPD Status Indicator | Description | APC | Relative Weight | Payment Rate | National Unadjusted Coinsurance | Minimum Unadjusted Coinsurance |
|---|---|---|---|---|---|---|---|
| 76977 | S | Us bone density measure | 0265 | 1.17 | $56.73 | $38.08 | $11.35 |
| 76986 | S | Echo exam at surgery | 0266 | 1.79 | $86.79 | $57.35 | $17.36 |
| 76999 | S | Echo examination procedure | 0266 | 1.79 | $86.79 | $57.35 | $17.36 |
| 77261 | E | Radiation therapy planning | | | | | |
| 77262 | E | Radiation therapy planning | | | | | |
| 77263 | E | Radiation therapy planning | | | | | |
| 77280 | X | Set radiation therapy field | 0304 | 1.49 | $72.25 | $41.52 | $14.45 |
| 77285 | X | Set radiation therapy field | 0305 | 4.06 | $196.86 | $97.50 | $39.37 |
| 77290 | X | Set radiation therapy field | 0305 | 4.06 | $196.86 | $97.50 | $39.37 |
| 77295 | X | Set radiation therapy field | 0310 | 13.98 | $677.85 | $339.05 | $135.57 |
| 77299 | E | Radiation therapy planning | | | | | |
| 77300 | X | Radiation therapy dose plan | 0304 | 1.49 | $72.25 | $41.52 | $14.45 |
| 77305 | X | Radiation therapy dose plan | 0304 | 1.49 | $72.25 | $41.52 | $14.45 |
| 77310 | X | Radiation therapy dose plan | 0304 | 1.49 | $72.25 | $41.52 | $14.45 |
| 77315 | X | Radiation therapy dose plan | 0305 | 4.06 | $196.86 | $97.50 | $39.37 |
| 77321 | X | Radiation therapy port plan | 0305 | 4.06 | $196.86 | $97.50 | $39.37 |
| 77326 | X | Radiation therapy dose plan | 0305 | 4.06 | $196.86 | $97.50 | $39.37 |
| 77327 | X | Radiation therapy dose plan | 0305 | 4.06 | $196.86 | $97.50 | $39.37 |
| 77328 | X | Radiation therapy dose plan | 0305 | 4.06 | $196.86 | $97.50 | $39.37 |
| 77331 | X | Special radiation dosimetry | 0304 | 1.49 | $72.25 | $41.52 | $14.45 |
| 77332 | X | Radiation treatment aid(s) | 0303 | 2.83 | $137.22 | $69.28 | $27.44 |
| 77333 | X | Radiation treatment aid(s) | 0303 | 2.83 | $137.22 | $69.28 | $27.44 |
| 77334 | X | Radiation treatment aid(s) | 0303 | 2.83 | $137.22 | $69.28 | $27.44 |
| 77336 | X | Radiation physics consult | 0311 | 1.32 | $64.00 | $31.66 | $12.80 |
| 77370 | X | Radiation physics consult | 0311 | 1.32 | $64.00 | $31.66 | $12.80 |
| 77399 | X | External radiation dosimetry | 0311 | 1.32 | $64.00 | $31.66 | $12.80 |
| 77401 | S | Radiation treatment delivery | 0300 | 1.98 | $96.00 | $47.72 | $19.20 |
| 77402 | S | Radiation treatment delivery | 0300 | 1.98 | $96.00 | $47.72 | $19.20 |
| 77403 | S | Radiation treatment delivery | 0300 | 1.98 | $96.00 | $47.72 | $19.20 |
| 77404 | S | Radiation treatment delivery | 0300 | 1.98 | $96.00 | $47.72 | $19.20 |
| 77406 | S | Radiation treatment delivery | 0300 | 1.98 | $96.00 | $47.72 | $19.20 |
| 77407 | S | Radiation treatment delivery | 0300 | 1.98 | $96.00 | $47.72 | $19.20 |
| 77408 | S | Radiation treatment delivery | 0300 | 1.98 | $96.00 | $47.72 | $19.20 |
| 77409 | S | Radiation treatment delivery | 0300 | 1.98 | $96.00 | $47.72 | $19.20 |
| 77411 | S | Radiation treatment delivery | 0301 | 2.21 | $107.16 | $52.53 | $21.43 |
| 77412 | S | Radiation treatment delivery | 0301 | 2.21 | $107.16 | $52.53 | $21.43 |
| 77413 | S | Radiation treatment delivery | 0301 | 2.21 | $107.16 | $52.53 | $21.43 |
| 77414 | S | Radiation treatment delivery | 0300 | 1.98 | $96.00 | $47.72 | $19.20 |
| 77416 | S | Radiation treatment delivery | 0301 | 2.21 | $107.16 | $52.53 | $21.43 |
| 77417 | X | Radiology port film(s) | 0260 | 0.79 | $38.30 | $22.02 | $7.66 |
| 77427 | E | Radiation tx management, x5 | | | | | |
| 77431 | E | Radiation therapy management | | | | | |
| 77432 | E | Stereotactic radiation trmt | | | | | |
| 77470 | S | Special radiation treatment | 0302 | 8.21 | $398.08 | $216.55 | $79.62 |
| 77499 | E | Radiation therapy management | | | | | |
| 77520 | S | Proton beam delivery | 0301 | 2.21 | $107.16 | $52.53 | $21.43 |
| 77523 | S | Proton beam delivery | 0301 | 2.21 | $107.16 | $52.53 | $21.43 |
| 77600 | S | Hyperthermia treatment | 0314 | 5.88 | $285.10 | $150.95 | $57.02 |
| 77605 | S | Hyperthermia treatment | 0314 | 5.88 | $285.10 | $150.95 | $57.02 |
| 77610 | S | Hyperthermia treatment | 0314 | 5.88 | $285.10 | $150.95 | $57.02 |
| 77615 | S | Hyperthermia treatment | 0314 | 5.88 | $285.10 | $150.95 | $57.02 |
| 77620 | S | Hyperthermia treatment | 0314 | 5.88 | $285.10 | $150.95 | $57.02 |
| 77750 | S | Infuse radioactive materials | 0301 | 2.21 | $107.16 | $52.53 | $21.43 |
| 77761 | S | Radioelement application | 0312 | 4.09 | $198.31 | $109.65 | $39.66 |
| 77762 | S | Radioelement application | 0312 | 4.09 | $198.31 | $109.65 | $39.66 |
| 77763 | S | Radioelement application | 0312 | 4.09 | $198.31 | $109.65 | $39.66 |
| 77776 | S | Radioelement application | 0312 | 4.09 | $198.31 | $109.65 | $39.66 |
| 77777 | S | Radioelement application | 0312 | 4.09 | $198.31 | $109.65 | $39.66 |
| 77778 | S | Radioelement application | 0312 | 4.09 | $198.31 | $109.65 | $39.66 |
| 77781 | S | High intensity brachytherapy | 0313 | 7.89 | $382.56 | $164.02 | $76.51 |
| 77782 | S | High intensity brachytherapy | 0313 | 7.89 | $382.56 | $164.02 | $76.51 |
| 77783 | S | High intensity brachytherapy | 0313 | 7.89 | $382.56 | $164.02 | $76.51 |
| 77784 | S | High intensity brachytherapy | 0313 | 7.89 | $382.56 | $164.02 | $76.51 |
| 77789 | S | Radioelement application | 0300 | 1.98 | $96.00 | $47.72 | $19.20 |
| 77790 | N | Radioelement handling | | | | | |
| 77799 | S | Radium/radioisotope therapy | 0313 | 7.89 | $382.56 | $164.02 | $76.51 |
| 78000 | S | Thyroid, single uptake | 0290 | 1.94 | $94.06 | $55.51 | $18.81 |
| 78001 | S | Thyroid, multiple uptakes | 0290 | 1.94 | $94.06 | $55.51 | $18.81 |
| 78003 | S | Thyroid suppress/stimul | 0290 | 1.94 | $94.06 | $55.51 | $18.81 |
| 78006 | S | Thyroid imaging with uptake | 0291 | 3.15 | $152.73 | $93.14 | $30.55 |
| 78007 | S | Thyroid image, mult uptakes | 0291 | 3.15 | $152.73 | $93.14 | $30.55 |
| 78010 | S | Thyroid imaging | 0290 | 1.94 | $94.06 | $55.51 | $18.81 |
| 78011 | S | Thyroid imaging with flow | 0290 | 1.94 | $94.06 | $55.51 | $18.81 |

CPT codes and descriptions only are copyright American Medical Association. All Rights Reserved. Applicable FARS/DFARS Apply.
Copyright American Dental Association. All rights reserved.

[1] Not subject to national coinsurance. Minimum unadjusted coinsurance is 25% of the payment rate. The payment rate is the lower of the HOPD payment rate or the Ambulatory Surgical Center payment.

[2] Not subject to national coinsurance.

[3] Eligible for pass-through payments. See Preamble for payment rate determination. See Addendum K for complete list of pass-through codes.