Case No. 1:12-cv-03029-WJM-MLC Document 68-7 filed 09/14/15 USDC Colorado pg 1 of 14

EXHIBIT 6



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Parts 410, 416, and 419**

**[CMS–1414–FC]**

**RIN 0938–AP41**

# Medicare Program: Changes to the Hospital Outpatient Prospective Payment System and CY 2010 Payment Rates; Changes to the Ambulatory Surgical Center Payment System and CY 2010 Payment Rates

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Final rule with comment period.

**SUMMARY:** This final rule with comment period revises the Medicare hospital outpatient prospective payment system (OPPS) to implement applicable statutory requirements and changes arising from our continuing experience with this system. In this final rule with comment period, we describe the changes to the amounts and factors used to determine the payment rates for Medicare hospital outpatient services paid under the prospective payment system. These changes are applicable to services furnished on or after January 1, 2010.

In addition, this final rule with comment period updates the revised Medicare ambulatory surgical center (ASC) payment system to implement applicable statutory requirements and changes arising from our continuing experience with this system. In this final rule with comment period, we set forth the applicable relative payment weights and amounts for services furnished in ASCs, specific HCPCS codes to which these changes will apply, and other pertinent ratesetting information for the CY 2010 ASC payment system. These changes are applicable to services furnished on or after January 1, 2010.

**DATES:** *Effective Date:* The provisions of this rule are effective January 1, 2010.

*Comment Period:* We will consider comments on the subject areas listed in the **SUPPLEMENTARY INFORMATION** section of this rule that are received at one of the addresses provided in the **ADDRESSES** section of this rule no later than 5 p.m. EST on December 29, 2009.

*Application Deadline for New Class of New Technology Intraocular Lenses:* Request for review of applications for a new class of new technology intraocular lenses must be received by 5 p.m. EST on March 8, 2010.

**ADDRESSES:** In commenting, please refer to file code CMS–1414–FC. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (no duplicates, please):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the instructions for ''Comment or Submission'' and enter the file code to find the document accepting comments.

2. *By regular mail.* You may mail written comments (one original and two copies) to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, *Attention:* CMS–1414–FC, P.O. Box 8013, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments (one original and two copies) to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, *Attention:* CMS–1414–FC, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments (one original and two copies) before the close of the comment period to one of the following addresses:

a. Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201.

(Because access to the interior of the HHH Building is not readily available to persons without Federal Government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b. 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, please call the telephone number (410) 786–9994 in advance to schedule your arrival with one of our staff members.

Comments mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

*Applications for a new class of new technology intraocular lenses:* Requests for review of applications for a new class of new technology intraocular lenses must be sent by regular mail to ASC/NTOL, Division of Outpatient Care, Mailstop C4–05–17, Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

**FOR FURTHER INFORMATION CONTACT:**

Alberta Dwivedi, (410) 786–0378, Hospital outpatient prospective payment issues.
Dana Burley, (410) 786–0378, Ambulatory surgical center issues.
Michele Franklin, (410) 786–4533, and Jana Lindquist, (410) 786–4533, Partial hospitalization and community mental health center issues.
James Poyer, (410) 786–2261, Reporting of quality data issues.

**SUPPLEMENTARY INFORMATION:**

*Comment Subject Areas:* We will consider comments on the following subject areas discussed in this final rule with comment period that are received by the date and time indicated in the **DATES** section of this final rule with comment period:

(1) The payment classifications assigned to HCPCS codes identified in Addenda B, AA, and BB to this final rule with comment period with the ''NI'' comment indicator;

(2) Recognition of plasma protein fraction as a blood product or a biological for OPPS payment, as discussed in section II.A.1.d.(2) of this final rule with comment period;

(3) Potential alternative coding schemes for reporting hospital clinic visits for new and established patients, as discussed in section IX.B.1. of this final rule with comment period;

(4) The possibility of extending the direct supervision requirements for hospital-based partial hospitalization program services to those same services in community mental health centers, as discussed in section XII.D.3. of this final rule with comment period; and

(5) The possibility of establishing direct physician supervision requirements for ASC services, as discussed in section XV.A.3. of this final rule with comment period.

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *http://www.regulations.gov.* Follow the search

and all other payers. We encourage hospitals to report all HCPCS codes that describe packaged services that were furnished, unless the CPT Editorial Panel or CMS provides other guidance. To the extent that hospitals include separate charges for packaged services on their claims, the estimated costs of those packaged services are then added to the costs of separately paid procedures on the same claims and used in establishing payment rates for the separately paid services.

*Comment:* One commenter argued that CMS' packaging methodology for guidance services used in radiation oncology procedures is not transparent. Specifically, the commenter claimed that CMS packaged payment for the radiation oncology image-guidance services (shown in Table 15) into the payment for independent radiation therapy services (shown in Table 16) without publishing its packaging methodology. The commenter further stated that the lack of transparency regarding CMS' packaging methodology is of concern to the radiation oncology community, and that it would be helpful if CMS published the information used in the APC Panel's determination of packaging and payment rates.

TABLE 15—PACKAGED RADIATION ONCOLOGY GUIDANCE SERVICES

| CY 2010 CPT code | CY 2010 Long descriptor |
|---|---|
| 77421 | Stereoscopic X ray guidance for localization of target volume for the delivery of radiation therapy. |
| 77014 | Computed tomography guidance for placement of radiation fields. |
| 77417 | Therapeutic radiology port film(s). |
| 76950 | Ultrasonic guidance for aspiration of ova, imaging supervision and interpretation. |

TABLE 16—SEPARATELY PAID RADIATION THERAPY SERVICES

| CY 2010 CPT code | CY 2010 Long descriptor |
|---|---|
| 77402 | Radiation treatment delivery, single treatment area, single port or parallel opposed ports, simple blocks or no blocks; up to 5MeV. |
| 77403 | Radiation treatment delivery, single treatment area, single port or parallel opposed ports, simple blocks or no blocks; 6–10MeV. |
| 77404 | Radiation treatment delivery, single treatment area, single port or parallel opposed ports, simple blocks or no blocks; 11–19 MeV. |
| 77406 | Radiation treatment delivery, single treatment area, single port or parallel opposed ports, simple blocks or no blocks; 20 MeV or greater. |
| 77407 | Radiation treatment delivery, 2 separate treatment areas, 3 or more ports on a single treatment area, use of multiple blocks; up to 5 MeV. |
| 77408 | Radiation treatment delivery, 2 separate treatment areas, 3 or more ports on a single treatment area, use of multiple blocks; 6–10 MeV. |
| 77409 | Radiation treatment delivery, 2 separate treatment areas, 3 or more ports on a single treatment area, use of multiple blocks; 11–19 MeV. |
| 77411 | Radiation treatment delivery, 2 separate treatment areas, 3 or more ports on a single treatment area, use of multiple blocks; 20 MeV or greater. |
| 77412 | Radiation treatment delivery, 3 or more separate treatment areas, custom blocking, tangential ports, wedges, rotational beam, compensators, electron beam; up to 5 MeV. |
| 77413 | Radiation treatment delivery, 3 or more separate treatment areas, custom blocking, tangential ports, wedges, rotational beam, compensators, electron beam; 6–10 MeV. |
| 77414 | Radiation treatment delivery, 3 or more separate treatment areas, custom blocking, tangential ports, wedges, rotational beam, compensators, electron beam; 11–19 MeV. |
| 77416 | Radiation treatment delivery, 3 or more separate treatment areas, custom blocking, tangential ports, wedges, rotational beam, compensators, electron beam; 20 MeV or greater. |
| 77417 | Therapeutic radiology port film(s). |
| 77418 | Intensity modulated treatment delivery, single or multiple fields/arcs, via narrow spatially and temporally modulated beams, binary, dynamic MLC, per treatment session. |

*Response:* Although the APC Panel provides valuable advice with regard to the establishment of OPPS payment policies and payment rates, the APC Panel does not, as the commenter suggested, determine what services are packaged under the OPPS or establish OPPS payment rates. We adopt the OPPS payment policies regarding packaging and other issues and establish payment rates through the annual rulemaking cycle.

In general, payment for a packaged HCPCS code is included in the payment for the independent service with which it is associated, to the extent that the cost of the packaged service is reflected on the single procedure claims that are used to calculate the median cost for the independent, separately paid service. We intend to further examine the packaging of image-guidance for radiation therapy in the analyses of the impact of packaging that we plan to discuss with the APC Panel at the winter 2010 meeting. However, as we describe earlier in this section, we make available a considerable amount of data for public analysis each year, provide the claims we use to calculate median costs, and provide a detailed narrative description of our data process that the public can use to analyze any topic of interest to them.

*Comment:* One commenter supported CMS' goal of increased efficiency in hospital outpatient care. However, the commenter was concerned that packaging payment for services too soon could create access problems for technologies that would otherwise improve patient outcomes and reduce costs. The commenter urged CMS to reinstate separate payment in CY 2010 for ICE, FFR, and IVUS until a thorough analysis has been performed on the impact of packaging payment for these services, including the rate of change in their utilization over time and market penetration.

patients to independent diagnostic testing facilities (IDTFs) or other entities to receive diagnostic services under arrangement. They added that although these facilities are not PBDs, the hospital would bill for these services as hospital outpatient services in accordance with the hospital bundling rules. Some of these stakeholders have asked what type of physician supervision is required for diagnostic services provided under arrangement.

A number of stakeholders urged CMS to withdraw or delay the physician supervision policies discussed in the CY 2009 OPPS/ASC final rule with comment period, arguing that this rule included policy changes rather than clarification and, therefore, sufficient opportunity for public notice and comment was not provided. Some further argued that CMS should suspend enforcement of these policies while CMS gathers additional public input and considered alternatives. These stakeholders suggested a variety of additional approaches to soliciting full feedback from the hospital and physician communities on the supervision policies and their impact, including holding an open door forum or town hall meeting and reopening the discussion during the CY 2010 OPPS rulemaking process.

As discussed in the CY 2010 OPPS/ASC proposed rule (74 FR 35365), we provided a restatement and clarification of existing policy in the CY 2009 OPPS/ASC proposed rule (73 FR 41518 through 41519), citing numerous existing statutory, regulatory, manual, and prior rule preamble statements in section XII.A. of that rule specifically titled, ''Physician Supervision of HOPD Services.'' The CY 2009 OPPS/ASC proposed rule provided for a 60-day comment period. We stated that we continue to believe that the CY 2009 restatement and clarification made no change to longstanding hospital outpatient physician supervision policies as incorporated in prior statements of policy, including the codified Federal regulations. In addition, we provided for public notice and comment regarding these physician supervision polices through the CY 2009 OPPS/ASC proposed rule in which, as noted above, we discussed physician supervision in a distinct section of the proposed rule. However, we received only a few public comments on that section. We also noted that the physician supervision policies for hospital outpatient diagnostic and therapeutic services as described in the CY 2009 OPPS/ASC final rule with comment period (73 FR 68702 through 68704) continue to be in effect for CY 2009. In the CY 2010 OPPS/ASC proposed rule (74 FR 35365), we stated that we have not instructed contractors to delay initiation of enforcement actions or to discontinue pursuing pending enforcement actions regarding the physician supervision of hospital outpatient services.

However, while we did not propose to withdraw the longstanding physician supervision policies for hospital outpatient services in CY 2009, we stated in the CY 2010 OPPS/ASC proposed rule (74 FR 35365) that we had extensively considered the many questions and concerns on this topic raised to us by stakeholders in the course of developing the proposed rule in order to assess whether proposed changes to the existing policies should be considered. We appreciated the many detailed comments and suggestions interested stakeholders have raised in the first few months since publication of the CY 2009 OPPS/ASC final rule with comment period. We considered a wide variety of potential modifications to our physician supervision policies in response to this information about current health care delivery practices and challenges. The dialogue with interested stakeholders provided us with sufficient information to develop proposals for certain changes to the supervision policies for hospital outpatient services for CY 2010 in order to take into full consideration current clinical practice and patterns of care, the need to ensure patient access, the associated hospital and physician responsibilities, consistency among requirements for different sites of services, and other important factors. We indicated our belief that the proposals we were making for CY 2010 would address many of the concerns and questions regarding our existing policies that had been raised to us by stakeholders over the first 6 months of CY 2009. In the CY 2010 OPPS/ASC proposed rule (74 FR 35365), we welcomed robust public comments regarding our CY 2010 proposals for physician supervision in order to inform our decisions regarding final policies for CY 2010.

In considering the questions and concerns that had been raised over the first 6 months of CY 2009, we identified three areas within our existing hospital outpatient physician supervision policies for which we stated our belief that proposals of policy changes were appropriate for CY 2010, two related to the supervision of therapeutic services and one related to the supervision of diagnostic services. Our specific CY 2010 proposals, including the proposed changes to our regulations to conform to these proposals, the public comments on the proposals and our responses, and our final CY 2010 supervision policies for hospital outpatient therapeutic and diagnostic services are discussed below.

3. Policies for Direct Supervision of Hospital and CAH Outpatient Therapeutic Services

In the CY 2010 OPPS/ASC proposed rule (74 FR 35365), we proposed that nonphysician practitioners, specifically physician assistants, nurse practitioners, clinical nurse specialists, and certified nurse-midwives, may directly supervise all hospital outpatient therapeutic services that they may perform themselves in accordance with their State law and scope of practice and hospital-granted privileges, provided that they continue to meet all additional requirements, including any collaboration or supervision requirements as specified in the regulations at §§ 410.74 through 410.77. Clinical psychologists may already provide direct supervision, as we mentioned in the CY 2009 OPPS/ASC final rule with comment period (73 FR 68703 through 68704) because they, along with physicians (as defined in section 1861(r)(1) of the Act), may be responsible for the care of a hospital patient, as discussed in the Medicare conditions of participation for hospitals in § 482.12(c) of our regulations. We stated our belief that allowing certain nonphysician practitioners (nurse practitioners, physician assistants, clinical nurse specialists, and certified nurse-midwives) to provide direct supervision of certain hospital outpatient therapeutic services is appropriate because, even though these practitioners are not physicians, they are recognized in statute and regulation as providing services that are analogous to physicians' services. Medicare Part B covers the professional services of clinical psychologists, nurse practitioners, physician assistants, clinical nurse specialists, and certified nurse-midwives when the services would be physicians' services if furnished by a physician (a doctor of medicine or osteopathy, as set forth in section 1861(r)(1) of the Act). Their services are described in §§ 410.71(a), 410.74(a), 410.75(a) and (c), 410.76(a) and (c), and 410.77(a), respectively, of our regulations. Medicare also makes payment for services provided incident to the services of these nonphysician practitioners as specified in §§ 410.71(a)(2)(iii), 410.74(b), 410.75(d), 410.76(d), and 410.77(c), respectively.

We also noted that section 1861(r) of the Act does not include clinical psychologists, nurse practitioners,

physician assistants, clinical nurse specialists, or certified nurse-midwives in the definition of a physician. However, as previously mentioned, the conditions of participation for hospitals at § 482.12(c)(1)(vi) of our regulations do include clinical psychologists as practitioners who may be responsible for the care of Medicare patients. The conditions of participation at §§ 482.12(c)(1)(i) through (c)(1)(vi) require that every Medicare hospital patient be under the care of a doctor of medicine or osteopathy, a doctor of dental surgery or dental medicine, a doctor of podiatric medicine, a doctor of optometry, a chiropractor, or a clinical psychologist; each practicing in accordance with the Act, Federal regulations, and State law. Further, § 482.12(c)(4) of our regulations requires that a doctor of medicine or osteopathy must be responsible for the care of each Medicare patient with respect to any medical or psychiatric condition that is present on admission or develops during hospitalization and is not specifically within the scope of practice of one of the other practitioners listed in §§ 482.12(c)(1)(ii) through (c)(1)(vi). Also, as permitted by State law, certain nonphysician practitioners may admit individuals to a hospital or CAH and order and provide therapeutic services to them. Since 1998, we have allowed payment for the professional services of these nonphysician practitioners in addition to payment for physicians' services when the nonphysician practitioner's professional services are furnished in an HOPD. We also have made outpatient facility payments to the hospital for those facility services provided incident to the professional services of these nonphysician practitioners (63 FR 58873). In addition, the conditions of participation for CAHs at § 485.631 require that a doctor of medicine or osteopathy, a nurse practitioner, a physician assistant, or a clinical nurse specialist be available to furnish patient care services at all times the CAH operates. A doctor of medicine or osteopathy must be present for sufficient periods of time to provide medical direction, medical care services, consultation and supervision as described in the conditions of participation and must be available through radio or telephone contact for assistance with medical emergencies or patient referral.

Taking into consideration the totality of these existing conditions and requirements, we proposed to revise § 410.27 of the regulations to make clear that Medicare Part B payment may be made for hospital outpatient services and supplies furnished incident to the services of a physician, clinical psychologist, nurse practitioner, physician assistant, clinical nurse specialist, or certified nurse-midwife service; and to add that, effective January 1, 2010, clinical psychologists, nurse practitioners, physician assistants, clinical nurse specialists, or certified nurse-midwives may provide direct supervision for hospital outpatient therapeutic services that they may perform themselves under State law and within their scope of practice and hospital-granted privileges in the context of the existing requirements in §§ 410.71, 410.74, 410.75, 410.76, and 410.77. However, we note that, in the CY 2010 OPPS/ASC proposed rule (74 FR 35366), we proposed that the direct supervision of CR, ICR, and PR services must be furnished by a doctor of medicine or osteopathy, as specified in the proposed coverage policy and regulations for CR, ICR, and PR services. We also noted that Medicare does not make a payment to a physician under the MPFS when the physician solely provides the direct physician supervision of hospital outpatient therapeutic services but furnishes no direct professional services to a patient. This also would apply to the supervision of hospital outpatient therapeutic services provided by nonphysician practitioners.

We also indicated that we did not propose to modify requirements relating to physician supervision or collaboration for these nonphysician practitioners. In regard to the supervision of physician assistants, § 410.74(a)(iv) requires that physician assistants perform services under the general supervision of a physician. We have further defined this general supervision in section 190(c) of Chapter 15 of the Medicare Benefit Policy Manual. Section 190(c) states that "the PA's physician supervisor (or a physician designated by the supervising physician or employer as provided under State law or regulations) is primarily responsible for the overall direction and management of the physician assistant's professional activities and for assuring that the services provided are medically appropriate for the patient. The physician supervisor (or physician designee) need not be physically present with the physician assistant when a service is being furnished to a patient and may be contacted by telephone, if necessary, unless State law or regulations require otherwise."

The requirements for collaboration of nurse practitioners are defined in § 410.75(c)(3) of the regulations and Section 200(D) of Chapter 15 of the Medicare Benefit Policy Manual. The requirements for clinical nurse specialists are located in § 410.76(c)(3) of the regulations and Section 210(D) of Chapter 15 of the Medicare Benefit Policy Manual. These sections define collaboration as a process in which the nurse practitioner or the clinical nurse specialist works with one or more physicians (doctors of medicine or osteopathy) to deliver health care services within the scope of the practitioner's expertise, with medical direction and appropriate supervision as required by the law of the State in which the services are being furnished. In the absence of more stringent State law requirements governing collaboration, collaboration is to be evidenced by the nurse practitioner or the clinical nurse specialist documenting his or her scope of practice and indicating the relationships that he or she has with physicians to deal with issues outside their scope of practice. The collaborating physician does not need to be present with the nurse practitioner or clinical nurse specialist when the services are furnished or to make an independent evaluation of each patient who is seen by the nurse practitioner or clinical nurse specialist.

In addition, for CY 2010, we proposed to refine the definition of direct supervision of hospital outpatient therapeutic services for those services furnished in a hospital and in on-campus PBDs of a hospital. For services furnished on a hospital's main campus, we proposed that direct supervision means that the supervisory physician or nonphysician practitioner must be present on the same campus, in the hospital or the on-campus PBD of the hospital as defined in § 413.65, and immediately available to furnish assistance and direction throughout the performance of the procedure. We proposed to add a new paragraph (a)(1)(iv)(A) to § 410.27 to reflect this requirement. We also proposed to define "in the hospital" in new paragraph § 410.27(g) as meaning areas in the main building(s) of a hospital that are under the ownership, financial, and administrative control of the hospital; that are operated as part of the hospital; and for which the hospital bills the services furnished under the hospital's CCN. Therefore, to be present in the hospital or the on-campus PBD of the hospital and immediately available requires that the physician or nonphysician practitioner must be physically present in areas on the campus of the hospital that are part of

the hospital, including on-campus PBDs, that are operated by the hospital, and where services furnished in those areas are billed under the hospital's CCN. Under the CY 2010 proposal, the supervisory physician or nonphysician practitioner of the hospital's outpatient therapeutic services may not be located in any other entity, such as a physician's office, IDTF, co-located hospital, or hospital-operated provider or supplier such as a skilled nursing facility (SNF), end-stage renal disease (ESRD) facility, or home health agency (HHA), or any other nonhospital space that may be co-located on the hospital's campus, as ''hospital campus'' is defined in § 413.65(a)(2) of the regulations.

We stated that while we have not previously specified in policy guidance a definition for the term ''immediately available'' with respect to services provided in areas of the hospital on its main campus that are not PBDs, we believe that the existing definitions of direct supervision in §§ 410.27(f) and 410.32(b)(3)(ii) that apply to PBDs and physician office settings indicate that the physician must be physically present in order to provide direct supervision of services. With regard to services provided in PBDs of hospitals or physicians' offices, these regulations specify that the physician must be present in the PBD or in the office suite, respectively. Thus, we have previously established that direct supervision requires immediate physical presence. While we also have not specifically defined the word ''immediate'' for direct supervision in terms of time or distance, we noted that the general definition of the word means ''without interval of time.'' Therefore, the supervisory physician or nonphysician practitioner could not be immediately available while, for example, performing another procedure or service that he or she could not interrupt. In addition, we stated that we understand that advances in medical technology, changes in the patterns of health care delivery, and changes in the organizational structure of hospitals have led to the development of extensive hospital campuses, sometimes spanning several city blocks. However, in the context of direct physician or nonphysician practitioner supervision, we believed that it would be neither appropriate nor ''immediate'' for the supervisory physician or nonphysician practitioner to be so physically far away on the main campus from the location where hospital outpatient services are being furnished that he or she could not intervene right away. As we stated in the CY 2009 OPPS/ASC final rule with comment period (73 FR 68703), if there were problems with outpatient care in a hospital or in an on-campus PBD where the requirement for direct supervision was not met, we would consider that to be a quality concern. Appropriate supervision is a key aspect of the delivery of safe and high quality hospital outpatient services that are paid under Medicare.

In addition, the definition of direct supervision in existing § 410.27(f) has included and would continue to specify under our CY 2010 proposal that the physician or nonphysician practitioner must be available to furnish assistance and direction throughout the performance of the procedure. This means that the physician or nonphysician practitioner must be prepared to step in and perform the service, not just to respond to an emergency. This includes the ability to take over performance of a procedure and, as appropriate to both the supervisory physician or nonphysician practitioner and the patient, to change a procedure or the course of treatment being provided to a particular patient. We originally stated in the April 2000 OPPS final rule (65 FR 18525) that the physician does not ''necessarily need to be of the same specialty as the procedure or service that is being performed.'' We also have stated in manual guidance that hospital medical staff that supervises the services ''need not be in the same department as the ordering physician'' (Section 20.5.1 of Chapter 6 of the Medicare Benefits Policy Manual). However, in order to furnish appropriate assistance and direction for any given service or procedure, we believed the supervisory physician or nonphysician practitioner must have, within his or her State scope of practice and hospital-granted privileges, the ability to perform the service or procedure.

We did not propose significant changes to the definition or requirements for direct supervision in off-campus PBDs of the hospital other than to allow nonphysician practitioners to provide direct supervision in these PBDs for the services that these practitioners may perform. With respect to off-campus PBDs of hospitals, direct supervision would continue to mean that the physician or nonphysician practitioner must be in the off-campus PBD and immediately available to furnish assistance and direction throughout the performance of the procedure. We proposed to revise existing § 410.27(f) and include the revised language as § 410.27(a)(1)(iv) and make a technical change in § 410.27(a)(i)(iv)(B) to clarify the current language by removing ''present and on the premises of the location'' and replacing it with ''present in the off-campus provider-based department.'' While the meaning of this provision is the same, we believed that this proposed modification to the language defining direct supervision is more consistent with the language of the other proposed changes to § 410.27. As we clarified in the CY 2009 OPPS/ASC final rule with comment period (73 FR 68704), the supervisory physician for hospital outpatient therapeutic services must be in each PBD of a particular off-campus outpatient location, but that does not mean that the physician must be in the room when the procedure is performed. In the April 2000 OPPS final rule (65 FR 18525), we responded to public commenters who asserted that requiring a physician to be onsite at a PBD throughout the performance of all ''incident to'' (therapeutic) services would be burdensome and costly for hospitals where there are a limited number of physicians available to provide coverage, particularly in rural settings. We disagreed then that the supervision requirement was unnecessary and burdensome because hospitals, prior to 2000, were already required to ''meet a direct supervision of 'incident to' services requirement that is unrelated to the provider-based rules. That is, we require that hospital services and supplies furnished to outpatients that are incident to physician services be furnished on a physician's order by hospital personnel and under a physician's supervision'' (Section 3112.4 of the Medicare Intermediary Manual). In addition, when we discussed the ''assumption'' or expectation that the physician supervision requirement is met on the hospital's main campus in the April 2000 OPPS final rule (65 FR 18525), we specifically did not extend that assumption to off-campus departments of the hospital. We stated that we continue to believe that it would be inappropriate to allow one physician or nonphysician practitioner to supervise all services being provided in all PBDs at a particular off-campus outpatient location. Since first allowing off-campus sites to be considered PBDs of hospitals, we have placed particular emphasis on ensuring the quality and safety of the services provided in these locations, which can be many miles from the main hospital campus, through both additional provider-based requirements in § 413.65(e) and our emphasis on direct physician supervision under existing § 410.27(f). In addition, because

the physician or nonphysician practitioner must be immediately available and have, within his or her State scope of practice and hospital-granted privileges, the ability to perform the services being supervised, we believed it would be highly unlikely that one physician or nonphysician practitioner would be both immediately available at all times that therapeutic services are being provided and would have the knowledge and ability to adequately supervise all services being performed at once in multiple off-campus PBDs at a single location.

To reflect these proposed changes for the provision of direct supervision of therapeutic services provided to hospital outpatients in our regulations, we proposed to revise the language of the existing § 410.27(f) and include the revised language in a new paragraph (a)(1)(iv) of § 410.27 to specify that direct physician or nonphysician practitioner supervision of hospital outpatient therapeutic services is required for Medicare Part B payment. We proposed to add a new paragraph (a)(1)(iv)(A) to § 410.27 to state that, for services provided on the hospital's main campus, direct supervision means that the physician or nonphysician practitioner must be present on the same campus, in the hospital or on-campus PBD of the hospital, as defined in § 413.65, and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician or nonphysician practitioner must be in the room when the procedure is performed. We also proposed to add new paragraph (a)(1)(iv)(B) to § 410.27 to reflect that, for off-campus PBDs of hospitals, the physician or nonphysician practitioner must be present in the off-campus PBD, as defined in § 413.65, and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician or nonphysician practitioner must be in the room when the procedure is performed. As we stated previously, the proposed language of paragraph (a)(1)(iv)(B) is similar to existing § 410.27(f) that we proposed to revise. Furthermore, we proposed to make a technical change to clarify the language in this paragraph to remove ''present and on the premises of the location'' and replace it with ''present in the off-campus provider-based department.'' Also, in the CY 2010 OPPS/ASC proposed rule (74 FR 35368) and as proposed in the CY 2010 MPFS proposed rule (74 FR 33674), we proposed that the direct supervision of CR, ICR, and PR services must be furnished by a doctor of medicine or osteopathy, as specified in proposed §§ 410.47 and 410.49, respectively. We proposed to include this exception in proposed paragraphs (a)(1)(iv)(A) and (a)(1)(iv)(B) in § 410.27. In addition, we proposed to add a new paragraph (f) to § 410.27 to define a nonphysician practitioner for purposes of § 410.27 as a clinical psychologist, a physician assistant, a nurse practitioner, a clinical nurse specialist, or a certified nurse-midwife. Proposed new § 410.27(a)(1)(iv) would provide that these nonphysician practitioners may directly supervise services that they could furnish themselves in accordance with State law and within their scope of practice and hospital-granted privileges, as long as all requirements for coverage, including the physician supervision or collaboration for these nonphysician practitioners, are met in accordance with §§ 410.71, 410.74, 410.75, 410.76, and 410.77, respectively. We also proposed to define ''in the hospital'' in new paragraph § 410.27(g) to mean areas in the main building(s) of the hospital that are under the ownership, financial, and administrative control of the hospital; that are operated as part of the hospital; and for which the hospital bills the services furnished under the hospital's CCN. Finally, we proposed to make a technical correction to the title of § 410.27 to read, ''Outpatient hospital or CAH services and supplies incident to a physician service: Conditions'' to clarify in the title that the requirements for payment of hospital outpatient therapeutic services incident to a physician or nonphysician practitioner service in that section apply to both hospitals and CAHs. Similarly, we proposed to include the phrase ''hospital or CAH'' throughout the text of § 410.27 wherever the text currently refers just to ''hospital.'' The omission of the term ''CAH'' from § 410.27 was a drafting oversight. However, we have applied the requirements of § 410.27, including ''incident to'' requirements such as the site-of-service requirement and physician supervision, as well as other hospital policies, such as the bundling rules, to CAHs, just as we have in 42 CFR Part 409 (Subparts A through D and F through H) and § 410.28 and § 413.65 of the regulations where CAHs are explicitly mentioned.

*Comment:* All commenters who addressed the proposed direct supervision by nonphysician practitioners (specifically physician assistants, nurse practitioners, clinical nurse specialists, and certified nurse-midwives) supported the proposal. Some commenters also requested that CMS include licensed clinical social workers in the list of nonphysician practitioners who are permitted to supervise outpatient psychiatric services and partial hospitalization program (PHP) services. Other commenters requested that pharmacists be permitted to supervise medication therapy management services and that specialty certified registered nurses, such as wound care nurses, also be able to provide the direct supervision of hospital outpatient therapeutic services. One commenter stated that because physicians do not furnish nursing services or the services of other ancillary health professionals, they should not be expected to supervise those services and it would be inappropriate to expect physicians to accept responsibility for care that they have not personally furnished.

*Response:* We appreciate the commenters' support for our proposal to revise § 410.27 of the regulations to allow certain nonphysician practitioners to directly supervise services that they may perform themselves under their State scope of practice and hospital-granted privileges in the context of the existing requirements in §§ 410.71, 410.74, 410.75, 410.76 and 410.77. We agree with the commenters that we should add licensed clinical social workers to the group of nonphysician practitioners permitted to provide direct supervision for hospital outpatient therapeutic services. We believe this is appropriate because licensed clinical social workers are recognized under the Medicare program as independent practitioners who may furnish services for the diagnosis and treatment of mental illness that they are legally authorized to perform under State law of the State in which the services are performed. We further agree with the commenters that the inclusion of licensed clinical social workers would help to ensure continued access to mental health services, especially in rural hospitals and CAHs where other types of practitioners may be less available. We emphasize though, that licensed clinical social workers, like other nonphysician practitioners, may only supervise those therapeutic services within their own scope of practice and hospital-granted privileges. We are not expanding the regulations further to allow supervision by pharmacists, registered nurses, or other medical professionals. These professionals are not recognized in the Social Security Act as providing services that would be physicians' services if performed by a physician and

they may not enroll in Medicare as independent practitioners and receive payment directly for their professional services.

With regard to the comments about physician scope of practice and supervision, we remind hospitals that the only statutory basis for payment of hospital outpatient therapeutic services is incident to the services of a physician, meaning the services are ordered by the physician or qualified practitioner and furnished as an integral though incidental part of his or her services. It follows, then, that a qualified physician or nonphysician practitioner would supervise the provision of those services to ensure the service or procedure is being furnished appropriately.

*Comment:* One commenter supported the proposed requirements for the direct physician supervision of CR programs and requested that CMS confirm that the proposed definition of ''direct supervision'' that would apply to therapeutic services in the HOPD would also apply to CR services. However, many commenters, especially CAHs and rural hospitals, asked that CMS permit physician assistants, nurse practitioners, clinical nurse specialists, and certified nurse-midwives who are functioning within their State licensure and scope of practice and who are permitted to supervise the services under the hospital or CAH bylaws to supervise CR, ICR, and PR services.

*Response:* As discussed in detail in sections sections II.G.8. and II.G.9. of the CY 2010 MPFS final rule with comment period and in section XII.B.4. of this final rule with comment period, section 144(a)(1) of Public Law 100–275 imposes strict requirements for the direct physician supervision of PR, CR, and ICR services and gives us no flexibility to modify the requirement. Therefore, we are finalizing our CY 2010 proposal, without modification, to require the direct physician supervision (by a doctor of medicine or a doctor of osteopathy) of PR, CR, and ICR services that are furnished to hospital outpatients. We note that we define ''direct supervision'' with regard to what it means to be immediately available and accessible for medical consultation and medical emergencies in the same manner for PR, CR, and ICR services as we do for other therapeutic services furnished in HOPDs, as discussed below. Also, the final definitions of direct supervision in § 410.27 for therapeutic services provided on campus and in off-campus PBDs also apply. These definitions and the final regulation text of §§ 410.27(a)(1)(iv)(A) and (B) are discussed in detail below.

*Comment:* With respect to the proposed definition of direct supervision of hospital outpatient therapeutic services, some commenters fully supported the proposals as appropriate and necessary for ensuring that Medicare beneficiaries receive safe and high quality care. Many commenters acknowledged that the proposal to broaden the location of the supervising physician from in the department on campus to ''in the hospital'' would give hospitals significantly more flexibility. However, the commenters stated that, while the proposal would be more flexible, it would still limit access to care and would cost hospitals and the Medicare program. Other commenters questioned why CMS has a supervision requirement at all, stating that there is no such specified requirement for hospital inpatient services. Many commenters believed that the proposals would not help CAHs and rural hospitals, where physicians often maintain offices off-campus and qualified nonphysician practitioners may not be readily available to provide services in the hospital. The commenters claimed that the proposed definition of direct supervision would mean that CAHs and rural hospitals would be required to hire staff solely to supervise services and that this extra cost would force these hospitals and CAHs to eliminate services. These commenters requested that CMS not apply the ''incident to'' requirements of § 410.27 to CAHs.

*Response:* We appreciate the commenters' support and the acknowledgement that we are striving to provide more flexibility for hospitals, while maintaining appropriate supervision of hospital outpatient therapeutic services that helps to ensure safe, high quality care and providing Medicare payment that is consistent with the statutory requirements for coverage. We have received numerous comments and questions since publication of the CY 2009 OPPS/ASC final rule with comment period, met with interested stakeholders to hear their questions and concerns throughout the year, and reviewed many thoughtful, wide-ranging comments on the CY 2010 OPPS/ASC proposed rule. In considering all of this information, we have taken into full consideration current clinical practice and patterns of care, the need to ensure patient access, the associated hospital and physician responsibilities, consistency among requirements for different sites of services, and other important factors. We believe that our final policies address many of the concerns and questions regarding our proposals. Through the expansion of supervisory authority to nonphysician practitioners and a modification to the requirement for direct supervision of on-campus therapeutic services, discussed in more detail below, we believe our final policies allow more flexibility for hospitals and CAHs and help ensure access to care for Medicare beneficiaries while maintaining our standards for safe, high quality care and consistent interpretation of longstanding regulations.

We disagree with the commenters who suggested that there should be no supervision requirements for hospital outpatient services because there are not similar codified supervision requirements for hospital inpatient services. Hospitals provide a wide variety of complex services to their outpatients who may or may not have an established relationship with the supervising physician or nonphysician practitioner and hospital staff on the day the hospital outpatient services are furnished. A treating physician or nonpractitioner in the community may not even be aware that ordered outpatient services are being furnished by the hospital on a given day. Therefore, we believe it is appropriate for CMS to set requirements for the safe and effective diagnosis and treatment of Medicare beneficiaries, including standards for the appropriate supervision of hospital outpatient services by a physician or nonphysician practitioner, in accordance with the statutory basis for payment of hospital outpatient services in section 1861(s)(2)(B) of the Act, which is ''incident to physicians' services rendered to outpatients.''

We set the standard for direct supervision of hospital outpatient therapeutic services that we have held since the implementation of the OPPS in 2000, and we have assumed that this standard was being met because we assumed that a physician would always be nearby in the hospital. Given that hospital inpatients generally have medically complex conditions requiring a high level of acute care, we have not established explicit supervision requirements in regulations because we believe hospitals would have physicians or other qualified practitioners available at all times that complex hospital inpatient services are being furnished. If this is not the case, we may consider addressing the supervision of hospital inpatient services in the future.

In regard to hospital and CAH concerns about hiring physician and nonphysician staff solely for

supervisory services, we reiterate that the supervisor need only be available when outpatient therapeutic services and procedures are being furnished, meaning that many services or departments would not require 24 hour per day, 7 days per week direct supervision, as some commenters believed. We also believe that allowing the supervisory physician or nonphysician practitioner to be located anywhere on the hospital campus, as discussed more fully below, should alleviate this concern for many hospitals and CAHs. In addition, we remind CAHs that the conditions of participation for CAHs at § 485.631 require that a doctor of medicine or osteopathy, a nurse practitioner, a physician assistant, or a clinical nurse specialist is available ''*to furnish patient care services at all times the CAH operates''* (emphasis added). It follows then that this physician or nonphysician practitioner who is available at all times the CAH operates would be directly furnishing services that are within his or her State scope of practice and CAH-granted privileges and that the CAH would not be furnishing services that are not within this practitioner's scope.

*Comment:* Many commenters stated that it is overly restrictive and arbitrary to not allow direct supervision by practitioners located in other entities on-campus and to require the immediate physical presence of the physician. Several commenters pointed out that, because of the varying ways that hospitals have structured their services and campuses, a physician's office may be next door or closer to the HOPD in which services that he or she would be supervising are furnished, than a practitioner located in another HOPD. Other commenters stated that the proposal would preclude physicians from taking a lunch break, patronizing the retail establishments in the hospital, or going to other areas such as parking lots.

The commenters were particularly concerned about specialized services such as chemotherapy, blood transfusions, and radiation therapy services. Several hospital associations and other commenters requested that CMS remove the phrase ''immediately available to furnish assistance and direction throughout the performance of the procedure.'' They instead recommended that CMS redefine direct supervision for therapeutic services to mean that the physician may be on or in close proximity to the campus and able to respond in a timely manner according to hospital's policies and bylaws. The commenters also believed that ''immediate availability'' does not and should not mean immediate physical presence and that requiring physical presence in every instance is impractical. Instead, the commenters believed the supervising practitioner should be able to directly supervise services and procedures remotely by telephone, radio, robotic device, or electronic media.

*Response:* We appreciate the many public comments that we received on the proposed definition of direct supervision for hospital outpatient therapeutic services provided on the campus of the hospital. We acknowledge the comments related to hospital building and campus structures and the physical proximity of physicians' offices and other entities to the hospital department where a particular hospital outpatient service is furnished. We agree with the commenters that allowing the supervising physician to be in nonhospital space on the campus could make it easier for a supervising physician or nonphysician practitioner to respond immediately. Therefore, we believe it would be appropriate to allow the supervising physician or nonphysician practitioner to be located anywhere on the same campus of the hospital, as long as he or she was immediately available to furnish assistance and direction throughout the performance of the procedure.

This is consistent with our longstanding definition of ''direct supervision'' as it has been applied across settings in terms of the immediate physical presence of the physician and what it means to ''furnish assistance and direction throughout the performance of the procedure.'' However, we continue to believe that the supervisory physician or nonphysician practitioner could not be immediately available while, for example, performing another procedure or service that he or she could not interrupt. It also would be neither appropriate nor ''immediate'' for the supervisory physician or nonphysician practitioner to be so physically far away on the main campus from the location where hospital outpatient services are being furnished that he or she could not intervene right away.

As we stated in the CY 2010 OPPS/ASC proposed rule (74 FR 35367), we believe that the existing definitions of direct supervision in §§ 410.27(f) and 410.32(b)(3)(ii) that apply to PBDs and physicians' office settings indicate that the physician must be physically present in order to provide direct supervision of services. With regard to services provided in PBDs of hospitals or physicians' offices, for at least 9 years these regulations have specified that the physician must be present in the PBD or in the office suite, respectively. Thus, we have previously established that direct supervision requires immediate physical presence. Medicare only covers hospital outpatient therapeutic services furnished incident to physicians' services, yet a hospital service ordered by a physician may be furnished on a day when the beneficiary does not receive services directly from a physician. Therefore, we believe it is important to retain direct supervision as the standard.

With regard to the commenters' recommendations that CMS redefine direct supervision for therapeutic services to mean that the physician may be ''on or in close proximity to the campus'' and ''able to respond in a timely manner'' according to hospital's policies and bylaws, we believe that the suggested new definition of direct supervision for on-campus hospital outpatient therapeutic services would be wholly inconsistent with the definition of the term as previously codified in at least two Medicare sections of the Code of Federal Regulations. We disagree with the commenters that describing immediate availability as without lapse of time would be read so narrowly as to require that the supervising physician or nonphysician practitioner must be standing in the room next to the nonphysician personnel furnishing the service. A similar argument could be made that the phrase ''able to respond in a timely manner'' is so vague that a supervising physician or nonphysician practitioner could interpret it to mean that arriving within an hour or hours would be reasonable. In addition, we note that the definition proposed by commenters is virtually identical in interpretation to the current existing definition of general supervision. Section 410.32(b)(3)(i) of the regulations defines general supervision to mean that ''the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure.'' We have historically interpreted this to mean that the physician may be available by telephone or other electronic device to supervise and direct the nonphysician personnel furnishing the service. This lower standard of general supervision would not ensure the immediate presence of a qualified practitioner in the hospital to furnish assistance and direction to hospital personnel providing a wide array of complex therapeutic services to hospital outpatients. Several of the

commenters requesting this relaxed definition of direct supervision also asked that certain services be designated as requiring only general supervision. We are unclear about the commenters' understanding of the definition of general supervision if their suggested definition of direct supervision requires no physical presence and only specifies availability in a reasonable period of time by telephone, radio, robotics, or telemedicine.

We have set direct supervision as a minimum standard for supervision of all Medicare hospital outpatient therapeutic services. We do not believe that this standard or the definition, as codified, precludes a hospital from developing bylaws, credentialing procedures, and policies that it believes are appropriate to ensure that all hospital patients receive high quality services in a safe and effective manner. We believe that hospitals take quality of care and patient safety very seriously, and we understand that hospitals are subject to accreditation requirements. Considering that hospitals provide a wide array of very complex services and procedures, including surgeries, we would expect that hospitals already have the leadership, credentialing procedures, bylaws, and other policies in place to ensure that services furnished to Medicare beneficiaries are being provided only by qualified practitioners in accordance with all applicable laws, regulations, and coding guidance. For services not furnished directly by a physician, we would expect that these bylaws and policies would ensure that the services are being supervised in a manner commensurate with the complexity of the service, including personal supervision where appropriate.

*Comment:* Many commenters disagreed with statements in the proposed rule that the supervising physician should have, within his or her scope of practice and hospital-granted privileges, the knowledge, ability, and hospital privileges to perform the services being supervised. Some commenters stated that the supervisor should be required to provide only medical consultation and attend to medical emergencies, but should not be expected to intervene or change the course of treatment because this usurps the responsibility of treating physician. Other commenters stated that the supervisor should be ''clinically appropriate'' to supervise the outpatient therapeutic services.

*Response:* As we explained in the CY 2010 OPPS/ASC proposed rule (74 FR 35367), we believe the supervising physician or nonphysician practitioner must be prepared to step in and perform the service, not just to respond to an emergency. This includes the ability to take over performance of a procedure and, as appropriate to both the supervisory physician or nonphysician practitioner and the patient, to change a procedure or the course of treatment being provided to a particular patient. We originally stated in the April 2000 OPPS final rule (65 FR 18525) that the physician does not ''necessarily need to be of the same specialty as the procedure or service that is being performed.'' We also have stated in manual guidance that hospital medical staff that supervises the services ''need not be in the same department as the ordering physician'' (Section 20.5.1 of Chapter 6 of the Medicare Benefits Policy Manual). We understand hospitals' concerns, and note that we would not expect that a supervising physician would operate in a vacuum, making all decisions without informing or consulting the patient's treating physician or nonphysician practitioner. This would be illogical and inappropriate for good medical practice. However, in order to furnish appropriate assistance and direction for any given service or procedure, we continue to believe the supervisory physician or nonphysician practitioner must have, within his or her State scope of practice and hospital-granted privileges, the ability to perform the service or procedure. We believe that our interpretation of the requirement means that the supervisor must be a person who is ''clinically appropriate'' to supervise the service or procedure. We believe it is inappropriate for a supervisory physician or nonphysician practitioner to be responsible for patients, hospital staff, and services that are outside the scope of their knowledge, skills, licensure, or hospital-granted privileges.

This interpretation of the previously codified language is consistent with our longstanding application of direct supervision across settings in terms of the physical presence of the physician and what it means to ''furnish assistance and direction throughout the performance of the procedure.'' We do not believe that allowing a supervisor to be responsible for emergencies only would satisfy the standard to ''furnish assistance and direction throughout the performance of the procedure'' as the language has historically been interpreted for physicians' offices and PBDs. We disagree with commenters who stated that the historical intent of direct supervision has been for a supervising physician to provide guidance and direction without expecting that professional to be able to perform the service or procedure and that performance of the procedure applies only to personal supervision. It would be unreasonable to think that a physician or nonphysician practitioner could competently assist and direct a procedure for which they do not have sufficient knowledge and skills to perform or redirect the procedure or service.

*Comment:* Several commenters requested additional guidance as to what CMS considers hospital outpatient ''incident to'' services. One commenter requested clarification on the applicability of ''incident to'' to emergency department services. The commenter believed that the ''incident to'' provision for hospital outpatient services may not be applicable to emergency department services because the emergency department physician would be immediately available in the area to care for patients, but would not have previously seen and established a relationship with the patient, as this commenter believed is required. Other commenters believed that the requirements for supervision of hospital outpatient therapeutic services should be specific to each clinical service and should be designated as either general or direct, as for diagnostics. Some commenters asked for clarification of how to report services in a Condition Code 44 situation when the patient received care as an inpatient, with no direct supervision, and the hospital then changed the patient's status to outpatient.

*Response:* As previously stated in this discussion, § 410.27(a)(1)(ii) of the regulations states that Medicare Part B pays for hospital services and supplies furnished incident to a physician service to outpatients if they are provided ''as an integral though incidental part of a physician's services.'' In addition, we have stated in Section 20 of Chapter 6 of the Medicare Benefit Policy Manual that hospitals provide two distinct types of services to outpatients: services that are diagnostic in nature and other services that aid the physician in the treatment of the patient. We further defined these therapeutic services and supplies in Section 20.5.1 of Chapter 6 of the Medicare Benefit Policy Manual, stating ''therapeutic services and supplies which hospitals provide on an outpatient basis are those services and supplies (including the use of hospital facilities) which are incident to the services of physicians in the treatment of patients.'' In essence, all hospital outpatient services that are not

diagnostic are services that aid the physician in the treatment of the patient, and are called therapeutic services. These are the services for which Medicare makes a hospital facility payment only when they are provided ''incident to'' the services of a physician.

We also provide in Section 20.5.1 that services and supplies must be furnished on a physician's order and delivered under physician supervision. However, the manual indicates further that each occasion of a service by a nonphysician does not need to also be the occasion of the actual rendition of a personal professional service by the physician responsible for the care of the patient. Nevertheless, as stipulated in that same section of the manual ''during any course of treatment rendered by auxiliary personnel, the physician must personally see the patient periodically and sufficiently often enough to assess the course of treatment and the patient's progress and, where necessary, to change the treatment regimen.'' Section 20.5.1 also explicitly includes clinic and emergency room services as examples of hospital outpatient services that are provided incident to the services of a physician. We note in this section that the policies for hospital services incident to physicians' services rendered to outpatients differ in some respects from policies that pertain to ''incident to'' services furnished in office and physician-directed clinic settings. Those requirements are discussed in Section 60 of Chapter 15 of the Medicare Benefit Policy Manual. The commenter incorrectly believed that for hospital services to be ''incident to'' a physician's services, the physician must have previously seen and established a relationship with the patient. When a patient presents to an emergency department or a hospital clinic and a physician examines the patient and orders services to be provided, the provision of those services is incident to the services of that physician.

We recognize the potential benefit to hospitals of specifically designating supervision requirements for individual therapeutic services based on clinical complexity, especially for less complex services that we might deem to require general supervision. We note that the commenters requesting individual designations mentioned only defining services as requiring general or direct supervision. However, as we discussed earlier in this section, direct supervision represents a minimum standard currently applicable to all outpatient therapeutic services. If we were to designate individual supervision levels for hospital outpatient therapeutic services just as we do for diagnostic services, it would be most consistent and appropriate for CMS to make specific determinations for services that we believe may only be safely provided under the personal supervision of a physician or that must be performed only by a physician. We stated above that we expect that hospitals already have credentialing procedures, bylaws, and other policies established to ensure that services furnished to Medicare beneficiaries are being provided only by qualified practitioners in accordance with all applicable laws, regulations and coding guidance. For services not furnished directly by a physician, we would expect that these bylaws and policies would ensure that the services are being supervised in a manner commensurate with the complexity of the service, including personal supervision where appropriate.

The use of Condition Code 44 pertains to the entire patient encounter, the patient's status, and the hospital bill type submitted. Reporting of individual HCPCS codes on an outpatient claim must be consistent with all instructions and CMS guidance, including the requirements of § 410.27 of the regulations, which specify that direct supervision is required for hospital outpatient therapeutic services.

*Comment:* One commenter requested clarification of the meaning of the phrase ''performance of the procedure'' in the definition of direct supervision. The commenter was unclear whether this phrase specifically applied only to surgical procedures or whether it was a general term for services and procedures. The commenter also asked if the direct supervision requirement would apply to recovery room services following a surgical procedure performed by the physician.

*Response:* The use of the term ''procedure'' is intended to encompass all services and procedures and includes all components of a service or procedure furnished by a hospital to an outpatient, including recovery room services, and covered and paid by Medicare, regardless of whether separate payment is made for those component services. This is how we have applied the term within the codified definitions of the levels of supervision (general, direct, and personal) in §§ 410.27 and 410.32. While each supervision definition uses the phrase ''performance of the procedure,'' the term ''service'' may be substituted for the word ''procedure'' each time ''procedure'' appears in the regulations.

*Comment:* Several commenters raised questions about the proposed definition of the phrase ''in the hospital.'' Some requested clarification of the meaning of ''on the same campus.'' Several commenters suggested that the word ''ownership'' in the definition seems to unintentionally exclude areas that are operated and controlled by the hospital under a lease agreement or a written operations agreement. These commenters suggested either removing this term from the definition of ''in the hospital'' or clarifying in this final rule with comment period where CMS is referring to the business operation aspect of ownership rather than the physical building.

*Response:* ''On the same campus'' was used to denote that the supervising physician or nonphysician practitioner must be physically located on the same campus as the services being furnished by the hospital because it is possible for some hospitals to have more than one main campus, as well as off-campus PBDs.

We appreciate the public comments that raised the questions about the term ''ownership.'' We agree with the commenters that a narrow interpretation of the word ''ownership'' would exclude spaces that the hospital leases or operates under another type of operations agreement. This was not our intention. The commenters correctly pointed out that the word ''ownership'' in this context applies to the actual business operation, not solely a physical building. However, we also believe that the rest of the definition includes these aspects. If the definition is read as a whole, instead of parsing individual clauses out of context, then the spirit of the regulation is understood. Because the phrase ''in the hospital or CAH'' applies broadly to ''incident to'' requirements such as the site of service requirement for therapeutic services provided by the hospital directly and under arrangement, we are finalizing the proposed definition of ''in the hospital'' in new paragraph (g) of § 410.27 as meaning areas in the main building(s) of a hospital that are under the ownership, financial, and administrative control of the hospital; that are operated as part of the hospital; and for which the hospital bills the services furnished under the hospital's CCN.

*Comment:* One commenter requested that CMS reiterate that the ''incident to'' and physician supervision requirements of § 410.27 do not apply to physical therapy, occupational therapy, and speech-language pathology services furnished under a therapy plan of care.

*Response:* Section 1833(t) of the Act excludes physical therapy, occupational

therapy, and speech-language pathology from hospital outpatient services paid under the OPPS. In addition, in the April 2000 OPPS final rule (65 FR 18525), we stated in response to a comment about physical therapy services that the coverage provision in section 1861(s)(2)(D) of the Act does not require that physical therapy services be provided incident to the services of a physician. Finally, in Section 20 (Hospital Outpatient Services) of Chapter 6 of the Medicare Benefit Policy Manual, we state, ''[t]he following rules pertaining to the coverage of outpatient hospital services are not applicable to physical therapy, speech-language pathology, occupational therapy, or end stage renal disease (ESRD) services furnished by hospitals to outpatients.'' This section instructs readers to consult sections 220 and 230 of Chapter 15 of the Medicare Benefit Policy Manual for rules on the coverage of outpatient physical therapy, occupational therapy, and speech-language pathology furnished by a hospital.

*Comment:* Several commenters from CMHCs and hospital-based PHPs questioned whether the direct physician supervision clarifications and the ''incident to'' requirements of § 410.27 apply to those programs. Several hospital-based PHP stakeholders noted the discrepancy in the physician supervision requirements for PHP services furnished by CMHCs and hospitals.

*Response:* Medicare makes payment for hospital outpatient therapeutic services only when provided ''incident to'' the services of a physician. Outpatient psychiatric and hospital-based PHP services are outpatient hospital services paid under the OPPS and, therefore, must meet all conditions of § 410.27, including the requirement for direct supervision by a physician or qualified nonphysician practitioner.

Because CMHCs are paid under the OPPS for PHP services, the ''incident to'' requirements of § 410.27 also apply to CMHCs, with the exception of direct supervision for outpatient PHP services. Currently, CMHCs have a different physician supervision standard to meet. On February 11, 1994, CMS issued the Partial Hospitalization Services in Community Mental Health Centers (CMHCs) interim final rule with comment period (59 FR 6570), developing and implementing the coverage criteria and payment methodology for CMHCs under Medicare. At the time when the CY 1994 CMHC rule was published, the decision was made to permit general supervision in CMHCs. As implemented in § 410.110(a), services provided in a CMHC PHP must be prescribed by a physician and furnished under the general supervision of a physician. General supervision means that a physician must be at least available by telephone, but is not required to be on the premises of the CMHC at all times (59 FR 6573). We recognized that a direct supervision requirement could cause hardship to CMHCs because some of these entities were unable to employ physicians on a full-time basis due to the expense involved. In the CY 1994 interim final rule with comment, we explained that because we believed that less than direct supervision by a full-time physician in a CMHC would not jeopardize a patient's health or treatment program, in combination with our belief that there would be a number of professionals involved in the care of the patient who are authorized to furnish services that would otherwise be furnished by a physician, we required general physician supervision.

On August 1, 2000 (65 FR 18434), the OPPS was implemented and provided payment for PHP services provided in two settings: hospital outpatient departments to their outpatients and CMHCs. Although PHP is one benefit and both provider types receive the same payment for services rendered, CMHCs have been permitted to furnish PHP services under general supervision; and the OPPS has, since 2000, held a standard of direct supervision for hospital outpatient therapeutic services, including PHP services (42 CFR 410.110 (a)). While the policy was clearly codified for PBDs of hospitals in the CY 2009 OPPS/ASC proposed rule and final rule with comment period, CMS restated and clarified that the policy also applies to hospital outpatient services not provided in PBDs due to questions referencing the assumption of physician supervision in the April 2000 OPPS final rule (73 FR 68702 through 68704 referencing 65 FR 18525). Even though there are different physician supervision standards for CMHCs and hospital-based PHPs, the certification, recertification, and plan of treatment requirements at § 424.24(e) and section 1835(2)(F) of the Act continue to apply to both provider types. The physician would certify and recertify (where services are furnished over a period of time) that the individual would require inpatient psychiatric care in the absence of such services; an individualized, written plan for furnishing such services has been established by a physician and is reviewed periodically by a physician; and such services are or were furnished while the individual is or was under the care of a physician. The physician recertification must be signed by a physician who is treating the patient and has knowledge of the patient's response to treatment.

In order to unify the benefit and create more equity and consistency, we are exploring the possibility of extending the same physician supervision requirements to both provider types. Specifically, we are concerned whether the current policy of requiring only general physician supervision in CMHCs continues to be appropriate, taking into account the differences among provider settings. We also plan to analyze PHP claims data from the past several years and assess whether our current policies and payment structures are working. Therefore, we will evaluate the policies and the possibility of extending the same physician supervision requirement to PHP services furnished in both CMHCs and HOPDs in future rulemaking.

With that in mind, we are requesting comments on this final rule with comment period that address: (1) What types of practitioners currently provide the supervision of PHP services in CMHCs; (2) what is the expertise of supervising practitioners in CMHCs and what is the expectation for their availability; (3) based on the final CY 2010 supervision requirements for hospital outpatient therapeutic services (including PHP services furnished in HOPDs), under what circumstances would direct supervision of PHP services furnished in CMHCs not be occurring, according to the applicable definitions for direct supervision of on-campus and off-campus therapeutic services; and (4) what would be the rationale for maintaining different supervision requirements for PHP services furnished in CMHCs and HOPDs, given that all PHP services are paid under the OPPS.

*Comment:* A few commenters stated that the provisions for off-campus PBDs should not require the supervising practitioner to be in the department because the existing policy is burdensome and costly, especially for rural providers. The commenters requested that a supervising physician or nonphysician practitioner be able to supervise services being furnished in more than one off-campus PBD at a time. Some commenters stated that they know of off-campus PBDs in current operation that operate with a supervisor nearby, for example, in a physician's office, but not in the PBD.

*Response:* We first note that the requirement for direct supervision of hospital outpatient therapeutic services furnished in PBDs of the hospital was

Case No. 1:12-cv-03029-WJM-MLC Document 68-7 filed 09/14/15 USDC Colorado pg 12 of 14



codified in § 410.27(f) of the regulations in the April 2000 OPPS final rule. In that rule, we explicitly stated that ''on the premises of the location'' means that the supervisor must be on the premises of the PBD (65 FR 18525). We also responded to public commenters who asserted that requiring a physician to be onsite at a PBD throughout the performance of all ''incident to'' therapeutic services would be burdensome and costly for hospitals where there are a limited number of physicians available to provide coverage, particularly in rural settings. We disagreed then that the supervision requirement was unnecessary and burdensome because hospitals, prior to 2000, were already required to ''meet a direct supervision of 'incident to' services requirement that is unrelated to the provider-based rules.'' We continue to believe that it would be inappropriate to allow one physician or nonphysician practitioner to supervise all services being provided in all PBDs at a particular off-campus outpatient location. Since first allowing off-campus sites to be considered PBDs of hospitals, we have placed particular emphasis on ensuring the quality and safety of the services provided in these locations, which can be many miles from the main hospital campus, through both additional provider-based requirements in § 413.65(e) and our emphasis on direct physician supervision under § 410.27(f). In addition, because the physician or nonphysician practitioner must be immediately available and have, within his or her State scope of practice and hospital-granted privileges, the ability to perform the services being supervised, we believe it would be highly unlikely that one physician or nonphysician practitioner would be both immediately available at all times that therapeutic services are being provided and would have the knowledge and ability to adequately supervise all services being performed at once in multiple off-campus PBDs.

*Comment:* Many commenters maintained that the CY 2009 OPPS/ASC final rule with comment period statements on supervision were not a ''restatement or clarification'' but a significant change in policy. They argued that any enforcement should be prospective beginning in CY 2010 only, with no enforcement regarding prior years' hospital outpatient therapeutic services. The commenters believed that the policy prior to CY 2009 at best was unclear, and that the regulations were not comprehensive, and therefore, they concluded that hospitals should not be held accountable to the policy stated in the CY 2009 OPPS/ASC final rule with comment period for hospital outpatient therapeutic services furnished in 2000 through CY 2008. The commenters stated that CMS should also not enforce the policy as clarified in the CY 2009 OPPS/ASC final rule with comment period for CY 2009 hospital outpatient therapeutic services because sufficient opportunity for public notice and comment was not provided. Many hospitals were unaware that the policy had been discussed in the CY 2000 OPPS rulemaking process, and the commenters argued that hospitals may not have had enough time to meet these requirements for CY 2009. Furthermore, hospitals expressed concern about their potential liability due to *qui tam* litigation.

*Response:* We provided a restatement and clarification of existing policy in the CY 2009 OPPS/ASC proposed rule (73 FR 41518 through 41519), citing numerous existing statutory, regulatory, manual, and prior rule preamble statements in section XII.A. of that rule, specifically titled, ''Physician Supervision of HOPD Services.'' The CY 2009 OPPS/ASC proposed rule provided for a 60-day comment period. We continue to believe that the CY 2009 restatement and clarification made no change to longstanding hospital outpatient physician direct supervision policies as incorporated in prior statements of policy, including the regulations. In addition, we provided for public notice and comment regarding these physician supervision policies through the CY 2009 OPPS/ASC proposed rule in which, as noted above, we discussed physician supervision explicitly in a distinct section of the proposed rule, and we responded in the final rule to the few public comments we received on the supervision discussion. Therefore, we believe that the usual enforcement practices of Medicare contractors are appropriate for services furnished in CY 2009. Likewise, the final supervision policies described in this CY 2010 final rule with comment period for hospital outpatient therapeutic services are effective and, therefore, subject to enforcement beginning January 1, 2010.

In regard to hospital outpatient therapeutic services provided in CY 2000 through CY 2008, in CY 2009 we recognized the need for clarification of the direct supervision policy. CMS was relatively silent on this topic between 2000 and 2008. Furthermore, the existing regulations at § 410.27(f) only specify the supervision requirements for hospital outpatient therapeutic services furnished in PBDs but do not address services furnished in areas of the hospital that may not be PBDs. However, we note that the details of the direct supervision policy for hospital outpatient therapeutic services furnished in off-campus PBDs were clearly and consistently stated in the April 2000 OPPS final rule discussion and the regulations, including the requirement that the supervising practitioner be physically present in an off-campus PBD when such services were being furnished. As stated earlier in this section, we have placed and will continue to place particular emphasis on ensuring the quality and safety of the services provided in these locations and will continue to do so through our enforcement and other efforts. However, in the case of hospital outpatient therapeutic services furnished on the hospital's campus in 2000 through 2008, we plan to exercise our discretion and decline to enforce in situations involving claims where the hospital's noncompliance with the direct physician supervision policy resulted from error or mistake.

After consideration of the public comments we received, we are finalizing our proposal to allow, in addition to clinical psychologists, certain other nonphysician practitioners to directly supervise services that they may perform themselves under their State license and scope of practice and hospital-granted or CAH-granted privileges, with one modification. In addition to physician assistants, nurse practitioners, clinical nurse specialists, and certified nurse-midwives, in this final rule with comment period, we are allowing licensed clinical social workers to provide direct supervision. Specifically, we are modifying the final text of revised § 410.27(f) to include licensed clinical social workers among the listing of nonphysician practitioners who may directly supervise the provision of hospital outpatient therapeutic services. These nonphysician practitioners may directly supervise services that they may personally furnish in accordance with State law and all additional requirements, including those specified in §§ 410.71, 410.73, 410.74, 410.75, 410.76, and 410.77, respectively. Accordingly, we also are adding the cross-reference to § 410.73 (Clinical social worker services) in the final revision of paragraph (a)(1)(iv) of § 410.27 (which indicates that services must be furnished under the direct supervision of a physician or a nonphysician practitioner as specified in paragraph (f)).

We are finalizing the proposed direct physician supervision requirements for PR, CR, and ICR services furnished in

the HOPD that would require the direct supervision to be provided by a doctor of medicine or osteopathy. Accordingly, we are finalizing the relevant language in proposed §§ 410.27(a)(1)(iv)(A) and (B) which indicates that, for PR, CR, and ICR services, direct supervision must be furnished by a doctor of medicine or osteopathy, as specified in §§ 410.47 and 410.49, respectively.

For services furnished on a hospital's main campus, we are finalizing a modification of our proposed definition of ''direct supervision'' in new paragraph (a)(1)(iv)(A) of § 410.27 that allows for the supervisory physician or nonphysician practitioner to be anywhere on the hospital campus, including a physician's office, an on-campus SNF, RHC, or other nonhospital space. Therefore, direct supervision means that the supervisory physician or nonphysician practitioner must be present on the same campus and immediately available to furnish assistance and direction throughout the performance of the procedure.

Because the term ''in the hospital or CAH'' applies broadly to ''incident to'' requirements such as the site of service requirement for therapeutic services provided by the hospital directly and under arrangement, we also are finalizing the definition of ''in the hospital'' in new paragraph § 410.27(g) as meaning areas in the main building(s) of a hospital or CAH that are under the ownership, financial, and administrative control of the hospital or CAH; that are operated as part of the hospital; and for which the hospital bills the services furnished under the hospital's or CAH's CCN.

We are finalizing, without modification, the addition of new paragraph (a)(1)(iv)(B) to § 410.27 to reflect that, for off-campus PBDs of hospitals, the physician or nonphysician practitioner must be present in the off-campus PBD, as defined in § 413.65, and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician or nonphysician practitioner must be in the room when the procedure is performed. As we stated previously, the language of paragraph (a)(1)(iv)(B) is similar to existing § 410.27(f) that we are revising and relocating. Furthermore, we are finalizing the proposed technical change to clarify the language in this paragraph by removing the phrase ''present and on the premises of the location'' and replacing it with the phrase ''present in the off-campus provider-based department.''

Additionally, we are finalizing the proposal to make a technical correction to the title of § 410.27 to read, ''Outpatient hospital or CAH services and supplies incident to a physician service: Conditions'' to clarify in the title that the requirements for payment of hospital outpatient therapeutic services incident to a physician or nonphysician practitioner service in that section apply to both hospitals and CAHs. Similarly, we are including the phrase ''hospital or CAH'' throughout the text of § 410.27 wherever the text currently refers just to ''hospital.''

4. Policies for Direct Supervision of Hospital and CAH Outpatient Diagnostic Services

As we discussed in detail in the CY 2010 OPPS/ASC proposed rule (74 FR 35368), with respect to the physician supervision requirements for individual diagnostic tests, we have continued since the April 2000 OPPS final rule discussion (65 FR 18526) to instruct hospitals that, for diagnostic services furnished in PBDs of hospitals, hospitals should follow the supervision requirements for individual diagnostic tests as listed in the MPFS Relative Value File. For diagnostic services not listed in the MPFS file, Medicare contractors, in consultation with their medical directors, define appropriate supervision levels in order to determine whether claims for these services are reasonable and necessary. To further specify the supervision policy across service settings and to provide consistency for all hospital outpatient diagnostic services, for CY 2010 we proposed to require that all hospital outpatient diagnostic services that are provided directly or under arrangement, whether provided in the main buildings of the hospital, in a PBD of a hospital, or at a nonhospital location, follow the physician supervision requirements for individual tests as listed in the MPFS Relative Value File. We also proposed that the definitions of general, direct, and personal supervision as defined in §§ 410.32(b)(3)(i) through (b)(3)(iii) would also apply. In the case of direct supervision of diagnostic services furnished directly by the hospital or under arrangement in the main hospital buildings or on-campus in a PBD, we proposed that the definition of direct supervision would be the same as the definition we proposed for therapeutic services provided on-campus as discussed in the CY 2010 OPPS/ASC proposed rule (74 FR 35369), meaning that the physician would be present on the same campus, in the hospital or the on-campus PBD of the hospital, as defined in § 413.65, and immediately available to furnish assistance and direction throughout the performance of the procedure. In addition, the definition of ''in the hospital or CAH'' as defined in proposed § 410.27(g), discussed above, would apply. In the CY 2010 OPPS/ASC proposed rule, we explained that this means that the supervisory physician may not be located in any entity such as a physician's office, co-located hospital, IDTF, or hospital-operated provider or supplier such as a SNF, ESRD facility, or HHA, or any other nonhospital space that may be co-located on the hospital's campus, as campus is defined in § 413.65(a)(2).

Similarly, in the case of direct physician supervision of diagnostic services furnished directly or under arrangement in an off-campus PBD, we proposed that the definition of direct supervision would be the same as the current definition for therapeutic services provided in an off-campus PBD as discussed in the CY 2010 OPPS/ASC proposed rule (74 FR 35369), meaning the physician must be present in the off-campus PBD, as defined in § 413.65 and immediately available to furnish assistance and direction throughout the performance of the procedure. As we discussed in the April 2000 OPPS final rule (65 FR 18524 through 18525) and the CY 2009 OPPS/ASC final rule with comment period (73 FR 68702 through 68704), we have long made the analogy of the PBD to the physician's office suite, as described in the definition of direct supervision in § 410.32(b)(3)(ii).

In addition to providing diagnostic services directly or under arrangement in the hospital, including PBDs of the hospital, a hospital may also send its outpatients to another entity, such as an IDTF, to furnish these services under arrangement for the hospital. For example, in the April 2000 OPPS final rule (65 FR 185440 through 185441), in a discussion of the hospital bundling rules, we discussed that an entity, like an IDTF, may be located in the main buildings of a hospital or on the hospital campus but operated independently of the hospital. In addition, these suppliers, providers, or other entities may be located elsewhere, not on a hospital's main campus or other hospital property. These entities, like IDTFs and physicians' offices, may provide services to their own patients (not hospital outpatients) and to hospital outpatients under arrangements with the hospital. They follow the physician supervision requirements of the MPFS and § 410.32 when providing services to Medicare beneficiaries who are not hospital outpatients. For consistency, we proposed for CY 2010

**ADDENDUM B.—FINAL OPPS PAYMENT BY HCPCS CODE FOR CY 2010**

| HCPCS Code | Short Descriptor | CI | SI | APC | Relative Weight | Payment Rate | National Unadjusted Copayment | Minimum Unadjusted Copayment |
|---|---|---|---|---|---|---|---|---|
| 77052 | Comp screen mammogram add-on | | A | | | | | |
| 77053 | X-ray of mammary duct | | Q2 | 0263 | 3.1192 | $210.25 | | $42.05 |
| 77054 | X-ray of mammary ducts | | Q2 | 0263 | 3.1192 | $210.25 | | $42.05 |
| 77055 | Mammogram, one breast | | A | | | | | |
| 77056 | Mammogram, both breasts | | A | | | | | |
| 77057 | Mammogram, screening | | A | | | | | |
| 77058 | Mri, one breast | | B | | | | | |
| 77059 | Mri, both breasts | | B | | | | | |
| 77071 | X-ray stress view | | X | 0260 | 0.6661 | $44.90 | | $8.98 |
| 77072 | X-rays for bone age | | X | 0260 | 0.6661 | $44.90 | | $8.98 |
| 77073 | X-rays, bone length studies | | X | 0260 | 0.6661 | $44.90 | | $8.98 |
| 77074 | X-rays, bone survey, limited | | X | 0261 | 1.1161 | $75.23 | | $15.05 |
| 77075 | X-rays, bone survey complete | | X | 0261 | 1.1161 | $75.23 | | $15.05 |
| 77076 | X-rays, bone survey, infant | | X | 0261 | 1.1161 | $75.23 | | $15.05 |
| 77077 | Joint survey, single view | | X | 0260 | 0.6661 | $44.90 | | $8.98 |
| 77078 | Ct bone density, axial | | S | 0288 | 1.0755 | $72.50 | $28.66 | $14.50 |
| 77079 | Ct bone density, peripheral | | S | 0282 | 1.6291 | $109.81 | $37.81 | $21.97 |
| 77080 | Dxa bone density, axial | | S | 0288 | 1.0755 | $72.50 | $28.66 | $14.50 |
| 77081 | Dxa bone density/peripheral | | S | 0665 | 0.4318 | $29.11 | $11.63 | $5.83 |
| 77082 | Dxa bone density, vert fx | | X | 0260 | 0.6661 | $44.90 | | $8.98 |
| 77083 | Radiographic absorptiometry | | X | 0261 | 1.1161 | $75.23 | | $15.05 |
| 77084 | Magnetic image, bone marrow | | S | 0336 | 5.1855 | $349.53 | $137.40 | $69.91 |
| 77261 | Radiation therapy planning | | B | | | | | |
| 77262 | Radiation therapy planning | | B | | | | | |
| 77263 | Radiation therapy planning | | B | | | | | |
| 77280 | Set radiation therapy field | | X | 0304 | 1.5271 | $102.94 | $34.71 | $20.59 |
| 77285 | Set radiation therapy field | | X | 0305 | 3.951 | $266.32 | $91.38 | $53.27 |
| 77290 | Set radiation therapy field | | X | 0305 | 3.951 | $266.32 | $91.38 | $53.27 |
| 77295 | Set radiation therapy field | | X | 0310 | 13.7576 | $927.34 | $325.27 | $185.47 |
| 77299 | Radiation therapy planning | | X | 0304 | 1.5271 | $102.94 | $34.71 | $20.59 |
| 77300 | Radiation therapy dose plan | | X | 0304 | 1.5271 | $102.94 | $34.71 | $20.59 |
| 77301 | Radiotherapy dose plan, imrt | | X | 0310 | 13.7576 | $927.34 | $325.27 | $185.47 |
| 77305 | Teletx isodose plan simple | | X | 0304 | 1.5271 | $102.94 | $34.71 | $20.59 |
| 77310 | Teletx isodose plan intermed | | X | 0304 | 1.5271 | $102.94 | $34.71 | $20.59 |
| 77315 | Teletx isodose plan complex | | X | 0305 | 3.951 | $266.32 | $91.38 | $53.27 |
| 77321 | Special teletx port plan | | X | 0305 | 3.951 | $266.32 | $91.38 | $53.27 |
| 77326 | Brachytx isodose calc simp | | X | 0304 | 1.5271 | $102.94 | $34.71 | $20.59 |
| 77327 | Brachytx isodose calc interm | | X | 0305 | 3.951 | $266.32 | $91.38 | $53.27 |
| 77328 | Brachytx isodose plan compl | | X | 0305 | 3.951 | $266.32 | $91.38 | $53.27 |
| 77331 | Special radiation dosimetry | | X | 0304 | 1.5271 | $102.94 | $34.71 | $20.59 |
| 77332 | Radiation treatment aid(s) | | X | 0303 | 2.8279 | $190.62 | $66.95 | $38.13 |
| 77333 | Radiation treatment aid(s) | | X | 0303 | 2.8279 | $190.62 | $66.95 | $38.13 |
| 77334 | Radiation treatment aid(s) | | X | 0303 | 2.8279 | $190.62 | $66.95 | $38.13 |

**ADDENDUM B.—FINAL OPPS PAYMENT BY HCPCS CODE FOR CY 2010**

| HCPCS Code | Short Descriptor | CI | SI | APC | Relative Weight | Payment Rate | National Unadjusted Copayment | Minimum Unadjusted Copayment |
|---|---|---|---|---|---|---|---|---|
| 77336 | Radiation physics consult | | X | 0304 | 1.5271 | $102.94 | $34.71 | $20.59 |
| 77338 | Design mlc device for imrt | NI | X | 0303 | 2.8279 | $190.62 | $66.95 | $38.13 |
| 77370 | Radiation physics consult | | X | 0304 | 1.5271 | $102.94 | $34.71 | $20.59 |
| 77371 | Srs, multisource | | S | 0127 | 108.9558 | $7,344.27 | | $1,468.86 |
| 77372 | Srs, linear based | | B | | | | | |
| 77373 | Sbrt delivery | | B | | | | | |
| 77399 | External radiation dosimetry | | X | 0304 | 1.5271 | $102.94 | $34.71 | $20.59 |
| 77401 | Radiation treatment delivery | | S | 0300 | 1.3764 | $92.78 | | $18.56 |
| 77402 | Radiation treatment delivery | | S | 0300 | 1.3764 | $92.78 | | $18.56 |
| 77403 | Radiation treatment delivery | | S | 0300 | 1.3764 | $92.78 | | $18.56 |
| 77404 | Radiation treatment delivery | | S | 0300 | 1.3764 | $92.78 | | $18.56 |
| 77406 | Radiation treatment delivery | | S | 0301 | 2.303 | $155.24 | | $31.05 |
| 77407 | Radiation treatment delivery | | S | 0300 | 1.3764 | $92.78 | | $18.56 |
| 77408 | Radiation treatment delivery | | S | 0300 | 1.3764 | $92.78 | | $18.56 |
| 77409 | Radiation treatment delivery | | S | 0300 | 1.3764 | $92.78 | | $18.56 |
| 77411 | Radiation treatment delivery | | S | 0301 | 2.303 | $155.24 | | $31.05 |
| 77412 | Radiation treatment delivery | | S | 0301 | 2.303 | $155.24 | | $31.05 |
| 77413 | Radiation treatment delivery | | S | 0301 | 2.303 | $155.24 | | $31.05 |
| 77414 | Radiation treatment delivery | | S | 0301 | 2.303 | $155.24 | | $31.05 |
| 77416 | Radiation treatment delivery | | S | 0301 | 2.303 | $155.24 | | $31.05 |
| 77417 | Radiology port film(s) | | N | | | | | |
| 77418 | Radiation tx delivery, imrt | | S | 0412 | 6.249 | $421.22 | | $84.25 |
| 77421 | Stereoscopic x-ray guidance | | N | | | | | |
| 77422 | Neutron beam tx, simple | | S | 0301 | 2.303 | $155.24 | | $31.05 |
| 77423 | Neutron beam tx, complex | | S | 0301 | 2.303 | $155.24 | | $31.05 |
| 77427 | Radiation tx management, x5 | | B | | | | | |
| 77431 | Radiation therapy management | | B | | | | | |
| 77432 | Stereotactic radiation trmt | | B | | | | | |
| 77435 | Sbrt management | | N | | | | | |
| 77470 | Special radiation treatment | | S | 0299 | 5.6461 | $380.58 | | $76.12 |
| 77499 | Radiation therapy management | | B | | | | | |
| 77520 | Proton trmt, simple w/o comp | | S | 0664 | 13.9796 | $942.31 | | $188.47 |
| 77522 | Proton trmt, simple w/comp | | S | 0664 | 13.9796 | $942.31 | | $188.47 |
| 77523 | Proton trmt, intermediate | | S | 0667 | 18.2873 | $1,232.67 | | $246.54 |
| 77525 | Proton treatment, complex | | S | 0667 | 18.2873 | $1,232.67 | | $246.54 |
| 77600 | Hyperthermia treatment | | S | 0299 | 5.6461 | $380.58 | | $76.12 |
| 77605 | Hyperthermia treatment | | S | 0299 | 5.6461 | $380.58 | | $76.12 |
| 77610 | Hyperthermia treatment | | S | 0299 | 5.6461 | $380.58 | | $76.12 |
| 77615 | Hyperthermia treatment | | S | 0299 | 5.6461 | $380.58 | | $76.12 |
| 77620 | Hyperthermia treatment | | S | 0299 | 5.6461 | $380.58 | | $76.12 |
| 77750 | Infuse radioactive materials | | S | 0301 | 2.303 | $155.24 | | $31.05 |
| 77761 | Apply intrcav radiat simple | | S | 0312 | 4.4846 | $302.29 | | $60.46 |
| 77762 | Apply intrcav radiat interm | | S | 0312 | 4.4846 | $302.29 | | $60.46 |