EXHIBIT 7

71800 Federal Register / Vol. 75, No. 226 / Wednesday, November 24, 2010 / Rules and Regulations

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Parts 410, 411, 412, 413, 416, 419, and 489**

**[CMS–1504–FC and CMS–1498–IFC2]**

**RIN 0938–AP82 and RIN 0938–AP80**

# Medicare Program: Hospital Outpatient Prospective Payment System and CY 2011 Payment Rates; Ambulatory Surgical Center Payment System and CY 2011 Payment Rates; Payments to Hospitals for Graduate Medical Education Costs; Physician Self-Referral Rules and Related Changes to Provider Agreement Regulations; Payment for Certified Registered Nurse Anesthetist Services Furnished in Rural Hospitals and Critical Access Hospitals

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Final rule with comment period; final rules; and interim final rule with comment period.

**SUMMARY:** The final rule with comment period in this document revises the Medicare hospital outpatient prospective payment system (OPPS) to implement applicable statutory requirements and changes arising from our continuing experience with this system and to implement certain provisions of the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010 (Affordable Care Act). In this final rule with comment period, we describe the changes to the amounts and factors used to determine the payment rates for Medicare hospital outpatient services paid under the prospective payment system. These changes are applicable to services furnished on or after January 1, 2011.

In addition, this final rule with comment period updates the revised Medicare ambulatory surgical center (ASC) payment system to implement applicable statutory requirements and changes arising from our continuing experience with this system and to implement certain provisions of the Affordable Care Act. In this final rule with comment period, we set forth the applicable relative payment weights and amounts for services furnished in ASCs, specific HCPCS codes to which these changes apply, and other pertinent ratesetting information for the CY 2011 ASC payment system. These changes are applicable to services furnished on or after January 1, 2011.

In this document, we also are including two final rules that implement provisions of the Affordable Care Act relating to payments to hospitals for direct graduate medical education (GME) and indirect medical education (IME) costs; and new limitations on certain physician referrals to hospitals in which they have an ownership or investment interest.

In the interim final rule with comment period that is included in this document, we are changing the effective date for otherwise eligible hospitals and critical access hospitals that have been reclassified from urban to rural under section 1886(d)(8)(E) of the Social Security Act and 42 CFR 412.103 to receive reasonable cost payments for anesthesia services and related care furnished by nonphysician anesthetists from cost reporting periods beginning on or after October 1, 2010, to December 2, 2010.

**DATES:** *Effective Dates:* The provisions of these rules are effective January 1, 2011, except for the amendment to 42 CFR 412.113(c)(2)(i)(A), which is effective on December 2, 2010.

*Applicability Dates:* (1) The amendments to 42 CFR 412.105(f)(1)(ii)(A), (B), (C), and (D) are applicable retroactive to January 1, 1983; (2) the amendment to 42 CFR 412.105(f)(1)(ii)(E) is applicable retroactive to July 1, 2010; (3) the amendments to 42 CFR 412.105(f)(1)(iii)(C) and (D) are applicable retroactive to January 1, 1983; (4) the amendment to 42 CFR 413.75(b) is applicable retroactive to July 1, 2009; (5) the amendment to 42 CFR 413.78(f)(1) is applicable retroactive to July 1, 2009; (6) the amendment to 42 CFR 413.78(g) is applicable retroactive to July 1, 2010; and (7) the amendment to 42 CFR 413.78(h) is applicable retroactive to January 1, 1983. In accordance with sections 1871(e)(1)(A)(i) and (e)(1)(A)(ii) of the Social Security Act, the Secretary has determined that the retroactive application of the specified regulatory amendments is necessary to comply with the statute and that failure to apply these changes retroactively would be contrary to public interest.

*Comment Period:* To be assured consideration, comments on the payment classifications assigned to HCPCS codes identified in Addenda B, AA, and BB to the final rule with comment period with the "NI" comment indicator and on other areas specified throughout the final rule with comment period, must be received at one of the addresses provided in the **ADDRESSES** section no later than 5 p.m. EST on January 3, 2011.

To be assured consideration, comments on the interim final rule with comment period (under section XXIII. of the preamble and the amendment to 42 CFR 412.113(c)(2)(i)(A)) relating to reasonable cost payments to otherwise eligible hospitals and critical access hospitals that have reclassified from urban to rural for anesthesia services and related care furnished by nonphysician anesthetists must be received at one of the addresses provided in the **ADDRESSES** section no later than 5 p.m. EST on January 3, 2011.

*Application Deadline—New Class of New Technology Intraocular Lenses:* Requests for review of applications for a new class of new technology intraocular lenses must be received by 5 p.m. EST on March 5, 2011.

**ADDRESSES:** In commenting, please refer to file code CMS–1504–FC for the provisions of the OPPS/ASC final rule with comment period, and to CMS–1498–IFC2 for the interim final rule with comment period. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (no duplicates, please):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov*. Follow the instructions under the "More Search Options" tab.

2. *By regular mail.* You may mail written comments to the following address only: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1504–FC or CMS–1498–IFC2, as applicable, P.O. Box 8013, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address only: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1504–FC or CMS–1498–IFC2, as applicable, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments before the close of the comment period to either of the following addresses:

a. For delivery in Washington, DC—Centers for Medicare & Medicaid Services, Department of Health and

TABLE 47—ADDITIONAL PROCEDURES REQUESTED BY COMMENTERS FOR REMOVAL FROM THE INPATIENT LIST FOR CY 2011—Continued

| CPT code | Long descriptor | CY 2011 status indicator |
|---|---|---|
| 19305 | Mastectomy, radical, including pectoral muscles, axillary lymph nodes | C |
| 19361 | Breast reconstruction with latissimus dorsi flap, without prosthetic implant | C |
| 20938 | Autograft for spine surgery only (includes harvesting the graft); structural, bicortical or tricortical (through separate skin or fascial incision). (List separately in addition to code for primary procedure.) | C |
| 21196 | Reconstruction of mandibular rami and/or body, sagittal split; with internal rigid fixation. | C |
| 21422 | Open treatment of palatal or maxillary fracture (LeFort I type) | C |
| 22554 | Arthrodesis, anterior interbody technique, including minimal discectomy to prepare interspace (other than for decompression); cervical below C2. | C |
| 22585 | Arthrodesis, anterior interbody technique, including minimal discectomy to prepare interspace (other than for decompression); each additional interspace. (List separately in addition to code for primary procedure.) | C |
| 22845 | Anterior instrumentation; 2 to 3 vertebral segments. (List separately in addition to code for primary procedure.) | C |
| 27557 | Open treatment of knee dislocation, includes internal fixation, when performed; with primary ligamentous repair. | C |
| 28800 | Amputation of midfoot—Amputation, foot; midtarsal (e.g., Chopart type procedure). | C |
| 35045 | Direct repair of aneurysm, pseudoaneurysm, or excision (partial or total) and graft insertion, with or without patch graft; for aneurysm, pseudoaneurysm, and associated occlusive disease, radial or ulnar artery. | C |
| 37182 | Insertion of transvenous intrahepatic portosystemic shunt(s) (TIPS) (includes venous access, hepatic and portal vein catheterization, portography with hemodynamic evaluation, intrahepatic tract formation/dilatation, stent placement and all associated imaging guidance and documentation). | C |
| 38724 | Cervical lymphadenectomy (modified radical neck dissection) | C |
| 39000 | Mediastinotomy with exploration, drainage, removal of foreign body, or biopsy; cervical approach. | C |
| 43770 | Laparoscopy, surgical, gastric restrictive procedure; placement of adjustable gastric restrictive device (e.g., gastric band and subcutaneous port components). | C |
| 54650 | Orchiopexy, abdominal approach, for intra-abdominal testis (e.g., Fowler-Stephens). | C |
| 55845 | Prostatectomy, retropubic radical, with or without nerve sparing; with bilateral pelvic lymphadenectomy, including external iliac, hypogastric, and obturator nodes. | C |
| 55866 | Laparoscopy, surgical prostatectomy, retropubic radical, including nerve sparing. | C |
| 58548 | Laparoscopy, surgical, with radical hysterectomy, with bilateral total pelvic lymphadenectomy and para-aortic lymph node sampling (biopsy), with removal of tube(s) and ovary(s), if performed. | C |
| 59856 | Induced abortion, by 1 or more vaginal suppositories (e.g., prostaglandin) with or without cervical dilation (e.g., laminaria), including hospital admission and visits, delivery of fetus and secundines; with dilation and curettage and/or evacuation. | C |
| 60270 | Thyroidectomy, including substernal thyroid; sternal split of transthoracic approach. | C |
| 63267 | Laminectomy for excision or evacuation of intraspinal lesion other than neoplasm, extradural; lumbar. | C |

## XII. OPPS Nonrecurring Technical and Policy Changes and Clarifications

### *A. Physician Supervision*

1. Background

In the CY 2000 OPPS final rule with comment period (65 FR 18524 through 18526), we amended our regulations to establish, as a condition of payment, the requirements for physician supervision of diagnostic and therapeutic services provided to hospital outpatients incident to a physician's service. We adopted physician supervision policies as a condition of payment to ensure that Medicare pays for high quality hospital outpatient services provided to beneficiaries in a safe and effective manner and consistent with Medicare requirements. In the CY 2009 OPPS/ASC proposed rule and final rule with comment period (73 FR 41518 through 41519 and 73 FR 68702 through 68704, respectively), we clarified and restated the various payment requirements for physician supervision of hospital outpatient therapeutic and diagnostic services. In response to concerns about our policy restatement that were expressed following the publication of the CY 2009 final rule with comment period, we met with stakeholders and further delineated our physician supervision policies for both therapeutic and diagnostic services in the CY 2010 OPPS/ASC proposed rule and the final rule with comment period (74 FR 35365 and 74 FR 60679 through 60680, respectively).

While we received and responded to many comments in the course of the CY 2010 rulemaking, addressing supervision for both diagnostic and therapeutic services, it was not until after the publication of the CY 2010 OPPS/ASC final rule with comment period that we received substantial comments from the CAH community in response to a technical correction we made to codify our longstanding view that CAHs are subject to the supervision policy for payment of therapeutic services in the regulations at 42 CFR 410.27. In addition, the broader hospital community continues to indicate that it would prefer that we modify the current supervision policy to permit a lower level of supervision for therapeutic services.

By way of introduction, we have defined supervision in the hospital outpatient setting by drawing on the three levels of supervision that were defined for the physician office setting at § 410.32(b) prior to the OPPS: General, direct, and personal supervision. Over time, we have tailored these definitions to apply them in the hospital outpatient setting, but to date we have maintained the following premises. General supervision means that a service is furnished under the overall direction and control of the physician, but his or her physical presence is not required during the performance of the procedure. Direct supervision means that the physician is physically present on-site and is immediately available to furnish assistance and direction throughout the performance of the procedure; however, the physician does not have to be present in the same room when the procedure is being performed. Personal supervision means the physician is present in the room when the service is being performed.

a. Outpatient Therapeutic Services

As set forth in the CY 2000 OPPS final rule with comment period establishing the hospital outpatient prospective payment system, direct supervision is the current standard for supervision of hospital outpatient therapeutic services covered and paid by Medicare in hospitals and provider-based departments (PBDs) of hospitals. In that rule, we defined "direct supervision" to mean that "the physician must be present and on the premises of the location and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." The requirement to be "immediately available" was a component of the requirement for direct supervision but we did not define the term at that time.

We clarified that our intention in defining direct supervision for services furnished at a department of a hospital was that a physician be present on the premises of the entity accorded status as a department of the hospital for as long as patients are being treated at that site (65 FR 18525). In that CY 2000 OPPS final rule with comment period, we finalized regulation text in § 410.27(f) specifying that direct supervision is required in PBDs of hospitals, and in the preamble discussion, we emphasized the importance of the direct supervision requirement for off-campus PBDs. We also stated that the language of § 410.27(f) "applies to services furnished at an entity that is located off the campus of a hospital that we designate as having provider-based status as a department of a hospital in accordance with § 413.65." We disagreed with commenters that the requirement for direct supervision in the off-campus PBD was more stringent than the standard we required on the hospital campus. We noted that section 1861(s)(2)(B) of the Act authorizes payment for hospital services provided incident to physicians' services furnished to outpatients. We stated that "we require that hospital services and supplies furnished to outpatients that are incident to physician services be furnished on a physician's order by hospital personnel and under a physician's supervision" (65 FR 18525). We further stated that "we assume the physician supervision requirement is met on hospital premises because staff physicians would always be nearby within the hospital."

In manual guidance, we have clarified that we expect outpatient services incident to physicians' services to be performed under direct supervision. We provide in Section 20.5.1, Chapter 6, of the Medicare Benefit Policy Manual (Pub. L. 100–02) that outpatient services and supplies must be furnished on a physician's order and delivered under supervision. Section 20.5.1 indicates further that each occasion of a service by a nonphysician does not need to also be the occasion of the actual rendition of a personal professional service by the physician responsible for the care of the patient. Nevertheless, as stipulated in that same section of the Manual "during any course of treatment rendered by auxiliary personnel, the physician must personally see the patient periodically and sufficiently often enough to assess the course of treatment and the patient's progress and, where necessary, to change the treatment regimen."

In the CY 2009 OPPS/ASC final rule with comment period, we provided a restatement and clarification of the requirements for physician supervision of hospital outpatient diagnostic and therapeutic services that were set forth in the CY 2000 OPPS final rule with comment period. We chose to restate the existing physician supervision policy for hospital outpatient therapeutic services in part because we were concerned that some stakeholders may have misunderstood our use of the term "assume" in the following statement: "We assume the physician requirement is met on hospital premises because staff physicians would always be nearby within the hospital. The effect of the regulations in this final rule is to extend this assumption to a department of a hospital that is located on the campus of the hospital" (65 FR 18525). We were concerned that stakeholders might believe that this statement meant that we do not require any supervision in the hospital or in an on-campus PBD for hospital outpatient therapeutic services, or that we only require general supervision for those services.

In our policy restatement in the CY 2009 OPPS/ASC final rule with comment period, we reiterated that direct supervision is the standard for physician supervision, as set forth in the CY 2000 OPPS final rule with comment period, for supervision of hospital outpatient therapeutic services covered and paid by Medicare in hospitals as well as in PBDs of hospitals. We stated clearly that we expect direct physician supervision of all hospital outpatient therapeutic services, regardless of their on-campus or off-campus location, but indicated that we would continue to emphasize the physician supervision requirements in off-campus PBDs as we did in the CY 2000 OPPS final rule with comment period. We noted that if there were problems with outpatient care in a hospital or in an on-campus PBD where direct supervision was not in place (that is, the expectation of direct supervision was not met), we would consider that to be a quality concern.

After we published the CY 2009 OPPS/ASC final rule with comment period, we received significantly more public feedback than during the rulemaking cycle about our restatement of our supervision policy for both diagnostic and therapeutic services. We met with stakeholders in the early part of 2009 as we prepared for the CY 2010 rulemaking cycle, as well as reviewed all public input that we received, to craft a response to these concerns regarding the supervision requirements. For therapeutic services, we considered the concerns of various stakeholders

along with our position that direct supervision for therapeutic services is appropriate and aligned with the statutory requirement that Medicare only makes payment for therapeutic services in the hospital outpatient setting that are "incident to" physician services.

In the CY 2010 OPPS/ASC final rule with comment period, we finalized our proposal to allow, in addition to clinical psychologists, certain other nonphysician practitioners to directly supervise services that they may perform themselves under their State license and scope of practice and hospital or CAH-granted privileges. The nonphysician practitioners who were permitted to provide direct supervision of therapeutic services under the CY 2010 OPPS/ASC final rule with comment period are physician assistants, nurse practitioners, clinical nurse specialists, certified nurse-midwives, and licensed clinical social workers. These nonphysician practitioners may directly supervise outpatient therapeutic services that they may personally furnish in accordance with State law and all additional requirements, including the Medicare coverage rules relating to their services specified in our regulations at 42 CFR 410.71, 410.73, 410.74, 410.75, 410.76, and 410.77 (for example, requirements for collaboration with, or general supervision by, a physician). In implementing the new benefits for pulmonary rehabilitation, cardiac rehabilitation, and intensive cardiac rehabilitation added by the Medicare Improvements for Patients and Providers Act of 2008 (MIPPA, Pub. L. 110–275), we required that direct supervision of services furnished in the hospital outpatient department must be provided by a doctor of medicine or osteopathy as required by statute. The statute does not permit general supervision or supervision by a nonphysician practitioner of PR, CR, or ICR services.

For services furnished on a hospital's main campus, we finalized a modification of our proposed definition of "direct supervision" in new paragraph (a)(1)(iv)(A) of § 410.27 that allowed for the supervisory physician or nonphysician practitioner to be anywhere on the hospital campus. Therefore, as of CY 2010, direct supervision on the hospital or CAH campus or in an on-campus PBD meant that "the supervisory physician or nonphysician practitioner must be present on the same campus and immediately available to furnish assistance and direction throughout the performance of the procedure." In the CY 2010 OPPS/ASC final rule with comment period, we interpreted "immediate availability" to mean "immediate physical presence" and interruptible (74 FR 60580). We stated that while we had not previously defined "immediately available," we believed that, in the context of the existing definitions of direct supervision in §§ 410.27(f) and 410.32(b)(3)(ii) of the regulations which indicated that the physician must be physically present in PBDs of hospitals or physicians' offices, we had previously established that direct supervision requires immediate physical presence. While we had not specifically defined the word "immediate" for direct supervision in terms of time or distance, we noted that the general definition of the word means "without interval of time." Therefore, the supervisory physician or nonphysician practitioner could not be immediately available while, for example, performing another procedure or service that he or she could not interrupt. In addition, we stated that we understood that advances in medical technology, changes in the patterns of health care delivery, and changes in the organizational structure of hospitals have led to the development of extensive hospital campuses, sometimes spanning several city blocks. However, in the context of direct supervision, we believed that it would not be "immediate" for the supervisory physician or nonphysician practitioner to be so physically far away on the main campus from the location where hospital outpatient services are being furnished that he or she could not intervene right away. In sum, the requirement to be physically present and "immediately available," whether within the hospital or PBD, ultimately determined how far away the supervisory practitioner could be located.

Because the term "in the hospital or CAH" applies broadly to "incident to" requirements such as the site-of-service requirement for therapeutic services provided by the hospital directly and under arrangement, we also established a definition of "in the hospital" in new paragraph § 410.27(g) as meaning areas in the main building(s) of a hospital or CAH that are under the ownership, financial, and administrative control of the hospital or CAH; that are operated as part of the hospital; and for which the hospital bills the services furnished under the hospital's or CAH's CMS Certification Number (CCN). In the preamble to the CY 2010 OPPS/ASC final rule with comment period, as part of the discussion of various public comments on the definition of the hospital campus, and on the supervision requirement specifically, we stated that we would recognize other areas or structures of the hospital's campus that are not part of the hospital, such as physician offices, rural health centers, skilled nursing facilities, or other entities that participate separately under Medicare to be part of the hospital's campus.

In the CY 2010 OPPS/ASC final rule with comment period, we also finalized our proposal to add paragraph (a)(1)(iv)(B) to § 410.27. This paragraph updated our previous regulation at § 410.27(f) to reflect that, for off-campus PBDs of hospitals, the physician or nonphysician practitioner must be present in the off-campus PBD, as defined in § 413.65, and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician or nonphysician practitioner must be in the room when the procedure is performed. In addition, we finalized the proposed technical change to clarify the language in § 410.27(f) by removing the phrase "present and on the premises of the location" and replacing it with the phrase "present in the off-campus provider-based department."

Finally, we finalized a technical correction to the title of § 410.27 to read "Outpatient hospital or CAH services and supplies incident to a physician service: Conditions," to clarify in the title that the requirements for payment of hospital outpatient therapeutic services incident to a physician or nonphysician practitioner service in that section apply to both hospitals and CAHs. Similarly, we included the phrase "hospital or CAH" throughout the text of § 410.27 wherever the text referred only to "hospital." We viewed this as a technical correction because the statute applies the same regulations to hospitals and CAHs when appropriate. Specifically, the definition of "hospital" in section 1861(e) of the Act expressly excludes CAHs "unless the context otherwise requires." Accordingly, we do not believe it is necessary for a payment regulation to reference specifically the applicability to CAHs for those regulations to be appropriate given the "context" for CAHs. Although payment to CAHs is authorized under section 1834(g) of the Act, many of the payment rules applicable to hospitals paid under sections 1886(d) and 1833(t) of the Act apply to CAHs.

We believe that the supervision requirements should apply in the context of CAHs because they represent appropriate safety and quality

requirements for Medicare payment of outpatient services. In the early part of this year, the CAH community asserted that the CAH conditions of participation (CoPs) offer more flexibility in staffing requirements than the rule requiring direct supervision, and that the CAH CoPs address the general availability of physician and nonphysician practitioners on the CAH campus. The hospital CoPs at 42 CFR 482.22 require hospital medical staff to be composed of doctors of medicine or osteopathy and, in accordance with State law, may also be composed of other practitioners appointed by the governing body. They also require 24-hour nursing services that are provided by or supervised by a registered nurse. Under section 1820(c)(2)(B) of the Act, among other criteria, a CAH must meet the same staffing requirements as would apply under section 1861(e) of the Act to a hospital located in a rural area. However, there are some exceptions to these staffing requirements. Section 1820(c)(2)(B)(iv) of the Act specifies that a CAH need not meet hospital staffing requirements under section 1861(e) of the Act regarding the days and hours in which it is open and fully staffed; the facility may provide certain services under arrangement at an off-site location; that inpatient care may be provided by a physician assistant, nurse practitioner, or clinical nurse specialist subject to the oversight of a physician, who need not be present in the facility.

The CAH CoPs in 42 CFR 485.631 are specific in recognizing the statutory authority to be staffed by nonphysician practitioners rather than physicians, provided a doctor of medicine or osteopathy, nurse practitioner, clinical nurse specialist, or physician assistant is available to furnish patient care services at all times the CAH operates. The requirement that the practitioner "be available" in § 485.631 has been interpreted to mean that the nonphysician practitioner or physician is available by phone, but not necessarily physically present on the CAH campus. The CAH CoPs also specify standards for emergency personnel under § 485.618, requiring that a doctor of medicine or osteopathy, or a nonphysician practitioner such as a physician assistant, a nurse practitioner, or a clinical nurse specialist, with training or experience in emergency care, be on call and immediately available by telephone or radio contact, and available onsite within 30 minutes, on a 24-hour a day basis in most areas.

However, in the Medicare program, payment requirements are frequently different from those identified in the CoPs because the two sets of rules serve very separate and distinct purposes. CoPs apply largely at the facility level, while payment regulations apply at the service level. Payment regulations, such as requirements for how contracted entities provide services to hospital patients, support program goals of appropriate and accurate payment for quality services. In contrast, for all providers including CAHs, the CoPs authorize hospitals to participate in the Medicare program. We establish CoPs as minimum standards for patient health and safety, and CoPs focus on creating a foundation to ensure quality and safe care for beneficiaries throughout a given facility, irrespective of the payment system or service provided. As previously mentioned, CoPs generally do not apply on the service level and do not ensure that payment is appropriate for specific types of purchased services nor can they substitute for payment requirements since that is not their function.

In summary, requirements established for purposes of payment frequently differ from the requirements established by the CoPs for many providers, including hospitals and CAHs. Whereas payment regulations establish basic parameters defining the services being purchased, CoPs (including both the hospital CoPs and the CAH CoPs) establish standards to ensure a minimum level of quality and safety for operating as a hospital or a CAH. The minimum standards established as CoPs are not always adequate to address the particular quality, safety and other requirements for payment for a service or group of services.

b. Outpatient Diagnostic Services

As we stated in the CY 2009 OPPS/ASC and CY 2000 OPPS proposed rules and final rules with comment period, section 1861(s)(2)(C) of the Act authorizes payment for diagnostic services that are furnished to a hospital outpatient for the purpose of diagnostic study. We have further defined the requirements for diagnostic services furnished to hospital outpatients, including requirements for physician supervision of diagnostic services, in §§ 410.28 and 410.32 of our regulations. In CY 2000, we established in § 410.28(e) that in order to receive payment, outpatient diagnostic services furnished in PBDs of hospitals must be supervised according to the levels assigned for the individual tests as listed in the MPFS Relative Value Unit File. For these services, we also adopted the definitions of general, direct and personal supervision used in the MPFS and delineated in §§ 410.32(b)(3)(i), (b)(3)(ii) and (b)(3)(iii). For CY 2010, we finalized a proposal to extend the rules we had established for PBDs to the hospital setting or any other location where diagnostic services may be provided under arrangement (for example, a nonhospital location such as an independent diagnostic testing facility or IDTF). Where § 410.28(e) had previously only referenced the MPFS supervision requirements for services "furnished at a facility * * * having provider-based status," we broadened the reference to those requirements for "services furnished by or under arrangements made by the participating hospital" and we added further requirements for direct supervision. In the CY 2010 OPPS/ASC rulemaking cycle, in §§ 410.28(e)(1) and (e)(2), we redefined direct supervision for outpatient diagnostic services to mean (with the exception of services provided under arrangement in nonhospital locations) the definition that we adopted at this time for outpatient therapeutic services, specifically that for services furnished directly or under arrangement in the hospital or in the on-campus or off-campus PBD, "direct supervision" means that the physician must be immediately available and present on the same campus or in the off-campus PBD to furnish assistance and direction throughout the performance of the procedure. For purposes of defining direct supervision of diagnostic services, in § 410.28, we applied the definition of "in the hospital" as incorporated in § 410.27(g) for therapeutic services. For diagnostic services furnished under arrangement in nonhospital locations such as an IDTF, in § 410.28(e)(3), we applied the definition of direct supervision used in the MPFS and at § 410.32(b)(3)(ii).

The MPFS Relative Value Unit File is updated quarterly and is available on the CMS Web site at: *http://www.cms.gov/PhysicianFeeSched/*. For diagnostic services not listed in the MPFS Relative Value Unit File, we have indicated that Medicare contractors, in consultation with their medical directors, would define appropriate supervision levels in order to determine whether claims for these services are reasonable and necessary.

We note that the existing requirement in §§ 410.28(e)(1), (e)(2), and (e)(3) that physician supervision of diagnostic services provided by or under arrangements made by the participating hospital or in any PBD follow the levels for diagnostic services established under the MPFS explicitly applies to hospitals that are paid in accordance with to section 1833(t) of the Act, which is the statutory authority for the OPPS.

Because Medicare makes payments to CAHs in accordance with section 1834(g) of the Act, at this time, CAHs are not subject to this supervision requirement.

2. Issues Regarding the Supervision of Hospital Outpatient Services Raised by Hospitals and Other Stakeholders

Following the adoption of our policies in the CY 2010 OPPS/ASC final rule with comment period (74 FR 60575 through 60591), beginning in January 2010, we began to receive a sizable amount of correspondence, as well as numerous phone calls, and questions through other public avenues, including the regular open door forum calls, from the rural hospital and CAH community indicating its belief that the requirement for direct supervision for therapeutic services finalized in that rule is at odds with longstanding and prevailing practice in rural communities. These hospitals and their representatives stated that they generally function with a reduced level of supervision for the provision of therapeutic services and that while they furnish services under a physician's or appropriate nonphysician practitioner's order, frequently no physician or nonphysician practitioner is physically present anywhere in the CAH or small rural hospital while the therapeutic services are being furnished. CAHs, in particular, noted that the provisions in their CoPs allow a CAH to operate under reduced staffing requirements. Specifically, under §§ 485.631 and 485.618 as described above, CAHs must have a physician or one of several types of nonphysician practitioners available by phone at all times, but not on campus. For emergencies, in most areas of the country, the CAH must have a physician or certain other nonphysician practitioners with training or experience in emergency care physically available onsite within 30 minutes.

Both CAHs and rural hospitals have stated that the flexibility to allow nonphysician practitioners to supervise services that we authorized in the CY 2010 OPPS/ASC final rule with comment period is helpful for meeting the direct supervision requirement for all therapeutic services, but that a shortage of qualified practitioners in rural areas continues to make it difficult to staff a physician or nonphysician practitioner for supervision purposes. They also noted that a practitioner retained on the campus of a small rural hospital or CAH to meet supervision requirements may not have other patients or medical activities to complete. In an urban or large urban hospital, a practitioner would be able to see other patients or engage in other activities so long as those activities could be interrupted, such that they would be immediately available to supervise.

In a series of questions and answers about supervision on the CMS Web site (*http://www.cms.gov/HospitalOutpatientPPS/05_OPPSGuidance.asp#TopOfPage*), we provided additional guidance regarding our regulations about who can supervise services in order to explain to CAHs and small rural hospitals the flexibility we believe exists within our requirement for direct supervision. For example, in that document, we state that we believe the emergency physician or the nonphysician practitioner, who would be the most likely practitioners staffing a small rural hospital or CAH, can directly supervise outpatient services so long as the emergency physician or nonphysician practitioner in the emergency department of the campus meets the other requirements of direct supervision. That is, the emergency physician or the nonphysician practitioner needs to be immediately available, so that, if needed, he or she could reasonably be interrupted to furnish assistance and direction in the delivery of therapeutic services provided elsewhere in the hospital. We believe that most emergency physicians and appropriate nonphysician practitioners can supervise many services within the scope of their knowledge, skills, licensure, and hospital-granted privileges, including observation services. With regard to whether an emergency physician or a nonphysician practitioner could be interrupted, such that the individual could be immediately available, we have stated that each hospital would need to assess the level of activity in its emergency department and determine whether at least one emergency physician or nonphysician practitioner could be interrupted to furnish assistance and direction in the treatment of outpatients.

In their correspondence and discussion in public forums, CAHs and small rural hospitals explicitly have raised concerns about services that extend after regular operating hours, especially observation services. They also have asserted that direct supervision is not clinically necessary for some services that have a significant monitoring component that is typically performed by nursing or other auxiliary staff, including IV hydration, blood transfusions, and chemotherapy. They stated that their facilities have protocols to safely deliver all of these services, relying on nursing or other hospital staff to provide the service and having a physician or nonphysician practitioner available by phone to furnish assistance and direction throughout the duration of the therapeutic service.

In the early part of this year, small rural hospitals and CAHs indicated that, regulations notwithstanding, many of them did not have appropriate staff arrangements to provide the required supervision of some services, particularly services being provided after hours or consisting of a significant monitoring component that last for an extended period of time. In response to rising concerns among the rural community about these rules and the inability of some hospitals to meet the direct supervision requirement, we issued a statement on March 15, 2010, indicating that we would not enforce the rules for supervision of hospital outpatient therapeutic procedures furnished in CAHs in CY 2010 (*http://www.cms.gov/HospitalOutpatientPPS/01_overview.asp#TopOfPage*). We also stated that we would proactively revisit the rules surrounding the supervision of services furnished by CAHs in the CY 2011 OPPS/ASC proposed rule.

Compared to supervision of therapeutic services, we have had relatively limited dialogue with stakeholders about our CY 2010 policy to recognize the supervision levels for diagnostic services under the MPFS for the provision of diagnostic services in the hospital. Individual stakeholders have asked about supervision of specific diagnostic services and have noted that our requirement that the hospitals follow the supervision levels for diagnostic services in the hospital identified in the MPFS Relative Value Unit File has required some modest changes in hospital staffing practices. We also have received questions requesting clarification about related supervision requirements for nonphysician practitioners. We note that adopting the supervision levels defined under the MPFS for diagnostic services in 42 CFR 410.32 means that nonphysician practitioners who are not specifically excluded under § 410.32(b) from the level of supervision required by the MPFS are subject to supervision by a physician at the level of supervision required by the diagnostic test. We also discussed in our CY 2010 OPPS/ASC final rule with comment period that diagnostic X-ray and other diagnostic tests must be furnished under the appropriate level of supervision by a physician as defined in section 1861(r) of the Act (74 FR 60588 through 60590).

3. Policies for Supervision of Outpatient Therapeutic Services in Hospitals and CAHs

As indicated in our March 15, 2010 statement, we are revisiting the issue of supervision of outpatient therapeutic services in CAHs to ensure a robust public discussion about supervision requirements for payment in hospital outpatient departments, including those located in rural communities, and CAH outpatient departments. In the CY 2011 OPPS/ASC proposed rule, we proposed modest changes to our supervision policy for therapeutic services that reflect our continuing commitment to require direct supervision for the provision of therapeutic services in the hospital outpatient setting as a requirement for payment (75 FR 46303). We proposed these changes for all hospitals, including CAHs, because we believe that Medicare should purchase a basic quality of service for all Medicare beneficiaries. Specifically, we proposed to identify a limited set of services with a significant monitoring component that can extend for a sizable period of time, that are not surgical, and that typically have a low risk of complication after assessment at the beginning of the service, as "nonsurgical extended duration therapeutic services" (also referred to as "extended duration services"). We listed these services in Table 37 of the proposed rule (75 FR 46308). We proposed for these services that there would be a requirement for direct supervision for the initiation of the service followed by general supervision for the remainder of the service. We proposed to adopt the definition of "general supervision" in existing § 410.32(b)(3)(i), which is the same definition of general supervision that we already recognize as appropriate for diagnostic services with a general supervision level requirement under the MPFS. Finally, at the end of the proposal, we included several discussion points designed to focus public comments and generate sufficient detail to assist us in crafting a final policy.

In considering the significant correspondence from CAHs and rural communities, as well as public discussion on the issue of supervision through the open door forum and calls with individual hospitals and other hospital representatives, we sought to propose modifications to the supervision standards that would balance several countervailing interests. While we sought to identify some means of offering flexibility within the direct supervision requirement and address industry concerns about specific services, we also believed strongly that Medicare should continue to purchase services that are delivered with a basic level of quality and safety and that fulfill the statutory requirement for payment of incident to services. We recognized the concerns of CAHs and rural hospitals that it could be difficult to staff a physician or nonphysician practitioner on the campus to supervise services that have a significant monitoring component and lack an active component being performed by the physician or nonphysician practitioner, especially when these services extend into after business hours or overnight. CAHs and rural hospitals explicitly identified observation services, IV hydration, chemotherapy, and blood transfusions as the services that are particularly challenging to provide under direct supervision. Observation services, in particular, can extend for a significant period of time. Data from the CAH outpatient claims indicate that most observation care lasts longer than 12 hours and that it frequently lasts 24 to 48 hours, suggesting that observation care often extends after business hours and through the night.

We recognized that any service with an extended duration and a significant monitoring component could challenge hospitals' ability to ensure direct supervision, and we decided to concentrate on those services. We set out to identify services with a significant monitoring component extending after business hours as identified by the CAHs and hospitals in rural communities and for which we could offer some flexibility in meeting the requirement for direct supervision of therapeutic services without compromising the quality and safety of services for which Medicare makes payment. One way to provide flexibility would be to allow a reduced level of supervision for part of these services. We established a requirement for direct supervision for all hospital outpatient services in our CY 2000 and CY 2010 rulemaking processes. However, we reasoned that, for certain extended duration services, for CY 2011 we could adopt a general supervision requirement for some portion of the service, as long as we believed that such flexibility would not undermine the quality and safety of purchased services. Therefore, we proposed to require, for a limited set of nonsurgical extended duration therapeutic services, direct supervision during the initiation of the service followed by general supervision for the remainder of the service (75 FR 46306).

We proposed to define "initiation of the service" as the beginning portion of a service ending when the patient is stable and the supervising physician or appropriate nonphysician practitioner believes the remainder of the service can be delivered safely under his or her general direction and control without his or her physical presence on the hospital campus or in the PBD of the hospital. We listed our proposed definition of initiation of the service in proposed § 410.27(a)(1)(v)(B). We considered further defining the term "stable" in this definition as there is an established definition in the Emergency Medical Treatment and Labor Act (EMTALA) regulations at 42 CFR 489.24(b). In those regulations, "stabilized" with respect to an emergency medical condition means "that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer for the individual from a facility * * *" However, this language is set within the context of emergency services, not hospital outpatient therapeutic services generally, and we have been clear that supervision is more than emergency response. Ultimately, we were not certain that this definition would be appropriate for a payment requirement for supervision of outpatient therapeutic services.

We also did not propose to further define the term "initiation" or to set time limits on this portion of the service because we believe that the determination that a patient is sufficiently stable to transfer from direct supervision to general supervision, and the timing of that decision, are clinical judgments. We believed it would be best to leave the determination of when to move from direct to general supervision to the discretion of the supervising physician or nonphysician practitioner. However, we considered whether the point of transfer from direct supervision to general supervision should be documented in the medical record or identified in a hospital protocol, and we invited public comment on how CMS might review the physician or nonphysician practitioner's decision to move from direct to general supervision to monitor for proper billing should an adverse event occur.

We considered four criteria when identifying the list of services to which this new policy of direct supervision during the initiation of the service followed by general supervision for the remainder of the service would apply. We first accepted the two criteria identified in correspondence and discussion with CAHs and rural hospitals, that the service be of extended duration, frequently extending

beyond normal business hours, and that the service largely consist of a significant monitoring component typically conducted by nursing or other auxiliary staff. We added a third criterion that the service must be of sufficiently low risk, such that the service typically would not require direct supervision often during the service. We added this criterion because, as we have previously discussed, our requirement for direct supervision has been grounded in the statutory "incident to" payment authority as well as the need to ensure that Medicare purchases services that represent a basic level of quality and safety. We have noted that, unlike an inpatient admission, the provision of outpatient services lacks certain safeguards such as a detailed medical history and a plan of care (74 FR 60578 through 60588). Finally, we excluded all surgical services including recovery time from potential inclusion because we believed the surgeon should be immediately available during the recovery period. We defined nonsurgical extended duration therapeutic services in proposed regulation text for § 410.27(a)(1)(v)(A).

Using these four criteria, we identified a list of nonsurgical therapeutic services that have a tendency to last for a long period of time, that largely consist of monitoring, and that have a low risk that the physician's physical presence will be needed once the patient is stable. To identify this list of potential services, we reviewed all medical services, including the services and procedures specifically identified by CAHs and rural hospitals in their correspondence and public discussion. The proposed list of nonsurgical extended duration therapeutic services appeared in Table 37 of the proposed rule. We explicitly did not include chemotherapy or blood transfusions in our proposed list of nonsurgical extended duration therapeutic services because we believed that these services would require the physician's or nonphysician practitioner's recurrent physical presence in order to evaluate the patient's condition in the event it is necessary to redirect the service.

We included observation services on the proposed list of nonsurgical extended duration services. In Section 20.6 of Chapter 2 of the Medicare Benefit Policy Manual (Pub. 100–02), we define observation care as "a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment before a decision can be made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital." Therefore, the acuity of patients receiving observation services and the amount of recurrent supervisory review that may be necessary for these services can vary significantly. Observation services can be of low acuity and can have a low probability that the supervising physician or nonphysician practitioner's physical presence would be needed to step in and perform the service or otherwise furnish assistance. We noted in Section 290.5.1 of Chapter 4 of the Medicare Claims Processing Manual (Pub. No 100–04) that, among other requirements for observation services, "(a) the beneficiary must be in the care of a physician during the period of observation, as documented in the medical record by outpatient registration, discharge, and other appropriate progress notes that are timed, written, and signed by the physician," and "(b) the medical record must include documentation that the physician explicitly assessed patient risk to determine that the beneficiary would benefit from observation care." We stated that we would continue to expect hospitals and CAHs to fulfill these specific requirements associated with observation care, so the supervising physician or appropriate nonphysician practitioner must continue to evaluate the patient periodically and include written notes in the medical record.

In crafting our policy for nonsurgical extended duration therapeutic services, we considered other avenues to offer flexibility within our requirement for direct supervision. We considered and presented the following alternatives in the proposed rule in order to focus public comments and generate sufficient detail to assist us in developing the final policy. Although we reconsidered these alternatives for this final rule, ultimately we did not adopt either of them.

In addition to considering the proposed policy to permit general supervision after an initial period of direct supervision for a limited subset of services, we also considered offering hospitals the flexibility to broaden the list to include chemotherapy and blood transfusions, which some stakeholders also maintain do not require direct supervision. Because we were concerned that these services had a high probability of needing a physician or nonphysician practitioner to redirect the service, we reasoned that under this option, we would have to require hospitals to create internal guidelines specifying a supervision level and protocols for staffing that supervision level for every nonsurgical extended duration therapeutic service. We considered proposing minimum requirements for these internal supervision guidelines, including annual review and approval by a governing committee, periodic internal evaluation of implementation, and the ability to make these guidelines available to Medicare program auditors if requested. Further, these guidelines would be reviewed thoroughly by CMS should a quality issue arise. We did not propose this policy because we believe that an independent entity should evaluate services such as chemotherapy administration and blood transfusion to determine whether or not general supervision is appropriate and safe. In our deliberations on policies for the final rule, we were concerned that this policy would not address many concerns that were brought to our attention by the rural hospital community (shorter duration services and supervision from locations in close proximity to the hospital). We also rejected this alternative because a variable standard of supervision could be administratively difficult for us to audit and evaluate.

We also considered whether for payment purposes we should explicitly or implicitly exclude outpatient therapeutic services provided in CAHs from the requirements for direct supervision. We considered limiting CAHs to their CoPs, which in effect only require them to operate under general supervision. As we stated in the proposed rule, we believe there are strong grounds for applying the same supervision requirements to CAHs as to all other hospital types. One of our grounds for applying the direct supervision requirement to CAHs is that outpatient hospital services are furnished "incident to" physicians' services, and we believe that the incident to rules apply equally to critical access and other types of hospitals. Outpatient hospital services are furnished "incident to" physicians' services under section 1861(s)(2)(B) of the Act and are paid under the OPPS in accordance with section 1833(t) of the Act. In contrast, "outpatient critical access hospital services" are defined under section 1861(mm)(3) of the Act, and CAHs are reimbursed for outpatient CAH services based on their reasonable costs pursuant to section 1834(g) of the Act. We believe that outpatient CAH services are correctly viewed as being furnished "incident to" physicians' services. Section 1861(mm)(3) of the Act defines "outpatient critical access hospital services" as "medical and other

health services furnished by a critical access hospital on an outpatient basis.” The term “medical and other health services” is defined at section 1861(s) of the Act as including “hospital services * * * incident to physicians’ services rendered to outpatients.” Furthermore, the same considerations regarding the need to ensure that services furnished to Medicare beneficiaries represent a basic level of quality and safety that apply to outpatient hospital services are equally applicable to outpatient CAH services. As a result, we believe it is appropriate to apply the same supervision requirements to outpatient therapeutic services furnished in hospitals and CAHs.

We acknowledge that statutory provisions allow CAHs some flexibility in their staffing requirements to operate with more nursing staff and nonphysician practitioners rather than physicians if those are the practitioners that are available, and that our regulations recognize those reduced staffing requirements in the CoPs by establishing that, at a minimum, the physician or nonphysician practitioner must be available within 30 minutes of an emergency. However, as discussed above, we believe that CAHs are subject to payment rules independent of their CoPs. Moreover, some have suggested that the regulations which establish only minimal requirements reduce the quality and safety of CAH services and that CAHs should be required to disclose their reduced staffing levels to patients prior to providing services. We elected not to limit the CAHs to their conditions of participation or to exclude them from direct supervision requirements, because we believe that Medicare should purchase outpatient services from CAHs and other hospitals that are of the same basic level of safety and quality. Also, we believe that both small rural hospitals paid under the OPPS through section 1833(t) of the Act and CAHs paid at reasonable cost under section 1834(g) of the Act have similar staffing and resource constraints. In fact, given that CAHs are reimbursed based on their reasonable costs, in our proposal we reasoned that CAHs might be better able than small rural PPS hospitals to hire staff to provide direct supervision and we did not receive comments as to why this would not be the case.

*Comment:* Many commenters asserted that there is no evidence of compromised quality of care or patient safety that justifies the new and burdensome change in supervision rules, and that commenters know of no adverse events that have necessitated a change in CMS’ supervision policies from general supervision to direct supervision. One commenter suggested that CMS commission an outcomes study to measure a need for direct supervision compared to general supervision in the hospital outpatient department. Many commenters requested that CMS continue to study potential negative effects of enforcing its requirement for direct supervision and that CMS extend the notice indicating that it will not enforce the rules for supervision of hospital outpatient therapeutic procedures furnished in CAHs through CY 2011. Commenters also requested that CMS expand its decision not to enforce the requirement for direct supervision of therapeutic outpatient services in CAHs to other small and rural hospitals that are paid under the OPPS and are located in areas experiencing workforce shortages.

Several commenters asserted that the Act does not prescribe a specific level of supervision for “incident to” physician’s services. These commenters believed that CMS has discretion to select an appropriate level of supervision for hospital outpatient “incident to” physician’s services other than direct supervision and that the requirement for direct supervision of incident to physician services is technologically outdated. They requested that CMS depart from its historic interpretation of the incident to provision by allowing general supervision for those services. They commented that, for some low-risk and low-complexity services, a physician does not need to be physically present. Many commenters requested that CMS set the minimum standard as general supervision for all services and allow individual facilities to establish other supervision levels for certain services at their discretion. Many commenters also requested that CMS establish an independent panel representative of geographic areas, particularly rural areas, and provider types to identify the appropriate supervision level for individual services.

*Response:* Our supervision policy is designed to preserve both quality and safety of purchased hospital outpatient services for Medicare beneficiaries. While our recent attention to supervision is not being informed by a specific quality event, we received a substantial number of inquiries from stakeholders prior to 2009 leading us to believe that hospitals were practicing general supervision or no supervision in the provision of services that are paid “incident to” physician’s services in the outpatient setting and for which we had established a policy of direct supervision. While literature or clinical opinions may exist on the risk of adverse outcomes and susceptibility to medical error associated with the provision of specific hospital outpatient procedures when a physician is not present, we do not know of any analyses that have directly examined levels of supervision and patient outcomes in the hospital outpatient setting. This may be an area for future study.

We disagree with commenters that our requirement for direct supervision is new or a change from previous policy, and appreciate that several commenters acknowledge that CMS’ requirement for direct supervision of hospital outpatient services is not new. One of our longstanding interpretations of the statutory authorization for hospital services “incident to” physicians’ services under section 1861(s)(2)(B) of the Act is that these services should be provided under direct supervision. As we have already discussed, we clearly stated in the CY 2000 final rule our regulatory requirement for direct supervision in the off-campus PBD and our presumption that the requirement for direct supervision would be met in the hospital.

In the CY 2010 OPPS/ASC final rule with comment period (74 FR 60580), we noted that, prior to 2000, we already required hospitals to meet a direct supervision of “incident to” services requirement for outpatient therapeutic services. That is, we required that hospital services and supplies furnished to outpatients that are incident to physicians’ services “must be furnished on a physician’s order by hospital personnel and under a physician’s supervision” (Section 3112.4 of the Medicare Intermediary Manual). In longstanding manual guidance, we have expressed our historical belief that direct supervision is required for hospital outpatient therapeutic services, and we have suggested that this requirement stems from the “incident to” nature of those services. We have stated in the Medicare Benefit Policy Manual (Pub. No. 100–02), Chapter 6, Section 20.5.2 (revised May 28, 2010) and previously discussed in the CY 2010 OPPS/ASC final rule with comment period (74 FR 60576) that we require direct supervision for the provision of therapeutic services to hospital outpatients: “Therapeutic services and supplies which hospitals provide on an outpatient basis are those services and supplies (including the use of hospital facilities) which are incident to the services of physicians and practitioners in the treatment of patients * * * The services and supplies must be furnished under the order of a physician or other practitioner

practicing within the extent of the Act, the Code of Federal Regulations, and State law, and furnished by hospital personnel under the direct supervision of a physician or nonphysician practitioner as defined at 42 CFR 410.27(f) and 482.12. This does not mean that each occasion of service by a nonphysician need also be the occasion of the actual rendition of a personal professional service by the physician responsible for care of the patient. However, during any course of treatment rendered by auxiliary personnel, the physician must personally see the patient periodically and sufficiently often to assess the course of treatment and the patient's progress and, where necessary, to change the treatment regimen. A hospital service or supply would not be considered incident to a physician's service if the attending physician merely wrote an order for the services or supplies and referred the patient to the hospital without being involved in the management of that course of treatment."

With respect to whether CMS has the authority to recognize a supervision level other than direct supervision for payment of "incident to" physician's services under section 1861(s)(2)(B) of the Act, we agree that the statute does not explicitly mandate direct supervision, but we continue to believe that direct supervision is the most appropriate level of supervision for most hospital outpatient services that are authorized for payment "incident to" physician's services. While we believe that the "incident to" authorization permits us to recognize specific circumstances appropriate for general supervision, such as we proposed for extended duration services, we also believe that our historical interpretation of section 1861(s)(2)(B) of the Act, specifically, that these services are furnished under the order of a physician (or nonphysician practitioner), the physician is involved in the management of the patient, and the physician supervises the provision of those services when he or she does not provide them directly, is reflected in a requirement for direct supervision. Therefore, we do not believe it is appropriate to authorize payment for "incident to" services to hospitals with a default supervision level of "general" for all services. In our proposed rule, we focused on extended duration services both because CAHs and small rural hospitals had identified these services as a primary source of their difficulty in complying with our requirement for direct supervision and because we agreed that the monitoring and low risk attributes of the services did not necessarily dictate direct supervision for the entire performance of those services. We also believed that our requirements for "incident to" services (that the physician be involved in the management of the patient and that the services be provided under the physician's supervision) would be met when a period of general supervision followed a period of direct supervision for the initiation of the service.

*Comment:* In addition to our proposed list of nonsurgical extended duration services (which we are finalizing for this CY 2011 final rule with comment period and discuss in greater detail later in this section), commenters requested that CMS recognize general supervision for many additional services that they considered to be of low risk and low complexity, such as minor surgical procedures, immunization administration, minor wound debridement, group psychotherapy, sleep laboratory services, and patient-controlled anesthesia pumps. One commenter indicated that the organization he represents had convened a physician panel to assess appropriate supervision levels of outpatient services and that the panel found 160 services eligible for general supervision based on a low physician work RVU. Commenters argued that technology has reduced the risk of needing a physician or nonphysician practitioner to furnish assistance and direction during some services.

*Response:* We agree with commenters that there may be some outpatient services that could be identified as appropriate for general supervision among these and other identified services. However, we are not confident that stakeholders would necessarily agree with our assessment of appropriate supervision levels and we observed through our review of comments that stakeholders did not always agree among themselves about the appropriate supervision level for any given service. For example, we received numerous requests from CAHs and small rural hospitals that we recognize blood transfusions and chemotherapy administration for general supervision, arguing that protocols were in place to handle changes in treatment or emergency situations. However, we also received opposing comments indicating that chemotherapy should not be provided without direct supervision. We note that many of the chemotherapy administration HCPCS codes, like many services, have physician work relative value units associated with them, suggesting that the physician typically would be involved in the provision of these services.

In light of heightened stakeholder interest in supervision requirements, CMS' continuing goal of purchasing safe, quality services that are provided "incident to" a physician's service; and potential disagreement among commenters regarding appropriate levels of supervision, we agree with commenters that there should be a mechanism for independent consideration of the most appropriate supervision level for individual therapeutic services to ensure that CMS purchases safe, quality outpatient care. Accordingly, while we are maintaining our policy that, in general, direct supervision is required for all outpatient therapeutic services, we will establish a process that provides for independent evaluation of the appropriate level of supervision for specific therapeutic services. We note that in considering the appropriate level of supervision for individual services, we may find that a higher level of supervision, (personal supervision) is appropriate for certain services, as well as finding that general supervision is appropriate for some services.

Therefore, in the CY 2012 OPPS rulemaking cycle, we will propose to establish an independent review process that will allow for an assessment of the appropriate supervision levels for individual hospital outpatient therapeutic services. At this point, we believe this process should include a committee with representation of many types of providers including rural providers, and that it should include a time frame for submitting requests for the assessment of individual services and considering potential changes, criteria for evaluating each service, and a means for documenting recommended supervision levels. We are considering the possibility of using CMS' Federal Advisory Panel on Ambulatory Classification Groups (the APC Panel) as the independent technical committee that would review requests for consideration of supervision levels other than direct for individual services and make recommendations to CMS regarding the appropriate levels. (*http://www.cms.gov/FACA/05_AdvisoryPanelonAmbulatoryPaymentClassificationGroups.asp*). As described previously in this final rule with comment period, the APC Panel is chartered by statute and consists of up to 15 members, selected by the HHS Secretary or CMS Administrator, who are full-time employees of hospitals and other Medicare providers paid under the OPPS. The Panel members are

representative of various geographic areas (rural and urban) and hospital professions (administration and clinical). We request comments regarding other potential entities that may serve as a technical panel to consider supervision levels for individual services. We also request comments on how this independent review process for an alternative level of supervision might work, and on potential criteria for evaluating a service for the appropriate level of supervision.

Because we believe that it would be best to develop such a process through notice and comment rulemaking, for CY 2011, we are extending our decision not to enforce the requirement for direct supervision of therapeutic services provided to CAH outpatients. As we stated in our proposed rule (75 FR 46309), we remain concerned about establishing policies that apply only to CAHs, because that small and rural PPS hospitals experience similar resource constraints. Therefore, for CY 2011 we are expanding the scope of our decision not to enforce the requirement for direct supervision of therapeutic services to include small rural hospitals having 100 or fewer beds. For purposes of this provision, we are using the same definition of small rural hospitals as Congress recognizes for Transitional Outpatient Payments (TOPs) under section 1833(t)(7) of the Act. Our decision not to enforce the requirement for direct supervision of therapeutic outpatient services applies to rural hospitals with 100 or fewer beds for CY 2011. As we do for TOPs, we will consider hospitals to be rural if they are either geographically located in a rural area or are paid through the OPPS with a wage index for a rural area (section 70, Chapter 4, of the Medicare Claims Processing Manual (Pub. 100–04)).

*Comment:* Several commenters stated that the requirement for the supervisory practitioner to have hospital privileges and State licensure to perform the services they are supervising translates into requiring licensure in the same specialty as those services. One hospital expressed concern about the language regarding "hospital privileges," stating that it forced hospitals to modify their bylaws and privileging documents to assure that a large majority of their medical staff could supervise. They stated that, in the past, supervision was carried out based on "scope of practice" and that CMS' new language regarding privileges presents new requirements.

*Response:* We do not believe that we have made substantive changes to the requirements regarding the supervisory practitioner's ability to perform services that he or she is supervising since we issued the first supervision rules in CY 2000. In the CY 2000 regulation text requiring direct supervision for therapeutic outpatient services in a PBD, we required that the supervisory physician be immediately available to furnish assistance and direction throughout the performance of the procedure. In order to furnish assistance and direction, we believe that a physician would have to be State licensed and possess hospital privileges to perform that procedure. As the commenter noted, in our CY 2010 OPPS/ASC final rule with comment period, we elaborated on this requirement when we stated that the supervisory practitioner "must have, within his or her State scope of practice and hospital-granted privileges, the ability to perform the service or procedure" that he or she is supervising (74 FR 60580).

However, we also have stated since 2000 that, in many circumstances, we believe that the supervising physician can furnish assistance and direction within their State scope of practice and hospital granted privileges without being of the same specialty as the service that is being performed (65 FR 18525). For example, we believe that blood transfusions do not require supervision by a hematologist and that an internist would typically possess hospital privileges and State licensure to provide and to supervise blood transfusion services. On the other hand, we have been clear that we require the supervisory practitioner to be knowledgeable enough about the service to be able to furnish assistance and direction, and not merely manage an emergency. Therefore, not all practitioners are qualified to supervise services of any specialty. Nonetheless, for many common OPPS services, we believe that hospitals can adjust their bylaws and privileging standards sufficiently to cover practitioners whom they wish to act in a supervisory capacity.

*Comment:* Commenters requested that CMS redefine direct supervision to broaden the definition of "immediate availability" and to allow the supervisory practitioner to be located in areas that are in close proximity to the hospital or PBD, but not on the hospital campus (or nonhospital space on the hospital campus) or in the PBD. With regard to "immediate availability," some commenters stated that, in many cases, the requirement to be immediately available (which we have described as physically present, interruptible, and able to furnish assistance and direction throughout the performance of the service) negates any benefit of allowing the supervisory practitioner to be present anywhere on campus. As discussed above, the commenters noted that the requirement to be "immediately available" in CMS' current definition of direct supervision in the hospital actually determines how far away the supervisory practitioner can be located because he or she must use their discretion to decide where they can be physically located within the hospital campus, given other activities they may be involved in and the amount of time it would take to reach the hospital nursing and auxiliary staff that he or she is supervising. Commenters stated that, practically speaking, emergency room physicians or nonphysician practitioners cannot supervise because they would not be interruptible if they were engaged in any other activity. With regard to being on the hospital campus or in the PBD, commenters indicated that there are many locations that would allow a physician to be immediately available that are not on the hospital campus or in the PBD. Specifically, commenters provided personal situations where a physician office or clinic is located in buildings adjacent to a PBD or hospital campus. Commenters noted that many of these locations are closer to the site of service than are parts of the hospital campus. In a similar case, a practitioner may perform services in two adjacent clinics within a single building, but one clinic is provider based and the other is not. We have received requests during the normal course of the year as well in public comments to our proposed rule requesting that we allow supervision from both locations.

Commenters also indicated that many CAHs and small or rural PPS hospitals have particular difficulty staffing a hospital in the situation where a primary care physician directly refers a patient after normal business hours for chemotherapy, drug administration, hydration, observation or other services from their office or from on-call in a location that is very close to the hospital campus but not on the campus. In general, these commenters believed that requiring any physician or nonphysician practitioner to be available is excessively burdensome and difficult to staff if there is no other activity to occupy the physician in the hospital. In addition, several commenters requested that CMS redefine direct supervision or immediate availability to allow for availability in ways other than appearing in person, and asked that CMS consider availability using technological advances in telemedicine

and other remote mechanisms. Commenters also requested that CMS consider redefining direct supervision to allow the supervising physician to be in close proximity to the department or hospital.

*Response:* Having carefully considered the comments regarding the challenges to providing direct supervision created by our requirement that the physician or nonphysician practitioner be either "in the hospital or CAH" or "in the provider based department," we are revising our definition of direct supervision for hospital outpatient therapeutic services in § 410.27(a)(1)(iv)(A) and (B) to remove the reference to "on the same campus" or "in the off-campus provider-based department of the hospital" and we are removing our definition of "in the hospital or CAH" provided under § 410.27(g) entirely. The definition of direct supervision will be revised simply to require immediate availability, meaning physically present, interruptible, and able to furnish assistance and direction throughout the performance of the procedure but without reference to any particular physical boundary. Since the new definition will now apply equally in the hospital or in on-campus or off-campus PBDs, we are removing paragraphs (a)(1)(iv)(A) and (B) of § 410.27 altogether. The new definition of direct supervision under § 410.27(a)(1)(iv) will now state, "For services furnished in the hospital or CAH or in an outpatient department of the hospital or CAH, both on- and off-campus, as defined in section 413.65 of this subchapter, 'direct supervision' means that the physician or nonphysician practitioner must be immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician or nonphysician practitioner must be present in the room when the procedure is performed. For pulmonary rehabilitation, cardiac rehabilitation, and intensive cardiac rehabilitation services, direct supervision must be furnished by a doctor or medicine or osteopathy as specified in §§ 410.47 and 410.49, respectively." This new definition of direct supervision will apply to hospitals and CAHs equally beginning in CY 2011. However, as already discussed, we are extending our notice of nonenforcement to CAHs and small rural hospitals with 100 or fewer beds through CY 2011. For purposes of this provision, we are using the same definition of small rural hospitals as Congress recognizes for TOPs under section 1833(t)(7) of the Act. Our decision not to enforce the requirement for direct supervision of therapeutic outpatient services applies to rural hospitals with 100 or fewer beds for CY 2011. As we do for TOPs, we will consider hospitals to be rural if they are either geographically located in a rural area or are paid through the OPPS with a wage index for a rural area (Section 70, Chapter 4, of the Medicare Claims Processing Manual (Pub. No. 100–04)).

This extension will allow CAHs and small rural hospitals to prepare to meet this definition of direct supervision in CY 2012.

Our goal in implementing this policy is twofold. First, we wish to allow for flexibility in providing for direct supervision from a location other than the hospital campus or PBD that still allows the physician to be immediately available to furnish direction and assistance. We wish to give CAHs and other hospitals more flexibility to meet the direct supervision requirement by allowing physicians or other practitioners in locations that are close to the hospital but not in actual hospital space to directly supervise services that are within their State scope of practice and hospital granted privileges, so long as these individuals remain immediately available. This policy also allows supervision from any location within a building off-campus that houses multiple PBDs of a hospital as long as the supervising practitioner is immediately available, rather than requiring a supervising practitioner to be located within each PBD in that building.

We note, however, that we are not relaxing the requirement that, for direct supervision, the supervisory physician or nonphysician practitioner must be immediately available, meaning that the supervisory practitioner must be physically present and interruptible. We wish to emphasize that once we remove reference to "in the hospital" or "in the provider based department," we continue to expect the supervisory practitioner to be physically present for the services he or she is supervising. As in the past, we are not defining immediate availability in terms of time or distance. We believe that removing specific boundaries provides reasonable flexibility but also holds the practitioner accountable for determining, in individual circumstances, how to be physically and immediately available when supervising services provided "incident to" a physician's service in the outpatient setting.

Although commenters again requested this year that we revise our definition of immediately available to recognize availability by telephone or modes other than in person, we believe that the requirement for physical presence distinguishes direct supervision from general supervision. Granting these requests would amount to revising the definition of direct supervision to be, for all intents and purposes, general supervision. Section 410.32(b)(3)(i) of the regulations defines general supervision to mean that "the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure." Rather than further modify the definition of direct supervision to accommodate more flexibility in the definition of immediately available, as discussed above, we intend to establish an independent review process to assess the appropriate supervision levels for specific services. We are retaining all other current requirements for direct supervision such as clinical appropriateness of the supervisor and an ability to step in and perform as we discuss in Section 20.5.2, Chapter 6, of the Medicare Benefit Policy Manual (Pub. No. 100–02).

With respect to telecommunication, we note that direct supervision requires the ability to be physically present immediately, and to be able to furnish assistance and direction throughout the performance of the procedure (74 FR 60580). We do not see how a practitioner who is only remotely available by phone or other means of telecommunication could fulfill these requirements and, therefore, we do not consider availability by means of telecommunication to be an acceptable means of providing direct supervision. However, this issue might potentially be considered by the independent panel in future years.

*Comment:* Several commenters asked CMS to continue to allow nurse practitioners and physician assistants to perform hospital outpatient therapeutic services under general supervision.

*Response:* As we have delineated in prior rules (74 FR 60590 through 60591) and manual guidance (Medicare Benefit Policy Manual (Pub. No. 100–02), Chapter 6, Section 20.5.2), beginning January 1, 2010, in accordance with 42 CFR 410.27(a)(1)(iv), in addition to physicians and clinical psychologists, licensed clinical social workers, physician assistants, nurse practitioners, clinical nurse specialists, and a certified nurse-midwife may directly supervise therapeutic services that they may personally furnish in accordance with State law and all additional requirements, including those specified at 42 CFR 410.71, 410.73, 410.74, 410.75, 410.76, and 410.77. These

nonphysician practitioners are specified at 42 CFR 410.27(f). Under our current policy, a physician assistant may perform hospital outpatient therapeutic services under general supervision because, in accordance with § 410.74, a physician assistant must perform outpatient therapeutic services under general supervision. Similarly, nurse practitioners can perform hospital outpatient therapeutic services so long as they furnish them "in collaboration with" a physician in accordance with § 410.75. The rules for provision of diagnostic services by nurse practitioners and physician assistants are delineated in Section 20.4.4 of the Medicare Benefit Policy Manual and we summarize them below in our discussion of supervision of outpatient diagnostic services.

*Comment:* Commenters made many of the same requests that were made during the previous rulemaking period, specifically that CMS allow PR, CR, and ICR services to be supervised by nonphysician practitioners. Commenters also requested that CMS change the required level of supervision for these services from direct to general supervision. One commenter stated that services provided "off-site," should not require direct supervision because the staff is specially trained and the patients are medically strong enough to participate in the treatments. Another commenter expressed appreciation for the clarification in the proposed rule that the outpatient departments of CAHs are a covered setting for the provision of PR, CR, and ICR services. However, the commenter asserted that the outpatient departments of hospitals, including CAHs, are deemed to have met the direct supervision requirement by the "presumption" language in section 144(a)(2)(B) of Public Law 110–275 (MIPPA) and that consequently these facilities are not required to provide direct supervision.

*Response:* As we stated in the CY 2010 OPPS/ASC final rule with comment period, we do not believe that the statute provides the flexibility for us to permit anyone other than a physician to supervise hospital outpatient PR, CR, and ICR services because nonphysician practitioners are not physicians as defined in section 1861(r)(1) of the Act. The statutory language of sections 1861(eee)(2)(B) and (eee)(4)(A) and section 1861(fff)(1) of the Act (as added by section 144(a)(1) of Pub. L. 110–275) defines PR, CR, and ICR programs as "physician-supervised." More specifically, section 1861(eee)(2)(B) of the Act establishes that, for PR, CR and ICR programs, "a physician is immediately available and accessible for medical consultation and medical emergencies at all times items and services are being furnished under the program, except that, in the case of items and service furnished under such a program in a hospital, such availability shall be presumed.* * *" The text of the statute uses the word "physician" and does not include nonphysician practitioners. Also, as we explained in the CY 2009 OPPS/ASC proposed rule and final rule with comment period (73 FR 41518 through 41519 and 73 FR 68702 through 68704, referencing the April 7, 2000 OPPS final rule (65 FR 18525)), the "presumption" or "assumption" that a physician is available to provide direct supervision means that direct physician supervision is the standard. We have assumed this requirement is met on hospital premises (meaning we have expected that hospitals are meeting this requirement) because staff physicians would always be nearby in the hospital. In other words, the requirement is not negated by a presumption that the requirement is being met. Hence, while we have some flexibility to determine the type of practitioner who may supervise other hospital outpatient therapeutic services, in the case of PR, CR, and ICR services specifically, the statutory language does not provide such flexibility. Instead, the statute imposes strict requirements, describing the direct physician supervision standard for PR, CR, and ICR services, and gives us no flexibility to modify the requirement to allow for other supervisory practitioners or another level of supervision. Nevertheless, we refer the commenters to our revised definition of direct supervision, which requires only the supervisory practitioner's immediate availability rather than any particular geographic location in § 410.27(a)(1)(iv) for CY 2011, and note that this new definition applies to the direct physician supervision of PR, CR, and ICR services.

*Comment:* Several commenters asserted that registered nurses (RNs) are board-certified or otherwise qualified to provide all necessary supervision of the extended duration services CMS proposed and of other services, for example, observation, IV hydration, chemotherapy, blood transfusions and patient-controlled anesthesia pumps. Commenters provided many examples of nurses handling initial reactions to blood transfusions, chemotherapy and other services by redirecting the service according to protocol or specialized knowledge of the service (for example, changing rate of infusion), or by referring emergencies to medical response or "code" teams. One commenter stated that CMS should add clinical experience as a qualification under "clinical appropriateness" for direct supervision; the commenter asserted that nurses are more qualified than physicians to supervise certain procedures because they have more experience in performing them.

*Response:* We support all specific training nurses may receive to administer safe and quality specialized services, such as chemotherapy, under direct supervision. However, we believe there is an important distinction between ability and training to administer a service, and ability to supervise a service or to administer it without supervision. The Act specifically recognizes certain professionals (nonphysician practitioners) to furnish certain services that would be considered physicians' services if furnished by a physician, and we have recognized that it is appropriate to permit these individuals to supervise or to perform the services themselves. In general, nurses are not afforded this authority. For example, we received a comment referencing safety standards for chemotherapy administration which supported specialized training of nurses, mid-level practitioners or physicians to administer chemotherapy, but these standards also recommended that either a mid-level practitioner or a physician be on site at all times to supervise the administration of those services. We emphasize that Medicare's supervision rules do not govern who may perform a service. Rather, they govern who must be available to furnish assistance and direction through the procedure should developments require a change in the course of treatment in order to ensure a therapeutic outcome. For these reasons, we do not believe that RNs should be permitted to provide all necessary supervision of outpatient therapeutic services.

We are concerned with the number of comments we received suggesting that protocols, processes, and procedures may substitute for evaluation by a physician or nonphysician practitioner and orders for treatment. As previously stated in this discussion, § 410.27(a)(1)(ii) of the regulations states that Medicare Part B pays for hospital services and supplies furnished incident to a physician's service to outpatients if they are provided "as an integral though incidental part of physician's services." In addition, we have stated in section 20.5.1, Chapter 6 of the Medicare Benefit Policy Manual that "during any course of treatment rendered by auxiliary personnel, the physician must

personally see the patient periodically and sufficiently often enough to assess the course of treatment and the patient's progress and, where necessary, to change the treatment regimen." Well-developed protocols, processes, and procedures can assist nurses in their management of a particular patient, allowing them to assess the patient's reaction to a course of treatment. We believe that quality and thoughtful nursing staff are a key component in the delivery of safe and quality care. However, protocols cannot address every possible development during a course of treatment. We believe that a physician or nonphysician practitioner who has had specific training and met further licensure and qualification requirements permitting a broader scope of practice must be available to evaluate the patient, provide assistance and direction, and order additional services if needed. Protocols cannot address all circumstances, nor can they substitute for the training and authority to redirect the service or potentially order a different course of treatment.

*Comment:* Many commenters continued to express the opinion that supervision requirements in CAHs should be limited to the requirements of their CoPs and that CAHs should be able to maintain a general supervision standard for the provision of all hospital outpatient therapeutic services. They asserted that CMS is promulgating two conflicting rules in that the supervision requirements for payment conflict with the supervision requirements delineated in the CAH CoPs. They asserted that Medicare is "forcing CAHs to provide life-saving services" for which they will not be reimbursed since they are not able to provide direct supervision. Another commenter asked if Advanced Beneficiary Notices (ABNs) could be distributed to patients who present to the hospital for services requiring direct supervision when such supervision is not available. On the other hand, several commenters recommended that CMS require CAHs to operate under the same supervision rules as all other types of hospitals. One commender recommended that supervision levels should only vary by type of service and safety requirements. One commenter, MedPAC, supported our recommendation to treat CAHs and small rural hospitals equally, and suggested that we better align the CAH CoPs with final payment requirements to better clarify supervision requirements for hospitals.

*Response:* As we discussed above, we disagree that our payment regulations requiring direct supervision for payment of outpatient services conflict with CAH CoPs. The CoPs and payment rules are written for different purposes. As we stated in our proposed rule (75 FR 46304), in order to participate in Medicare, CAHs must, at a minimum, follow their CoPs which ensure a basic environment of safety in the hospital. Under their CoPs, CAHs are permitted but not required to provide a broad array of hospital outpatient services. However, in order to bill and be paid for outpatient services, CAHs must meet additional payment requirements for specific services, including supervision requirements or, for example, the requirement for timed notes in the medical record for observation services. We have previously indicated why we believe supervision is an important requirement to ensure that Medicare purchase safe, quality outpatient care. We continue to believe that supervision is an important payment requirement for CAHs as well as other hospitals, and that Medicare should ensure the program is purchasing a minimum level of safe, quality care, wherever that care is provided. We have stated that unlike inpatients, outpatients do not have a plan of care, that a treating physician in the community may not be aware that outpatient services are being delivered, and that hospitals do not necessarily have an established relationship with registered outpatients the way they do for admitted inpatients (74 FR 60582).

We continue to disagree with commenters that we need to somehow "reconcile" the payment regulations for outpatient therapeutic services with CAH CoPs establishing minimum institutional safety and quality requirements for the services that CAHs provide. However, while we expect to retain a default requirement of direct supervision for outpatient therapeutic services, we believe that the issue of perceived discrepancy may be resolved as we move forward with our plan to establish a process that will lead to the assessment and adoption of an appropriate level of supervision for individual services. Specifically, as we begin to consider and adopt different levels of supervision for individual services, the distinction between the CAH CoPs and payment regulations should become more evident. We believe that recognizing a modified supervision approach for the extended duration services for CY 2011, discussed in more detail below, is a step towards clarifying the distinction between the payment rules that are applicable for specific services from the CoPs that apply to the facility in general.

As described in our manual provisions (Medicare Claims Processing Manual (IOM 100–04), Chapter 30, Sections 50.2.1 and 50.5), providers may only issue ABNs when Medicare will deny an otherwise covered item or service either as not reasonable and necessary under section 1862(a)(1) of the Act or because the item or service constitutes custodial care under section 1862(a)(9) of the Act. If Medicare withheld payment for a hospital outpatient service due to lack of direct supervision as required in our rules and regulations, the payment denial would not be for lack of medical necessity or because the item or service constituted custodial care. Therefore, failure to provide direct supervision is not a valid reason to issue a beneficiary an ABN, and hospitals are not permitted to do so.

*Comment:* Many commenters appreciated our proposal for extended duration services as an attempt to offer flexibility to CAHs and small rural hospitals to meet supervision requirements when providing these services. Many commenters favored the proposal overall, but offered several recommended refinements or revisions. First, commenters expressed concern that the requirement for direct supervision during the initiation of an extended duration service would compromise patient safety in small rural hospitals and CAHs because auxiliary staff would have to wait for the supervisory practitioner to arrive before initiating critical treatment. They recommended that CMS allow these services to be provided under general supervision for the duration of the service.

Many commenters did not believe that the list was long enough and suggested that we add additional services, although many of these services did not meet the stated criteria to be considered a nonsurgical extended duration service. We note that we addressed other services requested for general supervision in our first comment and response in this section. Many commenters requested general supervision of chemotherapy administration and blood transfusion. Several commenters also believed that certain portions of the post-operative recovery period did not need direct supervision and that after a certain amount of time has passed, patients are typically stable enough to be monitored by auxiliary personnel. They requested that CMS allow general supervision for portions of the post-operative period or designate the post-operative period as an extended duration service.

Several commenters agreed that CMS should not further define "initiation" or "stable." They noted that these are new unfamiliar terms in the context of extended duration services and were

concerned about liability. Commenters believed that they might be subject to inspection and interpretation of their decision about the transition of care by individuals who were not qualified to make a medical judgment about the need for a practitioner, and that they would be penalized for failures to adequately document the transition. The commenters stated that the determination that a patient is stable enough to transition to general supervision may create personal liability. They indicated that it may be difficult to properly judge or navigate the terms "initiation" and "stable" because they will vary with different circumstances, for example the practitioner who transfers the patient to a reduced level of supervision care may not be the same practitioner who initiated care.

Finally, commenters expressed their views as to whether the point of transition from direct supervision to general supervision should be documented in the medical record or identified in a hospital protocol, and on how CMS might review the supervisory practitioner's decision to move from direct to general supervision to monitor for proper billing should an adverse event occur. Several commenters favored documenting the transition to general supervision in the medical record or in progress notes, and one commenter specified that a physician order should be used. One commenter suggested a system that would grade the level of clinical decision making, similar to an existing system that grades level of risk and patient stability with parameters such as "Abrupt Change in Neurologic Status." However, many other commenters expressed reservations about documentation, concerned that documenting the point of transfer will provide ample opportunity for practitioner audit and liability since carrying out the transition is an unfamiliar arena involving clinical judgment and newly defined or undefined terms. Some commenters expressed concern about increasing providers' paperwork and administrative burden.

*Response:* We appreciate commenters support for our proposal to require, for certain extended duration services, direct supervision at the initiation of the service followed by general supervision for the remainder of a service at the discretion of the supervising physician or nonphysician practitioner once that physician has determined that the patient is stable.

We do not believe that requiring direct supervision for the initiation of the service for extended duration services will compromise patient safety in CAHs and small rural hospitals when they provide these services. We believe that many of the extended duration services frequently are referred services, giving the hospital or CAH time to arrange for a supervisory physician or nonphysician practitioner to be available. Specifically with regard to observation services, we noted in Section 290.5.1 of Chapter 4 of the Medicare Claims Processing Manual (Pub. No. 100–04) that "(a) the beneficiary must be in the care of a physician during the period of observation, as documented in the medical record by outpatient registration, discharge, and other appropriate progress notes that are timed, written, and signed by the physician," and "(b) the medical record must include documentation that the physician explicitly assessed patient risk to determine that the beneficiary would benefit from observation services." Because we require an evaluation of patient risk at the beginning of observation services, except in cases of direct referral we did not believe that the physician would not be available during the initiation of the service.

We also believe that hospitals typically would not need to stop delivery of extended duration services to a patient because a supervisory physician or nonphysician practitioner is not yet available. We note that the hospital frequently conducts diagnostic tests for patients presenting to the emergency department, many of which require a general level of supervision, which can allow time for a supervising physician or nonphysician practitioner to become available for the initiation of therapeutic services. Thus, in those circumstances where the patient presents to the emergency department and requires an extended duration service, we believe that the supervising physician or nonphysician practitioner could be immediately available for most, if not all, of the initiation period. We further note that we have removed the physical boundary requirement in the definition of direct supervision in order to allow for the supervising practitioner greater flexibility in location while still meeting the requirement to be immediately available.

We do not believe it would be appropriate without further assessment to define chemotherapy, blood transfusion, and the recovery period for surgical services as nonsurgical, extended duration therapeutic services. After a preliminary review of literature on chemotherapy administration, we believe that service-specific assessment may be necessary to determine the level of supervision that is safe. Adverse events can be severe, even fatal, and they seem to vary by type of chemotherapy being administered as well as the mechanism of administration. We also note that recent safety standards seem to support the equivalent of direct supervision of chemotherapy (*http://www.asco.org/ASCOv2/Practice+%26+Guidelines/Quality+Care/Quality+Measurement+%26+Improvement/ASCO-ONS+Standards+for+Safe+Chemotherapy+Administration*). We remain equally concerned about the safety of blood transfusion should circumstances require a physician to assess the situation and order a change in the course of treatment. We also do not believe it would be appropriate, without further assessment, to require general supervision for the recovery period for surgical services. We excluded all surgical services including recovery time from our proposal regarding extended duration services because we believe the surgeon should evaluate his or her patient during the recovery period. We believe that the best course of action is to exclude these services from our list of nonsurgical extended duration services and to include them in the list of services to be evaluated early on through the independent review process for service-specific supervision levels that we will establish for CY 2012.

We thank commenters who agreed with our proposal not to define the term "stable" and not to further define the term "initiation," and as we proposed, we will not further define these terms. Thus, the finalized definition of "initiation" in § 410.27(a)(1)(v)(B) is "the beginning portion of a service ending when the patient is stable and the supervising physician or appropriate nonphysician practitioner believes the remainder of the service can be delivered safely under general supervision."

With regard to documentation of transition from direct to general supervision, we are sympathetic to commenter concerns regarding potential liability and administrative burden. However, we also believe that in order to assure adequate patient safety and communication among hospital staff, the point of transition to general supervision should be documented prominently in progress notes or in the medical record. Therefore, we are finalizing our requirement that the transition from direct to general supervision be documented in the progress notes or in the medical record,

but we are otherwise leaving the manner of documentation to the discretion of each supervising practitioner.

After review of the public comments, we are finalizing our proposed nonsurgical extended duration services described in new § 410.27(a)(1)(v).

*Comment:* During the past year, we were often questioned about clinical requirements for practitioners supervising extremely specialized services, notably radiation oncology services. One commenter requested that CMS consider the direct supervision requirement to be met for diagnostic or therapeutic radiation oncology services if a non-specialist practitioner who can handle an emergency provides the direct supervision and also has access by phone or other telemedicine link to a specialist who is able to change the plan of care should the need arise. One commenter asserted that one does not have to posses the clinical skills to fully provide a service in order to be an effective supervisor.

*Response:* As we have stated in the Medicare Benefit Policy Manual (Pub. No. 100–02), Chapter 6, Section 20.5.24, "the supervisory physician or nonphysician practitioner must have, within his or her State scope of practice and hospital-granted privileges, the knowledge, skills, ability, and privileges to perform the service or procedure. Specially trained ancillary staff and technicians are the primary operators of some specialized diagnostic or therapeutic equipment, and while in such cases CMS does not expect the supervisory practitioner to operate this equipment instead of a technician, CMS does expect the physician or nonphysician practitioner that supervises the provision of the service must be knowledgeable about the test and clinically appropriate to furnish the test. The supervisory responsibility is more than the capacity to respond to an emergency, and includes furnishing assistance and direction throughout the performance of a procedure and, as appropriate to the supervisory physician or nonphysician practitioner and the patient, to change a procedure or the course of care for a particular patient. CMS would not expect that the supervisory practitioner would make all decisions unilaterally without informing or consulting the patient's treating physician or nonphysician practitioner." We do not believe it is sufficient or consistent with our rules for direct supervision for the individual on site to be capable of only emergency management. The supervisory practitioner or nonphysician practitioner who is physically present should have the training and knowledge to clinically redirect the service or provide additional orders.

*Comment:* Commenters remain concerned about the potential for liability for services provided prior to CY 2009. They requested that CMS prohibit enforcement of the direct supervision requirements applied to services furnished since January 1, 2001. They also commented that CMS' statement regarding enforcement in the CY 2010 final rule with comment period (74 FR 60587) forces hospitals to assert and provide supporting evidence that any divergence from CMS' rules during that time period was a result of error or mistake.

*Response:* In the CY 2010 OPPS/ASC final rule with comment period, we stated that in the case of services furnished in 2000 through 2008, "we plan to exercise our discretion and decline to enforce in situations involving claims where the hospital's noncompliance with the direct physician supervision policy resulted from error or mistake." (74 FR 60587)

In summary, after consideration of the public comments we received, we are maintaining our general requirement for direct supervision of all outpatient therapeutic services. However, we are redefining our definition of direct supervision in § 410.27(a)(1)(iv) to remove all references to physical boundaries and require only "immediate availability." We are removing § 407.27(g), which defines "in the hospital", because it is no longer necessary. In addition, through CY 2011 we will develop an independent review process for annual consideration of requests for alternative service-specific supervision levels, supported by an independent technical committee, potentially the APC Panel. We are specifically seeking comment on what the process should look like and the criteria that should be considered for identifying services for which personal, direct, or general supervision is appropriate. We will establish this process in the coming year through the CY 2012 rulemaking cycle, selecting a specific independent entity to assist in the process and establishing criteria for determining that a given service should be furnished under general or personal supervision rather than direct supervision. At least until the independent entity is in place (likely through CY 2011), we are establishing a new category of "nonsurgical extended duration therapeutic services" that require direct supervision as defined in § 410.27(a)(1)(iv) during an initiation period, followed by a minimum standard of general supervision as defined in § 410.32(b)(3)(i) for the duration of the service. The extended duration services will include the limited set of procedures identified in Table 48A of this final rule with comment period. We are adding a new paragraph (a)(1)(v) to § 410.27 to reflect this policy. In new § 410.27(a)(1)(v)(A), we are defining "nonsurgical extended duration therapeutic services" as services that can last a significant period of time, have a substantial monitoring component that is typically performed by auxiliary personnel, have a low risk of requiring the physician's or appropriate nonphysician practitioner's immediate availability after the initiation of the service, and are not primarily surgical in nature. In new § 410.27(a)(1)(v)(B), we are finalizing our definition of "initiation of the service" as the beginning portion of a service ending when the patient is stable and the supervising physician or appropriate nonphysician practitioner believes the remainder of the service can be delivered safely under his or her general direction and control without needing his or her immediate availability. We believe that these policies will address commenters' concerns while maintaining an adequate level of safety and quality of care in the hospital outpatient services that Medicare purchases.

As another interim measure, we are extending the nonenforcement policy for direct supervision of therapeutic services provided in CAHs for another year, through CY 2011, and we are expanding it during this year to include small and rural hospitals that have 100 or fewer beds. For purposes of this provision, we are using the same definition of small rural hospitals as Congress recognizes for TOPs under section 1833(t)(7) of the Act. Our decision not to enforce the requirement for direct supervision of therapeutic outpatient services applies to CAHs and rural hospitals with 100 or fewer beds for CY 2011. As we do for TOPs, we will consider hospitals to be rural if they are either geographically located in a rural area or are paid through the OPPS with a wage index for a rural area (Section 70, Chapter 4, of the Medicare Claims Processing Manual (Pub. No. 100–04)). We believe this nonenforcement policy will permit the CAHs and small and rural hospitals that do not consistently meet our direct supervision standard for outpatient therapeutic services to make appropriate adjustments over the coming year.

Finally, in our proposal, we noted that in the CY 2010 OPPS/ASC final rule with comment period, in presenting the regulation text changes for § 410.27, paragraph (a)(2) (relating to PHP

Case No. 1:12-cv-03029-WJM-MLC Document 68-8 filed 09/14/15 USDC Colorado pg 17 of 19



services) was inadvertently deleted from the Code of Federal Regulations. We did not receive any comments on this proposal. We are finalizing our proposal to restore paragraph (a)(2) as it originally appeared in the regulations.

TABLE 48A—LIST OF NONSURGICAL EXTENDED DURATION THERAPEUTIC SERVICES

| HCPCS Code | Long description |
|---|---|
| C8957 | Intravenous infusion for therapy/diagnosis; initiation of prolonged infusion (more than 8 hours), requiring use of portable or implantable pump. |
| G0378 | Hospital observation service, per hour. |
| G0379 | Direct admission of patient for hospital observation care. |
| 96360 | Intravenous infusion, hydration; initial, 31 minutes to 1 hour. |
| 96361 | Intravenous infusion, hydration; each additional hour (List separately in addition to code for primary procedure). |
| 96365 | Intravenous infusion, for therapy, prophylaxis, or diagnosis (specify substance or drug); initial, up to 1 hour. |
| 96366 | Intravenous infusion, for therapy, prophylaxis, or diagnosis (specify substance or drug); each additional hour (List separately in addition to code for primary procedure). |
| 96367 | Intravenous infusion, for therapy, prophylaxis, or diagnosis (specify substance or drug); additional sequential infusion, up to 1 hour (List separately in addition to code for primary procedure). |
| 96368 | Intravenous infusion, for therapy, prophylaxis, or diagnosis (specify substance or drug); concurrent infusion (List separately in addition to code for primary procedure). |
| 96369 | Subcutaneous infusion for therapy or prophylaxis (specify substance or drug); initial, up to 1 hour, including pump set-up and establishment of subcutaneous infusion site(s). |
| 96370 | Subcutaneous infusion for therapy or prophylaxis (specify substance or drug); each additional hour (List separately in addition to code for primary procedure). |
| 96371 | Subcutaneous infusion for therapy or prophylaxis (specify substance or drug); additional pump set-up with establishment of new subcutaneous infusion site(s) (List separately in addition to code for primary procedure). |
| 96372 | Therapeutic, prophylactic, or diagnostic injection (specify substance or drug); subcutaneous or intramuscular. |
| 96374 | Therapeutic, prophylactic, or diagnostic injection (specify substance or drug); intravenous push, single or initial substance/drug. |
| 96375 | Therapeutic, prophylactic, or diagnostic injection (specify substance or drug); each additional sequential intravenous push of a new substance/drug (List separately in addition to code for primary procedure). |
| 96376 | Therapeutic, prophylactic, or diagnostic injection (specify substance or drug); each additional sequential intravenous push of the same substance/drug provided in a facility (List separately in addition to code for primary procedure). |

In the CY 2010 OPPS/ASC final rule with comment period, we requested comments on the issue of standardizing the levels of supervision required for partial hospitalization services (PHP) provided in CMHCs and in hospital outpatient departments. To date, we require direct supervision for PHP services provided to hospital outpatients as for all outpatient therapeutic services, and we require only general supervision for PHP services provided at CMHCs. We appreciate the comments we received in response to the final rule with comment period and are taking them into consideration. In the CY 2010 OPPS/ASC final rule with comment period, we also requested comments on supervision requirements for payment to ASCs. We have no payment-related supervision requirement for ASCs. We appreciate the comments we received in response to the final rule with comment period and are taking them into consideration.

4. Supervision of Hospital Outpatient Diagnostic Services

We have received limited correspondence and questions on our policy finalized in the CY 2010 OPPS/ASC final rule with comment period to adopt for outpatient diagnostic services furnished in hospitals and in non-hospital locations the physician supervision levels in § 410.32(b)(3) established under the MPFS and indicated on the Practice Expense Relative Value Unit file. We also applied a new definition of direct supervision in new § 410.28(e)(1) and (e)(2). As discussed above, the CY 2010 policy applies to hospitals and not to CAHs. As we discuss above, nonphysician practitioners previously performing diagnostic tests without physician supervision, within their State scope of practice and hospital-granted privileges, can continue to perform those tests without physician supervision. The CY 2010 policy now requires physician supervision of those services, unless the nonphysician practitioner is specifically exempted under § 410.32(b)(2) or there is some other provision addressing supervision for that type of nonphysician practitioner.

In this final rule with comment period, in the interest of clarity we are adopting the same change in definition of direct supervision and immediate availability for outpatient diagnostic services as we are adopting for outpatient therapeutic services, except for diagnostic services performed under arrangement in non-hospital locations under § 410.28(e)(3). For diagnostic services furnished under arrangement in non-hospital locations, direct supervision will continue to mean physical presence in the office suite as defined in § 410.32(b)(3)(ii) ("in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure"). For all other outpatient diagnostic services, direct supervision will now mean immediately available, without reference to any physical boundary. To this end, we are amending the definition of direct supervision in §§ 410.28(e)(1) and (2).

*B. Payment for Preventive Services*

1. Definition of "Preventive Services"

Section 4104(a) of the Affordable Care Act revised section 1861(ddd) of the Act by adding a new paragraph (3), which defines the term "preventive services." Preventive services are defined as:

- Screening and preventive services currently described in section 1861(ww)(2) of the Act, except for electrocardiograms described in section 1861(ww)(2)(M) of the Act;
- An initial preventive physical examination (IPPE) as defined in section 1861(ww) of the Act; and
- Personalized prevention plan services (PPPS), also known as the "Annual Wellness Visit" (AWV), as defined in section 1861(hhh) of the Act (which was added by section 4103 of the Affordable Care Act).

The services specified in the definition of "preventive services" at section 1861(ddd)(3)(A) of the Act, as

cost available for redistribution from uncoded packaged drugs to separately payable drugs. Public comments on the proposed rule make comparable comments, and presenters at the August 2010 APC Panel meeting reiterated their recommended assumption of comparable overhead amounts. However, we do not believe we should assume that the costs reported under uncoded pharmacy revenue code lines are for the same drugs and biologicals, with the same ASPs, and overhead costs as the costs of packaged drugs and biologicals reported with a HCPCS code. For these reasons, we are not accepting the APC Panel's recommendation to redistribute a larger portion of overhead costs from packaged drugs to separately payable drugs for CY 2011.

The third alternative we considered and the one we selected for CY 2011 is to continue our CY 2010 redistribution methodology and redistribute $200 million in overhead costs from packaged coded and uncoded drugs to separately payable drugs which will result in a payment for non-pass-through separately payable drugs and biologicals at ASP+5 percent, which will continue to represent a combined payment for both the acquisition costs of separately payable drugs and the pharmacy overhead costs applicable to these products. We also are reducing the cost of packaged drugs that is included in the payment for procedural APCs to offset the $200 million adjustment to payment for separately payable drugs and biologicals, resulting in payment for packaged drugs and biologicals of ASP+198 percent. We chose this alternative because we believe that it provides the most appropriate redistribution of pharmacy overhead costs associated with drugs and biologicals, based on the analyses discussed in section V.B.3. of this final rule with comment period, and is the alternative that is most consistent with the principles of a prospective payment system.

c. Alternatives Considered for the Physician Supervision of Hospital Outpatient Services

Our proposed revision to our requirement for direct supervision of therapeutic services provided to hospital and CAH outpatients attempted to address industry concerns brought to our attention since we issued our CY 2010 final rule with comment period. The primary issue raised by CAHs, rural hospitals and other small hospitals following CY 2010 rulemaking was difficulty in staffing their facilities to meet our requirement for direct supervision of all outpatient therapeutic services, but especially services that involve a significant amount of monitoring by auxiliary staff, that may extend past regular business hours, and that typically are lower clinical complexity and risk. Our proposal to establish a limited set of "non-surgical extended duration therapeutic services" (extended duration services) was designed to address these issues. For these services, we proposed to require only a minimum of direct supervision during an initial period, followed by general supervision for the remainder of the service. Public commenters appreciated our attempt to offer flexibility through our proposal for non-surgical extended duration services, but made several additional requests. First, they note that direct supervision should require the supervising physician or nonphysician practitioner be available, but not specify a physical location. Commenters also requested that CMS adopt general supervision for all therapeutic services. They noted that there are other types of outpatient services that they believe qualify for general supervision, and they made extensive requests for an independent assessment of the clinically appropriate supervision level for any given outpatient service. In order to address these concerns while maintaining an adequate level of safety and quality of care, we are finalizing a supervision policy with the following four components:

1. We are maintaining our default requirement for direct supervision of all outpatient therapeutic services. However, we are revising our definition of direct supervision of both outpatient therapeutic and diagnostic services (except for diagnostic services provided under arrangement in non-hospital locations) to require only "immediate availability," meaning physically immediately available, without specifying a particular physical boundary.

2. Through rulemaking for CY 2012, we will develop a process to consider industry requests for alternative service-specific supervision levels that will include an independent technical advisory committee, potentially the APC Panel.

3. In the interim, we are extending for one year (through CY 2011) our notice of non-enforcement of the current policy for direct supervision of all outpatient therapeutic services furnished in CAHs (*http://www.cms.gov/HospitalOutpatientPPS/Downloads/WebNotice.pdf*). Because CAHs and small rural hospitals paid under the OPPS face comparable staffing challenges, we are extending this provision to hospitals geographically located in a rural area or designated to be located in a rural area for their wage index that have 100 or fewer beds.

4. Finally, for CY 2011, we are finalizing our proposal to establish a limited set of nonsurgical extended duration services for which we would allow direct supervision during the initiation of the service followed by general supervision for the remainder of service at the discretion of the supervising physician or nonphysician practitioner. The list of nonsurgical extended duration therapeutic services subject to this policy for CY 2011 appears in Table 48A of this final rule with comment period.

We considered two alternatives that we believed may have increased flexibility while sustaining our payment requirement for direct supervision of therapeutic hospital outpatient services provided incident to physicians' services. First, we considered offering hospitals the flexibility of broadening the list of extended duration services to include more complex and potentially acute services like chemotherapy administration and blood transfusions, which some stakeholders also maintain do not require direct supervision. Because we were concerned that these services had a higher probability of needing a physician or nonphysician practitioner to furnish assistance and direction through provision of the service, we had reasoned that we could require hospitals to create internal guidelines specifying a supervision level and protocols for staffing that supervision level for every extended duration service, including chemotherapy administration and blood transfusions. We considered minimum requirements for these internal supervision guidelines, including annual review and approval by a governing committee, periodic internal evaluation, and the ability to make these guidelines available to auditors if requested. Further, auditors would review those guidelines if a quality or patient safety event were to occur. Fundamentally, we did not choose this policy because, while many commenters liked this option for the flexibility that it offered, it did not address commenters fundamental concern that our uniform requirement for direct supervision as a condition of payment did not consider the relative risk for needing a supervising physician or nonphysician practitioner's physical presence against the cost of providing direct supervision. Because commenters disagreed about the appropriate level of supervision for individual services, such as chemotherapy, and because we continue

Case No. 1:12-cv-03029-WJM-MLC Document 68-8 filed 09/14/15 USDC Colorado pg 19 of 19



to believe supervision is a key component of the service Medicare purchases for its beneficiaries, we believe that an independent entity, whether the APC Panel or other technical committee, should evaluate services for the appropriate supervision level, potentially something other than direct supervision, to support provision of a safe, quality service. We also did not choose this alternative because some commenters did believe the policy would be burdensome to implement and maintain. Finally, we rejected this alternative because a variable standard of supervision across hospitals could be administratively difficult for us to audit and evaluate.

Second, we considered whether to exclude CAHs from the requirements for direct supervision of therapeutic services. We considered limiting CAHs to their CoPs, which in effect only require them to operate under general supervision. We also considered extending the notice of nonenforcement while we further develop policies. As discussed above, we believe there are strong grounds for applying the same supervision requirements to CAHs as to all other hospitals. One of these grounds is that hospital outpatient services are furnished "incident to" physicians' services, and we believe that the incident to rules apply equally to critical access and other types of hospitals. We continue to believe that Medicare should purchase the same basic level of quality and safe outpatient care for all beneficiaries, whether from a CAH, a small rural hospital, or other hospitals. Moreover, having reviewed public comments, we do not believe it is safe to permit general supervision of all hospital outpatient therapeutic services. At the same time, we acknowledge that in order to purchase the same outpatient care from CAHs as other hospitals, we need to have a national discussion about what constitutes the appropriate supervision for a given service. Therefore, we decided to extend the notice of nonenforcement for CAHs, as well as adding in small rural hospitals, while we propose and finalize a process for evaluating service-specific supervision levels.

We believe that the policies in this final rule will address industry concerns while maintaining an adequate level of safety and quality of care in the hospital outpatient services that Medicare purchases.

2. Limitations of Our Analysis

The distributional impacts presented here are the projected effects of the CY 2011 policy changes on various hospital groups. We post on the CMS Web site our hospital-specific estimated payments for CY 2011 with the other supporting documentation for this final rule with comment period. To view the hospital-specific estimates, we refer readers to the CMS Web site at: *http://www.cms.hhs.gov/HospitalOutpatientPPS/*. Select "regulations and notices" from the left side of the page and then select "CMS–1504–FC" from the list of regulations and notices. The hospital-specific file layout and the hospital-specific file are listed with the other supporting documentation for this final rule with comment period. We show hospital-specific data only for hospitals whose claims were used for modeling the impacts shown in Table 66 below. We do not show hospital-specific impacts for hospitals whose claims we were unable to use. We refer readers to section II.A.2. of this final rule with comment period for a discussion of the hospitals whose claims we do not use for ratesetting and impact purposes.

We estimate the effects of the individual policy changes by estimating payments per service, while holding all other payment policies constant. We use the best data available, but do not attempt to predict behavioral responses to our policy changes. In addition, we do not make adjustments for future changes in variables such as service volume, service mix, or number of encounters. As we have done in previous rules, in the CY 2011 OPPS/ASC proposed rule (75 FR 46445), we solicited public comment and information about the anticipated effects of our changes on providers and our methodology for estimating them.

We received many public comments on the proposed changes to payment policies and to proposed payment rates for the CY 2011 OPPS. We have summarized these public comments and provided our responses to them in other sections of this final rule with comment period as part of our discussions of the specific topics to which the comments pertained. We did not receive any public comments on our methodology for estimating the anticipated effects of our proposed changes on providers or other parties. For the reasons set forth in the proposed rule (75 FR 46444), we are finalizing our proposed methodology for estimating the anticipated effects of our proposed changes on providers or other parties.

3. Estimated Effects of This Final Rule with Comment Period on Hospitals

Table 66 below shows the estimated impact of this final rule with comment period on hospitals. Historically, the first line of the impact table, which estimates the change in payments to all hospitals, has always included cancer and children's hospitals, which are held harmless to their pre-BBA payment-to-cost ratio. As discussed in section II.F. of this final rule with comment period, we are not finalizing our proposal to extend an adjustment to certain cancer hospitals under section 3138 of the Affordable Care Act. Because these hospitals will continue to receive hold harmless payments, per our standard policy, we have excluded them from this impact table. We also include CMHCs in the first line that includes all providers because we include CMHCs in our weight scalar estimate.

We present separate impacts for CMHCs in Table 66 because CMHCs are paid only for partial hospitalization services and CMHCs are a different provider type from hospitals. For CY 2010, CMHCs and hospitals were paid under two APCs for services under the OPPS: APC 0172 (Level 1 Partial Hospitalization (3 services)) and APC 0173 (Level II Partial Hospitalization (4 or more services)). For CY 2011, we are paying CMHCs under APC 0172 (Level I Partial Hospitalization (3 services) for CMHCs) and APC 0173 (Level II Partial Hospitalization (4 or more services) for CMHCs), and we are paying hospitals for partial hospitalization services under APC 0175 (Level I Partial Hospitalization (3 services) for Hospital-based PHPs) and APC 0176 (Level II Partial Hospitalization (4 or more services) for Hospital-based PHPs). We display the impact on CMHCs of this policy change below and we discuss the impact on CMHCs in section XX.B.4. of this final rule with comment period.

The estimated increase in the total payments made under the OPPS is limited by the increase to the conversion factor set under the methodology in the statute. The distributional impacts presented do not include assumptions about changes in volume and service mix. The increase to the conversion factor is reduced by 0.25 percentage point as required by section 3401(i) of the Affordable Care Act and as amended by section 10319(g) of such Act and further amended by section 1105(e) of such Act. Section 3137 of the Affordable Care Act, as amended by the HCERA, extended additional payment to section 508 reclassification hospitals and special exception hospital wages outside budget neutrality through September 30, 2010. The amounts attributable to these reclassifications are incorporated into the CY 2010 estimates in Table 66. Section 10324 of the Affordable Care Act, as amended by HCERA, further authorized additional