Case No. 1:12-cv-03029-WJM-MLC Document 68-9 filed 09/14/15 USDC Colorado pg 1 of 10

EXHIBIT 8



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Parts 410, 411, 416, 419, 489, and 495**

**[CMS–1525–P]**

**RIN 0938–AQ26**

# Medicare and Medicaid Programs: Hospital Outpatient Prospective Payment; Ambulatory Surgical Center Payment; Hospital Value-Based Purchasing Program; Physician Self-Referral; and Provider Agreement Regulations on Patient Notification Requirements

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule would revise the Medicare hospital outpatient prospective payment system (OPPS) to implement applicable statutory requirements and changes arising from our continuing experience with this system. In this proposed rule, we describe the proposed changes to the amounts and factors used to determine the payment rates for Medicare hospital outpatient services paid under the OPPS. These proposed changes would be applicable to services furnished on or after January 1, 2012.

In addition, this proposed rule would update the revised Medicare ambulatory surgical center (ASC) payment system to implement applicable statutory requirements and changes arising from our continuing experience with this system. In this proposed rule, we set forth the proposed relative payment weights and payment amounts for services furnished in ASCs, specific HCPCS codes to which these proposed changes would apply, and other proposed ratesetting information for the CY 2012 ASC payment system. These proposed changes would be applicable to services furnished on or after January 1, 2012.

We are proposing to revise the requirements for the Hospital Outpatient Quality Reporting (IQR) Program, add new requirements for ASC Quality Reporting System, and make additional changes to provisions of the Hospital Inpatient Value-Based Purchasing (VBP) Program.

We also are proposing to allow eligible hospitals and CAHs participating in the Medicare Electronic Health Record (EHR) Incentive Program to meet the clinical quality measure reporting requirement of the EHR Incentive Program for payment year 2012 by participating in the 2012 Medicare EHR Incentive Program Electronic Reporting Pilot.

In addition, we are proposing to make changes to the rules governing the whole hospital and rural provider exceptions to the physician self-referral prohibition for expansion of facility capacity and changes to provider agreement regulations on patient notification requirements.

**DATES:** *Comment Period:* To be assured consideration, comments on all sections of this proposed rule must be received at one of the addresses provided in the **ADDRESSES** section no later than 5 p.m. EST on August 30, 2011.

**ADDRESSES:** In commenting, please refer to file code CMS–1525–P. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (no duplicates, please):

1. *Electronically.* You may (and we encourage you to) submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the instructions under the ‘‘submit a comment’’ tab.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1525–P, P.O. Box 8013, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments via express or overnight mail to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1525–P, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments before the close of the comment period to either of the following addresses:

a. For delivery in Washington, DC—Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201.

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal Government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD—Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, please call the telephone number (410) 786–7195 in advance to schedule your arrival with one of our staff members.

Comments mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

Submission of comments on paperwork requirements. You may submit comments on this document's paperwork requirements by following the instructions at the end of the ‘‘Collection of Information Requirements’’ section in this document.

For information on viewing public comments, we refer readers to the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION, CONTACT:**

Paula Smith, (410) 786–0378, Hospital outpatient prospective payment issues.

Char Thompson, (410) 786–0378, Ambulatory surgical center issues.

Michele Franklin, (410) 786–4533, and Jana Lindquist, (410) 786–4533, Partial hospitalization and community mental health center issues.

James Poyer, (410) 786–2261, Reporting of Hospital Outpatient Quality Reporting (OQR) and ASC Quality Reporting Program issues.

Teresa Schell, (410) 786–8651, Physician Ownership and Investment in Hospitals issues.

Georganne Kuberski, (410) 786–0799, Patient Notification Requirements issues.

James Poyer, (410) 786–2261, and Ernessa Brawley (410) 786–2075, Hospital Value-Based Purchasing (VBP) Program issues.

**SUPPLEMENTARY INFORMATION:**

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following Web site as soon as possible after they have

evaluation criteria mentioned above. We also are proposing to not accept the APC Panel's recommendations to remove the procedures described by CPT codes 22551, 22552, 22554, 22585, 54411, 61107, 61210, and 63267, because upon further clinical review subsequent to the February 28–March 1, 2011 APC Panel meeting, we do not believe that these procedures may be appropriately provided as hospital outpatient procedures for some Medicare beneficiaries, based upon the evaluation criteria mentioned above, due to the clinical intensity of services provided. Furthermore, according to our utilization data, the procedures described by CPT codes 22551, 22552, 22554, 22585, 54411, 61107, 61210, and 63267 have very low volume in the outpatient hospital setting. We note that despite its low overall volume, CPT code 54411 is performed a significant percentage of the time in the outpatient hospital setting; however, we do not believe that the outpatient procedures being performed are truly reflective of the intensity of services requisite when performing the procedure as described by the CPT code's long descriptor. We invite public comment on the inclusion of CPT code 54411 on the CY 2012 inpatient list. The three procedures we are proposing to remove from the inpatient list for CY 2012 and their CPT codes, long descriptors, proposed APC assignments, and proposed status indictors are displayed in Table 40 below.

TABLE 40—PROCEDURES PROPOSED FOR REMOVAL FROM THE INPATIENT LIST AND THEIR PROPOSED APC ASSIGNMENTS FOR CY 2012

| HCPCS code | Long descriptor | Proposed CY 2012 APC assignment | Proposed CY 2012 status indicator |
|---|---|---|---|
| 21346 | Open treatment of nasomaxillary complex fracture (Lefort II type); with wiring and/or local fixation. | 0254 | T |
| 35045 | Direct repair of aneurysm, pseudoaneurysm, or excision (partial or total) and graft insertion, with or without patch graft; for aneurysm, pseudoaneurysm, and associated occlusive disease, radial or ulnar artery. | 0093 | T |
| 54650 | Orchiopexy, abdominal approach, for intra-abdominal testis (e.g., Fowler-Stephens). | 0154 | T |

## X. Proposed Policies for the Supervision of Outpatient Services in Hospitals and CAHs

### *A. Background*

In the CY 2000 OPPS final rule with comment period, CMS established the hospital OPPS and indicated that direct supervision is the standard for all hospital outpatient therapeutic services covered and paid by Medicare in hospitals and in provider-based departments (PBDs) of hospitals (65 FR 18524 through 18526). Currently, as discussed in the CY 2011 OPPS/ASC final rule with comment period (75 FR 72008), this standard requires the supervisory practitioner to be immediately available to furnish assistance and direction throughout the performance of a hospital outpatient therapeutic service or procedure. In the CY 2000 OPPS final rule with comment period, we established in regulation at § 410.28(e) that outpatient diagnostic services furnished in PBDs of hospitals must be supervised at the level indicated in the Medicare Physician Fee Schedule (MPFS) for each service, that is, general, direct or personal supervision. Since that time, we have clarified and refined these rules in several ways. In the CY 2011 OPPS/ASC final rule with comment period (75 FR 71998 through 72001), we provided a comprehensive review of the history of the supervision policies for both outpatient therapeutic and diagnostic services from the inception of the OPPS through CY 2010. In this section, we provide a more condensed overview of our supervision policy during that time period, and present background on issues that have arisen during the CY 2011 payment year.

By way of overview, we have defined supervision in the hospital outpatient setting by drawing on the three levels of supervision that CMS defined for the physician office setting at § 410.32(b) prior to establishment of the OPPS: General, direct, and personal supervision. Over time, we have tailored these definitions as needed to apply them in the hospital outpatient setting, so the definitions or applications in the OPPS may differ slightly from those in the physician office setting. This is the case in defining direct supervision, where the MPFS requires presence "in the office suite," and the OPPS currently does not require presence within any specific physical boundary (in the past, the OPPS rules for direct supervision required presence on the hospital campus or in the PBD) (75 FR 72008, 72012).

To date, for purposes of the hospital outpatient setting, we have only defined direct and general supervision, and we have only defined general supervision insofar as it applies to the provision of nonsurgical extended duration therapeutic services (extended duration services) for which we require direct supervision during an initiation period, followed by a minimum standard of general supervision for the duration of the service (75 FR 72012). Under the OPPS, general supervision means that the service is furnished under the overall direction and control of the physician or appropriate nonphysician practitioner, but his or her physical presence is not required during the performance of the service. Direct supervision means that the physician or appropriate nonphysician practitioner is immediately available to furnish assistance and direction throughout the performance of a therapeutic service or procedure; however, he or she does not have to be present in the room where the service or procedure is being performed.

In the CY 2000 OPPS final rule with comment period (65 FR 18524 through 18526), we adopted physician supervision policies as a condition of payment under the OPPS to ensure that Medicare pays for high quality hospital outpatient services that are furnished in a safe and effective manner and consistent with Medicare requirements. The agency has long divided hospital outpatient services into the two categories of "diagnostic" services and other "therapeutic" services that aid the physician in the treatment of patients (Section 3112 of the Medicare Part A Intermediary Manual (July 1987)). Thus, we considered all nondiagnostic services to be "therapeutic services" which would include, but not be limited to, the services listed under section 1861(s)(2)(B) of the Act as incident to the services of physicians. As early as

1985, the agency defined therapeutic services as those services and supplies (including the use of hospital facilities) which are incident to the services of physicians in the treatment of patients (Section 3112.4 of the Medicare Part A Intermediary Manual (May 1985)). In recognition of this historic classification of services, we established a direct supervision standard for outpatient therapeutic services under our regulation at § 410.27, which establishes the conditions for payment for outpatient hospital services provided ''incident to'' physicians' services. In the text of § 410.27, we also established standards requiring that these services be furnished either by or under arrangements made by the participating hospital (§ 410.27(a)(1)(i)), either in the hospital or in a location that the agency designates as a department of a provider under § 413.65 of the regulations (§ 410.27(a)(1)(iii)). Since 2000, we have maintained the classification of services as either diagnostic or therapeutic in our manual guidance that establishes the conditions of payment for hospital outpatient services under the OPPS (Sections 20.4 and 20.5, Chapter 6 of the Medicare Benefit Policy Manual (Pub. 100–02)). In the requirements for therapeutic services, in addition to the direct supervision standard, we applied the requirements of §§ 410.27(a)(1)(i) and (a)(1)(iii) regarding under arrangement and provider-based site of service to all outpatient therapeutic services that are paid under the OPPS (Section 20.5, Chapter 6 of the Medicare Benefit Policy Manual (Pub. 100–02)).

In the CY 2000 OPPS final rule with comment period, we amended our regulation at § 410.27 to specify that direct supervision is required for outpatient hospital services and supplies furnished incident to a physician's service in a location we designate as a department of a provider under § 413.65 of our regulations. We specified further in the regulation that direct supervision means the physician must be present on the premises of the location and immediately available to furnish assistance and direction throughout the performance of the service or procedure. The requirement to be ''immediately available'' was included in the regulation, although at that time we did not define the term. Although the regulation required the physician to be present on the premises of the location where services were being furnished, it specified that the physician did not have to be present in the room when the procedure was performed. In the CY 2000 OPPS final rule with comment period (65 FR 18525), we emphasized the importance of establishing a supervision standard for services furnished in departments of the hospital that are not located on campus, indicating that our amendment applies to services furnished at an entity that is located off the campus of a hospital that we designate as having provider-based status in accordance with the provisions of § 413.65. In response to a commenter, we stated that, in accordance with Section 3112.4(A) of the Intermediary Manual, we assume the direct supervision standard is met when outpatient therapeutic services are provided incident to a physician's service in an on-campus department of a hospital.

In the CY 2000 OPPS final rule with comment period, we also defined the supervision standards for outpatient hospital diagnostic services furnished in PBDs of hospitals in § 410.28(e) of our regulations. The regulation at § 410.28(e) provided that diagnostic services furnished at facilities having provider-based status must be performed under the level of supervision indicated for the diagnostic test under the MPFS in accordance with the definitions in §§ 410.32(b)(3)(i), (b)(3)(ii), and (b)(3)(iii). In the CY 2010 OPPS/ASC final rule with comment period (74 FR 60588 through 60591, and 60680), we revised § 410.28(e) to extend the supervision standards we had established for outpatient diagnostic tests furnished in PBDs to also apply to services furnished in the hospital setting or any other location where diagnostic services may be provided under arrangement. The supervision rules for diagnostic services under the regulation at § 410.28(e) explicitly apply to hospitals that are paid in accordance with section 1833(t) of the Act, which is the statutory authority for the OPPS. As noted in the CY 2010 OPPS/ASC final rule with comment period, Medicare makes payments to CAHs in accordance with section 1834(g) of the Act. Accordingly, CAHs are not subject to the supervision requirements for outpatient diagnostic services at this time. The supervision requirements for outpatient diagnostic services were also set forth in Section 20.4, Chapter 6, of the Medicare Benefit Policy Manual.

In the years following establishment of the initial OPPS regulations, we began to receive inquiries from providers about the supervision requirements. Many of these inquiries led us to believe that some hospitals may have misunderstood our statement to the effect that we assume physician supervision requirements are met for services furnished on the hospital premises, and were providing either general supervision or no supervision for therapeutic services furnished incident to physicians' services in the outpatient setting and for which we had established a requirement of direct supervision. Therefore, in the CY 2009 OPPS/ASC proposed rule and final rule with comment period (73 FR 41518 through 41519 and 73 FR 68702 through 68704, respectively), we clarified and restated the various supervision requirements for outpatient hospital therapeutic and diagnostic services. We clarified that therapeutic services furnished in the hospital and in all PBDs of the hospital, specifically both on-campus and off-campus PBDs, must be provided under the direct supervision of physicians. We also reiterated that all diagnostic services furnished in PBDs, whether on or off the hospital's main campus, should be supervised according to the levels assigned for the individual tests under the MPFS. We received very few public comments regarding this clarification and restatement during the comment period.

In response to concerns about our policy restatement articulated by stakeholders after publication of the CY 2009 OPPS/ASC final rule with comment period, we further refined our supervision policies in the CY 2010 OPPS/ASC proposed rule and final rule with comment period (74 FR 35365 and 74 FR 60679 through 60680, respectively). We established rules for diagnostic services furnished in locations other than PBDs (that is, in the hospital and under arrangement in nonhospital facilities). Accordingly, we expanded and refined the regulatory language regarding direct supervision of diagnostic services in those locations to refer to presence of the supervisory practitioner in the hospital or PBD (for services furnished in those locations) or in the office suite (for services furnished under arrangement in nonhospital space). For therapeutic services, we increased hospitals' flexibility regarding the direct supervision requirement by allowing all nonphysician practitioners whose services are those the practitioner is legally authorized to perform under State law that ''would otherwise be covered if furnished by a physician or as an incident to a physician's service'' (''would be physicians' services'') to supervise outpatient therapeutic services that are within their scope of practice under State law and their hospital-granted or CAH-granted privileges (sections 1861(s)(2)(K) through (N) of the Act; §§ 410.71 through 410.77 of the regulations). However, in implementing the new

benefits for pulmonary rehabilitation (PR), cardiac rehabilitation (CR) and intensive cardiac rehabilitation (ICR) services, we required that direct supervision of those services furnished in the hospital outpatient setting must be provided by a doctor of medicine or a doctor of osteopathy because, as we discussed in the CY 2010 and CY 2011 OPPS/ASC final rules with comment period (74 FR 60573 and 60582 and 75 FR 72009, respectively), the statute specifies that these services are physician-supervised (section 144(a) of the Medicare Improvements for Patients and Providers Act of 2008, Pub. L. 110–275). In addition, in the CY 2011 OPPS/ASC final rule with comment period, we revised our regulations at § 410.27 to remove the physical boundary requirements for direct supervision, and instead to allow the supervisory practitioner simply to be ''immediately available,'' meaning physically present, interruptible, and able to furnish assistance and direction throughout the performance of the procedure, but without reference to any particular physical boundary.

In the CY 2010 OPPS/ASC final rule with comment period, we finalized a technical correction to the regulation at § 410.27 to clarify that the direct supervision requirement under that section applies to services furnished in CAHs as well as hospitals. Specifically, we added the phrase ''or CAH'' in the title and throughout the regulation text wherever the text referred only to ''hospital,'' to clarify that the requirements for payment of hospital outpatient therapeutic services in that section apply to CAHs as well as other types of hospitals. As we discussed in the CY 2011 OPPS/ASC final rule with comment period (75 FR 72000), we viewed this as a technical correction because the Act applies the same regulations to hospitals and CAHs when appropriate (CAHs are included if ''the context otherwise requires'' under section 1861(e) of the Act).

In response to our clarification that CAHs are subject to the direct supervision standard for payment of outpatient therapeutic services, CAHs and the hospital community at large suggested that CAHs should be exempt from this requirement because the requirement is at odds with longstanding and prevailing practices of many CAHs. For example, commenters noted that, due to low volume of services, a practitioner retained on the campus of a small rural hospital or CAH to meet supervision requirements may not have other concurrent responsibilities or patient care, which could lead to inefficiencies. In their correspondence and discussion in public forums, CAHs and small rural hospitals explicitly raised concerns about services that extend after regular operating hours, especially observation services. They asserted that direct supervision is not clinically necessary for some services that have a significant monitoring component that is typically performed by nursing or other auxiliary staff, including IV hydration, blood transfusions, and chemotherapy. They stated that their facilities have protocols to safely deliver all of these services, relying on nursing or other hospital staff to provide the service and having a physician or nonphysician practitioner available by phone to furnish assistance and direction throughout the duration of the therapeutic service.

We provided guidance regarding the flexibility that we believe exists within our requirement for direct supervision for an emergency physician or nonphysician practitioner, who would be the most likely practitioners staffing a small rural hospital or CAH, to provide the supervision, on the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS/05_OPPSGuidance.asp#TopOfPage*. However, these hospitals continued to express difficulty in meeting the standard. Small rural hospitals and CAHs indicated that, regulations notwithstanding, many of them did not have appropriate staff arrangements to provide the required supervision of some services, particularly services being provided after hours or consisting of a significant monitoring component that last for an extended period of time. In addition, the broader hospital community began requesting that we modify our policy to permit a lower level of supervision for therapeutic services for all hospitals.

After consideration of these requests, on March 15, 2010, we issued a **Federal Register** notice of nonenforcement of the requirement for direct supervision of outpatient therapeutic services in CAHs (which is available on the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS/Downloads/CMS_1504FC_OPPS_2011_FR_Physician_Supervision_Nonenf_Notice.pdf*). While CAHs remained subject to the direct supervision standard, we instructed our contractors not to evaluate or enforce the standard in CY 2010 until the agency could revisit the supervision policy during the CY 2011 rulemaking cycle.

As indicated above, in the CY 2011 OPPS/ASC final rule with comment period (75 FR 71998 through 72013), we further adjusted the direct supervision standard to increase flexibility for hospitals while maintaining an appropriate level of quality and safety and consistent with the incident to statutory provision. Specifically, we redefined direct supervision to remove all requirements that the supervisory practitioner remain present within a particular physical boundary, although we continued to require immediate availability. We also established a new category of services, ''nonsurgical extended duration therapeutic services'' (extended duration services), which have a substantial monitoring component. We specified that direct supervision is required for these services during an initiation period, but once the supervising physician or nonphysician practitioner has determined the patient is stable, the service can continue under general supervision.

In addition, in response to concerns expressed by the industry about appropriate levels of supervision for certain services furnished in various settings (for example, chemotherapy administration, and post-operative recovery services), we stated our intent to create through the CY 2012 rulemaking cycle an independent advisory review process for consideration of stakeholder requests for assignment of supervision levels other than direct supervision for specific outpatient hospital therapeutic services. We stated that the review entity would evaluate services for assignment of both higher (personal) and lower (general) levels of supervision because, in the course of evaluating a given service, the review entity may find that personal supervision is the most appropriate level (75 FR 72006). We also indicated that, as an interim measure while we are in the process of establishing an advisory review body, we would extend the nonenforcement policy for direct supervision of outpatient therapeutic services provided in CAHs for a second year through CY 2011 (which is available at the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS/Downloads/CMS_1504FC_OPPS_2011_FR_Physician_Supervision_Nonenf_Notice.pdf*). In addition, we expanded the nonenforcement notice to include small and rural hospitals that have 100 or fewer beds, as defined by TOPs criteria, because we believe that these hospitals experience resource constraints that are similar to CAHs.

We indicated that we would consider the Federal Advisory Ambulatory Payment Classification (APC) Panel as a potential candidate to serve as the independent review entity to consider requests for alternative service-specific

supervision standards, and we requested public comment both on that idea and on other aspects of the review process, such as evaluation criteria and the potential structure of the process. We suggested the APC Panel could serve as the review entity because it is already funded and established by law under the Federal Advisory Committee Act (FACA, Pub. L. 92–463) to make independent recommendations to CMS. The APC Panel membership is geographically diverse, and it includes members with clinical as well as administrative, hospital billing, and coding expertise. In response to our discussion in the CY 2011 OPPS/ASC final rule with comment period, we received public comments and other considerable input on these topics from the hospital and CAH community and from rural stakeholders. In this proposed rule, we discuss these comments and our proposals for the independent review process in CY 2012, taking into account the comments received in response to the CY 2011 OPPS/ASC final rule with comment period.

With respect to outpatient hospital diagnostic services, following our revisions to the regulation at § 410.28(e) in the CY 2010 OPPS/ASC final rule with comment period described above, we have received very few comments from stakeholders regarding our revised policy. Therefore, we are not proposing any changes to those requirements in this proposed rule.

*B. Issues Regarding the Supervision of Hospital Outpatient Therapeutic Services Raised by Hospitals and Other Stakeholders*

1. Independent Review Process

In the CY 2011 OPPS/ASC final rule with comment period (75 FR 72012), we stated our intent to develop an independent technical review process through our CY 2012 rulemaking. Public comments that we received on this statement of intent focused on three primary topics: the potential nature of the review entity; the potential nature and structure of the review process; and potential means of evaluating services.

Commenters were generally favorable towards the establishment of an independent review entity, including use of the APC Panel as that entity, provided that CMS expand the APC Panel charter and its membership to include representatives of CAHs. They also were concerned that CMS ensure an adequate representation of clinicians on the Panel to provide the appropriate clinical review of supervision levels. Some commenters supported creation by law of a new committee comprised solely of clinicians (at least 15 multi-specialty physicians and mid-levels). Citing the potentially significant impact of the supervision rules on rural and CAH providers, these commenters also recommended that at least 50 percent of committee members be comprised of representatives of CAHs and other providers from rural States, with recommendations for supervision levels decided by majority vote. Other commenters preferred use of an existing body (for example, the APC Panel or the Relative Value Scale Update Committee (RUC)) and emphasized inclusion of nonclinical professionals with expertise in hospital/facility resource consumption in order to balance the panel's expertise. Some commenters sought to assure that if the APC Panel were selected, it would remain appropriately balanced and qualified to carry out its current role in APC deliberations under section 1833(t)(9)(A) of the Act. Commenters also were supportive of CMS using its authority to convene a Technical Expert Panel (TEP) as the review entity, but noted potential lack of available funding.

In considering these issues, we believe that the best course of action is to obtain independent advice with the transparency, formality and process associated with a Federal advisory committee. Stakeholders may view the recommendations of a FACA Committee as having greater legitimacy and, thus, its recommendations could be more useful to CMS than the recommendations that would be offered by other types of groups such as the American Medical Association's Relative Value Update Committee or a TEP. A TEP might be more conducive to in-depth research and data analysis, but unless the TEP complies with the Federal Advisory Committee Act, the TEP as a group cannot provide advice to CMS.

At this time, funding is not available to CMS to convene a new entity; therefore, we believe the most realistic and appropriate option is to use an existing body for reviewing supervision levels. We agree with commenters that the review body should be representative of all types of facilities that are subject to the supervision rules for payment, but we disagree that it should be 50 percent representative of a specific class of hospitals, particularly if those hospitals represent a minority of hospital outpatient service volume and payments. In addition, while we agree with commenters that clinical expertise is critical to this review process, we believe that additional perspectives should be represented, including those of hospital administrators and coding representatives. Under the FACA, committees and their subcommittees must have balanced membership with respect to points of view represented and the topics that are under their consideration; therefore, a Federal advisory review entity would be required to have a balanced representation of geographic interests, including those of CAHs and rural hospitals. It also would be required to have a balanced representation of clinical as well as any other relevant expertise.

With respect to structure of the actual review process, most commenters requested that we subject the recommendations of the review entity and CMS' decisions to notice and comment rulemaking. However, most commenters also requested a ''real-time'' process that would be more flexible than annual rulemaking and allow for continuous evaluation of services. Commenters further requested that there be a mechanism for reconsideration of CMS' decisions. In addition, they requested that CMS not allow any information presented to the review entity in the course of the review process to be used for enforcement purposes.

We believe that employing a subregulatory process to establish CMS' final decisions may best serve the interests of beneficiaries and also meet the needs of other stakeholders. While rulemaking would arguably provide some additional procedural protections to stakeholders in terms of an opportunity for notice and comment, due to the time involved in rulemaking, stakeholders would only be able to request changes in supervision levels once a year. Similarly, if confined to annual rulemaking, CMS would not be able to make swift changes to address any problems associated with supervision levels, for example access to care. Historically, CMS has used subregulatory processes rather than rulemaking to issue changes in certain administrative specifications at the level of individual CPT codes due to a need for agility in making such changes. For example, CMS has used a subregulatory process to set supervision levels for individual diagnostic services under the MPFS, which are adopted for provision of those services in the hospital outpatient setting. Given the strong stakeholder interest in policy changes in supervision levels for outpatient hospital therapeutic services, we believe we should provide an opportunity for public comment on our proposed decisions (which would be based upon

the review entity's recommendations) prior to finalizing them.

We agree with commenters that there should be a means of requesting reevaluation of CMS' decisions. However, because there is a potential for significant administrative burden in reconsidering requests for reevaluation, we believe that stakeholders should be required to provide significant justification to support consideration of a request for a change in supervision levels that has previously been considered, such as new clinical evidence, new technology, or new techniques in how patient care is furnished. In addition, we believe that new consideration of previously considered requests should receive the same independent evaluation as the initial request. Therefore, once we decide to consider a decision, we would request a new review by the independent review entity and follow the same process as a new request. The review entity would then deliberate and make a new recommendation to CMS, and CMS would then make another determination based on the new recommendation.

We received substantial comment on how we might structure the evaluation process. First, stakeholders continued to request that we establish a default supervision standard of general supervision for all therapeutic services, and assign direct supervision only as indicated through the review process. Commenters believed it was important that the review entity and CMS not consider services for assignment of personal supervision because many services that might qualify for personal supervision are already personally performed by a physician or nonphysician practitioner. Commenters also noted that certain services are not furnished personally by these practitioners and instead are furnished personally by auxiliary personnel such as technicians or registered nurses (RNs). However, commenters maintained that hospitals currently furnish adequate supervision of those services by higher-level practitioners. Further, they requested that any evaluation for personal supervision be based on clinical evidence and evidence of a current deficiency in the quality of care.

In the CY 2011 OPPS/ASC final rule with comment period (75 FR 72006), we expressed our belief that direct supervision is the most appropriate level of supervision for most hospital outpatient therapeutic services due to the ''incident to'' nature of most hospital outpatient therapeutic services. We discussed how our historic requirements for physician (or nonphysician practitioner) orders and direct physician involvement in patient care stem from our interpretation of the nature of incident to services under the law. We reviewed our regulations and other guidance over the years which reflect these beliefs and interpretations (75 FR 71999 and 72005).

We continue to believe that, while the statute does not explicitly mandate direct supervision, direct supervision is the most appropriate level of supervision for most hospital outpatient services that are authorized for payment as ''incident to'' physicians' services unless personal supervision is appropriate. We also believe that the ''incident to'' nature of hospital outpatient therapeutic services under the law permits us to recognize specific circumstances in which general supervision is appropriate, as we have for extended duration services, and that CMS has authority to accept a recommendation by the review entity of general supervision for a given service. However, we continue to believe that direct supervision is the most appropriate level of supervision for the great majority of hospital outpatient therapeutic services and, as such, it is the proper choice for a default supervision standard.

In the course of evaluating a stakeholder request for review of the supervision level required for a given service, the independent review entity may recommend that personal supervision is the most appropriate level of supervision for the service. It may also be appropriate to assign personal supervision to certain services to ensure that auxiliary personnel or personnel in training (such as medical students) are adequately supervised. As we indicated in last year's final rule with comment period, our supervision policy is designed to preserve both the quality and safety of purchased hospital outpatient services for Medicare beneficiaries. Accordingly, we believe that the review entity should have authority to recommend personal supervision for a service if, in the course of its evaluation, it believes that personal supervision is most appropriate and safe.

We believe that the review entity should base its recommendations on any clinical evidence that is available. It should also take into consideration any known impacts of supervision on the quality of care. As we have previously noted (75 FR 72005), while literature or clinical opinions may exist on the risk of adverse outcomes and susceptibility to medical error associated with the provision of specific hospital outpatient procedures when a physician is not present, we do not know of any analyses that have directly examined levels of supervision and patient outcomes in the hospital outpatient setting. This may be an area for future study.

With respect to an initial agenda of services for the review entity, commenters recommended that CMS begin evaluating services with work Relative Value Units (RVUs) $< 1.0$ (approximately 160 services), which they believe would include many extended duration services. They also requested that CMS evaluate surgical procedures (especially minor surgical procedures) and portions of the surgical recovery period for general supervision. We continue to support direct supervision as the default supervision level for all hospital outpatient therapeutic services. We believe it would be appropriate to solicit services for evaluation from stakeholders, in a process similar to that currently used to solicit agenda items for the APC Panel meetings. Also, it will be important for CMS to be able to place services on the Panel agenda as issues arise, similar to the way the agency brings inpatient only procedures before the APC Panel for consideration of removal from the inpatient only list. If we received an unmanageable number of requests during a particular period, we propose to prioritize requests according to service volume, total expenditures for the service, frequency of requests, and the repetition of requests from prior public comments. In addition, we propose to require the submitter of a request to furnish a justification for the request, supported to the extent possible with clinical evidence. We would use the justifications to assist in prioritizing agenda items.

Commenters suggested that evaluation criteria include the general categories of risk, complexity, the type of professional and scope of practice of the professional furnishing the service, and whether the service is furnished in a CAH or rural facility, taking into consideration the workforce typically available to those hospitals. We agree with the suggested general parameters of risk and complexity, and we offer several similar potential measures below for the public's consideration. In recommending a level of supervision that would apply for a particular service described by a CPT code, we also believe that the review entity could take into consideration the varied environments in which the service described by that code may be delivered. We anticipate that representatives of different types of facilities on the Panel will facilitate an

understanding of any potential variation in conditions at different types of facilities.

Under the conditions of participation for hospitals at § 482.11(a), hospitals must comply with applicable Federal law related to the health and safety of patients. Under § 482.11(c), hospitals must also assure that personnel are licensed or meet other applicable standards of State or local law. Registered nurses (RNs) are not authorized to independently furnish services that would be physicians' services if furnished by a physician as described in section 1861(s)(2)(K) of the Act. In addition, under their State scope of practice, RNs are not licensed to independently furnish these services. Under the condition of participation regulation at § 482.11, hospitals must comply with these Federal and State rules. Because under the law RNs are not permitted to furnish ''would be'' physicians' services, we do not believe RNs should be permitted to supervise those services. Therefore, under the regulations at §§ 410.27 and 482.11, RNs cannot supervise ''would be'' physicians' services that they may not independently furnish (though they may furnish some of them under the supervision of an appropriately higher level practitioner), even in a CAH or rural facility that may be experiencing difficulty obtaining a higher level practitioner to supervise or furnish those services. In this case, the statute and the regulations determine at the service level which nonphysician professionals can and cannot supervise therapeutic services.

Furthermore, we note that we anticipate extending the notice of nonenforcement for direct supervision of outpatient therapeutic services in both CAHs and small rural hospitals another year through CY 2012, which we discuss in section X.C.2. of this proposed rule.

2. Conditions of Payment and Hospital Outpatient Therapeutic Services Described by Different Benefit Categories

Another issue that has been raised to us is the applicability of the payment conditions for hospital outpatient therapeutic services in § 410.27 to services described in paragraphs or subparagraphs of section 1861(s) of the Act other than section 1861(s)(2)(B) of the Act, which describes outpatient hospital services incident to physicians' services. Over the years, and particularly in recent months, we have received inquiries asking that we explain or clarify our application of the payment conditions under our regulation at § 410.27, which explicitly applies to ''hospital services and supplies furnished incident to a physician service to outpatients,'' to outpatient therapeutic services other than those specified under section 1861(s)(2)(B) of the Act. For example, we have received inquiries as to whether it is permissible for hospitals to furnish radiation therapy (described under section 1861(s)(4) of the Act) or ambulatory surgical center services (described under section 1832(a)(2)(F)(i) of the Act) under arrangement in locations that are not provider-based. Some have suggested that the language in § 410.27 is not applicable to services described by benefit categories in section 1861(s) of the Act other than section 1861(s)(2)(B) of the Act because § 410.27 only refers to ''incident to'' services.

Although we acknowledge the language of § 410.27 could be read as limited to services and supplies described under section 1861(s)(2)(B) of the Act, hospital services incident to physicians' services furnished to outpatients, we have not interpreted the regulation so narrowly. For instance, in the CY 2010 OPPS/ASC final rule with comment period, we noted that, long before the OPPS, we required that hospital services and supplies furnished to outpatients incident to a physician's service must be furnished ''on a physician's order by hospital personnel and under a physician's supervision'' (section 3112.4 of the Medicare Intermediary Manual). We also clearly treated all nondiagnostic services that are furnished to hospital outpatients as ''incident to services'' (sections 3112 and 3112.4 of the Medicare Intermediary Manual; Section 20.5, Chapter 6, of the Medicare Benefit Policy Manual (Pub. 100–02)). While we have not delineated this position as clearly in the regulations, and while the regulation text of § 410.27 only explicitly refers to ''incident to'' services, we note that our policy is longstanding and, in fact, predates the OPPS. In longstanding manual guidance, we have expressed our view that direct supervision is required for hospital outpatient therapeutic services, and suggested that this requirement stems from the ''incident to'' nature of those services. In the CY 2010 OPPS/ASC final rule with comment period, we stated, ''Therapeutic services and supplies which hospitals provide on an outpatient basis are those services and supplies (including the use of hospital facilities) which are incident to the services of physicians and practitioners in the treatment of patients'' (74 FR 60584 through 60585). We indicated that outpatient therapeutic services and supplies must be furnished under the order of a physician or other appropriate nonphysician practitioner, and by hospital personnel under the direct supervision of a physician or appropriate nonphysician practitioner.

Thus, we have long maintained that all hospital outpatient therapeutic services are, in some sense, furnished ''incident to'' a physician's service even when described by benefit categories other than the specific ''incident to'' provision in section 1861(s)(2)(B) of the Act. Because hospital outpatient therapeutic services are furnished ''incident to'' a physician's professional service, we believe the conditions for payment, including the direct supervision standard, should apply to all of these services. As discussed above, because the statute includes specific requirements for physician supervision of PR, CR, and ICR, we believe that those statutory specifications take precedence over the agency's general requirements.

*C. Proposed Policies on Supervision Standards for Outpatient Therapeutic Services in Hospitals and CAHs*

In this proposed rule, we are proposing policies for the independent review process, grouped under three key topics: selection of a review body; structure of the review process; and evaluation criteria.

1. Selection of Review Entity

We are proposing that the existing APC Panel serve as the independent review entity. However, we would make some modifications to the APC Panel scope and composition in order to create a body that is prepared to address supervision standards and reflects the full range of parties subject to the standards. Specifically, we would use the discretionary authority in the Panel charter to expand its scope to include the topic of supervision standards. We are proposing to add several (2 to 4) representatives of CAHs as Panel members so that all hospitals subject to the supervision rules for payment would be represented. However, CAHs would not participate in deliberations about APC assignments under the OPPS, as these assignments do not affect CAHs. According to customary practice for the APC Panel, we are proposing to create a supervision subcommittee on the Panel, with balanced representation, that is charged to evaluate appropriate supervision standards for individual services and present its deliberations to the full Panel. Each member of the full

Panel would then vote to decide on the Panel's recommendation to CMS.

We are proposing to use the APC Panel for many reasons. As we discussed above, funding is not available to CMS at this time to convene a new entity. Also, it is not clear that the entire resources of a new body are necessary to accomplish the consideration of service-specific supervision standards, especially once initial determinations are made regarding key services. We are also proposing to use the APC Panel because we believe it is important to obtain advice that carries the weight of a Federal advisory recommendation, which may have greater legitimacy both with stakeholders and with CMS compared to the opinions of other types of groups.

In addition to being already established and funded, the APC Panel would necessarily be inclusive and well-balanced because it is subject to the FACA rules. Consistent with stakeholders' requests that the review entity have balanced representation from all hospitals that are subject to the supervision rules, the Federal Advisory APC Panel would be required by the FACA to have balanced membership on committees and their subcommittees with respect to the topics—in this case, supervision—that are under their consideration. In addition, the Panel incorporates clinical as well as facility, administrative, and coding perspectives. Commenters have been generally favorable towards selection of the APC Panel, provided we make the changes to the APC Panel that we are proposing in this proposed rule.

2. Review Process

We are proposing to issue agency decisions based on APC Panel recommendations through sub-regulatory guidance. We would use a process similar to the one currently used to set supervision levels for diagnostic services under the MPFS, which are adopted for provision of those services in the hospital outpatient setting. CMS' decisions (which would be based upon the Panel's recommendations) would be posted on the OPPS Web site for public review and comment, and would be effective either in July or January following the most recent APC Panel meeting, or only in January of the upcoming payment year. In setting the diagnostic supervision levels under the MPFS, there is no provision for public comment. However, given the strong stakeholder interest in this topic and the extent of prior dialogue with the various stakeholders, we believe it is important to provide some means of notice and comment on our proposed decisions prior to finalizing them.

The flexibility of a subregulatory process in comparison to rulemaking would allow stakeholders to submit requests for evaluations of services on a more frequent basis (at least twice a year at APC Panel meetings) rather than only annually, which most commenters requested. It also would give CMS the ability to respond more rapidly to any issues that may arise in access to care or patterns of care. Subjecting CMS' decisions to notice and comment rulemaking would provide a more structured, formal review of decisions, but changes could only be requested or made once a year due to the annual OPPS/ASC rulemaking cycle.

3. Evaluation Criteria

To begin evaluating services in CY 2012, we are proposing to use the same APC Panel process that is used to solicit services or categories of services from stakeholders to construct the agenda to solicit potential services for consideration of a change in supervision level. In addition, as discussed in section X.C.2. of this proposed rule, we are proposing that CMS would have the ability independently to ask the Panel to review the supervision level for one or more services as necessary. If we receive an unmanageable number of requests, we are proposing to prioritize requests by service volume, total expenditures and/or frequency of requests. We also are proposing to prioritize services requested for review through public comment on the CY 2010 and CY 2011 OPPS/ASC proposed rules. We are proposing to require requests to include justification for the change in supervision level that is sought, supported to the extent possible with clinical evidence. We also would consider these justifications in deciding which services to forward to the APC Panel for evaluation.

We are proposing to charge the Panel with recommending a supervision level (general, direct, or personal) to ensure an appropriate level of quality and safety for delivery of a given service, as defined by a CPT code. The Panel should take into consideration the context in which the service is delivered, that is, the clinical, payment, and quality context of a patient encounter. In recommending a supervision level to CMS, we are proposing that the Panel assess whether there is a significant likelihood that the supervisory practitioner would need to reassess the patient and modify treatment during or immediately following the therapeutic intervention, or provide guidance or advice to the individual who provides the service. In answering that question, the Panel would consider—

- Complexity of the service;
- Acuity of the patients receiving the service;
- Probability of unexpected or adverse patient event; and
- Expectation of rapid clinical changes during the therapeutic service or procedure.

These criteria include, but extend well beyond, the likelihood of the need to manage medical emergencies during or after the provision of the service. As we have stated in previous rules (74 FR 60580 and 75 FR 72007 and 72010), the supervisory responsibility is more than the mere capacity to respond to an emergency. It also includes being available to reassess the patient and potentially modify treatment as needed on a nonemergency basis. It includes the ability to redirect or take over performance of the service and to issue any additional necessary orders.

We are proposing that, in the event there has been a previous consideration and decision on the supervision standard for a service, we would consider the request and, as warranted, forward the request to the APC Panel for its review. For requests for review of a service that has already been considered, we are proposing to require the requestor to submit new evidence to support a change in policy, for example, evidence of a change in clinical practice patterns due to new techniques or new technology. If sufficient new information was provided with the request, CMS would send the request to the APC Panel, and the Panel would reconsider the service and make another recommendation to CMS, which could be the same or a different level of supervision than the current level for the service.

Finally, in the interim period while we work toward establishing the independent review process, we anticipate that we will extend the notice of nonenforcement of the requirement for direct supervision in CAHs and small rural hospitals as defined by the notice (available on the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS/01_overview.asp*) another year, through CY 2012. The purpose of this proposed policy would continue to be to allow these facilities time to meet the direct supervision standard while we continue to deliberate on any policy alternatives. Under our current timeline, we would not complete policy decisions on many key services until sometime in 2012.

We note that we have not yet defined the terms ''personal supervision'' or ''general supervision'' for the hospital outpatient setting, except, as explained above, for general supervision in relation to extended duration services in § 410.27(a)(1)(v)(A). Because we are proposing to allow the independent review entity to recommend that CMS assign either personal or general supervision to other hospital outpatient therapeutic services, we are proposing to define these terms in the regulations at proposed new § 410.27(b)(1)(vi). We are proposing to use the definitions established for purposes of the MPFS as specified at § 410.32(b)(3). Specifically, ''personal supervision'' would have the same meaning as the definition specified at § 410.32(b)(3)(iii) and ''general supervision'' would have the same meaning as the definition specified in § 410.32(b)(3)(i), which is the same definition that we established for the general supervision portion of an extended duration service.

4. Conditions of Payment and Hospital Outpatient Therapeutic Services Described by Different Benefit Categories

With respect to the issue of application of the payment conditions in § 410.27 to services described by benefit categories other than section 1861(s)(2)(B) of the Act, we are proposing to amend our regulations to clarify our policy. Therapeutic services and supplies described by benefit categories other than the hospital outpatient ''incident to'' services under section 1861(s)(2)(B) of the Act are nevertheless subject to the conditions of payment in § 410.27 when they are furnished to hospital outpatients and paid under the OPPS or to CAHs under section 1834(g) of the Act.

We believe that this clarification could most readily be accomplished by more specifically defining the services and supplies described in the regulation text to which the requirements at § 410.27 apply. Accordingly, we are proposing to revise the description of the services and supplies addressed in § 410.27(a) by adding the term ''therapeutic'' so that paragraph (a) would read, ''Medicare Part B pays for therapeutic hospital or CAH services and supplies furnished incident to a physician's or nonphysician practitioner's service'' to outpatients. We are proposing to define these services, similar to the way they are currently defined in Section 20.5, Chapter 6, of the Medicare Benefit Policy Manual, to mean ''all services and supplies furnished to hospital or CAH outpatients that are not diagnostic services and that aid the physician or practitioner in the treatment of the patient.'' We would also add the term ''therapeutic'' to the title of § 410.27 so that it would read, ''Therapeutic outpatient hospital or CAH services and supplies incident to a physician's or nonphysician practitioner's service: Conditions.''

We believe it is important that we continue to apply the requirements in § 410.27 to all hospital outpatient therapeutic services and supplies that are paid under the OPPS and to services furnished in CAHs that are paid under section 1834(g) of the Act. In addition to the supervision rules, the payment conditions in § 410.27 include rules regarding services furnished under arrangements and in PBDs. The goals of the ''under arrangements'' and PBD rules are different from the safety and quality goals of the supervision rules. They ensure clinical and financial integration between the main hospital and any on-campus or off-campus departments of hospitals. In particular, § 410.27(a)(1)(iii) subjects hospital outpatient services to the requirements in § 413.65 for PBDs of hospitals. The provider-based regulations in § 413.65 govern numerous aspects of PBD operations including quality assurance, accountability to hospital medical director staff, licensure, personnel management, how far the departments can be located from the main hospital, and assurance that the departments are serving the same population as the main provider. Section 410.27(e) subjects services to the ''under arrangement'' regulations at § 410.42(a) which govern the liabilities of the beneficiary and other parties when hospitals contract services out. It is important to reiterate that § 410.27 is applicable to all hospital outpatient therapeutic services. We note, for example, that ASCs are not permitted to enter into arrangements with hospitals to furnish hospital outpatient services. We believe we should clarify and reinforce our longstanding policy that hospitals are not permitted to furnish therapeutic services or surgery under arrangement with ASCs because under § 413.65(a)(1)(ii)(A), CMS does not make provider-based determinations regarding ASCs and under § 410.27(a)(1)(iii) therapeutic services must be furnished in provider-based space. Moreover, a hospital is not permitted to furnish services to hospital outpatients under arrangements with an ASC because ASCs are paid under section 1833(i)(2)(D) of the Act (the ASC payment system), not under section 1833(t) of the Act (the OPPS payment system). As a result, an ASC could not be a provider-based department of a hospital for purposes of § 410.27. If § 410.27 did not apply, an ASC could furnish hospital outpatient therapeutic services under arrangements and obtain payment at the OPPS rate rather than the ASC rate. This practice would distort the financial incentives within those payment systems, and would be contrary to the advice and determinations that have historically been made by CMS and other enforcement bodies such as the Office of the Inspector General.

In addition, § 410.27(a)(1)(ii) subjects hospital outpatient services to the incident to rules that CMS has historically applied to all therapeutic services. As we discussed above, these rules ensure that services are ordered by a physician (or appropriate nonphysician practitioner) and that he or she is directly involved in the delivery of care. Sections 410.27(b) and (c) subject services to other significant rules governing drugs and biologicals and emergency services.

Additionally, we believe that there is a similar level of clinical risk in the therapeutic hospital outpatient services covered under other benefit categories that are not explicitly defined as ''incident to'' services. For example, stereotactic radiosurgery (a radiation therapy service under section 1861(s)(4) of the Act) is a high risk and technically demanding surgical procedure. We do not believe that the current requirements under § 410.27 regarding supervision, under arrangement, provider-based, and other aspects of service, were intended to apply only to a subset of hospital outpatient therapeutic services and supplies, or that the agency ever intended to omit large classes of services that are routinely furnished to hospital outpatients from being governed by this regulation.

5. Technical Corrections to the Supervision Standards for Hospital Outpatient Therapeutic Services Furnished in Hospitals or CAHs

We recently noted that the text of §§ 410.27(b) and (c) includes cross-references to section § 410.168 of the regulations, which is obsolete. We believe that § 410.27(b) refers to § 410.168 in error and should instead reference § 410.29 (Limitations on drugs and biologicals). We are proposing to correct § 410.27(b) so that it cross-references § 410.29. It would then read, ''Drugs and biological are also subject to the limitations specified in § 410.29.'' In addition, we are proposing to update § 410.27(c) to cross-reference the

sections of the regulation that have replaced § 410.168, that is, Part 424, Subparts G and H. For this update, we are proposing to revise paragraph (c) to read, ''Rules on emergency services furnished to outpatients by nonparticipating hospitals are specified in subpart G of Part 424 of this chapter'' and to add a new paragraph (d) to read, ''Rules on emergency services furnished to outpatients in a foreign country are specified in subpart H of Part 424 of this chapter''. Accordingly, we are proposing to redesignate the existing paragraphs (d) through (f) of § 410.27 as paragraphs (e) through (g), respectively.

In addition, we noted that CAHs are not specifically named in the definition of nonsurgical extended duration therapeutic services at § 410.27(a)(1)(iv)(E). We are making a technical correction to insert the words ''or CAH'' after ''hospital'' in this paragraph. This is the same technical correction that we made throughout § 410.27 in the CY 2010 OPPS/ASC final rule with comment period, discussed above. This technical correction clarifies that CAHs are subject to all of the requirements of § 410.27 in the same manner as all other types of hospitals.

6. Summary

In summary, we are proposing to establish the Federal Advisory APC Panel as an independent review body that would evaluate individual outpatient therapeutic services for potential assignment by CMS of general (lower) or personal (higher) supervision. We are proposing to amend the APC Panel charter to render the Panel more appropriate for this task by expanding its scope to include the topic of supervision. We also are proposing to add two to four members to the Panel who would be representative of CAHs, so that there is broad representation of the types of hospitals that are subject to the supervision rules for payment. We are proposing to use the standard APC Panel protocols with respect to frequency of meetings and receiving requests for evaluation and reconsideration of services. However, CMS' decisions based on the Panel's recommendations would not be subject to notice and comment rulemaking, in contrast to recommendations by the Panel on issues other than supervision. We are proposing several means of prioritizing requests for evaluations, particularly if the Panel agenda could not accommodate all timely requests at a particular meeting. We also are proposing clinical and other evaluation criteria that the Panel would use in recommending a supervision level that would apply at the individual CPT code level. As we have not yet defined personal supervision or general supervision for all hospital outpatient therapeutic services, we are proposing definitions for these terms in this proposed rule.

We anticipate extending the notice of nonenforcement for direct supervision in CAHs and small rural hospitals as defined by the notice through CY 2012, because, even if the new APC Panel review process is adopted, we likely will not have finalized our policy decisions on many key services that are reviewed during that year. In addition, we are proposing to clarify our policy that the requirements under § 410.27 apply to outpatient therapeutic services and supplies furnished in hospitals and in CAHs, which includes services and supplies described by Medicare benefit categories other than section 1861(s)(2)(B) of the Act. To that end, we are proposing to redefine the services described in that section to clarify the nature and scope of the included services.

## XI. Proposed OPPS Payment Status and Comment Indicators

### *A. Proposed OPPS Payment Status Indicator Definitions*

Payment status indicators (SIs) that we assign to HCPCS codes and APCs play an important role in determining payment for services under the OPPS. They indicate whether a service represented by a HCPCS code is payable under the OPPS or another payment system and also whether particular OPPS policies apply to the code. The proposed CY 2012 status indicator assignments for APCs and HCPCS codes are shown in Addendum A and Addendum B, respectively on the CMS Web site at: *http://www.cms.hhs.gov/HospitalOutpatientPPS*. We note that, in the past, a majority of the Addenda referred to throughout the preamble of our OPPS/ASC proposed and final rules appeared in the printed version of the **Federal Register** as part of the annual rulemakings. However, beginning with this CY 2012 proposed rule, the Addenda will no longer appear in the printed version of the OPPS/ASC rules that are found in the **Federal Register**. Instead, these Addenda will be published and available only via the Internet on the CMS Web site at: *http://www.cms.hhs.gov/HospitalOutpatientPPS*.

For CY 2012, we are not proposing to make any changes to the definitions of status indicators that were listed in Addendum D1 of the CY 2011 OPPS/ASC final rule with comment period. The proposed CY 2012 status indicators and their definitions are listed in the tables under sections XI.A.1., 2., 3., and 4. of this proposed rule.

1. Proposed Payment Status Indicators to Designate Services That Are Paid under the OPPS

| Indicator | Item/code/service | OPPS payment status |
|---|---|---|
| G | Pass-Through Drugs and Biologicals | Paid under OPPS; separate APC payment. |
| H | Pass-Through Device Categories | Separate cost-based pass-through payment; not subject to copayment. |
| K | Nonpass-Through Drugs and Nonimplantable Biologicals, including Therapeutic Radiopharmaceuticals. | Paid under OPPS; separate APC payment. |
| N | Items and Services Packaged into APC Rates | Paid under OPPS; payment is packaged into payment for other services. Therefore, there is no separate APC payment. |
| P | Partial Hospitalization | Paid under OPPS; per diem APC payment. |
| Q1 | STVX-Packaged Codes | Paid under OPPS; Addendum B displays APC assignments when services are separately payable.<br>(1) Packaged APC payment if billed on the same date of service as a HCPCS code assigned status indicator "S," "T," "V," or "X."<br>(2) In all other circumstances, payment is made through a separate APC payment. |