Case No. 1:12-cv-03029-WJM-MLC Document 68-10 filed 09/14/15 USDC Colorado pg 1 of 13

EXHIBIT 9



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Parts 410, 411, 416, 419, 489, and 495**

**[CMS–1525–FC]**

**RIN 0938–AQ26**

# Medicare and Medicaid Programs: Hospital Outpatient Prospective Payment; Ambulatory Surgical Center Payment; Hospital Value-Based Purchasing Program; Physician Self-Referral; and Patient Notification Requirements in Provider Agreements

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Final rule with comment period.

**SUMMARY:** This final rule with comment period revises the Medicare hospital outpatient prospective payment system (OPPS) for CY 2012 to implement applicable statutory requirements and changes arising from our continuing experience with this system. In this final rule with comment period, we describe the changes to the amounts and factors used to determine the payment rates for Medicare hospital outpatient services paid under the OPPS.

In addition, this final rule with comment period updates the revised Medicare ambulatory surgical center (ASC) payment system to implement applicable statutory requirements and changes arising from our continuing experience with this system. In this final rule with comment period, we set forth the relative payment weights and payment amounts for services furnished in ASCs, specific HCPCS codes to which these changes apply, and other ratesetting information for the CY 2012 ASC payment system.

We are revising the requirements for the Hospital Outpatient Quality Reporting (OQR) Program, adding new requirements for ASC Quality Reporting System, and making additional changes to provisions of the Hospital Inpatient Value-Based Purchasing (VBP) Program.

We also are allowing eligible hospitals and CAHs participating in the Medicare Electronic Health Record (EHR) Incentive Program to meet the clinical quality measure reporting requirement of the EHR Incentive Program for payment year 2012 by participating in the 2012 Medicare EHR Incentive Program Electronic Reporting Pilot.

Finally, we are making changes to the rules governing the whole hospital and rural provider exceptions to the physician self-referral prohibition for expansion of facility capacity and changes to provider agreement regulations on patient notification requirements.

**DATES:** *Effective Date:* This final rule with comment period is effective on January 1, 2012.

*Comment Period:* To be assured consideration, comments on the payment classifications assigned to HCPCS codes identified in Addenda B, AA, and BB of this final rule with comment period with the ''NI'' comment indicator and on other areas specified throughout this final rule with comment period, and comments on the suspension of the effective dates of the Hospital-Acquired Condition (HAC), Agency for Healthcare Research and Quality (AHRQ), and Medicare spending per beneficiary measures discussed in section XVI.A.2. of this final rule with comment period, must be received at one of the addresses provided in the **ADDRESSES** section no later than 5 p.m. EST on January 3, 2012.

*Application Deadline—New Class of New Technology Intraocular Lenses:* Requests for review of applications for a new class of new technology intraocular lenses must be received by 5 p.m. EST on March 2, 2012, at the following address: ASC/NTOL, Division of Outpatient Care, Mailstop C4–05–17, Centers for Medicare and Medicaid Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

**ADDRESSES:** In commenting, please refer to file code CMS–1525–FC. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (no duplicates, please):

1. *Electronically.* You may (and we encourage you to) submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the instructions under the ''submit a comment'' tab.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1525–FC, P.O. Box 8013, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments via express or overnight mail to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1525–FC, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments before the close of the comment period to either of the following addresses:

a. For delivery in Washington, DC—Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201.

Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal Government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.

b. For delivery in Baltimore, MD—Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, please call the telephone number (410) 786–7195 in advance to schedule your arrival with one of our staff members.

Comments mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

For information on viewing public comments, we refer readers to the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:**

Marjorie Baldo, (410) 786–4617, Hospital outpatient prospective payment issues.
Char Thompson, (410) 786–2300, Ambulatory surgical center issues.
Michele Franklin, (410) 786–4533, and Jana Lindquist, (410) 786–4533, Partial hospitalization and community mental health center issues.
James Poyer, (410) 786–2261, Reporting of Hospital Outpatient Quality Reporting (OQR) and ASC Quality Reporting Program issues.
Teresa Schell, (410) 786–8651, Physician Ownership and Investment in Hospitals issues.
Georganne Kuberski, (410) 786–0799, Patient Notification Requirements issues.
James Poyer, (410) 786–2261, and Ernessa Brawley (410) 786–2075, Hospital Value-Based Purchasing (VBP) Program issues.

| HCPCS Code | Long Descriptor | CY 2012 Status Indicator |
|---|---|---|
| 51840 | Anterior vesicourethropexy, or urethropexy (eg, marshall-marchetti-krantz, burch); simple | C |
| 56630 | Vulvectomy, radical, partial; | C |
| 61624 | Transcatheter permanent occlusion or embolization (eg, for tumor destruction, to achieve hemostasis, to occlude a vascular malformation), percutaneous, any method; central nervous system (intracranial, spinal cord) | C |
| 63044 | Laminotomy (hemilaminectomy), with decompression of nerve root(s), including partial facetectomy, foraminotomy and/or excision of herniated intervertebral disc, reexploration, single interspace; each additional lumbar interspace (list separately in addition to code for primary procedure) | C |
| 63710 | Dural graft, spinal | C |

BILLING CODE 4120–01–C

## X. Policies for the Supervision of Outpatient Services in Hospitals and CAHs

*A. Background*

In the CY 2000 OPPS final rule with comment period, CMS established the hospital OPPS and indicated that direct supervision is the standard for all hospital outpatient therapeutic services covered and paid by Medicare in hospitals and in provider-based departments (PBDs) of hospitals (65 FR 18524 through 18526). Currently, as discussed in the CY 2011 OPPS/ASC final rule with comment period (75 FR 72008), this standard requires the supervisory practitioner to be immediately available to furnish assistance and direction throughout the performance of a hospital outpatient therapeutic service or procedure. In the CY 2000 OPPS final rule with comment period, we established in the regulation at § 410.28(e) that outpatient diagnostic services furnished in PBDs of hospitals must be supervised at the level indicated in the Medicare Physician Fee Schedule (MPFS) for each service, that is, general, direct or personal supervision. Since that time, we have clarified and refined these rules in several ways. In the CY 2011 OPPS/ASC final rule with comment period (75 FR 71998 through 72001), we provided a comprehensive review of the history of the supervision policies for both outpatient therapeutic and diagnostic services from the inception of the OPPS through CY 2010. In this section, we provide a more condensed overview of our supervision policy during that time period, and present background on issues that have arisen during the CY 2011 payment year.

By way of overview, we have defined supervision in the hospital outpatient setting by using the three levels of supervision that CMS defined for the physician office setting at § 410.32(b) prior to establishment of the OPPS: General, direct, and personal supervision. Over time, we have tailored these definitions as needed to apply them in the hospital outpatient setting, so the definitions or applications in the OPPS may differ slightly from those in the physician office setting. This is the case in defining direct supervision, where the MPFS requires presence ''in the office suite,'' and the OPPS currently does not require presence within any specific physical boundary (in the past, the OPPS rules for direct supervision required presence on the hospital campus or in the PBD) (75 FR 72008, 72012).

To date, for purposes of the hospital outpatient setting, we have only defined direct and general supervision, and we have only defined general supervision insofar as it applies to the provision of nonsurgical extended duration therapeutic services (extended duration services) for which we require direct supervision during an initiation period, followed by a minimum standard of general supervision for the duration of the service (75 FR 72012). Under the OPPS, general supervision means that the service is furnished under the overall direction and control of the physician or appropriate nonphysician practitioner (NPP), but his or her physical presence is not required during the performance of the service. Direct supervision means that the physician or appropriate NPP is immediately available to furnish assistance and direction throughout the performance of a therapeutic service or procedure; however, he or she does not have to be present in the room where the service or procedure is being performed.

In the CY 2000 OPPS final rule with comment period (65 FR 18524 through 18526), we adopted physician supervision policies as a condition of payment under the OPPS to ensure that Medicare pays for high quality hospital outpatient services that are furnished in a safe and effective manner and consistent with Medicare requirements. The agency has long divided hospital outpatient services into the two categories of ''diagnostic'' services and ''therapeutic'' services that aid the physician in the treatment of patients (Section 3112 of the Medicare Part A Intermediary Manual (July 1987)). Thus, we considered all nondiagnostic services to be ''therapeutic services'' which would include, but not be limited to, the services listed under section 1861(s)(2)(B) of the Act as incident to the services of physicians. As early as 1985, the agency defined therapeutic services as those services and supplies (including the use of hospital facilities) that are incident to the services of

physicians in the treatment of patients (Section 3112.4 of the Medicare Part A Intermediary Manual (May 1985)). In recognition of this historic classification of services, we established a direct supervision standard for outpatient therapeutic services under our regulation at § 410.27, which establishes the conditions for payment for outpatient hospital services provided ''incident to'' physicians' services. In the text of § 410.27, we also established standards requiring that these services be furnished either by or under arrangements made by the participating hospital (§ 410.27(a)(1)(i)), and either in the hospital or in a location that the agency designates as a department of a provider under § 413.65 of the regulations (§ 410.27(a)(1)(iii)). Since 2000, we have maintained the classification of services as either diagnostic or therapeutic in our manual guidance that establishes the conditions of payment for hospital outpatient services under the OPPS (Sections 20.4 and 20.5, Chapter 6 of the Medicare Benefit Policy Manual (Pub. 100–02)). In the requirements for therapeutic services, in addition to the direct supervision standard, we applied the requirements of § 410.27(a)(1)(i) and (a)(1)(iii) regarding under arrangement and provider-based site of service to all outpatient therapeutic services that are paid under the OPPS (Section 20.5, Chapter 6 of the Medicare Benefit Policy Manual (Pub. 100–02)).

In the CY 2000 OPPS final rule with comment period, we amended our regulation at § 410.27 to specify that direct supervision is required for outpatient hospital services and supplies furnished incident to a physician's service in a location we designate as a department of a provider under § 413.65 of our regulations. We specified further in the regulation that direct supervision means the physician must be present on the premises of the location and immediately available to furnish assistance and direction throughout the performance of the service or procedure. The requirement to be ''immediately available'' was included in the regulation, although at that time we did not define the term. Although the regulation required the physician to be present on the premises of the location where services were being furnished, it specified that the physician did not have to be present in the room when the procedure was performed. In the CY 2000 OPPS final rule with comment period (65 FR 18525), we emphasized the importance of establishing a supervision standard for services furnished in departments of the hospital that are not located on campus, indicating that our amendment applies to services furnished at an entity that is located off the campus of a hospital that we designate as having provider-based status in accordance with the provisions of § 413.65. In response to a commenter, we stated that, in accordance with Section 3112.4(A) of the Intermediary Manual, we assume that the direct supervision standard is met when outpatient therapeutic services are provided incident to a physician's service in an on-campus department of a hospital.

In the CY 2000 OPPS final rule with comment period, we also defined the supervision standards for outpatient hospital diagnostic services furnished in PBDs of hospitals in § 410.28(e) of our regulations. The regulation at § 410.28(e) provided that diagnostic services furnished at facilities having provider-based status must be performed under the level of supervision indicated for the diagnostic test under the MPFS in accordance with the definitions in §§ 410.32(b)(3)(i), (b)(3)(ii), and (b)(3)(iii). In the CY 2010 OPPS/ASC final rule with comment period (74 FR 60588 through 60591, and 60680), we revised § 410.28(e) to extend the supervision standards we had established for hospital outpatient diagnostic tests furnished in PBDs to also apply to services furnished in the hospital setting or any other location where diagnostic services may be provided under arrangement. The supervision rules for diagnostic services under the regulation at § 410.28(e) explicitly apply to hospitals that are paid in accordance with section 1833(t) of the Act, which is the statutory authority for the OPPS. As noted in the CY 2010 OPPS/ASC final rule with comment period, Medicare makes payments to CAHs in accordance with section 1834(g) of the Act. Accordingly, CAHs are not subject to the supervision requirements for hospital outpatient diagnostic services at this time. The supervision requirements for hospital outpatient diagnostic services were also set forth in Section 20.4, Chapter 6, of the Medicare Benefit Policy Manual.

In the years following establishment of the initial OPPS regulations, we began to receive inquiries from providers about the supervision requirements. Many of these inquiries led us to believe that some hospitals may have misunderstood our statement to the effect that we assume physician supervision requirements are met for services furnished on the hospital premises, and that some hospitals were providing either general supervision or no supervision for therapeutic services furnished incident to physicians' services in the outpatient setting and for which we had established a requirement of direct supervision. Therefore, in the CY 2009 OPPS/ASC proposed rule and final rule with comment period (73 FR 41518 through 41519 and 73 FR 68702 through 68704, respectively), we clarified and restated the various supervision requirements for outpatient hospital therapeutic and diagnostic services. We clarified that outpatient therapeutic services furnished in the hospital and in all PBDs of the hospital, specifically both on-campus and off-campus PBDs, must be provided under the direct supervision of physicians. We also reiterated that all outpatient diagnostic services furnished in PBDs, whether on or off the hospital's main campus, should be supervised according to the levels assigned for the individual tests under the MPFS. We received very few public comments regarding this clarification and restatement during the comment period.

In response to concerns about our policy restatement articulated by stakeholders after publication of the CY 2009 OPPS/ASC final rule with comment period, we further refined our supervision policies in the CY 2010 OPPS/ASC proposed rule and final rule with comment period (74 FR 35365 and 74 FR 60679 through 60680, respectively). We established rules for hospital outpatient diagnostic services furnished in locations other than PBDs (that is, in the hospital and under arrangement in nonhospital facilities). Accordingly, we expanded and refined the regulatory language regarding direct supervision of diagnostic services in those locations to refer to presence of the supervisory practitioner in the hospital or PBD (for services furnished in those locations) or in the office suite (for services furnished under arrangement in nonhospital space). For therapeutic services, we increased hospitals' flexibility regarding the direct supervision requirement by allowing all NPPs whose services are those the practitioner is legally authorized to perform under State law that ''would otherwise be covered if furnished by a physician or as an incident to a physician's service'' (''would be physicians' services'') to supervise hospital outpatient therapeutic services that are within their scope of practice under State law and their hospital-granted or CAH-granted privileges (sections 1861(s)(2)(K) through (N) of the Act; §§ 410.71 through 410.77 of the regulations). However, in implementing the new benefits for pulmonary rehabilitation (PR), cardiac

rehabilitation (CR) and intensive cardiac rehabilitation (ICR) services, we required that direct supervision of those services furnished in the hospital outpatient setting must be provided by a doctor of medicine or a doctor of osteopathy because, as we discussed in the CY 2010 and CY 2011 OPPS/ASC final rules with comment period (74 FR 60573 and 60582 and 75 FR 72009, respectively), the statute specifies that these services are physician-supervised (section 144(a) of the Medicare Improvements for Patients and Providers Act of 2008, Pub. L. 110–275). In addition, in the CY 2011 OPPS/ASC final rule with comment period, we revised our regulations at § 410.27 to remove the physical boundary requirements for direct supervision of hospital outpatient therapeutic services, and instead allow the supervisory practitioner to be ''immediately available,'' meaning physically present, interruptible, and able to furnish assistance and direction throughout the performance of the procedure, but without reference to any particular physical boundary.

In the CY 2010 OPPS/ASC final rule with comment period, we finalized a technical correction to the regulation at § 410.27 to clarify that the direct supervision requirement under that section applies to services furnished in CAHs as well as other types of hospitals. Specifically, we added the phrase ''or CAH'' in the title and throughout the regulation text wherever the text referred only to ''hospital,'' to clarify that the requirements for payment of hospital outpatient therapeutic services in that section apply to CAHs as well as other types of hospitals. As we discussed in the CY 2011 OPPS/ASC final rule with comment period (75 FR 72000), we viewed this as a technical correction because the Act applies the same regulations to hospitals and CAHs when appropriate (CAHs are included if ''the context otherwise requires'' under section 1861(e) of the Act).

In response to our clarification that CAHs are subject to the direct supervision standard for payment of outpatient therapeutic services, CAHs and the hospital community at large suggested that CAHs should be exempt from this requirement because the requirement is at odds with longstanding and prevailing practices of many CAHs. For example, commenters noted that, due to a low volume of services, a practitioner retained on the campus of a small rural hospital or CAH to meet supervision requirements may not have other concurrent responsibilities or patient care, which could lead to inefficiencies. In their correspondence and discussion in public forums, CAHs and small rural hospitals explicitly raised concerns about services that extend after regular operating hours, especially observation services. They asserted that direct supervision is not clinically necessary for some outpatient services that have a significant monitoring component that is typically performed by nursing or other auxiliary staff, including IV hydration, blood transfusions, and chemotherapy. They stated that their facilities have protocols to safely deliver all of these services, relying on nursing or other hospital staff to provide the service and having a physician or NPP available by phone to furnish assistance and direction throughout the duration of the therapeutic service.

We provided guidance regarding the flexibility that we believe exists within our requirement for direct supervision for an emergency physician or NPP, who would be the most likely practitioners staffing a small rural hospital or CAH, to provide the supervision, on the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS/05_OPPSGuidance.asp#TopOfPage.* However, these hospitals continued to express that they have difficulty in meeting the standard. Small rural hospitals and CAHs indicated that, regulations notwithstanding, many of them did not have appropriate staff arrangements to provide the required supervision of some services, particularly services being provided after hours or consisting of a significant monitoring component that last for an extended period of time. In addition, the broader hospital community began requesting that we modify our policy to permit a lower level of supervision for outpatient therapeutic services for all hospitals.

After consideration of these requests, on March 15, 2010, we issued a **Federal Register** notice of nonenforcement of the requirement for direct supervision of outpatient therapeutic services in CAHs (which is available on the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS/Downloads/CMS_1504FC_OPPS_2011_FR_Physician_Supervision_Nonenf_Notice.pdf*). While CAHs remained subject to the direct supervision standard, we instructed our contractors not to evaluate or enforce the standard in CY 2010 until the agency could revisit the supervision policy during the CY 2011 rulemaking cycle.

As indicated above, in the CY 2011 OPPS/ASC final rule with comment period (75 FR 71998 through 72013), we further adjusted the direct supervision standard for hospital outpatient therapeutic services to increase flexibility for hospitals while maintaining an appropriate level of quality and safety and consistent with the Medicare statute. Specifically, for these services we redefined direct supervision to remove all requirements that the supervisory practitioner remain present within a particular physical boundary, although we continued to require immediate availability. We also established a new category of services, ''nonsurgical extended duration therapeutic services'' (extended duration services), which have a substantial monitoring component. We specified that direct supervision is required for these services during an initiation period, but once the supervising physician or NPP has determined that the patient is stable, the service can continue under general supervision.

In addition, in response to concerns expressed by the industry about appropriate levels of supervision for certain outpatient therapeutic services furnished in various settings (for example, chemotherapy administration, and post-operative recovery services), we stated our intent to create through the CY 2012 rulemaking cycle an independent advisory review process for consideration of stakeholder requests that CMS assign supervision levels other than direct supervision for specific outpatient hospital therapeutic services. We stated that the review entity would evaluate services and recommend that CMS assign the same level of supervision (direct supervision), a lower level of supervision (general supervision), or a higher level of supervision (personal supervision) because in the course of evaluating a given service, the review entity may find that personal supervision is the most appropriate level (75 FR 72006). We also indicated that, as an interim measure while we are in the process of establishing an advisory review body, we would extend the nonenforcement policy for direct supervision of outpatient therapeutic services provided in CAHs for a second year through CY 2011 (which is available at the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS/Downloads/CMS_1504FC_OPPS_2011_FR_Physician_Supervision_Nonenf_Notice.pdf*). In addition, we expanded the nonenforcement notice to include small and rural hospitals that have 100 or fewer beds, as defined by Transitional Outpatient Payments (TOPs) criteria, because we believe that

these hospitals experience resource constraints that are similar to CAHs.

We indicated that we would consider the Federal Advisory Panel on Ambulatory Payment Classification Groups (APC Panel) as a potential candidate to serve as the independent review entity to consider requests for alternative service-specific supervision standards, and we requested public comment both on that idea and on other aspects of the review process, such as evaluation criteria and the potential structure of the process. We suggested the APC Panel could serve as the review entity because it is already funded and established by law under the Federal Advisory Committee Act (FACA, Pub. L. 92–463) to make independent recommendations to CMS. The APC Panel membership is geographically diverse, and it includes members with clinical as well as administrative, hospital billing, and coding expertise.

In response to our discussion in the CY 2011 OPPS/ASC final rule with comment period, we received public comments and other considerable input on these topics from the hospital and CAH community and from rural stakeholders. In the CY 2012 OPPS/ASC proposed rule (76 FR 42277 through 42285), we discussed these comments and further developed our proposals for the independent review process in CY 2012, taking into account the comments received in response to the CY 2011 OPPS/ASC final rule with comment period.

With respect to outpatient hospital diagnostic services, following our revisions to the regulation at § 410.28(e) in the CY 2010 OPPS/ASC final rule with comment period described above, we have received very few comments from stakeholders regarding our revised policy. Therefore, we did not propose any changes to those requirements in the CY 2012 proposed rule.

*B. Issues Regarding the Supervision of Hospital Outpatient Therapeutic Services Raised by Hospitals and Other Stakeholders*

1. Independent Review Process

In the CY 2012 OPPS/ASC proposed rule (76 FR 42277 through 42285), we proposed to establish an independent technical review process to consider service-specific requests that CMS assign supervision levels other than direct supervision to hospital outpatient therapeutic services. Our proposals focused on three primary topics: The potential nature of the review entity; the potential nature and structure of the review process; and potential means of evaluating services.

a. Selection of Review Entity

We proposed that the existing APC Panel serve as the independent review entity. However, we proposed to modify the APC Panel's scope and composition in order to create a body that is prepared to address supervision standards and that reflects the full range of parties subject to the standards. Specifically, we proposed to use the discretionary authority in the Panel charter to expand its scope to include the topic of supervision standards. We proposed to add several (2 to 4) representatives of CAHs as Panel members because CAHs are subject to the supervision rules for payment. We proposed that we would continue to exclude these members from deliberations about APC assignments under the OPPS, as these assignments do not affect CAHs. CAHs are not paid under the OPPS, and we do not believe that they are ''appropriate representative providers'' for the Panel's deliberations on APC groups and weights under the authorizing section 1833(t)(9) of the Act.

We proposed to use the APC Panel for many reasons. In addition to being already established and funded, we believed that the APC Panel would be inclusive and well-balanced because it is subject to the FACA rules. We also proposed to use the APC Panel because we believed it will be important to obtain advice that carries the weight of a Federal advisory recommendation, which may have greater legitimacy both with stakeholders and with CMS compared to the opinions of other types of groups.

*Comment:* Most commenters were in favor of the proposal to use the APC Panel, provided that CAHs and small rural PPS hospitals received appropriate representation. Many commenters requested that CMS add 4 representatives of CAHs and an additional 4 representatives of small rural PPS hospitals to the current 15 Panel members, to ensure a strong voice for small and rural hospitals and because both CAH and non-CAH rural hospitals are having difficulty complying with the direct supervision requirement. The commenters also recommended that small rural hospitals paid under the OPPS be permitted to participate in the Panel's deliberations about APC groupings and weights. One commenter requested an equal number of rural and urban provider representatives on the Panel. Another commenter urged CMS to ensure adherence to the FACA rules.

*Response:* We agree with commenters that the APC Panel is an appropriate entity to serve as the review body, provided CAHs and small rural hospitals are given appropriate representation on the Panel. Therefore, we are finalizing the APC Panel as the entity that will advise and make independent recommendations to the agency regarding the appropriate supervision level for individual hospital outpatient therapeutic services. We believe that it will be important to obtain advice that carries the weight of a Federal advisory recommendation. In addition to being already established and funded, the Federal advisory APC Panel will, of necessity, be inclusive and well-balanced because it is subject to the FACA rules. Panel members bring relevant clinical and nonclinical expertise to the discussions. Through amendment of the Panel charter, the Panel will be authorized under section 222 of the Public Health Service Act (42 U.S.C. 217(a)) to advise the Secretary of the Department of Health and Human Services and the CMS Administrator on the appropriate supervision level for individual hospital outpatient therapeutic services. Under this authority, we will also designate representatives of CAHs to serve on the Panel to advise CMS regarding supervision but they will not advise CMS regarding APC groups and weights.

As we discuss below, a recent study indicated significant differences between CAHs and non-CAH small rural hospitals in resources, quality of care, and outcomes (Joynt K, Harris Y, et al. Quality of Care and Patient Outcomes in Critical Access Rural Hospitals. JAMA. 2011;306(1):45–52). However, as we stated in our CY 2011 OPPS/ASC final rule with comment period (75 FR 72007), we believe that CAHs and small rural PPS hospitals may, at times, face similar resource constraints such as workforce shortages, which could lead to difficulty in meeting certain supervision standards. We believe that it would be appropriate for both small rural PPS hospitals and CAHs to have added representation on the Panel in a manner that would be balanced under the FACA rules. Therefore, as part of our final policy we are adding four new seats to the Panel. Two of these seats will be designated for representatives of CAHs and the other two will be designated for representatives of small rural PPS hospitals. We are defining ''small rural PPS hospital'' in the same manner as we defined ''small rural hospital'' for the notice of nonenforcement of direct supervision of therapeutic services in CAHs and small rural hospitals, that is, hospitals with 100 or fewer beds and either geographically located in a rural area or paid under the hospital OPPS with a

rural wage index (75 FR 72007; *https://www.cms.gov/HospitalOutpatientPPS/downloads/CMS_1504FC_OPPS_2011_FR_Physician_Supervision_Nonenf_Notice.pdf*). This is the same definition of small rural hospital that Congress recognizes for TOPs under section 1833(t)(7) of the Act. All PPS hospital representatives on the Panel, including the representatives of small rural PPS hospitals, will continue to advise CMS on the APC groups and weights as well as the appropriate supervision levels for individual hospital outpatient therapeutic services.

*Comment:* Several commenters addressed the types of practitioners that should be appointed to the Panel, and the degree to which CMS and the Panel should rely on clinical and specialty expertise. Two commenters suggested that recommendations and decisions about supervision levels be made only by clinicians, and that nonclinicians not be permitted to participate in the review process. One commenter supported the concept of an independent review process but opposed use of the APC Panel, stating that the Panel's members are selected based on their knowledge of payment and reimbursement systems rather than clinical judgment and expertise. The commenter believed that the Panel's recommendations should be based solely on clinical judgment, and pointed out that several current Panel members do not have clinical expertise. The commenter expressed concern that these individuals' recommendations would be based upon payment implications rather than clinical criteria. One commenter recommended that CMS involve its specialty society in its reviews. Another commenter encouraged CMS to include experts on the Panel that specialize in the particular service that is being evaluated, and to seek out the resources of specialty societies. One commenter noted that in the CY 2011 OPPS/ASC final rule with comment period (75 FR 72011), in making the decision to exclude chemotherapy administration from the list of extended duration services pending an independent assessment, CMS noted a safety standard that was published by the American Society of Clinical Oncology and the Oncology Nursing Society. The commenter requested information as to how CMS might consider such specialty association guidelines in future decision-making.

*Response:* As we stated in the proposed rule (76 FR 42280), we believe that the APC Panel is an appropriate body to review supervision levels because, under the FACA rules, it must have a ''balanced'' composition. The Panel members must reflect expertise in the areas that are important for informed, representative decision-making on supervision which we believe includes both clinical and other types of expertise. In evaluating the supervision levels that are required for payment, we believe that the Panel will need input from individuals with knowledge in hospital billing, coding, and administration, as well as clinical matters. For example, in the past several OPPS rulemaking cycles, commenters have requested that CMS evaluate the surgical recovery period for a change in supervision level from direct to general supervision. Several commenters to the current (CY 2012) proposed rule were seeking additional information on how to request a change in supervision level for a ''service'' like the recovery period that is not defined by a CPT code but rather by phases assigned by a specialty society. As we discuss below, one commenter requested that CMS synchronize the supervision requirement for the recovery period with the phases into which the American Society of Anesthesiology (ASA) divides the recovery period. Individuals with billing and coding expertise may help inform these and similar issues.

In addition, we note that it is possible for both clinicians and nonclinicians to make recommendations that are inappropriately based on payment implications rather than clinical or other criteria that may be set forth. Clinicians must adhere to the supervision rules in order to receive payment for their services, and furnishing supervision uses resources that might otherwise be devoted to increasing payment by furnishing additional services. Thus, we believe there is some potential among clinicians and nonclinicians to give inappropriate weight to payment implications in making their recommendations. Excluding nonclinicians from the Panel would not necessarily prevent these types of considerations from affecting decision-making.

In accordance with the FACA rules, we will maintain balanced membership on the Panel. We encourage specialty associations and other entities with specialized expertise in services that may be under the Panel's consideration to nominate representatives to the Panel. We also encourage these groups to participate in the public Panel meetings, and to submit public presentations that would inform the Panel's deliberations. In setting supervision levels, CMS will continue to consider safety and other guidelines published by specialty associations, and the Panel may consider them as well.

*Comment:* Several commenters requested that Panel members include clinicians furnishing hospital outpatient services, certified registered nurse anesthetists (CRNAs), and other NPPs who furnish high volume services, especially registered nurses (RNs), physical therapists, and respiratory therapists. One commenter indicated that the Panel should seek input from providers who compete with physicians in the marketplace, and not restrict opportunities to inform the Panel to medical doctors only. Several commenters expressed concern about CMS' policy to not allow certain NPPs to supervise hospital outpatient therapeutic services, especially CRNAs and pharmacists. One commenter indicated that it will ask the Panel to consider allowing pharmacists to supervise hospital outpatient therapeutic services as appropriate, for example, medication management and, in States where it is authorized, collaborative drug therapy management. The commenter requested that, in the course of the review process, the Panel consider pharmacists to be NPPs who may furnish supervision. Another commenter believed that supervision of RNs by physicians will not necessarily prevent medical errors, and also stated that physicians have been implicated in the increase in wrong-patient and wrong-site surgical errors.

*Response:* We note again that, in accordance with the FACA rules, CMS will follow a balance plan for the Panel membership. For purposes of supervision deliberations, we believe that the clinicians on the Panel should largely represent the types of practitioners who furnish hospital outpatient services and those with supervisory responsibilities because they are most directly impacted by the rules. As we discussed in the proposed rule (76 FR 42282), the agency does not allow RNs to supervise hospital outpatient therapeutic services because they are not authorized under the Act to independently furnish ''would be physicians' services.'' For the same reason, CMS does not permit pharmacists to supervise these services. CRNAs have a narrow scope of practice, and we typically would seek practitioners that furnish a broader array of hospital outpatient services to serve as Panel members. However, these practitioners are eligible to serve on the Panel, depending on their areas of expertise. We note that, currently, one Panel member is an RN and Panel members in the past have been pharmacists. While we did not receive

any comments directly on the number of nurse practitioners, physician assistants or other supervisory NPPs that should serve on the Panel, we would encourage nominations of these types of practitioners, especially for the CAH seats because these types of practitioners might be used more frequently to furnish supervision in CAHs.

Regarding the Panel's supervision deliberations, we note that, as we proposed, the Panel's scope of review will be limited to addressing the level of supervision that should be furnished for a given hospital outpatient therapeutic service, and will not include the type of practitioner that should be permitted to furnish the supervision. The Panel will recommend the appropriate supervision level for a particular service, given the type of practitioner that is permitted to furnish and supervise the service under the current laws and regulations.

b. Review Process

We proposed to issue agency decisions based on APC Panel recommendations through a subregulatory process. We proposed a process similar to the one currently used to set supervision levels for diagnostic services under the MPFS, which are also applicable to those services when furnished in the hospital outpatient setting. We proposed that CMS' decisions, which would be based upon the Panel's recommendations, would be posted on the OPPS Web site for public review and comment, and would be effective either in July or January following the most recent APC Panel meeting, or only in January of the upcoming payment year. In setting the supervision levels for diagnostic services under the MPFS, there is no provision for public comment. However, given the strong stakeholder interest in the supervision requirements and the extent of prior dialogue with the various stakeholders, we proposed to provide a period of notice and comment on our posted decisions prior to finalizing them.

We reasoned that the flexibility of a subregulatory process in comparison to annual notice and comment rulemaking would allow stakeholders to submit, and for the APC Panel to consider, requests for evaluations of services on a more frequent basis (at least twice a year at APC Panel meetings) rather than only annually, which most commenters to the CY 2011 OPPS/ASC final rule with comment period had requested (75 FR 42280). It also would give CMS the ability to respond more rapidly to any issues that may arise in access to care or patterns of care. Subjecting CMS' decisions to notice-and-comment rulemaking would provide a more structured, formal review of decisions, but changes could only be made once a year due to the annual OPPS/ASC rulemaking cycle.

*Comment:* Most commenters opposed the agency issuing its decisions through a subregulatory process. The commenters requested that, to ensure the greatest transparency and allow sufficient time and opportunity for public comment, CMS subject its decisions to notice and comment through rulemaking. One commenter requested a 45- to 60-day comment period. A few commenters suggested that, to facilitate evaluations more than once a year, CMS could address supervision standards using both the OPPS rule and another non-OPPS rule. In response to the concerns expressed by the agency in the proposed rule that the review process should be nimble and flexible enough to address access or other urgent needs, several commenters noted that the agency possesses other means of assuring access, for example notices of nonenforcement, additional rulemaking, and other administrative powers. Several commenters requested that CMS not use any information that is presented by stakeholders in the course of the review process for enforcement purposes.

*Response:* As we indicated in the proposed rule, we believe that employing a subregulatory process to establish our final decisions will best serve the interests of beneficiaries and also meet the needs of other stakeholders. While rulemaking would arguably provide some additional procedural protections to stakeholders in terms of a more formal opportunity for notice and comment, due to practical considerations involved in rulemaking, it is very likely that we would only be able to accomplish changes in supervision levels once a year. We agree with commenters that the agency has several administrative means to respond to urgent problems associated with supervision levels, for example exercising our enforcement discretion. However, we believe it is preferable to have a more nimble means of addressing access or pattern-of-care concerns within a short timeframe. In addition, as we noted in the proposed rule, CMS has historically used subregulatory processes rather than rulemaking to issue changes in certain administrative specifications at the level of individual CPT codes due to a need for agility in making such changes. For example, CMS has used a subregulatory process to set supervision levels for individual diagnostic services under the MPFS, which are also applicable to those services when furnished in the hospital outpatient setting.

Given the strong stakeholder interest in our consideration of changes in supervision levels for hospital outpatient therapeutic services, we continue to believe that we should provide an opportunity for public comment on our decisions (which will be based upon the Panel's recommendations) prior to finalizing them. Therefore, we are finalizing our proposal to issue our decisions based on Panel recommendations at the subregulatory level. We will post our preliminary decisions on the OPPS Web site for public review and comment. Given that the issues will be service-specific and therefore narrow, we will allow for a 30-day public comment period. We will give careful consideration to the comments that we receive, and we anticipate finalizing decisions within 60 days of the end of the comment period. Our final decisions will be effective either in July or January following the most recent APC Panel meeting.

c. Evaluation Criteria

To begin evaluating services in CY 2012, we proposed to use the same APC Panel process that is currently used to solicit requests from stakeholders for APC and status indicator changes for services or categories of services to construct the agenda to solicit potential services for consideration of a change in supervision level. In addition, we proposed that CMS would have the ability to request that the Panel review the supervision level for services as necessary. If we receive an unmanageable number of requests, we proposed to prioritize requests by service volume, total expenditures and/or frequency of requests. We also proposed to give priority to services requested for review through public comment on the CY 2010 and CY 2011 OPPS/ASC rules. We proposed to require that requests include a justification for the change in supervision level that is sought, supported to the extent possible with clinical evidence. We also proposed that we would consider these justifications in deciding which services to forward to the APC Panel for evaluation.

We proposed to charge the Panel with recommending a supervision level (general, direct, or personal) to ensure an appropriate level of quality and safety for delivery of a given service, as defined by a CPT code. We proposed that the Panel should take into consideration the context in which the

Case No. 1:12-cv-03029-WJM-MLC Document 68-10 filed 09/14/15 USDC Colorado pg 8 of 13



service is delivered, that is, the clinical, payment, and quality context of a patient encounter. In recommending a supervision level to CMS, we proposed that the Panel assess whether there is a significant likelihood that the supervisory practitioner would need to reassess the patient and modify treatment during or immediately following the therapeutic intervention, or provide guidance or advice to the individual who provides the service. In answering that question, the Panel would consider the following:

• Complexity of the service;
• Acuity of the patients receiving the service;
• Probability of unexpected or adverse patient event; and
• Expectation of rapid clinical changes during the therapeutic service or procedure.

We noted that these criteria include, but extend well beyond, the likelihood of the need to manage medical emergencies during or after the provision of the service. As we have stated in previous rules (74 FR 60580, 75 FR 72007, and 75 FR 72010 through 72012), the supervisory responsibility is more than the mere capacity to respond to an emergency. It also includes being available to reassess the patient and potentially modify treatment as needed on a nonemergency basis. The supervisory practitioner must have, within his or her State scope of practice and hospital-granted privileges, the knowledge, skills, ability, and privileges to perform the service or procedure. Specially trained ancillary staff and technicians are the primary operators of some specialized diagnostic or therapeutic equipment, and while in such cases CMS does not expect the supervisory practitioner to operate this equipment instead of a technician, CMS does expect the practitioner that supervises provision of the service to be knowledgeable about the test and clinically appropriate to furnish the test. The supervisory responsibility includes the ability to furnish assistance and direction throughout the performance of a procedure and, as appropriate to the supervisory practitioner and the patient, to change a procedure or the course of care for a particular patient. CMS would not expect that the supervisory practitioner would make all decisions unilaterally without consulting the patient's treating physician or NPP. The supervisory practitioner should have the training and knowledge to clinically redirect the service or provide additional orders.

We proposed that, in the event there has been a previous consideration and decision on the supervision standard for a service, we would consider the request and, as warranted, forward the request to the APC Panel for its review. We proposed to require the requestor to submit new evidence to support a change in policy, for example, evidence of a change in clinical practice patterns due to new techniques or new technology. We proposed that if sufficient new information was provided with the request, CMS would send the request to the APC Panel, and the Panel would reconsider the service and make another recommendation to CMS, which could be the same or a different level of supervision than the current level for the service.

Finally, we stated that we anticipated extending through CY 2012 the notice of nonenforcement of the requirement for direct supervision in CAHs and small rural hospitals as defined by the notice (available on the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS/01_overview.asp*). This extension would allow these facilities time to meet the appropriate supervision standard and allow us to complete supervision policy decisions on many key services during 2012.

*Comment:* Commenters largely supported the proposed four clinical criteria. One commenter requested that CMS expand these criteria to allow exceptions based on changes in technology.

*Response:* We believe that a change in technology or practice patterns that affects a procedure's level of safety is an appropriate additional criterion. Therefore, as part of our final policy, we are adding a fifth criterion, ''Recent changes in technology or practice patterns that affect a procedure's safety.'' This criterion is similar to the criteria CMS will use to determine whether there is a need for reconsideration of a particular service as discussed below.

*Comment:* Several commenters continued to request that CMS establish a default supervision standard of general supervision for all hospital outpatient therapeutic services, and assign direct supervision only as recommended by the review entity. The commenters reiterated public comments on prior rules, stating that the review entity and CMS should not consider services for assignment of personal supervision because many services that might qualify for personal supervision are already personally performed by a physician or NPP. They again noted that certain services are not furnished personally by these practitioners and instead are furnished personally by auxiliary personnel such as technicians or RNs. However, the commenters maintained that hospitals currently furnish adequate supervision of those services by higher level practitioners. Further, they requested that any evaluation for personal supervision be based on clinical evidence and evidence of a current deficiency in the quality of care. In contrast, one commenter suggested that, to shorten the list of services that need consideration, CMS assign personal supervision to all services that require the practitioner to personally furnish the service and limit the Panel's scope to consideration of any remaining services. One commenter requested that the Panel be permitted to advise the agency on ''alternative'' forms of supervision such as satellite offices and telemedicine.

*Response:* In the CY 2012 OPPS/ASC proposed rule and the CY 2011 OPPS/ASC final rule with comment period (76 FR 42281 and 75 FR 72006, respectively), we expressed our belief that direct supervision is the most appropriate level of supervision for most hospital outpatient therapeutic services due to the ''incident to'' nature of most hospital outpatient therapeutic services. We discussed how our requirements for physician (or NPP) orders and direct physician involvement in patient care stem from our interpretation of the nature of incident to physicians' services under the law. We reviewed our regulations and other guidance over the years which reflect these beliefs and interpretations (75 FR 71999 and 72005).

We stated in the proposed rule and continue to believe that, while the statute does not explicitly mandate direct supervision, direct supervision is the most appropriate level of supervision for most hospital outpatient services that are authorized for payment as ''incident to'' physicians' services. We believe that the ''incident to'' nature of hospital outpatient therapeutic services under the law permits us to recognize specific circumstances in which general supervision is appropriate, as we have for extended duration services, and that CMS has authority to accept a recommendation by the review entity of general supervision for a given service. However, we continue to believe that direct supervision is the most appropriate level of supervision for the majority of hospital outpatient therapeutic services and, as such, it is the default supervision standard.

In the course of evaluating a stakeholder request for review of the supervision level required for a given service, the APC Panel may recommend that personal supervision is the most

appropriate level of supervision for that service. It may also be appropriate for the Panel to recommend personal supervision for certain services to ensure that auxiliary personnel or personnel in training (such as medical students) are adequately supervised. As we indicated in last year's final rule with comment period, our supervision policy is designed to preserve both the quality and safety of the hospital outpatient services that are paid for by Medicare. Accordingly, we believe that the APC Panel should have authority to recommend personal supervision for a service if, in the course of its evaluation, it believes that personal supervision is most appropriate and safe. Therefore, we are finalizing our proposal that the Panel shall recommend general, direct or personal supervision for a service.

For situations where the supervisory practitioner is not available in person, but only by ''telemedicine'' or in a location such as a ''satellite office,'' the Panel shall apply the definitions of direct, general and personal supervision in accordance with the regulations. For example, if a supervisory practitioner is only available via telemedicine, meaning telephone or Internet, and is not able to be immediately physically present, the supervisory practitioner would be furnishing general supervision. If a supervisory practitioner is present in a satellite office such as an off-campus PBD and is able to be immediately physically present but is not present in the room where the service is being furnished, he or she would be furnishing direct supervision. As we previously noted in the CY 2011 OPPS/ASC final rule with comment period (75 FR 72008), with regard to recognizing availability by phone or modes other than in-person, we believe that the requirement for physical presence distinguishes direct supervision from general supervision because the regulations define general supervision as ''the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure'' (§ 410.32(b)(3)(i)). We believe that it would be out of the APC Panel's scope of activities for it to deliberate on the underlying definitions of direct, general or personal supervision, or for it to consider recommending yet another type of supervision based on a supervisory practitioner's location. Any changes to the definitions would be proposed and finalized through the notice and comment rulemaking process.

The APC Panel must base its recommendations on the available clinical evidence. It shall also take into consideration any known impacts of the level of supervision on the quality of care. As we have previously noted (75 FR 72005), while literature or clinical opinions may exist on the risk of adverse outcomes and susceptibility to medical error associated with the provision of specific hospital outpatient procedures when a physician is not present, we do not know of any analyses that have directly examined levels of supervision and patient outcomes in the hospital outpatient setting. This may be an area for future study.

*Comment:* With respect to a starting agenda, several commenters continued to request that the Panel begin by evaluating all therapeutic services with a work RVU < 1.0 under the MPFS, which includes many extended duration services. Many commenters requested that the Panel review surgical procedures and the surgical recovery period, chemotherapy administration, and blood transfusions. A few commenters also requested that the Panel evaluate therapies that accompany chemotherapy administration such as hydration and anti-emetics. One commenter asked how stakeholders could request evaluation of services that are not defined by CPT codes, notably the surgical recovery period. The commenter requested that CMS allow general supervision after ''phase 1'' of the recovery period as designated by the American Anesthesiology Association (ASA), and asked that CMS synchronize its supervision requirements for the recovery period with the phases established by the ASA. Another commenter requested that CMS place on the agenda services that are high volume or of high priority for CAHs and small rural hospitals.

*Response:* In considering our final policy for the appropriate unit of service evaluation, we noted that the HCPCS code is a broader unit of service than the CPT code, and concluded that it would be more appropriate for use to identify services that do not have an assigned CPT code. Therefore, we will consider requests, and forward them to the APC Panel for evaluation as described above, for service(s) that are identified by either a HCPCS code or a CPT code.

With regard to setting an agenda, we noted in the proposed rule that we may receive more requests for evaluation than can be addressed at a given Panel meeting. We did not receive any public comments regarding criteria for prioritizing requests and services to be reviewed at each meeting. Therefore, we will prioritize requests based on service volume, total expenditures for the service, and frequency of requests. As proposed, we will also give priority to services that the public has requested for evaluation in the CY 2010 through CY 2012 OPPS/ASC rules. In addition, we will give priority to services that have not previously been evaluated by the Panel. As we proposed, requests must include justification for the change in supervision level that is sought, supported to the extent possible with clinical evidence. In prioritizing services for review, we also will take these justifications into consideration.

We did not receive any public comments on our proposal that the agency would retain the independent discretion to request that the Panel evaluate supervision levels for one or more services. Therefore, we are finalizing that provision.

*Comment:* Several commenters requested that CMS explicitly include the place of service as an evaluation criterion, especially when the service is furnished in a CAH or rural facility. However, several other commenters recommended that supervision requirements should be applied based on service type and safety requirements, irrespective of location.

*Response:* We continue to believe that the overall patient experience for a given encounter may differ significantly by facility depending on physician practice patterns, the facility's patient and payer mix, Medicare payment structure for the facility, applicable regulations, quality of care, available resources and practitioners, and many other factors. In recent years, researchers have noted an undesirable amount of variation in the care that is furnished to Medicare patients in both metropolitan and nonmetropolitan areas of the country (MedPAC Report to the Congress: Regional Variation in Medicare Service Use, January 2011, available at: *http://www.medpac.gov/documents/Jan11_RegionalVariation_report.pdf*). In addition, according to a recent study, the quality of care that is furnished in CAHs appears to be worse in comparison to small rural hospitals (Joynt K, Harris Y, *et al.*: Quality of Care and Patient Outcomes in Critical Access Rural Hospitals, JAMA. 2011; 306(1):45–52). Joynt *et al.* found significant differences between CAHs and non-CAH small rural hospitals in resources, quality of care, and outcomes. In public comments to date, there has not been consensus on whether or not CMS should set supervision levels for individual services that are unique to CAHs or rural facilities. Many commenters opposed the agency's requirement of direct supervision of

outpatient chemotherapy administration in rural areas, citing access concerns and potentially lengthy patient commutes for care. However, as we discussed above, published safety standards appear to recommend direct supervision of chemotherapy administration.

We continue to believe that in making its recommendations, the Panel should consider the context in which care is furnished and that CMS should seek balanced input from various groups on these issues, and this belief is reflected in our proposed charge to the Panel. To emphasize this point, in our final policy, we are incorporating the clinical setting as a specific evaluation criterion, thereby instructing the Panel to consider the clinical context in which the service is delivered when making recommendations on supervision levels.

*Comment:* One commenter recommended that, to ensure consistency among settings, the Panel should be allowed to set supervision requirements no higher than the supervision requirements for a given service under the MPFS. Several commenters recommended that CMS require the same supervision levels in the hospital outpatient setting and ASCs, or among the hospital outpatient setting, ASCs, and physician offices.

*Response:* We disagree with this commenter. We do not believe that supervision requirements should necessarily be the same in the hospital outpatient setting and the physician office setting for therapeutic services. Various factors contribute to the appropriate level of supervision that is needed in different settings, for example, differences in patient populations. Patients receiving treatment in a hospital are generally sicker that patients treated in physician offices. Therefore, in some cases the appropriate level of supervision would be higher in the hospital than in a physician office setting.

*Comment:* One commenter suggested that CMS allow reconsideration requests. One commenter requested that CMS expand its proposed criteria to include unique circumstances generally, rather than limiting the criteria for conducting another evaluation to changes in technology or practice patterns.

*Response:* As we indicated in the proposed rule, conducting evaluations of services that the Panel has previously considered without new evidence supporting a change in the supervision level could become burdensome and consume a disproportionate amount of the Agency's and the Panel's resources. As our final policy, we are providing that the Panel may consider requests for re-review of a service that has already been evaluated. The public may request reconsideration of a service if new information indicates recent changes in technology or practice patterns that affect a procedure's safety. Such a request must be substantiated with new information such as a change in clinical practice patterns due to new techniques or new technology. If CMS believes that another evaluation is warranted, the Panel shall review the service again using the same process that it uses to evaluate new requests, and shall make another recommendation to CMS that could be the same or a different level of supervision.

*Comment:* Most commenters supported extending through CY 2012 the notice of nonenforcement of the requirement for direct supervision of hospital outpatient therapeutic services in CAHs and small rural hospitals with 100 or fewer beds.

*Response:* Because we will not complete supervision policy decisions on many key services until sometime in CY 2012, we are extending the notice of nonenforcement for CAHs and small rural hospitals with 100 or fewer beds as defined in the notice another year, through CY 2012. The purpose of the nonenforcement extension is to allow these facilities time to meet the appropriate supervision standard, and to give us an opportunity to use the new APC Panel review process to consider certain changes in required supervision levels. We will post a notice of the extension on the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS/01_overview.asp.*

We noted in the proposed rule that we have not yet defined the terms ''personal supervision'' or ''general supervision'' for the hospital outpatient setting, except, as explained above, for general supervision in relation to extended duration services in § 410.27(a)(1)(v)(A). Because we proposed to allow the independent review entity to recommend that CMS assign either personal or general supervision to hospital outpatient therapeutic services, we proposed to define these terms in the regulations. We proposed to use the definitions established for purposes of the MPFS as specified at § 410.32(b)(3). Specifically, we proposed that ''personal supervision'' would have the same meaning as the definition specified at § 410.32(b)(3)(iii) and ''general supervision'' would have the same meaning as the definition specified in § 410.32(b)(3)(i), which is the definition that we established for the general supervision portion of an extended duration service.

We did not receive any public comments on this proposal. Therefore, in § 410.27(a)(1)(iv)(B), we are finalizing our proposed definitions of ''personal supervision'' for hospital outpatient therapeutic services to mean the definition specified at § 410.32(b)(3)(iii), and ''general supervision'' for hospital outpatient therapeutic services to mean the definition specified in § 410.32(b)(3)(i). In addition, we are revising the language in § 410.27(a)(1)(iv)(C) to clarify that the NPPs that are authorized in this section to furnish direct supervision may also furnish general or personal supervision (as required by CMS). Specifically, we are removing the word ''directly'' and inserting ''the required'' to provide that ''nonphysician practitioners may provide the required supervision of services that they may personally furnish in accordance with State law and all additional requirements, including those specified in §§ 410.71, 410.73, 410.74, 410.75, 410.76, and 410.77.''

*Comment:* One commenter raised an issue that CMS has discussed in recent OPPS rules, namely that under the CAH CoP at § 485.618 governing standards for emergency personnel, in most areas, a physician or NPP with training or experience in emergency care must be on call and immediately available only by telephone or radio contact, and available on site within 30 minutes. The commenter suggested that hospitals are only required to adhere to the CoPs in order to submit a claim; therefore, they are not required to follow the more strict direct supervision rule for payment of services. The commenter also recommended that CMS require the same level of supervision for payment as the level that is required under the CAH CoP.

*Response:* We refer readers to the CY 2011 OPPS/ASC final rule with comment period (75 FR 72000 through 72010) for a more detailed discussion of this issue. We continue to believe that the supervision rules are a condition of payment for CAH services, irrespective of their CoP staffing standard. In the CY 2011 final rule, we also discussed our position that the CoP is a general condition of the CAH's participation in the Medicare program, while the supervision standards apply to particular individual services furnished by the CAH. The CoP and the supervision requirements serve different purposes and are not inconsistent with each other. As such, there is no need to reconcile them.

2. Conditions of Payment and Hospital Outpatient Therapeutic Services Described by Different Benefit Categories

Another issue that we addressed in the CY 2012 OPPS/ASC proposed rule (76 FR 42277 through 42285) is the applicability of the payment conditions for hospital outpatient therapeutic services in § 410.27 to services described in paragraphs or subparagraphs of section 1861(s) of the Act other than section 1861(s)(2)(B) of the Act, which describes outpatient hospital services incident to physicians' services. Over the years, and particularly in recent months, we have received inquiries asking that we explain or clarify our application of the payment conditions under our regulation at § 410.27, which explicitly applies to ''hospital services and supplies furnished incident to a physician service to outpatients,'' to outpatient therapeutic services other than those specified under section 1861(s)(2)(B) of the Act. For example, we have received inquiries as to whether it is permissible for hospitals to furnish radiation therapy (described under section 1861(s)(4) of the Act) or ambulatory surgical center services (described under section 1832(a)(2)(F)(i) of the Act) under arrangement in locations that are not provider-based. Some inquirers have suggested that the language in § 410.27 is not applicable to services described by benefit categories in section 1861(s) of the Act other than section 1861(s)(2)(B) of the Act because § 410.27 only refers to ''incident to'' services.

In the proposed rule, we acknowledged that the language of § 410.27 could be read as limited to services and supplies described under section 1861(s)(2)(B) of the Act, hospital services incident to physicians' services furnished to outpatients. However, we noted that CMS has not interpreted the regulation so narrowly. For instance, in the CY 2010 OPPS/ASC final rule with comment period, we noted that, long before the OPPS, we required that hospital services and supplies furnished to outpatients incident to a physician's service must be furnished ''on a physician's order by hospital personnel and under a physician's supervision'' (section 3112.4 of the Medicare Intermediary Manual). We also clearly treated all nondiagnostic services that are furnished to hospital outpatients as ''incident to services'' (sections 3112 and 3112.4 of the Medicare Intermediary Manual; Section 20.5, Chapter 6, of the Medicare Benefit Policy Manual (Pub. 100–02)). While we have not delineated this position as clearly in the regulations, and while the regulation text of § 410.27 only explicitly refers to ''incident to'' services, we noted that our policy is longstanding and, in fact, predates the OPPS. In longstanding manual guidance, we have expressed our view that direct supervision is required for hospital outpatient therapeutic services, and suggested that this requirement stems from the ''incident to'' nature of those services. In the CY 2010 OPPS/ASC final rule with comment period, we stated, ''Therapeutic services and supplies which hospitals provide on an outpatient basis are those services and supplies (including the use of hospital facilities) which are incident to the services of physicians and practitioners in the treatment of patients'' (74 FR 60584 through 60585). We indicated that outpatient therapeutic services and supplies must be furnished under the order of a physician or other appropriate NPP, and by hospital personnel under the direct supervision of a physician or appropriate NPP.

Thus, we have long maintained that all hospital outpatient therapeutic services are, according to our policy, furnished ''incident to'' a physician's service even when described by benefit categories other than the specific ''incident to'' provision in section 1861(s)(2)(B) of the Act. Because hospital outpatient therapeutic services are furnished ''incident to'' a physician's professional service, we believe the conditions for payment, including the direct supervision standard, should apply to all hospital outpatient therapeutic services. As discussed above, because the statute includes specific requirements for physician supervision of PR, CR, and ICR, we believe that those statutory specifications take precedence over the agency's general requirements.

In the CY 2012 OPPS/ASC proposed rule, we proposed to amend our regulations to clarify our policy as follows. Therapeutic services and supplies described by benefit categories other than the hospital outpatient ''incident to'' services under section 1861(s)(2)(B) of the Act are subject to the conditions of payment in § 410.27 when they are furnished to hospital outpatients and paid under the OPPS or to CAHs under section 1834(g) of the Act.

We stated our belief that this clarification could most readily be accomplished by more specifically defining the services and supplies described in the regulation text to which the requirements at § 410.27 apply. Accordingly, we proposed to revise the description of the services and supplies addressed in § 410.27(a) by adding the term ''therapeutic'' so that paragraph (a) would read, ''Medicare Part B pays for therapeutic hospital or CAH services and supplies furnished incident to a physician's or nonphysician practitioner's service'' to outpatients. We proposed to define these services, similar to the way they are currently defined in Section 20.5, Chapter 6, of the Medicare Benefit Policy Manual, to mean ''all services and supplies furnished to hospital outpatients that are not diagnostic services and that aid the physician or practitioner in the treatment of the patient.'' We also proposed to add the term ''therapeutic'' to the title of § 410.27 so that it would read, ''Therapeutic outpatient hospital or CAH services and supplies incident to a physician's or nonphysician practitioner's service: Conditions.''

*Comment:* Several commenters requested that CMS clarify that certain services which are not paid under the OPPS are excluded from the requirements of § 410.27 and thus from our proposed clarification, especially physical therapy (PT), speech language pathology (SLP) and occupational therapy (OT); diabetes self management training (DSMT); medical nutrition therapy; end-stage renal disease (ESRD) services; and services paid under the MPFS or the Clinical Laboratory Fee Schedule (CLFS).

*Response:* The requirements of § 410.27 must be met for payment of the facility component of hospital outpatient therapeutic services. They do not apply to the professional component of the services or to services that are paid under other fee schedules such as the CLFS.

*Comment:* One commenter noted that because CAHs are paid based on reasonable cost and not under the OPPS or the MPFS for outpatient PT/SLP/OT services, under the proposed clarification, the supervision and other requirements of § 410.27 would apply to CAHs but not to hospitals that are paid for those services under the MPFS. They expressed concern that CAHs will be disproportionately affected by CMS' clarification regarding the applicability of the requirements of § 410.27 to outpatient therapeutic services furnished in CAHs.

*Response:* CAHs have long been paid at reasonable cost rather than under the MPFS for PT/SLP/OT services, and, as discussed above, CAHs and other hospitals have long been subject to the requirements of § 410.27. We are not imposing any new requirements on CAHs through this clarification. We are finalizing our proposed amendment to

our regulations to clarify our policy as follows. Hospital outpatient therapeutic services and supplies, including those services described by benefit categories other than the hospital outpatient ''incident to'' category under section 1861(s)(2)(B) of the Act, are subject to the conditions of payment in § 410.27 when they are paid under the OPPS or paid to CAHs under section 1834(g) of the Act.

We proposed to define more specifically in the regulation text the services and supplies to which the requirements at § 410.27 apply. Accordingly, we are finalizing our proposed revision of the description of the services and supplies addressed in § 410.27(a) by adding the term ''therapeutic'' so that paragraph (a) reads, ''Medicare Part B pays for therapeutic hospital or CAH services and supplies furnished incident to a physician's or nonphysician practitioner's service'' to outpatients. We are defining these services, similar to the way they are defined in Section 20.5, Chapter 6, of the Medicare Benefit Policy Manual, to mean ''all services and supplies furnished to hospital outpatients that are not diagnostic services and that aid the physician or practitioner in the treatment of the patient.'' Also, as we proposed, we are adding the term ''therapeutic'' to the title of § 410.27 so that it reads, ''Therapeutic outpatient hospital or CAH services and supplies incident to a physician's or nonphysician practitioner's service: Conditions.''

3. Technical Corrections to the Supervision Standards for Hospital Outpatient Therapeutic Services Furnished in Hospitals or CAHs

In the proposed rule, we noted that CAHs are not specifically named in the definition of nonsurgical extended duration therapeutic services at § 410.27(a)(1)(v). We proposed to make a technical correction to insert the words ''or CAH'' after ''hospital'' in this paragraph. This is the same technical correction that we made throughout § 410.27 in the CY 2010 OPPS/ASC final rule with comment period, discussed above. We did not receive any public comments on this proposal. Therefore, we are inserting the words ''or CAH'' after ''hospital'' in revised § 410.27(a)(1)(iv)(E) to clarify that CAHs are subject to all of the requirements of § 410.27 in the same manner as other types of hospitals.

As we discussed in the proposed rule (76 FR 42284 through 42285), we recently noted that the text of § 410.27(b) and (c) includes cross-references to section § 410.168 of the regulations, which is obsolete. We believe that § 410.27(b) refers to § 410.168 in error and should instead reference § 410.29 (Limitations on drugs and biologicals). We proposed to correct § 410.27(b) so that it cross-references § 410.29. It would then read, ''Drugs and biological are also subject to the limitations specified in § 410.29.'' In addition, we proposed to update § 410.27(c) to cross-reference the sections of the regulation that have replaced § 410.168, that is, Part 424, Subparts G and H. For this update, we proposed to revise paragraph (c) to read, ''Rules on emergency services furnished to outpatients by nonparticipating hospitals are specified in subpart G of Part 424 of this chapter'' and to add a new paragraph (d) to read, ''Rules on emergency services furnished to outpatients in a foreign country are specified in subpart H of Part 424 of this chapter''. Accordingly, we proposed to redesignate the existing paragraphs (d) through (f) of § 410.27 as paragraphs (e) through (g), respectively.

We did not receive any public comments on this proposal. Therefore, we are finalizing our proposal to correct § 410.27(b) so that it cross-references § 410.29 rather than § 410.168 and now reads, ''Drugs and biological are also subject to the limitations specified in § 410.29.'' In addition, we are updating § 410.27(c) to cross-reference the sections of the regulation that have replaced § 410.168, that is, Part 424, Subparts G and H. For this update, as we proposed, we are revising paragraph (c) to read, ''Rules on emergency services furnished to outpatients by nonparticipating hospitals are specified in subpart G of Part 424 of this chapter'' and are adding a new paragraph (d) to read, ''Rules on emergency services furnished to outpatients in a foreign country are specified in subpart H of Part 424 of this chapter''. Accordingly, as we proposed, we are redesignating the existing paragraphs (d) through (f) of § 410.27 as paragraphs (e) through (g), respectively.

*C. Summary of CY 2012 Final Policies on Supervision Standards for Outpatient Therapeutic Services in Hospitals and CAHs*

As we have indicated earlier in this section, after consideration of the public comments we received, we are finalizing the following policies.

1. Independent Review Process

We are designating the APC Panel as the body that will review and advise the agency regarding the appropriate level of supervision for individual hospital outpatient therapeutic services. We will amend the Panel Charter to add the appropriate statutory authority and to allow representatives of CAHs to serve on the Panel for purposes of the supervision deliberations. We will add 4 voting seats to the Panel (for a current total of 19), and will designate two of these seats for representatives of CAHs and two for representatives of small rural PPS hospitals. ''Small rural PPS hospital'' means the definition of small rural hospital that is used by the Congress for purposes of TOPs, and that is used in CMS' notice of nonenforcement of direct supervision of outpatient therapeutic services in CAHs and small rural hospitals. With respect to supervision policy, the scope of the Panel's activity is limited to recommending to CMS the appropriate level of supervision (general, direct, or personal) for individual hospital outpatient therapeutic services.

We will issue agency decisions based on Panel recommendations through a subregulatory process. We will post our preliminary decisions on the OPPS Web site for a 30-day period of public review and comment. After consideration of any public comments that we receive, we will issue our final decisions which will be effective either in July or January following the most recent APC Panel meeting.

The Panel will be charged with recommending to CMS a supervision level (general, direct, or personal) that will ensure an appropriate level of quality and safety for delivery of a given service, as defined by a HCPCS or CPT code. In recommending a supervision level to CMS, the Panel will assess whether there is a significant likelihood that the supervisory practitioner would need to reassess the patient and modify treatment during or immediately following the therapeutic intervention, or provide guidance or advice to the individual who provides the service. In answering that question, the Panel will consider the following factors but may also consider others as appropriate:

- Complexity of the service.
- Acuity of the patients receiving the service.
- Probability of unexpected or adverse patient event.
- Expectation of rapid clinical changes during the therapeutic service or procedure.
- Recent changes in technology or practice patterns that affect a procedure's safety.
- The clinical context in which the service is delivered.

As we have discussed above, these criteria include, but extend well beyond, the likelihood of the need to manage medical emergencies during or

after the provision of the service. The supervisory responsibility is more than the mere capacity to respond to an emergency, and includes being available to reassess the patient and potentially modify treatment as needed on a nonemergency basis. We will prioritize stakeholder requests for APC Panel review of specific services based upon service volume, total expenditures for the service and frequency of requests. We also will give priority to services that the public has requested we evaluate in the CY 2010 through CY 2012 OPPS/ASC rules, and to services that have not been previously evaluated by the Panel. All requests must include justification for the change in supervision level that is sought, supported to the extent possible with clinical evidence. In prioritizing services for the agenda, we also will take these justifications into consideration.

We may ask the Panel to consider requests for review of a service that has already been evaluated. If there has been a previous consideration and decision on the supervision standard for a service, the requestor should submit new evidence to support a change in policy. For example, the public could request another review of a previously reviewed service if new information indicates recent changes in technology or practice patterns that affect a procedure's safety. Such a request must be substantiated with new information such as a change in clinical practice patterns due to new techniques or new technology. If CMS believes that another evaluation is warranted, the agency will ask the APC Panel to review the service again using the same process that it uses to evaluate new requests. The Panel will then make another recommendation to CMS that could be the same or a different level of supervision than the previous recommendation.

Because the agency will not complete APC Panel review or consideration of changes to supervision levels for many key services until sometime in CY 2012, we are extending the notice of nonenforcement of the requirement for direct supervision of outpatient therapeutic services in CAHs and small rural hospitals as defined by the notice (available on the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS/01_overview.asp*) another year, through CY 2012. The purpose of this nonenforcement extension is to allow these facilities time to meet the appropriate supervision standard, and to allow us time to complete our review of supervision levels for at least some services.

Because the APC Panel may recommend that CMS assign either personal or general supervision to services, we are defining these terms for hospital outpatient therapeutic services in the regulations at new § 410.27(a)(1)(iv)(B). We are revising the language in § 410.27(a)(1)(iv)(C) to provide that the NPPs that are authorized in this section to furnish direct supervision may also furnish general or personal supervision as required by CMS.

2. Conditions of Payment and Hospital Outpatient Therapeutic Services Described by Different Benefit Categories

We are finalizing our clarification that therapeutic services and supplies described by benefit categories other than the hospital outpatient ''incident to'' services under section 1861(s)(2)(B) of the Act are subject to the conditions of payment in § 410.27 when they are furnished to hospital outpatients and paid under the OPPS or paid to CAHs under section 1834(g) of the Act. To that end, we are redefining the services described in § 410.27 to clarify the nature and scope of the included services.

3. Technical Corrections

We are correcting § 410.27(b) so that it cross-references § 410.29 rather than § 410.168 and now reads, ''Drugs and biological are also subject to the limitations specified in § 410.29.'' In addition, we are updating § 410.27(c) to cross-reference the sections of the regulation that have replaced § 410.168, that is, Part 424, Subparts G and H. For this update, we are revising paragraph (c) to read, ''Rules on emergency services furnished to outpatients by nonparticipating hospitals are specified in subpart G of Part 424 of this chapter'' and are adding a new paragraph (d) to read, ''Rules on emergency services furnished to outpatients in a foreign country are specified in subpart H of Part 424 of this chapter''. Accordingly, we are redesignating the existing paragraphs (d) through (f) of § 410.27 as paragraphs (e) through (g), respectively.

We are inserting the words ''or CAH'' after ''hospital'' in the revised § 410.27(a)(1)(iv)(E) to clarify that CAHs are subject to the requirements of § 410.27 in the same manner as other types of hospitals.

## XI. Final CY 2012 OPPS Payment Status and Comment Indicators

### *A. Final CY 2012 OPPS Payment Status Indicator Definitions*

Payment status indicators (SIs) that we assign to HCPCS codes and APCs play an important role in determining payment for services under the OPPS. They indicate whether a service represented by a HCPCS code is payable under the OPPS or another payment system and also whether particular OPPS policies apply to the code. The CY 2012 status indicator assignments for APCs and HCPCS codes are shown in Addendum A and Addendum B, respectively, on the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS*. We note that, in the past, a majority of the Addenda referred to throughout the preamble of our OPPS/ASC proposed and final rules appeared in the printed version of the **Federal Register** as part of the annual rulemakings. However, beginning with the CY 2012 proposed rule, the Addenda will no longer appear in the printed version of the OPPS/ASC rules that are found in the **Federal Register**. Instead, these Addenda will be published and available only via the Internet on the CMS Web site at: *http://www.cms.gov/HospitalOutpatientPPS*.

As we proposed in the CY 2012 OPPS/ASC proposed rule (76 FR 42285 through 42287), for CY 2012, we are not making any changes to the definitions of status indicators that were listed in Addendum D1 of the CY 2011 OPPS/ASC final rule with comment period. The final CY 2012 status indicators and their definitions are listed in the tables under sections XI.A.1., 2., 3., and 4. of this final rule with comment period.

1. Payment Status Indicators To Designate Services That Are Paid Under the OPPS

BILLING CODE 4120–01–P