EXHIBIT 23

# Transcript of the Testimony of:
# **Elizabeth Ceilley, M.D.**

**Date:** July 15, 2015

United States of America, et al. ex rel. Martha Baker v. Banner Health, et al.

No. 1:12-CV-03029-WJM-CBS

Mile High Court Reporting & Video, Inc.

14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

Mile High Court Reporting and Video, Inc.
Phone: 303-202-0210
Fax: 303-205-0034

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-03029-WJM-CBS

---

DEPOSITION OF ELIZABETH CEILLEY, M.D.
July 15, 2015

---

UNITED STATES OF AMERICA, et al.
ex rel. MARTHA L. BAKER,

Plaintiff/Relator,

vs.

BANNER HEALTH, et al.,

Defendants.

---

PURSUANT TO NOTICE, the deposition of ELIZABETH CEILLEY, M.D., called for examination by the Plaintiff/Relator herein, was taken at McKee Medical Center, 2000 Boise Avenue, Loveland, Colorado 80538, commencing at 9:00 a.m., on Wednesday, July 15, 2015, before Aimee S. Reisinger, a Registered Professional Reporter and Notary Public in and for the State of Colorado.

APPEARANCES:

JAMIE M. BENNETT, ESQ.
The J. Bennett Law Firm
8 Creek Side Court
Middle River, Maryland 21220
443-844-4629
jbennettlawfirm@gmail.com

For the Plaintiff-Relator

MEGHAN E. POUND, ESQ.
Caplan and Earnest
1800 Broadway
Suite 200
Boulder, Colorado 80302
303-443-8010
mpound@celaw.com

For the Defendants

INDEX


| EXAMINATION: | PAGE |
|---|---|
| BY MS. BENNETT | 4 |
| BY MS. POUND | 69 |

| EXHIBITS: | MARKED |
|---|---|


(No exhibits were marked or referenced.)

P R O C E E D I N G S
ELIZABETH CEILLEY, M.D.,
having been sworn by the Reporter, testified as follows:
EXAMINATION
BY MS. BENNETT:
**Q. Could you please state your full name for the record.**
A. Elizabeth Ann Ceilley.
**Q. And you're a doctor of medicine?**
A. Uh-huh.
**Q. When did you receive your degree?**
A. My medical degree? Okay. I have to think about that. 1992.
**Q. And what university did you attend?**
A. University of Iowa. It might have been '93. I'd have to --
**Q. That's all right. It's not critical. But if you do remember a different year and you want to correct --**
A. I know I finished my residency in 2002.
**Q. Okay. Have you been deposed before?**
A. Yes.
**Q. When were you deposed?**
A. I think it was 2009.



**Q. In what context or in what case?**
A. It was a case of three widows versus Honeywell, Pratt & Whitney and Augusta.
**Q. And what was your role?**
A. I was one of the widows. I am one of the widows.
**Q. Oh, I'm sorry. So you were deposed as a party?**
A. Uh-huh.
**Q. So you know the ground rules for a deposition?**
A. I don't remember in detail, but I assume it's just that you only answer questions and...
**Q. Well, let me just go over a few ground rules with you because we may have different things in mind.**
**If I ask you a question that you don't understand, please tell me and I'll try to reword it. This isn't a game where I'm trying to trick you into giving answers. I want to make sure you understand the question, and you have a perfect right to say you don't understand the question and you need to have it rephrased. That's more or less what I want to talk to you about.**
A. Uh-huh.



**Q. If you need to take a break for any reason, you should let me know. I'm not good about taking breaks, so I'll just tell you that if you want to take a break to take a drink or go to the bathroom, just say so and we'll break.**
A. Okay.
**Q. If you need to talk to your attorney for any reason, you should feel free to do that as well.**
A. Okay.
**Q. So those are the rules I was talking about.**
A. Okay.
**Q. Just so you feel comfortable. Sometimes people feel trapped in the deponent's chair.**
A. And we were hoping to take a break at 10:00. I don't know if that was mentioned. That was a scheduling issue. I have two patients that they moved around and -- it should be pretty quick.
**Q. No problem. I brought work with me. Whatever you need to do.**
A. Okay.
**Q. So you completed your medical degree in 1992. And then you say you finished your --**
A. No, I'm sorry, that was when I finished college.



**Q. Oh, college.**
A. So I finished college in '93.
**Q. '93. Okay.**
A. So technically December of '92, class of '93. And then it would have been 1997 that I finished medical school and got my M.D. And then it was five years later in 2002 that I completed my radiation oncology training.
**Q. So just to make sure I am clear, in 1993 you graduated from University of Iowa?**
A. No. That was Drake University undergrad.
**Q. Okay.**
A. And then it was medical school at the University of Iowa.
**Q. And when you were at Drake University, did you graduate with a BS or BA?**
A. BA.
**Q. And what was your major?**
A. Biology.
**Q. You graduated from the University of Iowa in 1997. And then where did you do your residency?**
A. Massachusetts General Hospital in Boston.
**Q. And can you describe for me the training that you received in your residency or during your medical school tenure that's specific to radiation**

**oncology?**
A. Well, very little in medical school. I did a rotation in my fourth year in radiation oncology. And then I did -- of those five years of residency, the first year was actually a transitional year, which had no radiation oncology, and then the next four years were all radiation oncology, both clinical and research.
**Q. When did you decide to go into radiation oncology as your subspecialty?**
A. When I was in medical school.
**Q. And is radiation oncology one of the specialties that has a board certification?**
A. Uh-huh.
**Q. Do you have a board certification?**
A. Yes.
**Q. When did you receive that?**
A. I received the first one in 2002, and then I recertified in 2012.
**Q. And what is the board certification -- what does that require you to do?**
A. Well, for the first one you have to complete a residency, you have to take -- you have to be a licensed physician, you have to take all those certifications, and then you have to take a written and



an oral test for board certification for your original board certification.
For the recertification you have to have so many CMEs and self-assessment modules every so many years, a research project every so many years, and another test, which is a computer test.
**Q. So in terms of your residency, the four years you've spent you said were all radiation oncology. What was the -- what was the division of your training between actual patient care and in classroom?**
A. Almost the entire time involved patient care, but sometimes there would be like one or two hours a day in the classroom, like an hour-long meeting or a class or something. But throughout the entire time there was patient interaction except for maybe the last few months when I was doing research, and there wasn't as much patient care then.
**Q. And since you've received your -- is there a degree that you get after your residency that is specific to radiation oncology, or you just become --**
A. You're just -- radiation oncologist.
**Q. Okay. Since you left your residency, what do you do yearly to keep yourself apprised of new developments in the field?**



A. I do a lot of CMEs. Well, even -- I go to tumor board almost every week, and that's a CME. I do online self-assessment modules through ASTRO, our national website. And I go to a meeting -- probably two out of three years I go to an ASTRO meeting, not every year; either an updated technology meeting or a refresher course.
**Q. And outside of ASTRO are there other voluntary organizations that you belong to that are specific to radiation oncology?**
A. No.
**Q. So it's just ASTRO?**
A. Uh-huh.
THE REPORTER: Can you try to answer "yes" or "no" instead of "uh-huh" or "huh-uh."
THE DEPONENT: Sorry.
THE REPORTER: It just makes a better record.
**Q. (By Ms. Bennett) What do the tumor boards involve?**
A. Every week we have a prospective tumor board here at McKee that we go over all cases, new cases of cancer and also follow-up cases where things are happening.
**Q. And who attends the tumor boards?**



A. Radiation oncology, medical oncology, surgery, pathology, radiology. All the ancillary services like social work and dietary, physical therapy. Those are like -- that's the minimum.
**Q. And is the tumor board attended just by physicians, or are there other -- are there other persons who attend?**
A. Like I was saying, social workers, dieticians. Regular -- the public is not allowed, but staff that is involved with cancer care can come.
**Q. So the advanced practice nurses would come?**
A. Uh-huh.
**Q. Do you have physician's assistants here at McKee?**
A. We do not have physician assistants. Our NP usually does go as well.
**Q. The nurse practitioner --**
A. Uh-huh.
**Q. -- you mean by "NP"?**
A. Uh-huh. Yes.
MS. POUND: Also, just let her finish her question and then answer, because you guys are starting to talk over each other.
MS. BENNETT: And that's a big problem for

the reporter and for us when we try to read the -- when we try to read the transcript.

**Q. (By Ms. Bennett) So when you -- when you finished your residency, where were you employed?**

A. Are you asking what my next job was --

**Q. What your next -- uh-huh.**

A. -- after residency? I worked at the Durango Cancer Center.

**Q. And where is that? In Durango?**

A. Uh-huh.

**Q. Colorado?**

A. Durango, Colorado.

**Q. Colorado. Okay. Are you from Colorado?**

A. No.

**Q. How did you end up here?**

A. My first husband was from here.

**Q. Okay. And after -- how long were you at Durango?**

A. A total of four years.

**Q. What was your position there?**

A. Radiation oncologist.

**Q. Did you have any management or supervisory responsibilities?**

A. I was the liaison to the American Cancer Society. I was editor of the cancer newsletter.



**Q. And when you left the Durango Cancer Center, where were you employed?**

A. Mountain Radiation Oncology Consultants.

**Q. Where is that?**

A. Denver. I think technically Wheat Ridge.

**Q. And that was Mountain Radiation Oncology Consultants?**

A. Uh-huh. Yes.

**Q. And how long were you there?**

A. Three-and-a-half years, I believe.

**Q. And you were a physician there, not a supervisor or administrator?**

A. Correct.

**Q. And then when you left that employment, where did you go?**

A. I became employed by Banner Medical Group.

**Q. When was that? Do you remember the date?**

A. September or October of 2010.

**Q. And what was the reason for your leaving your previous employer and going to Banner?**

A. The head radiation oncologist there and I had different practice philosophies.

**Q. So when you joined Banner, where were you -- what was the physical location of your employment intended to be?**



A. My understanding was that I would be based here at McKee, but that I would also cover and have privileges in Sterling and in Greeley.

**Q. At Sterling, and I didn't catch the rest of it?**

A. Greeley.

**Q. Greeley.**

A. NCMC.

**Q. Okay. And are you the only radiation oncologist that Banner employs who's primarily hosted here at McKee?**

A. Yes.

**Q. What other radiation oncologists are employed by Banner in this area?**

A. Dr. Brian Fuller.

**Q. Anyone else?**

A. And Dr. Jeff Albert.

**Q. Jeff Albert?**

A. Yes.

**Q. Has Dr. Fuller been employed by Banner Medical Group over the same period of time that you have?**

A. Approximately.

**Q. And what about Dr. Albert, when did he join Banner?**



A. I believe he started in August of 2013.

**Q. At McKee -- let me just strike that and ask you: Does Dr. Fuller see patients or provide radiation therapy treatments at McKee?**

A. Yes.

**Q. He does. Where is he primarily located, however, in terms of his practice?**

A. NCMC.

**Q. And what about Dr. Albert, does he see patients at McKee?**

A. Yes.

**Q. Where is he primarily stationed?**

A. He is equally stationed between those two facilities.

**Q. So between McKee and NCMC?**

A. Yes.

**Q. You described before that you keep abreast of developments in the field of radiation oncology by taking tutorials online and several other activities. I don't mean to limit it in any way.**

A. Yes.

**Q. Is radiation oncology a field, in your opinion, where there have been a lot of technical or medical developments over the last four or five years?**

A. Yes.

**Q. And can you explain to me what some of those developments are?**
A. You're asking specifically for technical developments?
**Q. No. Just it is a changing field; do you agree with that?**
A. Yes.
**Q. And what kinds of changes have been most dramatic, let's say, over the last five years?**
A. I think that would take more than the amount of time we have allotted to discuss.
**Q. Uh-huh. Can you give me a couple of examples, if we can't discuss all of them? Maybe the primary examples of what's changed in radiation oncology in the last five years?**
A. Stereotactic radiosurgery has become more commonly used, more standard of care. IMRT is expected in many more types of cases than previously. Treatment planning has become more complicated in that we have the ability to do 4D CTs and we are expected to track motion and account for that with our treatment planning, whereas that was not necessarily routine five years ago.
Those are probably the main things I can think of off the top of my head.



**Q. Do you agree that radiation oncology is not only a rapidly changing field, but also one that is very complex?**
A. Yes.
**Q. Here at McKee can you give me a description of the staffing that you use when you're seeing patients and delivering treatments to patients?**
A. We have the front desk. We have business experts at the front desk that check in patients and also help with insurance authorization and do scheduling, et cetera. We have multiple RNs, one that's -- usually just one on staff at a time -- or on duty at a time that work with the patients, and an NP. We haven't always had an NP. We have Dr. Albert and myself, the physicians. We have the radiation therapists who are in charge of delivering the radiation treatment and they also do the CT simulations. We have the dosimetrists who help with treatment planning and the physicists who do the quality assurance and the physics checks, as well as assist with treatment planning. The administrators. We have a radiation oncology supervisor.
Does that answer your question?
**Q. Yes. And how many NPs do you have?**
A. One at McKee.



**Q. You said you didn't always have an NP; did I understand that correctly?**
A. That's correct.
**Q. When -- is it a she?**
A. Uh-huh.
**Q. When did she join?**
A. Fall of last year.
**Q. Fall of 2014?**
A. Yes.
**Q. And what's her name?**
A. Angie Burns.
**Q. Angie?**
A. Yes.
**Q. What about at Sterling? What's the staffing situation there?**
A. We have a nurse practitioner, we have therapists, we have a front desk, we have an RN. It's very similar.
**Q. And the NP, has there been an NP at Sterling the entire time you've worked for Banner?**
A. No.
**Q. When did the NP become employed at Sterling?**
A. I don't know the exact dates.
**Q. What's her name or his name?**



A. The current NP is Mitzi Garrison.
**Q. And who was there before her?**
A. Helene Christner.
**Q. And anyone before her?**
A. No.
**Q. What about at NCMC, what's the staffing? And let's focus on the RNs or the NPs.**
A. It's very similar. There are RNs and there's an NP. I believe they have more RNs because they're busier.
**Q. And who is the NP there?**
A. Sheryl Ehrman.
**Q. Sheryl?**
A. Yes.
**Q. Is that E-h-r-m-a-n?**
A. Uh-huh. Yes.
**Q. And how long has she been employed there, to your knowledge?**
A. I'm not sure.
**Q. Do you do CyberKnife treatments?**
A. Not currently.
**Q. Have you done those in the past?**
A. Yes.
**Q. And while you were employed by Banner?**
A. Yes.

**Q. Where did you do those?**
A. Colorado CyberKnife in Lafayette.
**Q. How long is that from here?**
A. Half-hour or 40 minutes.
**Q. What period of time did you do CyberKnife treatments at that facility?**
A. I think just 2011.
**Q. Was that on a regular basis?**
A. No.
**Q. Do you know if any of the other Banner radiation oncologists provide CyberKnife treatments at this facility or any facility?**
A. Yes.
**Q. Who does?**
MS. POUND: Objection to form. You can answer the question.
A. Dr. Fuller.
**Q. (By Ms. Bennett) And do you know what period he's done CyberKnife treatments?**
A. Not exactly.
**Q. How many patients do you treat on a daily basis here at McKee?**
A. You're asking just the patients on the LINAC?
**Q. Yes, for starters.**



A. It can vary from 8 to 28, approximately.
**Q. And how many patients do you see for either preliminary evaluations or follow-up on a daily basis?**
A. It's easier to look at it over a week.
**Q. Okay. You can look at it over a week. That's fine with me, Dr. Ceilley.**
A. I would say 2 to 7 new patients a week; 4 to 15 follow-ups a week.
**Q. What are your hours?**
A. They vary greatly. Sometimes I am here at 7 a.m., almost always by 8; sometimes I'm done around 4, but often I'm here past 6.
**Q. What is the training of the nurse practitioner that you work with here? What training does she have in radiation oncology?**
A. So when she started we had her shadow us for several weeks. I gave her several books and papers and articles and so forth to read about radiation oncology, and she also spent time with our other nurse practitioner.
**Q. The other nurse practitioner being the one at NCMC?**
A. Yes.
**Q. So this training you described that you**



**provided to the nurse practitioner was in what time period?**
A. Are we asking about Angie now, or which nurse practitioner are we asking -- I don't understand the question.
**Q. Okay. That's a perfect example. So let's start by talking about the first -- the first nurse practitioner that you worked with here. I can't recall the names off the top of my head, but -- in fact, I didn't write down her name. But the first nurse practitioner, when did you provide this training to her?**
A. When she started.
**Q. And that was around the same time that you started?**
A. Shortly after I started.
**Q. So let me ask you a question. Before you came to -- before you were employed by Banner, who was providing radiation oncology treatment services here at McKee Cancer Center?**
MS. POUND: Objection; foundation.
**Q. (By Ms. Bennett) If you know. You can answer --**
THE DEPONENT: What happens when --
MS. BENNETT: You can go ahead and answer.



MS. POUND: You can answer, yeah.
MS. BENNETT: Unless she tells you not to, unless she tells you not to, in which case you need to follow her instructions.
THE DEPONENT: Okay.
A. There was a private practice group that provided services here.
**Q. (By Ms. Bennett) Okay.**
A. They were not employed by Banner. I don't recall their names. The name of the group, I don't recall.
**Q. Okay. Was McKee owned by Banner at that time, do you know?**
A. I believe so.
**Q. So you provided this training to the first nurse practitioner. Can you describe for me in a little more detail what articles did you give her, what books did you give her?**
A. I gave her the radiation oncology textbook written by Perez. I gave her a radiation oncology handbook. I gave her the Mass General resident's guide to treating acute side effects and kind of quick tips kind of thing. I showed her the important websites. I reviewed the website and described how we used the NCCN guidelines. She shadowed me with new patients, with

on-treats, with follow-ups. And then after we saw the patient I would review what was going on with that patient and why I made the recommendations I did.
She also spent time with the radiation therapists, watching what they do and seeing how they set up patients and got an overview of that aspect.
**Q. And then when she left and she was replaced by the new nurse practitioner, did you provide that second nurse practitioner with the same training?**
A. Yes.
**Q. Is that Angie Burns?**
A. Yes.
**Q. That's the only name I wrote down.**
A. Yes.
**Q. And what was the name of the first person, if you don't mind?**
A. Pamola Gale.
**Q. Pamola Gale. And is Pamola Gale still employed by Banner?**
A. Yes.
**Q. She changed locations to another facility; is that correct?**
A. Yes.
**Q. Is she at NCMC now?**
A. I don't know.



**Q. What is your assessment of Ms. Burns' level of understanding of the training that you gave her?**
A. Good.
MS. POUND: I'm going to object to the -- I just want to make a record about some of these questions are outside the agreed-upon time scope of the lawsuit, 2010 to November 2012, right? So October 2012 through November 2012. And so I'm not going to object to the -- I just want to have a continuing objection to questions outside the time frame in the sense that they're not relevant to the lawsuit.
MS. BENNETT: That's fine.
**Q. (By Ms. Bennett) What was your assessment of the level of understanding of Ms. Gale's --**
A. Outstanding.
**Q. In your training of either Ms. Burns or Ms. Gale, did you teach them how to perform radiation therapy?**
A. No.
**Q. Do you have any reason to believe that they know how to perform radiation therapy treatments?**
MS. POUND: Object to the form of the question.
A. I don't turn the linear accelerator on, so



I would not assume that a nurse practitioner would turn the linear accelerator on.
**Q. (By Ms. Bennett) Aside from that, in terms of coming up with treatment plans, in terms of making decisions about how radiation treatment should be delivered to a patient, do the nurse practitioners do that or is that something that you do?**
MS. POUND: Object to the form of the question.
A. It's something I do.
**Q. (By Ms. Bennett) And what is their role in caring for patients during the delivery of radiation treatment therapies, the nurse practitioner's role?**
A. When you say "delivery of radiation," are you talking about when the patient is laying on the table being irradiated, or are you talking about when -- the two- to eight-week course that they're coming in here for treatment?
**Q. I'm talking about the entire course of treatment.**
A. So the nurse practitioner is available for emergencies, for issues -- for medication issues, for managing side effects of radiation treatment, and also other issues surrounding the cancer diagnosis.
**Q. But the nurse practitioner doesn't decide**



**what radiation course of treatment should be provided to patients, do they?**
A. No.
**Q. And when the patient is on the table under the LINAC, what is the nurse practitioner's role at that time?**
A. To be available if there is an emergency. If the patient has a seizure or is in pain, if there's an emergency and the physician is not available, then the NP is available.
**Q. And what about if some change needs to be made in the course of treatment, in the delivery of treatment itself, does the nurse practitioner make those additions or do you?**
A. What kind of change?
**Q. A change in the beam, for example. Would that ever happen?**
A. Not on a daily basis. That's an overall planning decision. That wouldn't take place when a patient is actively being treated.
**Q. Are there any circumstances when the patient is being actively treated that the radiation oncologist would have to make a decision about making a change in any aspect of the treatment?**
MS. POUND: Object to the form of the

question.
A. Yes. If the patient is having a seizure or falling off the table, yes, absolutely.
**Q. (By Ms. Bennett) And then what would the plan of action be from the radiation oncologist?**
A. It would be to give that patient the adequate medication to control their pain, to control their seizure, to control their anxiety so they can tolerate treatment.
**Q. And is that something that you would do and not delegate to a nurse practitioner?**
A. A nurse practitioner can do that just as well as I can.
**Q. But in terms of the actual physical delivery of radiation, is there any aspect of that that a nurse practitioner could change or make a decision about while the patient is being treated?**
A. No. And neither could I.
**Q. And why is that?**
A. Because it's a huge process to plan the radiation before that beam is turned on. You can't just make a decision to change it on the fly.
**Q. Uh-huh. So if something needed to be changed, let's just say hypothetically, you would have to stop the treatment and redo the treatment plan; is**



**that true?**
A. Yes.
**Q. It wouldn't just happen that you would make a change in the, say -- excuse me if I'm not using the right words -- but the direction of the beam --**
A. That is correct.
**Q. -- for example, while the patient is on the table?**
A. I would never do that as a radiation oncologist.
**Q. You would stop the treatment and redo the treatment plan; are we agreed on that?**
A. Yes.
**Q. So let's step back for a moment. I want to talk a little bit about the types of radiation treatment that you generally provide.**
**You described your patient load. About what percentage of those patients are getting, let's say, IMRT?**
A. Approximately a third.
**Q. And what other types of radiation therapy are the other patients getting? As a general matter. I'm not trying to pin you down to any specifics, I'm just trying to get a sense of what you do on a day-to-day basis.**



A. Well, when you use the word "radiation," I think what you mean is what kind of treatment plan.
**Q. Right.**
A. Most are 3D.
**Q. And so of the 100 percent, if a third are IMRT, are the rest -- the vast majority of the rest are 3D?**
A. Correct.
**Q. And can you describe to me the steps that go into planning IMRT therapy, a course of treatment, as a general matter?**
A. The clinical decision that IMRT would be best, the actual planning process initially is the same as 3D where we contour all of the target structures and all of the normal structures, delineate the areas of concern for different volumes, GTV, CTV, PTV. We -- the physician directs the dosimetrist as far as the dosage that we want to deliver, over how much time, and how we need to spare the normal tissues.
The decision to do 3D versus IMRT is somewhat clinically driven based on studies and knowledge of, you know, what we're going to run into in that planning process, but sometimes it's also realized in that process that we're not going to be able to spare normal tissues unless we do IMRT. Does that make



sense?
**Q. Yes, it does. And in terms of the -- you mentioned adjusting the dose. Is that something that's determined at the beginning of the course of treatment or is that something that varies during the course of treatment?**
A. It's initially planned at the beginning of treatment. There is the possibility it could change, but 90 percent of the time it's set at the beginning of treatment, and that is what we deliver.
**Q. Uh-huh. And in terms of the differences between IMRT and 3D, what are the main differences?**
A. IMRT is -- involves more complex planning with the computer, it involves more beam angles, it involves modulation of the individual beams and is more intensive for our physicist to check it before the patient starts.
**Q. Do you use IGRT in either the IMRT process or the 3D process?**
A. Yes.
**Q. And what is IGRT?**
A. Image guided radiation therapy.
**Q. Is that done by you? The planning for that, is that done by you?**
A. We don't plan image guidance.

**Q. Okay. Why don't you describe for me what it is and tell me who is responsible for doing that.**
A. Image guided radiation therapy refers to when we image the patient on the table prior to their treatment delivery to be sure everything is correct anatomically and we're targeting correctly. That is technically performed by the radiation therapist but supervised by the physician.
**Q. And is that a diagnostic or a therapeutic?**
A. I don't know. Both.
**Q. Do the nurse practitioners have any role in IGRT?**
A. No.
**Q. Are the nurse practitioners credentialed by the hospital, to your knowledge?**
A. Yes.
**Q. Do you know the scope of their credentials?**
A. Yes.
**Q. What is that?**
A. They can oversee radiation therapy, they can assist with the side effects of management of radiation therapy and cancer.
**Q. And are these credentials a matter of the medical staff bylaws?**



A. I don't know.
**Q. And what are your credentials?**
A. Radiation oncologist.
**Q. Are the credentials set forth in writing?**
A. Yes. I have a whole two-page list of privileges.
**Q. Do you know the differences between your credentials and the nurse practitioners?**
A. Yes.
**Q. What are the differences?**
A. Mine has specific things about delivering stereotactic radiosurgery, brachytherapy, things like that. Technical things.
**Q. So let's talk a little bit about your schedule in terms of your presence at the various locations that we described earlier. How many days are you at McKee a week or a month, whatever you're more comfortable with? It really doesn't matter to me how you describe it.**
MS. POUND: Do you mean now or during the time of the lawsuit?
**Q. (By Ms. Bennett) Let's start with when you first were employed by Banner in the fall of 2010.**
A. Four to five.
**Q. And did that change in 2011 in any**



**significant way?**
A. I don't remember.
**Q. And how many days a week are you at McKee now?**
A. Four to five.
**Q. What about Sterling? How many days a week, if any, were you at Sterling when you first were employed by Banner in the fall of 2010?**
A. One day every other week.
**Q. Would you spend the entire day there?**
A. Yes.
**Q. How far is Sterling from here?**
A. Driving, two hours.
**Q. What day of the week did you spend if you -- did you have a fixed day?**
A. It did vary somewhat, but it was typically a Tuesday.
**Q. And why would it vary, if it varied?**
A. If there was a holiday or some, you know, coverage issue with the other physicians.
**Q. Is there a record in the hospital's documents that show where you are at any given time?**
A. I don't know.
**Q. And what about NCMC, did you spend any time there on a regular basis?**



A. Not a regular basis.
**Q. How often would you go there, say, on a weekly basis?**
A. Less than once a week.
**Q. Would you go there for a full day?**
A. No.
**Q. Why would you go there? What would be the reason for your going there?**
A. If one of my patients needed brachytherapy, I would care for my patient there.
**Q. Is that because there's not a facility here for brachytherapy?**
A. There is no brachytherapy at McKee.
**Q. Are there any other circumstances that would send you to NCMC as opposed to seeing your patients here?**
A. I was over at NCMC for meetings, mainly after-hours, but not otherwise that I can recall.
**Q. I'm talking about patient care. Was there any other patient care that would send you to NCMC?**
A. No.
**Q. And so how -- would it be fair to say that you were at NCMC an afternoon a week? An hour a week? How many patients did you see there a week for brachytherapy?**

A. Less than one a week.
**Q. And how long did that take, that process, to -- to oversee a patient or see a patient who was having brachytherapy?**
A. A couple hours, at most.
**Q. Are the facilities that we've talked about -- NCMC, Sterling, and McKee -- the only Banner facilities in this area of Colorado?**
A. There's a new facility in Fort Collins as well.
**Q. And what is the name of that?**
A. Banner Fort Collins.
**Q. When did that open?**
A. Recently.
**Q. So it wasn't open in 2010 or 2011, it's fair to say, when you -- during the time period we're primarily interested in in this lawsuit?**
A. No.
**Q. Do you have any patients that you see there?**
A. No.
**Q. In your role as radiation oncologist for Banner, do you have any decision-making authority with respect to developing general compliance rules or regulations for Banner?**



A. I don't understand the question.
**Q. Do you have input into general compliance procedures that Banner requires all of its staff to follow?**
A. No.
**Q. Who is responsible for addressing compliance issues here at McKee?**
A. I'm not sure.
**Q. What about more generally within Banner -- NCMC, McKee or Sterling -- who would you go to if you had a compliance question yourself?**
A. If I had a compliance question, I would probably first contact our billing person.
**Q. And who is that?**
A. Currently? Susan Johnson.
**Q. And who was the billing person when you were first employed at Banner, if you can remember?**
A. I don't remember her name.
**Q. Do you know what Banner's compliance policy is with regard to supervision of radiation oncology treatment services?**
A. Yes.
MS. POUND: Object to the form of the question.
**Q. (By Ms. Bennett) What is that policy?**



A. So the things that do require direct supervision like CT scans and IGRT, the physician must be on-site. However, administration of radiation is within the scope of practice for the nurse practitioner to supervise that.
**Q. And what is that based on, that compliance policy, do you know?**
A. The CMS guideline that includes the wording of "nonphysician provider."
**Q. We've discussed that nurse practitioners can't perform radiation oncology treatments. Do you agree with that?**
A. Yes. And neither can I.
**Q. But your position is that nurse practitioners can supervise the performance of radiation oncology treatment services. Is that your opinion?**
A. Yeah.
**Q. And you say you've read the CMS guideline. Which guideline are you referring to?**
A. I don't remember.
**Q. When did you read it?**
A. I don't remember.
**Q. So you're not familiar with a Banner compliance policy that requires a radiation oncologist to supervise radiation oncology treatment?**
A. Well, it depends on your --
MS. POUND: Object to the form of the question.
A. -- depends on your definition of "supervise."
**Q. (By Ms. Bennett) What's your definition of "supervise"?**
A. I believe if I'm not physically present, I have oversight as to what's going on with my patients who are being treated. But as far as being available for an emergency while the patient is on the table, I do believe an NP can adequately perform that service.
**Q. And that's based on your review of the CMS guideline?**
A. Yes, and my personal clinical opinion.
**Q. Are you familiar with any radiation oncology treatment centers that Banner has in Colorado other than the ones we've discussed?**
A. No.
**Q. These are the only facilities in Colorado, the ones we've discussed today?**
A. That are Banner?
**Q. That are Banner.**
A. Yes.

**Q. Just bear with me for a minute. I need to go back to my list.**
**Were you -- have you been consulted at any point during the last few years about the issue of who can supervise radiation oncology treatments? Have you been consulted by anyone within Banner about that decision?**
A. I don't remember.
**Q. Do you know whether the policy that you've just expressed about nurse practitioners being able to supervise radiation oncology treatment is expressed in writing in any Banner publication that you've reviewed?**
A. I don't know. No, I don't.
**Q. Do you know whether Banner has written compliance policies and procedures?**
A. I believe so.
**Q. Have you reviewed those?**
A. No.
**Q. Do you have any legal training?**
A. No.
**Q. You don't recall reviewing the Banner compliance policy manual or any such document during the course of your employment here?**
A. I may have. I don't remember.
**Q. And as a member of ASTRO, have you ever**



**received and reviewed publications about ASTRO's policy with respect to physician supervision of radiation oncology treatments?**
A. Not recently, no.
**Q. Do you know if ASTRO has published any guidance on that?**
A. No.
**Q. And other than the CMS regulation which you've referenced, what else have you reviewed to determine that a nurse practitioner can supervise the delivery of radiation oncology therapy to a patient?**
A. Nothing else that I've read. I know of other colleagues who also use nurse practitioners in the same capacity.
**Q. And where is that?**
A. Wyoming.
**Q. Any other location?**
A. There are, but I don't remember off the top of my head.
**Q. Are there any colleagues that you know of in Colorado who use nurse practitioners to supervise delivery of radiation oncology treatment?**
A. No.
**Q. Are you familiar with the Colorado Advanced Nurse Practice Act?**



A. No.
**Q. Have you ever reviewed that to determine whether supervising radiation oncology therapy treatment is within the scope of a nurse practitioner's --**
A. I have not read the policy.
**Q. You've not read the Colorado Nurse Practices Act?**
A. No.
**Q. So you don't know whether supervision of radiation oncology treatment is within the scope of practice for a nurse practitioner under that Act?**
A. I'm doubting the policy lists every single thing a nurse practitioner can do.
**Q. What's your doubt based on?**
A. That would be an extremely long list.
**Q. But you haven't reviewed the Act, so you don't know for sure? You're speculating?**
A. Right.
**Q. In terms of the training that the nurse practitioners undergo, we talked a little bit about the training that you gave them when you first employed them. What ongoing training does Banner have for its nurse practitioners?**
MS. POUND: Object to the form of the



question.
A. They participate in all of the quality assurance meetings that I do. They go to tumor board. They do ongoing education online through ASTRO and through OCN.
**Q. Is there anything else that's provided by Banner for the nurse practitioners in terms of training that is specifically substantively addressed to radiation oncology treatment?**
A. Not that I'm thinking of off the top of my head.
**Q. And in the other places that you worked before you came to Banner, did you use nurse practitioners to supervise radiation treatment?**
A. No.
**Q. Did you have nurse practitioners who worked at those other radiation therapy centers?**
A. No.
**Q. You didn't employ nurse practitioners at all?**
A. No.
**Q. Was there any particular reason for that?**
A. No.
**Q. In terms of your employment by Banner, what interactions do you have with radiation**

**oncologists that work for Banner in other states?**
A. I have a monthly phone meeting with Dr. Callister, who is the head of radiation oncology at MD Anderson in Arizona. I call them as needed regarding specific clinical cases, clinical things.
**Q. Could you spell Dr. Callister's name for the reporter?**
A. C-a-l-l-i-s-t-e-r.
**Q. Is there anyone else within Banner Health System that you deal with on a regular basis for radiation oncology issues?**
A. I'm on the clinical oncology consensus group, so once a month I have a meeting with all kinds of cancer doctors, including radiation oncologists.
**Q. And are you aware of any other of the radiation oncologists who use nurse practitioners to supervise the delivery of radiation treatment within Banner?**
MS. POUND: Object to the form of the question.
A. Can you repeat the question?
**Q. (By Ms. Bennett) Do you know of any other doctors who work for Banner who use nurse practitioners to supervise radiation treatment?**
A. No.



**Q. And is that because they don't employ nurse practitioners or they simply don't use them, or do you know?**
A. They employ them, but they don't have the need for them to supervise. They have so many doctors, there is just always a doctor there.
**Q. And if you had enough doctors here in Colorado, you would prefer to have the patient's treatment supervised by a physician, do you agree?**
A. No.
**Q. You think it would be all right to have the nurse practitioners supervising treatment even if a doctor were available?**
A. Yes.
**Q. Was there ever a discussion among the physicians who work for Banner in this area about using nurse practitioners to supervise radiation treatment?**
A. I don't remember.
**Q. Did you ever discuss the issue with Dr. Fuller?**
A. Probably.
**Q. What do you recall, if anything, about the discussion?**
A. That we both felt confident that our NPs could handle an emergency if we weren't available.



**Q. And what about the new doctor, whose name escapes me at the moment?**
A. Dr. Albert.
**Q. Did you discuss it with him?**
A. Yes.
**Q. And was his opinion the same as yours and Dr. Fuller's?**
A. Yes.
**Q. Can you tell me of any instance in which a patient had an emergency while being treated that a nurse practitioner dealt with over the last three or four years?**
A. We've had patients who couldn't hold still for treatment because they were in so much pain, and the nurse practitioner managed their pain so that they could have treatments.
**Q. Uh-huh.**
A. It might have been later that day, but they actually were able to hold still for treatments.
**Q. Uh-huh. Any other instances you can think of where a nurse practitioner was required to step in and handle an emergency?**
A. We have had patients who had anxiety attacks, particularly if they're feeling claustrophobic. We've withheld treatment and gave



required counseling and potentially antianxiety medication.
**Q. And in those instances were you involved in assisting the nurse practitioner to deal with the emergencies?**
A. This has happened countless times, and I'm sure there have been times the NP handled it without my assistance.
**Q. And if you're here, does she generally consult you about what to do?**
A. Not necessarily.
**Q. Have there been any situations in which you've had to terminate a patient's radiation treatment for a technical reason while they're actually on the table?**
A. No.
MS. BENNETT: So it's almost 10:00. I suggest what we do is break now and let Dr. Ceilley go about her business. And then I can evaluate if I have any more questions, whether she needs to come back. How does that sound?
MS. POUND: Okay.
THE DEPONENT: Sounds good.
MS. BENNETT: Okay.
(A recess was taken from 9:51 to 10:21

a.m.)
**Q. (By Ms. Bennett) So earlier, Dr. Ceilley, you said that you don't perform the delivery of radiation treatment when the patient is on the table. Who does?**
A. The radiation therapist.
**Q. So do you have any understanding of why CMS requires any physician supervision at all?**
A. Can you repeat the question?
**Q. So there is a requirement that a physician supervise the delivery of external beam radiation; is that correct?**
A. Yes.
**Q. Do you agree with that?**
A. Yes.
**Q. And in your view, that can be provided either by a physician or a nurse practitioner?**
A. Yes.
**Q. What's your understanding for why that requirement is in place if the radiation therapist is the person who's performing the radiation therapy when the patient is on the table?**
A. I believe it's in the unlikely chance that a patient had an acute event that would otherwise require 911 or require resuscitation from a medical



provider to be physically available.
**Q. There is no -- there is nothing at all you can think of with respect to the actual delivery of the radiation therapy that would require the presence of a physician?**
A. No.
**Q. You're talking about something that would happen that would be more or less a side effect of the radiation?**
A. If a patient had an acute event like that, that is not likely from the radiation. That's likely a separate issue.
**Q. Uh-huh. But something caused by the radiation? As you described before, an anxiety attack? A seizure?**
A. Those are not caused by the radiation.
**Q. So the seizures are caused by the patient's underlying condition?**
A. Yes.
**Q. Do you have --**
MS. POUND: Hold on. You're starting to talk over each other again, so...
MS. BENNETT: I forgot.
MS. POUND: So let her finish the question and then answer.



**Q. (By Ms. Bennett) You mentioned previously that you read -- that was my understanding, but correct me if I'm wrong, the CMS regulation on physician supervision for delivery of radiation therapy treatment; is that correct?**
A. I don't recall if I read the whole thing, but I do recall reading at least a portion of it.
**Q. And when was that?**
A. I don't remember.
**Q. Was it around the time that you came to Banner?**
A. I don't remember.
**Q. Was it before you came to Banner or after you came to Banner?**
A. After I came to Banner.
**Q. How long after, approximately?**
A. I don't remember.
**Q. Was it within the first year after you came to Banner?**
A. Probably.
**Q. When was the last time you read that regulation?**
A. Within the last year.
**Q. And what prompted you to read it within the last year?**



A. Discussion of providing coverage and working on maximizing our compliance.
**Q. And who was involved in that discussion?**
A. I don't remember. I believe the other physicians and Dr. Albert, Dr. Fuller, and the nurse practitioners and myself and Julianne.
**Q. Julianne Fritz?**
A. Yes.
**Q. So you know Ms. Fritz?**
A. Yes.
**Q. When did the conversation take place, the discussion that you've just described take place, approximately?**
A. I don't remember. I don't remember the dates or -- I mean, I've worked here five years, so I'm not sure.
**Q. And what prompted you to look at the regulation when you first looked at it after you came to work at Banner?**
A. Because we were using nurse practitioners, and that was new for me as a clinician.
**Q. Did someone prompt you to take a look at the regulation or did you take that on your own?**
A. It came up in discussion of the supervision, if an NP was qualified, and at some point

in there I know I read it.
**Q. So who was that discussion with, the earlier discussion?**
A. I don't remember. I've had a million discussions over five years.
**Q. A million discussions about nurse practitioner supervision of delivering radiation treatment?**
A. Not necessarily, but all the compliance things and billing things and coverage things.
**Q. So when you say you looked at the regulation, are you talking about the regulation that appears in the Code of Federal Regulations?**
A. I don't know.
**Q. Do you have the document that you looked at now?**
A. No.
**Q. Did you keep -- you didn't keep a file of it?**
A. No.
**Q. Where did you get the document?**
A. I think I saw it one time when we had Revenue Cycle here. I don't recall otherwise.
**Q. And did Revenue Cycle provide the regulation for you to look at?**



A. Not the entire thing. They quoted some parts of it.
**Q. Did they quote it in the document that you reviewed or did they quote it to you orally --**
A. They quoted it orally --
**Q. -- in conversation?**
A. -- in a conversation.
MS. POUND: All right. Hold on for a second. Let her finish the question.
**Q. (By Ms. Bennett) So they quoted it orally to you?**
A. Uh-huh.
**Q. But you also remember independently looking at the regulation, the actual document that the regulation appears in?**
A. I don't remember the actual document. I remember a quote from the document.
**Q. Being offered to you by someone at Revenue Cycle?**
A. Yes.
**Q. And who was the person at Revenue Cycle who you interacted with on this subject?**
A. Ron DiGiaimo or --
**Q. Ron DiGiaimo, does that sound right?**
A. I'm not sure how to spell his last name.



**Q. I'm not either, but I can provide that for you later. I'm not even sure how to pronounce it. That's a bit of a challenge.**
**So this was in a one-on-one meeting you had with Mr. DiGiaimo?**
A. No.
**Q. It was a bigger meeting?**
A. Yes.
**Q. But it was a meeting?**
A. Yes.
**Q. Who was present at the meeting?**
A. The radiation therapists, our supervisor, Cindy McBlair, Julianne Fritz, our nurse practitioner, myself. That's all I can remember right now.
**Q. And did Mr. DiGiaimo express Revenue Cycle's opinion about whether a nurse practitioner could supervise delivery of radiation treatment?**
A. Yes, he expressed his opinion.
**Q. And what was his opinion?**
A. That he wasn't sure it fit in the letter of the law as far as what he quoted from CMS.
**Q. And did you disagree with him?**
A. Yes. I didn't talk to him about it at the time, but --
**Q. So you didn't openly disagree with him?**



A. Correct.
**Q. You didn't engage in a debate with him, did you?**
A. No.
**Q. And you just silently disagreed with him?**
A. Yes.
**Q. Did you discuss it with Ms. Fritz afterwards?**
A. Yes.
**Q. And what did you discuss with her?**
A. The wording of "nonphysician provider" and the scope of practice of providers -- of NPs in the state of Colorado and Banner legal's review of that.
**Q. She told you that Banner legal had reviewed the issue?**
A. Yes.
**Q. Just answer yes or no. Did she tell you that?**
A. Yes.
**Q. And during this discussion did Ms. Fritz give you her opinion about whether NP supervision of radiation therapy was appropriate?**
A. Yes.
**Q. What did she say?**
A. That her opinion is that it's appropriate.

**Q. And did she provide you with any documents that she'd examined to reach that conclusion?**
A. No.
**Q. In terms of documents that you might have examined to reach that -- your own independent conclusion, were there any documents or online resources that you examined to determine that NP supervision was appropriate, other than the regulation which you say you didn't read but was quoted to you by Mr. DiGiaimo?**
A. No.
**Q. So you never accessed the CMS website to see what guidance CMS provided on that issue?**
A. No.
**Q. And did you ever access ASTRO's online resources to see if they provided any guidance on that?**
A. No.
**Q. Do you participate in the ASTRO Listserv?**
A. I don't know what that is.
**Q. Do you know if there is an ASTRO Listserv where physicians can email each other about topics of concern to them?**
A. Oh, no.
**Q. Was there any other research that you did to come to your conclusion that nurse practitioner**



**supervision was appropriate?**
A. No other research. But being a radiation oncologist for many years and knowing what an NP can do and what the issues might be, I felt it was appropriate in my clinical opinion.
**Q. And did Ms. Fritz tell you about what resources she'd examined to come to her decision that nurse practitioner supervision was appropriate?**
A. I do recall that she had reviewed -- as I said before, the CMS guidelines and the scope of NP practice in the state of Colorado. I don't know the exact documents though.
**Q. Did you -- did Ms. Fritz tell you that she discussed the issue with someone at CMS? Did she ever tell you that?**
A. No.
**Q. Did you ever discuss the issue with someone at CMS?**
A. No.
**Q. And did you receive a copy of the Revenue Cycle report that resulted from Mr. DiGiaimo's engagement?**
A. Yes, I believe so.
**Q. You reviewed that report?**
A. I believe there was more than one report.



**Q. Did you review all the reports, if there were more than one report?**
A. I don't remember.
**Q. Do you recall in reviewing that report whether Mr. DiGiaimo said anything in writing about whether nurse practitioner supervision was appropriate?**
A. No, I don't remember.
**Q. What was your understanding of the reason for Revenue Cycle coming here to meet with you?**
A. I had actually requested some kind of consultation because when I started here I was the first employed physician, Dr. Fuller and I were, and they had never done professional billing before. And when I first started they weren't billing anything because they didn't realize there was a separate physician component that was billed in addition to the technical. That hadn't been all sorted out with bringing on employed physicians.
**Q. And in that answer when you say "they," you mean Banner?**
A. Yes.
**Q. There were a lot of pronouns there, so...**
**When you came here, Banner wasn't billing for the pro fee?**
A. That's correct.



**Q. They were just billing for the technical fee?**
A. Yes.
**Q. And that resulted from -- probably from the fact that previously a private group had provided services here for radiation oncology; is that correct?**
A. Yes.
**Q. And that they had billed the wrong pro fee?**
A. Yes.
**Q. And so you requested a consultation with Revenue Cycle?**
A. Yes.
**Q. And that was the reason Mr. DiGiaimo was brought on board?**
A. Yes.
**Q. Did you -- were you involved in setting the parameters of that engagement?**
A. No.
**Q. Who was involved? Who was responsible for that?**
A. I believe Mary Dreiling, but I'm not positive that's correct.
**Q. Who is Mary Dreiling?**
A. She worked for BMG at that time and was

kind of a practice supervisor over oncology.
**Q. Do you know Jan Johnson?**
A. No.
**Q. Do you know Pam Stieb?**
A. No.
**Q. And was your understanding that one of the parameters of the engagement was to have Revenue Cycle look -- determine whether nurse practitioner supervision of radiation therapy was appropriate?**
A. No.
**Q. So do you recall how that topic came up?**
A. I do recall it in that meeting when they were doing chart reviews and going through individual cases and so forth, that topic came up.
**Q. Did Mr. DiGiaimo bring the topic up himself?**
A. Yes.
**Q. Was it something he observed about the medical records that led him to raise that issue?**
A. I'm not sure.
**Q. And you say that you understood that Mr. DiGiaimo and Revenue Cycle believed that nurse practitioner supervision was not appropriate. Why didn't you follow that guidance from those experts?**
A. Because I believed --



MS. POUND: Object to the form of the question and foundation.
A. I believed that was their opinion. And they seemed very anti-nurse practitioner in many ways, not just about the supervision of radiation therapy.
**Q. (By Ms. Bennett) In what ways were they anti-nurse practitioner?**
A. They didn't seem to think the nurse practitioners could really do anything.
**Q. How did they express that to you?**
A. Multiple times with the discussion of -- when this came up about NPs doing something they said, No, NPs can't do that; we believe the physician has to do that.
**Q. What other examples can you provide where they discussed the ability of a nurse practitioner to do something?**
A. I don't know exact examples, but I believe it was managing radiation side effects like skin care, and things like that.
**Q. They thought -- Revenue Cycle thought that nurse practitioners couldn't manage side effects?**
A. That was my impression.
**Q. What else do you remember them saying nurse practitioners were not qualified to do?**



A. I don't remember specifically.
**Q. Did you talk at all with Revenue Cycle -- first of all, let me ask -- strike that and ask another question.**
**Was anyone there at this meeting other -- for Revenue Cycle other than Mr. DiGiaimo?**
A. Yes.
**Q. Who was with him?**
A. I don't remember.
**Q. Was it more than one person?**
A. I don't remember.
**Q. Was it female or male?**
A. I believe there was a woman who helped him, but I don't know that she was at all the meetings.
**Q. What else did you discuss with Revenue Cycle about nurse practitioners in that meeting that you can remember?**
A. I don't remember anything else.
**Q. Do you remember any other discussions with them about any aspect of billing with respect to nurse practitioners billing for their services?**
A. Not with respect to nurse practitioners.
**Q. Okay. What other issues about billing did you discuss with them in this meeting?**
A. They reviewed charts and they found some



things that we missed and could have charged, and they also found things that we charged that they didn't feel like our documentation was strong enough. And I thought the goal of the whole thing was to help us improve our documentation so that we were more solid. And then there was also a varying opinion on how much documentation is enough documentation for a given thing or a given charge.
**Q. So did Revenue Cycle make some recommendations how you could improve your documentation?**
A. Yes.
**Q. And did you follow those recommendations?**
A. Yes.
**Q. Have they returned to do another review since the 2011 review?**
A. No.
**Q. Were there any other recommendations that Revenue Cycle made about your documentation, about your billing, that you did not follow?**
A. Yes.
**Q. What other recommendations?**
A. They recommended we get a full-time financial counselor for all patients. They recommended we go to Dragon Speak. I believe they recommended

doing some auto things, like when -- you know, when -- some charges that could drop automatically with an automated system in MOSAIQ. And that never happened. I think there may have been other things that I don't remember.
**Q. So the full-time financial counselor for patients, is that something that you would bill to a third-party payor?**
A. No.
**Q. And the Dragon Speak, does that have anything to do with billing?**
A. No.
**Q. So the only issue you mentioned that apparently has to do with billing is the auto drop in MOSAIQ?**
A. They also recommended that we hire them to oversee our entire strategic plan, and I assume that would be billing and everything else.
**Q. So let's focus -- I'm going to come back to that, but let's focus on the auto drop. Do you remember the details of the auto drop? What would be the billing aspect that would automatically pop up in MOSAIQ that you disagreed with him about, or that you did not --**
A. I didn't disagree.



**Q. Did you implement it?**
A. No.
**Q. Why didn't you implement it?**
A. Because I don't have control over that kind of thing within Banner.
**Q. Someone else made the decision not to do that?**
A. That's correct.
**Q. Who was that?**
A. I don't know.
**Q. Do you know the service that was supposed to be automatically added?**
A. Multiple services.
**Q. Okay. And then you say -- you mentioned in your last answer that they wanted Banner to hire them to oversee strategic planning. Is that what you said?**
A. Yes.
**Q. And Banner decided not to do that?**
A. That's correct.
**Q. Were you part of that decision?**
A. No.
**Q. Who made that decision?**
A. I don't know.
**Q. I get the impression that you didn't like**



**Revenue Cycle very much. Is that true? Or maybe you just don't like me very much.**
A. I don't like being deposed.
**Q. I don't blame you at all.**
**What was your overall impression of Revenue Cycle?**
A. That they had their own agenda. That they wanted us to hire them for a lot more than what they were there for.
**Q. Uh-huh. That's the -- that's always the deal with consultants, I've found, since that's how they make their living.**
**But was there anything other than the fact that they wanted to expand their engagement that you would criticize about them?**
A. I felt like they were extraordinarily picky about the documentation. You want to have good documentation for our services, but it just seemed, you know, compared to everywhere else I worked that what they expected or thought in their opinion was required was very detailed.
**Q. Did you, nonetheless, implement their suggestions with respect to documentation though?**
A. I wouldn't say we implemented every single small suggestion, but we implemented things to make the



overall documentation more seamless and accurate.
**Q. And have you -- at your other places of employment did you have any billing review done that was similar to the review that Revenue Cycle did in 2011?**
A. No.
**Q. Did you have any training in documentation and billing at your other places of employment?**
A. Yes.
**Q. And when you came to Banner did you have training here provided by Banner?**
A. Not beyond what we've talked about.
**Q. And that would be the Revenue Cycle training?**
A. Yes.
**Q. And we've discussed your schedule at the various Banner facilities in the area. Is that still your schedule today?**
A. It's similar.
MS. POUND: Object to the form of the question.
A. We have three doctors now, so I don't need to go to Sterling as often. Otherwise, it's very similar.
**Q. (By Ms. Bennett) Are there any facilities**

**at which nurse practitioners today provide supervision of the delivery of the radiation therapy?**
A. Yes.
MS. POUND: Object to the form of the question.
**Q. (By Ms. Bennett) And where is that?**
A. In Sterling at the David Walsh Cancer Center, and very rarely at NCMC and McKee.
**Q. As of today?**
A. Yes.
**Q. So that -- when I ask that question, I'm talking about the nurse practitioners without any physician present.**
A. And we're talking about today, and we're not talking about 2011?
**Q. No, I'm talking about today.**
A. Yes, there are rare occasions at NCMC and McKee where there may not be a radiation oncologist present.
**Q. But the vast majority of the time there is a radiation oncologist present?**
A. Yes.
**Q. And when the new doctor -- whose name I still can't remember --**
A. Dr. Albert.



**Q. -- Dr. Albert was hired, what was the reason for him being hired? Was that to provide physician supervision? To make sure there was physician supervision at all of the treatment centers?**
MS. POUND: Object to the form and foundation.
A. It was to help with physician supervision, but also everything else that a physician does. The -- the two physicians were starting to get very busy for two physicians.
**Q. (By Ms. Bennett) So the -- would you say the hiring of the new doctor was motivated more by the patient load?**
A. I would say it was both.
MS. BENNETT: Let me just think for a minute and see if I've got anything else.
(Pause in the proceedings)
MS. BENNETT: I think we're done.
MS. POUND: I just have a couple follow-up questions.
EXAMINATION
BY MS. POUND:
**Q. Dr. Ceilley, when you were talking about the things that the nurse practitioners can do, you were talking about treating a patient with pain, so**



**much pain that they're not able to sit still on the table. Do you recall that?**
A. Yes.
**Q. Do you consider that an emergency?**
A. No.
**Q. And you also talked about anxiety attacks and trying to manage the anxiety attacks so that the person could receive treatment that day. Do you consider that an emergency?**
A. Not a true emergency.
**Q. What would you consider a "true emergency"?**
A. Somebody codes in our department.
MS. POUND: I don't have any further questions.
MS. BENNETT: All right. You're free to go. Thank you very much for your time.
THE DEPONENT: Okay.
MS. BENNETT: And I apologize for interrupting you and taking you away from your patients.
THE DEPONENT: Oh, thanks.
(The deposition concluded at 10:47 a.m.)



AFFIDAVIT

I have read my deposition and it is true and accurate, except for any changes or corrections now indicated by me on the Amendment sheet.
Amendment sheet attached ( )
No changes to testimony ( )

_______________________________
ELIZABETH CEILLEY, M.D.
SUBSCRIBED AND SWORN to before me this date, ________________________.

My commission expires ________________

_______________________________
NOTARY PUBLIC

_______________________________
STREET ADDRESS

_______________________________
CITY, STATE, ZIP

Return to: MILE HIGH COURT REPORTING & VIDEO, INC.
14143 Denver West Parkway
Suite 100
Golden, Colorado 80401

CERTIFICATE

I, Aimee S. Reisinger, RPR, Notary Public of the State of Colorado, certify that before the deposition the witness was sworn by me to testify to the truth, and that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not related to any party herein, nor their counsel, and have no interest in the result of this litigation.

Aimee S. Reisinger, RPR, CSR
My Commission expires 9/16/2016
Notary No. 19964015065