# EXHIBIT 25

# Transcript of the Testimony of:

# **Julieanne Fritz**

**Date:** July 17, 2015

United States of America, et al. ex rel. Martha Baker v. Banner Health, et al.

No. 1:12-CV-03029-WJM-CBS

Mile High
Court Reporting & Video, Inc.

14143 Denver West Parkway
Suite 100
Golden, Colorado 80401
303-202-0210
Fax 303-205-0034
contact@milehighreporting.com
www.milehighreporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-03029-WJM-CBS

---

DEPOSITION OF JULIANNE FRITZ
July 17, 2015

---

UNITED STATES OF AMERICA, et al.
ex rel. MARTHA L. BAKER,

Plaintiff/Relator,

vs.

BANNER HEALTH, et al.,

Defendants.

---

PURSUANT TO NOTICE, the deposition of JULIANNE FRITZ, called for examination by the Plaintiff/Relator herein, was taken at North Colorado Medical Center, 1801 16th Street, Greeley, Colorado 80631, commencing at 8:50 a.m., on Friday, July 17, 2015, before Aimee S. Reisinger, a Registered Professional Reporter and Notary Public in and for the State of Colorado.

APPEARANCES:

JAMIE M. BENNETT, ESQ.
The J. Bennett Law Firm
8 Creek Side Court
Middle River, Maryland 21220
443-844-4629
jbennettlawfirm@gmail.com

For the Plaintiff-Relator

MEGHAN E. POUND, ESQ.
LINDA L. SIDERIUS, ESQ.
Caplan and Earnest
1800 Broadway
Suite 200
Boulder, Colorado 80302
303-443-8010
mpound@celaw.com
lsiderius@celaw.com

For the Defendants

INDEX


| EXAMINATION: | PAGE |
|---|---|
| BY MS. BENNETT | 3 |
| BY MS. POUND | 164 |

| EXHIBITS: | | MARKED |
|---|---|---|
| 56 | Email, 6/24/10, to Joy Wilson from Julianne Fritz, Subject: Compliance Letter for Direct Supervision, with attached document entitled "Physician Direct Supervision Under the HOPPS Regulations, 6/24/10," BB-0007306 and 0007307 | 29 |
| 57 | Email string, July 14, 16 and 17, 2009, between Jan Johnson and Jason Bezozo, Subject: Physician Supervision Outpatient Hospital Therapeutic Services, BB-0004884 | 36 |
| 58 | Email string, November 4, 5 and 9, 2009, between Cindy McBlair, Lori Sehrt, Jan Johnson and others, Subject: OPPS Final Rule... with attached article entitled "CMS Relaxes Supervision Requirement for Hospital Outpatient Departments, BB-0005125 through 0005128 | 39 |
| 59 | Email string, various dates in January 2010 and November and December 2009, between Kelley Simpson and Julianne Fritz, Subject: CMS Supervision requirements, BB-0007238 through 007243 | 43 |
| 60 | Email string, 1/8/10, between Rhonda Peterson and Jenna Vangilder, Subject: ACCCExchange Digest, Vol 39, Issue 10, BB-0007251 through 007254 | 49 |
| 61 | Email string, 1/12/10, between BH CDM Team, HHA and Pam Stieb, Subject: Hospitals face new physician supervision requirements for 2010, BB-007271 through 0007273 | 50 |

INDEX OF EXHIBITS (continued)

| EXHIBITS: | | MARKED |
|---|---|---|
| 62 | Summary of CY 2010 Physician Supervision Final Policy BB-0007274 through 0007275 | 56 |
| 63 | Email, 1/14/10, to Mary McCabe and Jan Johnson from Julianne Fritz, Subject: Physician Coverage in Radiation Therapy - compliance question, with attached CMS guideline, BB-0004886 through 0004889 | 59 |
| 64 | Email string, 1/29/10, between Julianne Fritz, Marty Baker and Eva Huddleston, Subject: Physician Supervision Requirements, BB-0005129, with attached HOPPS Final 2010 highlighted for supervision, BB-0006060 through 0006100 | 67 |
| 65 | Email string, 2/12/10, between Julianne Fritz and Jan Johnson, Subject: ACCC to Host Conference Call on Physician Supervision in 2010 HOPPS Rules, with attached newsletter, BB-0004905 through 0004907 | 75 |
| 66 | Email string, 2/12/10, between Julianne Fritz and Jan Johnson, Subject: ACCC to Host Conference Call on Physician Supervision in 2010 HOPPS Rules, with attached newsletter, BB-0004939 through 0004942 | 78 |
| 67 | Email string, February 12 and 15, 2010, between Jan Johnson, Janice Dinner, David Ledbetter and others, Subject: New Requirements Contained in 2010 OPPS Final Rule... With attached Complying with Physician Supervision Requirements, BB-0004947 through 0004962 | 79 |

INDEX OF EXHIBITS (continued)

| EXHIBITS: | | MARKED |
|---|---|---|
| 68 | Email, 3/8/10, to Helen Bixenman and Janice Dinner from Jan Johnson, Subject: Physician Supervision - Medicare Requirement, with attached Outpatient Hospital Physician Supervision Requirements, BB-0004990, 4991, 4994, 4995 and 4997 | 82 |
| 69 | Email string, 3/9/10, between Jan Johnson, Julianne Fritz, Mary McCabe and others, Subject: Physician Supervision Article - very helpful! BB-0005005 | 83 |
| 70 | Email, 3/11/10, to David Ledbetter from Jan Johnson, Subject: Direct Supervision, with attached article abstracted from "Outpatient Hospital Supervision Requirements," BB-0005048 through 0005053 | 86 |
| 71 | Email string, 3/23/10, between Jan Johnson from Lori Sehrt, no subject, BB-0005011 | 87 |
| 72 | Email, 3/23 and 3/29/10, from Tina Laubli/David Ledbetter to various parties, Subject: Direct supervision requirements... with various attachments, BB-0005054 through 0005068 | 89 |
| 73 | Common Questions about Supervision Requirements for Medicare Payment of Hospital Outpatient Services, April 23, 2010, BB-0004526 through 0004528 | 89 |
| 74 | Email, 6/18/10, to David Ledbetter from Jan Johnson, Subject: Physician Supervision Risk Assessments, with various attachments, BB-0005069 through 0005083 | 91 |

INDEX OF EXHIBITS (continued)



| EXHIBITS: | | MARKED |
|---|---|---|
| 75 | Email string, 6/18/10, between Jan Johnson, David Ledbetter, Helen Bixenman and others, Subject: Physician Supervision Risk Assessment, BB-0005084 | 94 |
| 76 | Physical Supervision excerpt from OPPS Final Rule, 11/11/10, BB-0007115 and BB-0007164 | 95 |
| 77 | Email string, 2/2/11, between Linda Robbins, Julianne Fritz and others, Subject: 77421, BB-0007366 through 0007370 | 96 |
| 78 | Revenue Cycle Consulting Report: Professional and Technical Chart Review, Radiation Oncology, 4/19-21/11 | 103 |
| 79 | Email, 4/20/11, to Mary Dreiling and others from Julianne Fritz, Subject: Chemo supervision by a physician - CMS policy, BB-0000830 through 0000831 | 112 |
| 80 | Email string, 4/21/11, between Helen Christner, Julianne Fritz and others, Subject: Chemo Supervision by a physician - CMS policy, BB-0000833 through 0000835 | 116 |
| 81 | Email, 5/11/11, to Marty Baker from Julianne Fritz, Subject: Thursday May 12, 2011, BB-0000894 | 123 |
| 82 | Email string, 5/13/11, between Julianne Fritz, Cindy McBlair and others, Subject: CMS Document - Supervision, BB-0000900 | 130 |
| 83 | Email, 5/13/11, to Mary Dreiling and others from Julianne Fritz, Subject: Direct Supervision article, with attached article entitled "Reflections on physician supervision under the HOPPS," BB-0003076 through 0003077 0003077 | 133 |

INDEX OF EXHIBITS (continued)

| EXHIBITS: | | MARKED |
|---|---|---|
| 84 | Email string, 4/29/11 and 5/21/11, between Mary McCabe, Scott Baker and others, Subject: ASTRO Update on Physician Supervision, with attached Medicare's Physician Supervision Requirements updated February 2010, BB-007309 through 0007316 | 135 |
| 85 | Email string, May 13, 21 and 23, 2011, between Julianne Fritz, Mary Dreiling and others, Subject: CMS Document - Supervision, BB-0004793 through 0004796 | 139 |
| 86 | Email string, 6/16/11, between Marty Baker and Julianne Fritz, Subject: Chart Audit Info - please, BB-0001022 through 0001023 | 144 |
| 87 | Typewritten notes entitled "Julie Klein - 1:1 mtg/June 22, 2011, BB-0004767 through 0004768 | 145 |
| 88 | Agenda, June 24, 2011, BB-0000654 through 0000655 | 147 |
| 89 | Various slides from a PowerPoint presentation entitled: Physician Supervision for Provider-Based Clinics: Ensuring Compliance, BB-0004589, 0004602 and 0004605 | 148 |
| 90 | Various slides from a PowerPoint presentation entitled: Non Physician Practitioner Billing, Coding, and Documentation, BB-0004665, 0004670 and 0004671 | 157 |
| 91 | Affidavit of Julianne Fritz, M.S.N. | 159 |
| 92 | Excerpt of the CMS guidelines, Sections 410.27 and 410.28 | 160 |

| PREVIOUSLY MARKED EXHIBITS | | REFERENCED |
|---|---|---|
| 55 | Radiation Oncology Core Privileges, BB-0020230 and 0020231s | 109 |
| | BB-0020230 and 0020231s | 109 |

P R O C E E D I N G S

JULIANNE FRITZ,

having been sworn by the Reporter, testified as follows:

EXAMINATION

BY MS. BENNETT:

**Q. Could you please state your full name for the record and spell your first and last names.**

A. Julianne Fritz. It's J-u-l-i-a-n-n-e, it's all one word, Fritz. F-r-i-t-z.

**Q. I'm going to talk to you a little bit before we start about some basic ground rules of depositions. One is if you don't understand my question, please just let me know. I want to make sure that you understand and answer the question that was intended to be answered. So just speak up --**

A. Okay.

**Q. -- that would be fine. If you need to take a break, let me know, we can take a break at any time for any reason. So just put your hand up or say you need a break.**

**And as Meghan has been pointing out, it's important for you to wait for me to finish my question before you start your answer so that the record is clear and we're not both talking at the same time.**



**It's hard for Aimee to figure out who's saying what at times when you do that. Okay?**

A. Okay.

**Q. Can you tell me where you're employed?**

A. I'm employed by Banner Health here in Northern Colorado.

**Q. And how long have you been employed by Banner Health?**

A. I have been employed -- actually part of the North Colorado Medical Center since July of -- excuse me, July of 1981.

**Q. 1981?**

A. Uh-huh.

**Q. So you were employed by Northern Colorado Medical Center before it was acquired by Banner?**

A. I was employed originally as a new graduate by Weld County General Hospital, which then became North Colorado Medical Center, which then became part of Lutheran Health System, which then became part of Banner Health.

**Q. So when did Banner Health acquire NCMC?**

A. I don't have that date right in front of me. I believe it was in the '90s, but I'm not -- I don't remember the exact date.

**Q. Can you tell me starting with college or**



**post-secondary school what your education is?**

A. I graduated from University of Wyoming in 1981 with a bachelor of science in nursing. I also have my bachelor's in nursing, my master's of science in nursing, with a focus on healthcare leadership. I have had various different roles and job responsibilities throughout those years. Do you want me to go through details of those?

**Q. I want to focus right now on your education.**

A. My education is I have a bachelor of science in nursing. I also have my master's of science in nursing with a focus on healthcare administration and leadership. And I also have a national certification in oncology.

**Q. Do you have any educational background in compliance? Healthcare compliance?**

A. All Banner leaders and managers have what I would consider fairly rigorous education and training regarding compliance, and we also have an annual review of compliance standards.

**Q. I'm talking about -- I'd like to focus -- we'll talk about that later. But I'd like to focus right now on your educational background in leading organizations in the healthcare field in compliance**



**matters. Not compliance training, but your education to be making decisions about compliance.**

A. I do not make decisions about compliance. All managers and leaders receive training and education in compliance, but we have a compliance department and facility compliance officers that are a resource to us for any questions that would arise.

**Q. Tell me -- starting with your current position and working backward I think would be best -- what is your current position with Banner?**

A. My current role is Northern Colorado and western region director of oncology services.

**Q. And how long have you held that position?**

A. My position was restructured a little over a year ago with a change in title, but I've been in some level of a regional role for oncology services since the early 2000s.

Prior to that in the early '90s became a service line director for oncology services at North Colorado Medical Center.

**Q. So functionally what is the difference between your position -- I didn't actually get your title. Could you repeat it, please?**

A. I'm not clear on what question. The title that I started out with?

**Q. The title that you have now.**
A. My title is NoCo and regional director of oncology services for Banner Health.
**Q. And before that you were a service line director?**
A. I was a regional service line director, correct.
**Q. So what is the difference in terms of your duties and responsibilities between being a service line director and being the Northern Colorado director for west -- for oncology services? That's a mouthful. I probably didn't get that right, but...**
A. Very little, actually. My responsibilities are regarding operational responsibilities for the cancer program, some level of strategic planning, and outcomes of the cancer program. Job titles within the Banner Health System change and get revised from time to time, so I don't have my portfolio right in front of me to tell you the exact dates and times of when my job descriptions have been changed.
**Q. And the training that you mentioned about compliance, can you be more specific? What annual training do you have or what biannual training do you have in compliance?**



A. All managers and leaders within Banner Health are required to do an annual training through our Banner Learning Center on compliance standards. And they incorporate ethics, business integrity, billing and coding aspects, HIPAA, all of those aspects.
**Q. Does the training include information about the False Claims Act?**
A. Yes, it does.
**Q. And does it also include segments on other fraud and abuse laws like --**
A. Kickback and antitrust, yes, it does.
MS. POUND: So I'm just going to interrupt you guys --
MS. BENNETT: Because we're doing it already.
MS. POUND: Right. Remind -- remember, let Ms. Bennett finish her question and then answer the question.
THE DEPONENT: I apologize.
MS. BENNETT: Right. We don't get any points here for speed. It's not like Jeopardy.
**Q. (By Ms. Bennett) So is it online training, then, that you get every year?**
A. Correct.



**Q. And is there some kind of certification mechanism to show that you attended the online training?**
A. Yes, there is. In the Banner system there is an electronic -- what's called Banner Learning Center that we're able to print out a certification for that annual compliance.
**Q. And other than the annual compliance training, do you receive any other training in compliance from Banner?**
A. As I recall, a number of years ago there were some classroom trainings that we did. I do not recall the dates for those. But the Banner standard is that those are online.
**Q. So all training is online?**
A. Yes.
**Q. Who do you report to in your current position?**
A. In my current position I report to Brook Richardson, who is the NoCo chief nursing officer.
**Q. And who does he report to? Or her.**
A. Brook is a she.
**Q. She.**
A. Brook reports to Rick Sutton, S-u-t-t-o-n,



who is our Northern Colorado CEO.
**Q. And the position that Ms. Richardson holds as chief nursing officer, how long has she been there?**
A. I do not have her exact dates of employment, but as I recall she started in May of 2014.
**Q. And who was her predecessor?**
A. I'll have to think about that. Prior to Brook coming in it was Dr. Lisa Hoyle.
**Q. And how long was she in that position?**
A. I do not have her exact dates of employment. I do not recall.
**Q. Do you think she would have been in that position in 2010?**
A. I believe that she came into that role in the very early part of 2011.
**Q. And who was chief nursing officer before her in 2010?**
A. As I recall -- again, I don't have the exact dates of employment when those transitions -- there was an interim role with Kathy Harris. And I don't recall the dates of employment when Kathy was in that interim role prior to Dr. Lisa Hoyle coming on board.
**Q. Do you know how long Rick Sutton has been CEO of Northern Colorado? Is that his position?**

A. I do not have the exact dates of his employment. Prior to his NoCo role -- Northern Colorado -- he is actually the CEO of North Colorado Medical Center, McKee Medical Center, and our newly opened hospital, Banner Fort Collins Medical Center. Prior to that he was the chief executive officer for North Colorado Medical Center.

**Q. Do you have any educational background that qualifies you as a nurse practitioner?**

A. No, I do not. I am not a nurse practitioner.

**Q. I'd like to talk a little bit about how you got involved in the issue that we're here to discuss today, which is the supervisory roles of nurse practitioners in radiation oncology.**

**Why did you get tasked with determining whether nurse practitioners could supervise radiation oncology treatments?**

A. Are you speaking about specifically in 2010?

**Q. Yes.**

A. Our discussions regarding the role of nurse practitioners particularly arose -- that goes all the way back to 2008. And that arose when we were talking about the various options of how we could



develop the David Walsh Cancer Center in Sterling, Colorado.

**Q. And when the 2009 proposed rule came out which made some clarifications of CMS policy on supervisory roles of nurse practitioners, why were you asked to opine about whether that was appropriate or not?**

MS. POUND: Object to the form of the question.

**Q. (By Ms. Bennett) You can still go ahead and answer, unless she instructs you not to.**

THE DEPONENT: I'm sorry, what did you say?

MS. POUND: Object to the form of the question. But answer the question.

A. I was not specifically tasked to look at compliance for the advanced nurse practitioner. That topic came up and actually a number of us in various different areas within the hospital were looking at the direct supervision standards from CMS. There was a lot of information in healthcare literature, webinars, information coming out, electronic information regarding the clarification of direct supervision, and it impacted multiple areas within the hospital.

So I was not alone tasked to look at the



compliance for advanced nurse practitioners, that arose when we were talking about various aspects of oncology services.

**Q. But you eventually issued an opinion letter on the subject, did you not, in June of 2010?**

A. I did. That request came from Mary McCabe, who is our chief financial officer at NCMC. She is also the compliance officer -- facility compliance officer for NCMC. And also Pam Stieb, who was the chief financial officer and also the compliance officer for Sterling Regional Med Center.

**Q. Okay. I think that for my purposes -- I don't know how Aimee feels about it -- but it would be helpful if you could talk a little bit slower.**

A. Okay.

**Q. So I -- you mentioned Mary McCabe, who was the facility compliance officer for NCMC?**

A. Correct.

**Q. And then you also mentioned Pam Stieb. And I -- you were going so fast, I didn't get her role. She's the chief financial officer for --**

A. Pam Stieb was the chief financial officer for Sterling Regional Med Center and was also the compliance officer for Sterling.

**Q. So in June 2010 when you issued your**



**opinion, why was it that you did it? Why did you issue an opinion instead of having this come from compliance?**

A. At that time in 2010 we were actively working on the development of the David Walsh Cancer Center. We had had multiple conversations, meetings, review of literature and information. And Mary McCabe and Pam Stieb felt that it would be appropriate for me to compile a document to file to reflect that work that had been done.

**Q. Isn't this something that ordinarily would come from your compliance department?**

A. I'm not really able to answer that. Our compliance officers work in collaboration and in sync with multiple managers and leaders. I am aware that both Mary McCabe and Pam Stieb also had conversations with our compliance department, but it would not have been an alert to me to think that it wouldn't be appropriate for me to compile a document to reflect the work and the literature that we had looked at at that time.

**Q. Did you consult with any of the compliance officers about that opinion letter that you wrote in June of 2010?**

A. The compliance officers that I directly worked with through Dr. Lisa Hoyle, who was at that

time my direct supervisor, would have been the compliance officers in the facilities, which would be Mary McCabe and Pam Stieb. That's my direct line to compliance officers.

**Q. So Mary McCabe is the facility compliance officer, but Pam Stieb is a chief financial officer. What is her compliance role?**

A. Let me correct that. Both Mary McCabe and Pam Stieb at that time were the chief financial officers. They also carry a dual role, and did at that time carry a dual role as the facility compliance officers.

**Q. Did you consult with anyone in the western regional office who had compliance responsibilities about your opinion?**

A. Yes. There was not myself alone, but Dr. Lisa Hoyle, Mary McCabe, and Pam Stieb also brought in Jan Johnson, who at that time was our western region compliance officer.

**Q. And did you have conversations with Ms. Johnson?**

A. I did as a group, along with the facility -- the facility compliance officers and Dr. Lisa Hoyle.

**Q. Does Banner, to your knowledge, have a**



**system-wide compliance policy with respect to appropriate supervision of radiation therapy treatment?**

A. To my knowledge we do not have a specific written policy. We follow the CMS guidelines.

**Q. So there is no formal Banner policy, to your knowledge, on supervision of radiation oncology treatments?**

A. Can you clarify that? In direct supervision for nurse practitioners or direct supervision from CMS guidelines or specific to radiation oncology?

**Q. I'm talking about a Banner policy that's specific to radiation oncology and addresses the appropriate level of supervision.**

A. No, I'm not aware that there is a specific policy for radiation oncology.

**Q. So how was it that the issue was first raised to your attention, the issue of the CMS clarification of their policy with regard to nurse practitioners supervising radiation therapy treatments? And just to be clear, by "treatment," I mean the actual time that the patient is being treated on the table under the LINAC. How did that first come to your attention?**

MS. POUND: Object to the form of the



question.

THE DEPONENT: I'm sorry, what?

MS. POUND: Object to the form of the question. You can still answer.

A. Can you clarify that? I'm not clear on --

**Q. (By Ms. Bennett) So focusing on the June 2010 letter, what I'm trying to find out is when were you -- when was your first involvement that led to you producing that opinion letter?**

A. The discussions that we started in looking at the development of the David Walsh Cancer Center went back to, as I recall, 2008 when we were evaluating the feasibility of developing a cancer center in Northeastern Colorado at Sterling Regional Med Center. We looked at all different types of staffing guidelines, what would be appropriate, the volume, how we would facilitate that feasibility of different scenarios. And at the same time -- at that same time there was a lot of information in healthcare literature coming out in electronic versions of journals regarding the CMS clarification or for -- many in healthcare thought that it was a change in the ruling or understanding. We spent a significant amount of time looking at all of those aspects of what was written from the CMS guidelines.



**Q. How did it relate specifically to the development of the David Walsh Cancer Center? That's what I'm trying to find out. Why did the development of that center prompt you to look at the supervision guidelines.**

A. It did not, in and of itself. We were looking at all kinds of compliance aspects for direct supervision for all outpatient therapeutic services. So it involved not only the development of David Walsh Cancer Center, but also how the oncology program functions -- both medical oncology and radiation oncology -- in all of our facilities.

**Q. Was there anything in particular about the David Walsh Cancer Center, though, that prompted you to look at this issue?**

A. It did come up when we were looking at the entire staffing model of how we would go about feasibility of staffing a smaller facility.

**Q. What was the staffing model you were looking at?**

A. We evaluated a number of different scenarios and options to develop the David Walsh Cancer Center, from what we classified as a full staffing model to a satellite model. And we looked at all different aspects of staffing with not only a nurse

practitioner, but with dosimetry and physics, nursing support, radiation therapists, the management structure, even to the front business office.

**Q. What was the full staffing model?**

A. The full staffing model would have been a radiation oncologist, an RN, a front business office, a billing staff, two radiation therapists, a full-time certified medical dosimetrist, and at least a half-time certified medical physicist.

I'm sorry, I went through a little fast there. Sorry. I'll slow down.

**Q. And what is the alternative staffing model that you were looking at?**

A. As I recall, we developed several scenarios. One was to have a part-time radiation oncologist in the department and to utilize a nurse practitioner that in the state of Colorado has a full practice with specialized training and education in radiation oncology to oversee the daily treatments of radiation. Not the development of the prescription, but the development -- or the delivery of the daily radiation therapy.

**Q. Would it be accurate to say, then, that the reason that the development of the David Walsh Cancer Center prompted you to look at the supervision**



**guidelines is because you weren't having a full-time radiation oncologist there?**

MS. POUND: Object to the form of the question.

A. That would not be accurate. We looked at all different types of scenarios regarding the David Walsh Cancer Center.

**Q. (By Ms. Bennett) But did you want to determine whether if you did not choose to have a full-time radiation oncologist there it would be acceptable under CMS guidelines? Was that part of what you were looking at?**

A. Yes.

**Q. So when you were looking at the staffing model, was cost an issue in terms of how you were going to -- whether you were going to choose a full-time staffing model or a less full staffing model?**

A. The finance and the cost and the revenue were all looked at in the business plan and the business pro forma.

**Q. And the cost of a full-time radiation oncologist was one of those factors?**

A. Correct.

**Q. So in staffing the David Walsh Cancer Center, did you choose to go with a full-time radiation**



**oncologist?**

A. We did not.

**Q. And has that changed over time?**

A. I'm not clear on what you're asking.

**Q. Do you now have a full-time radiation oncologist assigned to Sterling?**

A. We do not.

**Q. What is the staffing at the David Walsh Cancer Treatment Center? What is the staffing in terms of radiation oncologists at present?**

MS. POUND: I'm going to object to this question and any other questions that are outside the agreed-upon scope of the lawsuit, which is October 2010 through November 16th, 2012. And that will just be a continuing objection throughout the course of the deposition.

You can answer.

**Q. (By Ms. Bennett) What is the staffing now at DWCC? That's a mouthful.**

A. The staffing pattern that we have today is we have a department manager who is a full-time --

**Q. Let's focus on the radiation oncologist.**

A. Well, that is a part of the overall staffing --

**Q. Okay. Sorry to interrupt you.**



A. -- process.

**Q. Go ahead.**

A. We have a full-time manager that is also a treating radiation therapist. We have a second radiation therapist that works full time. We also have per diem to back up the delivery of radiation therapy, so we always have two radiation therapists on the machine. Our dosimetry is done electronically through the dosimetrist in Greeley and at McKee, which is in Loveland. We have our physicians that are rotating to support Sterling. They see the patients a minimum of, in person, one day a week, and we have a full-time nurse practitioner.

**Q. In terms of the opinion that you wrote in June of 2010, was there a discussion of who would write that opinion?**

A. I'm not sure I'm clear on what you're asking.

**Q. You say you consulted with Pam Stieb and -- I can't read my own handwriting here.**

A. Mary McCabe.

**Q. Mary McCabe. And they're both facility compliance officers?**

A. Correct.

**Q. Is that correct? Did the three of you**

**discuss whether you should write the opinion or whether someone with compliance background should write the opinion?**
A. Mary McCabe and Pam Stieb requested that I write that and that I forward it to them. It was my understanding that they were also going to use that, what they called a white paper, to have further discussions with Jan Johnson.
**Q. Do you know if those further discussions took place?**
A. I assume that they did. I was not present when those happened. I did receive some follow-up emails from Jan Johnson.
**Q. Did you ever have any direct contact with Jan Johnson?**
A. By telephone, yes.
**Q. And what did you discuss with her?**
A. At that point in time we were discussing the nurse practice role in multiple areas in the facility as well as the direct supervision guidelines.
**Q. When did that call take place?**
A. I do not recall.
**Q. Was it before or after you wrote the opinion?**
A. I do not recall.



**Q. So what did you rely upon -- let's do this. Why don't we mark the opinion, just so you have it in front of you.**
MS. BENNETT: I was going to do this in chronological order, but let's get this in front of you so you have something to refresh your recollection if you need it. Let's mark this as 56.
(Deposition Exhibit 56 was marked for identification.)
MS. BENNETT: Here is a copy. I'm sorry, Linda, I didn't know you were going to be here today.
MS. SIDERIUS: That's okay; we can share.
**Q. (By Ms. Bennett) Looking at what's been marked as Exhibit 56, do you recognize this document and the document attached to it?**
**(The deponent perused the exhibit.)**
A. What was your question regarding this document?
**Q. Do you recognize the document?**
A. I do not recall this specific email, but I do recognize the document which was classified as a white paper that I did write per request of the facility compliance officers in June of 2010.
**Q. Do you recognize this as an email that would have emanated from your Windows Outlook account?**



A. Yes, I do recognize it.
**Q. You're not saying that you didn't send this email, did you -- or are you?**
A. I do not recall the specific reasons why I sent this email, but at that point in time --
**Q. I didn't ask if you recall the reason.**
MS. POUND: Hold on. Let her finish answering the question and then -- and then wait for Ms. Bennett to finish her question.
A. Can you restate the question that you're asking me?
**Q. (By Ms. Bennett) I asked you if you had any reason to doubt that this email was sent by you on June 24th, 2010, from your Outlook account at Banner.**
A. I do not recall sending this.
**Q. That's not my question, Ms. Fritz. And I'm sorry to interrupt you, but we're going to be here for a very long time.**
**Do you have any reason to doubt that this email is an email that you sent? I'm not asking you why you sent it, I'm not asking you if you recall sending it, I'm only asking you if this looks to be an email that you sent from your Outlook account on June 24th, 2010.**
A. It appears that this email was sent from



my account, my Outlook email account, on June 24, 2010.
**Q. Okay. Thank you.**
**Now, this email is directed to Joy Wilson. Who is Ms. Wilson?**
A. Joy Wilson is with physician recruiting.
**Q. And why was this document relating to physician direct supervision that's attached here dated June 24th, 2010, directed to Ms. Wilson by you?**
A. I honestly don't recall.
**Q. What about Brian Underwood, who is that?**
A. Brian Underwood was with the Banner Medical Group at that time.
**Q. What was his position?**
A. I do not recall his specific title, but he was with leadership with Banner Medical Group.
**Q. In Northern Colorado?**
A. As I recall, yes.
**Q. And do you have any idea why you copied this email to him?**
A. I do not -- I do not recall. I would assume that it was related to physician recruiting, and at that time would have involved Banner Medical Group for the physician recruiting.
**Q. And how is this related to physician recruiting?**

A. Joy Wilson is and has been an employee with the physician recruiting department in Northern Colorado for Banner Health.
**Q. But how is the issue that you raise in your opinion letter related to physician recruiting?**
A. I honestly do not recall. From the email it states that I am forwarding the requested letter per their request. I do not recall the exact discussion that happened over five years ago.
**Q. What about Ms. Cox, what is her role?**
A. I vaguely remember that name as that she was employed with physician recruiting. I don't recall what her specific title was.
**Q. What about -- well, we've already talked about Cindy McBlair, I believe?**
A. Cindy McBlair in 2010 was in a leadership role with the McKee cancer program.
**Q. Okay. And we know who Ms. Baker is.**
**In the body of your email you reference Dr. Lawson, and you say that you are forwarding the requested letter for Dr. Lawson.**
**Who is Dr. Lawson and why was the letter for him?**
A. I honestly don't recall a Dr. Lawson.
**Q. Do you recall why the letter was for him,**



**the opinion was for him?**
A. I do not recall what Dr. Lawson was. I could guess, but it would only be a guess. At that point in time we were actively recruiting for an employment model for physicians. He may have been a potential applicant. I do not recall.
**Q. You mention that Jan Johnson, Mary McCabe and Dr. Vanetti have been extremely helpful. Who is Dr. Vanetti?**
A. Dr. Carol Vanetti was with Banner Health medical staff services. I do not recall her specific title, but I do know that she was involved in medical staff services and a medical officer role and a leadership role for the western region.
**Q. The email goes on to talk about the fact that you have a very large folder of information on this topic.**
**Did you keep a paper file of information that you reviewed in connection with your opinion letter?**
A. I did have some paper copies. I also had some electronic documents.
**Q. And where is the paper file today?**
A. I believe that I submitted that to our legal and compliance department.



**Q. What was the format in which you kept it? Was it in a Redweld?**
A. I believe it was in a file folder.
**Q. And was the file folder labeled with a name?**
A. I believe it was labeled as CMS.
**Q. And what about the electronic documents? Did you keep those in a folder on your computer?**
A. Yes, I did.
**Q. And what was the folder labeled?**
A. As I recall, there were several folders. I had a folder under my Outlook account, and then I also had compliance folders that were in my H drive on my computer.
**Q. And did you turn those documents over to your attorneys in connection with this litigation?**
A. Yes, I believe I did.
**Q. Between the time that you rendered this opinion in June of 2010 and the time you turned those documents over to your attorneys, did you make any deletions from those folders?**
A. No, I did not.
**Q. Did you make any additions to those folders?**
A. I may have.



**Q. And as you sit here today, can you recall what was in the folder? Let's start with the hard copy folder. What was in the hard copy folder?**
A. As I recall, there was a hard copy document from a webinar that we participated in regarding CMS guidelines for supervision, specifically for the CMS guidelines for outpatient therapeutic services. I believe there was a hard copy of an article that was in one of the "Oncology Issues" magazine that is published by the Association of Community Cancer Centers, what we commonly refer to as ACCC. And I believe that there were some paper documents that were frequently asked questions and clarification documents that had come out from CMS.
**Q. And what about in the electronic file, do you recall what was in there?**
A. I believe that there were some of the similar documents that were in the electronic files.
**Q. Did you review these files today -- in preparation for your deposition today?**
A. I did a few months back. Before writing the written deposition, I did go back and look at some of those folders basically to refresh my memory on time frame.
**Q. And you're talking about the affidavit**

**that you submitted in connection with this litigation?**
A. Correct.
**Q. Okay. Let's put this aside for a moment.**
**Did you have any interaction -- I just want you to answer this question yes or no, okay? That's important.**
**Did you have any interaction with Banner's legal department when you wrote the opinion that was set forth in Exhibit 56?**
A. No.
**Q. Do you have any -- again, just a yes-or-no answer -- do you have any understanding of whether the policy that's expressed in Exhibit 56 was approved by Banner legal department? Yes-or-no answer.**
A. No.
**Q. Okay. So let's take the next document, which we'll mark as Exhibit 57.**
**(Deposition Exhibit 57 was marked for identification.)**
**Q. And looking at what's been marked as Exhibit 57, do you recognize this document?**
**(The deponent perused the exhibit.)**
A. No.
**Q. The document is an email from Jan Johnson to Jason Bezozo. Do you know who Jason Bezozo is?**



A. No.
**Q. What about Jim Brannon?**
A. Yes.
**Q. Who is Jim Brannon?**
A. Jim Brannon is with our managed care and contracts department.
**Q. And what about Brian Underwood, do you know who he is?**
A. Brian Underwood at that time was in a leadership role with Banner Medical Group.
**Q. What was his area of responsibility?**
A. I honestly could not tell you that. He was in a leadership role for Banner Medical Group. I don't know what his specific title was or his specific job description.
**Q. In this email Ms. Johnson refers to the expense of recruiting a physician for physician supervision needs.**
**Do you recall -- does this document refresh your recollection about any conversation you might have had with Ms. Johnson about the cost of hiring another physician?**
A. No.
**Q. And the email below that references a document, a special bulletin that AHA prepared. Do you**



**recall reviewing that AHA bulletin as a part of your work on your June 2010 opinion letter?**
A. May I answer in more than a yes or a no?
**Q. The yes or a no is only because I was asking you about lawyers, so we don't want you to talk about something that a lawyer might have told you. You're allowed to answer all of these questions as more than a yes or no unless I say something to the contrary.**
A. As I recall, particularly between 2008 and 2011 there were numerous documents that came out from the American Hospital Association, as well as through the advisory committee, as well as through the oncology roundtable and ACCC. I have no way of knowing which specific AHA document they're referring to in this email.
**Q. Do you recall reviewing some documents or bulletins that AHA put out yourself in preparation for the June -- preparing the June 2010 opinion letter?**
A. Yes.
**Q. Is there anything specific that comes to mind that you might have reviewed from AHA?**
A. As I recall, I did sit in on a live webinar regarding direct supervision for outpatient therapeutic services.



**Q. And that was a webinar that was sponsored by AHA, I'm assuming?**
A. As I recall, yes.
**Q. And do you remember when that occurred?**
A. I do not remember the specific date.
**Q. Would it have been before your opinion letter, do you think?**
A. Yes.
**Q. So before June 2010 and after the CMS proposal?**
A. The best that I can recall, it would have been in the late fall of 2009.
**Q. Okay. That's helpful. Thanks.**
**And who was the speaker, do you remember?**
A. As I recall, there were several speakers on that live webinar.
**Q. Do any names leap to mind?**
A. I cannot honestly recall.
**Q. Let's mark this as Exhibit 58.**
**(Deposition Exhibit 58 was marked for identification.)**
**Q. Do you recognize this document? And just so you understand, Ms. Fritz, when I'm asking if you recognize a document, I'm just asking you to tell me whether this is a document that you recognize as having**

**emanated from Banner Health, from its email system, not whether you recall why you sent it. But just do you recognize this as a document that would have been used in the ordinary course of business at Banner.**
**(The deponent perused the exhibit.)**
A. Can you restate your question?
**Q. I just want to know if this looks like a business record that would have been used or produced in the ordinary course of Banner's business?**
A. This appears to be a common daily email communication, yes.
**Q. And were you copied on this email?**
A. It appears so, yes.
**Q. It attaches a statement from Foley Lardner on the CMS proposed supervision requirements that came out in the fall of 2009. Do you see that?**
A. Yes.
**Q. And did you review this when you received the email or thereafter, shortly thereafter?**
A. I honestly don't recall, but I -- as a common practice when I get an email with an attachment, yes, I do read them very thoroughly.
**Q. And the Foley Lardner article that's attached, if you turn to the second page, which is Bates-stamped 5126, the middle paragraph -- there you**



**go -- the middle paragraph that starts "CMS announced." If you could turn your attention there and read that first sentence.**
**(The deponent perused the exhibit.)**
A. Can you restate your question?
**Q. I actually didn't have a question, I just wanted to direct your attention to that. Foley Lardner says that CMS is going to authorize nurse practitioners "to provide direct supervision for all hospital outpatient therapeutic services that they are authorized to perform personally..."**
**Do you see that statement there?**
A. Yes, I do.
**Q. Do you remember reviewing that at that time?**
A. Yes, I did.
**Q. So when you reviewed this document, was this one of the things that you took into account when you wrote your opinion on physician supervision for radiation therapy in June 2010?**
A. Yes, probably it did include.
**Q. Okay. Did you review the proposed rule?**
A. As I recall, yes.
**Q. And have you reviewed the final rule?**
A. As I recall, yes.



**Q. Okay. I want to take a few minutes to try to determine who else was copied on this that we haven't talked about before.**
**Who is Janet Beltz? I don't think we've talked about her before.**
A. Jan Beltz is an advanced nurse practitioner that works in the wound care clinic.
**Q. And what about Joyce -- is it Honea?**
A. Joyce Honea --
**Q. Honea.**
A. -- is -- had been a nurse practitioner who also worked in wound care services at McKee Medical Center.
**Q. Lori Sehrt, is that how you say her name? Lori Sehrt. Who is she?**
A. Lori Sehrt in 2009 was the chief financial officer for McKee Medical Center. She also served as the facility compliance officer for McKee.
**Q. And just a follow-up question on that. The facility compliance officers, what is their role?**
A. I don't have --
MS. POUND: Object to the form of the question. You can answer.
A. I don't have their specific job description. My understanding of their role as a



compliance officer is to be our first line of compliance for questions and compliance and ethics issues.
**Q. (By Ms. Bennett) Do they have formal compliance training, to your knowledge?**
A. I do not know the specific training that they've all received regarding compliance at the facility level.
**Q. Who is Anne Rydesky?**
A. Anne Rydesky had been an associative administrator at McKee Medical Center.
MS. BENNETT: Let's mark this as Exhibit 58. 59.
(Deposition Exhibit 59 was marked for identification.)
**Q. Do you recognize this document?**
**(The deponent perused the exhibit.)**
A. Yes, I do recall this email.
**Q. Who is -- is it Ms. -- is it Ms. or -- Ms. Simpson or Mr. Simpson?**
A. Dr. Kelley Simpson is a male radiation oncologist.
**Q. And was he employed by Banner?**
A. No.
**Q. Why was he communicating to you about this**

**issue?**
A. At that time I -- in early 2010 Dr. Kelley Simpson was the owner and proprietor of Centennial Medical Physics, which was the group of physicians that Banner contracted with to provide the professional component for both North Colorado Medical Center and McKee Medical Center.
**Q. And he -- I'm sorry, was it a he or a she?**
A. He.
**Q. He opined that it would be a good idea to have the Banner compliance officer give us an opinion about MD supervision?**
A. Correct.
**Q. Did you get an opinion from the compliance officer about this issue that Dr. Simpson raises in this email?**
A. As I recall, I circled back with the team that was working on this that also included Pam Stieb and Mary McCabe.
**Q. I'm talking about the compliance officers who work in the western region like Jan Johnson and not the facilities compliance officers, just so we're clear. Did you reach out to Ms. Johnson or someone in her office to get an opinion about that?**
A. My direct reporting relationship does not



allow me to go directly to the western region compliance. I need to work through my direct supervisor and the facility compliance officers that then take that up the chain of command.
**Q. Do you know if Ms. Stieb took it up with Ms. Johnson?**
A. It's my understanding that both Pam Stieb and Mary McCabe had ongoing conversations with Jan Johnson regarding direct supervision.
**Q. Did they ever communicate to you that Jan Johnson had approved a compliance position with respect to the Centennial Medical physicians and direct supervision of radiation oncology?**
A. I'm not sure of your question.
MS. POUND: Object to the form of the question.
**Q. (By Ms. Bennett) Did either Ms. McCabe or Ms. Stieb ever tell you that they had communicated with Ms. Johnson on the issue that Dr. Simpson raises in this email?**
A. We had ongoing conversations regarding the direct supervision component, and I believe that came up in conversation, that they had had conversations with Jan Johnson at the western region.
**Q. Did you ever see anything in writing from**



**Jan Johnson giving an opinion on the issue that Dr. Simpson raises in this email?**
A. Specific to Dr. Simpson's email, no. I do recall receiving an email back from Jan Johnson regarding the Sterling component, because I had been involved in an email chain back and forth regarding direct supervision, that there was some discrepancy between what one article had said and between another -- I don't know if it was the American Hospital Association or the Colorado Hospital Association -- there was a discrepancy regarding the nonphysician practitioners providing direct supervision. And Jan emailed back saying I think we're okay on Sterling. It was not a formal approval, but I do remember seeing that email from Jan Johnson.
**Q. So just so we're oriented to this exhibit, let's take a look at the page that's Bates-stamped -- hold on a second. Let's take a look at Dr. Simpson's email and find out what he was asking you about.**
A. Which part of the email are you questioning?
**Q. Right. Let me direct you to a particular part of the email.**
**So if you look at the page that's marked -- that's Bates-stamped 7240, there is an email**



**from Dr. Simpson to Marsha Kaufman. Who is Marsha Kaufman?**
A. I do not know.
**Q. He raises the issue, Previously -- at the bottom of that page Dr. Simpson raises the issue, "previously I had thought that the family docs would cover the supervision for four days. We anticipate treating five to ten patients a day. What do you think? Who can I talk to?"**
**That's the issue that Dr. Simpson was raising with you in this email, don't you agree, whether a family doctor could cover radiation oncology?**
A. No. It appears that this email was from Dr. Kelley Simpson to Marsha Kaufman. I was not cc'd on this specific email.
**Q. Uh-huh. But is that the -- is that the issue that was being addressed in this email chain, whether family doctors could supervise radiation oncology when a radiation oncologist wasn't present?**
A. I cannot speak to Dr. Simpson's intent of what he intended on this particular email, I can only look at my personal interpretation of that, that it would appear that he's asking for clarification.
I do not know who Marsha Kaufman is.
**Q. Does Banner have a policy on whether**

**family physicians can directly supervise radiation treatment?**
A. I'm not aware of a policy to that specific focus, no.
**Q. Do you have any facilities in Northern Colorado where physicians other than -- physicians I want to focus on now, just physicians -- other than radiation oncologists supervise the provision of radiation therapy to patients?**
A. Not that I'm aware of in the Banner system, no.
**Q. What is your opinion about whether that would be an appropriate level of supervision for radiation treatment?**
A. I'm certainly not a compliance officer, but my understanding of the CMS guidelines is that the physicians or nonphysician practitioners can provide supervision for all outpatient therapeutic services as long as they have the skills, training, and it's within their scope of practice. A family practice physician would not have the scope or training to be able to provide direct oversight for specific radiation oncology.
**Q. Okay. We'll move along to -- we'll mark this as Exhibit 60.**



**(Deposition Exhibit 60 was marked for identification.)**
A. Are we done with this?
**Q. Yes. Just put them in a pile there because I might come back to them.**
**Do you recognize this document?**
**(The deponent perused the exhibit.)**
A. It appears that there are two documents in here. There is an email from Pam Stieb to the CDM team, which is an internal Banner, and then there is also an ACCC exchange of communication, the ACCC exchange, which the Association of Community Cancer Centers has an ongoing email exchange that people can post questions. It appears that there are two separate documents here, and I honestly don't recall the specifics about either one of these documents from 2010.
**Q. Let's do this, just so the record is clear since there are two documents. Why don't we mark the second document as Exhibit 61. And that starts here on the page that's Bates-stamped 7271. You need to have the reporter mark that.**
**(Deposition Exhibit 61 was marked for identification.)**
**Q. So getting back to the documents, the**



**exhibits that have now been marked Exhibit 60 and 61. Do you recall seeing these before today?**
**(The deponent perused the exhibits.)**
A. I do not specifically recall reading through the details of each one of these, no, I do not.
**Q. Do you remember seeing them before today, whether you read them in detail or not?**
A. May I answer in more than yes or no?
**Q. Yes. Yes. That was only for the lawyer questions, honestly. I'll let you know when I need a yes-or-no answer.**
A. North Colorado Medical Center and McKee Medical Center are members of ACCC, and I get daily emails regarding the ongoing exchange of information. That is an ongoing topic on various topics that come up in oncology. That's a daily occurrence. I do not remember this specific document from 2010.
Regarding the email that Pam Stieb sent to the Banner Health CDM team, I was not cc'd on that email, so I would not have a record of that particular email.
**Q. So focusing on the ACC (sic) email for a moment, which is marked as Exhibit 60, when you say you were a member of ACC, you're a member of the listserv?**
A. I am a full member. I am listed as the



administrator for the cancer program. But the facility is a member, as well as McKee -- both NCMC and McKee are members of ACCC -- so I have access to their ongoing publications, their electronic publications, their notices that come out. We get hard copy paper journals that come through. We have access to attend conferences, regional conferences and national conferences. And, yes, I do see their -- some people call it a listserv, but it is their email exchange of different topics.
**Q. So likely you would have received this email in or around January of 2010?**
A. I probably did.
**Q. And turning to what's been marked as Exhibit 61, which is the email from Ms. Stieb to the Banner Health CDM team. What is the CDM team?**
A. The CDM team is a Banner system-wide team of individuals that standardize billing and charging codes for -- CPT codes and HCPCS codes -- and that we standardize that all across the Banner system.
**Q. And how large is that team?**
A. I do not know.
**Q. If you look in the lower portion of Exhibit 61 there's an email that is dated February 2nd, 2010, which references a webinar sponsored by HCCA and**

**SCCE. Are you a member of HCCA?**
A. Where do you see HC...
**Q. Here. I'm sorry, on -- are you on the right page? It's 7271. Is that the Bates stamp number?**
A. I believe the hospital is a member of HCCA. I personally am not.
**Q. And it references the speakers. Do you recall, was this a webinar that you listened in on?**
A. I remember sitting in on several webinars and -- in person as well as live webinars. I don't remember if this was a specific one I sat in on.
**Q. And below that it says that CMS has clarified the rules on physician supervision to require that a physician be ready to intervene and conduct or modify the procedure, if necessary.**
**Do you see that?**
A. Yes, I do.
**Q. Is that your understanding of what is involved in direct supervision of a radiation therapy treatment?**
A. Can you restate that? I'm not clear on your question.
**Q. Is that your understanding that for a physician to directly supervise a radiation therapy**



**treatment, they have to be ready to intervene and conduct or modify the procedure, if necessary?**
A. Our perception of the CMS guidelines were clear that the CMS guidelines allowed physicians or nonphysician practitioners to provide oversight to all outpatient therapeutic services that were within their scope of practice, state licensure, and had specific training and guidelines, as well as credentialing and privileging by the facility.
**Q. Does that, in your understanding, include being ready to intervene and conduct or modify the procedure, if necessary?**
A. The nurse practitioners would not modify the treatment plan. The nurse practitioner certainly could intervene and evaluate within the full scope of practice, evaluate how a patient is tolerating treatment, or could make a decision to stop the treatment for the day.
**Q. So do you agree or disagree with this statement, that to be billed for "incident to" services, the provider must be ready to intervene and conduct or modify the procedure, if necessary, in order to meet CMS billing requirements?**
MS. POUND: Object to the form of the question.



A. I do not work with the billing and coding, so I'm not really able to respond to that question.
**Q. (By Ms. Bennett) From a compliance perspective is that what direct supervision means, that the provider must be ready to intervene and conduct or modify the procedure, if necessary?**
MS. POUND: Object to the form of the question.
**Q. (By Ms. Bennett) For radiation therapy treatments.**
MS. POUND: Same objection.
A. There are a number of aspects of the delivery of radiation therapy. Certainly our understanding of lots of different regulations, CMS included, guidelines, credentialing, is that the physician, the radiation oncologist, needs to evaluate the patient and determine the prescription for the treatment plan for that patient. But that patient then is treated over a much longer course of time.
**Q. Do you agree or disagree with the statement that direct supervision requires the provider to be ready to intervene and conduct or modify the procedure if necessary for purposes of CMS guidelines?**
MS. POUND: Object to the form of the question.



A. I'm not clear if you're asking the -- can you clarify, the provider meaning the physician or the provider meaning the advanced --
**Q. (By Ms. Bennett) Any provider. I'm just asking about any provider, Ms. Fritz. Does the provider, in order to qualify under CMS regulations to directly supervise a therapeutic procedure such as radiation treatment, have to be ready to intervene and conduct or modify the procedure, if necessary? I just want to know if you agree or disagree with that statement.**
MS. POUND: Object to the form of the question.
A. The physician can modify the treatment plan. The nurse practitioner that has received specific training and compliance and credentialing and privileging in radiation can intervene for emergency or when the patient is not tolerating treatment.
**Q. (By Ms. Bennett) Stepping back from -- I know you're anxious to tell me about nurse practitioners, but I want you to step back and answer a more general question, which is, as a general matter does the provider under CMS direct supervision rules have to be ready to intervene and conduct or modify the procedure, if necessary? Provider in general. Not**

**nurse practitioner, but the provider in general?**
A. Those are three different --
MS. POUND: Object to the form of the question.
**Q. (By Ms. Bennett) You can go ahead and answer.**
A. Those are three very different, distinct aspects, and so there is not one answer for that. The physicians would be the one to modify a treatment plan. They would need to be the ones to change the overall prescription for that patient.
**Q. Okay. Let's move on.**
MS. POUND: So we've been going for about an hour and ten minutes --
MS. BENNETT: Oh, we have? Yeah, I don't have a clock.
MS. POUND: Can we take a break?
MS. BENNETT: Sure.
(A recess was taken from 9:58 to 10:08 a.m.)
(Deposition Exhibit 62 was marked for identification during the recess.)
**Q. (By Ms. Bennett) Let's move on to what I've marked as Exhibit 62. Have you seen this document before?**



**(The deponent perused the exhibit.)**
A. Yes.
**Q. What is this document?**
A. This is the direct supervision final ruling from the year 2010.
**Q. And it's a publication by CMS; is it not?**
A. I can't speak to that, but, yes, it appears to be.
**Q. It says, "We are not making any significant changes in the definition..." "We are finalizing the proposed direct physician supervision requirements..."**
**It appears to be a document --**
A. From CMS.
**Q. -- from CMS?**
A. Yes.
**Q. And did you review this when you were considering the issue of the appropriate supervision for radiation therapy treatments?**
A. I do not recall the specific documents. There were numerous documents that came through from CMS. And, yes, I would have had this included in that review.
**Q. In the first paragraph CMS mentions that for direct supervision of hospital outpatient**



**therapeutic procedures, nonphysician providers have to be able to perform the service themselves under their state scope of practice. Do you see that?**
A. Yes, I do.
**Q. And how do nurse practitioners perform radiation therapy treatments?**
A. Neither physicians nor nurse practitioners are the ones who treat patients on the machine. That is -- the delivery is actually done by the radiation therapist.
**Q. My question was really about nurse practitioners. Is there any sense in which a nurse practitioner can be said to perform radiation therapy treatment?**
A. No.
**Q. Do they prescribe radiation therapy treatment?**
A. Absolutely not.
**Q. Can they modify or change the treatment plan while the patient is undergoing treatment?**
A. No.
**Q. Let's move on to -- you can put that document aside, and let's mark the next document as Exhibit 63.**
**(Deposition Exhibit 63 was marked for**



**identification.)**
**Q. And take a look at the document and let me know whether you recognize this.**
**(The deponent perused the exhibit.)**
A. Would you restate your question?
**Q. I just wanted to know if you recognize the document.**
A. Yes, I do.
**Q. Is this an email that you sent on January 14th, 2010, to Mary McCabe and Jan Johnson?**
A. Yes, it is.
**Q. And in the middle of the document, the first page, it says, "Here is the CMS guideline which addresses this issue."**
**Is that something you typed?**
A. No.
**Q. But you attached this to your email to Ms. McCabe and Ms. Johnson?**
A. Yes.
**Q. Turning to the next page, which is Bates stamp number 4887. In the first full paragraph near the end it says that "CMS will allow nonphysician practitioners to supervise..." .**
**Do you see where I'm reading?**
A. Yes.

**Q. Okay. "...that they may perform themselves in accordance with state law and scope of practice and hospital-granted privileges."**
**Do you see where I'm reading?**
A. Yes.
**Q. So you had this document in your mind or in your folder when you considered the June 2010 opinion?**
A. Yes.
**Q. This was one of the things you looked at; do you agree?**
A. Yes.
**Q. And you knew that, at least according to ACCC, a nurse practitioner had to be able to perform the procedure they were supervising themselves. Do you agree?**
MS. POUND: Objection to form of the question.
A. No.
**Q. (By Ms. Bennett) You don't agree that that's what this document says?**
A. Our interpretation of this was that nurse practitioners would need to have specific training and education in that area in order to provide the direct supervision component, if I understood your question



correctly.
**Q. I thought you just testified that a nurse practitioner could not perform radiation therapy, that is, they could not modify a treatment while a patient was on the table being treated.**
MS. POUND: Object to the form of the question.
A. The nurse practitioners can stop treatment, but they would not be able to modify a prescription.
**Q. (By Ms. Bennett) So at least with respect to that part of the radiation therapy services, they can't be considered to be performing the service; do you agree or disagree?**
A. A nurse practitioner working in radiation oncology would not be able to develop a treatment plan or to modify a treatment plan. They can certainly, within the scope of practice in the state of Colorado, provide medical management of those patients undergoing a course of treatment or could stop a treatment from occurring until further evaluation of the patient could be made.
**Q. And when you say "medical management," what do you mean, Ms. Fritz?**
A. The medical management of a patient would



be as the patient is going through the course of treatment there are oftentimes general or site-specific side effects that that patient may incur. The overall medical management includes being able to prevent, minimize or treat treatment-related side effects as they're going through treatment.
**Q. If you turn to the page of Exhibit 63 that is Bates-stamped 4888. At the top of the page, the first full paragraph that starts, "CMS also notes..." "...the supervisory physician or nonphysician practitioner must have, within his or her State scope of practice..."**
**Do you see where I'm reading?**
A. No, I do not.
**Q. The first paragraph starts, "CMS also notes..."**
A. Okay.
**Q. And then it goes on to say, "...in order to furnish appropriate assistance and direction for any given service or procedure..."**
**Do you see where I'm reading?**
A. Yes.
**Q. "...the physician or nonphysician practitioner must have within his or her State scope of practice and hospital-granted privileges the ability to**



**perform the services or procedure."**
**Do you see where I'm reading?**
A. Correct.
**Q. And where within the state scope of practice does a nurse practitioner have the authority to perform a radiation therapy treatment?**
A. There is not a laundry list, per se, in the state scope of practice of services that a nurse practitioner could provide or not provide. In the state of Colorado an advanced nurse practitioner has what's called a full scope of practice, meaning that within their training and expertise they have the ability to diagnose and do medical management follow-up and interpretation of diagnostic tests related to that area. Nurse practitioners function in multiple different areas in healthcare.
**Q. And are you familiar with the hospital-granted privileges at NCMC for nurse practitioners?**
A. I have a general awareness of them, yes.
**Q. Do those privileges include performing radiation treatment therapy?**
A. I do not have the privileging and credentialing form in front of me, but it is my understanding that each hospital has a slightly

different approach from medical staff bylaws and credentialing. The nurse practitioners functioning within oncology, and specifically within radiation oncology, have been granted privileges by the medical staff services.
**Q. And what is the scope of those privileges?**
A. I do not have that form in front of me. I can't -- I can't speak to that in detail.
**Q. When you were preparing your opinion letter in June of 2010, did you have those privileges in front of you? Was that part of what was in your folder?**
A. As I recall, those privileges were being formed during that period of time.
**Q. Is that something that you consulted in connection with your determination about whether a nurse practitioner could perform radiation therapy treatments?**
A. Can you restate your question?
**Q. Is that something that you consulted, the credentialing document, when you issued your June 2010 opinion about the role of nurse practitioners in radiation treatment?**
MS. POUND: Object to the form of the question.



A. Dr. Carol Vanetti, who was the western region of medical staff services, was involved with medical staff services in each hospital. She was a part of those conversations. I did not go directly to the credentialing/privileging committee in each facility regarding that specific topic.
**Q. (By Ms. Bennett) Let me try again because I don't think my question was clear.**
**When you wrote your letter in June 2010, had the credentials been fully developed?**
MS. POUND: Object to foundation.
A. I do not recall the specific time frame around the credentialing and privileging in each facility.
**Q. (By Ms. Bennett) Do you recall having any credentials in your -- nurse practitioner credentials in the folder of material you looked at when you formed the June 2010 opinion?**
A. Not that I recall specifically.
**Q. So when you rendered that opinion, how were you able to determine what the nurse practitioner's credentials were at McKee or NCMC?**
MS. POUND: I'm going to object to foundation and the form of the question.
**Q. (By Ms. Bennett) You can go ahead and**



**answer.**
A. In my role as a general service line director, it would not be my responsibility to create the specific wording that is done through the medical staff services for credentialing and privileging. That would be outside of the scope of what I would normally do in my role.
**Q. But in order to determine whether delivery of radiation therapy treatments was within a nurse practitioner's credentials at the hospital, wouldn't you need to know what those credentials were?**
MS. POUND: Objection; form and foundation.
A. I did have discussions with my direct supervisor, Dr. Lisa Hoyle, who is the chief nursing officer, who was also very familiar with the scope of practice of an advanced nurse practitioner, and she also gave guidance and input into the discussion on nurse practitioner's role within specialty areas, which included radiation oncology.
**Q. (By Ms. Bennett) So can you answer whether or not you had the credentials in front of you when you were -- the nurse practitioner credentials in front of you when you were preparing your June 2010 opinion letter?**



A. No.
MS. POUND: Objection to form and foundation.
**Q. (By Ms. Bennett) Okay. Let's move on and mark this as Exhibit 64. You can put that one to the side.**
**(Deposition Exhibit 64 was marked for identification.)**
**Q. And let me ask you first, do you recognize this document?**
A. Yes, I do recognize this document.
**Q. And what is Exhibit 64?**
A. Can you restate that?
**Q. What is it? Can you identify it for the record?**
A. Yes. This is an email that I received to my Outlook inbox from Marty Baker in January 29, 2010, that was an email forwarded with an attachment from an individual that worked with Revenue Cycle.
**Q. And is this part of what you had in your folder of information that helped you prepare the June 2010 opinion letter?**
A. Yes, it was.
**Q. Did you review it at the time in January 2010, do you recall?**

A. Yes, I did review it. And this was also the same document that we had reviewed prior to this point in time. This topic came up when an outside consulting firm, Revenue Cycle, was contracted to come into Northern Colorado.

**Q. So when you say you reviewed it prior, you reviewed Revenue Cycle's document prior to January 29th, 2010?**

A. No. This document is from CMS. And this was the same document that we had reviewed prior, and then CMS forwarded this document to Marty Baker, who forwarded it to me.

**Q. Are you talking about you and I reviewed it prior or are you talking you and Marty reviewed it prior? That's what I'm not following.**

A. This document from CMS was a document that prior to Revenue Cycle forwarding this in an email that we all had a copy of before.

**Q. Okay.**

A. So this was the same document that we had reviewed previously that then Marty forwarded to me.

**Q. And at the time that Eva Huddleston from Revenue Cycle forwarded this to Marty, were they engaged by Banner to do an audit of radiation oncology billing?**



A. They were engaged by Banner Health to come in and do additional education to the physicians and to the staff regarding documentation, and specifically for the use of MOSAIQ, which is our electronic medical record.

**Q. Okay. And when did that engagement begin, do you recall?**

A. I do not have the specific dates in front of me. Revenue Cycle was brought in and contracted by Banner Medical Group, and at that point in time the -- I don't know if she was the clinic manager or the director from Banner Medical Group, or BMG, contracted Revenue Cycle to come in.

**Q. As of the date of this email, do you believe that Revenue Cycle had been contracted by Banner to review radiation oncology billing?**

MS. POUND: Object to the foundation.

A. I do not have the dates in front of me and I do not recall.

**Q. (By Ms. Bennett) Okay. So reviewing this document, these are the comments on the proposed outpatient services rule; do you agree?**

A. This appears to be the document from CMS regarding outpatient therapeutic direct supervision.

**Q. And you reviewed the comments that are**



**contained in the document that begins on Bates stamp number 6060? Did you review them in preparation for your June 2010 opinion letter? I'm just talking generally the next page.**

A. Yes.

**Q. You reviewed them. Okay.**

**So directing your attention to what's Bates-stamped 6072 after number 3. You reviewed the statement that begins, "We proposed that nonphysician practitioners..." -- do you see where I'm reading?**

A. Yes, I do.

**Q. -- "...can directly supervise any outpatient therapeutic services they may perform themselves in accordance with their state law and scope of practice and hospital-granted privileges." You reviewed that, correct?**

A. Correct.

**Q. And moving along to what's Bates-stamped 6075. CMS -- at the top of the page CMS reiterates that, "Nurse practitioners may provide direct supervision for hospital outpatient therapeutic services that they may perform themselves under state law and within their scope of practice and hospital-granted privileges."**

**You knew -- you had that information**



**before you when you wrote the June 2010 letter, correct?**

A. Correct.

**Q. And moving along to 6079. In the middle of the page there is a paragraph that begins, "In addition..."**

**Do you see where I'm reading?**

A. Yes.

**Q. And then the second sentence of that says, "This means that the physician or nonphysician practitioner must be prepared to step in and perform the service, not just respond to an emergency."**

**You had that before you when you prepared your June 2010 opinion letter; is that correct?**

A. Correct.

**Q. And that goes on to say, "This includes the ability to take over performance of a procedure..." You see that? You knew that at that time?**

A. Yes.

**Q. You understood that that was CMS's position?**

A. Yes.

**Q. Let's look at 6081. At the bottom of that page there's a sentence that begins, "In addition," and it goes on to reiterate the requirement that the**

**nonphysician provider must be able to perform the service within his or her state scope of practice and hospital-granted privileges.**
**Do you see where I'm reading?**
A. Yes.
**Q. And you read that as well?**
A. Yes.
**Q. In fact, that's one of the portions that Ms. Baker highlighted for you when she forwarded this -- these comments to you for your review?**
A. As I recall, after Marty Baker sent me this email, I met with Marty in person and we rereviewed this document. It was my understanding that Marty did not highlight these areas, that Revenue Cycle had highlighted these areas and forwarded that to Marty.
**Q. In any event, they were highlighted by someone to make them stand out in particular when you were reviewing the document, correct?**
A. Correct.
**Q. Okay. And looking at 6083, in the -- smack in the middle of that page there is a sentence that begins, "Proposed new section 410.27(a)(1)(iv) would provide that nonphysician practitioners may directly supervise services they can furnish**



**themselves."**
**Do you see where I'm reading?**
A. Yes.
**Q. And you reviewed that section as well?**
A. Yes.
**Q. Now, moving along to 6085, at the top of that page, "Response." CMS says, "We appreciate the commenters' support for our proposal to allow certain nonphysician practitioners to directly supervise services they may perform themselves within their state scope of practice."**
**Do you see where I'm reading?**
A. Yes.
**Q. You reviewed that?**
A. Yes.
**Q. And the other statement on that page that says near the bottom, "We emphasize, though, that nonphysician practitioners may only supervise therapeutic services within their own scope of practice and hospital-granted privileges."**
**You reviewed that as well?**
A. Yes.
**Q. Looking at the page that's in Bates stamp 6096. Again, the highlighted material reiterates the CMS requirement with respect to the state scope of**



**practice and hospital credentials, the first highlighting on that page.**
**Do you see where I'm looking?**
A. Yes.
**Q. And then CMS goes on in the second paragraph to say, "We do not believe that allowing a supervisor to be responsible for emergencies only would satisfy the standard to furnish assistance and direction throughout the performance of the procedure."**
**You were aware of that when you wrote your June 2010 opinion letter?**
A. Yes, I was.
**Q. Finally, let's look at the Bates stamp 6097. At the top of that page CMS says, "It would be unreasonable to think that a nonphysician practitioner could competently assist and direct a procedure for which they do not have sufficient knowledge and skills to perform or redirect the procedure or service."**
**Do you see where I'm reading?**
A. To clarify, you left out "physician." So the exact statement is, "It would be unreasonable to think that a physician or a nonphysician practitioner could competently assist and direct a procedure for which they do not have sufficient knowledge and skills to perform or redirect the procedure or service."



**Q. And you had that in mind when you were writing the June 2010 opinion letter?**
A. Yes.
**Q. And is it your opinion that a nurse practitioner can redirect a radiation treatment?**
A. A nurse practitioner can stop a treatment if a patient is not tolerating treatment, and they certainly can do more than respond to an emergency situation.
**Q. Can they redirect a treatment?**
A. They can stop treatment.
**Q. Let's take a look at what we'll mark as Exhibit 65.**
**(Deposition Exhibit 65 was marked for identification.)**
**Q. And while we're -- before you take a look at that, let me ask you a follow-up question.**
**Is it within the nurse practitioner's hospital credentials that they can stop a radiation treatment without consulting a radiation oncologist or a radiation therapist?**
MS. POUND: Objection; foundation.
A. Can you restate that?
**Q. (By Ms. Bennett) Is it within the nurse practitioner's hospital credentials at McKee or NCMC**

**that they can by themselves stop a radiation therapy treatment without consulting a radiation oncologist or a radiation therapist?**
MS. POUND: Objection; foundation. Go ahead and answer.
A. I do not have a copy of the individual credentialing and privileges for the nurse practitioners in front of me to be able to respond adequately to that, but it is my understanding that, yes, a nurse practitioner can stop treatment and not allow that patient to be treated for the day without consulting with a physician.
**Q. (By Ms. Bennett) Let's take a look at Exhibit 65. Do you recognize this document?**
**(The deponent perused the exhibit.)**
A. Yes.
**Q. And can you identify it for the record?**
A. This is an email that was sent from Jan Johnson in response to an email that I had forwarded on to her regarding a conference call that ACCC, or the Association of Community Cancer Centers, was hosting. And it appears that I was informing Jan Johnson that I was planning on participating in the conference call regarding direct supervision guidelines.



**Q. And his email -- her email to you says, "I am trying to ferret out how we get attention throughout Banner to review this issue."**
**Do you know what he meant by that? What she meant by that?**
A. I do not.
**Q. Was there any further development of that theme that they would -- that Ms. Johnson would get attention throughout Banner to review the issue?**
A. I would not have knowledge of that.
**Q. As far as you know, there was no further consideration throughout Banner of the nurse practitioner supervision issue?**
A. I would not know what transpired after that email. I would not have access to that.
**Q. And did you attend this ACC conference call?**
A. As I remember, yes.
**Q. What was the -- what was the roster of attendance for that conference call, as you remember?**
A. I do not remember.
**Q. Do you remember who was on the call?**
A. I do not remember.
**Q. Do you remember, was someone from ACCC on the call?**



A. I believe that ACCC had facilitated that, and they had national speakers that came in to do that live webinar.
**Q. Okay. Did you get any handouts or PowerPoint presentation from this conference call?**
A. I do not recall.
MS. BENNETT: Let's mark this as Exhibit 66.
(Deposition Exhibit 66 was marked for identification.)
**Q. Do you recognize this document?**
**(The deponent perused the exhibit.)**
A. This appears to be an email that I responded back to Jan Johnson in February of 2010.
**Q. And in the email that appears in the middle of page that's Bates stamped 4939, Ms. Johnson says to you, "Yes, please attend. Give me a copy of the handouts, please."**
**Do you recall getting handouts that you gave to Ms. Johnson? Does this help refresh your recollection on this issue?**
A. I'm sure I did receive handouts. I don't recall what was specifically in the handouts.
**Q. Would that have been in the folder that you maintained of documents relevant to your June 2010**



**opinion?**
A. I would assume so, but I don't recall.
**Q. And then above that you respond to Jan giving you -- Ms. Johnson, rather, giving you some handouts. Do you recall which handouts she sent to you?**
A. I do not recall.
**Q. So let's mark this as Exhibit 67.**
**(Deposition Exhibit 67 was marked for identification.)**
**Q. Do you recognize what this document is?**
A. I do not recognize this email. I was not cc'd on this email, so I don't have recollection of this particular email.
**Q. So my question is more general, though. Does this appear to be an email that would have been created in the ordinary course of business at Banner?**
A. I can't speak to that because this is not an email that I was cc'd on. I would assume that, yes, this was a normal email trail that went back and forth with compliance.
**Q. So the top part of the page that's Bates-stamped 4947 reflects an email from Jan Johnson to Janice Dinner. Who is Janice Dinner?**
A. I do not know.

**Q. And what about David Ledbetter?**
A. David Ledbetter works with our compliance and legal department.
**Q. Is he a lawyer?**
A. I do not know.
**Q. And Ginger Zech, who is that?**
A. As I recall, Ginger Zech worked with compliance, along with Jan Johnson. I do not know her specific title or her job duties.
**Q. Do you know whether she was a lawyer?**
A. I do not know.
**Q. Is Jan Johnson a lawyer?**
A. I do not know.
**Q. And you don't know who Janice Dinner is, so you don't know whether she's a lawyer?**
A. I do not know.
**Q. Turning to the next page, which is Bates-stamped 4948. Have you seen that attachment before?**
A. As I recall, yes.
**Q. And was this -- would this possibly be the handouts that Ms. Johnson references in Exhibit 66? "I have attached the handouts I received as part of the seminar I attended this week."**
A. I do recall seeing this handout. I was



not on Jan's email, so I can't speak as to how she obtained this handout.
**Q. But you recognized the handout, which is complying with physician supervision requirements?**
A. Yes, I do recognize this.
**Q. Was that part of the material that you reviewed to prepare your June 2010 letter?**
A. I'm sure it was something we considered, yes. This was from the advisory board and so, yes, this would be one of the things that we probably took into consideration.
**Q. So the advisory board is part of what organization?**
A. The advisory board is a -- not a regulatory agency; the advisory board is an outside firm that is -- many hospital systems use as a resource and information. It is an opinion service.
**Q. So is that the name of the group, "the advisory board"? Is that the whole name of the organization, do you know?**
A. As far as I'm aware, yes. I do not know the specific legal term for their organization.
**Q. So if you turn to page Bates stamp 4951. There's a block of text to the right that says, "Supervisory authority limited to services that the NPP**



**can personally perform."**
**Do you see that?**
A. Yes, I do.
**Q. You reviewed that?**
A. I'm sure I did.
**Q. Turning to the next page, which is 4952. Take your time. It says: "Defining Supervision. Must be able to step in and perform services if necessary."**
**Did you review that?**
A. I'm sure I did.
**Q. And turning to 4954. Actually, strike that.**
**Okay. We're done with that. You can put that to one side.**
**Let's mark this as Exhibit 68.**
**(Deposition Exhibit 68 was marked for identification.)**
**Q. Do you recognize the document that's attached to this email?**
A. I have a vague recollection of this particular document, yes.
**Q. Do you think this is one of the things that you reviewed in connection with preparing your June 2010 opinion letter?**
A. I do not recall if this was one of the



specific documents. We reviewed a number of documents and information. I do not recall this specific document being one of the key documents we reviewed. I do have a general recollection -- recognition -- recollection of this particular document.
**Q. This is something that's produced by the Regulatory Compliance Support. Do you know what organization that is?**
A. No, I do not.
**Q. Let's mark the next exhibit as 69.**
**(Deposition Exhibit 69 was marked for identification.)**
A. May I clarify that this was an email that Jan Johnson sent to others that I was not cc'd on, so I would not have had purview or a copy of this.
**Q. I understand you didn't have a copy of the email. I was wondering if you ever saw the attachment?**
A. I have a vague recollection and general recollection of reviewing that, yes.
**Q. Let's take a look at what we've marked as Exhibit 69.**
**Do you recognize this document?**
A. Yes.
**Q. What is it? Could you identify it for the record, please?**

A. This was an email that I had sent to Jan Johnson, Mary McCabe and Dan Dennie in March of 2010, and -- asking for clarification that there was discrepancy between two of our documents regarding the direct supervision.

**Q. So in terms of the people you sent this to, I think we know who everyone is except maybe Dan Dennie. We haven't talked about him before, I don't believe. Can you tell me who he is?**

A. Dan Dennie was our director of medical imaging, which direct supervision for diagnostics would have fallen under him.

**Q. And you reference a -- you reference a particular page. "On page 11, it states that radiation oncology treatments should be supervised by a radiation oncologist."**

**Do you know what document you were referring to here? It says, "Physician Supervision Article - very helpful!"**

A. I am assuming that it was one of the documents that had been forwarded to me by someone else. Particularly it might have come from Jan Johnson. And I brought to her attention that there was a discrepancy between that document and the American Hospital Association webinar.



**Q. And the American Hospital Association webinar, is that one of the online presentations that you attended?**

A. As I recall, yes.

**Q. And were there handouts from that?**

A. As I recall, yes.

**Q. Have we looked at the handouts in any of the documents that we've looked at so far today?**

A. I do not know. I do remember -- I do recall that it was a live meeting and they were going through a PowerPoint presentation on the live meeting.

**Q. When Ms. Johnson wrote back to you saying, "I agree with you, we need a broader look," what was she referring to, if you know?**

A. I can't speak to that.

**Q. Was there a broader look at this issue?**

A. I can't speak to that. I would not know.

**Q. If someone in the compliance department had taken a broader look at the issue -- I'm talking about the compliance department in the western regional office, not in the individual facilities -- had taken a broader look at it, is that something that would have been communicated to you do you think?**

A. I do not know. Probably, but I do not know.



**Q. If we -- in going through additional documents during the deposition today if you recognize the document to which you're referring here, could you let me know, "On page 11, it states that..."?**

A. Yes, I'd be happy to.

**Q. Okay. I'd appreciate that. Also, if we look at any AHA webinar handout that you may have received, you could let me know, Oh, this is the AHA handout I was referring to. Would you please let me know that?**

A. I will.

**Q. Okay. Thank you.**

**Let's move along to Exhibit 70.**

**(Deposition Exhibit 70 was marked for identification.)**

**(The deponent perused the exhibit.)**

**Q. Do you recognize -- I understand you weren't copied on the email, but do you recognize any of the attachments?**

A. No, I do not.

**Q. I think there is a new person who appears on the email from Ms. Johnson to Mr. Ledbetter -- well, first of all, I'm not sure we talked about Mr. Ledbetter. Do you know who he is?**

A. David Ledbetter works in our compliance



and legal department at corporate.

**Q. Is he a lawyer?**

A. I do not know.

**Q. And what about Helen Bixenman? We didn't talk about her yet, did we?**

A. I do not know who she is.

**Q. The email references, "David, you indicated you would pull together the right folks to review and take action on this issue," which is the issue of supervision for diagnostic and outpatient therapeutic services.**

**Were you part of that group?**

A. I was not included on this email, and, no, I was not part of that group.

**Q. Do you know who was in that group?**

A. No, I do not.

**Q. Did you ever hear that there was such a group?**

A. No.

**Q. Let's mark the next exhibit as 71.**

**(Deposition Exhibit 71 was marked for identification.)**

**(The deponent perused the exhibit.)**

**Q. Do you recognize this document as a Banner email?**

A. I recognize that this is a copy of an email, but I was not included on this email.
**Q. In the email Ms. Johnson -- from Ms. Johnson to Lori Sehrt dated March 23rd, 2010, she refers to "calling for a meeting of 'deciders' to survey the organization to determine which services/departments need to have direct supervision of therapeutic services based on the recent Medicare changes."**
**Do you recall being included within the "deciders" who would determine which departments needed direct supervision?**
A. No.
**Q. Do you recall there being such a group?**
A. I'm not aware of that.
**Q. Did you ever communicate with any group of deciders within Banner about your June 2010 opinion letter?**
A. I was requested by the facility compliance officers to create that white document, the white paper.
**Q. Do you know whether that was approved or -- let's start with approved -- at any higher level within Banner?**
A. I'm not aware of that.



**Q. Let's mark the next document as Exhibit 72.**
**(Deposition Exhibit 72 was marked for identification.)**
**(The deponent perused the exhibit.)**
**Q. I understand you weren't copied on this email either, but I was wondering if you recognize any of the attachments to the email that's been marked as Exhibit 72.**
**(The deponent perused the exhibit.)**
MS. BENNETT: We can mark 73, Aimee, while she is reading that.
(Deposition Exhibit 73 was marked for identification.)
A. Can you restate your question?
**Q. I just want to know if you recognize any of the attachments as things you might have reviewed in connection with your June 2010 opinion letter?**
A. I do not recognize these specific documents, but the topics are all topics that we reviewed previously. And I was not included on this email and, no, I did not read these at that point in time from this email.
**Q. But do you recognize any of them specifically as things that you might have read when**



**you prepared your letter?**
A. I do not recognize this specific document, but the topics and the information is consistent with what I remember of other documents that I reviewed.
**Q. And do you know why you weren't invited to participate in this conference call?**
A. I'm not a part of the compliance team or the facility-based compliance officers. I don't recognize all the names on who this was sent to, but it appears that this was a group of compliance officers within the Banner system.
**Q. And do you recognize within the group any of the facility compliance officers that you dealt with on this issue? For example, was Pam Stieb included?**
A. Yes, Pam Stieb was on here. Lori Sehrt, who was at that time the facility chief financial officer and facility compliance officer. Jan Johnson is on here. I am looking for Mary McCabe's name, but I don't see it at the moment, and I don't know why she would not have been included in this.
And I can't speak to this email or the purpose of that or discussions that were occurring within compliance.
**Q. I understand. Let's move on to Exhibit 73.**



**Do you recognize this document?**
A. Yes.
**Q. Is this something that you had in your folder, either your electronic or hard folder, when you wrote your June 2010 opinion letter?**
A. As I recall, yes.
**Q. And you would have reviewed that before you drafted the opinion?**
A. As I recall, yes.
**Q. And on page -- Bates stamp 4528, number 6, you would have specifically reviewed this paragraph?**
A. Yes.
**Q. Okay. Let's mark the next document as 74.**
**(Deposition Exhibit 74 was marked for identification.)**
**Q. Once again, I know you're not copied on this email, but I was wondering if you could turn to the attachments and let me know if you recognize any of those attachments as things you might have had in your folder in connection with your June 2010 opinion letter.**
**(The deponent perused the exhibit.)**
A. I am not familiar with this email, nor am I familiar with the organization AAPC.
**Q. What about the Medicare benefit policy**

**manual provisions that are attached, did you have these handy when you were preparing your opinion letter in June of 2010?**
A. Not that I recall, no.
**Q. John --**
MS. BENNETT: I cannot get this person's name right, ever since we talked about it yesterday, Aimee --
**Q. (By Ms. Bennett) Ms. Johnson's email refers to a "physician supervision risk assessment." Did you ever hear that phrase used in connection with the discussion of that topic?**
A. No.
**Q. Were you in any way involved in doing a risk assessment for either NCMC, McKee or Sterling?**
A. I do recall that Lori Sehrt at McKee pulled together the managers and directors over outpatient areas, both in diagnostic and in therapeutic areas, and we participated in a live webinar. And we did complete a report back to her regarding services and how they were performed in that area. And I specifically recall that as it related to wound care and outpatient infusion and radiation oncology.
**Q. And did the -- so what makes you think that might be the risk assessment? Let's start there.**



A. I don't know if it's the risk assessment. I assume, because of the information that the facility compliance officer and chief financial officer requested, it could be related to that, but I am not aware.
**Q. When did that take place?**
A. I do not recall.
**Q. And you say Lori Sehrt pulled together -- I think you said managers?**
A. Correct.
**Q. Managers. And who was the -- who were the attendees at that meeting?**
A. I do not have a listing of who attended, but it would have been the managers over outpatient areas at McKee at that point in time.
**Q. And the live webinar, was that something that was put together by Banner?**
A. I believe that Lori Sehrt had arranged for us to participate in that.
**Q. Was it put together by Banner or by an outside organization?**
A. As I recall, it was an outside organization. It was not internal to Banner.
**Q. Do you remember what organization?**
A. I do not.



**Q. Do you remember whether there was a PowerPoint or handout?**
A. It was a live meeting that they went through a PowerPoint, but I did not receive a copy of that.
**Q. And what was the topic?**
A. It was regarding --
**Q. You said wound care --**
A. It was regarding direct supervision for diagnostic areas and for outpatient therapeutic areas, which are really two very distinct areas from the CMS guidelines.
**Q. And do you recall when that took place?**
A. No, I do not recall when it took place.
**Q. The attachments to what we marked as Exhibit 74, were they part of this webinar?**
A. Not that I recall, no.
**Q. And let's mark the next exhibit as 75.**
**(Deposition Exhibit 75 was marked for identification.)**
**(The deponent perused the exhibit.)**
**Q. Reviewing what's been marked as Exhibit 75, does this refresh your recollection in any way about the risk assessments? I know you weren't copied on this, but...**



A. I was not a part of what I recall ever being a formalized risk assessment. I was not part of this email and I can't really respond to this email.
**Q. Do you have any idea what the term "risk assessment" as used within Banner would mean?**
A. I do not.
**Q. Have you heard that term used in any context during your employment by Banner?**
A. A formal risk assessment? No.
**Q. Let's move on to Exhibit 76.**
**(Deposition Exhibit 76 was marked for identification.)**
**Q. Do you recognize this document?**
A. Not this specific document, no.
**Q. Do you remember seeing something like this?**
A. During 2009 through at least 2010 and early 2011 there was a lot of information that was put out from various organizations. I do not recall this specific PowerPoint slide, no.
On the page 50, which is the second page of this document, it's exactly the same wording that we've reviewed in other documents before.
**Q. Okay. That's fine. Thank you.**
**Let's move along and mark this as 77.**

**(Deposition Exhibit 77 was marked for identification.)**

MS. POUND: We've been going for about another hour and ten minutes. It's about 11:20. Do you want to take a break?

MS. BENNETT: Yeah, this is a good time to break.

(A recess was taken from 11:17 to 11:29 a.m.)

**Q. (By Ms. Bennett) All right. So when we -- when we broke I think I had just marked 77. And can I just take a look at that for a moment? I want to make sure we're on the same page here. Okay. That is right. 77.**

**Do you recognize this document?**

A. Yes, I do recognize this email.

**Q. This is an email that you -- the top part is an email you sent to a number of people on February 2nd, 2011?**

A. Uh-huh.

**Q. And the bottom part is an email that Rob -- Linda Robbins sent to you on February 2nd, among other people, correct?**

A. Correct.

**Q. Who is Linda Robbins?**



A. Linda Robbins was employed by Banner Health and worked with our revenue integrity team.

**Q. And who is Patrick Schooley?**

A. Pat Schooley is our radiation therapist and frontline department manager for the David Walsh Cancer Center.

**Q. And Linda Robbins is passing some information on to you and others from Ron DiGiaimo from Revenue Cycle, correct?**

A. Yes.

**Q. And that information is attached hereto. It starts on Bates number 7367.**

A. Yes.

**Q. Did you review this email from Ron DiGiaimo that's attached as 7367?**

A. After it was forwarded to me, yes.

**Q. And in that Mr. DiGiaimo reflects his opinion that if there's no radiation oncologist on site, the answer is no to meeting supervision guidelines?**

MS. POUND: Object to the form of the question.

**Q. (By Ms. Bennett) Do you see where I'm reading?**

A. I see what you're referring to in the email.



**Q. That's what Ron DiGiaimo says in the email, that you can't bill unless there is a radiation oncologist on site?**

MS. POUND: Object to the form of the question.

A. That was his interpretation of the standards at that time.

**Q. (By Ms. Bennett) And who is Mr. DiGiaimo?**

A. And I have a terrible time pronouncing his last name.

**Q. Who doesn't?**

A. But Ron G, DiGiaimo, is the owner and proprietor of Revenue Cycle.

**Q. And what does Revenue Cycle do?**

A. Revenue Cycle is an independent for-profit company that assists organizations with questions from billing and coding specific to oncology.

**Q. And that's all they do, right? They focus on radiation oncology?**

A. I also believe that they have an interest in medical oncology as well. But I believe primarily the organization/business started with radiation oncology.

**Q. Do you know how long Revenue Cycle has been in business?**



A. No, I would not have information on that.

**Q. In your email responding to the email Linda Robbins sent to you, you reference a link to the ACCC document, which includes the compliance standards for direct supervision?**

A. Correct.

**Q. Yes. Is that one of the documents we've looked at so far today?**

A. I believe it is.

**Q. Do you remember what exhibit it is?**

A. Without clicking on the link, I'm not sure I can get the specific one. It may be Exhibit 73, but I can't verify that without clicking on the link.

I don't want to get these out of order here.

**Q. So 73 is the document that's dated April 23rd, 2010, and is entitled "Common Questions about Supervision Requirements."**

A. Without clicking on the link, I cannot validate exactly the document from ACCC. As I recall, it was a lengthy document that went through a discussion of frequently asked questions about direct supervision in outpatient therapeutic areas.

**Q. And you say -- you go on to say, "We have**

**also obtained documentation from compliance on this topic."**
**What were you talking about there?**
A. Numerous emails that had gone back and forth, and then also the white paper that I developed and submitted to the facility compliance officers per their request.
**Q. In February 2011 you're referring to the June 2010 opinion letter that you prepared for the facility compliance officers?**
A. Correct. And also a tremendous amount of review and discussions, emails, meetings, regarding the direct supervision compliance standards.
**Q. So the documentation from compliance that you're talking about here includes the letter that you prepared?**
A. I believe what I was referring to is all of the documentation, the webinars, the frequently asked questions from CMS, the information that we had from ACCC.
**Q. So your testimony is that you just disagreed with Mr. DiGiaimo?**
A. When Ron DiGiaimo -- and I apologize for not pronouncing his name correctly -- originally came into -- and he was contracted by the Banner Medical



Group to come in and help, particularly the physicians and the staff, with better documentation and understanding of billing. And that was both for the medical oncology and the radiation oncology side.
When they first came in there was some confusion. They were brought in by Mary Dreiling, who at that time was one of the managers/leaders from Banner Medical Group. When they first came in there was some confusion regarding scheduling of them. And they were taken out to our corporate office and given access to get into the electronic medical record, which they accessed Cerner. We utilized MOSAIQ on both radiation and on the medical oncology side.
So their initial review didn't show much documentation at all on the Cerner side because they weren't looking at the MOSAIQ side. And at that point in time early on we still had what we call a blended chart where we had some paper charts as well as some information in the electronic medical record, and we were not very well standardized between Loveland, Greeley and Sterling with the use of the electronic medical record.
**Q. So how did that lead you to conclude that Mr. DiGiaimo was wrong when he stated that a radiation oncologist had to be on site with respect to meeting**



**supervision guidelines?**
A. We did not immediately say that he was wrong. That's an incorrect statement. What we did was take that information, we circled back, we rereviewed the documents, we rereviewed the compliance standards, we circled back and had further discussions with the C Suite or administrative folks, as well as the compliance officers, and relooked at that all over again.
**Q. Who was involved in that discussion?**
A. As I recall, Dr. Lisa Hoyle was involved in that discussion, who was my direct supervisor at that time. In addition, there was Mary McCabe, there was Lori Sehrt, there was Pam Stieb, there was Michelle Joy -- I'm sorry, I'll slow down --
**Q. Who was the last person?**
A. Michelle Joy --
**Q. Okay.**
A. -- who was the chief executive officer at that time for Sterling Regional Med Center. And it also included the direct managers of radiation oncology.
**Q. Did you reach out to anyone at CMS to clarify the direct supervision requirement for nurse practitioners?**



A. I reached out to my direct supervisor and to the compliance officers.
**Q. Did you reach out to anybody at CMS?**
A. Myself personally, no.
**Q. Did anyone that you know of at Banner ever reach out to CMS to clarify the circumstances under which nurse practitioners can supervise radiation oncology treatments?**
A. I would not be aware of that.
**Q. But no one ever told you that they had done so?**
A. Not that I'm aware of.
(Deposition Exhibit 78 was marked for identification.)
**Q. Let's take a look at Exhibit 78, which is here. But before we do that, let's just go back to 77 for one question.**
**You mention in your email back to Ms. Robbins that the NPs have obtained credentialing and privileges through each facility to be able to provide direct supervision to patients undergoing radiation therapy.**
**Is it your recollection, based on this statement, that at this time the credentials and privileges had been developed formally?**

A. Absolutely.
**Q. And the privileges and credentials that the nurse practitioners had included a privilege to administer radiation therapy treatment?**
A. I do not know the specific language, and I don't recall the specific language for Sterling versus NCMC versus McKee, and as I recall each one was slightly different because the medical staff bylaws and guidelines and regulations are slightly different between each facility. Those are overseen by the individual hospital's credentialing and privileging committee.
It's my understanding, though, and what I understood at the time was that they had been granted privileges to function in a nurse practitioner role in the radiation oncology department.
**Q. To perform treatments?**
A. To provide the medical management and oversight of patients going through daily radiation therapy.
**Q. But they weren't able to prescribe radiation therapy under those credentials, were they?**
MS. POUND: Object to foundation.
**Q. (By Ms. Bennett) You can go ahead and answer.**



MS. POUND: Go ahead and answer.
A. They are not able to develop a treatment plan for patients starting with radiation therapy.
**Q. (By Ms. Bennett) And they can't modify a plan once it's put in place by the radiation oncologist, can they?**
A. They cannot modify a plan, but they can stop treatment.
**Q. Okay. Let's look at 78. Are you familiar with this document? I really apologize for the quality of this document, but this is the only copy we seem to have that's complete. It's very hard to read.**
**(The deponent perused the exhibit.)**
A. Yes, I recall this report.
MS. POUND: Can we go off the record for a second?
(A discussion was held off the record.)
**Q. (By Ms. Bennett) So did you review this document?**
A. Yes.
**Q. And when did you review it?**
A. I do not recall the specific date and time that I reviewed it. After they -- after Revenue Cycle had completed their initial visits and then Mary Dreiling had gone back and re-allowed them to have some



additional access to the correct medical records -- I do not recall the specific time frame or the specific dates of when that happened -- but then the final report came after that.
**Q. So if you turn your attention to page 10 of the report, Mr. DiGiaimo or Revenue Cycle goes into some detail discussing the applicability of the supervision rules to radiation oncology treatments, starting at the bottom of the page. "It is apparent that the facility..."**
**Do you see where I'm reading?**
A. Yes.
**Q. "...however, the provision of the supervision by nonphysician practitioners is the area of concern." It's "...not considered appropriate for the radiation oncology specialty, due to the nature in services and expectations for specialized training..."**
**Do you recall reviewing that?**
A. I do recall reviewing this.
**Q. "It is understood that nurse practitioners are trained to handle emergencies, radiation side effects and general medical needs, but it's not within their training or scope of work to prescribe, adjust or administer radiation therapy services."**
**Do you remember reviewing that?**



A. I do remember reviewing that.
**Q. And you disagreed with Mr. DiGiaimo's opinion?**
A. We took the report quite seriously and, as a team, we circled back and rereviewed the documentation, the information. We had further meetings and discussions regarding that.
**Q. So did you conclude that nurse practitioners in Colorado could prescribe radiation therapy services?**
A. No. We never came to the conclusion that radiation -- that the treatment plan could be developed by a nurse practitioner.
**Q. Did you conclude that nurse practitioners in Colorado could adjust radiation?**
A. We concluded that the nurse practitioners within a full scope of practice in the state of Colorado could provide the direct supervision with those guidelines because of their specialized training in oncology, radiation oncology, and that within a full scope of practice in the state of Colorado that they could provide the direct supervision with those components.
**Q. But what --**
A. That they could stop treatments, that they

could provide the medical management of those patients going through treatment. But, no, that it was not within their scope to develop a treatment plan or to modify a plan. They could stop treatment and they could provide the direct oversight.
**Q. And did you conclude that the nurse practitioner under Colorado law could administer radiation therapy services?**
MS. POUND: Object to the form of the question.
A. The nurse practitioners or the physicians do not administer radiation therapy. The radiation therapists on the machine administer the daily treatments of radiation therapy.
**Q. (By Ms. Bennett) Could a physician administer radiation therapy if the radiation therapist wasn't present?**
A. No. They do not have competency on the machine.
**Q. And what is that based on? What is that statement based on?**
A. Personal experience and the fact that the radiation oncologists don't know how to manage the machine.
**Q. But radiation oncologists have privileges**



**at NCMC to administer radiation therapy treatment, don't they?**
A. Part of their credentialing and privileging is to consult with the patient to develop the treatment plan. The plan is actually developed by dosimetry, it's approved by physics, the physicians sign off on that, but the daily delivery is provided by the radiation therapist.
**Q. Let's take a look at Exhibit 55.**
**Do you recognize that document?**
A. I'm not entirely familiar. This appears to be for privileges for radiation therapy for medical staff services.
**Q. And you can see the highlighted portion at the top says that --**
A. I do.
**Q. -- radiation therapists are privileged or credentialed at NCMC to administer radiation therapy?**
A. That is the core privileges. But within the daily working of those privileges, they are responsible for the development of that plan and for the oversight of administration of external beam radiation.
**Q. And their credentials include administering external beam radiation, according to**



**Exhibit 55?**
A. According to this exhibit, that's correct.
**Q. Do you know if that same language appears in credentials for nurse practitioners?**
A. I do not have the credentialing in front of me, so I cannot speak to that.
**Q. Why don't you put Exhibit 55 right here in case we need to come back. Thank you.**
**And if you turn to page 11 of the Revenue Cycle report, Mr. DiGiaimo or Revenue Cycle discuss the comments to the proposed rule that we've been over this morning. Do you see where that begins? "Comment: During the past year we were often questioned about clinical requirements for practitioners..."**
A. Uh-huh.
**Q. And then on page 12, Revenue Cycle goes on to comment on that saying, "Based on this comment and response..." Do you see where I'm reading?**
A. Yes, I do.
**Q. "...it is understood that CMS expects the supervising staff to be able to redirect or provide additional orders for services rendered."**
**Do you see where I'm reading?**
A. Yes, I do.
**Q. And you, again, just disagreed with**



**Mr. DiGiaimo and Revenue Cycle on this issue?**
A. We spent a tremendous amount of time going back and re-reviewing the information that we had. We went back and reviewed the documents, we had additional conversations and discussions regarding that. Revenue Cycle and Ron is not a regulatory agency, they are an outside company; it was their opinion on interpretation of that standard.
**Q. Did you reach out to CMS to clarify CMS's interpretation of the regulation relating to supervision of radiation oncology treatments by nurse practitioners?**
A. I personally did not. But I did reach out to my direct supervisor and to the facility compliance officers, which is my direct chain of command.
**Q. Do you know if anyone above you reached out to CMS to clarify this after you received this report from Revenue Cycle?**
A. I do not know that.
**Q. Let's mark this as Exhibit 79.**
MS. BENNETT: Wait a minute. There's -- it feels like there is something wrong here. This appears to have more pages than this one. Yep. Two are together here.
So I don't seem to have an extra copy of

that one for you, Meghan. I'm sorry. Oh, here you go. Here's an extra copy. I already wrote the number on it for you. You're welcome.

(Deposition Exhibit 79 was marked for identification.)

**Q. (By Ms. Bennett) Do you recognize this document?**

A. Yes, I do.

**Q. What is it, for the record?**

A. This is an email that I sent to oncology leadership on April 20th of 2011 in follow-up to a discussion that had occurred with Ron and the Revenue Cycle -- Ron DiGiaimo -- and Revenue Cycle to the oncology staff and physicians.

**Q. And in this email you reference the fact that the nurse practitioners have been granted hospital privileges to provide direct supervision. Do you see where I'm reading? "...have current Colorado license, is within their scope of practice, and have been granted hospital privileges to provide direct supervision for radiation oncology."**

**You don't mention the fact that they've been given credentials to provide or administer or modify or direct the provision of radiation therapy treatment?**



A. No, I did not state that.

**Q. Just that they've been given privileges to supervise radiation oncology treatment?**

A. That was our interpretation of the standards, yes.

**Q. Despite the fact that many of the documents we've looked at say that the nurse practitioner has to be able to modify or change the course of treatment in order to provide direct supervision?**

MS. POUND: Object to the form of the question.

A. Our interpretation of "modify" is that if the patient is not tolerating treatment, that the nurse practitioners can stop treatment until further evaluation can be given.

**Q. (By Ms. Bennett) But do you agree, Ms. Fritz, that that's the only thing they can do? They can't prescribe, they can't modify, they can't change the course of treatment, all they can do is if a patient can't tolerate treatment is to stop it?**

MS. POUND: Object to the form of the question.

A. The nurse practitioners can provide medical management and oversight to those patients, do



the patient teaching, they can prescribe medications, they can prescribe interventions that can prevent, modify, minimize, or treat treatment-related side effects, they can fully evaluate a patient's tolerance to treatment or non-tolerance to treatment, and can stop treatment until further evaluation. They are not privileged to develop a treatment plan and they are not privileged to change the treatment plan itself.

**Q. So all of the things except for stopping treatment have to do with managing symptoms, not with actually administering treatment to a patient, don't you agree?**

A. I would agree that they have the ability to assess the patient, that they have the ability to provide the medical management for that patient, and to certainly stop treatment when it's necessary and to really provide the medical management while they're going through the daily treatments.

**Q. And "medical management" means managing reactions to or symptoms arising from the radiation treatment?**

A. That and more. They can evaluate if a patient's disease is progressing, they can also evaluate if the patient is responding very well to treatment.



**Q. Did anyone ever encourage you to issue an opinion that provided a broad definition of what nurse practitioners could supervise in order to save Banner money?**

A. No.

**Q. Did anyone ever tell you that if Banner could not justify allowing nurse practitioners to supervise radiation therapy treatments that they would have to hire another radiation oncologist?**

A. No. That was never stated.

**Q. No one ever discussed with you about how expensive it would be to hire a radiation oncologist to be full time at the David Walsh Cancer Center?**

A. We evaluated the cost between all different types of providers and we evaluated numerous different scenarios when we were developing a business plan and pro forma for the David Walsh Cancer Center. And that included doing nothing if we didn't build the cancer center to a full -- what we called a full scope, meaning a full CT simulator and full scope in that facility. And we also looked at various different models of what could be feasible. We looked at all of those things. No one ever put pressure on me to say make it work with a nurse practitioner, and no one ever put pressure on me saying this has to happen, we're not

going to be able to afford a radiation oncologist. We looked at all different types of scenarios, always keeping in mind patient quality and safety and what would be an appropriate fit for delivering oncology services.

**Q. Did you feel that pressure, even if no one mentioned it to you overtly?**

A. Absolutely not.

**Q. So let's take a look at the next document, which is -- we'll mark as Exhibit 80.**

**(Deposition Exhibit 80 was marked for identification.)**

**Q. Do you recognize this document?**

**(The deponent perused the exhibit.)**

A. I do recognize this string of emails.

**Q. And in responding to Ms. Christner's concerns that she can't take over giving a radiation treatment because I'm not trained or certified, did that raise any additional issues for you regarding your opinion that she could provide direct supervision for a radiation treatment?**

A. No. And if you read the rest of her paragraph, she also talks about how the radiation oncologist cannot operate the linear accelerators either.



**Q. I'm talking about nurse practitioners here. Did this raise any additional concerns for you about having direct supervision provided by radiation -- or by nurse practitioners?**

A. We were all concerned to make sure that we were doing due diligence and that we were fully practicing within the scope of compliance and the standards, and most of all that we were providing a quality care for our oncology patients. We took these discussions very seriously. No one was flippant, no one dismissed them. We took all those discussions very seriously and, in my opinion, did due diligence of really looking through all of those things.

I remember I circled back with my direct supervisor, Dr. Lisa Hoyle, and had additional conversations with her particularly regarding the nurse practitioner role in the state of Colorado. And at that time she was very supportive and very clear in her opinion as the chief nursing officer that we were within scope.

**Q. You say that we took it very seriously, but so far the only people that you've told me you discussed it with are Pam Stieb, Ms. McCabe, and Dr. Hoyle. You never raised this up the chain of command to the compliance division, nor did any one of**



**them raise it up the chain of command to the compliance division. Is that correct?**

MS. POUND: Object to the form and foundation.

A. No, that is not correct.

**Q. (By Ms. Bennett) So who raised it beyond the facility's compliance officers to a Banner compliance officer in the western regional division? Who raised it to them?**

A. The chain --

MS. POUND: Objection; foundation.

A. The chain of command --

**Q. (By Ms. Bennett) Go ahead.**

THE DEPONENT: I didn't hear what you said.

MS. POUND: Oh, I just said, "Objection; foundation."

A. The chain of command goes from the facility compliance officers to Jan Johnson, who was the western region. Her chain of command then goes to corporate. So I'm not involved in some of those other decisions. We as a team was the leadership group from oncology services, my direct report, the C Suite, the chief financial officers, which were also the facility compliance officers, and Jan Johnson. The physicians



were included in that as well as the nurse practitioners.

**Q. Did you or any one of those persons that you just mentioned raise Ron DiGiaimo's report, the Revenue Cycle report, and his opinion that nurse practitioners could not provide direct supervision with Jan Johnson or anyone else in the western regional division compliance office?**

MS. POUND: Objection; form and foundation.

A. Can you restate that?

**Q. (By Ms. Bennett) Did you -- let's start with you. Did you raise the concerns expressed by Revenue Cycle about nurse practitioner directly supervising radiation therapy treatments with Jan Johnson or anyone in the western regional compliance department?**

A. As a team, yes.

**Q. I'm asking about you. Just so we make sure the record is clear. Did you raise this issue with Jan Johnson?**

A. I was a part of a discussion with Mary Dreiling and Mary McCabe regarding the Revenue Cycle report that included the direct supervision concerns raised by Ron and Revenue Cycle. And as I

recall we also had a conference call that I was present with, with Jan Johnson.
**Q. And when did that take place?**
A. Not long after the Revenue Cycle report came back. I do not remember.
**Q. And who was present on the conference call?**
A. As I recall, it was Jan Johnson on the call, Mary McCabe, Mary Dreiling, and myself.
**Q. And did -- was Ms. Johnson provided with a copy of the Revenue Cycle report?**
A. It was my understanding during the course of that conversation that she had seen that.
**Q. And what did she say exactly about Revenue Cycle's opinion that nurse practitioners could not provide direct supervision?**
A. I don't recall her exact statements.
**Q. And you don't recall the date?**
A. No, I do not recall the date.
**Q. Do you remember the number that you called into?**
A. We called from one of the phones in administration, but I do not -- I would not have record of which phone line was called.
**Q. And how long did the conversation last?**



A. Off -- to my recollection, maybe 30 minutes.
**Q. But you don't recall what Ms. Johnson said?**
A. Not her specific responses, no.
And may I add to that?
**Q. Sure.**
A. It was the whole Revenue Cycle report, which included documentation, the electronic medical record, you know, the use of the electronic medical record, and it also included the supervisory standards. That was all part of that discussion.
**Q. How much time did you spend discussing the supervisory requirements?**
A. I don't recall the specific number of minutes that were on that topic during those -- that conversation.
**Q. Did you discuss nurse practitioner supervision?**
A. That was part of the supervision that was discussed, yes.
**Q. And what did you discuss about it?**
A. As I recall, it was a general discussion regarding the direct supervision guidelines from CMS.
**Q. And did you discuss the fact that Revenue**



**Cycle thought it was inappropriate for nurse practitioners to supervise?**
A. Yes. That came up during that conversation.
**Q. You specifically recall that?**
A. That was the report that came back, and that was included in that report.
**Q. But was it specifically discussed in this telephone call?**
A. I honestly don't recall.
**Q. Did you take notes?**
A. I did not.
**Q. Did anyone present in the room with you take notes?**
A. I do not recall.
**Q. And you don't -- you don't recall the date?**
A. No, I don't. I do remember that it was not very long after the Revenue Cycle report came.
**Q. Did any email precede the conference call setting it up?**
A. I don't recall that.
**Q. And did any email go out after the conference call was completed confirming what had been discussed?**



A. I don't recall that.
**Q. Let's mark this as Exhibit 81.**
**(Deposition Exhibit 81 was marked for identification.)**
**(The deponent perused the exhibit.)**
**Q. I'm sorry, I was reading the next document. I thought you were still reading this one, which would be surprising because it's only got two sentences on it.**
**So looking at what's been marked as 81, do you recall the conversation, the tense conversation you had with Ron about, I'm assuming -- Revenue Cycle, rather, over nurse practitioner role and supervision?**
A. Yes, I do.
**Q. And what was that conversation?**
A. As I recall, Ron and his team were doing a PowerPoint presentation at McKee going through their initial review and education, particularly regarding documentation and some of the billing codes, and during that presentation he had -- he had put in some information regarding direct supervision. I had a meeting at NCMC that morning and so I was a little late arriving. When I walked in the rest of the team was there and they were already going through that. At that time Ron stopped his presentation and turned

around, and my perception was in a tense or terse conversation was very concerned about the nurse practitioner and thought that we had gotten that wrong.
**Q. And what was the -- what was the discussion? Did you respond to him or --**
A. I did respond. I responded to him that we had looked at that. That we felt in our interpretation of the CMS guidelines that in the state of Colorado there was a full nurse practice, a full scope of practice for nurse practitioners in the state, that the nurse practitioners had received additional training and expertise and validation of their knowledge of working in radiation oncology, and that we had also addressed some credentialing through medical staff services.
Ron -- as I recall, Ron's perception was that it didn't matter about state guidelines for scope of practice, that radiation had to be looked at separately. That there was more common practice in medical oncology to use nurse practitioners, but that in radiation oncology, in his opinion, that that was not appropriate.
**Q. He felt strongly about it?**
A. He did.
**Q. And you felt strongly about it?**



A. Well, in all honesty, I was a little taken aback by his abruptness and his tone as he presented that to me as I walked into a meeting with the rest of the team. And I did not get defensive about it, but I was quite concerned that did we miss something in the regulations? So as a response to that, we circled back and rereviewed the documents, had further conversations. Were we right? Were we on solid ground or did we think we were on solid ground with our interpretation of those guidelines, particularly around the Colorado State scope of practice for a nurse practitioner.
**Q. Did you or anyone you discussed it with discuss getting a legal opinion?**
A. My direct report is through my direct report in C Suite and with the facility compliance officers. That's my direct chain of command.
**Q. Did any of those people suggest getting a legal opinion?**
A. To me?
**Q. Uh-huh.**
A. They did not.
**Q. Did they suggest getting an opinion from CMS?**
A. To me personally, they did not mention



that.
**Q. Did you know that you can get opinions on things like this from CMS?**
A. I am aware that following the right chains, hospitals can reach out to CMS and get opinions, yes.
**Q. But as far as you know, that was never done?**
A. I'm not aware of that if that was done. We have a very active compliance department, we have a very active CDM team as far as billing and coding, the revenue integrity team. We have a lot of resources within Banner to look at those things.
**Q. So I think we discussed a little bit at the beginning of your deposition that Banner never issued a formal compliance policy on this issue. Do you know why not?**
MS. POUND: Object to the form of the question.
A. I'm not able to speak to that. I would not know that in my scope and my role.
**Q. (By Ms. Bennett) Given the contentiousness around this, the disagreement -- the strong disagreement between Revenue Cycle and how you were conducting things here at Banner, don't you think**



**that would have been a good idea, to get an opinion from CMS or a legal opinion?**
MS. POUND: Object to the form of the question.
A. Within the Banner structure, I report directly to my supervisor in C Suite. If there is a concern or issue that I can't resolve on my own, my chain of command is going directly to my direct supervisor and/or the compliance officers in the facility.
**Q. Do you think as a personal matter that it would have been a good idea to get this resolved, given the fact of Revenue Cycle's expertise -- level of expertise and the strong opinion that Mr. DiGiaimo expressed to you about the fact that Banner was wrong? Do you think it would have been a good idea to get a higher-level opinion on this?**
MS. POUND: Object -- sorry, are you done?
MS. BENNETT: Yes, I'm done.
MS. POUND: Object to the form of the question.
A. I followed the correct chain of command within the Banner system.
**Q. (By Ms. Bennett) I know. But I'm asking for your personal opinion.**

MS. POUND: Object to the form of the question.
A. My personal opinion is that I had all the trust in the world, and I still do, in Dr. Lisa Hoyle and her understanding of the Nurse Practice Act in the State of Colorado, that the facility compliance officers as well as the -- that are also the chief financial officers are very competent in being able to be a solid resource. And if they felt in all of these to then pull in a legal opinion, I would trust their opinion on that.
**Q. (By Ms. Bennett) Don't you think that Mr. DiGiaimo and Revenue Cycle are experts also?**
A. I can't speak to Ron's expertise on CMS guidelines or regulatory. I can't speak to that. I don't know his background.
**Q. What's your expertise on CMS regulations and guidelines?**
A. Only from a personal leadership position within healthcare for a number of years. As far as billing and coding and CMS requirements, fire/life safety codes, the direct supervision, which we've been working on for a number of years, how we do business -- you know, I feel like I'm not a walking expert, but I also know what my resources are. If there is anything in question, I have resources to pull in.
**Q. How often are you called upon to interpret CMS regulations and guidelines?**
A. Myself personally?
**Q. Uh-huh.**
A. As a walking expert -- I'm not sure I'm clear on your question.
**Q. Well, you questioned Mr. DiGiaimo's expertise in interpreting CMS regulations and guidelines, so I'm trying to understand what your expertise is.**
A. My expertise is from years of experience working within healthcare. Oncology particularly, but all of healthcare is highly regulated. We have the Joint Commission, we have CMS, we have fire/life safety codes. Our cancer programs are also accredited by the American College of Surgeons' Commission on Cancer, we have a radioactive materials license from the State of Colorado, we have the state health department, we have the FDA, particularly over some of our research. So we deal with a lot of regulations, and we take none of them lightly.
**Q. So you think you're more expert than Revenue Cycle?**
A. No, I'm not saying that at all.
**Q. So you're equally expert with Revenue Cycle?**
MS. POUND: Object to the form of the question.
A. I can't speak to the level of experience or expertise or training that Ron DiGiaimo has in his role. I do know he is the owner and proprietor of Revenue Cycle, I know that in his business he does a lot of education, particularly around billing codes and changes in CPT codes, but I -- I know really nothing about his training or expertise.
**Q. (By Ms. Bennett) Did you make any effort to find out what his experience was in this area before you rejected his opinion?**
MS. POUND: Objection to the form of the question.
A. I personally did not reject his opinion and, no, I'm not aware of his background and expertise.
MS. BENNETT: Let's mark this as Exhibit 82.
(Deposition Exhibit 82 was marked for identification.)
(The deponent perused the exhibit.)
**Q. (By Ms. Bennett) Do you know what this email chain refers to?**
A. It appears that this was an email that I sent on Friday, May the 13th, in follow-up to a discussion -- an ongoing review of physician and nonphysician provider information, particularly on -- from the CMS interpretations. It was responded to by Cindy McBlair, who at that time was our director for the McKee Cancer Center, in response to following up and looking at billing questions.
**Q. And it reflects a statement by Ms. McBlair, "Banner's lawyers interpretation and not the responsibility of the coders."**
**What legal interpretation was she referencing, to your knowledge?**
MS. POUND: Objection to foundation.
A. I am not aware that she had access to a lawyer's interpretation. She may have been referring to compliance, but I'm not aware that there was a lawyer's interpretation.
**Q. (By Ms. Bennett) And what -- do you have any sense from reading this email what the particular issue was that she was asking for guidance on?**
A. I cannot speak to the specific situation in May of 2011 what this was in reference to.
**Q. It says Ceilley is covered since she was on campus the entire day. What does that refer to? Do**

**you have any idea?**
A. Dr. Elizabeth Ceilley is a radiation oncologist, so I'm assuming from this email that she was in the department at McKee the entire day.
**Q. And "I assume Sheryl was at NCMC, plus the medical oncologist." Is that Sheryl Ehrman?**
A. In -- yes, it would have been Sheryl Ehrman.
**Q. So what's the -- what do you understand that reference to be, "I assume Sheryl was at NCMC plus the med oncs are in the cancer institute"?**
A. Sheryl would have been the nurse practitioner functioning in radiation oncology. And I don't know what this was in reference to. I suspect it could have been that Dr. Fuller left to go over and do a case at McKee.
**Q. So it's --**
A. But I don't know that.
**Q. So it's about whether -- whether Ms. Ehrman was providing direct supervision of a procedure? Is that the way you interpret this?**
A. This was --
MS. POUND: Objection to foundation.
A. -- in May of 2011 --
**Q. (By Ms. Bennett) Go ahead.**



THE DEPONENT: Did you get what she said?
THE REPORTER: I did. Thank you.
MS. BENNETT: Just objection to the form of the question.
A. I do not recall a situation in 2011, what the specific clinical situation was at that time.
**Q. (By Ms. Bennett) Okay. Let's mark the next document as Exhibit 83.**
**(Deposition Exhibit 83 was marked for identification.)**
**Q. Do you recognize this document?**
A. I do.
**Q. And what is this document?**
A. This was an email that I put out on Friday, May the 13th in 2011, and it included Mary Dreiling, who at that time was the frontline manager from the Banner Medical Group. It included Dr. Brian Fuller and Dr. Elizabeth Ceilley, who were radiation oncologists, as well as Pam Gale, Sheryl Ehrman, Helene Christner, which were our advanced nurse practitioners working in radiation, as well as -- I said Helene, sorry. It also included our department leadership, Marty Baker, Cindy McBlair and Pat Schooley. This -- and I also cc'd Ron on this email.



At that time Ron had said that he had done consulting work for ACCC and that no one was doing direct supervision with nurse practitioners in radiation oncology. And so this was an article that I had forwarded. This article was printed in one of the ACCC journals called "Oncology Issues" that came out in the spring of 2010. This was in direct relationship to a topic on the use of nurse practitioners for radiation oncology.
**Q. Who was this article written by?**
A. Luana R. Lamkin.
**Q. She's an RN, right?**
A. From her email -- or from her professional designation, yes.
**Q. She has a master's in public health?**
A. From what is on the article, yes.
**Q. She's not a lawyer?**
A. Correct.
**Q. And this is the article you sent to Ron DiGiaimo to prove to him that others were using nurse practitioners to supervise radiation oncology?**
A. I wanted to share this with him because, yes, that did come up in the course of our conversation that we were wrong, that no one else in the United States was using nurse practitioners.



**Q. So where is her practice located, do you know?**
A. As I understand, the Mountain States Tumor Institute is in Idaho.
**Q. Not in Colorado?**
A. It is not in Colorado.
**Q. Are you familiar with the Idaho Advanced Nurse Practice Statute of scope of practice?**
A. Only to the effect that they are a full-practice state as Colorado. I do not know the details of their Nurse Practice Act in that state.
I do know from the national information that Idaho is listed as a full-practice state.
**Q. And do you know anything about their credentials at their hospital?**
A. No, I do not know the specifics about their credentialing or privileging at their hospital.
**Q. Did you make any effort to find any of those things out?**
A. No, I did not.
**Q. Let's mark the next document as Exhibit 84.**
**(Deposition Exhibit 84 was marked for identification.)**
**Q. And I know you're not mentioned on the**

**email, but do you recognize the attachment? This is something we've looked at before, I believe.**
A. I do not recall the specific document, but I have a general awareness of these topics.
**Q. So this is something that Ron DiGiaimo sent to Mary Dreiling in April of 2011. Can you refresh my recollection again about what Mary's -- Mary Dreiling's role was in determining the appropriate supervision for radiation therapy?**
A. Mary Dreiling was employed with Banner under the Banner Medical Group. Her role was -- as part of BMG was with the physician support.
**Q. What was her involvement in the supervision issue?**
A. As it related to physicians and nurse practitioners that are employed by Banner Medical Group, she would be the clinic manager or support for their practice.
**Q. You mentioned a number of times that Dr. Hoyle was involved in these discussions?**
A. Dr. Lisa Hoyle, yes.
**Q. And yet in the emails that we've reviewed yet, I don't recall seeing her name as an addressee or as a sender. Have you seen her name at all in any of these emails that we've reviewed as exhibits this**



**morning?**
A. Not the emails that you have forwarded. Dr. Lisa Hoyle I believe came to the organization in either late 2010 or early 2011.
**Q. Did you ever email her on this topic?**
A. I had regular direct-report meetings with Dr. Lisa Hoyle.
**Q. And do you take notes at those meetings?**
A. I have my monthly report that I take to my direct supervisors, and at that time I would have taken the same type of report to Dr. Hoyle.
**Q. And did you report -- do a written report to her on the supervision issue relating to nurse practitioners?**
A. I don't recall a full written report to her. In my regular one-on-one meetings with my direct supervisor, I would have a standard report of what was going on, operations and strategies. Basically our employee engagement, physician friendly, patient satisfaction, quality, safety, finance review and any operational issues, and I would take that report to my direct supervisor.
**Q. And that was a written report; is that what you're talking about?**
A. It was a written document of some of the



highlights to talk through on my regular one-on-one direct-report meetings with her.
**Q. And you specifically recall discussing the direct-supervision issue with her in one of these meetings?**
A. Yes.
**Q. Who else would have been present?**
A. In the direct one-on-one meetings I have with my direct supervisor it is just the supervisor and myself.
**Q. Okay. And so --**
A. Those are direct-report management meetings.
**Q. So do you have any idea what documents Dr. Hoyle reviewed about the direct-supervision issue?**
A. I would not know the specific documents she reviewed.
**Q. Did you ever give her any documents to review?**
A. Yes, I did.
**Q. Which document?**
A. I don't recall the specific documents. As I recall, they were the CMS frequently asked questions. I remember sharing the ACCC "Oncology Issues" article that came out. I honestly can't remember all the



documents that went back and forth during that time.
**Q. But she wasn't copied on any of these general emails that we've reviewed so far. Is there any particular reason for that?**
A. I can't respond to that.
MS. BENNETT: Okay. Let's --
MS. POUND: It's about 12:30.
MS. BENNETT: Yeah. Maybe we should break here. So I'll see you back here around 1:00.
(The lunch recess was taken from 12:30 to 1:08 p.m.)
(Deposition Exhibit 85 was marked for identification.)
(The deponent perused the exhibit.)
**Q. (By Ms. Bennett) So looking at Exhibit 85, which is a June 13, 2013, email from Robert Jensen to Robert Jensen, and it includes another email trail from Jan Johnson to Robert Jensen. I know you're not copied on this, but I want to ask you a few questions about the document.**
**First of all, who is Robert Jensen?**
A. I do not know.
**Q. How big an organization is Banner?**
A. It's recently gotten a lot bigger. We've purchased a number of additional hospitals. I honestly

don't know off the top of my head. I think we're somewhere around 26 hospitals maybe.
**Q. And how many employees does Banner have?**
MS. POUND: Object to foundation.
A. I don't know that off the top of my head.
**Q. (By Ms. Bennett) This is -- below the email from Robert Jensen, whoever he is, to Robert Jensen there is an email from Mary McCabe to Jan Johnson. And she says, "Is there a local BM..." -- this is -- and the topic they're discussing is supervision. "Is there a local BMG compliance representative that I should be coordinating with?"**
**Do you remember Ms. McCabe raising a concern that she should be perhaps reaching out to someone else about the supervision issue?**
A. Mary McCabe did not mention to me a specific concern about a BMG compliance resource.
**Q. And looking at the page that's Bates stamped 4794, which is the second page of this email trail, there is an email from Mary Dreiling to Pete McNally. Who is Pete McNally?**
A. Pete McNally is no longer with Banner. I do believe that in 2011 he was one of the leadership folks with Banner Medical Group.
**Q. And what about -- have we talked about**



**Scott Baker? I think that's another new name.**
A. Scott Baker is also with leadership with Banner Medical Group.
**Q. And when you say "with leadership," what level is that?**
A. I don't recall exactly their titles in 2011. I do know at that point in time that Mary Dreiling reported to -- I think -- Pete McNally, who reported to Scott Baker.
**Q. So Scott Baker, would that be the equivalent of a senior vice president position or in the corporate office? Just trying to get a sense of how high up in the organization they might be.**
MS. POUND: Objection to foundation.
A. I do not know his exact title. I do know that he is over Banner Medical Group. And I don't know if that's specifically in Northern Colorado or if that's the western region. I don't know the span of his scope.
**Q. (By Ms. Bennett) But you think it would be within Colorado?**
MS. POUND: Object to the form of the question.
A. I don't know his exact job description within the Banner Medical Group. I know that he is



fairly high up within Banner Medical Group.
**Q. (By Ms. Bennett) And Michael Lewis, who is that?**
A. Michael Lewis is one of the finance individuals with Banner Medical Group.
**Q. Okay. So Mary Dreiling is communicating directly to Pete McNally and copying two fairly senior people within the organization?**
A. Yes.
**Q. Is that consistent with your description of the chain of command in terms of reporting up -- compliance problems up through the hierarchy?**
A. Yes.
MS. POUND: Objection to foundation.
**Q. (By Ms. Bennett) And that's because she's a direct report to one of the people on the email?**
MS. POUND: Object to foundation.
THE DEPONENT: What did you say?
MS. POUND: You can keep answering. I'm just objecting to the foundation.
A. Okay. I do not recall Mary Dreiling's direct chain of command in 2011, but, yes, those would have been her direct chain of command reports up through the Banner Medical Group.
**Q. (By Ms. Bennett) And in this email**



**Mary Dreiling says, referencing CMS document supervision, "This was sent out yesterday. Clearly there are differing opinions. We need further direction in this area."**
**Did Mary Dreiling communicate that sense to you, that because there were differing opinions, you needed further direction?**
A. After the Revenue Cycle report came out, we had numerous follow-up discussions relooking at the CMS direct supervision guidelines, interpretation of the standards. And both from the facilities side and from the Banner Medical Group side, we, you know, included a number of other folks in that discussion. I was not privy to the discussions Mary Dreiling had with her direct reports.
**Q. Did she ever come back to you and say, "I emailed Pete and told him we need further direction in the area of direct supervision"?**
A. I don't recall that she did.
**Q. And did Banner bring in another consultant with expertise on radiation oncology billing to get a second opinion after you disagreed with Revenue Cycle's opinion?**
MS. POUND: Objection to the form of the question.

**Q. (By Ms. Bennett) To your knowledge?**
MS. POUND: Same objection.
A. To my knowledge, I am not aware of the actions taken by the compliance officers or individuals within Banner Medical Group or the facility on that next level of leadership. I do not know what the -- what occurred at that level.
**Q. (By Ms. Bennett) Did you ever see a report from any expert consultant who was brought in to opine for Banner on the direct supervision requirements for radiation oncology?**
A. For me personally, no.
**Q. Did you ever see a report that was prepared for Banner by another consultant?**
A. An outside consultant?
**Q. Uh-huh.**
A. During this period of time?
**Q. During any period of time.**
MS. POUND: Object to the form of the question.
A. No, not that I'm aware of.
MS. BENNETT: Okay. Let's move on and mark this as 86.
(Deposition Exhibit 86 was marked for identification.)



(The deponent perused the exhibit.)
MS. BENNETT: We can mark this as 87 while she's doing that.
(Deposition Exhibit 87 was marked for identification.)
**Q. (By Ms. Bennett) Do you recognize this document?**
A. Yes.
**Q. This is an email written by you to Marty Baker on June 16th, 2011. Can you tell me what you were talking about in this email?**
A. Yes. As I recall, after the report came back from Revenue Cycle, we had numerous discussions and folks involved regarding a number of things that were in the Revenue Cycle report. As a follow-up to that, Mary Dreiling was requested through the Banner Medical Group to do an internal chart audit on documentation, and some of that information had to be provided by Marty Baker. And Mary was concerned that Marty had not responded in a timely manner to that, so I had a follow-up email to Marty to check on the status of when -- the status of where she was at with that audit.
**Q. So it says -- you say, "This is very important as you know, since compliance has been**



**brought into this review and discussion."**
**What had compliance been brought into? Which discussion?**
A. Regarding the Revenue Cycle report. We had gone directly to the facility compliance officers who had had conversations with their direct reporting on the compliance standpoint. I don't know the exact folks that were brought in from the Banner Medical Group, but I do know that there were a number of folks involved in wanting to go back and look to make sure we were billing appropriately, documenting appropriately. And part of that required Marty to pull some of the documentation from her department.
**Q. The email goes on to say at the top from you to Marty, "I know she has to report it to legal tomorrow."**
**What was being reported to legal?**
A. I do not know other than the results of the audit.
**Q. So who would know? Mary Dreiling?**
A. Mary --
MS. POUND: Objection to foundation.
MS. BENNETT: Go ahead. You can answer.
A. Mary would have to respond to that. I don't know the folks that were brought in from the



Banner Medical Group side to review that.
**Q. (By Ms. Bennett) Did anyone ever discuss with you that the Revenue Cycle report was going to be reviewed by the legal department at Banner?**
A. I cannot speak to the fact of the legal department. I do know that it was being looked at by finance and it was being looked at by compliance.
**Q. So in this email when you say, "I know she has to report it to legal tomorrow," what was that based on?**
A. That was based on her email to me.
**Q. An email that apparently is not part of this chain?**
A. Correct.
**Q. Okay. Let's mark this as -- we've already marked this as 87. There you go. 87.**
**(The deponent perused the exhibit.)**
MS. BENNETT: And we can mark this as 88 while she's taking a look at that.
(Deposition Exhibit 88 was marked for identification.)
**Q. (By Ms. Bennett) Do you recognize this document?**
**(The deponent perused the exhibit.)**
MS. BENNETT: Might as well go ahead and

do this as 89 while she takes a look at that.
Here's 89, Meghan.
(Deposition Exhibit 89 was marked for identification.)
A. Yes.
**Q. (By Ms. Bennett) What is this document?**
A. This is a document that I prepared from my one-on-one direct report meeting. At that time I reported directly in June of 2011 to Julie Klein, who was an associate administrator for North Colorado Medical Center.
**Q. Okay. And in this you reflect the -- at the top under NCMC, "Follow up to Revenue Cycle visit and recommendation: Billing issues, compliance concerns with NP role (not consistent with ACCC interpretation of direct supervision standards - follow up with compliance this week."**
**Is that something that you put into this agenda for your meeting with Ms. Klein?**
A. Yes.
**Q. And when you say, "Follow up with compliance this week," was that something that you were suggesting that she do or something that you were saying that you would do?**
A. The format of this is my direct report



meeting. So when I go into a one-on-one direct report meeting with my direct supervisor -- and at that time Julie Klein had not been in this role for very long -- it was my obligation to update her on what I was working on, some of what we call the hot issues, strategy issues, operational issues, and an update to her for her to have a better understanding of the work that I was currently doing.
**Q. What was your reference to "follow up with compliance"? Were you saying, I'm going to follow up with compliance? Were you saying, I followed up with compliance? Were you suggesting that she follow-up with compliance?**
A. What I believe this is in reference to is to report to her that there would be follow-up with compliance this week.
**Q. And what follow up with compliance did you have that week of June 22nd, 2011?**
A. I honestly don't remember the specific details of my calendar for that week.
**Q. Do you have a calendar?**
A. I do have a calendar.
**Q. Is it on Outlook?**
A. It is on Outlook.
**Q. Do you know if that's been produced in**



**this litigation?**
A. I do not know.
**Q. Okay. So what follow-up do you recall doing with compliance?**
A. I believe in June of 2011, was not very long after Revenue Cycle had been here and had given their report. At that point in time Dr. Lisa Hoyle left the organization and was no longer with Banner, and Julie Klein, then -- I was assigned to Julie Klein as my direct report. So it was my obligation to bring her up to speed on what I was working on. And this would have been just bullet points for me to remember the significant things that I would need to talk to her about. This is not a detailed report, but as a report to go through some of the main topics that were pertinent at that point in time in June of 2011.
**Q. So what follow-up did you do with compliance after this meeting?**
A. Without looking at my calendar, I cannot speak to that accurately.
**Q. How often did you meet with Ms. Klein?**
A. The early part I believe I met with her every two weeks, but a minimum of once a month.
**Q. Did you prepare something like this for every meeting?**



A. I should have, yes.
**Q. Did you meet with her for two weeks from June 22nd, 2011, or thereabouts?**
A. I believe when Julie first came into her role, she established regular ongoing monthly meetings with us, and then we could have additional ad hoc meetings as we would need to for additional items.
**Q. So is it accurate to say that you would have had a meeting with her either two or four weeks after this June 22, 2011, meeting?**
A. That would be correct.
**Q. And you would have prepared a written document?**
A. Yes.
**Q. And that document might have reflected what follow-up you did with compliance between the time of the June 22nd, 2011, meeting and your next meeting?**
A. It probably should have, yes. This is an ongoing working document. It's not a formal report, but it's an ongoing working document to keep the communication flow going between myself and my direct report.
**Q. And it would have reflected, among other things, whatever follow-up you had done with compliance on this issue in the interim?**

MS. POUND: Objection; form.
**Q. (By Ms. Bennett) Okay.**
A. Probably. It probably would have included information if I had not had an informal conversation with her before that time.
**Q. (By Ms. Bennett) And do you recall following up with Ms. Klein to let her know what you had done regarding the direct supervision issue and follow-up with compliance?**
A. I had ongoing conversations with Julie Klein, my direct supervisor, regarding a number of different issues. We do what's called rounding, and so frequently she would stop by my office or I had the ability to stop by her office to have a short, quick conversation or a hallway conversation in addition to our formal monthly meetings. So I cannot speak to the specific time and date of when those would have been talked about. There was ongoing discussions regarding the follow-up to the Revenue Cycle report at that time.
**Q. What did you tell her about the follow-up you had done after your June 22nd, 2011, meeting?**
A. I'm unclear on that question. So as a follow-up from our June 22nd, what did I tell her in the following meeting?
**Q. Do you have a specific recollection of**



**telling her after the June 22, 2011, meeting that's reflected in Exhibit 87, I followed up with compliance on the issue we discussed in our June 22nd meeting.**
MS. POUND: Objection; form.
A. I cannot speak to the exact content. There were ongoing communications regarding all of the issues that were brought forward with the Revenue Cycle report. It would have been common for me to report and update her on an ongoing basis of the audit, the internal audit, our work being done with education and all of those components at that time. So it would have been an ongoing conversation between Julie Klein and myself.
**Q. Just to be clear, I'm asking about the supervision issue and your follow-up with Ms. Klein after the June 22nd, 2011, meeting on that issue. Not any other issues, just that issue. What do you specifically recall you told her had been accomplished in your follow-up with compliance after the June 22nd meeting?**
MS. POUND: Objection; form.
A. I do not recall the details of what I discussed with Julie Klein on that specific issue.
**Q. (By Ms. Bennett) Okay. Let's move on to Exhibit 88. There you go.**



**Do you recognize this document?**
**(The deponent perused the exhibit.)**
A. Yes.
**Q. What is this document?**
A. This document reflects an agenda for a radiation oncology called V-Tel meeting, video teleconferencing meeting, between McKee, North Colorado Medical Center, and the David Walsh Cancer Center, specifically at Sterling Regional Med Center. And it would have been an oncology-focused meeting between the three facilities.
**Q. Were those meetings recorded or transcribed in any way?**
A. I do not recall.
**Q. And I notice there's an agenda item with your name in the "who," and the topic is, "Follow-up to NP compliance and IMPAQ templates."**
**What did you discuss that day on that issue? All I want to know is what you discussed on the issue of "Follow-up to NP compliance."**
MS. POUND: Object to the form of the question.
A. I do not recall the specific details around that other than in general concept we were talking about better documenting which physicians were



at which location on which specific dates as well as the nurse practitioners.
**Q. (By Ms. Bennett) And did you make some improvements in documentation?**
A. I believe we did.
**Q. What did you do to improve that documentation?**
A. I believe at that time we put the responsibility on the department managers to reflect the physicians and the nurse practitioners on the daily IMPAQ schedules.
**Q. And what is the IMPAQ schedule?**
A. It is our MOSAIQ schedule. It is our record and verify system in radiation oncology. It also serves as our electronic medical record. It also serves as our automated charge capture system. It also ties to scheduling in the department.
**Q. So these changes that were suggested, were they implemented?**
A. The responsibility was put to the department managers to get them implemented.
**Q. And do you know how far back you can look on the MOSAIQ system to see what physician was scheduled to be at a facility on a particular date? In other words, could you go back to 2010 or 2011 and**

**determine what doctor was at a facility on a particular day?**
A. I'm not able to respond to that for the specific dates that you are requesting.
**Q. Do you have any general sense of how far -- how long the MOSAIQ calendar is maintained?**
A. The MOSAIQ calendar we document -- let me back up. The physicians are documented as far as their clinic schedule and if they are seeing follow-ups or new consults on that schedule.
This particular topic went in addition to that to putting it on the top of the schedule for every day so that we would have a clear way to track that process.
**Q. Do you know when that was implemented?**
A. I do not recall the specific date at which that was fully implemented. And if I could expand just a little bit on that.
**Q. Sure.**
A. In June of 2011, particularly after the Revenue Cycle report, we really worked on a lot of process improvement and quality improvement aspects on our documentation. We were also working very diligently on trying to standardize our processes and our documentation between all three facilities so that



if a physician walked into McKee or Sterling or NCMC, it would be the same workflow and the same processes.
So in the early days when we first rolled out Sterling, we were not consistent with how far totally electronic the medical record was in all three facilities. We had some differences. For example, NCMC was a little slower in being able to get rid of our paper document or our paper chart; we were using some electronic and -- some electronic and some paper. In Sterling they were much more electronically focused and a lot less paper. And McKee was kind of in the middle. So we were working very hard on trying to standardize that across all three facilities.
**Q. Okay. Let's take a look at what -- the next document, which we will mark as Exhibit 89. Which we've already marked as Exhibit 89.**
**(The deponent perused the exhibit.)**
**Q. Do you recognize this document?**
MS. BENNETT: We can mark this as 90 while she's reading that.
(Deposition Exhibit 90 was marked for identification.)
A. I do not recall this specific document, but the language in this document is consistent with other documents and information we've reviewed.



**Q. (By Ms. Bennett) Do you know if you've seen this document before?**
A. I cannot speak if I --
MS. POUND: I'm just going to object to the representation that it would be -- it's a complete document.
**Q. (By Ms. Bennett) Have you seen this PowerPoint before?**
A. I cannot speak to the fact if I've seen or not seen this document. I don't have a specific reference to put this with.
**Q. Okay. That's fine.**
**Let's go ahead and look at Exhibit 90. Do you recognize this exhibit?**
**(The deponent perused the exhibit.)**
A. I do not recall seeing this document.
MS. BENNETT: Let's mark this as Exhibit 91.
A. May I ask, was this a part of a larger presentation?
**Q. Well, there were more slides. I only brought the ones that had to do with the nurse practitioner and the state scope of practice. There is only so much you can carry when you're traveling, so...**
A. Was there any further information about



who developed this slide? It's obviously from Banner Health.
**Q. No, I don't know who developed it, but you didn't apparently.**
**Okay. So let's mark this as Exhibit 91.**
**(Deposition Exhibit 91 was marked for identification.)**
MS. BENNETT: This appears to be a duplicate. I think we've looked at this before. Yes, this is a duplicate. So what would be best is if we can unmark this, otherwise we're just going to have so many duplicates in the record. Maybe we just -- just give me that back and I will ask the reporter to mark the next exhibit as 91.
(Exhibit 91 was withdrawn and a new Exhibit 91 was marked for identification.)
**Q. (By Ms. Bennett) Do you recognize this document?**
A. Yes, I do.
**Q. What is this?**
A. This was a written affidavit that I was requested to do in regard to this legal matter.
**Q. This litigation that we're currently deposing you in; is that what you mean?**
A. Yes.

**Q. And did you draft this yourself?**
A. Yes, I did.
Let me clarify that. I was given the template of how to put the words in, and -- but I did -- this is my writing.
**Q. Okay. That's fine. Thank you.**
A. I didn't create the template.
**Q. And let's mark this as Exhibit 92.**
**(Deposition Exhibit 92 was marked for identification.)**
A. Do you need me to respond to my affidavit?
**Q. Just put this to the side for a minute. I'm just going to finish marking the exhibits. And then I think what we'll do -- how long have we been going? About 45 minutes. I think what we'll do is after we review this document, take a break, and then I can get organized to go into the last part of your deposition. It will give me time to go over my notes and see if there is anything that I left out that I need to ask you.**
A. Okay.
**Q. So let's take a look at what's been marked as Exhibit 92. Do you recognize this document?**
**(The deponent perused the exhibit.)**
A. Yes.



**Q. What is this document?**
A. This is a portion of the CMS guidelines for direct supervision and "incident-to" standards.
**Q. Did you have this in your folder when you prepared your June 2010 opinion letter?**
A. I had this information, yes.
**Q. Did you have this regulation?**
A. I don't remember this specific document, but I had the regulations, yes. They were in electronic format and they appeared differently than this form looks.
**Q. But it was from the Code of Federal Regulations?**
A. Yes.
MS. BENNETT: Okay. All right. Let's do this. Let's break for 15 minutes. We'll come back a little bit after 2:00 and we'll -- we're going to start going into the final stages of your deposition.
THE DEPONENT: Okay.
(A recess was taken from 1:47 to 2:00 p.m.)
**Q. (By Ms. Bennett) Could you pull out Exhibit 56, please. It's the first one we marked today, so it should be at the bottom of your pile.**
A. Okay.



**Q. We're coming back to your June 24th, 2010, opinion letter on the nurse practitioner supervision issue.**
**Is this an official statement of Banner compliance policy?**
A. What are you in reference to?
**Q. I'm referencing your June -- did I give you the wrong exhibit number? 56.**
A. You're talking about the affidavit that I did?
**Q. No, I'm talking about your June 24th, 2010, opinion letter.**
A. Okay.
**Q. Is this an official statement of Banner compliance policy?**
A. No.
**Q. And it was not intended to be, was it?**
A. Not from my understanding, no.
**Q. After your discussions with Ron DiGiaimo and your review of the Revenue Cycle report, did you ever come back and update or elaborate on this opinion letter in any context?**
A. The -- from the original document that was done in June of 2010?
**Q. Right.**



A. No, I did not amend or change this document.
**Q. So this is the final version of it?**
A. This was the white paper document that I prepared per request of Mary McCabe and Pam Stieb to discuss the outpatient direct supervision as it related to oncology. I did not update it after the Revenue Cycle report.
**Q. And this was something you prepared for Dr. Lawson?**
A. No, this was prepared -- this document, what's called a white paper, this was not prepared for Dr. Lawson, this was prepared in response to a request from Mary McCabe and Pam Stieb as a follow-up to our multiple discussions on direct supervision.
**Q. Okay.**
A. They requested that I put a lot of those thoughts together as a white paper so they'd have this as a reference on file. What they did with that further, I'm not aware.
This was utilized, then, in this email -- and I do not recall who Dr. Lawson was. I assume that he was one of the physicians that we were looking at recruiting. But I did not prepare this document for Dr. Lawson.

164

**Q. And after the Revenue Cycle report, did Pam Stieb or Ms. McCabe ask you to update this? I'm sorry, McCabe or McBlair? I think I --**
A. Mary McCabe is our chief financial officer and also the facility compliance officer. That's different than Cindy McBlair, who was in a leadership position for radiation oncology.
**Q. Yes, right. Slip of the tongue.**
**Did either of them ask you after the Revenue Cycle report was circulated to update this position paper?**
A. No.
MS. BENNETT: Okay. That's all I have.
MS. POUND: I have a couple follow-up questions.
EXAMINATION
BY MS. POUND:
**Q. At the very beginning of your deposition, Ms. Fritz, you talked about the fact that you had -- you know what, never mind.**
**Can the nurse practitioners who are working in radiation oncology -- or radiation oncology departments within -- at NCMC, McKee, and the David Walsh Cancer Center do more than respond to emergencies?**

165

A. Absolutely, yes.
MS. POUND: I have no further questions.
MS. BENNETT: Okay. You're free to go.
THE DEPONENT: Thank you.
(The deposition concluded at 2:04 p.m.)

166

AFFIDAVIT

I have read my deposition and it is true and accurate, except for any changes or corrections now indicated by me on the Amendment sheet.

Amendment sheet attached ( )
No changes to testimony ( )

______________________________
JULIANNE FRITZ

SUBSCRIBED AND SWORN to before me this date, ____________________.

My commission expires ______________

______________________________
NOTARY PUBLIC

______________________________
STREET ADDRESS

______________________________
CITY, STATE, ZIP

Return to: MILE HIGH COURT REPORTING & VIDEO, INC.
14143 Denver West Parkway
Suite 100
Golden, Colorado 80401

167

CERTIFICATE

I, Aimee S. Reisinger, RPR, Notary Public of the State of Colorado, certify that before the deposition the witness was sworn by me to testify to the truth, and that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not related to any party herein, nor their counsel, and have no interest in the result of this litigation.

Aimee S. Reisinger, RPR, CSR
My Commission expires 9/16/2016
Notary No. 19964015065