EXHIBIT 26

**In The Matter Of:**

*United States of America v*
*Banner Health*

---

*Jan Johnson*
*August 14, 2015*

---

*Griffin & Associates Court Reporters*
*2398 E. Camelback Road, Suite 260 Phoenix, AZ 85016*
*www.arizonacourtreporters.com*
*602.264.2230*

Original File JJ081415.txt
**Min-U-Script®**

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. Martha Baker, | ) | |
| Plaintiff/Relator, | ) | No. 1:12-cv-03029-WJM-CBS |
| vs. | ) | |
| BANNER HEALTH, et al., | ) | |
| Defendants. | ) | |

DEPOSITION OF JAN JOHNSON

Phoenix, Arizona
August 14, 2015
10:00 a.m.

REPORTED BY:
WILMA A. WEINREICH, CSR, RPR
Certified Reporter
Certificate No. 50530

PREPARED FOR:

(ASCII/COPY)

# I N D E X


| WITNESS | PAGE |
|---|---|
| JAN JOHNSON | |
| Examination by Mr. Stone | 5 |


## E X H I B I T S


| Deposition Exhibits: | Description | Page |
|---|---|---|
| No. 56 | Email Sent 6/24/2010 from Julianne Fritz to Joy Wilson BB0007306-7307 (2 pages) | 91 |
| No. 57 | Email String Between Jan Johnson And Jason Bezozo July 2009 BB0004884 (1 page) | 45 |
| No. 58 | Email String Re: OPPS Final Rule - Physician Supervision On/Off Campus Outpatient Hospital Departments BB0005125-5128 (4 pages) | 51 |
| No. 61 | Email String Between Pam Stieb And HCCA BB0007271-7273 (3 pages) | 57 |
| No. 63 | Email from Julianne Fritz Sent 1/14/2010 BB0004886-4889 (4 pages) | 60 |
| No. 64 | Email String between Marty Baker And Eva Huddleston Sent 1/29/2010 BB0005129 and BB0006060-6100 (42 pages) | 62 |

# E X H I B I T S


| Deposition Exhibits: | Description | Page |
|---|---|---|
| No. 65 | Email String Between Jan Johnson And Julianne Fritz 2/12/2010 Re: ACCC Hosting BB0004905-4907 (3 pages) | 64 |
| No. 66 | Email String Between Jan Johnson And Julianne Fritz 2/12/2010 Re: ACCC Hosting BB0004939-4942 (4 pages) | 66 |
| No. 67 | Email Sent 2/15/2010 from Jan Johnson Re: New Requirements With Attachment BB0004947-4962 (16 pages) | 70 |
| No. 68 | Email from Jan Johnson Sent 3/8/2010 with Attachment BB0004990-4991, 4994-4995, 4997 (5 pages) | 103 |
| No. 69 | Email String Between Jan Johnson And Julianne Fritz Sent 3/9/2010 BB0005005 (1 page) | 103 |
| No. 72 | Email from Tina Laubil Sent March 2010 Re: Bridge Line Instructions BB0005054-5068 (15 pages) | 106 |
| No. 77 | Email String Between Julianne Fritz And Linda Robbins 2/2/2011 Re: 77421 BB0007366-7370 (5 pages) | 114 |
| No. 85 | Email String May 2011 Re: CMS Document - Supervision BB0004793-4797 (5 pages) | 130 |
| No. 91 | Affidavit of Julianne Fritz (5 pages) | 82 |
| No. 94 | Consulting Report Prepared for Banner Medical Group Specialists BB0000531-589 (59 pages) | 119 |

DEPOSITION OF JAN JOHNSON was taken on August 14, 2015, commencing at 10:00 a.m. at the court reporting offices of Griffin & Associates, 2398 East Camelback Road, Suite 260, Phoenix, Arizona, before WILMA A. WEINREICH, a Certified Reporter in the State of Arizona.

COUNSEL APPEARING:

STONE LAW FIRM
By: Mr. Andrew M. Stone
437 Grant Street
Suite 1806
Pittsburgh, Pennsylvania 15219

For the Plaintiff/Relator;

CAPLAN AND EARNEST, LLC
By: Ms. Linda L. Siderius
1800 Broadway
Suite 200
Boulder, Colorado 80302-5289

For the Defendants.

JAN JOHNSON,

a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. STONE:

Q. Mrs. Johnson, my name is Andrew Stone. I represent the plaintiffs in this case -- or the plaintiff in this case -- which is a Medicare fraud case.

I'm going to be asking you some questions today with regard to the allegations made in the Complaint and some of the defenses that have been raised.

If at any time you do not hear my question or you do not understand it, please stop me. I will be happy to repeat it or rephrase the question to make sure you understood it.

Also I would ask that you verbalize any of your responses to make sure that the court reporter can take down your answer. Sometimes a nod of the head or a gesture is very difficult to indicate on a written record.

Do you understand that?

A. Yes.

Q. Mrs. Johnson, have you ever been deposed before?

A. No.

to sessions and supporting us to get the CDs and give us the time to listen to them, et cetera.

Q. So during the time that you worked at Banner, did you always maintain that?

A. Yes.

Q. That certification?

A. Yes.

Q. And so you did this periodic continuing education in the area --

A. Yes.

Q. -- in order to meet those qualifications?

A. Yes.

Q. Now, your training and background in compliance, is that the same as the training and background that the facility compliance officers have?

A. Yes.

Q. So just as a facility compliance officer would go through the course and become certified, that's the same certification and course that you went through?

A. Um. Are you asking that in a general way across the industry or specific to Banner?

Q. I'm asking specific to Banner. Because I understand you held this position as the Western Region compliance officer?

A. Yes.

Q. And I understand there's also a facility compliance officer.

A. Yes, you are absolutely right. And also business unit compliance officers. Over time -- we started the facility compliance officers in about 2003 -- we migrated -- Banner migrated towards developing business unit compliance officers in home care, mental health, surgery centers, research, lab, where those kinds of specialties, for want of a better word, transcended facilities.

So we felt -- Banner felt if you have mental health at NCMC in Colorado and you have got mental health down at Good Sam, we want somebody who knows mental health enough to become certified in healthcare compliance so they can speak to their individual situations and unique nuances.

So we had facility compliance officers, and I will call them business unit compliance offices, they all had to go through the certification. They all had to maintain their certification.

They all had to be -- those in the Western Region had to have an orientation session with the regional compliance officers, and they warmed their chairs for the first time. We talked about what was compliance, how do you spell it, and we would hand out a compliance

you recall was there one person that staffed that position?

A. No. Honestly -- not honestly. I am being honest. Like I keep saying, it evolved over time. When I transferred down to Arizona from Colorado in 2011, that seemed to be the year in which the business unit compliance officers were more or less developed.

And when I moved down, I was given additional responsibilities over the Western Region: Six state hospitals, of which there were over 20; and the business units of mental health, surgery centers, lab, and research and home care.

So I not only had all the facilities that I had -- and Good Samaritan Hospital down here. So I had all the facilities I had had up in Alaska and Nebraska and Colorado and Wyoming and California and Nevada but then I also had these five additional business units compliance folks.

And I think -- it isn't that there wasn't somebody responsible for compliance in those units before, but it became clear that, you know, Jan's coming down, let's divvy up the work a little bit more, I guess reasonably, and that's pretty much when I think those folks got -- got gelled, if you will.

Q. So let's talk for a minute. You mentioned some

of the different states and facilities that you had. Did you have particular hospitals, then, that you had -- had responsibility for?

A. Yes. Well, again, I'm not sure I agree with the term "responsibility" necessarily.

Q. Okay.

A. It depends -- really, I'm sorry. But when you say responsibility, is that compliance responsibility? I didn't have complete compliance responsibility which means I was related with the compliance officer at that facility. They had responsibility. They had -- they had to do the --

Q. Maybe let's use the word jurisdiction.

A. That would be a good word. I will go with jurisdiction. We agree on jurisdiction.

Q. So --

A. Thank you.

Q. So which facilities and in which states did you have jurisdiction over?

A. Thank you.

Q. And if that changed over time, just explain that.

A. Okay. When I first joined Banner, and as the West Region, I had responsibility for the hospitals in Colorado which were North Colorado Medical Center, McKee Medical Center, Sterling Regional Medical Center, and

Brush -- I'm going to say Hospital. It was a real hospital. It wasn't a medical center.

So Greeley, NCMC; Loveland, Colorado, McKee; Sterling Regional Medical Center, Sterling; and Brush Hospital in Brush, Colorado.

I had responsibility for Ogallala Medical Center in Ogallala, Nebraska. Oh boy. Torrington Hospital in Torrington, Wyoming; Worland Hospital in Worland, Wyoming. Fairbanks Hospital in Fairbanks, Alaska. That's how the West Region started.

I'm not sure exactly when this occurred. Rose Ann had responsibility for Arizona and the hospital in -- Susanville, California. I can't think of the name of the one in Nevada -- Fallon, Fallon, Nevada.

That got put on my shoulders sometime in the mix before we -- I moved down. I'm not sure what year it is, but then I gained also those hospitals.

So that was the jurisdiction that I had when -- before I moved down in 2011. And when I moved down in 2011, I was given Good Samaritan Medical Center, which is the flagship hospital, and then the five business units in addition to keeping jurisdiction over the others.

Q. So what happened to the Arizona region compliance officer if you took on all the hospitals?

MS. SIDERIUS: Objection. Form and

foundation.

THE WITNESS: She remained in place and did a good job and continues to do a good job as far as I know.

BY MR. STONE:

Q. But if she doesn't oversee or have jurisdiction --

A. No, no, no, no. In that interim, Banner purchased, built, bought Estrella, took on Del Webb up north and another hospital whose name escapes me, so they took on additional facilities down here. I may not have them all.

So the idea was we are building in Arizona. We are adding facilities, so let's take the workload and try to even it out a little bit.

So Rose Ann was plenty busy during the acquisition of Del E. Webb -- and I'm not sure I can remember the other. It was north Phoenix. I can't remember the name of the other hospital. It was a large hospital. So these were not small, rural hospitals. These were large.

Q. So it sounds to me like you continued with your original portfolio of hospitals. You took on some of hers and she took on new hospitals?

A. Yes. That's it.

is a good place to do it.
(Recess taken 11:00 a.m. - 11:09 a.m.)
BY MR. STONE:
Q. I'm going to show you, Mrs. Johnson, a document which has previously been marked as Exhibit No. 57. If you could take a minute to read through that. This appears to be an email chain between you and Jason Bezozo.
A. Just a second. I'm reading, please.
Q. It appears to originate on July 14, 2009. Do you see that?
A. Yes. I'm still reading, however.
Q. Oh, I'm sorry.
A. Okay. I'm sorry.
Q. The email appears to originate with you on July 14, 2009, and it requests information about the physicians supervision outpatient hospital therapeutic services.
Is this the first time this had come on to your radar screen, or was this something that you were dealing with on a regular basis?
A. "This" meaning?
Q. The issue of physician supervision outpatient hospital therapeutic services.
A. Well, this is an email that I'm seeing here on July 14th where I sent to Jason. I don't know that this

was necessarily the first time this issue came on board.
Q. Do you remember why you were inquiring about it?
A. Well, physician supervision has not only hospital therapeutic but diagnostic services has been an ever-changing issue with CMS and their regulations since 2002. So this is an issue that we were trying to see what changes might be coming, be abreast of those changes, and that's what initiated this email.
Q. Okay. So in the summer of 2009, this was an issue that was on your radar screen obviously?
A. Well, I had many issues on my radar screen. I don't know -- this is an issue, one of many, that I was dealing with.
Q. Okay. And am I correct that this would have preceded CMS from -- preceded the issuing of the final rules that came out in 2009?
A. When did the final rules come out? Do you have a date for me?
Q. Do you know when they came out?
A. Well, typically there is a proposed rule and then there is a final rule that's impacted the next year. If this was written in the summer, I don't know if there was a proposed rule out there. Do you?
Q. Well, I'm reading the response from Mr. Bezozo.
A. Let me read that again.

Q. If you look at that.
A. Let me read that again, okay?
Okay. So the proposed rule must have been out there, yes, you are right.
Q. And it looks like in the follow-up on July 17th you were asking Mr. Bezozo to keep you in the loop?
A. Yes.
Q. And then you go on to make the comment that if we have to provide specific physician supervision, it will involve potentially recruiting and staffing issues at a fairly high expense.
A. Yes, that's what I said.
Q. What did you mean by that? What were you referring to?
A. I'm asking -- I'm basically responding that if the proposed rule becomes the final rule that we will have to make sure that we are in compliance with the supervision requirements of the final rule.
Q. Did you anticipate that you would have to hire additional doctors at some of your facilities that you previously would not have had?
MS. SIDERIUS: Objection. Form and foundation.
THE WITNESS: Yes.

BY MR. STONE:
Q. And specifically did you have any particular situations in mind at any of your facilities that you were -- that you were referring to when you made this comment, this general comment?
A. No.
Q. And was it your opinion at that time that you were not required to have physician supervision of outpatient therapeutic services?
A. No.
MS. SIDERIUS: Objection. Form and foundation.
BY MR. STONE:
Q. What was the change in the proposed rules that you thought would require these additional costs and expenses?
A. I would have to look at the proposed rules to answer that.
Q. But obviously you were raising a cost concern in your email here?
A. Yes.
Q. Who is Jason Bezozo? What was his position?
A. I can't give you an official position title, but he was considered to be a lobbyist for Banner with governments, local, state, and a track into federal, like

A. Yes. I now see it. I'm sorry.
I have no idea. I don't know.
Q. You have never heard of the advisory board?
A. I believe I have heard of it, but I can't recall the specifics around it. I believe it's an outside entity that -- I don't know if it's any connection to Banner. I don't believe so. I believe it's some kind of independent think tank that's out there that pulls people together to think.
Q. Did they provide seminars or consulting services?
A. That would be -- from just looking at this and looking at, you know, who is doing these things, you have got a law firm, you have the oncology roundtable, and you have got -- here you have got a representative of the advisory board, Imaging Performance Partnership. Well --
Q. Are those authoritative people in your field?
A. Kutak Rock is a well-known -- well-known law firm. The oncology roundtable I'm not familiar with. And, again, the advisory board, I'm not that familiar with them.
Q. It says that you called into the seminar?
A. Probably.
Q. And you obviously thought it was important for you to attend the seminar, is that right?
A. Well, thought it was important? Again, we are

going to ask for clarification.

At this time frame, trying to keep everything, you know, in the mix, the whole supervision question was important.

So any time -- I shouldn't say any time. But those of us who got information pushed out to us on the supervision issue that was across all service lines at Banner would take advantage of if it was typically free and didn't cost us a lot of money, and a lot of these were free types of -- hot topic.

And these folks wanted to get in front of people like us to present what they knew about the topic, and we would take advantage of as much information as we could suck in, frankly.

Q. In fact, you thought it was important enough that you passed it on to the group, right?

A. I would have.

Q. So if you had attended it and looked at the materials and thought they were nonsense, you wouldn't have passed it on, would you?

A. You are right. Correct.

Q. If you could take a look at the slide which is the fifth page in the exhibit and it says "finding the middle ground in 2010" at the top.

A. Okay.

Q. If you look on the right-hand side -- well, on the left-hand side, it says "NPP is permitted to provide supervision"?

A. Yes.

Q. And that's what you talked about was the plan that you had discussed with Julianne Fritz, or at least that she was referencing in her email. The plan was to provide NPP or non-physician practitioners to provide supervision at Sterling, right?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: I will say yes. Again, I think "supervision" is a broad term. Supervision.

BY MR. STONE:

Q. Supervision of radiation oncology therapy.

A. No.

Q. No?

A. No.

Q. That was not the plan?

A. No.

Q. What was the plan?

A. The plan, as I indicated earlier, was that we would provide nurse practitioner services to Sterling to handle the medical needs of the patients while they were being treated with radiation oncology. That's different

than supervising radiation oncology.
Q. And that plan, who would provide the supervision of the radiation oncology therapy?
A. That was not part of the plan. This was something that Julianne worked on with our Pam Stieb and Mary McCabe being the satellite of NCMC and to provide someone to handle the medical issues of the patients while they were undergoing radiation oncology.
Q. But there was never a plan that the non-physician practitioners would supervise radiation oncology therapy?
A. Not that I'm aware of.
Q. If you look to the right-hand side of the document, it says "CMS Requirements," and then it says "permitted to provide supervision under state laws, scope of practice, regulations, and hospital-granted privileges." Do you see that?
A. Yes, I do.
Q. And then the next thing down says "supervisory authority limited to services that the non-physician practitioner can personally perform"?
A. Yes, I see that.
Q. And that's a qualification to the general rule that the non-physician practitioner can provide supervisory services?
MS. SIDERIUS: Objection. Form and

foundation.

BY MR. STONE:

Q. Am I correct?

A. I'm sorry, would you mind repeating the first part of the question?

Q. The idea, the general rule, that the nurse -- the non-physician practitioner can provide supervisory services is qualified by the requirement that the supervisory authority is limited to services that the non-physician practitioner can personally perform.

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: Yes, that is what is here.

BY MR. STONE:

Q. Do you agree with this statement of what the new rule provided for?

A. This is what the new rule provided for.

Q. You agree with that?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: Can I ask a question?

BY MR. STONE:

Q. Well, you are the one that's answering the questions.

A. I'm trying to get clarification so I can properly

answer the question.

Q. What's your question?

A. What is the difference if I agree or disagree? I already responded that this is what this says.

Q. I'm just asking your opinion.

A. It's irrelevant.

Q. No, it's relevant.

A. I agree with what this says. I agree with what it says.

I have to take a break here.

MS. SIDERIUS: I was going to ask about a lunch break and how long do you think you are going to go.

(Discussion off the record.)

(Lunch taken 12:23 p.m. - 1:07 p.m.)

BY MR. STONE:

Q. I'm going to show you a document that we have marked as Exhibit No. 91. If you could take a couple of minutes and read through this document to yourself, I'd appreciate it.

Mrs. Johnson, the document I just showed you was an affidavit that was prepared and signed by Julianne Fritz in connection with this litigation. I would like to direct your attention specifically to Paragraph 8 on Page 4.

A. Okay.

Q. Paragraph 8 says that "I discussed my research and my position statement with Jan Johnson who was the Banner Health Western Region compliance officer and Pam Stieb who was the chief financial officer and compliance officer of SRMC," which I assume means --

A. Sterling Regional.

Q. Do you recall discussing with Julianne Fritz a position statement and research that she had done regarding physician supervision at Sterling?

A. I don't recall discussing the position statement. I do recall discussing the research she had done.

Q. Okay. And in those discussions, do you recall Pam Stieb being present as part of that?

A. Yes.

Q. And describe for me how those discussions came about. Was this in a meeting? Was this in telephone conversation?

A. We had -- it was a meeting whereby I believe it included Dr. Carol Vanetti who was the medical -- West Region medical director at the time.

And I honestly can't remember if Julianne was physically in the room at the North Colorado Medical Center. She may have been on the phone. Pam was on the phone piped in, and I was physically present. And so it was in a meeting.

Q. Okay. It goes on in Paragraph 8 to say: "Collectively, we decided that under HOPPS regulations and the Colorado Nurse Practice Act an advanced practice nurse could act as a direct supervisor for the delivery of external beam radiation therapy as long as the criteria outlined were met."
Do you see that?
A. Yes, I see that.
Q. Do you agree with the statement that collectively you came to a decision with regard to the HOPPS regulations?
A. To the HOPPS regulations in general? To the HOPPS regulations --
Q. No. It references -- well, did you come to any agreement collectively with regard to the HOPPS regulations with Julianne Fritz and with Pam Stieb?
MS. SIDERIUS: Objection to form and foundation.
THE WITNESS: We did not come to a determination, a collective determination -- I'm sorry, is that your word? A collective decision.
BY MR. STONE:
Q. It says "collectively we decided." Did you collectively decide anything with Julianne Fritz and Pam Stieb?

A. We collectively reviewed her research that she had performed on the HOPPS regulations and determined that we would be in compliance in having an advanced practice radiation oncology experienced nurse practitioner, non-NPP, be at Sterling handling the medical needs and difficulties -- the medical needs and difficulties of patients undergoing external beam radiation therapy.

Q. Do you believe or did you at the time believe that that satisfied the CMS rules as recently revised in 2010?

A. Yes.

Q. So you felt that having an advanced practice nurse present, or at the facility onsite, would satisfy the supervision requirements under the new rules?

A. Yes.

Q. Now, she says "as long as the criteria outlined were met." Do you know the criteria that she is referring to? What criteria would need to be met?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: I cannot quote you chapter and verse on the criteria. If you have the criteria available, I'd be happy to review it.

BY MR. STONE:

Q. I don't know what she is referring to.

A. Well, there were certain criteria involved with using an NPP for supervision for any type of medical -- or service lines, not just radiation oncology.

And some of that criteria had to do with the fact that the -- whoever the NPP was designated to be had to be within the scope of state law practice, they had to be trained in the services that they were supervising, and that -- there were probably several others that I can't recall off the top of my head. But they had to be onsite or immediately available. Those kinds of things. Not necessarily in the same room. That's about the third and last one I can recall off the top of my head.

Q. Okay. So you felt that as long as the person was onsite and they were acting within their practice area as required by state law and they were properly credentialled?

A. Yes, that's the other piece I will respond to. Dr. Carol Vanetti who was present -- I believe she was physically present as the medical director of the West Region -- was to work with Pam to make sure that this individual, whoever they designated it to be, because I didn't necessarily know who the individual would be, would be properly credentialled and given medical staff privileges to perform the services that he/she were being asked to perform.

So I'm not a part of the medical staff. Carol was one -- worked with the medical staff. She was medical director. She was the one with Pam that would have worked with -- you know, to get the credentialing part done, to get the medical staff privileging part done. Nothing to do with that.

Q. Now, if you look back at Paragraph 6 on Page 3, it refers to various sources that Julianne Fritz reviewed and researched before preparing her position statement.

A. Okay.

Q. Do you see that?

A. Yes, I do.

Q. Okay. And in Paragraph 7, it says that she then drafted a position statement summarizing her research.

Now, with regard to the research, did you yourself actually look at some of this research that she refers to in this document?

A. The only thing that I recall that I looked at, because as I recall she was the person most qualified from her clinical background and her knowledge of the divergent services and service delivery people who are involved in delivering radiation oncology -- it's a very complex delivery modality and a very complex billing modality. It's a very complex -- it's the most complex of any other service line.

I remember reviewing a -- I probably went and tried to retrieve it on the Web -- map of the United States. It was 48 -- the lower 48, probably Alaska over on the side -- that had by color code those states that had -- I'm going to miss the term I'm looking for here -- allowed nurse practitioners to have full privileges, full practice scope, and there were some states that were color coded to show that some of these non-physician practitioners had limited practice scope.

Full practice scope, again, I'm -- I may be speaking in error -- might include prescriptive authority. Limited practice scope might not.

I remember looking at that map and saying, oh, Colorado is a full practice state. And that's the last I remember of looking at anything. And I know that she looked at that because she was -- then took that research the next step.

Q. What was the next step?

A. Was to look at the state law governing, and that's when she developed her information.

Q. So did you rely on Julianne Fritz then to do the research and put together the position paper?

A. Yes.

Q. And would it be fair to say that by acknowledging that you reached this decision collectively that you

agreed with or accepted her position paper as a proper guideline for Banner?

A. Yes.

Q. Do you know anything about Julianne Fritz's background in terms of compliance training?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: I know that she had been -- she was a nurse, an oncology nurse for many years, and -- no.

BY MR. STONE:

Q. Do you know anything about her experience in reading regulations and compliance documents put out by CMS?

A. No.

Q. She's not a lawyer, is she?

A. No. I say no as much as I know no.

Q. Do you know whether she has had prior experience interpreting regulations dealing with radiation therapy --

A. No.

Q. -- on physician supervision?

A. No.

Q. Do you know whether she's ever -- other than this particular position statement, do you know whether she's authored any other position statements for Banner?

A. No.
Q. You don't know, or she hasn't?
A. I don't know.
Q. What was the reason why you and apparently Pam Stieb decided to delegate this to Julianne Fritz as opposed to doing it through the compliance department?
MS. SIDERIUS: Objection. Form and foundation.
THE WITNESS: I don't recall.
BY MR. STONE:
Q. Did Ms. Fritz volunteer or offer to perform this service which seems to be a little outside the scope of her normal job duties?
A. I don't recall.
Q. Do you know whether the position statement that she authored was reviewed by anybody in compliance other than yourself and Pam Stieb?
MS. SIDERIUS: Objection. Form and foundation.
THE WITNESS: I don't know.
BY MR. STONE:
Q. What happened to that position statement in terms of utilization by either Sterling or Banner or NCMC? Was it used as a policy document in any way?
MS. SIDERIUS: Objection. Form and

foundation.

THE WITNESS: I don't know.

BY MR. STONE:

Q. I'd like you to take a look at a document No. 56. The front page you don't have to worry about so much. It's an email which attaches the position statement that Ms. Fritz authored which is on the second page. And that's what I would like to direct your attention to.

Is this position statement something you have seen previously?

A. No.

Q. Did you know that Ms. Fritz had written a position statement as a result of her research?

A. I don't recall. This wasn't sent to me. You asked me not to look at the email. But -- I'm sorry.

Q. You can look at the email.

A. Thank you.

Q. Maybe it will help you.

A. This was sent to I believe the then -- either the nursing director of NCMC, Joy Wilson -- forget what I just said. I was inaccurate. I don't know who Joy Wilson is off the top of my head.

But it was carboned to some additional people, some of whom I know, some of whom I don't know, but I don't recall seeing this and I don't recall knowing

that she had developed a position statement.
Q. As the compliance officer for the Western Region, would you have wanted to know if one of your service lines or hospitals had developed a position statement on a regulatory matter?
A. Yes.
Q. Do you have any reason to think that this would have been sent directly to corporate compliance?
MS. SIDERIUS: Objection. Form and foundation.
THE WITNESS: I don't know that. I can't tell. I don't know.
BY MR. STONE:
Q. Do you know whether any of the other facilities in Banner had a similar issue with regard to radiation oncology services?
A. Did you say any other facility within Banner?
Q. Within Banner.
A. No, I don't know that.
Q. They did not, or you don't know?
A. I don't know.
Q. Is the particular issues relating to physician supervision and radiation oncology therapy services, was that something that was discussed at the -- any of the weekly corporate compliance meetings?

A. Yes.
Q. And when was that discussed?
A. "When" meaning?
Q. During what time period did those discussions take place?
A. My recollection, it was in the changes that occurred in 2009, '10, '11, and '12 to the physician supervision -- general physician supervision regulations.
Q. What do you recall about in the period -- this document seems to be authored on June 24, 2010.
A. That's the date that's on the email.
Q. And that is the date on the email as well.
A. I see the date on the document itself.
Q. The date on the document says June 24, 2010.
A. Yes.
Q. Prior to that, do you recall having any discussions with the corporate compliance group relating to specifically how the physician services regulations -- physician supervision would apply to the radiation oncology therapy?
A. No, I don't recall specifically, no.
Q. Do you recall discussing at any of those meetings the particular situation in Sterling relating to the satellite service and staffing with physicians?

A. No.
Q. Do you recall discussing with the corporate group the meetings that you had with Pam Stieb and Julianne Fritz related to supervision services at Sterling?
A. No.
Q. Is there some reason that that wouldn't be discussed in those corporate meetings?
A. No.
Can I just excuse myself for a few minutes, please?
MR. STONE: Sure.
(Recess taken 1:38 p.m. - 1:40 p.m.)
BY MR. STONE:
Q. Looking at this document further, at about the middle of the page, it talks about several national organizations as well as CS -- CMS as publishing responses to questions concerning the rulings.
And Ms. Fritz goes on to say in a final ruling by CMS, in April of 2010, CMS documented that the ruling "allowed certain non-physician practitioners to directly supervise all hospital outpatient therapeutic services that they have performed themselves within their state scope of practice and hospital-granted privileges provided that they meet additional requirements including collaboration or supervision requirements."

Now, I think there may be a typo in there. That doesn't seem to -- the syntax doesn't seem to be right. Do you understand what she is saying there?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: (Reading).

Yes, I understand that.

BY MR. STONE:

Q. You understand that. And what she seems to be suggesting is that the non-physician practitioners can supervise for those services that they can perform themselves, is that right?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: That's what this says.

BY MR. STONE:

Q. Even though it says "have" instead of "can" perform. I'm not sure why --

A. I see what you are saying. You said have performed or can perform themselves.

Q. I think there is probably a mistake in there because that doesn't make sense.

A. No, but I believe I understand this.

Q. Okay. And that's within their state scope of practice. That's what you were referring to earlier?

A. Yes.
Q. That it's something under state law they can perform?
A. Yes.
Q. So I guess the question would be, do you know what she looked at to determine what the state authorizes or restricts in terms of the practice of radiation oncology therapy?
MS. SIDERIUS: Objection. Form and foundation.
THE WITNESS: I don't know what she looked at.
BY MR. STONE:
Q. Did you look at anything with regard to state requirements for use of external beam therapy?
A. Not that I recall.
Q. You did say that you looked at something that showed a map and that that was something that you remember which had different scope of practices for various states?
A. Yes.
Q. And that would be for the Nurse Practice Act, is that right?
A. Yes.
Q. Did you look at any state regulations or laws that dealt with external beam radiation therapy?

A. No.
Q. Would you agree that if state law had certain requirements for the use of external beam radiation therapy that that would be something important to a determination whether the nurse could supervise those procedures?
MS. SIDERIUS: Objection. Form and foundation.
THE WITNESS: I'm sorry, could I ask you to repeat it?
BY MR. STONE:
Q. Yeah. The state law that you said that you looked at was the Nurse Practice Act?
MS. SIDERIUS: Objection. Form and foundation.
THE WITNESS: I didn't say that. I didn't do that.
BY MR. STONE:
Q. You said you looked at some maps --
A. Yes.
Q. -- that would show the different states with Nurse Practice Acts and how they differed from one another?
A. Yes.
Q. So -- and you -- did you note how Colorado

handled the Nurse Practice Act?
A. That's not a good question. Note how they handled it?
Q. Did you specifically look to see if Colorado had a broad Nurse Practice Act versus a narrow one?
A. Yes.
Q. So you did do some research into state law as it applied to the Nurse Practice Act?
A. No. That's not what I said.
Q. Tell me what you did do.
A. I looked up a map that simply showed, color coded, which states had full range of practices -- and I am probably saying this wrong -- in their practice acts and which had limited and just eyeballed it and thought, oh, Colorado has full.
Q. Did you look at the statute to see what it said?
A. No.
Q. Do you know whether Julianne Fritz looked at the statute?
MS. SIDERIUS: Objection. Form and foundation.
THE WITNESS: I don't know.
BY MR. STONE:
Q. Do you know whether she looked at any other state laws?

A. No.

MS. SIDERIUS: Objection. Form and foundation.

BY MR. STONE:

Q. Did she tell you what materials she reviewed?

A. I don't recall.

Q. Did anybody else from the compliance department look to see what state law required with regard to the use of external beam radiation therapy?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: I don't know.

BY MR. STONE:

Q. Now, the other thing that we talked about was the hospital grant or privileges which I assume this also is referring to credentialing for different practitioners?

A. Yes.

Q. And you said that there was somebody that you consulted with regard to credentialing and privileges with regard to this analysis?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: I believe what I said was that there was a meeting in which Dr. Carol Vanetti was present, Julianne either was present or on the phone, and

Pam Stieb was on the phone.

And one of the things that in terms of discussing credentialing privilege -- the privilege aspect, the staff privilege aspect of any of this, was handed off to Carol and Pam to have them do whatever they needed to do to do whatever they needed to do and that's -- I had nothing to do -- I did not involve myself.

BY MR. STONE:

Q. Would you agree with me that the hospital in order to properly grant privileges or credential somebody, they would have to -- the person would have to comply with state law in order to be credentialled in a particular area?

A. I would agree with that.

Q. In the next paragraph, it says that "North Colorado Medical Center oncology program has carefully reviewed these guidelines for direct supervision."

Do you know who she's referring to there?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: No.

BY MR. STONE:

Q. Do you know whether anybody other than herself has carefully reviewed these guidelines for direct supervision?

A. I'm going to answer that no.
Q. You weren't aware of that?
A. I was aware that the department, predominantly Mary Dreiling, who was the physician manager of the physician side, wanted to have a consulting firm come in because it was felt in the department that they were not properly billing or collecting.
She, under direction or guidance from folks within her facility, called me to ask me if she could have a consulting firm come in.
I gave her advice that if she is having a consulting firm come in from the outside that they make very specific contract language of what they should be reviewing, what they should be doing, and then make sure that any report that's issued subsequent to them coming in is issued in draft form and given to our legal counsel prior to being disseminated. That's the only time I remember being asked about Revenue Cycle.
Q. And so that was in response to an inquiry from Mary Dreiling. Is there some reason why that request would have come to you as opposed to Mr. Jensen?
A. What request? Oh, I'm sorry. The timing, I believe. Again, I'm trying to get my head wrapped around all this timing thing.
It was, again, at the beginning of the time

that Banner was starting to employ/contract with physicians and get into the physician side of the business.

And I think radiation oncology, if I'm recollecting correctly, was one of the first areas where we were wanting to contract and employ physicians for whatever reason.

Anyway. At that point, the physician side of our business, is the way I will tell it, was still being managed, if you will, under the hospital facility structure.

Once Banner Medical Group was formed -- and I'm not even sure -- geez. It was after I came down here in 2011 -- they then recruited a compliance officer for the Banner Medical Group. So I was on the front end of somebody wanting somebody to come in.

Q. So is it your recollection then that perhaps Mr. Jensen had not been hired at that point?

A. That would be my recollection, yes.

Q. So you were asked and you told them how you thought it should be handled?

A. Right.

Q. Now, subsequent to that, did you learn that in fact Revenue Cycle did in fact come in and do a report for them?

A. I knew that they had come in, and I received a copy of a slide presentation that, as I recall, was quite thick that they performed on behalf of radiation oncology at some point in time. I never saw a report.

Q. Going back to this exhibit No. 77, if you would look at the attached email correspondence, you will see some passages that are highlighted. I'm not sure who did the highlighting on it.

A. Okay. Give me a minute here.

Q. If you read the passage on Bates No. BB-7368, that looks like that's the initial inquiry that starts the email chain. Do you see that there? It's highlighted at the bottom.

A. I see it. I have read it.

Q. And then it indicates specifically "the doctor is not at the location of the patient." Do you see that in the last sentence?

A. Yes.

Q. Now, if you go forward, it looks like there is a response from a Ron DiGiaimo that suggests that the carrier may not be meeting the supervision guidelines.

A. I see that.

Q. Okay. And then it goes on to say that nothing has been billed yet and that they are just thinking they are in the planning stages.

And then there's a further response from Mr. DiGiaimo above that says -- that asks the question, "is there a rad onc onsite? If not, the answer is no to meeting supervision guidelines. Therefore, no... unfortunately."

Which is a fairly short statement. Fairly concise.

MS. SIDERIUS: Objection. Form and foundation.

BY MR. STONE:

Q. Now, this information was being passed on apparently to Julianne Fritz from Linda Robbins -- I'm sorry. It looks like it was being passed on to some others with a copy to Julianne Fritz. Do you see that?

A. Yes.

Q. And her response is to tell everybody that there's been extensive research into this issue and that she has a lot of information on the topic.

Do you see that?

A. I'm seeing that right now. If I can take a minute.

Okay. I see it, yes.

Q. And specifically as it relates to the David Walsh Cancer Center.

A. Okay. Yes, I see that.

speciality?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: I would disagree with that. I would disagree with the part that says -- (reading) and not disagree due to the complex nature of the radiation modality. Orders and redirection of treatment delivery.

I would say "orders and redirection of simulation, dosimetry planning can only be provided by a physician trained within the speciality."

I would take out orders -- not orders and redirection, but I would take out "treatment delivery."

BY MR. STONE:

Q. Let me ask you this, Mrs. Johnson. You would agree, though, that Mr. DiGiaimo is offering an opinion that the supervision has to be provided by a physician?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: Yes.

BY MR. STONE:

Q. And that you also agree that based on what you know about Mr. DiGiaimo and Revenue Cycle that they are in the business of specifically consulting on coding and billing of radiation oncology services?

A. Yes.

MS. SIDERIUS: Objection. Form and foundation.

BY MR. STONE:

Q. And what would be -- let me ask it this way. As a compliance officer, if you got a report from a consultant that said what we just said, what you just read, would that be a reasonable indication of suspected noncompliance?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: I did not receive the report.

BY MR. STONE:

Q. I understand that. But had you received this and you had gotten this at the time that it was authored, what would you have done with it?

A. I can't answer that because I haven't read the report. I'd like to read the whole report. Then I might be able to respond.

Q. Let me give you a hypothetical. Let's assume you got a report that said that physician supervision was required at the Sterling facility for radiation oncology therapy services.

MS. SIDERIUS: Objection. Form and foundation.

BY MR. STONE:
Q. After you had done all this research and looked at all the materials that you had looked at and you got an expert to say that you were not in compliance, would that set off any bells or alarms as a compliance officer?
MS. SIDERIUS: Objection. Form and foundation.
THE WITNESS: I don't know how to answer that question. No. 1, I didn't have access to all this information. And No. 2, this report -- did this report go to our legal counsel?
BY MR. STONE:
Q. I don't know.
A. I don't know either. Does this report --
Q. If you had received it, would you have provided it to your legal counsel?
A. Yes.
Q. And do you believe that that would be the responsibility of other compliance officers at Banner, that if they had received that report that it would have gone to the legal counsel?
MS. SIDERIUS: Objection. Form and foundation.
THE WITNESS: Yes.

BY MR. STONE:

Q. And, again, assuming that Mr. DiGiaimo is contradicting Julianne Fritz's conclusion, would that be something that would require further reviews either by compliance or by legal counsel or both?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: The compliance department, if this had gone to legal counsel, would have been directed by legal counsel as to the next steps.

BY MR. STONE:

Q. Do you know whether any further steps were taken after Mr. DiGiaimo's report was received?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: No.

BY MR. STONE:

Q. You said that you did not get a copy of the report. You did get a copy of some slides that were --

A. I did.

Q. -- that were presented by Revenue Cycle?

A. I did.

Q. Did you request a copy of the report?

A. I did not.

Q. Was there a reason why you didn't request it?

A. I didn't know that there was a report. Suddenly I got copies of these slides as if there had been an educational session. I filed those away. I wasn't --

Q. Did you read through the slides?

A. I did.

Q. Did you think there was anything in those slides that contradicted what you were doing in Sterling?

A. No.

(Recess taken 2:48 p.m. - 2:48 p.m.)

BY MR. STONE:

Q. We are into the home stretch here. I'm going to show you what we have marked as Deposition Exhibit 85. This starts with an email from Scott Baker to Mary McCabe. Maybe it goes on to the second page.

Actually it starts with an Julianne Fritz email to Mary Dreiling and others -- apparently you were not copied on this -- in which she is forwarding some information from CMS. Do you see that?

A. Yes.

Q. And then there is an email to Pete McNally from Mary Dreiling. Do you see that? Who's Pete McNally?

A. Pete McNally was the first, I would say, CEO of BMG on the physician side.

Q. Well, the correspondence from Mary Dreiling says this was sent out yesterday. Not exactly clear what she

is referring to, but it says "clearly there are differing opinions. We need further direction in this area."
Do you see that?
A. Yes.
Q. And the reference is supervision. The reference line. So I'm assuming that Ms. Dreiling is looking for further direction in the area of supervision. And that's as of May 13, 2011. Do you see that?
A. Yes.
Q. It was copied to Mr. Baker and he replies that he's going to be forwarding several references with regard to the issue that they spoke about yesterday. These references were provided by the consultant.
A. This is the email on Page 1 from Scott to Mary?
Q. Yeah.
A. Okay.
Q. And then in response to that Mary copies you -- or sends it to you apparently. Do you see that?
A. Yes, I do.
Q. And says: "Jan, just to keep you in the loop, attached is some of the documentation that RCI used to base their opinion. Much of the same documentation. It all is how it is being interpreted. Is there a local BMG compliance representative that I should be coordinating with?"

Does this refresh your recollection about the RCI report or Revenue Cycle report?

THE WITNESS: No. I never got the Revenue Cycle report.

BY MR. STONE:

Q. But apparently you got some of the background information?

A. Well, I don't know what you mean by background information.

Q. It says the documentation that RCI used.

A. Well, to me, that would mean perhaps this new blurb dated 2010 from CMS. It doesn't say it was an attachment. I can't really tell. It says that RCI used it to base their opinion.

Q. Okay.

A. Much of the same, which we have all been looking at this stuff for years. And I don't want to make an assumption that this is what she is talking about. I don't know that that's the case.

Q. I don't want you to make any assumptions either.

And then it says -- you respond by saying, "B.J. should take a look at this as well." And that's I assume Mr. Jensen that you are talking about?

A. Yes.

Q. Okay. So this information was provided to

Mr. Jensen?
A. Yes.
Q. I assume?
A. Yes.
Q. And then at the top there's actually several attachments that are referenced in that top email, and I'm not sure why it's going from Mr. Jensen to Mr. Jensen.
A. I don't know either.
Q. But apparently that correspondence to and from Mr. Jensen included several of the documents that we have referenced here including the position statement on supervision?
A. Yes. I don't understand why it went from B.J. to B.J. I don't know who it went to.
Q. But it looks like he must have had the position statement on supervision, isn't that right? Isn't that what it indicates?
A. Well, there's an FW position statement on supervision in the attachments. That's what I see here.
Q. Now, as far as you know, there was no investigation of the supervision issue after the Revenue Cycle report, is that right?
A. As far as I know. Is that a yes or no question?
Q. Yes.
A. Yes, as far as I know.

Q. So you are not aware of any investigation that was conducted after Banner Medical Group received the Revenue Cycle report?
A. No.
Q. And you are not aware of any referral to any law enforcement agency?
A. No.
Q. Are you aware of any further white papers or position statements that were prepared for Banner with regard to the physician supervision issue?
A. No.
Q. Are you aware of any modifications or changes to the position statement that Julianne Fritz wrote?
A. No.
Q. Are you aware of any corrective action plan that was developed in responding to the Revenue Cycle report?
A. No.
Q. Are you aware of any return of moneys to the government in connection with the issues raised in the Revenue Cycle report?
A. No.
Q. Did Banner conduct any systemic review of the supervision issue at other facilities as a result of the Revenue Cycle report?
MS. SIDERIUS: Objection. Form and

foundation.

THE WITNESS: I don't know.

BY MR. STONE:

Q. Do you know whether outside counsel was engaged in connection with the findings of the Revenue Cycle report?

A. No.

Q. You don't know, or they were not?

A. I said no.

Q. You don't know?

A. I don't know.

Q. Do you know whether Banner engaged any other experts on this particular subject after they received the Revenue Cycle report?

A. I don't know.

Q. Did you have any discussions with David Ledbetter or any of the other compliance officers with regard to the Sterling facility and the Revenue Cycle report?

MS. SIDERIUS: Objection. Form and foundation.

THE WITNESS: I don't recall.

BY MR. STONE:

Q. Do you remember any discussions with Mr. Jensen about the Revenue Cycle report?

MS. SIDERIUS: Objection. Form and