EXHIBIT 27

# Transcript of the Testimony of:
# **Brian Fuller, M.D.**

**Date:** July 16, 2015

United States of America, et al. ex rel. Martha Baker v. Banner Health, et al.

No. 1:12-CV-03029-WJM-CBS

Mile High
Court Reporting & Video, Inc.
14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

Mile High Court Reporting and Video, Inc.
Phone: 303-202-0210
Fax: 303-205-0034

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-03029-WJM-CBS

---

DEPOSITION OF BRIAN FULLER, M.D.
July 16, 2015

---

UNITED STATES OF AMERICA, et al.
ex rel. MARTHA L. BAKER,

Plaintiff/Relator,

vs.

BANNER HEALTH, et al.,

Defendants.

---

PURSUANT TO NOTICE, the deposition of BRIAN FULLER, M.D., called for examination by the Plaintiff/Relator herein, was taken at North Colorado Medical Center, 1801 16th Street, Greeley, Colorado, 80631, commencing at 1:04 p.m., on Thursday, July 16, 2015, before Aimee S. Reisinger, a Registered Professional Reporter and Notary Public in and for the State of Colorado.

APPEARANCES:

JAMIE M. BENNETT, ESQ.
The J. Bennett Law Firm
8 Creek Side Court
Middle River, Maryland 21220
443-844-4629
jbennettlawfirm@gmail.com

For the Plaintiff-Relator

MEGHAN E. POUND, ESQ.
Caplan and Earnest
1800 Broadway
Suite 200
Boulder, Colorado 80302
303-443-8010
mpound@celaw.com

For the Defendants

INDEX


| EXAMINATION: | PAGE |
|---|---|
| BY MS. BENNETT | 4, 45 |
| BY MS. POUND | 41 |

| EXHIBITS: | | MARKED |
|---|---|---|
| 55 | NCMC Radiation Oncology Core Privileges, BB-0020230 and 0020231 | 22 |

PROCEEDINGS

BRIAN FULLER, M.D.,
having been sworn by the Reporter, testified as follows:

EXAMINATION

BY MS. BENNETT:

**Q. Could you state your full name for the record.**

A. Brian Gildas Fuller.

**Q. And can you spell your middle name.**

A. G-i-l-d-a-s.

**Q. And how are you employed, Dr. Fuller?**

A. I work for Banner Medical Group.

**Q. How long have you worked for Banner?**

A. Since -- I really started working here in November of 2010. I think I came -- it was either October or November of 2010. I don't remember exactly.

**Q. And what is your position with Banner?**

A. I am a radiation oncologist and medical director of radiation oncology at North Colorado Medical Center. I'm medical director. There is a lot of directors, but I'm just the medical director.

**Q. I understand completely.**

**So why don't you take me through your educational experience, starting with college.**



A. So I went to Cal State Hayward in Hayward, California. And before that I did a brief stint at Cal State LA. But when I left Los Angeles in 1980 I decided to really focus full-time on my career. Coming out of high school I really wasn't that interested in doing more than working and having it, so I had a -- I worked various jobs around Los Angeles.

And I realized that that was not taking me where I needed to be as far as my career, so I moved to the San Francisco Bay Area and I went to Hayward State. And I did well there and was able to get into --

(The deposition was briefly interrupted.)

A. So I got into -- I had a realization while I was on BART one day that I wanted to go to medical school, and so I got into a number of medical schools and decided to go to UCLA. So I got into UCLA and I graduated on time in 1987.

And from there I did a surgical internship at Harbor UCLA in Torrance. And a -- a radiation oncology residency position was offered to me, and I took that opportunity. And from -- from '88 to '91 I did a radiation oncology residency at Stanford. And then I stayed on to do a fellowship at Stanford from '91 until the early part of -- end of '92.

And from there I took a job as a junior



faculty person at University of Colorado San -- I mean, University of California San Diego. I was in San Diego there from -- I think it was January '93 up until April or May of '94, something like that. And I moved from there to -- to Maryland -- to Bethesda, Maryland, to take a position as a senior clinical investigator at the National Cancer Institute. And I was at the NCI for about eight years, and then moved on to University of Virginia in Charlottesville.

And following that -- I was there for -- off and on for about eight years. I took also a brief private practice job in Charlottesville before coming here. And I've been here since 2010.

**Q. Thank you.**

**So in terms of your -- the residency, was that -- that was specifically for radiation oncology?**

A. Yes.

**Q. And the fellowship, was that --**

A. It was a fellowship in stereotactic radiosurgery and radiobiology at Stanford.

**Q. And when you were on the junior faculty at the University of California at San Diego, what was your -- what were you teaching?**

A. I was a clinical radiation oncologist. So I really wasn't teaching students, but I was on their



clinical faculty. So I was involved in clinical research and really primarily taking care of radiation oncology patients, practicing as a university radiation oncologist.

**Q. And when you were with the NCI, were your duties and responsibilities about radiation oncology?**

A. They were, indeed. So I was a radiation oncologist. I also taught residents and -- yeah.

**Q. And you mentioned that you were in private practice -- well, let me see. Eight years at the University of Virginia. Was that involving radiation oncology?**

A. That was a combination of laboratory and clinic. So I spent time in the laboratory in biochemistry. I had a joint position in biochemistry and molecular genetics, as well as radiation oncology when I was at UVA. So I kind of split my time between working in the lab and then filling in in the clinic.

**Q. And in terms of your practice in radiation oncology, what do you do to keep yourself current with developments in the area?**

A. I read the Red Journal, or the International Journal of Radiation Oncology, Biology & Physics. I almost daily review and do article searches in PubMed under various different topics. And I attend

CME courses.
Now, this year I haven't done as much as I have in the past, but I was -- I attended the American Brachytherapy Society course on breast brachytherapy, GYN and prostate brachytherapy. That was in 2014.
**Q. Would you agree that the area of radiation oncology is one that's changed dramatically over the last few years in particular?**
A. Few years, no; decade, yes. Few years, not really. What's really changed over the past few years has been how radiation oncology is being -- you know, kind of management of radiation oncology. How -- how, you know, insurance and managed care are kind of affecting what we do. But in terms of the -- the actual practice of radiation oncology, it's changed immensely since I did my residency. And -- you know.
**Q. And so that's, therefore, the need to constantly keep yourself abreast of new developments?**
A. It's really in the technical aspect of radiation oncology that we've seen a lot of change.
**Q. Could you be more specific?**
A. Well, the advent of, you know, personal computers and small computers really affected not only the EMR, but also dose distributions and our technical planning ability, allowing us to do more elaborate



plans. That really helped usher in the era of IMRT. And then more recently, in addition to that, there's been the advent of onboard imaging where we're imaging patients with x-rays on the treatment table in a way that allows us to be much more precise.
**Q. Is that IGRT that you're referring to?**
A. That's image guidance. Yes, image guidance.
There's also the kind of increasing popularity over the past almost two decades now of stereotactic radiation. I was involved in that very early on. The very first stereotactic patient treated at Stanford. That was when I was a resident; it was my patient. And I stayed on to do a stereotactic radiosurgery fellowship.
**Q. What is stereotactic radiation?**
A. That's the precise delivery of radiation using millimeter accuracy. Submillimeter accuracy.
**Q. Is that done on a different piece of equipment than --**
A. There are various different platforms that can be used.
MS. POUND: I'm going to just interrupt you. Let Ms. Bennett finish her question --
THE DEPONENT: Oh, sorry.



MS. POUND: -- before you answer the question.
MS. BENNETT: Otherwise the reporter will have a hard time keeping us straight and the transcript will look like a mess.
THE DEPONENT: Okay.
**Q. (By Ms. Bennett) Okay. So when you came to Banner in November of 2010, were you primarily stationed here at NCMC in terms of seeing patients?**
A. Yes.
**Q. Were there any other places, any other facilities where you saw patients on a regular basis?**
A. I started going to Sterling Regional Medical Center, the David Walsh Cancer Center, I believe it was January of 2011. I'm not sure exactly. But it was -- when I was first here I wasn't going to Sterling, and then I started I think in January of 2011.
**Q. And how frequently did you go to Sterling?**
A. Initially I would go every other week. Initially.
**Q. Was it a fixed day or did it vary?**
A. We initially agreed on Tuesdays as the day.
**Q. And did that change over time?**



A. No. It's actually stayed Tuesdays. It did change in that for a while there was a locum who was permanently stationed there and we stopped going. I think that was in 2012. So that did change. But the actual day has always been Tuesday.
**Q. Do you ever go to see patients at McKee?**
A. Rarely. And so there have been times when I've covered for Dr. Ceilley when she was on vacation and there have been times when patients have been seen here but they wanted their treatment at McKee. In that setting I've accommodated that and I've been able to meet them there.
In addition to that, when we started our radiosurgery program here in Northern Colorado, the first radiosurgery facility was at McKee; so I would very often see patients here and treat them at McKee. So in that sense, I would see patients on-treatment during treatment at McKee.
MS. POUND: I'm sorry, did you say you would very often see patients here and treat them at McKee or not very often?
THE DEPONENT: I would do that when -- when --
MS. POUND: I'm sorry, I was just --
THE DEPONENT: -- when there was a

radiosurgery patient, instead of seeing them initially at McKee, I would see them here and then treat them at McKee. That's what I meant, to be clear.

**Q. (By Ms. Bennett) I understood.**
**Are you the only radiation oncologist who treats patients here on a regular basis?**

A. No.

**Q. Who does?**

A. Dr. Albert. Dr. Jeffrey Albert.

**Q. Referring back to the time period in -- when you first came to Banner, between November 2010 and when Dr. Albert was hired in 2013, were you then the only radiation oncologist who regularly saw patients here?**

A. No.

**Q. Who else?**

A. Dr. Susanna Gordon was here when I first got here, and she stayed for at least a month, but approximately a month.

**Q. And when she left were you the only radiation oncologist?**

A. Yes. But there were times -- yes. But there were times when Dr. Ceilley would treat patients here who needed high-dose-rate brachytherapy, so they would come over for those.



**Q. When you went to Sterling on a weekly basis, was it generally the case that there was no radiation oncologist here?**

A. Let me think about that. When I did go to Sterling, our nurse practitioner was here.

**Q. But no other radiation oncologist?**

A. Initially, that's correct.

**Q. And when you say "initially," can you be more specific about the period of time?**

A. Well, really I guess -- I guess what I meant there was that in 2012 I stopped going to Sterling, so -- there was a radiation oncologist in Sterling, so I didn't need to go.

**Q. So who was the radiation oncologist in Sterling during 2012?**

A. I think it was -- there were various different locums, but the one who I remember is Dr. Davidson. Deanna Davidson. And I want to be honest that I don't remember the exact dates, and I haven't tried to go back and look at that. But I believe in general she was there, and there were a couple of others whose names I don't remember.

**Q. What documents could we look at that would refresh your recollection about what radiation oncologist was where at any particular time within the**



**Banner system?**

A. Oh, I think that MOSAIQ is probably -- our EMR would be one place to look. But I don't know how accurate that would reflect the actual -- what actually happened. So that would be my -- you know, that's -- off the top of my head, that would probably be the...

**Q. Are there any medical records that would reflect whether you were present when a patient was treated?**

A. I am not aware of any.

**Q. So there are no medical records that would reflect whether you or a nurse practitioner was present when a patient was actually being treated?**

A. Medical records?

**Q. Uh-huh.**

A. By that you mean a patient chart?

**Q. Exactly.**

A. I'm not aware of that. I'm not aware. There may be, but I'm not aware of that.

**Q. And do you have any idea how far back you can look in MOSAIQ to see what you were doing, say, in January of 2011?**

A. I don't have a clear idea. I've never tried or had to do that. But my understanding is that,



you know, MOSAIQ records aren't destroyed. So it's an EMR, so it should be able to go back quite a ways.

**Q. When you came to Banner in November -- October or November of 2010, was there a nurse practitioner working here at NCMC?**

A. In November, no. But she joined our practice very soon after I got here.

**Q. And who was that nurse practitioner?**

A. It was Sheryl Ehrman.

**Q. Okay. So she's been here with you the whole time?**

A. Pretty much. I think she came -- I don't remember exactly, but it was I think early 2011.

**Q. And what training did she have in radiation oncology when she was hired?**

A. There was a module that I recall. I don't -- it was a series of CDs and a booklet. I can't give you the name, but I know it did exist. Sheryl shadowed me quite a bit initially. She was in the room with me when I did history, physicals, follow-ups. She also spent a considerable amount of time in dosimetry with our dosimetrist learning about radiation therapy. And she was trained by I think the best radiation oncology nurse I've ever worked with, and that's Carol Kranig. So Carol spent a lot of time training Sheryl.

**Q. Would you mind spelling Carol's last name?**
A. K-r-a-n-i-g.
**Q. I didn't have a clue. I wasn't even close.**
**And Carol Kranig is an RN?**
A. Yes.
**Q. Not an nurse practitioner?**
A. She's an RN.
**Q. What is your evaluation of Ms. Ehrman's understanding of the technical aspects of radiation oncology?**
A. I think that for someone who hasn't gone through a normal residency that it's quite good.
**Q. Is she able to develop treatment plans for patients?**
A. No, she is not.
**Q. And is she able to provide primary care to radiation oncology patients?**
A. Yes.
**Q. Okay. What do you include within that definition of "primary care"?**
A. Medical symptom management.
**Q. Could you be a little bit more specific?**
A. If someone develops a skin reaction from radiation, which is very common, Sheryl Ehrman is very competent and able to manage that.



**Q. Are there any other symptoms that she's capable of managing?**
A. Yes. If someone develops a sore throat, she is able to manage that. If someone develops loose stools from pelvic or abdominal radiation or nausea, she is able to manage that. The -- I can't -- I mean, the -- almost any radiation-induced side effect, Sheryl is able to manage that symptom or provide recommendations for symptom management.
**Q. Is that her primary role in interacting with patients, managing symptoms?**
A. It's one of her primary roles. I wouldn't say it's her primary role.
**Q. What are her other roles?**
A. She has also served to provide counseling and teaching on radiation side effects. She has also seen patients in follow-up after completion of radiation. And those are the ones that come to mind.
**Q. You would agree that the nurse practitioners aren't qualified to determine whether a patient needs radiation oncology treatment?**
A. I think that that's not their role here. I think if someone presented with a radiation emergency, a cord compression, intractable seizures, superior vena cava syndrome, and that was explained to our nurse practitioners, they would understand what the proper radiation -- what the proper role of radiation might be in that setting. But they're not responsible for and nor do we expect them to intervene and make those types of recommendations directly to patients.



**Q. And that's not within their credentials with the hospital, is it?**
A. I am not sure about that. I don't know their -- I'm not, you know -- I don't know their credentials with the hospital, you know, to the letter, meaning in extreme detail. So I don't know -- those are details that I don't know exactly what those are. But that is not, you know, what I consider their role.
**Q. And they don't plan radiation therapy course of treatment, do they?**
A. They do not.
**Q. And if a patient was being treated, they wouldn't be able to -- if something arose during the course of that treatment, they wouldn't be able to take over the procedure and change anything about the course of treatment, would they?**
A. Can you be more specific?
**Q. Well, suppose a patient was being treated and there needed to be an adjustment of the dose or adjustment of the beam, would a nurse practitioner be able to assume the role of taking over the treatment and making determinations about changing the dose or changing the beam?**
A. No.



**Q. But you would be able to do that if something happened --**
A. Yes.
**Q. -- while a patient --**
A. Yes.
**Q. -- was being treated?**
A. Yes.
**Q. Sorry. There we go again, talking over each other.**
**So getting back to the training that Sheryl had. You mentioned this module. Do you remember the name of it or who it was sponsored by?**
A. No, I don't specifically. It may have been the American Society of Oncology Nursing, but I'm not -- I really don't remember.
**Q. Was the CD aimed at the role of the nurse practitioner in the patient's radiation oncology treatment?**
A. In our context, yes.
**Q. And when you say "in our context," can you**

**explain what you mean by that?**
A. I don't know -- I don't recall. I'm not -- I don't recall whether that was the -- the explicit reason for that particular module, meaning it was specifically designed for radiation oncology nurse practitioners. I don't recall in that detail if that's what it was for. I don't know if it was -- you know, kind of what I'm trying to say is I don't know if it was to distinguish between radiation oncology RNs or radiation oncology nurse practitioners. I don't remember whether it was -- I don't remember if there was a distinction as to intended target.
**Q. I understand. But it was -- are you certain that it was designed to train nonphysician practitioners in their role in radiation oncology?**
A. I would say yes.
**Q. Was there anything else that you can remember that Sheryl was offered in terms of training in her role as a nurse practitioner in radiation oncology?**
A. We encourage her to go to conferences, and she's been to -- I think she's been to ASTRO, the American Society of Therapeutic Radiation Oncology, and there is a nurse practitioner contingent and regular meetings that are subsumed within that conference.



It's a large conference that addressed the nurse practitioner's role and topics of interest to nurse practitioners.
**Q. Okay. Anything else you can think of that's been offered by Banner to the nurse practitioner here or anywhere else in Northern Colorado?**
A. Not really. Not really. No, I can't.
**Q. And when you go to Sterling, is there a nurse practitioner there?**
A. Now or during --
**Q. During the period of time between the end of 2010 and roughly the end of 2012.**
A. There was. There was.
**Q. And who was the nurse practitioner there?**
A. I believe it was Helene Christner at the time.
**Q. And do you know how she was trained?**
A. She came here and had the similar -- trained in the same fashion that Sheryl was trained. She spent time with Sheryl, with myself, with Carol. And I believe she also spent time at McKee, but I can't -- I can't be certain of that. But that's my recollection.
**Q. I'm going to show you a document which we'll have -- I think we're up to 55. 54 was the last**



**one in Marty's deposition.**
**(Deposition Exhibit 55 was marked for identification.)**
**(The deponent perused the exhibit.)**
**Q. Okay. I'm showing you what's been marked as Deposition Exhibit 55. Are you familiar with this document? Have you seen it before?**
**(The deponent perused the exhibit.)**
A. It looks like a radiation oncology core privileges form. I have to say that this form or that has changed several times since I've been here, so I don't know what time period this is from and I don't see any dates here.
**Q. I don't either.**
A. So I don't really know when this -- when this actually applied.
**Q. Are you involved in determining the credentialing at NCMC?**
A. Not directly. I have been asked to review the credentialing forms in the past and I have worked with the credentialing office to review the forms, but I -- more than that, I'm not really involved.
**Q. And what about developing privileges, core privileges such as are reflected in Exhibit 55?**
A. I've been asked to review the -- a form



like this core privilege form.
**Q. And turning your attention to the upper part of the form, it lists the initial qualifications for core privileges for radiation oncologists is completion of a residency in that area.**
**Do you see where I'm reading?**
A. It's yellowed out I think.
**Q. Yeah.**
A. Yeah.
**Q. And documentation of current competence and documented training and experience.**
**We've discussed the things that you do to keep your training and experience up to date.**
**Below that there is a list of core privileges. One of them is administration of external beam radiotherapy. Do you see that?**
A. Yes, I do.
**Q. Do you agree that that is one of the core privileges that you have as a radiation oncologist?**
A. Yes.
**Q. Do you know whether the nurse practitioners have that privilege?**
A. I don't believe that they do.
**Q. I understand that in -- sometime in 2013 Banner hired a third radiation oncologist. Do you know**

**what the reason for that was?**
A. To be quite honest, I don't. That's a complex question that you've asked, and I don't know what the final -- final reasoning was on that.
**Q. Well, let me ask it another way. Were you involved in the decision to hire another radiation oncologist?**
A. Very peripherally.
**Q. What was your involvement?**
A. They asked if a third radiation oncologist, if that would be beneficial to our program. And at the time I felt it was because it would really kind of assist in the fact that we have three centers and two radiation oncologists, so hiring a third seemed to make sense.
**Q. Do you remember any discussion of whether a third radiation oncologist could be supported by your -- by your patient load?**
MS. POUND: I'm going to object to these questions in that they're outside the relevant time frame. My ongoing objection with the deposition.
**Q. (By Ms. Bennett) You can answer.**
A. I can answer?
**Q. Unless Ms. Pound --**
A. Can you repeat the question again?



**Q. The question was were you involved in any discussions of whether it made sense to hire a third radiation oncologist based on your patient load?**
A. I think that -- I think that these were things that were discussed at times, but it -- I did not have a definitive -- you know, I did not have any definitive input in those discussions. In other words, they asked me what I felt and I told them what I felt, and that was really the extent of it. I did not have any decision-making ability with respect to justifying the third radiation oncologist based on our numbers.
**Q. Who are "they"?**
A. The management and the leadership. The leadership. BMG and the oncology leadership here.
**Q. Who do you think was primarily responsible for the decision?**
A. That's a complex question too. I can only -- I don't know, to be quite honest. I have to say I don't know.
**Q. Were you involved in any way in the Revenue Cycle audit that took place in the spring of 2011 at Banner?**
A. I have to say yes.
**Q. I'm not sure how to take that. You have to say yes --**



A. Yes.
**Q. -- because?**
A. Because they audited radiation oncology, and I was a radiation oncologist.
**Q. Okay.**
A. But also they -- I was involved in direct feedback. And, you know, they reviewed my charts and I was -- I reviewed the results of their review, and so I was involved in that process.
**Q. It sounds like a little bit of kicking and screaming went on there of your being involved?**
MS. POUND: Objection.
A. No. No.
**Q. (By Ms. Bennett) I'm reading you wrong then.**
A. No. Yeah.
**Q. Okay. So did you meet with them one-on-one to review your charts?**
A. Not initially. What I do recall was that after the review was over, I was offered the ability to discuss results of the review over the phone with one of the Revenue Cycle employees.
**Q. And did you do that?**
A. I did. I want to say Tammy, but that's probably not her name. It was something like that. I don't remember her name.



**Q. We'll put that in quotes, Tammy. Last name unknown. Did you do that?**
A. I did.
**Q. What did you learn from that session?**
A. Oh, I think that I learned that there were some areas of documentation that we could improve on.
**Q. Were you involved in any other meetings with Revenue Cycle other than the -- other than the phone call?**
A. There was a meeting where -- I think after the initial review where there was an oral presentation by Revenue Cycle, and I was present at that meeting.
**Q. Where did that take place?**
A. I believe that took place at McKee.
**Q. Do you remember who from Revenue Cycle was present?**
A. I think it was Ron. I don't know how to say his last name.
**Q. DiGiaimo is the best we've been able to come up with.**
A. DiGiaimo. Okay. So Ron was present.
**Q. And what was your -- what is your recollection, what were the main takeaways from that meeting for you?**

A. Oh, my gosh. It was a long time ago. I think that our -- my takeaway is that we were doing most of the things correctly, but there were some -- there were a few areas where we could improve on our documentation.
**Q. Did you review the Revenue Cycle report that was issued after the audit?**
A. Very peripherally. I did not read it in-depth.
**Q. Do you recall there being a discussion of whether it was appropriate for patients to receive radiation oncology treatment when there was no radiation oncologist at the site?**
A. Can you be more specific?
**Q. Do you recall anyone from Revenue Cycle pointing out that there might be an issue under CMS guidelines with treating patients when no physician was present?**
A. I do remember that there was a discussion about Sterling and the fact that we were there -- or that we were there on like one day a week. But there was also as part of that discussion the -- the -- I don't know how to say it, but the physician -- that Sterling was somewhat of a different case in that it was a rural point-of-access hospital. And that was



part of that discussion as well.
**Q. And do you recall what Revenue Cycle said about the possibility that Sterling might be subject to different rules?**
MS. POUND: Object to the form of the question. You can answer.
A. I don't know if they -- if they -- I don't know if that's who said it. So I don't know if it was -- you know, if it was Revenue Cycle who introduced that idea. My recollection was that it was -- that it wasn't so much Revenue Cycle, but that it may have been someone else in the room or in the audience listening that introduced that idea.
**Q. Do you recall Revenue Cycle responding to that?**
A. I know that they acknowledged it, but I don't recall what their response was in detail. I know they acknowledged that fact.
**Q. You said that you reviewed the report peripherally. Do you recall a discussion in the report about the appropriateness of a nurse practitioner supervising the administration of external beam radiation to patients?**
A. I forgot your first name.
**Q. Jamie.**



A. Jamie. No, I don't.
**Q. Okay.**
A. I don't recall seeing that. That was not my focus. I was more interested in learning from the report what I could do to improve what I was doing, so I really wasn't focused on the nurse practitioner when I reviewed it very peripherally or very superficially.
**Q. Were you involved in any discussions apart from the Revenue Cycle audit and debriefing of whether that was an appropriate level of supervision for a nurse practitioner to supervise treatment of a patient?**
A. I don't believe that I was, but I don't believe that that's -- I don't believe that that's what we considered what was going on. In other words, I don't believe that we considered the nurse or the nurse practitioner equivalent to a physician in their ability to supervise radiation oncology.
**Q. Is it your view that a radiation oncologist has to be present when the -- in the hospital when a patient is actually being treated? Is that your understanding?**
A. That is my understanding of what should happen in a practice such as the one here at NCMC.
**Q. Uh-huh.**
A. But in Sterling, I -- my understanding is



that it is a rural point-of-access hospital and that the CMS guidelines are either -- are a little bit different. And I don't really know precisely how that is different, but that's what I've been told by -- by the -- by the people -- by my employers.
**Q. So putting Sterling aside, there were times, weren't there, when you were at Sterling and there wasn't a radiation oncologist at site here at NCMC?**
A. I think there were times when there was a nurse practitioner here and not a radiation oncologist. Yes, I think that is true.
**Q. So --**
A. That was on Tuesday when I would go to Sterling.
**Q. Right. So did you ever become involved in any discussion of whether that was an appropriate level of supervision of patients receiving treatment under CMS rules?**
A. I don't recall being involved in a discussion about that.
**Q. So that issue was never addressed to your attention in any way?**
A. I do know that we were not -- that it was -- that -- what I do recall is that for IGRT

charges, that those could not be -- those could not be charged or we couldn't charge for that if a physician wasn't actually present. I do recall that.
**Q. And is your understanding of that because IGRT is there -- is a dia- -- sorry. Let me try that again.**
**Is it your understanding that that was because IGRT is diagnostic?**
A. No. It's because -- my understanding is that to bill for IGRT -- and don't ask me where this comes from, because I can't say exactly where -- but my understanding is that to bill for IGRT requires direct supervision by a physician and that a nonphysician provider can't support billing those charges.
**Q. And what about delivery of IMRT or other external beam radiation, does that require direct supervision, in your understanding?**
MS. POUND: Object to the form of the question.
**Q. (By Ms. Bennett) You can go ahead and answer.**
A. I think it depends on where. In a point-of-access hospital, a rural point-of-access hospital, it is not my belief that a radiation oncologist is needed for the direct supervision of



administration of external beam radiation.
**Q. What about here at NCMC, which isn't a rural-access hospital? Is it required to have direct supervision by a physician of the treatment and delivery of external beam radiation?**
A. Well, I want to be clear on what you mean by "direct supervision." Can you elaborate on that?
**Q. Why don't you tell me, because you actually used that phrase when you answered my questions about IGRT. What do you think of as "direct supervision"?**
A. So being available or physically present.
**Q. Immediately available --**
A. Uh-huh.
**Q. -- to respond to an emergency?**
A. Or to respond to an issue regarding the treatment.
**Q. So we do mean the same thing by direct supervision.**
**The question is does that direct supervision have to be delivered by a physician when the patient is being treated with external beam radiation in a -- let me -- since you gave that pause, let me go ahead and say in a facility such as NCMC?**
A. To -- are you asking me about the CMS



guidelines or are you asking me in my view?
**Q. Let's start with the CMS guidelines.**
A. I have to say I'm not facile with all the CMS guidelines.
**Q. Have you ever reviewed the guidelines that CMS issued in 2010 about direct supervision in outpatient hospital settings?**
A. Not outside of the context of the Revenue Cycle discussion that we had. I think that that was some of the discussion, the debriefing. But on my own, I have not.
**Q. And what about in terms of your own practice and procedure, do you believe that a radiation oncologist should be present to supervise when a patient is actually being treated with external beam radiation?**
A. I think that -- that a radiation oncologist does not need to be at the machine when the treatments are being given, but that they should be available to respond if there is a problem with the treatment that requires their decision-making ability.
**Q. Can you describe for me some of the situations that might arise that would require your decision-making ability when a patient is actually being treated?**



A. If they're not lining up and able to be set up properly on the treatment table despite several attempts by the therapist, usually we are queried as to how the therapist should proceed at that point. That's one not uncommon situation.
**Q. Are there any other situations that you can think of where you might be asked to become involved with respect to delivery of the radiation treatment?**
A. If a patient is notably having a very brisk or severe reaction to radiation, I might be approached by the therapist to find out whether a break in treatment would be appropriate, or if a patient requests a break in treatment for a meeting or a deposition or something --
**Q. Or jury service?**
A. -- or jury service, would -- is that something that -- that would be recommended by me. So those are the types of questions that I do get approached and that I think a radiation oncologist is needed to respond.
**Q. Certainly you would agree that the situation where a patient isn't lining up properly despite several attempts by the radiation therapist is something you should deal with as a radiation**

**oncologist instead of delegating to a nurse practitioner?**
A. What I would say to that is that decision to proceed with treatment would be one that requires a radiation oncologist. A decision not to treat is one that can be made by the therapist. So if a therapist said we didn't treat him today because -- or her today because they were just not able to comply with the treatment position, I would -- I would respect that, and I think that -- that that's a -- that is not -- that's not uncommon. That has happened. Usually we're notified. But the decision to proceed with treatment despite things not being lined up exactly takes the judgment of a radiation oncologist.
**Q. Are there any -- are there ever any situations where while a patient is being treated you would adjust the beam or the dose during the treatment?**
A. No.
**Q. No? That never happens?**
A. The dose?
**Q. Uh-huh.**
A. The only way that would happen -- the only way that --
**Q. You can laugh at me.**
A. No, the only way that would happen is if



the machine quit in the middle of a treatment, and then we would have to figure out a way to continue on. And usually the EMR and the automation allows us to pick up where we left off. But if that didn't occur, then I would have to make a decision about the dose that day or when to add the -- when to make up that dose. That's not an unusual situation. It's rare, but not unusual. Okay. By that I mean it doesn't happen often, but it's certainly heard of. It's not unheard of.
Let's say one of the MLCs didn't function and the machine did an auto shutoff or something, something like that, and then we only delivered a portion of that day's treatment. It's not uncommon for us to -- for the therapist to approach me and say how are we going to make up that dose? Do we give more tomorrow or do we tack it on at the end? I always say we tack it on at the end, but...
**Q. So MLC is the multileaf collometer (phonetic)?**
A. Collimator.
**Q. Collimator. I always say that wrong.**
**And what about changing the position of the beams, is that something that ever happens during treatment?**



A. No.
**Q. No.**
A. Because you're not delivering the plan if you do that. So you have to deliver the plan. You have to follow the plan you've developed. Sometimes there are interruptions in the delivery of radiation, but we don't change beam positions or the treatment plan in the middle of a treatment. That's something that I don't do.
**Q. Is there any other situation that we haven't discussed that you can think of that would come up while a patient is being treated that would need your intervention?**
A. If they're noncompliant with the treatment position, if they just could not lie still, I'm approached very often -- in situations that very often that is one of the issues that we're approached with. And the question is how long do we continue to try to deliver treatment or do we stop treatment on that day and try to resume the next day.
**Q. Is that something that you would delegate to a nurse practitioner?**
MS. POUND: Object to the form of the question.
A. No, it's not something I would delegate to



a nurse practitioner.
**Q. (By Ms. Bennett) And just so the record is clear, the reason why these decisions are so important is because -- and correct me if I'm wrong -- the optimum situation is that the patient receives the full dose during a specified period of time, and any deviation from that would be potentially detrimental to the patient's prognosis?**
MS. POUND: Object to the form of the question.
A. I think that -- I think that it depends on the degree of deviation. "Any deviation," I would say, no, I don't agree with that. But if we're saying, for instance, that someone's treatment is delayed for or lengthened by a day, that is not going to affect their prognosis. If it's lengthened by a month, it has the potential -- much more potential to affect their prognosis.
**Q. (By Ms. Bennett) The ideal situation is to make sure the patient gets the full dose in the specified period of time?**
A. That is the ideal situation, I agree.
MS. BENNETT: So let me just -- why don't we do this. I think I'm near the end of what I need to ask you, but it would be helpful if I could just have a

few minutes to think about what I've asked you so far.
THE DEPONENT: Okay.
MS. BENNETT: Do you mind if we take just a five-minute break and then come back, and it probably won't be much longer?
THE DEPONENT: That's fine.
MS. BENNETT: Okay. Great.
(A recess was taken from 1:51 to 2:01 p.m.)
MS. BENNETT: We'll go back on the record.
**Q. (By Ms. Bennett) Did you discuss the substance of your testimony with anyone during the break?**
A. Yes.
**Q. With whom?**
A. With Meghan.
MS. BENNETT: Meghan, I don't think that's proper. He's still on direct examination.
MS. POUND: I didn't discuss what he said in the depo.
THE DEPONENT: It wasn't -- yeah, so...
MS. POUND: I don't think I did anything improper, and you're not entitled to know the substance of our discussion.
MS. BENNETT: Well, I stand by my



objection. It's not proper to discuss the substance of testimony with the witness when they're on direct examination.
I just have a couple more questions.
**Q. (By Ms. Bennett) In the past at your previous places of employment where you were treating patients clinically, was it the practice of those institutions to have a radiation oncologist available to respond to emergencies when a patient was being treated?**
A. Yes.
MS. BENNETT: Okay. That's all. That's all I have. Thanks.
Meghan?
MS. POUND: I have a few questions, and I apologize if you answered these.
EXAMINATION
BY MS. POUND:
**Q. What kind of emergencies does a radiation oncologist encounter when a patient is being treated? Or let me rephrase that. What would you -- can you describe a time when you've encountered an emergency while treating a patient?**
A. There have been times when patients have begun to move on the table in a way that was



potentially unsafe and they could have fallen. So while that's not an emergency in the classic sense, it is potentially an emergent situation for a patient.
**Q. And what would you do in that event?**
A. We would rush in and, along with the therapist, try to calm the patient down and make sure they're secure and that for whatever reason they're moving, that that movement would -- would stop so that they weren't a danger to themselves.
I've also actually been present in the hospital when -- during my fellowship at Stanford there was a large earthquake in the San Francisco Bay Area that was considered an emergency. And in that setting, radiation oncologists, along with other staff, ushered patients to safety.
That's a different type of an emergency, but...
**Q. Have you ever -- do you remember an occasion when you were here and a patient coded in the waiting room?**
A. Yes, I do.
**Q. And did you respond to that?**
A. I did, indeed.
**Q. Would Ms. Ehrman be able to assist and direct a patient who was squirming on the table so much**



**that they were about to fall off of the table?**
A. She absolutely would.
**Q. Would she be able to help if someone was coding in the waiting room?**
A. Probably better than I would.
**Q. Would she be able to assist and direct if someone coded on the table?**
A. Yes, she would, absolutely.
**Q. Would she be able to -- well, let me put it this way. There is nothing specific to your radiation oncology skills that helped you direct people out of the --**
A. Yeah, that's true.
**Q. -- building in San Francisco, right?**
A. Yeah. At Stanford, yeah.
**Q. At Stanford.**
MS. BENNETT: They probably were more willing to follow you since you were the smartest person in the room.
THE DEPONENT: I don't know about that, but...
**Q. (By Ms. Pound) You testified that during the 2000 -- from when you started really in 2011 -- beginning of 2011, through the 2000 -- through November 16, 2012, there were times when you would go**

44

**to Sterling and Ms. Ehrman would be here to furnish the delivery and the clinical management of radiation beam therapy to the patients. Do you recall saying that?**
A. Yes. I remember saying that when I was gone to Sterling on Tuesdays, that Sheryl Ehrman would be here to provide direct supervision.
**Q. And it wasn't every Tuesday that you went to Sterling, was it?**
A. It was every other Tuesday.
**Q. And then for a period of time there were -- were there locum tenens present?**
A. In Sterling?
**Q. Yes, in Sterling.**
A. Yes.
**Q. Therefore -- and during that -- when there were locums in Sterling, you did not travel to Sterling; is that correct?**
A. That is correct.
**Q. Do you think it was appropriate for Ms. Ehrman to be here supervising the delivery of the external radiation beam therapy when you were not here?**
MS. BENNETT: Objection to form. You can answer.
**Q. (By Ms. Pound) When you were not present in the -- I'll rephrase the question.**

45

**When you were not present in -- at NCMC when Sheryl was here and patients were receiving radiation treatments on the LINAC --**
A. Yes.
**Q. -- was it appropriate for her to supervise those services?**
MS. BENNETT: Objection to the form of the question.
MS. POUND: You can answer.
A. Yes, absolutely, it was appropriate for Sheryl to be here. I felt completely comfortable with Sheryl being here while I was gone.
MS. POUND: I have no further questions.
MS. BENNETT: I just have one question, Dr. Fuller.

EXAMINATION

BY MS. BENNETT:
**Q. When you say it was appropriate, that means that you have confidence in her ability to respond to problems that patients might have while they're being treated; isn't that the case?**
A. Yes.
**Q. But you're not saying it was appropriate under any CMS guideline or billing rule that Medicare might have promulgated, are you?**

46

MS. POUND: Object to the form of the question and foundation.
A. I was speaking just in terms of whether it was -- whether I felt that patients were safely being treated and that it was proper medical supervision, and my answer to that is yes. We trained Sheryl, she is outstanding, and have every confidence that patients were treated appropriately with her being present.
**Q. (By Ms. Bennett) And is it possible that CMS might differ with that opinion with respect to whether services that are supervised by a nurse practitioner can be billed to Medicare?**
MS. POUND: Objection; foundation.
A. I don't recall the exact provisions in the CMS, but what I do recall is that there is something about an M.D. or D.O. and other properly trained nonphysician, and that those are the requirements for direct supervision. That's what I recall. And I think Sheryl is definitely a "properly trained nonphysician."
**Q. (By Ms. Bennett) And what if the CMS guidelines actually refer to the nurse practitioner's scope of practice and privileges as opposed to the phrase "adequately trained"?**
A. If they --
MS. POUND: Object to the foundation.

47

**Q. (By Ms. Bennett) Well, let me strike that and say you'd need to know exactly what the CMS regulations are to answer my question; do you agree?**
A. I need to understand your question a little better. If you're asking me what are the -- what exactly are the CMS guidelines for -- for, you know, supervision of radiation oncology, I cannot recite them word for word. I have a general sense of what they are, but I have not reviewed them recently, and I don't -- I can't really give you a precise answer there.
**Q. Okay. So in terms of saying that Ms. Ehrman is the appropriate supervisor of the delivery of external beam radiation, you can't -- under CMS guidelines, you can't answer that as you sit here today?**
A. No, I --
MS. POUND: Object to foundation.
A. What I can say is that I believe that she is. I believe that she is.
**Q. (By Ms. Bennett) When was the last time you reviewed the CMS regulations with respect to when nurse practitioners can supervise the delivery of external beam radiation?**
A. I've never reviewed it with respect to

nurse practitioners. I've just reviewed it in the past, and I don't remember when this was with respect to who can do that. And what I recall is that there's some verbiage that goes something like M.D. or D.O. or properly trained nonphysician. That's all I remember is that those -- that that was part of who could do -- who was authorized to do direct supervision.

**Q. Do you know if Ms. Ehrman is an authorized user, as that term is defined in state or federal law?**

A. I don't know if she is.

**Q. Do you know whether delivery or the administration of external beam radiation is within her scope of practice under Colorado state law?**

MS. POUND: Object to foundation.

A. Under Colorado state law, I don't. I don't know that for a fact. I don't know that.

**Q. (By Ms. Bennett) Do you know whether delivery of external beam radiation to patients is within her privileges at the hospital?**

A. I think -- I think supervising patients is within her privilege, but the actual delivery is performed by our therapists, so...

**Q. What about is she qualified to administer external beam radiation, as you are in your scope of privileges, according to Exhibit 55?**



MS. POUND: Object to foundation.

**Q. (By Ms. Bennett) Your privileges include administration of external beam radiotherapy.**

A. And I would take that to mean --

MS. POUND: Is that a question?

**Q. (By Ms. Bennett) Don't they? As we've reviewed Exhibit 55 --**

A. Yes, they do.

**Q. Is that included within Ms. Ehrman's privileges at the hospital, to your knowledge?**

A. I can't answer that. I don't know as far as the hospital privileges because I have not -- you know, I have not reviewed those recently, so I don't know.

As far as the distinction I would make here is that administration also includes designing a course of therapy. And what we -- what I feel comfortable in requiring Sheryl to do is to supervise treatments in my absence. I feel comfortable that she is able to do that.

MS. BENNETT: All right. I have nothing further. Thank you so much.

THE DEPONENT: Okay. You're welcome.

(The deposition concluded at 2:13 p.m.)



AFFIDAVIT

I have read my deposition and it is true and accurate, except for any changes or corrections now indicated by me on the Amendment sheet.

Amendment sheet attached ( )

No changes to testimony ( )

____________________________________

BRIAN FULLER, M.D.

SUBSCRIBED AND SWORN to before me this date, ___________________________.

My commission expires ________________

____________________________________

NOTARY PUBLIC

____________________________________

STREET ADDRESS

____________________________________

CITY, STATE, ZIP

Return to: MILE HIGH COURT REPORTING & VIDEO, INC.
14143 Denver West Parkway
Suite 100
Golden, Colorado 80401



CERTIFICATE

I, Aimee S. Reisinger, RPR, Notary Public of the State of Colorado, certify that before the deposition the witness was sworn by me to testify to the truth, and that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not related to any party herein, nor their counsel, and have no interest in the result of this litigation.

____________________________________

Aimee S. Reisinger, RPR, CSR
My Commission expires 9/16/2016
Notary No. 19964015065